# IN THE UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF ARIZONA

| | |
|---|---|
| IRIS SPEDALE and DANIEL SPEDALE, husband and wife,<br><br>Plaintiffs,<br><br>v.<br><br>CONSTELLATION PHARMACEUTICALS, INC.<br><br>Defendant. | CIVIL NO. _____<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiffs, Iris and Daniel Spedale, husband and wife, by and through their undersigned counsel, sues defendant, Constellation Pharmaceuticals, Inc., and state as follows:

## PARTIES

1. Plaintiffs Iris ("Mrs. Spedale") and Daniel Spedale ("Mr. Spedale") (collectively "plaintiffs") are individuals and citizens of the state of Arizona, with an address of Iris Spedale, c/o The Inn at Freedom Plaza, 13725 N. 93rd Avenue, Room 302, Peoria, AZ 85381 and Daniel Spedale with an address of 133373, Plaza Del Rio Boulevard, Peoria, AZ 85381.

2. Defendant Constellation Pharmaceuticals, Inc. ("Constellation" or "defendant") is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business located at 215 First Street, Suite 200, Cambridge, MA 02142. It is a citizen of Massachusetts.

3. Constellation is the developer and manufacturer of pharmaceuticals in the emerging field of epigenetics. At all relevant times, Constellation did business in and distributed pharmaceuticals to locations throughout the United States, including Arizona.

1621302.1

## JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332, in that the plaintiffs are a citizens of Arizona and the defendant is a citizen of Massachusetts, and the amount in controversy is in excess of $75,000.00.

5.  The events giving rise to this lawsuit occurred in Arizona. Venue is therefore proper in the District of Arizona.

## FACTUAL ALLEGATIONS

6.  Mrs. Spedale was born on November 20, 1942.

7.  In 2009, Mrs. Spedale was diagnosed with multiple myeloma, a cancer that affects how normal blood cells grow and work.

8.  After her diagnosis, Mrs. Spedale received treatment followed by a stem cell transplant and was thereafter in remission for several years.

9.  When the cancer returned, Mrs. Spedale's second course of treatment was Revlimid, which had to be discontinued due to development of blood clots.

10. At some point, Mrs. Spedale's physicians, who at all relevant times were agents of Constellation, recommended that she enter a clinical trial titled: A Phase 1 Study of CPI-0610, a Small Molecule Inhibitor of BET Proteins, in Patients with Previously Treated Multiple Myeloma (the "Study").

11. The listed sponsor of the Study was Constellation, which hoped to market the drug to cancer patients and/or their physicians.

12. On information and belief, Constellation designed the Study, wrote the majority if not all of the protocol for the Study, and wrote the majority if not all of the informed consent form provided to human subjects ("Informed Consent Form").

13. Thus, it was Constellation that designed the Study whereby, as discussed below, patients with previously treated multiple myeloma would be studied to assess the activity of an investigational new drug called CPI-0610.

14. In addition, Constellation designed and manufactured CPI-0610 (which is referred to as the "study drug" in the Informed Consent Form).

15. Ms. Spedale was advised through the materials provided by Constellation and its agents that the study drug was her best chance of treating her cancer and it was in her best therapeutic interest to participate in the study.

16. In reality, this was a Phase One study whose only purpose was to determine the highest dose of CPI-0610 that can be given without causing severe side effects.

17. CPI-0610 is an investigational drug purportedly designed to inhibit cancer growth by blocking a group of proteins called BET proteins. These proteins are known to regulate the cellular levels of different proteins that promote cancer cell growth and survival.

18. The Study is a dose escalation study in which participants are assigned to either a 21 day treatment schedule or a less frequent schedule. Participants would also be subjected to various screening tests including blood tests, bone marrow aspirations/biopsies and electrocardiograms.

19. The Informed Consent Form indicates that CPI-0610 may have a number of different side effects but that in animal studies most side effects resolve over a period of several weeks when treatment is discontinued.

20. The Informed Consent Form failed to disclose that the FDA identified significant safety concerns related to CPI-0610 heart-related issues, including congestive heart failure, cardiac arrest, and irregular heart rhythm, and lung-related side effects, including shortness of

breath, clots in lungs, and fluid accumulation in lungs. Moreover, it did not advise of the risk of psychosis and other symptoms of mental illness.

21. Mrs. Spedale trusted the study organizers regarding their recommendation to join the Study, and relied on their representations that it was safe for her to do so, that the study drug would treat her cancer, and was the recommended treatment of the options available to her.

22. On December 1, 2015, Mrs. Spedale executed the Informed Consent Form, which failed to disclose significant issues and concerns regarding the safety, risks, and benefits of the study drug.

