Arthur J. Liederman (Bar No.1184167)
(*Admitted Pro Hac Vice*)
aliederman@morrisonmahoney.com
Nicole M. Battisti (Bar No. 4961413)
(*Admitted Pro Hac Vice*)
nbattisti@morrisonmahoney.com
**MORRISON MAHONEY LLP**
120 Broadway, Suite 1010
New York, NY 10271
Telephone: (212) 825-1212
Facsimile: (212) 825-1313


Jeffrey S. Hunter, Esq. (Bar No. 024426)
JHunter@rcdmlaw.com
**RENAUD, COOK, DRURY, MESAROS, PA**
One North Central, Ste. 900
Phoenix, AZ 85004-4117
Tel: (602) 307-9900


*Attorneys for Defendant*
*Constellation Pharmaceuticals, Inc.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

-----------------------------------------------------------------------

IRIS SPEDALE and DANIEL SPEDALE,
husband and wife,

                                    Plaintiffs,

             -against-

CONSTELLATION PHARMACEUTICALS, INC.,

                                    Defendant.

-----------------------------------------------------------------------

No. 2:17-CV-00109-ESW

**DEFENDANT'S MOTION TO EXCLUDE OPINIONS OF PLAINTIFFS' EXPERT DR. SUTTON**

**[ORAL ARGUMENT REQUESTED]**

Assigned to: Hon. John J. Tuchi

Pursuant to Federal Rules of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Defendant Constellation Pharmaceuticals Inc., ("Constellation" or "Defendant"), move this Court to exclude the report and proposed testimony of Plaintiff's expert, Dr. James P. Sutton. This motion is supported by the following Memorandum of Law and the attached exhibits.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

This matter involves plaintiff, Iris Spedale, who was enrolled in an oncology clinical trial of a BET inhibitor study drug by her treating physician at the Mayo Clinic to treat her progressive multiple myeloma cancer, and subsequently developed mania which she attributed to the study drug.   Plaintiff has designated Dr. James P. Sutton as an "expert" to offer ten separate opinions that can be combined into three general areas: (i) the standard of care in the IND submission and the advancement of the study drug CPI-0610 from animal to human trials, and an alleged failure to create an exclusion criteria in the protocols to prevent Plaintiff's enrollment; (ii) the substance and procedure surrounding Plaintiff's informed consent; and (iii) the alleged causation between the BET inhibitor drug at issue and Plaintiff's injury.

While Dr. Sutton is a clinical neurologist in what he has described as his field of expertise (neurology, movement disorders and Parkinson's disease and dementia), it is eminently clear that he is being proffered to offer opinions which are both outside the scope of his expertise and fail to approach the standard for reliability and sound methodology set by *Daubert v Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and its progeny. Dr. Sutton's opinions are broad and range from regulatory issues surrounding the adequacy of the clinical trial workup of an *oncology* drug, to the appropriate language and information that should be included in clinical trial protocols

and informed consents, the latter of which is typically reserved for research ethical committees called Independent Review Boards (IRB).  The record demonstrates that Dr. Sutton should not be qualified as an expert in the three general areas in which he seeks to offer testimony.

## II.    STANDARD OF REVIEW

The *Daubert* inquiry consists of both a reliability and relevance prong.  Expert testimony is admissible when (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999); *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512 (1997); *Daubert v Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589-91 (1993).

As to the reliability prong, the central inquiry must focus upon the expert's principles and methodology, not on his conclusions.  *Daubert*, 509 U.S. at 595, 113 S. Ct. at 2797.  The proffered expert testimony must be "scientific," that is, that it pertains to "scientific knowledge" and is based upon a scientific methodology.  **The trial court is to rule out testimony based upon "subjective belief or unsupported speculation."**  *Daubert,* 509 U.S. at 590, 113 S. Ct. at 2795.  [Emphasis supplied].