23. As a result of her participation in the Study in general and administration of CPI-0610, Mrs. Spedale's life went on a downward spiral due to psychiatric and cognitive side effects of the drug.

24. Up until December 2015, Mrs. Spedale was rational, thoughtful and made logical decisions; however, as a result of the study drug, Mrs. Spedale began experiencing psychosis, delusions and paranoia such that she was no longer the same person as she was before participating in the Study.

25. Towards the end of her initial cycle of CPI-0610, Mrs. Spedale's family noticed a marked change in her mental status.

26. Around Christmas of 2015, Mrs. Spedale commenced episodes of non-stop speaking for hours at a time and would become agitated if anyone tried to respond.

27. These episodes occurred daily, with Mrs. Spedale repeating the same stories about her childhood, younger years and marriage over many hours.

28. Mrs. Spedale also began experiencing chronic panic and anxiety attacks, even calling 911 and the fire department on multiple occasions during such an attack.

29. Around this time, Mrs. Spedale's sleep pattern also changed; prior to the Study, Mrs. Spedale would sleep about 8 hours a night, but upon joining the Study, Mrs. Spedale would only sleep for about 1-2 hours and then remain awake for 24 hours or more in between.

30. In this impaired mental state, Mrs. Spedale became wrongfully convinced that Mr. Spedale was abusive and sought to harm her.

31. In January and February 2016, Mrs. Spedale began calling her son and her sister and spending an hour or more complaining about Mr. Spedale; by early February 2016, she became convinced that Mr. Spedale suffered from dementia and required placement in an elder care facility. Mrs. Spedale would hang up the phone if any comment was made to the contrary.

32. On January 18, 2016, Mrs. Spedale's physician prescribed the antipsychotic drug Zyprexa indicating on the script that the drug was needed "to block the adverse side effect of experimental chemo drug."

33. However, in her altered mental state, Mrs. Spedale had become convinced that all her prescribed medications were poisoning her, and she refused to take new medications as prescribed, including the Zyprexa.

34. During this time, Mrs. Spedale refused to take any medication, including Warfarin which she previously took to treat blood clots, and which could lead to a heart attack at any time.

35. As Mrs. Spedale's paranoia grew worse, she obtained an order of protection against Mr. Spedale requiring him to leave his home and live alone after almost 50 years together because she falsely believed that he and everyone close to her was plotting against her and planning to harm her.

36. On March 3, 2016, neighbors called the police after finding Mrs. Spedale in their garage erratically looking through their things, and taking one of their suitcases, claiming it was

hers. In fact, the neighbors expressed concerns to Mr. Spedale that she could be dangerous to them.

37. On March 11, 2016 Mrs. Spedale was taken in by the police after acting highly erratically at a restaurant, where she spoke incoherently to the staff and then walked into the kitchen where she began going through all of the restaurant's cooked food and claiming that the restaurant was trying to poison her.

38. Thereafter, Mrs. Spedale was hospitalized and in treatment due to her acute psychiatric and cognitive symptoms. Her physician indicated that, in light of her psychosis, delusions and paranoia, she lacked the capacity to make her own decisions and was disorientated to place, date, day and year, and she required further inpatient treatment and care.

39. Mrs. Spedale had no history of psychotic behavior, and this psychotic episode which began towards the end of her initial cycle of CPI-0610 was her first psychotic episode.

40. On March 29, 2016, Mrs. Spedale's physician recommended placement in a facility with twenty-four hour monitoring and care.

41. Prior to the Study, Mrs. Spedale was a rational person and was able to perform her usual duties and provide comfort, society and support to her family.

42. Upon her release from the psychiatric ward of the hospital, Mrs. Spedale received 24-hour care at home from home-care aides who were employed at the family's personal expense.

43. However, because of Mrs. Spedale's psychotic behavior and challenging mental state, several of these aides quit because they could not work with Mrs. Spedale, and they had to be replaced several times.

44. Mrs. Spedale's family ultimately had to coordinate a complex plan of care for Mrs. Spedale that included not only in-home aides, but also that involved aides that lived nearby, as well as regular fly-in visits from her son and sister, as she was now estranged from her husband of almost 50 years.

45. As a consequence of Mrs. Spedale's complex needs resulting from her mental state, her son Darren Spedale left his highly-paid job in banking to coordinate her care and focus on helping her with her needs, at great financial cost to himself.

46. Mrs. Spedale's mental condition seemed to worsen over time. By September of 2016, she had become more confused and disoriented, stopped eating without being prompted, had virtually no short-term memory capabilities, and refused to leave her bed for almost the entire day.

47. In early October 2016, Mrs. Spedale was placed in an assisted living facility, out of concerns for her own safety and security as a result of her mental state. Expenses for the facility to date have been paid by her family.