An expert's bare assurance of validity is insufficient to allow his opinions to proceed to the jury.  Rather, the party presenting the expert must be able to show that the expert's findings are based on sound science, which requires some objective, independent validation of the expert's methodology.  *Daubert*, 509 U.S. 579, 113 S. Ct. 2786; *General Elec.*, 522 U.S. 136, 118 S. Ct. at 519 (nothing in *Daubert* or Rule 702 of the Federal Rules of Evidence requires a district court to

admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert). A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. *General Elec.*, 522 U.S. 136, 118 S. Ct. at 519.  The Ninth Circuit has noted that a "very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharms.*, Inc., 43 F.3d 1311, 1317 (9th Cir. 1995).   If the evidence is not based upon independent research, the Court must determine whether the evidence is based on scientifically valid principles. *Id.* at 1317-18.

The Court identified several factors to be considered, which include whether the theory or technique can be tested; whether it has been subject to peer review; whether the technique has a high known or potential rate of error; and whether the theory has attained general acceptance within the scientific community.  *Daubert,* 509 U.S. 593-95, 113 S. Ct. 2796-97.   None of the *Daubert* factors are necessarily applicable in every case or dispositive; nor are the four enunciated factors exhaustive.  *Daubert,* 509 U.S. at 593-95, 113 S. Ct. at 2796-98; *Kuhmo*, 526 U.S. 137, 119 S. Ct. at 1179.

The second prong under *Daubert* is relevance and requires the court to determine whether expert testimony "assists the trier of fact in understanding the evidence or determining a fact in issue."  *Daubert,* 509 U.S. at 592, 113 S. Ct. at 2796.  Expert testimony must be of "the kind that enlightens and informs lay persons without expertise in a specialized field."  *United States v. Burchfield,* 719 F.2d 356 (11th Cir. 1983); *United States v. Smith,* 122 F.3d 1344, 1358 (11th Cir. 1997). The proffered testimony must "fit" the case about which the expert is testifying.  *Daubert*,

509 U.S. at 591, 113 S. Ct. 2795-96.  There must be a logical relationship between the proffered testimony and the factual issues in the case.  *Daubert*, 509 U.S. at 591, 113 S. Ct. at 2796.

## III.   DR. SUTTON'S OPINIONS ARE OUTSIDE THE SCOPE OF HIS KNOWLEDGE AND EXPERTISE

Dr. Sutton's testimony and opinions focus on the conduct of a sponsor with respect to FDA acceptance of pre-clinical studies and FDA approved clinical trials, including the formulation of informed consent forms and protocols, and the critical issue of brain neurotoxicity of BET inhibitors and clinical trial risks to patients.  The opinion must reflect an expertise in clinical trial studies, BET inhibitors, oncology drugs and the guidelines and requirements in dealing with the FDA submission process.  Yet, Dr. Sutton has no FDA regulatory expertise, nor is he a cellular or molecular biologist.

He has not conducted research with BET inhibitors or even worked with oncology drugs, including BET inhibitors, has never participated in pre-clinical trials or studies, or been a consultant in pre-clinical phases for drugs [**Exhibit B**, p. 22, lines 4-6].  He has never participated in any clinical trial involving a BET inhibitor or oncology drugs, has never been involved in regulatory discussions or negotiated with the FDA about the approval or non-approval of clinical drugs, has never advised a sponsor of a clinical trial regarding the workup of an IND submission to the FDA, or been involved in creating the pre-clinical packages to be submitted to the FDA, and has never directly worked for a pharmaceutical manufacturer, and is unfamiliar with the governing guidelines for pre-clinical trials, including ones that govern oncology drugs. [**Exhibit B**, pgs. 19 lines 24-25, p. 20, lines 1-25, p. 21, lines 1-8, p. 29, line 6-13].  Dr. Sutton has no specific knowledge about other BET inhibitor clinical trials and whether these trials conducted additional neurotoxicity testing in the pre-clinical phase. [**Exhibit B**, p. 32, lines 3-9].  Dr. Sutton has never even seen a BET inhibitor IND submission. [**Exhibit B**, p. 33, lines 2-3].