48. In the Spring of 2016, as a result of being kicked out of his own home and moving into a 3rd story walk-up apartment, Mr. Spedale experienced physical injuries on walking up the stairs to his apartment that led to nerve damage and made walking difficult and painful for him.

49. While Mrs. Spedale had historically assisted Mr. Spedale when he needed physical assistance, she was now unable to assist him because of her mental state resulting from the CPI-0610 drug trial.

50. As a result of his injuries, Mr. Spedale had to undergo back surgery and multiple spine injections, however the pain continued after these treatments.

51. Given his difficulty walking with his daily physical pain, and with Mrs. Spedale unable to assist him, Mr. Spedale concluded that he had no choice but to move to an elder-care "independent living" facility where he could receive some assistance with his ongoing physical needs.

52. This move to an elder-care facility came at significant expense to Mr. Spedale.

53. As a direct and proximate result of the intentional, reckless and/or negligent actions/inactions of defendant as set forth herein, Mr. Spedale has been deprived of the society, comfort, services, and consortium of his wife, Mrs. Spedale.

54. When Mrs. Spedale was presented with the Informed Consent Form, she was merely asked to sign it; no one reviewed it with her or explained the significant risks participation posed.

55. In addition, the Informed Consent Form was materially misleading and deceptive in a number of respects as defendant understated the risks of serious adverse effects from the study drug.

56. Had Mrs. Spedale been fully informed, she would not have agreed to participate in the Study.

57. A reasonably prudent person in Mrs. Spedale's position would not have agreed to participate in the Study if he or she were properly informed.

## COUNT I

### NEGLIGENCE

58. Plaintiffs incorporate by reference the above paragraphs as if fully set forth at length herein.

59. Defendant knew or should have known of the risks of the study drug and its dangerous nature prior to commencing the Study.

60. As the sponsor for the experiment, defendant had a duty to the Study's subjects to (among other things) draft a consent form that ensured patient safety, and provide physicians with all necessary information and warnings.

61. 21 C.F.R. § 312.50 provides as follows (emphasis added): "Sponsors are responsible for selecting qualified investigators, providing them with the information they need to conduct an investigation properly, ensuring proper monitoring of the investigation(s), ensuring that the investigation(s) is conducted in accordance with the general investigational plan and protocols contained in the IND, maintaining an effective IND with respect to the investigations, and ensuring that FDA and all participating investigators are promptly informed of significant new adverse effects or risks with respect to the drug. Additional specific responsibilities of sponsors are described elsewhere in this part."

62. 21 C.F.R. § 312.60 in turn provides as follows: "An investigator is responsible for ensuring that an investigation is conducted according to the signed investigator statement, the investigational plan, and applicable regulations; for protecting the rights, safety, and welfare of subjects under the investigator's care; and for the control of drugs under investigation. An investigator shall, in accordance with the provisions of part 50 of this chapter, obtain the informed consent of each human subject to whom the drug is administered … ."

63. 45 C.F.R. § 46.116(a) requires an informed consent document to contain an accurate description of the purposes of research and risks of participation, among other things.

64. Thus, the study sponsor is obligated to provide the investigator sufficient information about risks and benefits so that informed consent is properly given by the subjects.

65. The Informed Consent Form was materially misleading and deceptive in a number of respects described above, including that defendant understated the risks of serious adverse effects from the study drug.

66. The Informed Consent Form drafted by defendant failed to adequately disclose the risks and warnings related to the study drug.

67. Additionally, on information and belief, defendant failed to disclose the risks and warnings set forth above to either Mrs. Spedale or her physicians.

68. Had Mrs. Spedale been fully informed, she would not have agreed to participate.

69. The aforesaid violations of regulations caused or contributed to Mrs. Spedale's injury.

70. The injury resulted from the kind of occurrence the regulations were designed to prevent, and Mrs. Spedale was a member of the class of persons the regulations were intended to protect.

71. By conducting itself in the manner described above, Constellation caused harm to and/or increased the risk of harm to Mrs. Spedale, thereby causing the injuries and pain and suffering.

72. As set forth above, Constellation breached its obligations and duties as the Study's sponsor.

73. As a result of the careless, negligent and reckless conduct of Constellation, Mrs. Spedale was caused to suffer pain, discomfort and loss of life's pleasures.

**WHEREFORE**, plaintiffs claim of defendant compensatory damages, pre- and post-judgment interest, dignity damages, and allowable costs of suit.

## COUNT II

## LACK OF INFORMED CONSENT

74. Plaintiffs incorporate by reference all other paragraphs of the Complaint as if fully set forth herein.

75. Defendant intentionally, recklessly and/or negligently enrolled Mrs. Spedale in the human subject experiment without obtaining her informed consent.