Dr. Sutton is a board-certified neurologist whose clinical practice focuses on patients with complex neuropsychiatric issues due to neurodegenerative disease. [**Sutton Expert Report**, p. 1, attached as **Exhibit A**]. He performed a residency in neurology and a two-year fellowship in neuropharmacology and movement disorders. [**Sutton Deposition**, p. 6, lines 18-24, attached as **Exhibit B**]. He has described his field of expertise as "neurology with additional expertise in movement disorders and Parkinson's disease and dementia." [**Exhibit B**, p. 7, lines 2-3]. His practice at Pacific Neuroscience Medical Group evaluates and manages patients mostly with Parkinson's disease, other Parkinsonism disorders, dementia with Lewy Bodies, and Alzheimer's disease. [**Exhibit B**, p. 8, lines 4-10]. Dr. Sutton does not participate in Phase 1 clinical trials and has never participated in any clinical trial involving oncology drugs or BET inhibitor drugs. [**Exhibit B**, p. 17, lines 9-15, p. 19, lines 24-25, p. 20, lines 1-4]. His sole clinical trial experience is not as a sponsor, member of an IRB or a CRO. His practice experience has been limited to work at clinical site for a number of Phase 2 and 3 clinical trials in which he had been the principal investigator. [**Exhibit B**, p. 9, lines 5-7, p. 17, lines 7-15].

There is no standard, credible, relevant and accepted research or relevant expertise that Dr. Sutton can rely upon that will aid the jury in determining whether the study drug required further pre-clinical testing; whether the pre-clinical package was proper; whether the protocols met the standard of care; what Constellation's obligations were with respect to the FDA submissions, the protocol, the informed consent and whether there was a breach of a standard of care in the pre-clinical package, or the FDA application; or the creation of the protocols or the informed consent. This Court should exclude Dr. Sutton's opinions because it is not based on any objective scientific research, testing or methodology, and amounts to nothing more than personal opinion. Dr. Sutton has offered opinions regarding the dangers and risks of the study drug that were never tested for,

or that establish Ms. Spedale should have been excluded from the trial.  His unsupported opinions are personal opinions and gratuitous observations that are not and connect be derived from an expertise from which it can be deemed reliable and credible.

Moreover, Dr. Sutton has no knowledge of the federal regulations that govern pre-clinical phases of cancer study drugs.  [**Exhibit B**, p. 28, lines 15-20].  He testified that he has no personal knowledge other than he is aware of them and has reviewed them for purposes of this litigation.  *Id*.  Surprisingly, Dr. Sutton has no direct knowledge of the guideline (ICH S9) that governs the pre-clinical trials.  When asked if he has knowledge about the governing guideline ICH S9, he states, "It sounds familiar" [**Exhibit B**, p. 29, line 7].  He does not refer to this guideline in his report or rely on it even though he considers the guideline to be "very relevant".  [**Exhibit B,** p. 30, lines 2-6].  Dr. Sutton is not aware of any regulatory guidelines that require specific types of testing for FDA approval for cancer-oncology drugs, such as the drug at issue. [**Exhibit B**, p. 35, lines 9-12].  He has never read any BET inhibitor IND submissions and did not know that IND submissions for cancer drugs differ from non-cancer drugs. [**Exhibit B**, p. 33, lines 2-11].  Dr. Sutton has no knowledge whether other BET inhibitor studies have reported manic or psychotic episodes or neurological type illnesses. [**Exhibit B**, p. 36, lines 8-11].

Dr. Sutton's training and experience do not qualify him to provide his expert opinions on preclinical studies or the specific information needed to be included in the protocol or informed consent or the proper location for any information within the documents.  Dr. Sutton should be precluded from providing an opinion on the protocol and FDA regulatory procedures because his views are not based on any "scientific, technical, or otherwise specialized knowledge." Fed. Rules Evid. Rule 702.