76. The regulations provide that both investigators and sponsors have a role in obtaining informed consent from study subjects.

77. As stated above, the Informed Consent Form, was materially misleading and deceptive in a number of respects; namely, defendant understated the risks of serious adverse effects from the study drug.

78. Further, when Mrs. Spedale was presented with the consent form, she was merely asked to sign it; no one reviewed it with her or explained the significant risks participation posed.

79. A reasonably prudent person in Mrs. Spedale's position would not have agreed to participate in the Study if he or she were properly informed.

80. Had Mrs. Spedale been fully informed, without any element of coercion or undue influence, she would not have agreed to participate.

81. As a direct and proximate result of lack of informed consent, Mrs. Spedale suffered pain, discomfort and loss of life's pleasures.

**WHEREFORE**, plaintiff claims of defendant compensatory damages, pre- and post-judgment interest, dignity damages, and allowable costs of suit.

## COUNT III

## STRICT PRODUCTS LIABILITY

82. Plaintiffs incorporate by reference all other paragraphs of the Complaint as if fully set forth herein.

83. Defendant had a duty to provide adequate warnings and instructions for CPI-0610, to use reasonable care to design a product that is not unreasonably dangerous to users, and to adequately test their product.

84. The CPI-0610 manufactured and/or supplied to plaintiff by defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or supplier, it was in an unreasonably dangerous and defective condition for its intended use and posed a risk of serious psychotic behaviors and harm to plaintiff and other consumers which could have been reduced or avoided, inter alia, by the adoption of a reasonable alternative design.

85. The CPI-0610 manufactured and/or supplied to plaintiff by defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or supplier, CPI-0610 had not been adequately tested, was in an unreasonably dangerous and defective condition, and posed a risk of serious adverse effects and harm to plaintiff and other consumers.

86. The CPI-0610 manufactured and/or supplied to plaintiff by defendant was defective due to inadequate warnings or instructions because the defendant knew, or should have known, through testing, scientific knowledge, advances in the field or otherwise, that the product created a risk of serious adverse effects and harm, such as those experienced by plaintiff, and was unreasonably dangerous to plaintiff and other consumers.

87. The CPI-0610 manufactured and/or supplied to plaintiff by defendant was defective, dangerous, and had inadequate warnings or instructions at the time it was distributed, and defendant had or should have had knowledge and information confirming the defective and dangerous nature of CPI-0610. Despite this knowledge and information, defendant failed and neglected to issue adequate warnings that CPI-0610 causes serious adverse effects and harm, such as those experienced by plaintiff. Defendant failed to provide adequate warnings to users, purchasers, or prescribers of CPI-0610, including plaintiff and her physicians, and instead continued to distribute CPI-0610 in an unreasonably dangerous form without adequate warnings or instructions.

88. As a direct and proximate result of defendant's conduct, including the inadequate warnings, lack of adequate testing, and the defective and dangerous nature of CPI-0610, plaintiff has suffered, and will continue to suffer, physical injury, emotional distress, harm, and economic loss as alleged herein.

**WHEREFORE**, plaintiff claims of defendant compensatory damages, pre- and post-judgment interest, dignity damages, and allowable costs of suit.

### COUNT IV
### LOSS OF CONSORTIUM, INTEREST AND PUNITIVE DAMAGES

89. By reason of the foregoing, Mr. Spedale has been caused to suffer the loss of his wife's companionship, services and society.

90. By reason of the foregoing, plaintiff and the decedent sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction in this matter, and in addition thereto, plaintiff seeks interest against defendants in an amount to be determined upon the trial of this matter.

91.     Plaintiff additionally seeks punitive and exemplary damages against Constellation in that its conduct was willful and/or in reckless disregard to the health and safety of plaintiffs.

**WHEREFORE**, plaintiffs claim of defendant, and each of them jointly and severally, compensatory damages, pre- and post-judgment interest, dignity damages, and allowable costs of suit.

Dated:          Friday, January 13, 2017

_____
Alan C. Milstein
Sherman, Silverstein, Kohl,
  Rose & Podolsky, P.A.
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662-0700
*Attorneys for Plaintiffs,*
*Iris and Daniel Spedale*

## JURY TRIAL DEMAND

**TAKE NOTICE** that the plaintiffs demand a trial by jury as to all issues in the above matter.

Dated: <u>Friday, January 13, 2017</u>

Alan C. Milstein
Sherman, Silverstein, Kohl,
   Rose & Podolsky, P.A.
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662-0700
*Attorneys for Plaintiffs,*
*Iris and Daniel Spedale*