The physician precluded from testifying in *Cloud* was a board certified psychiatrist who had practiced for over 33 years. *Cloud v Pfizer Inc.,* 198 F.Supp.2d 1118, 1130 (D. Ariz. 2001). He had spent over twenty years on a committee at a psychiatric institute where he was responsible for doing psychological autopsies, and was also a clinical investigator in the pre-marketing clinical trials for Zoloft. *Id.* at 1131. Notwithstanding a claimed experience in suicidology, and even experience conducting clinical trials of Zoloft, the court held that he was unqualified because he had no clinical experience with a patient committing suicide while on Zoloft, he had not published any articles, given any testimony, or communicated to scientific organizations or government agencies that Zoloft causes suicide. *Id.* The instant litigation was the first time the doctor expressed his opinion about the correlation. *Id.* In citing *Daubert v. Merrell Dow Pharms.,* 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*"), the court noted that the Ninth Circuit has placed a strong emphasis on considering "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Id.* at 1129. Accordingly, the *Cloud* court found that he developed his opinion expressly for the purpose of testifying in the case. *Id* at 1135. Similarly, in an action involving a doctor who held a Ph.D. in physical chemistry and intended to testify as to biomedical sciences relating to silicone gel filled breast implants, the court held that he "was not a medical doctor, had not supported his theories with testing, and did not develop his opinions independent of the litigation." *Grant v. Bristol-Myers Squibb,* 97 F.Supp.2d 986, 988 (D. Ariz. 2000).

Dr. Sutton has basic knowledge and understanding of medical issues and can read journals and medical literature, but his lack of expertise in the specific areas of his opinion is fatal to admissibility as was the physician's testimony in *Cloud*. Dr. Sutton's opinions on the adequacy

of Constellation's informed consent, and protocol in monitoring the site and the clinical trial, far exceed the scope of his expertise. He cannot express opinions on what Constellation knew, what its obligations were, and how it failed to fulfill its obligations. Dr. Sutton is not in a position to opine that Constellation failed to include adequate exclusion criteria in the protocol.

## IV.    SUTTON'S OPINIONS ARE NOT BASED ON SUFFICIENT DATA OR A RELIABLE SCIENTIFIC METHODOLOGY

His opinions and testimony do not approach the standard for reliability and sound methodology set by *Daubert v Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and its progeny.   The focus of Dr. Sutton's opinions is that Constellation failed to sufficiently analyze and test for neurotoxicity prior to the human trials (notwithstanding FDA approval), failed to act on purported research, and most significantly, failed to create an exclusion criteria that would have excluded individuals with psychiatric injuries or conditions – that would have excluded Ms. Spedale from the trial.

Dr. Sutton's opinions are not based on his own research or on work he has personally performed in the field of either BET inhibitors or cellular research in general. Dr. Sutton conceded that even if additional testing was conducted he did not know if it would have produced any results that would have altered the trial or identified additional risks. [**Exhibit B**, p. 39, lines 4-11].

Dr. Sutton admits that he is not a regulatory expert. He has agreed that he is not providing an opinion on the adequacy of the pre-clinical package or comment on the FDA approval of the pre-clinical package. [**Exhibit B**, p. 33, lines 21-25, p. 34, line 1]. He has never worked for a sponsor or a clinical research organization responsible for drafting the preclinical package documents to the FDA.  Dr. Sutton has only been a principal investigator in Phase 2 and 3 clinical trials, for drugs that are not involved in this litigation. His knowledge is limited to what he has been given and read from others who had the expertise and experience in drafting such documents,

conducting the pre-clinical testing and knowing and complying with FDA regulations. Dr. Sutton is not and should not be permitted to provide an opinion on whether Constellation breached the standard of care with respect to the preparation of the IND or in obtaining approval from the FDA.

Without his own conducted lab research, Dr. Sutton has relied on his own personal opinion of what neurotoxicity testing might demonstrate. His "opinion" rests on his identification and reliance of one article. *See* Korb E, "BET protein Brd4 activates transcription in neurons and BET inhibitor Jq1 blocks memory in mice." Nat. Neurosci. 2015; 18(10):1464-73 (Aug. 24, 2015) ("Allis Article") [**Exhibit C**]. The subject matter is not within his expertise of his practice, it is not research he would naturally work with or rely upon for his practice. Rather it is a product of his literature research for plaintiff, similar to a term paper.

The Allis Article was published two years after the Phase 1 clinical trial began. As a result of Dr. Sutton's own limitations, the findings he has cited are factually inaccurate. Dr. Sutton has cited the Allis Article because one of the authors, Dr. C. David Allis, was a founder of Constellation over a decade ago. Even though Dr. Allis has not been with Constellation for a number of years, Dr. Sutton contends that the Allis Article established a need for further toxicity testing that should have prompted Constellation to modify its preclinical testing procedures, clinical trial protocol, informed consent, and warnings to the enrollees of the trial. He contends that this was all necessary because the Allis Article proved that BET inhibitors could cause brain injury. However, Dr. Sutton's conclusion about the findings in the Allis Article are misconstrued and appear nowhere in the Article. [**Exhibit G**, ¶¶ 7, 12-14]. The Allis Article, and Sutton's opinion, provide no sound basis for any of his opinions.

      a. **"Additional Neurotoxicity Testing Should have been performed in the Preclinical Phase."**

Plaintiffs rely upon Dr. Sutton to establish that Constellation did not meet the standard of care in the development of the clinical trial and created a risk to Ms. Spedale in failing to perform additional neurotoxicity testing.  Significantly, Dr. Sutton is unable to definitively indicate whether any proposed testing would have in fact identified additional risk, would have altered or changed the product or the proposed trials, or would have affected Ms. Spedale's enrollment.

Dr. Sutton's opinion that additional testing should have been conducted is based on two factors: 1) that published data links epigenetic mechanisms and psychiatric disorders, and 2) the Allis Article demonstrated that the "class of medication can cause or, actually, does cause brain injury in mammals." [**Exhibit B**, p. 42, lines 5-19].

Dr. Sutton does not rely on any published data of specific BET inhibitors that were linked to psychiatric disorders. Rather, Dr. Sutton cites to general mechanisms that produce changes to the genome such as histone modification.  Dr. Sutton's hypothesis is that since a BET inhibitor is known to affect DNA transcription, the study drug can be linked to very general and broad research on epigenetic modification.  However, Dr. Sutton only offers a general hypothesis that is not tested or demonstrated for any BET inhibitors and certainly not for the BET inhibitor at issue in this action.  It is a hypothesis, but even Dr. Sutton cannot with certainty identify whether any test would demonstrate the risk.  Multiple classes of drugs function at the epigenetic level. To apply general and broad research as Dr. Sutton seeks to do, conflicts with the *Daubert* standard for admissibility. BET inhibitors are within a broad spectrum of epigenetic mechanisms. Dr. Sutton's conclusion is unsound because articles on epigenetic mechanism and psychiatric disorder only **suggest** a link between BET inhibitors (and other epigenetic mechanisms) and brain function. And even to suggest a link to brain function has not been indicative – nor does Dr. Sutton opine – that it created a risk of brain injury or should be avoided by anyone with a psychiatric disorder. Dr. Sutton has

not supported his opinion with any data demonstrating affirmatively that there is a direct correlation between BET inhibitors and psychiatric disorders.

Dr. Sutton seeks to find refuge for his hypothesis by relying on the Allis Article's findings. The Article itself does not establish the reliable medical knowledge from which Dr. Sutton can translate a hypothesis into a credible basis for his opinion.  The fatal flaw in his reliance on the article is that his representations of the findings are **factually inaccurate**.  The Allis Article does not conclude anything about the "class" of BET inhibitors.  It studied a very specific inhibitor called Jq1, which was not the inhibitor used by Constellation. There is no conclusion, statement or finding anywhere in the Article that Jq1 caused brain injury in mammals.

Constellation's microbiologist, Dr. Robert Sims, is familiar with the Allis Article and confirmed that there were no findings regarding brain injury, or even psychological injury/concern. There were no major changes in short-term memory, movement, learning ability or anxiety, or that the mice suffered brain cell death or change in the brain's neuronal structure. [**Dr. Sims Affidavit, ¶¶ 7, 12-14, attached as Exhibit G**].  Moreover, the BET inhibitor being used in the Allis Article (Jq1) was not the same BET inhibitor that Constellation was developing, or more specifically, not the same as CPI-0610.  [**Exhibit G, ¶ 9**].

Dr. Sutton relies on this article entirely to opine that Constellation should have done additional testing, revised the protocol to include an exclusion for psychiatric disorders and alerted plaintiff about the Article. (p. 43, lines 13-25).  The fatal flaw in Dr. Sutton's opinion, is that he has formulated a hypothesis but never performed any independent research on the CPI-0610 inhibitor or any BET inhibitor to determine whether it could affect patients with prior psychiatric disorder, nor was he able to cite any published data that studied the effects of CPI-0610 on the brain.  Moreover, Dr. Sims who was personally involved in the preclinical testing of the study drug

stated that six independent general toxicology studies looking at the brain and central nervous system were conducted, and no findings of neurological or psychological issues were found. [Exhibit G, ¶ 16].

The substantial limitations in his expertise and the lack of credibility for his own purported bases for his hypothesis were reflected in his own admissions during his deposition. He testified that the fact that no other BET inhibitor study has reported manic or psychotic episodes, does not influence his opinion because those BET inhibitors were different agents, different protocols, different populations and there were many unknown variables. [**Exhibit B**, p. 36, lines 12-21]. He further stated that it would require "an in-depth analysis of all the pre-clinical safety data, clinical safety data" [**Exhibit B**, p. 36, lines 22-23].  His testimony undermines his opinion and reliability as an expert.  Even though Dr. Sutton conceded that the Allis Article involved a different BET inhibitor and he had not conducted a review of all the safety data and clinical safety data associated with that study, he relies on the Allis Article as the sole basis for why Constellation should have conducted additional testing, revised its protocol and its exclusion criteria.

The District Court has found expert opinions to be unreliable when the medical and scientific articles relied upon by the expert do not support his conclusion.  *Cloud v Pfizer Inc.,* 198 F.Supp.2d 1118, 1132 (D. Ariz. 2001).  The expert in *Cloud*, was not permitted to rely on articles that were only suggestive of a link between the drug and the injury, to conclude that the drug does or did in-fact cause injury. *Id; Cabrera v. Cordis Cop.,* 134 F.3d 1418, 1422 (9th Cir. 1998)(excluding the expert's opinion after he failed to identify any peer-reviewed research justifying his conclusions).

In this instance, Dr. Sutton's testimony that Constellation was negligent in advancing the BET inhibitor from animal studies to human clinical trials is unreliable and should be excluded. The speculative nature of Dr. Sutton's opinion is analogous to the opinion in *Cloud* that was held

to be impermissible. The Allis Article warns that BET inhibitors' function on the brain is unknown and that the rodent's long-term memory was affected by the Jq1 inhibitor. [**Exhibit C**]. Based on the epigenetic data and the Allis Article, it is speculative, at best.  The lack of reliability renders it inadmissible.

The lack of reliability is further evidenced by Dr. Sutton's own inconsistency.  He testified, "I didn't offer opinion about [IND] submission, and I don't have an opinion now about [IND] submission to be negligent." [**Exhibit B**, p. 33, lines 21-22].  However, an IND submission is when a sponsor of a clinical trial drug, such as Constellation, applies to the FDA to move the drug from animal testing to human clinical testing.  While Dr. Sutton's report opined that Constellation was negligent for lack of testing – hence inadequate pre-clinical work up prior to proceeding to clinical trials, his testimony states otherwise.

Sutton is unable to assign a specific time point as to when the negligence occurred. [**Exhibit B**, p. 34, lines 5-7].

> "I can't comment or speculate on the specific times, but one important aspect of negligence was not addressing the possibility that a bromo domain inhibitor could have consequences that would go beyond its effect on malignancy … and not including measures to look at the potential effects on many organ systems, including the brain, so that would be very early in the, if you will, exploration period." (**Exhibit B**, p. 34, lines 22-25, p. 35, lines 1-4).

When asked whether he saw any neurological issues in the general toxicology data, he recalled that "nothing was noted" but indicated that the details of the data was "very sketchy and limited." [**Exhibit B**, p. 35, lines 17-21].  Dr. Sutton fails to explain how the preclinical toxicology data was "sketchy and limited".  The FDA approved Constellation's pre-clinical IND submission, which included all the general toxicology data that was supposedly "sketchy and limited" and in the FDA's approval letter stated nothing about the inadequacy of the toxicology data. [*See* FDA approval letter, attached as **Exhibit D**].

13

An expert "may not reach his conclusion first and do the research later," or not do it at all. *Claar v. Burlington N.R.R.*, 29 F.3d 499, 502-503 (9ᵗʰ Cir. 1994). Scientific evidence is only reliable if it is based on an assertion that is grounded in methods of science; the focus on principles and methodology, not conclusions. *Cloud v Pfizer Inc.,* 198 F.Supp.2d 1118 (D. Ariz. 2001)**;** *In re Bard IVC Filters Products Liability Litigation,* 2018 WL 495187 (D. Ariz. 2018)(excluding plaintiffs' expert doctor because it was clear that his opinions were based on his own personal views, rather than on any scientific, technical, or specialized knowledge). Dr. Sutton's failure to review and examine the necessary evidence renders his opinions nothing but "subjective belief [and] unsupported speculation." *Daubert*, 509 U.S. at 589-590. Dr. Sutton's opinions regarding the adequacy of the informed consent and protocol, and whether additional studies should have been done and warnings or exclusions should have been added, has all been based on mere speculation and personal opinion. It is not grounded in scientific proof or reliable methodology.

### b. Constellation's exclusion criteria was inadequately drafted

Dr. Sutton critiques two aspects of the clinical trial protocol – 1) no exclusion criteria for subjects who had other treatment options, and 2) no exclusion criteria for patients with prior or active central nervous system neurological or psychiatric illness.

With respect to opinion (1), Section 4 of the Protocol, provided guidance to the clinical trial sites with respect to the enrollment of appropriate participants in the study. The protocol provided both the inclusion and exclusion criteria for participation. It stated:

> "The patients enrolled in this study will be adults … with a … confirmed diagnosis of multiple myeloma that has progressed following standard treatment, and for whom further effective standard treatment is not available." [**Clinical Trial Protocol**, p. 33, section 4, attached as **Exhibit E**]

Immediately below this language were the inclusion and exclusion criteria. Dr. Sutton testified that because this information was not under the exclusion criteria, the protocol was

deficient. [**Exhibit B**, p. 70-71]. Dr. Sutton has never drafted a protocol and has not consulted with any sponsor in the drafting of a protocol. He is not a human factors expert and has not even reviewed the deposition testimony regarding whether the principal investigator in this trial knew or did not know of the fact that a participant should be without alternative treatments. His opinion only addresses where in the protocol he would prefer the direction to be located. But the basis for this opinion is only his own preference as a recipient of such protocols. That does not make him an expert on protocol design and drafting. Moreover, he does he rely on any studies regarding proper recitation of the caution. His opinion is only anecdotal and a personal preference.

With respect to critique (2), Dr. Sutton relies on the Allis Article to support his opinion that there should have been an exclusion for neurological and psychological illness in the protocol. The inference is that since Ms. Spedale had steroid induced mania 6 years prior to the trial, she should have been excluded from the trial. This is the only opinion from which causation can be inferred. However, as argued above, nothing in the Allis Article suggests that the study drug could causes neurological or psychiatric issues. Dr. Sutton could identify no pre-clinical toxicology data that raised the spectre or possibility for neurological or psychological events, warranting further testing and such an exclusion criteria. [**Exhibit B**, p. 35, lines 17-21]. Dr. Sutton acknowledged that just because an adverse reaction, like mania, occurs while taking a study drug, does not mean that the sponsor of the drug could have predicted that outcome. [Exhibit B, p. 37, lines 17-20]. Nor is there any evidence, research, or literature cited or relied upon demonstrating that all prior psychological histories, no matter when, and no matter whether they resolved, mandated exclusion from the trial. Dr. Sutton's opinion assumes a relationship would have been expected because the alleged injury occurred. However, no one else has sustained such an injury in the trial, and the Ms.

15

Spedale had undergone various cancer treatments with drugs known to breach the blood brain barrier for six years subsequent to her steroid induced mania without any similar reaction.

### c.   The informed consent was inadequate

Without support, Dr. Sutton has opined that the informed consent did not identify the "mechanism of action (MOA) of the drug, define what epigenome is, explain that CPI-0610 alters the epigenome, that it might do so irreversibly, and why this might result in unanticipated consequences different than those she might have had in the past." [**Exhibit A**, p. 10, section 5(e)]. He further opined that the informed consent does not mention the findings of the Allis Article and that the risk of death is hidden in the middle of the consent form and it does not adequately explain the dose escalation of the trial. [**Exhibit A**, pgs. 10-11, section 5].

As argued above, Dr. Sutton has no regulatory, communications, or human factors experience and has no knowledge in drafting an informed consent or protocols.  Dr. Sutton has not identified any regulations or guidelines from which he can support his personal opinion regarding where information should be in the informed consent, the format of the form, and the type of information that should be conveyed to the enrollee. Dr. Sutton has not reviewed or considered the Mayo Clinic's IRB guidelines even though the Mayo Clinic's IRB was the entity responsible for reviewing, amending, and finalizing the informed consent.  [**Dr. Italo Biaggiani Expert Report,** p. 3, section 6, attached as **Exhibit F**]. The Mayo Clinic's guidelines require its IRB to ensure that the informed consent is written in a language that is understandable to the research project population and accurately describes the risks and benefits. [**Exhibit F,** p. 4, section 10]. Moreover, Constellation's IRB expert has confirmed that the informed consent complied with all applicable guidelines and regulations, yet Dr. Sutton has pointed to none that Constellation has violated. [**Exhibit F**, Page 6, ¶ 7].

**V.    DR. SUTTON'S OPINIONS ARE IRRELEVANT BECAUSE IT CANNOT ESTABLISH LIABILITY AGAINST CONSTELLATION**

Dr. Sutton's report states that Constellation was negligent in not keeping abreast of the BET inhibitor research and in its choice of Michael Cooper as the Chief Medical Officer, as well as Constellation relying on flawed reasoning for suggesting a lack of causality between the injury and the drug.  [**Exhibit A**]. These opinions by Dr. Sutton do not provide any support that would assist a trier of fact in determining whether Constellation is liable to plaintiffs.  Notwithstanding the irrelevancy of these opinions, Dr. Sutton has not spoken with anyone at Constellation or inquired about what information they had in 2014 or 2015. [**Exhibit B**, p. 45, lines 13-15].  Dr. Sutton has also never spoken with Dr. Cooper and understood the role he played at Constellation as well as other scientists who worked on this clinical trial. Dr. Sutton is not qualified to provide an opinion regarding any standard of care or any breach and should be precluded from providing an opinion on "negligence" or causation.

**VI.    CONCLUSION**

The Supreme Court held that an expert must employ "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumbo Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  Dr. Sutton has not met this standard.  For all the reasons set forth above, the Court should exclude the testimony of Plaintiff's expert, James P. Sutton.

DATED this 19th day of November, 2018

> */s/ Arthur J. Liederman* (Bar No.1184167)
> (*Admitted Pro Hac Vice*)
> aliederman@morrisonmahoney.com
> */s/ Nicole M. Battisti* (Bar No. 4961413)
> (*Admitted Pro Hac Vice*)
> nbattisti@morrisonmahoney.com
> **MORRISON MAHONEY LLP**
> 120 Broadway, Suite 1010
> New York, NY 10271
> Telephone: (212) 825-1212
> Facsimile: (212) 825-1313
>
> */s/ Jeffrey S. Hunter* (Bar No. 024426)
> JHunter@rcdmlaw.com
> **RENAUD, COOK, DRURY, MESAROS, PA**
> One North Central, Ste. 900
> Phoenix, AZ 85004-4117
> Tel: (602) 307-9900
>
> *Attorneys for Defendant*
> *Constellation Pharmaceuticals, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify on this 19th day of November, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

**Alan Milstein**
**Sherman, Silverstein, Kohl, Rose & Podolsky, P.A.**
308 Harper Drive, Suite 200
Moorestown, NJ 08057
AMilstein@shermansilverstein.com
*Attorney for Plaintiff*

_____***/s/ Cindy K. Bowlin***_____

19