
MAYO CLINIC

| | |
|---|---|
| | Name and Clinic Number |

**Approval Date:**     February 27, 2015
**Not to be used after:**     February 26, 2016

# RESEARCH PARTICIPANT CONSENT AND PRIVACY AUTHORIZATION FORM

**Study Title:**   0610-03, A Phase I Study of CPI-0610, a Small Molecule Inhibitor of BET proteins, in Patients with Previously Treated Multiple Myeloma

**IRB#:**   13-008753

**Principal Investigator:** Dr. L. Bergsagel and Colleagues

Please read this information carefully. It tells you important things about this research study. A member of our research team will talk to you about taking part in this research study. If you have questions at any time, please ask us.

Take your time to decide. Feel free to discuss the study with your family, friends, and healthcare provider before you make your decision.

To help you decide if you want to take part in this study, you should know:
- Taking part in this study is completely voluntary.
- You can choose not to participate.
- You are free to change your mind at any time if you choose to participate.
- Your decision won't cause any penalties or loss of benefits to which you're otherwise entitled.
- Your decision won't change the access to medical care you get at Mayo Clinic now or in the future if you choose not to participate or discontinue your participation.

For purposes of this form, Mayo Clinic refers to Mayo Clinic in Arizona, Florida and Rochester, Minnesota; Mayo Clinic Health System; and all owned and affiliated clinics, hospitals, and entities.

If you decide to take part in this research study, you will sign this consent form to show that you want to take part. We will give you a copy of this form to keep. A copy of this form will be put in your medical record.



**MAYO CLINIC**

| | | Name and Clinic Number |
|---|---|---|

**Approval Date:** February 27, 2015
**Not to be used after:** February 26, 2016

## CONTACT INFORMATION

| You can contact ... | At ... | If you have questions or about ... |
|---|---|---|
| **Principal Investigator:** Dr. Leif Bergsagel | **Phone:** (480) 301-8335 <br><br> **Address:** 13400 E. Shead Blvd. Scottsdale, AZ 85259 | ▪ Study tests and procedures <br> ▪ Research-related injuries or emergencies <br> ▪ Any research-related concerns or complaints <br> ▪ Withdrawing from the research study <br> ▪ Materials you receive <br> ▪ Research-related appointments |
| **Mayo Clinic Institutional Review Board (IRB)** | **Phone:** (507) 266-4000 <br><br> **Toll-Free:** (866) 273-4681 | ▪ Rights of a research participant |
| **Research Subject Advocate (The RSA is independent of the Study Team)** | **Phone:** (507) 266-9372 <br><br> **Toll-Free:** (866) 273-4681 <br><br> **E-mail:** researchsubjectadvocate@mayo.edu | ▪ Rights of a research participant <br> ▪ Any research-related concerns or complaints <br> ▪ Use of your Protected Health Information <br> ▪ Stopping your authorization to use your Protected Health Information |
| **Research Billing** | **Arizona:** (800) 603-0558 | ▪ Billing or insurance related to this research study |

**Other Information:**

A description of this clinical trial will be available on http://www.ClinicalTrials.gov, as required by U.S. Law. This Website will not include information that can identify you. At most, the Website will include a summary of the results. You can search this Website at any time.


MAYO
CLINIC

Name and Clinic Number

**Approval Date:**           February 27, 2015
**Not to be used after:**    February 26, 2016

## 1.    Why are you being asked to take part in this research study?

You are being invited to take part in this research study because you have multiple myeloma that has progressed following at least one prior line of standard treatment.

Approximately 36 adult patients with multiple myeloma will participate in this study. The research will be conducted in approximately 4-5 clinics in the United States.

## 2.    Why is this research study being done?

The main purpose of this study is to determine the highest dose of CPI-0610 that can be given without causing severe side effects. This is a Phase 1 study, which means that CPI-0610 is in very early stages of testing in humans.

Future studies may then test whether or not CPI-0610 is useful against different types of cancer.

CPI-0610 is experimental, which means that it is not approved by the U.S. Food and Drug Administration (FDA) or other regulatory agencies around the world to treat cancer or for any other disease.

The purpose of this study is to find answers to the following research questions:
- What is the highest dose of CPI-0610 that can be given to patients with multiple myeloma without causing severe side effects?
- What are the side effects of CPI-0610?
- How much CPI-0610 is in the bloodstream at specific times after taking it, and how rapidly does the body get rid of CPI-0610?
- What are the effects of CPI-0610 on the expression of certain genes, both in normal blood cells and in multiple myeloma cells?
- Will CPI-0610 help reduce the amount of multiple myeloma in patients' bodies?



MAYO
CLINIC

| | Name and Clinic Number |
|---|---|

**Approval Date:**        February 27, 2015
**Not to be used after:**   February 26, 2016

## 3.    Information you should know

**Who is Funding the Study?**

This study is being funded by the study sponsor, Constellation Pharmaceuticals.

**Information Regarding Conflict of Interest:**

Your doctor may be referring you to this study and if your doctor is also an Investigator in this study, he or she has a conflict by having two sets of interests (your well-being, and the scientific conduct of the study).  If you are uncomfortable with your doctor working with you as part of this research study, but still wish to participate in the research, you may request to work with a different member of the research team.

## 4.    How long will you be in this research study?

Your time in this research study will be followed in "cycles".  The total number of cycles you go through in the study will depend on the side effects you may experience and if your cancer gets worse.

You may be able to continue to take CPI-0610 as long as:
- your cancer does not get worse
- you do not have severe side effects
- you do not become pregnant
- both the study doctor and the sponsor agree

## 5.    What will happen to you while you are in this research study?

In order to determine the highest dose of CPI-0610 that can be given safely, this study will test a range of CPI-0610 doses. CPI-0610 will be given by mouth in the form of capsules, starting with a dose of 24 mg once daily. Three to six patients will be enrolled and started at the 24 mg daily dose for 14 days in a row, followed by a 7 day break (21-day treatment schedule).  If this dose is tolerated, the dose will be increased in a new group of three to six patients. The dose of CPI-



MAYO
CLINIC

| | Name and Clinic Number |
|---|---|

**Approval Date:** February 27, 2015
**Not to be used after:** February 26, 2016

0610 will continue to be increased until unacceptable side effects occur in patients. It is also possible that during the study a decision will be made to reduce the number of days of treatment. For example, it may be necessary to give 7 rather than 14 consecutive days of treatment if 14 days is not well tolerated.

It is also possible that, rather than a single dose per day, a decision will be made to split your dose. For example, if it is felt that your determined dose may work better as ½ the dose twice per day, you will change to a schedule that includes both a morning and evening dosing schedule.

You will be assigned to either the 21 day treatment schedule or a less frequent treatment schedule, depending on when you enroll in the study.

- If you are assigned to the 21 day schedule, you will take CPI-0610 capsules daily for 14 days and rest for 7 days.
- If you are assigned to a less frequent schedule, you will take CPI-0610 capsules daily for a shorter period of time. For example, you could be assigned to take CPI-0610 capsules daily for 7 days and rest for 7 days.

Your CPI-0610 dose may stay the same throughout the study depending on whether or not you have side effects. If you have side effects, your study doctor may decide to lower the amount of CPI-0610 you take. The study doctor may also decide to delay, or stop CPI-0610 because of side effects. You may ask your study doctor what dose of CPI-0610 you will receive in this study.

Once the highest dose with acceptable side effects is found, an additional 12 patients (for a total of 18 patients) will be enrolled at that dose level. Therefore, the dose of CPI-0610 you receive will depend on when you enter the study. As a result, the dose you receive may not be the best dose for treating your cancer, but the information obtained may help other patients in the future.

Screening and Baseline Period:
Before you can start the study, the study doctor or study staff will talk to you about the study. Then you will need to sign this consent form before the study doctor or study staff can begin the Screening Period to see if you qualify to be in the study.

The Screening Period can last up to 28 days. It is possible that, after the Study Doctor reviews the results of the tests performed during the Screening Period, he will determine that you do not qualify to be in the study. If you are not eligible to be in this study, your Study Doctor or the study staff will explain why.



MAYO
CLINIC

| Name and Clinic Number |
| --- |

**Approval Date:**        February 27, 2015
**Not to be used after:**  February 26, 2016

It is also possible that, at the time you complete these tests, there may not be an available dosing slot open in the dosing level being studied, and you may have to wait to enter the treatment phase of the study. If this happens, then the study doctor or study staff will let you know when you can begin the treatment phase of the study. It is possible that some of the screening tests may need to be repeated at that time.

The study doctor will let you know how many times you may have to come to the study center for your screening tests. This will depend on whether you have already had some of the screening tests recently.

The screening tests are described below:

- Health and Medication Questions: You will be asked about your health history and medications you are taking, including prescription, over-the-counter and herbal medicines.
- A physical exam will be performed, including measurements of your height, weight, and vital signs (blood pressure, pulse, breathing rate and temperature)
- Performance Status: You will be asked how well you are able to perform the normal activities of daily living.
- You will have an "ECG" or "electrocardiogram". This is a test that measures the electrical activity of your heart.
- You will have an "ECHO" or "echocardiogram". This is a test that uses sound waves to create a moving picture of your heart.
- Blood Tests: some blood (see below for quantity) will be taken to do laboratory tests.
- Some of your blood will be used to check on your health, for routine laboratory tests such as blood chemistries (testing for levels of things in your blood like potassium, chloride), blood counts (counting parts of the blood like red blood cells and white blood cells) and check on liver and kidney function, and blood clotting ability.
- If you are a woman and can become pregnant, you will have a blood pregnancy test. The results of the pregnancy test must be negative in order for you to be in the study.
- ACTH stimulation testing: you will get a small injection of a hormone and then have a small amount of blood drawn 30 and 60 minutes thereafter. This testing is done to check the ability of your adrenal glands to produce cortisol. Cortisol is a hormone that helps to support many of the body's functions, including reactions to physical stress.
- Some of your bone marrow sampled in this manner may be used for biomarker testing. This testing is designed to see how CPI-0610 acts on your bone marrow cells. You will read more about biomarker testing in the section below, entitled "Testing for Biomarkers."
- Some blood will be drawn to look at parts of your DNA sequence which might affect the way your body eliminates CPI-0610 (called pharmacogenetics). You will read more about biomarker testing in the section below titled, "Testing for Biomarkers."



MAYO CLINIC

| | Name and Clinic Number |

**Approval Date:** February 27, 2015
**Not to be used after:** February 26, 2016

- Myeloma Assessments: your myeloma will be examined using the following tests.
  - Bone Marrow Aspiration and/or Biopsy: a bone marrow aspiration is a procedure that removes a small amount of bone marrow fluid and cells through a needle put into a bone. A bone marrow biopsy is a procedure that removes a small piece of bone with the marrow inside to look at under a microscope. The bone marrow fluid and cells are checked for problems with any of the blood cells made in the bone marrow.
  - Blood tests can be used to diagnose myeloma, assess if organs are working well and check the results of cancer treatments. Blood tests can also be used to assess the amount of myeloma in the body, sometimes referred to as the "tumor burden."

CPI-0610 Treatment Period:
If you are eligible and agree to receive CPI-0610, you will need to come to the study site at various times to have procedures done. These procedures and schedule are described below. Your study doctor may ask you to return to the study site for unscheduled visits if needed to check your health or to repeat a procedure.

During Cycle 1, Day 1, the following tests and procedures will occur:
- After you arrive at the clinic, your study doctor will tell you when to take the first dose of CPI-0610. Before you take the first dose there will be a number of procedures and tests performed.
- You will be asked about how you are feeling and any medications you have taken since the last visit (including prescription, over-the-counter and herbal medicines).
- Physical exam (Does not need to be repeated on Day 1 if it was done within the preceding 72 hours)
- Vital signs
- Performance Status
- You will have 5 sets of ECGs performed: before you take CPI-0610, and 1, 2, 4, and 6 hours after you take CPI-0610. Your vital signs will be checked at the same time that these ECGs are performed.
- Blood Tests: some blood will be taken to do laboratory tests.
  - Some of your blood will be used to check on your health, for routine laboratory tests such as blood chemistries, blood counts and to check on liver and kidney function. (Does not need to be repeated on Day 1 if it was done within the preceding 72 hours)
  - If you are a woman and can become pregnant, you will have a blood pregnancy test. The results of the pregnancy test must be negative in order for you to continue in the study. (Does not need to be repeated on Day 1 if it was done within the preceding 72 hours)



MAYO
CLINIC

| Name and Clinic Number |

**Approval Date:** February 27, 2015
**Not to be used after:** February 26, 2016

- Some of your blood will be used for pharmacokinetic testing. This testing determines the levels of CPI-0610 in the bloodstream and shows how long CPI-0610 stays in your body. Ten small blood samples will be drawn over the course of 24 hours for this type of testing. You will need to return for a brief clinic visit for the 24 hour sample draw. Remember that you should not take the second dose of CPI-0610 before you have had this 24 hour sample draw. Ask the study doctor if you have any questions about providing blood samples for this testing.
- Some of your blood will be used for biomarker testing. Four small blood samples will be drawn over the course of 8 hours for this testing (at the same time some of the pharmacokinetic samples are drawn). This testing shows how CPI-0610 acts in your blood. You will read more about biomarker testing in the section below titled, "Testing for Biomarkers."
- Your study doctor or nurse will provide you with a bottle of CPI-0610 and a study diary to take home. You will record when you take CPI-0610 in your study diary. Bring your bottle of CPI-0610 and your study diary with you to every clinic visit.

Cycle 1, on Day 8 (of the 21 day cycle), the following tests and procedures will occur:
- After you arrive at the clinic, your study doctor will tell you when to take that day's dose of CPI-0610.
- You will be asked about how you are feeling and any medications you have taken since the last visit (including prescription, over-the-counter and herbal medicines). The study staff may contact you by phone for this.
- You will have 5 sets of ECGs performed: before you take CPI-0610, and 1, 2, 4, and 6 hours after you take CPI-0610. Your vital signs will be checked at the same time that these ECGs are performed.
- Blood Tests: Some blood will be taken to do laboratory tests.
  - Some of your blood will be used to check on your health, for routine laboratory tests such as blood chemistries, blood counts and to check on liver and kidney function. Some blood will be drawn for pharmacokinetic testing. One sample will be drawn on Day 8 before you receive that day's dose of CPI-0610.
  - Some of your blood may be used for biomarker testing. One sample will be drawn on Day 8 prior to when you receive your dose of CPI-0610.
  - You will record when you take CPI-0610 in your study diary. Bring your bottle of CPI-0610 and your study diary with you to every clinic visit.



MAYO
CLINIC

Name and Clinic Number

**Approval Date:**          **February 27, 2015**
**Not to be used after:**   **February 26, 2016**

During Cycle 1, between Days 8 and 13 (of the 21 day cycle), the following tests and procedures will occur:

- After you arrive at the clinic, your study doctor will tell you when to take the first dose of CPI-0610.
- You will be asked about how you are feeling and any medications you have taken since the last visit (including prescription, over-the-counter and herbal medicines). The study staff may contact you by phone for this.
- Bone Marrow Biopsy and Aspiration: your bone marrow biopsy and aspirate will be collected 2 to 6 hours after dosing with CPI-0610, between Days 8 and 13 of the 21 day cycle.
- Blood Tests:
  - One blood sample will be drawn for pharmacokinetic testing shortly before you have the bone marrow aspiration and biopsy performed.
  - Another blood sample will be drawn for biomarker testing at the same time.
- You will record when you take CPI-0610 in your study diary. Bring your bottle of CPI-0610 and your study diary with you to every clinic visit.

During Cycle 1, Day 14 (of the 21 day cycle), the following tests and procedures will occur:

- After you arrive at the clinic, your study doctor will tell you when to take that day's dose of CPI-0610.
- You will be asked about how you are feeling and any medications you have taken since the last visit (including prescription, over-the-counter and herbal medicines).
- You will have 5 sets of ECGs performed: before you take CPI-0610, and 1, 2, 4, and 6 hours after you take the CPI-0610. Your vital signs will be checked at the same time that these ECGs are performed.
- Blood Tests: Some blood will be taken to do laboratory tests.
  - Some of your blood will be used to check on your health, for routine laboratory tests such as blood chemistries, blood counts and to check on liver and kidney function.
  - Some of your blood will be used for pharmacokinetic testing. Ten small blood samples will be drawn over the course of 24 hours for this type of testing. You will need to return for a brief clinic visit for the 24 hour sample draw. Ask the study doctor if you have any questions about providing blood samples for this testing.
  - Some of your blood will be used for biomarker testing. Four small blood samples will be drawn over the course of 8 hours for this testing (at the same time some of the pharmacokinetic samples are drawn). This testing shows how CPI-0610 acts in your blood. You will read more about biomarker testing in the section below titled, "Testing for Biomarkers."



MAYO
CLINIC

| Name and Clinic Number |
|---|

**Approval Date:**       February 27, 2015
**Not to be used after:**       February 26, 2016

- You will record when you take CPI-0610 in your study diary.  Bring your bottle of CPI-0610 and your study diary with you to every clinic visit.

During Cycle 1, between Days 15 and 19 (of the 21 day cycle), the following tests and procedures will occur:
- You will be asked about how you are feeling and any medications you have taken since the last visit (including prescription, over-the-counter and herbal medicines).
- Blood Tests:  Some blood will be taken to do laboratory tests.
  - Some of your blood will be used for pharmacokinetic testing.  (You will be scheduled to come in for a brief clinic visit on each of these days for a blood sample draw)
  - Some of your blood may be used for biomarker testing.  (One additional sample on Days 17 and 19 (of the 21 day cycle).)
  - Some of your blood will be drawn to assess the amount of myeloma in your body. Most myelomas produce abnormal proteins that can be measured in blood samples, and the amount of these abnormal proteins increases or decreases with the number of myeloma cells in the body. Blood tests for measurement of myeloma proteins will be measured after each cycle of therapy has been completed.

You will not be taking CPI-0610 during these days.

Once you have completed a cycle, if you are eligible to continue in the study, you will begin the next cycle.

During Day 1 of Cycle 2 and subsequent cycles, the following tests and procedures will occur:
- After you arrive at the clinic, your study doctor will tell you when to take that day's dose of CPI-0610.
- You will be asked about how you are feeling and any medications you have taken since the last visit (including prescription, over-the-counter and herbal medicines).
- Physical exam and vital signs
- Performance Status
- ECG
- Blood Tests: some blood will be taken to do laboratory tests.
  - Some of your blood will be used to check on your health, for routine laboratory tests such as blood chemistries, blood counts and to check on liver and kidney function.
  - If you are a woman and can become pregnant, you will have a blood pregnancy test.  The results of the pregnancy test must be negative in order for you to continue in the study.


MAYO
CLINIC

Name and Clinic Number

**Approval Date:**      February 27, 2015
**Not to be used after:**   February 26, 2016

- Some of your blood will be used for pharmacokinetic testing. One blood sample will be drawn before you take your daily dose. (Cycle 2 only)
- Some of your blood will be used for biomarker testing. One blood sample will be drawn before you take your daily dose. (Cycle 2 only)
- Your study doctor or nurse will provide you with a bottle of CPI-0610 to take home. You will record when you take CPI-0610 in your study diary. Bring your bottle of CPI-0610 and your study diary with you to every clinic visit.

During Cycle 2 and subsequent cycles, on Day 8 (of the 21 day schedule), the following tests and procedures will occur:
- You will be asked about how you are feeling and any medications you have taken since the last visit (including prescription, over-the-counter and herbal medicines).
- Blood Tests: some blood will be taken to check on your health, for routine laboratory tests such as blood chemistries, blood counts and to check on liver and kidney function.

During Cycle 2 and subsequent cycles, between Days 15 and 21 (of the 21 day schedule), the following tests and procedures will occur:
- You will be asked about how you are feeling and any medications you have taken since the last visit (including prescription, over-the-counter and herbal medicines). The study staff may contact you by phone for this.
- ACTH stimulation testing to check the ability of the adrenal gland to make cortisol, at the end of Cycles 2, 4, 6, and then every 4 cycles.
- ECHO scan to check your heart at the end of Cycles 2, 4, 6, and then every 4 cycles.
- Blood Tests:
  - Some blood will be taken to check on your health, for routine laboratory tests such as blood chemistries, blood counts and to check on liver and kidney function.
  - Some of your blood will be drawn to assess the amount of myeloma in your body. Blood tests for measurement of myeloma proteins will be measured after each cycle of therapy has been completed.

You will not be taking CPI-0610 during these days, but you should bring your bottle of CPI-0610 and your study diary with you to every clinic visit.



MAYO
CLINIC

| | |
|---|---|
| | **Name and Clinic Number** |

**Approval Date:**        **February 27, 2015**
**Not to be used after:**   **February 26, 2016**

End-of-Study/Early Termination Visit:
Upon discontinuation of CPI-0610 for any reason, you will be asked to complete an End-of-Study/Early Termination Visit no later than 30 days after your last dose of CPI-0610. The following assessments should be completed at the End–of-Study/Early Termination Visit:

You will be asked about how you are feeling and any medications you have taken since the last visit (including prescription, over-the-counter and herbal medicines).
- Physical exam
- Performance Status
- If you are a woman and can become pregnant, you will have a blood pregnancy test.
- Cancer Assessments:
- Some of your blood may be drawn to assess the amount of myeloma in your body.
- If you complete this End-of-Study Visit earlier than 30 days after your last dose of CPI-0610, the study staff will call you around the 30th day to ask how you are feeling.

Follow-up Contact(s) or Visit(s):
In certain cases, your study doctor or study staff may continue to contact you or ask you to return to the clinic over an extended period of time after your last CPI-0610 dose. This "follow-up" would be done to evaluate your health and disease status, and your study doctor or study staff would explain the exact purposes and follow-up schedule to you.

Blood Samples:
The approximate volume of blood collected from each patient will be up to 40 mL (about 8 teaspoons) during Screening, up to 255 mL (about 51 teaspoons) during Cycle 1 and up to 62 mL (about 12 ½ teaspoons) during each subsequent cycle.

If multiple samples are drawn on the same day, they will be drawn by the safest and easiest method.   A small flexible plastic catheter (tube) may be placed in your arm so that the blood can be drawn for testing without additional "needle sticks".

Testing for Biomarkers
As part of this study, the study doctor will collect your blood and bone marrow biopsies/aspirates for biomarker testing.  Biomarkers are assessments of genes or proteins that may predict or show how your body may respond to CPI-0610.  All of the cells of your body contain a molecule called deoxyribonucleic acid (DNA).  DNA is received from your parents and carries a code, in the form of genes, which determines your physical characteristics such as the color of your hair and eyes.  Just as differences in our genetic code help explain why we all look different; cancer cells have different codes to explain how they work.  A protein is a compound made by the genes in the body.  Proteins are used in many different functions, such as immunity and digestion.


MAYO
CLINIC

| | Name and Clinic Number |
|---|---|

**Approval Date:**      February 27, 2015
**Not to be used after:**   February 26, 2016

Differences in genes or proteins can help explain why some drugs have side effects and are useful in treating cancer for some people but not for others.

---

## 6.   What are the possible risks or discomforts from being in this research study?

---

You will be monitored for possible side effects during the study. You should contact your study doctor or your health care provider as soon as possible if you think you are having a medical problem, side effect, or a change in your medical condition or health. You should talk to the study doctor if you have any questions.

Risks of CPI-0610
The risks and discomforts related to CPI-0610 are not well known. You will be closely watched by your study staff for any side effects or reactions during the study. It is important that you notify your study doctor if you have complaints, or if unusual symptoms occur while you are participating in this study.

Studies in animals suggest that CPI-0610 may have a number of different side effects. In the animal studies most of these side effects resolved over a period of several weeks when treatment with CPI-0610 was stopped. If these same side effects occur in patients it may be necessary to stop treatment with CPI-0610 and provide additional medical treatment while waiting for them to resolve. Some of the possible additional medical treatments are described in the paragraphs below. It is also possible that the treatment of side effects could require hospitalization.

CPI-0610 decreases the number of lymphocytes (a type of white blood cell) in lymph nodes and other tissues, and this may decrease an individual's ability to fight off certain types of infection. CPI-0610 also decreases the bone marrow's production of blood cells, and a reduction in some of these cells can also increase the risk of infection. Your doctor and study staff will monitor you closely for any evidence of an infection, and if an infection is identified you may need to be treated with an antibiotic.

CPI-0610's interference with the production of blood cells by the bone marrow also decreases the number of red blood cells and the number of platelets. A decrease in red blood cells is called anemia, and it can cause fatigue and shortness of breath. A decrease in platelets can increase the risk of bleeding. These problems may be temporarily addressed by giving transfusions of red blood cells or platelets, respectively, if needed.



MAYO
CLINIC

Name and Clinic Number

**Approval Date:**        **February 27, 2015**
**Not to be used after:** **February 26, 2016**

CPI-0610 also causes damage to the lining of the gastrointestinal tract. This could cause mouth sores, difficulty or pain with swallowing, abdominal pain, nausea, vomiting, and diarrhea. If severe, the damage to the lining of the gastrointestinal tract could also result in bleeding and infection. Your doctor will carefully monitor you for these types of side effects. In addition to interrupting treatment with CPI-0610 it may be necessary to provide intravenous fluids to prevent dehydration. Anti-nausea and ant-diarrheal medications may be used as well.

CPI-0610 has been observed to cause increases in blood levels of glucose (the main form of sugar). For this reason patients who have diabetes mellitus will not be allowed to participate in this study. High levels of blood glucose can cause dehydration, with excessive thirst and urination, and if extremely high can also cause patients to become confused. Therefore blood glucose levels will be measured frequently while patients are being treated with CPI-0610. If the blood glucose level is considered to be dangerously high, treatment with CPI-0610 will be interrupted.

CPI-0610 interferes with the normal production of sperm by the testicles. Although it is expected that this side effect is reversible, its reversibility has not been show in animal studies. Therefore, it is possible that CPI-0610 treatment could have long term effects on a man's fertility.

A compound related to CPI-0610 was found to cause damage to the heart and to the adrenal glands in mice, but not in rats or dogs. Although there is no evidence that CPI-0610 causes damage to the heart or to the adrenal glands, as a precautionary measure you will undergo special testing to monitor the function of the heart and the adrenal glands.

It is possible that CPI-0610 may interact with other medications (including prescription, over-the-counter and herbal medicines) you are taking. It is important that you inform your study doctor of all medications and supplements you are taking at each visit.

CPI-0610 may have side effects that no one knows about yet. Many side effects from drugs go away when the treatment is stopped, but in some cases, it is possible that the side effects could be serious, long lasting, permanent, or even fatal.

Your study doctor will let you know if he or she learns anything new about the safety of the drug or any new findings. You can then decide if you would like to continue taking part in this study.

Treatment with CPI-0610 may involve currently unforeseeable risks, including risks to an unborn child (an embryo or a fetus) in a pregnant woman, or to children of nursing women. Before the study begins, a pregnancy test will be done for all female participants who have the potential to become pregnant. This test, however, might not detect a pregnancy until 7 days after conception. Therefore, you will agree to use a medically acceptable method of contraception (such as a condom or a diaphragm) both during the study and for 90 days after the end of the


MAYO
CLINIC

| Name and Clinic Number |
| --- |

**Approval Date:** February 27, 2015
**Not to be used after:** February 26, 2016

study. If you are pregnant or nursing or could become pregnant during the study, you or your child may be exposed to additional unknown risks. If you or your spouse or partner become pregnant or suspect that you have become pregnant during the study, notify the study doctor immediately.

Risks of Study Procedures

Blood Drawing: Placement of a tube or needle in your vein to draw blood is associated with some immediate pain at the time of insertion. Although uncommon, continued pain, bruising, bleeding, or infection can occur.

Bone Marrow Aspirate / Biopsy: A small sample of bone marrow is taken usually from the hip (pelvis) bone. You will be given a small injection to numb the area. A special type of needle will be passed through the skin into the bone. A small sample of the bone marrow is then drawn into a syringe. It may be painful, but this only lasts for a short time. You may be offered medication to reduce any pain or discomfort during the test. There is a risk of continued pain, bruising, scarring, and rarely, infection or severe bleeding at the site of this needle stick.

ECG: This is a recording of the electrical activity of your heart and is harmless. The sticky pads used may be cold when applied and sometimes cause some discomfort such as redness or itching.

ECHO: This is a test that uses sound waves to create a moving picture of your heart. The sticky pads used may be cold when applied and sometimes cause some discomfort such as redness or itching.

---

## 7.     Are there reasons you might leave this research study early?

---

You may decide to stop at any time. You should tell the Principal Investigator if you decide to stop and you will be advised whether any additional tests may need to be done for your safety.

In addition, the Principal Investigator, the study sponsor, or Mayo Clinic may stop you from taking part in this study at any time:
- o   if it is in your best interest,
- o   if you don't follow the study procedures,
- o   if the study is stopped, even if you wish to continue



MAYO
CLINIC

| Name and Clinic Number |

**Approval Date:**      February 27, 2015
**Not to be used after:**   February 26, 2016

If you leave this research study early, or are withdrawn from the study, no more information about you will be collected; however, information already collected about you in the study may continue to be used.

We will tell you about any new information that may affect your willingness to stay in the research study.

---

## 8.   What if you are injured from your participation in this research study?

---

**Where to get help:**

If you think you have suffered a research-related injury, you should promptly notify the Principal Investigator listed in the Contact Information at the beginning of this form. Mayo Clinic will offer care for research-related injuries, including first aid, emergency treatment and follow-up care as needed.

**Who will pay for the treatment of research related injuries:**

The Sponsor Constellation Pharmaceuticals will offer to pay for medical treatment of research-related injuries directly resulting from the proper application of the study drug CPI 0610.  The Sponsor may decide not to pay for several reasons.   The Sponsor may not pay if the Sponsor concludes the injury happened because you did not follow the study directions or the injury resulted from your actions.   The Sponsor may not consider the worsening of an existing health condition to be a research-related injury. In the case of injury resulting from your participation in this study, you do not lose any of your legal rights to seek payment by signing this form. Contact the Principal Investigator, who can help you obtain this reimbursement.

---

## 9.   What are the possible benefits from being in this research study?

---

There may or may not be medical benefit to you.  Other people may benefit from the information that is learned in this study.  This study may help to develop a new therapy for others with a similar condition.



MAYO
CLINIC

| | Name and Clinic Number |
|---|---|

**Approval Date:** February 27, 2015
**Not to be used after:** February 26, 2016

## 10. What alternative do you have if you choose not to participate in this research study?

There may be other ways to treat your cancer, or you may choose to have no treatment at all. Your study doctor can discuss your different treatment options and the potential benefits and risks of each option.

## 11. What tests or procedures will you need to pay for if you take part in this research study?

You won't need to pay for tests and procedures which are done just for this research study. These tests and procedures are:
- Electrocardiograms after starting treatment
- Echocardiograms after starting treatment
- ACTH Stimulation test (measures how your adrenal glands are working)
- PT/INR and Partial thromboplastin time (measures how thin your blood is)
- Research blood tests
- Bone marrow biopsy and aspiration for research testing at Cycle 1 Day 8
- Investigational drug – CPI-0610

However, you and/or your insurance will need to pay for all other tests and procedures that you would have as part of your clinical care, including co-payments and deductibles.
- Physical examinations
- Electrocardiogram prior to starting treatment (Screening visit)
- Echocardiogram prior to starting treatment (Screening visit)
- Pregnancy test if you are a woman of child bearing potential
- Routine blood and urine tests used to monitor your multiple myeloma
- Bone marrow biopsy and aspiration at screening and to confirm response to treatment

If you have billing or insurance questions call Research Billing at the telephone number provided in the "Contact Information" section of this form.



MAYO CLINIC

| | Name and Clinic Number |
|---|---|

Approval Date:        February 27, 2015
Not to be used after:  February 26, 2016

## 12.    Will you be paid for taking part in this research study?

You will not be paid to take part in this study. However, you will be reimbursed, upon providing original receipts, for reasonable costs to travel as follows:

- For only those participants who travel in excess of 50 miles one way (>100 miles round trip), mileage will be reimbursed at @ 24 cents per driven mile:  Your reimbursement for travel is calculated based on the actual round trip miles you travel from your home address to the site address and back as determined by a web-based mileage calculator (e.g., MapQuest). This distance in miles will be documented in your study file.  You will receive reimbursement at the rate of $0.24 per mile.
- Hotel Parking  up to $20.00 per visit
- Overnight hotel accommodations, for those travelling in excess of 50 miles one way, up to $150.00 dollars per visit provided the stay is study related.
- There will be no meal reimbursement.

## 13.    What will happen to your samples?

Your study doctor and the study staff will collect samples from you as described in this informed consent form.  Your samples will be sent to the Sponsor and or third parties working with the sponsor.  The Sponsor can use your samples for research purposes only as described in the research study.  Your sample will be sent to the Sponsor in a coded format, which protects your identity. Mayo Clinic may destroy the sample at any time without telling you. By signing this informed consent form, you are allowing your study doctor and study staff to provide these samples to the sponsor and third parties working with the sponsor.



MAYO
CLINIC

| | Name and Clinic Number |
| --- | --- |

**Approval Date:**          February 27, 2015
**Not to be used after:**   February 26, 2016

---

## 14.    How will your privacy and the confidentiality of your records be protected?

---

Mayo Clinic is committed to protecting the confidentiality of information obtained about you in connection with this research study.

In order to maintain your privacy, all eCRFs, study drug accountability records, study reports and communications will identify the patient by initials where permitted and/or by the assigned patient number. The investigator will grant monitor(s) and auditor(s) from Constellation or its designee and regulatory authority (ies) access to the patient's original medical records for verification of data collected on the eCRFs and to audit the data collection process. The patient's confidentiality will be maintained in accordance with all applicable laws and regulations.

During this research, information about your health will be collected.  Under Federal law called the Privacy Rule, health information is private.  However, there are exceptions to this rule, and you should know who may be able to see, use and share your health information for research and why they may need to do so.  Information about you and your health cannot be used in this research study without your written permission.  If you sign this form, it will provide that permission.

**Health information may be collected about you from:**
- Past, present and future medical records.
- Research procedures, including research office visits, tests, interviews and questionnaires.

**Why will this information be used and/or given to others?**
- To do the research.
- To report the results.
- To see if the research was done correctly.

If the results of this study are made public, information that identifies you will not be used.

**Who may use or share your health information?**
- Mayo Clinic research staff involved in this study.
- The sponsor of this study (Constellation Pharmaceuticals) and its representatives, including the clinical research organizations that manage the study



MAYO
CLINIC

Name and Clinic Number

**Approval Date:**       February 27, 2015
**Not to be used after:**  February 26, 2016

## With whom may your health information be shared?

- The Mayo Clinic Institutional Review Board that oversees the research.
- Other Mayo Clinic physicians involved in your clinical care.
- Researchers involved in this study at other institutions.
- Federal and State agencies (such as the Food and Drug Administration, the Department of Health and Human Services, the National Institutes of Health and other United States agencies) or government agencies in other countries that oversee or review research.
- The sponsor(s) of this study and the people or groups it hires to help perform this research.
- A group that oversees the data (study information) and safety of this research.

## Is your health information protected after it has been shared with others?

Mayo Clinic asks anyone who receives your health information from us to protect your privacy; however, once your information is shared outside Mayo Clinic, we cannot promise that it will remain private and it may no longer be protected by the Privacy Rule.

## Your Privacy Rights

You do not have to sign this form, but if you do not, you cannot take part in this research study.

If you cancel your permission to use or share your health information, your participation in this study will end and no more information about you will be collected; however, information already collected about you in the study may continue to be used.

If you choose not to take part or if you withdraw from this study, it will not harm your relationship with your own doctors or with Mayo Clinic.

You can cancel your permission to use or share your health information at any time by sending a letter to the address below:

Mayo Clinic
Office for Human Research Protection
ATTN: Notice of Revocation of Authorization
200 1st Street SW
Rochester, MN  55905

Alternatively, you may cancel your permission by emailing the Mayo Clinic Research Subject Advocate at: researchsubjectadvocate@mayo.edu



MAYO
CLINIC

1035532

| | Name and Clinic Number |

**Approval Date:** February 27, 2015
**Not to be used after:** February 26, 2016

Please be sure to include in your letter or email:
- The name of the Principal Investigator,
- The study IRB number and /or study name, and
- Your contact information.

Your permission lasts until the end of this study, unless you cancel it.  Because research is an ongoing process, we cannot give you an exact date when the study will end.

---

## ENROLLMENT AND PERMISSION SIGNATURES

---

**Your signature documents your permission to take part in this research.**

_Iris R. Spedale_        12/1/2015        12:39        A̶M̶/(PM)
Printed Name                    Date                    Time

_Iris R. Spedale_ (signature)
Signature

**Person Obtaining Consent**
- I have explained the research study to the participant.
- I have answered all questions about this research study to the best of my ability.

_Charnjit Singh_   12/1/15        12:40        AM/(PM)
Printed Name                    Date                    Time

_(signature)_
Signature

MCS 7371

Hematology Subsequent Visit
* Final Report *

SPEDALE, IRIS R - 05-917-191-8

---

Result Type:        Hematology Subsequent Visit
Result Date:         10-Dec-2015 00:00 MST
Result Status:       Auth (Verified)
Performed By:       Bergsagel MD, Peter on 20-Jan-2016 15:29 MST
Verified By:         Bergsagel MD, Peter on 21-Jan-2016 14:45 MST
Encounter info:      1035532, Mayo Clinic in Arizona, MCA Patient, 02-Nov-2001 -

# * Final Report *

**Mayo Clinic in Arizona**
**CLINICAL NOTES**

Patient Name: Spedale, Iris R Mrs.          Service Date: 12/10/2015
Medical Record Number: 59171918           Facility Name: MCA
DOB: November 20, 1942                  Provider Name: P. Leif Bergsagel, M.D.
Age: 73                              Account Number: 1035532
Service: Hematology                    Visit Type: Subsequent Visit

CHIEF COMPLAINT / REASON FOR VISIT:
t(14;16) kappa light chain multiple myeloma, relapsed, to start day-1 clinical trial with BET inhibitor CPI-0610.

HISTORY OF PRESENT ILLNESS:
The patient was seen last week and has undergone workup in order to start the clinical trial. She feels well and has no
complaints referable to multiple myeloma and is prepared to start treatment.

CURRENT MEDICATIONS:
Prescriptions
Prescribed
Boniva 150 mg oral tablet: 150 mg, 1 Tab, PO, Q30Days, 3 Tab
Lab Tests: 1 Each, MISC, Daily, INR/Protime STAT daily DX anticoagulant therapy ICD-9 code V58.61. Fax results to
480-301-7047, 180 Each, PRN: Anticoagulation
Lab Tests: 1 Each, MISC, Daily, INR/Protime daily STAT. Ok for pt to have fingerstick if available. Dx: anticoagulation
therapy. ICD-9 code: V58.61 & PE. Fax results to 480-301-7047, 180 Each
Restasis 0.05% ophthalmic emulsion: 1 Drop, EYE BOTH, BID, 90 Day Supply, 180 Vial
Vicodin 5 mg-300 mg oral tablet: 1 Tab, PO, Q6H, for 10 Day(s), Sciatica pain, PRN: Pain Moderate, 40 Tab, 0 Refill(s)
Zantac 150 oral tablet: 150 mg, 1 Tab, PO, BID, for 30 Day(s), while on prednisone to protect stomach, 60 Tab, 0 Refill(s)
warfarin 5 mg oral tablet: 5 mg, 1 Tab, PO, QHS, 30 Tab
Documented Medications
Documented
Flexeril: PO, TID, 0 Refill(s)
Metamucil: 1tbsp, PO, Daily, in am
POLYETHYLENE GLYCOL PWD (MIRALAX): 17 g, PO, QHS, dissolve in water or juice
Vitamin D3 5000 intl units oral tablet: 5,000 IU, 1 Tab, PO, Daily, afternoon
aspirin 81 mg oral enteric coated tablet: 81 mg, 1 Tab, PO, Daily, in am
predniSONE: PO, Daily, 0 Refill(s).

Printed by:     Hanson, Amber L.
Printed on:     08-Dec-2017 08:15 MST



Hematology Subsequent Visit
* Final Report *

SPEDALE, IRIS R - 05-917-191-8

---

ALLERGIES:
This patient is allergic to Daypro, Naprosyn, ibuprofen, and Celebrex, as well as iodine, and shellfish.

PAST MEDICAL/SURGICAL HISTORY:
Past Medical History:
1. Mrs. Spedale was treated for amyloidosis with an autologous stem cell transplant in November of 2009. Before that, she received induction with CyBorD chemotherapy. She was first noted to have macroglossia which ultimately led to the diagnosis of amyloidosis. She also had evidence of submandibular gland enlargement. The patient was originally diagnosed in the summer of 2008. Patient had to be restarted on therapy with CyBorD in the summer of 2013 and completed that by year's end. Because of that the patient achieved an excellent response but the therapy ultimately had to be stopped because of gastrointestinal toxicity. I did discuss with the patient again the possibility of a stem cell transplant but she opted for a maintenance strategy with Revlimid. She took Revlimid for about 3 months but ultimately developed DVT with associated pulmonary embolism.
2. History of pathologic multiple myeloma in her bone marrow associated with translocation 14;16.
3. Macroglossia.

SOCIAL HISTORY:
She is married. She was trained as an attorney, but was working in business development and sales. She smoked half a pack per day for five years and then quit. She has one child and one stepchild. No alcohol or drugs.

PHYSICAL EXAM:
General: Healthy-appearing elderly woman.
Chest: Clear.
Heart: Heart sounds are normal.
Extremities: Without edema.
ECOG Score: 0.

IMPRESSION/REPORT/PLAN:
Clinical Impression: t(14;16) kappa light chain multiple myeloma, day-1 CPI-0610.


PLB/sw

DD: 01/20/2016  15:26
DT: 01/21/2016  06:27


**Completed Action List:**
* Transcribe by West, Susan L on 21-Jan-2016 06:27 MST
* Sign by Bergsagel MD, Peter on 21-Jan-2016 14:45 MSTRequested on 21-Jan-2016 06:35 MST
* Verify by Bergsagel MD, Peter on 21-Jan-2016 14:45 MST

---



## Document info

| | |
|---|---|
| Result type: | Hematology Subsequent Visit |
| Result date: | Dec 10, 2015, 12:00 a.m. |
| Result status: | authenticated |
| Modified by: | Peter Bergsagel |

| Patient: | SPEDALE, IRIS R | DOB: | Nov 20, 1942 |
|---|---|---|---|

**Mayo Clinic in Arizona**
**CLINICAL NOTES**

Patient Name: Spedale, Iris R Mrs.
Medical Record Number: 59171918
DOB: November 20, 1942
Age: 73
Service: Hematology

Service Date: 12/10/2015
Facility Name: MCA
Provider Name: P. Leif Bergsagel, M.D.
Account Number: 1035532
Visit Type: Subsequent Visit

CHIEF COMPLAINT / REASON FOR VISIT:
t(14;16) kappa light chain multiple myeloma, relapsed, to start day-1 clinical trial with BET inhibitor CPI-0610.

HISTORY OF PRESENT ILLNESS:
The patient was seen last week and has undergone workup in order to start the clinical trial. She feels well and has no complaints referable to multiple myeloma and is prepared to start treatment.

CURRENT MEDICATIONS:
Prescriptions
Prescribed
Boniva 150 mg oral tablet: 150 mg, 1 Tab, PO, Q30Days, 3 Tab
Lab Tests: 1 Each, MISC, Daily, INR/Protime STAT daily DX anticoagulant therapy ICD-9 code V58.61.
Fax results to 480-301-7047, 180 Each, PRN: Anticoagulation
Lab Tests: 1 Each, MISC, Daily, INR/Protime daily STAT. Ok for pt to have fingerstick if available. Dx: anticoagulation therapy. ICD-9 code: V58.61 & PE. Fax results to 480-301-7047, 180 Each
Restasis 0.05% ophthalmic emulsion: 1 Drop, EYE BOTH, BID, 90 Day Supply, 180 Vial
Vicodin 5 mg-300 mg oral tablet: 1 Tab, PO, Q6H, for 10 Day(s), Sciatica pain, PRN: Pain Moderate, 40 Tab, 0 Refill(s)
Zantac 150 oral tablet: 150 mg, 1 Tab, PO, BID, for 30 Day(s), while on prednisone to protect stomach, 60 Tab, 0 Refill(s)
warfarin 5 mg oral tablet: 5 mg, 1 Tab, PO, QHS, 30 Tab
Documented Medications
Documented
Flexeril: PO, TID, 0 Refill(s)
Metamucil: 1tbsp, PO, Daily, in am
POLYETHYLENE GLYCOL PWD (MIRALAX): 17 g, PO, QHS, dissolve in water or juice
Vitamin D3 5000 intl units oral tablet: 5,000 IU, 1 Tab, PO, Daily, afternoon
aspirin 81 mg oral enteric coated tablet: 81 mg, 1 Tab, PO, Daily, in am
predniSONE: PO, Daily, 0 Refill(s).

ALLERGIES:
This patient is allergic to Daypro, Naprosyn, ibuprofen, and Celebrex, as well as iodine, and shellfish.

PAST MEDICAL/SURGICAL HISTORY:
Past Medical History:
1. Mrs. Spedale was treated for amyloidosis with an autologous stem cell transplant in November of 2009. Before that, she received induction with CyBorD chemotherapy. She was first noted to have macroglossia which ultimately led to the diagnosis of amyloidosis. She also had evidence of submandibular gland enlargement. The patient was originally diagnosed in the summer of 2008. Patient had to be restarted on therapy with CyBorD in the summer of 2013 and completed that by year's end. Because of that the patient achieved an excellent response but the therapy ultimately had to be stopped because of gastrointestinal toxicity. I did discuss with the patient again the possibility of a stem cell transplant but she opted for a maintenance strategy with Revlimid. She took Revlimid for about 3 months but ultimately developed DVT with associated pulmonary embolism.
2. History of pathologic multiple myeloma in her bone marrow associated with translocation 14;16.
3. Macroglossia.

SOCIAL HISTORY:
She is married. She was trained as an attorney, but was working in business development and sales. She smoked half a pack per day for five years and then quit. She has one child and one stepchild. No alcohol or drugs.

PHYSICAL EXAM:
General: Healthy-appearing elderly woman.
Chest: Clear.
Heart: Heart sounds are normal.
Extremities: Without edema.
ECOG Score: 0.

IMPRESSION/REPORT/PLAN:
Clinical Impression: t(14;16) kappa light chain multiple myeloma, day-1 CPI-0610.


PLB/sw

DD: 01/20/2016  15:26
DT: 01/21/2016  06:27

Hematology Miscellaneous Note                                    SPEDALE, IRIS R - 05-917-191-8
* Final Report *

| | |
|---|---|
| Result Type: | Hematology Miscellaneous Note |
| Result Date: | 18-Jan-2016  00:00 MST |
| Result Status: | Auth (Verified) |
| Performed By: | Fonseca MD, Rafael on  18-Jan-2016  11:42 MST |
| Verified By: | Fonseca MD, Rafael on  18-Jan-2016  15:05 MST |
| Encounter info: | 1035532, Mayo Clinic in Arizona, MCA Patient, 02-Nov-2001 - |

# * Final Report *

**Mayo Clinic in Arizona**
**Clinical Notes**

Patient Name:  Spedale, Iris R Mrs.                Service Date:  01/18/2016
Medical Record Number:  59171918               Facility Name:  MCA
DOB:  November 20, 1942                        Provider Name:  Rafael Fonseca, M.D.
Age:  73                                        Account Number:  1035532
Service:  Hematology                            Visit Type:  Miscellaneous Note

This dictation is to document toxicity associated with medication BET inhibitor for patient Iris Spedale.  I met with Mrs. Iris
Spedale on 12/29/2015.  In hindsight during that visit she was already exhibiting some mild forms of mania which I would
characterize as grade 1.  This included slight irritability and a very rapid pace in her speech.  After this episode the patient
went back home and discontinued the medication but the symptomatology worsened up to a grade 3.  The attribution for
this toxicity is that this is possibly related to the medication.  The patient has been previously treated with corticosteroids
and experienced a similar outburst.  It is unclear to me whether this represents direct toxicity from the medication or
whether the need for treatment precipitated a functional episode.

RF/kj

DD: 01/18/2016  11:42
DT: 01/18/2016  11:52

**Completed Action List:**
* Perform by Fonseca MD, Rafael on  18-Jan-2016  11:42 MST
* Transcribe by Johnson, Karen E on  18-Jan-2016  11:52 MST
* Sign by Fonseca MD, Rafael on  18-Jan-2016  15:05 MSTRequested on  18-Jan-2016  12:02 MST
* Verify by Fonseca MD, Rafael on  18-Jan-2016  15:05 MST



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Iris Spedale and Daniel Spedale,
husband and wife,

       Plaintiff,

                      No. 2:17-cv-00109-JJT

   vs.

Constellation Pharmaceuticals,
Inc.,

       Defendant.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


VIDEOTAPED DEPOSITION OF

RAFAEL FONSECA, M.D.



May 15, 2018

2:15 p.m.



5777 East Mayo Boulevard
Phoenix, Arizona









Talia Douglas, RPR, CR No. 50775

```
 1                  APPEARANCES OF COUNSEL

 2
    For the Plaintiff:
 3
        SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.
 4      ALAN C. MILSTEIN, ESQ.
        308 Harper Drive, Suite 200
 5      Moorestown, NJ 08057
        856.661.2078
 6      amilstein@shermansilverstein.com

 7
    For Defendant Constellation Pharmaceuticals, Inc.:
 8
        MORRISON MAHONEY, LLP
 9      ARTHUR LIEDERMAN, ESQ.
        120 Broadway, Suite 1010
10      New York, NY 10271
        212.825.1212
11      aliederman@morrisonmahoney.com

12
    For Mayo Clinic and Dr. Fonseco and Dr. Bergsagel:
13
        ROBERT F. KETHCART, ESQ.
14      SNELL & WILMER L.L.P.
        400 East Van Buren Street, Suite 1900
15      Phoenix, AZ 85004
        602.382.6000
16      rkethcart@swlaw.com

17
    ALSO PRESENT:
18
        J. Robert Sonne, Esq., Mayo Clinic Arizona
19      Frederick Van Norman, Videographer

20

21

22

23

24

25
```

Page 3

1                           INDEX OF EXAMINATION

2

3       WITNESS:   RAFAEL FONSECA, M.D.

4       EXAMINATION                                           PAGE

5       By Mr. Liederman                                         6

6       By Mr. Milstein                                         50

7       By Mr. Liederman                                        90

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXHIBITS

2

3    Exhibit              Description                    Page

4    Exhibit 29   12/29/2015 Clinical Notes               80

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               VIDEOTAPED DEPOSITION OF RAFAEL FONSECA, M.D.

2                           MAY 15, 2018

3

4               THE VIDEOGRAPHER:  My name is Frederick Van

5       Norman, legal videographer, representing Esquire Deposition

6       Services.  Our court reporter is Talia Douglas,

7       representing Esquire Deposition Services, as well.

8               We're on the record.  The time on the monitor

9       is 2:15 p.m.  The date today is May the 15th, 2018.  The

10      witness being video and audio recorded is Rafael Fonseca,

11      M.D.

12              The case name is Iris Spedale and Daniel

13      Spedale versus Constellation Pharmaceuticals, Incorporated.

14      It's being held in the United States District Court for the

15      District of Arizona.  The case number is 2:17-cv-00109-JJT.

16      Our location is the Mayo Clinic at 5777 Mayo Boulevard, and

17      that's in Phoenix, Arizona.

18              Will all counsel present please introduce

19      yourselves, after which time our court reporter will swear

20      in the witness.

21              MR. MILSTEIN:  Alan Milstein, representing

22      the plaintiffs.

23              MR. LIEDERMAN:  Arthur Liederman for Morrison

24      Mahoney, representing Constellation Pharmaceuticals.

25              MR. KETHCART:  Robert Kethcart with Snell &

Page 6

1    Wilmer and Rob Sonne from Mayo Clinic, Arizona,

2    representing Mayo Clinic Arizona and Dr. Fonseca.

3                    THE WITNESS:  Rafael Fonseca, physician at

4    Mayo Clinic.

5

6                    RAFAEL FONSECA, M.D.,

7    having been first duly sworn, testifies as follows:

8                              EXAMINATION

9    BY MR. LIEDERMAN:

10        Q.    Dr. Fonseca, good afternoon.

11        A.    Good afternoon.

12        Q.    In preparation for this deposition, did you have

13    occasion to review the notes that you may have maintained,

14    created with respect to the treatment of Ms. Spedale?

15        A.    Yes, I have.

16        Q.    Okay.  As a beginning point, could you just review

17    your medical background, when you became a doctor, where

18    was your training?

19        A.    Of course, happy.  I finished medical school in

20    1991 in Mexico City.  From that point, I went on to pursue

21    residency training at the University of Miami and Jackson

22    Memorial Hospital.  That was from 1991 through 1994.

23                    Subsequent to that, I pursued fellowship

24    training, meaning subspecialty training in hematology and

25    oncology at the Mayo Clinic in Rochester, completing in

1   1998.

2                And I have been practicing in my specialty

3   for the past 20 years since 1998.  Part of that time at the

4   Mayo Clinic in Rochester, and for the past 14 and a half

5   years now here at Mayo Clinic in Arizona.

6        Q.   And what portion of that is in the treatment of

7   multiple myeloma?

8        A.   100 percent of my clinical activities related to

9   the care of myeloma and related conditions.

10       Q.   Okay.  And in your work, have you worked on any

11   clinical trials?

12       A.   Yes.  I have participated in a good number of

13   them, both as a principal investigator, as well as named

14   investigator in such trials over the years.

15                I would say it's probably in the range of

16   scores at this point.

17       Q.   Of how much?

18       A.   Scores.

19       Q.   Scores.

20                And that would be as a principal investigator

21   or --

22       A.   As a principal investigator in a minority of them,

23   as a participating investigator, meaning someone who can

24   enroll patients and present trials to that number, the

25   scores.

1    Q.  And with respect to the scores of trials, could

2  you estimate how many may have been Phase 1, Phase 2 or

3  Phase 3.

4    A.  Probably an equal distribution, perhaps.  It's

5  hard to come to an exact number, but I would say about a

6  third of each.

7    Q.  Have you ever had occasion to deal with

8  Constellation Pharmaceuticals?

9    A.  Not until we have this trial, and I have not done

10  so personally, only knowing that we, as an institution,

11  participated in this trial.

12    Q.  When did you first start treating Ms. Spedale?

13    A.  I met her back in 2009, was the first encounter we

14  had with her, right after she was diagnosed with a

15  condition.

16          She has been diagnosed since then with

17  multiple myeloma, and that's when we started the

18  relationship in her care.

19    Q.  How severe was her condition when you first

20  started to treat her?

21    A.  It was severe mostly because of some of the

22  complications she was exhibiting.

23          There's a secondary complication to myeloma

24  that it's called amyloidosis.  That complication refers to

25  protein deposits that can occur in a person's body and can

1  be frequently lethal.

2              That's the reason she was started on her

3  treatment.

4      Q.   And that was back in 2009?

5      A.   That is correct.

6      Q.   And is it correct that you treated her with

7  various regimens over the last decade?

8      A.   That is correct.

9      Q.   Okay.  At some point in 2009, do you recall

10  whether she developed a steroid induced mania from

11  dexamethasone?

12     A.   She did develop a complication associated with

13  dexamethasone when she was first treated, the first line of

14  treatment, yes.

15     Q.   And do you know why this occurred?

16     A.   I cannot tell for sure, but it's sometimes a

17  complication of patients who get high doses of steroids

18  that they can develop mania or mania like symptoms as a

19  consequence of that medication, which was our

20  predisposition at the time.

21     Q.   In your treatment of patients for myeloma, how

22  often do you find that patients may manifest symptoms of

23  mania of some grade?

24     A.   There is a whole range to that.  Some patients

25  develop mild symptoms.  Some patients develop no symptoms

1   at all.   And she would be someone who developed a more

2   intense form of those symptoms.

3        Q.   Is the mania that you have found with patients

4   that you've treated always caused by or induced by a drug

5   or at times unexplained?

6        A.   Not necessarily.   It could be unexplained.   And

7   there's other factors that could explain and precipitate

8   something like mania.

9        Q.   Are you aware whether there have been studies

10  regarding whether myeloma itself has had associated with it

11  reported mania?

12       A.   No.

13       Q.   Okay.   Now, in 2009 when she manifested what was

14  suggested as possibly a manic state, did that at all impede

15  or -- did that in any way impede or affect decisions with

16  respect to when you would treat her for her myeloma?

17       A.   We could proceed with her treatment and ultimately

18  take her to the stem cell transplant.

19            We required adjunct help from our colleagues

20  in psychiatry at that time.

21       Q.   And did you seek that type of help?

22       A.   We requested that assistance.

23       Q.   Okay.   And what was the result of seeking that

24  help?

25       A.   They provided diagnostic assistance and a

Page 11

1    recommendation for symptoms.

2        Q.    Did they believe it was steroid induced, the

3    psychiatrists, or they didn't deal with causation?

4        A.    I believe at the time in their medical records

5    they thought it was a steroid induced mania.

6        Q.    Did you witness any manifested symptoms of mania

7    or some type of psychological issues in her comportment and

8    her demeanor when you were meeting with her?

9        A.    Can you clarify --

10       Q.    In 2009 --

11       A.    -- is that after treatment was started or --

12       Q.    Well, when you saw her and asked to get

13   psychiatric consult, what were you finding were some of the

14   symptoms that were manifesting, at least to your

15   knowledge?

16       A.    So once she was started on treatment, she started

17   manifesting some symptoms that to any physician would be

18   indicative of the possibility of mania, including rapid

19   speech, anxiety and some other manifestations that would

20   lead us to think that.

21              Now, not being a psychiatrist, that's why we

22   requested the help from our colleagues there.

23       Q.    Did you -- was there any treatment then to affect

24   these types of symptoms that you prescribed?

25       A.    We can sometimes prescribe things, but in this

1    case, we seek their assistance.

2              And the symptoms can be managed with some

3    psychiatric medications.  There's usually not a root cause

4    treatment for that.

5        Q.   Did you see resolution of the symptoms after you

6    had the consult?

7        A.   In large part, yes.

8        Q.   Okay.  What remained, when you say in large

9    part?

10             What did you still see persisting?

11       A.   It is impossible for anyone to measure 100 percent

12   whether one comes back to fully normal, and there is some

13   subjectivity in how that is assessed, but she was able to

14   complete her examinations and be cooperative with our

15   recommendations and proceed with the next steps in her

16   care.

17       Q.   It wasn't affecting her activities of daily living

18   as far as you observed?

19       A.   I can't recall that part at the time, to what

20   extent it affected beyond what we saw in the clinic.

21       Q.   And the time frame for what we'll call

22   resolution --

23       A.   Uh-huh.

24       Q.   -- of these symptoms, how long would you say it

25   took before you observed some resolution of it?

1    A.   This is a process that normally takes a few weeks.

2  It's hard to be precise about dates or number of days, but

3  it's a process that usually a takes few weeks before you

4  see full improvement.

5    Q.   Did this also require, then, a withdrawal of the

6  steroid, use of steroids in her regimen because she was

7  having a steroid induced mania?

8    A.   I would have to review my notes to make reference

9  to that point, particularly my notes as we proceeded to the

10  next phase of her treatment.

11            MR. LIEDERMAN:  I'm wondering, you were going

12  to mark, Alan --

13            MR. MILSTEIN:  Yeah.

14            MR. LIEDERMAN:  -- her entire series of

15  notes?

16            MR. MILSTEIN:  I think this is it.

17  BY MR. LIEDERMAN:

18    Q.   So why don't we mark -- this will be Exhibit 24.

19  It's been marked.

20            Just take a look at this.

21            This is a copy of many of your notes.

22            MR. LIEDERMAN:  They're in chronological

23  sequence?

24            MR. MILSTEIN:  Yeah.

25            And where that tab is, I think, is the --

1          MR. LIEDERMAN:  It's 2009?

2          MR. MILSTEIN:  Uh-huh.

3    BY MR. LIEDERMAN:

4     Q.   Rather than -- let me try to move on.

5     A.   Uh-huh.

6     Q.   You had indicated that before you would proceed

7    with the stem transplant, stem cell transplant, you wanted

8    to get a psychiatric consult.

9     A.   That is correct.

10    Q.   And the reason why you felt it imperative that you

11   had that consult before you proceed further was

12   representing what concern?

13          What did it reflect, what concern?

14    A.   Well, as I can relate to the note that I'm writing

15   here, her behavior was such that it became disruptive to

16   the staff in our clinic --

17    Q.   Uh-huh.

18    A.   -- and participation in a stem cell transplant

19   does require significant participation of a patient in care

20   and the family members.

21          And had her manic episodes not improved, she

22   would have not been a good candidate for stem cell

23   transplant.

24          As I read my note, I don't see documentation

25   that we stopped or decreased the dose of dexamethasone,

1   although that would be a usual and customary practice in a

2   situation where someone has a side effect such as this one.

3        Q.   Okay.  Now, she was also being treated with

4   bortezomib --

5        A.   That is correct.

6        Q.   -- and cyclophosphamide?

7        A.   That's correct.

8        Q.   Are those -- not bad.

9        A.   Not bad.

10             Are those associated at all with any type of

11   psychiatric or neurological adverse effect?

12        A.   The proteasome can have some neurologic effects

13   that are unrelated to the symptoms she presented, more in

14   the form of inflammation of peripheral nerves.

15        Q.   Now, referring to your -- well, the fact that you

16   then proceeded with the stem transplant, cell transplant,

17   would be indicative, then, that you felt that it had

18   resolved sufficiently that you could proceed?

19        A.   That is correct.

20        Q.   Was the stem cell transplant considered

21   successful?

22        A.   It was.

23        Q.   Okay.  But did she eventually have what might be

24   or you have referred to as a biological relapse, a

25   biochemical relapse?

1      A.    That is correct.

2      Q.    What do you mean by biochemical relapse?

3      A.    It's the medical term we use to describe detection

4    of residual recurrent cancer in a person who has one of

5    those diagnoses.

6      Q.    So given that she had this relapse, was further

7    therapy or treatments required?

8      A.    That is correct.

9            Because of the complications that she had as

10   a consequence of amyloidosis, we like to keep those protein

11   markers under very good control.

12           So biochemical relapse under this

13   circumstance would be an indication of treatment.

14     Q.    So what treatment, at that point, did you

15   consider?

16     A.    So given the drugs that were available and given

17   what she had received before, we decided to repeat the

18   prior treatment she had received before her stem cell

19   transplant.

20     Q.    Now, is the fact that she had had a steroid

21   induced mania a consideration now when you were considering

22   what regimen to proceed with or recommend to her?

23     A.    It remained a consideration for the rest of her

24   care until the present time.

25           We don't consider steroids absolutely

1    contraindicated, but they have to be minimized and be

2    carefully monitored.

3        Q.    Is there a danger if you eliminate them

4    altogether?

5        A.    There is no danger, but there is a decreased

6    ability to control the disease in the absence of steroids.

7              So in other words, steroids enhance the

8    ability of most of the medications we use to treat them.

9        Q.    Has she always been on some level of steroid

10   treatment?

11       A.    We have tried to avoid it.  And in some instances

12   she has received treatment without steroids, but sometimes

13   they're an essential part of the treatment that must be

14   provided to the patient.

15       Q.    So in focusing on what might be alternatives,

16   there is mention of a CyBorD?

17       A.    Uh-huh.

18       Q.    Is that a treatment or a drug?

19       A.    That is an acronym for a combination of drugs,

20   which are the same drugs she got in the first time she was

21   treated.

22       Q.    Which would be the ones I mentioned before?

23       A.    That is correct.

24       Q.    Which I'll try to avoid pronouncing.

25       A.    That's good.

1      Q.    I was lucky the first time.

2            Except that there was the drug Velcade, and

3   then there was a discussion in your notes about

4   carfilzomib?

5      A.    Uh-huh.

6      Q.    Okay.  Are there any adverse effects associated

7   with carfilzomib?

8      A.    Every drug has side effects and benefits.  And we

9   would have to engage in that discussion at the given time

10  with the patient.

11     Q.    Was there a reason why you were moving from

12  Velcade to carfilzomib?

13     A.    No.  We decided to try the Velcade again, which is

14  what we did with the CyBorD --

15     Q.    Uh-huh.

16     A.    -- because she had a previous good response, and

17  at least the first time the bortezomib had not been, had

18  been tolerated well.  So we decided to give that a try

19  again.

20     Q.    Were you disappointed that she had this

21  biochemical relapse?

22            I mean, was it the hope that the stem cell

23  transplant would have been sufficient, not only to

24  remission, but essentially prevent relapses?

25     A.    Disappointment is probably not a good word.  It's

 1   an emotional response to what I know would be a fact, that

 2   is --

 3       Q.   Right.

 4       A.   -- the disease has a propensity to come back.

 5       Q.   Uh-huh.

 6       A.   So my preference would be that she would never

 7   need treatment again.

 8       Q.   Okay.

 9       A.   But in passing, yes, we're disappointed every time

10   a patient experiences a relapse.

11       Q.   Now, in your notes, you said, we also talked about

12   participation in a clinical trial that uses an oral

13   proteasome inhibitor --

14       A.   Uh-huh.

15       Q.   -- but she's inclined to go with the standard of

16   care medications at this point.

17            What was the reason for raising the

18   possibility of entering into a clinical trial?

19       A.   Clinical trials are options that we provide to our

20   patients at all the stages of the disease, depending on

21   whether a trial opens a new treatment avenue for them.

22            In that particular case at the time,

23   participating in a trial such as that would allow her to

24   get medications in the pill form instead of the injectable

25   form.

1    Q.   And why was that a consideration?

2    A.   It was a consideration of preference for her and

3    convenience.

4    Q.   Was this a preference that she expressed verbally

5    to you, that she did not want or she wanted to avoid having

6    a PICC?

7              Is that what it's called, I guess?

8    A.   Not at this particular time, but I do remember

9    clearly that conversation later as we get into the

10   experimental treatment.

11   Q.   Now, do you recall what clinical trial you were

12   thinking of at that point in time?

13   A.   I cannot remember, but I know if I said an oral

14   proteasome inhibitor, it must have been a clinical trial

15   looking at either oprozomib, which is one the ones that

16   were in development -- it's not FDA approved yet -- or

17   ixazomib, which is mentioned at other points in her

18   notes.

19   Q.   At this stage of her treatment and care, would you

20   believe that she was an appropriate candidate for a Phase 1

21   clinical trial, as opposed to going into a Phase 2 or Phase

22   3 clinical trial?

23   A.   Are you asking when she had this biochemical

24   relapse?

25   Q.   When she had the biochemical relapse and you were

Page 21

1    raising the possibility of participation in a clinical

2    trial, would that clinical trial have been a Phase 1, Phase

3    2 or Phase 3?

4         A.    It's a hypothetical question, but it's possible

5    that a Phase 1 clinical trial would provide an option to

6    the patient at that point that would be suitable for that

7    stage of her disease.

8         Q.    There is discussion in, if I suggest to you, in

9    the protocols --

10        A.    Uh-huh.

11        Q.    -- for the Phase 1 clinical trial for the 0610 --

12        A.    Uh-huh.

13        Q.    -- item that a Phase 1 clinical trial should be

14   something that is turned to when there's no standard

15   treatment that may be available.

16             Is -- with respect to your experience with

17   Phase 1 clinical trials, was that your understanding of

18   general, one of the criteria for deciding whether someone

19   was appropriate?

20        A.    It is very specific to every trial.  So I think

21   the criteria on how it applies to a patient is always

22   specific to the circumstance.

23             In general, Phase 1 trials are geared towards

24   the testing of the toxicity of a new medication.  So often

25   times it will be given in patients who have advanced

Page 22

1   disease, but every case has to be discussed specifically.

2       Q.   But it's true, isn't it, that in a Phase 1 trial

3   there's no firm knowledge and conclusion that the drug is

4   efficacious?

5            There's the hope it could be.  Isn't that

6   true?

7       A.   Phase 1 trials have an explicit goal of just

8   determining a maximally tolerated drug dose.

9       Q.   Uh-huh.

10      A.   Essentially, they're looking at toxicity.

11      Q.   So when a participant is considering or potential

12  participant is considering enrolling, at that point, there

13  is risk, as there always is associated with any drug.

14           Isn't that true?

15           Would you agree that there's always a risk

16  associated with a drug?

17      A.   Whether a patient participates in a trial or gets

18  clinically available medicine, there's always risks and

19  benefits that we discuss with them.

20      Q.   Well, in making the decision on taking a

21  particular therapy, a doctor and a patient usually explore

22  whether the benefits are either equal to the risk or the

23  benefits outweigh the risks?

24      A.   First and foremost, we have patient benefit before

25  we make any clinical decision.

Page 23

 1              That includes the estimation of what you say

 2    between risk and benefit and how a particular drug might be

 3    appropriate for a patient or not at the given circumstance.

 4       Q.   Excuse me if I repeat this one question, but were

 5    there any drugs or now types of drugs based on her steroid

 6    induced mania episode that you would want to stay away from

 7    and never considered or would want to consider?

 8       A.   Given her history with the mania, my main

 9    treatment consideration would be to minimize or eliminate,

10    if possible, steroids.

11              There is a tradeoff in that if you don't use

12    steroids -- most of the regimens we use require them --

13    your rate of response is lower.

14       Q.   Now, in her course of treatment and response,

15    there are clinical notes from you in August of 2015 --

16       A.   Uh-huh.

17       Q.   -- and she was being treated with Revlimid?

18       A.   Uh-huh.

19       Q.   Do you remember the circumstances that led you to

20    start treatment on Revlimid?

21              Was this a consequence of the earlier

22    discussion we just had about whether she should be in a

23    clinical trial or you would try some other type of

24    treatment, like, was it the CyBorD?

25       A.   Uh-huh.  We always present our patients with

1    options that are available to them, both in clinical

2    medicine, as well as in clinical trials.

3        Q.   Uh-huh.

4        A.   And given she had not been previously exposed to

5    that medication, Revlimid, that's why we considered that

6    particular drug.

7        Q.   Now, she did not have a good course with the

8    Revlimid, did she?

9        A.   Not from the perspective of complications.

10            She developed deep venous thrombosis

11   associated with the Revlimid, that is a blood clot, that

12   precluded us from continuing that treatment.

13       Q.   Now, at that point, it was noted that her free

14   light chain is just barely above normal.

15       A.   Uh-huh.

16       Q.   Could you explain what is the significance of the

17   free light chain --

18       A.   Uh-huh.

19       Q.   -- in analyzing and diagnosing and treating

20   somebody with myeloma?

21       A.   So the free light chain is one of the biomarkers

22   we follow, and it's a measure of how a treatment is working

23   or not.

24            In a condition such as hers, keeping that

25   under good control becomes of importance to prevent

1  additional complications from that protein being deposited

2  in her body.

3      Q.   Now, the -- was the Revlimid then discontinued as

4  a treatment?

5      A.   The Revlimid had to be discontinued as a

6  treatment, yes.

7      Q.   And at that point, her free light chain was barely

8  above normal.

9           So would that be considered, then, to be

10  within normal or still requiring treatment?

11      A.   In a patient that has complications like she did,

12  anything that is abnormal would be a consideration for me

13  to start treatment.

14      Q.   Okay.  So we have your notations from August 2015.

15           And we're monitoring her blood counts to make

16  sure there's no evidence of disease recurrence that would

17  cause us to start treatment again.

18           And then go to November 17.  She's returning

19  for a monitoring of her plasma cell neoplasma associated

20  with the amyloidosis.  She remains asymptomatic from the

21  perspective but is still on anticoagulations.  That's for

22  the DVT.  And she has no avert evidence of disease

23  progression.

24           So as of November 17, 2015 -- do you have a

25  copy of that?

1      A.    I do have that.

2              Well, I do have that fresh in my memory.  I'm

3      looking through it.

4              Hear it goes from May.  But you can proceed

5      with the questions, and then I'll -- I'll answer.

6      Q.    Whoever -- you do report that, at that point she

7      continues to do well, but her free light chain has gone up.

8      I think we need to start considering the next line of

9      treatment in her situation.

10             Do you recall that?

11     A.    I do.

12     Q.    Do you recall what options you then had for her

13     treatment --

14     A.    Uh-huh.

15     Q.    -- or believe that you had, that you could

16     recommend for her treatment?

17     A.    We had a range of options that could be used in

18     her particular case, and they included options associated

19     with a clinical trial or options that we could prescribe.

20             That included the possibility -- by then, we

21     had this oral medication, Ninlaro.  Ixazomib is the generic

22     name.

23             Do you want me to spell that?

24             I-x-a-z-o-m-i-b, and the commercial name is

25     Ninlaro, N-i-n-l-a-r-o.  So that was one of the options.

1            The other option that was relevant was the

2    carfilzomib, c-a-r-f-i-l-z-o-m-i-b.  Commercial name is

3    Kyprolis, K-y-p-r-o-l-i-s.

4            And we also talked about looking into the

5    availability of medications through clinical trials that

6    might fit into her particular situation.

7       Q.   Who raised the question of clinical trials --

8       A.   We --

9       Q.   -- the patient or you did?

10      A.   We always raise a question of a clinical trials to

11   our patients if there is the possibility that a trial might

12   provide them with new options for their treatment.

13      Q.   Now, in your note of that date November 17, it

14   says, the patient inquired about the use of bortezomib?

15      A.   Uh-huh.

16      Q.   Was it -- in your experience dealing with Ms.

17   Spedale, would she often come to you with suggestions of

18   possible therapies?

19      A.   She's a very smart person, so she's always had

20   specific questions about her care.

21      Q.   So she did research into options for treatment?

22      A.   She would normally do that or her family members

23   would inquire.

24      Q.   Now, she had previously been on that drug?

25      A.   That is correct.

Page 28

1    Q.   And she said that she believed she tolerated it

2    well.

3    A.   Uh-huh.

4    Q.   But you reminded her that there was significant GI

5    toxicity at the end of her therapy?

6    A.   That is correct.

7    Q.   Was that impacting on whether you would recommend

8    that drug to her for treatment?

9    A.   That is correct.  Prior tolerance of medications

10   is a major factor.

11   Q.   Now, you said at the beginning of the impression

12   report plan paragraph, which was the final paragraph,

13   "Because of the previous problems with blood clots, I would

14   be inclined not to use meds, at least for the time being."

15            Is that meaning what you had said just before

16   that you wanted to stay with oral medications?

17   A.   No.  This particular sentence, as I read it --

18   Q.   Uh-huh.

19   A.   -- it's a transcription error in these particular

20   notes.

21            What I meant by that is IMiDs, and that's

22   I-M-I-D-S.  IMiDs belong to a class of drugs that include

23   thalidomide and related medications which are associated

24   with a risk of thrombosis, which was her case with

25   Revlimid.  Revlimid belongs to that class of drugs.

1  Q. When you say you communicated with our study

2 coordinators in this paragraph --

3  A. Uh-huh.

4  Q. -- who are you referring to as study

5 coordinators?

6  A. So in this particular case, the person that we

7 communicated with was J.R. Singh.

8    We have staff, a group of individuals who

9 help us determine patient eligibility, and that's who we

10 would normally communicate with.

11    MR. MILSTEIN:  What's the date of the note,

12 just for the record?

13    MR. LIEDERMAN:  November 17, 2015.

14 BY MR. LIEDERMAN:

15  Q. Was there a regular contact that a doctor such as

16 yourself would have with Dr. Sing and the clinical trial

17 teams in the Mayo Clinic?

18  A. J.R. Singh, for clarification, is not a doctor.

19  Q. Right.

20  A. He's a study coordinator.

21    How the process starts, if we decide that we

22 want to explore the possibility of clinical trials, we,

23 meaning the physicians in care of a person, would initiate

24 that communication with our staff so they can look for

25 eligibility criteria in potential clinical trials that we

1    might offer to one of our patients.

2        Q.   So if you could summarize the rationale, your

3    reasoning at this point for pursuing or considering a

4    clinical trial as opposed to approved treatments that were

5    available --

6        A.   Uh-huh.

7        Q.   -- what would that be?

8        A.   I'm going to start with the simple part, which is,

9    at the time, we thought that we provide her with an option

10   for a medication that she would be eligible for in a

11   clinical trial that would not expose her to the known

12   toxicities we have from prior medications.

13            She did not do well with the bortezomib.  So

14   she had toxicity with the bortezomib, the gastrointestinal

15   toxicity.

16            Ninlaro, which was the other drug that

17   potentially would have been available to her, is nothing

18   but the oral version of bortezomib.  So that, in almost

19   certainty, would have given her the same toxicity.  So

20   they're just different preparations of the same medication.

21            And lastly, carfilzomib, which is an

22   intravenous medication, was not high in her interest.  She

23   had expressed an interest to think about an oral medication

24   at the time.

25       Q.   So all of those considerations then led you to

Page 31

1  make inquiries with Mr. Singh?

2      A.   That is correct.

3      Q.   Was it the practice or has it been the practice at

4  the Mayo Clinic that when there are ongoing trials that

5  there are lists that are circulated of the trials that are

6  ongoing so that the medical staff is aware of what type of

7  drugs are in the midst of trials for what type of

8  treatments or diseases?

9      A.   First, I cannot speak to the practice of Mayo

10  Clinic.

11     Q.   Uh-huh.

12     A.   But what I can tell you is we have access to a

13  website where we have a list of all of our clinical trials

14  that are available, which is not circulated.

15          It usually requires an intent from a

16  physician caring for a patient to go and look at that list

17  and see if there are clinical trials that are available.

18     Q.   So in speaking to Mr. Singh, then, did you do any

19  research or readings about 0610 before you decided to raise

20  the possibility with Ms. Spedale --

21          MR. KETHCART:  Form.

22  BY MR. LIEDERMAN:

23     Q.   -- for possibly enrolling in this trial?

24     A.   What we do is, once a trial has been identified as

25  potentially matching a patient that we're discussing, we

1    review that specific trial to make sure it's something that

2    would be proper for the person and then decide to move

3    forward if that's the case.

4        Q.   Okay.   So the elements or the criteria that you

5    felt were important through discussions with Dr. Singh that

6    would have highlighted this particular trial for something

7    to investigate further would be what?

8             What would the criteria have been that you

9    would have been focusing on primarily with Mr. Singh that

10   you could recall that would lead you to further investigate

11   and review the possibility of this clinical trial for Ms.

12   Spedale?

13             MR. KETHCART:   Form and foundation.

14             THE WITNESS:   So the criteria we follow is a

15   standard criteria.

16             One, determination that a patient needs

17   additional treatment.   Number two is that they fit into

18   that criteria for the specific clinical trial.

19             And as we move forward, present that to the

20   patient as one of the options that's available to them.

21   BY MR. LIEDERMAN:

22       Q.   So the fact that this was targeting myeloma --

23       A.   Uh-huh.

24       Q.   -- was obviously the first criteria?

25       A.   Uh-huh.

1      Q.   Do you recall whether there was anything else that

2    stood out about this trial at this time that fit into the

3    type of regimen that you were looking for?

4      A.   At the time, the main component that made this a

5    possibility that we wanted to present to her was the fact

6    that it could be done in an oral fashion.

7      Q.   And you said that after discussing this with

8    Mr. Singh, you would pursue some additional investigation

9    about the drug and the trial; is that correct?

10     A.   That is correct.

11     Q.   Were there documents that you would ask to take a

12   look at in particular?

13     A.   I cannot recall the specifics on this trial, but

14   my usual practice would be to go and read the protocol and

15   the background for the protocol and the eligibility

16   criteria and present this back to the patient, as well,

17   through J.R. Singh.

18     Q.   Would there have been reason to talk to

19   Dr. Bergsagel about this trial as part of the process of

20   making a recommendation to your patient?

21     A.   It is standard practice that, as we think about

22   the clinical trial, if we have questions, we would go

23   sometimes to the principal investigator.

24               I don't recall having those conversations,

25   but it would be standard practice for us to potentially do

1    that.

2        Q.    Was there anything in her medical history that you

3    were aware of that raised any concern for you with respect

4    to enrolling her in the clinical trial?

5        A.    No.

6        Q.    So your notes of December 1, 2015 review the

7    treatment options and the issues that you just testified to

8    and then indicate that she had an opportunity to meet with

9    our study coordinator.

10                When you say study coordinator, who would

11   that be?

12       A.    Mr. Singh.

13       Q.    When you entered these notes and you indicated

14   that she had an opportunity to meet with our study

15   coordinator and review the potential risks, benefits,

16   logistics and usual protocol for the clinical trial she

17   will be enrolled later today, would you have occasion in

18   this time, then, to discuss with her the risks that she was

19   advised of by Mr. Singh?

20       A.    I go to great lengths every time I offer clinical

21   trials to explain this to patients, to explain the

22   experimental nature of a protocol, to explain the goals for

23   the protocol and to explain the voluntary nature of

24   participation in clinical trials including the fact that

25   their care will not be affected in any way if they so

1   desire to participate in this trial.

2              And as I reviewed my notes, I think this

3   would be a good example where we never take the decisions

4   in haste, and we allow plenty of time for patients and

5   family members to ponder and decide on whether they want to

6   participate in such a trial.

7       Q.   In speaking to your patients, do you find that

8   there's a different type of discussion that's invited by

9   entering someone in a Phase 1 clinical trial as opposed to

10  a Phase 3 clinical trial?

11      A.   The discussion is always different for every

12  trial, but in a Phase 1 trial, it would always include the

13  specific goals of the Phase 1 trial.

14              The nature that this compounds are usually

15  early in drug development, sometimes new to humans, and why

16  we would consider this particular trial for someone like

17  her.

18      Q.   Do you recall ever making any representation about

19  the drug being efficacious?

20      A.   I don't recall specifically ever saying anything

21  to the extent that this medication holds promise that we're

22  going to make your disease better in that way.

23      Q.   Do you have any reason to believe that she thought

24  that this treatment was not an experimental treatment?

25              MR. KETHCART:  Foundation.

Page 36

```
 1                THE WITNESS:  I have no reason to believe

 2    that at the time as a physician without going through a

 3    formal psychiatric evaluation.

 4                She seemed to be competent and capable of

 5    making a discussion to participate in this trial.

 6    Furthermore, she was supported by family members, so she

 7    thought about the decisions.

 8    BY MR. LIEDERMAN:

 9        Q.   So in your discussions, would you refer to the

10    fact that treatment with a Phase 1 drug will have

11    potentially adverse effects that are unknown?

12        A.   Whenever I discuss a Phase 1 trial with a patient,

13    I would say that there is the potential for unknown side

14    effects which will only be discovered through the process

15    of the Phase 1 trial, and we have that explicitly stated in

16    our consent forms.

17        Q.   And would you equally, then, contrast that with

18    the fact that one does not know whether the drug will, in

19    fact, improve her condition along with these concomitant

20    risks?

21        A.   That is correct.  We never talk about efficacy in

22    the setting of a Phase 1 trial.

23        Q.   Were you familiar with the informed consent form

24    for this clinical trial?

25        A.   Yes.
```

Page 37

1    Q.    Did you -- did you review the informed consent

2    with her?

3    A.    That is correct.

4    Q.    Okay.  When you review -- is there a process that

5    you generally practice when you go over an informed consent

6    with any patient?

7    A.    We usually have -- before we embark on informed

8    consent, we have an in depth discussion with the patient

9    about the potential for a given clinical trial.

10          And there's a process that we delegate to our

11   study coordinators who provide additional details to the

12   patients and provide them with a copy of the consent form,

13   and they personally review each one of the elements.

14          Once that is completed, the patient comes

15   back to us, and we will review eligibility, willingness to

16   proceed with the clinical trial and any further questions

17   or queries that a person might have about the clinical

18   trial, including the consent form itself, after which point

19   we would go ahead and sign and enroll the patient in the

20   trial.

21   Q.    Do you review page by page with the patient the

22   informed consent?

23   A.    That is a review process that normally occurs

24   through the study coordinators, but we sit with the patient

25   with the consent form with them and ask them if they have

1   any further questions.

2        Q.   So do you recall discussing with Ms. Spedale the

3   meeting that she had with the study coordinator and any

4   question she might have regarding the informed consent?

5        A.   In broad terms, I do, yeah.

6        Q.   Okay.  Do you recall anything in particular that

7   she raised regarding the informed consent --

8        A.   No --

9        Q.   -- that she was unsure?

10       A.   -- not in particular.

11       Q.   In your review of the informed consent for this

12   trial, was it -- did anything -- strike that.

13            In reviewing the informed consent that was

14   used in this trial, did you have any questions about the

15   informed consent?

16       A.   No.  It was a pretty standard Phase 1 consent

17   form.

18       Q.   Did -- when you say it was pretty standard, was it

19   pretty standard in the way it addressed the potential risks

20   associated with a Phase 1 trial?

21       A.   That consent form contains the element including

22   the unknown risks to a person participating in a Phase 1

23   trial.

24       Q.   Now, when you spoke with Ms. Spedale about her

25   enrollment in the trial, was anyone else present during

Page 39

1    your discussion?

2       A.   Yes, at some point.  I can't remember, and I'm

3    planning to read my note, if you give me a second here, for

4    December 1st.

5            On a number of occasions we had conversations

6    with her son Darren and her husband, as well, too, about

7    participation in the clinical trial.

8            I can't remember if it was specifically on

9    December 1st or not.

10      Q.   In your December 1 note you say that she

11   previously suffered with thrombosis with IMids.

12           Is it IMiDs?

13      A.   That's right.

14      Q.   Okay.  And GI toxicity with proteasome inhibitors

15   and is hopeful that her disease can be controlled on this

16   clinical trial.

17           When you wrote that she was hopeful --

18      A.   Can you -- can you point me to where --

19      Q.   December 1, 2015, first page, history of present

20   illness.

21      A.   First page.  Okay.  Sure.

22           Sorry, December 1st, I'm looking for the word

23   hopeful here.

24      Q.   It's history of present illness, middle paragraph,

25   last sentence.

Page 40

1               MR. MILSTEIN:  I mean, I don't think you're

2    necessarily looking at the same document.

3               MR. LIEDERMAN:  No, we're not.  Sorry.

4    BY MR. LIEDERMAN:

5       Q.   Okay.  I will tell you that Dr. Bergsagel --

6       A.   Uh-huh.

7       Q.   -- had entered -- my mistake -- that he had -- the

8    patient was seen earlier today by Dr. Fonseca.  She

9    previously suffered thrombosis with IMids and GI toxicity

10   and is hopeful that her disease can be controlled on this

11   clinical trial.

12              Did you have any discussions with her in

13   which she expressed hope that her disease can be controlled

14   on the clinical trial?

15              MR. MILSTEIN:  That's Dr. Bergsagel's --

16              MR. LIEDERMAN:  I know.  I'm asking --

17              MR. MILSTEIN:  -- December 1st note was.

18              MR. LIEDERMAN:  -- whether or not he had --

19   yes, that's right.  I'm asking Dr. Fonseca.

20              THE WITNESS:  Any patient who goes into a

21   clinical trial, regardless of the stage, by human nature

22   has a hope.

23              That does not mean that we instill

24   conversations or discussions about hope in the process of

25   enrolling a patient into a clinical trial.

Page 41

1    BY MR. LIEDERMAN:

2        Q.    Would you agree that the hope that one might have

3    their disease controlled on a clinical trial is different

4    when one is using a Phase 1 drug or one is using, for

5    instance, a nonclinical drug that's approved by the FDA?

6                    MR. KETHCART:   Form, foundation.

7                    MR. MILSTEIN:   Well, I'll object.   If they

8    know the difference.

9                    THE WITNESS:   I cannot speak to that not

10   being a researcher in the particular field of patient

11   reported outcomes for clinical trials.   And I think it

12   would be dependent on every patient to what extent they

13   want to hope for a drug or not.

14   BY MR. LIEDERMAN:

15       Q.    But there is a difference in the expectation that

16   the medical community treating a patient has to create for

17   someone when they're utilizing a treatment that's only a

18   Phase 1 as opposed to, let's say, an approved drug.

19                   MR. KETHCART:   Form, foundation.

20   BY MR. LIEDERMAN:

21       Q.    Isn't there?

22       A.    The medical community will focus on determining

23   safety and toxicity in a Phase 1 trial.

24       Q.    Okay.

25                   MR. MILSTEIN:   Not treatment, right?

1           THE WITNESS:  Not treatment.

2    BY MR. LIEDERMAN:

3       Q.   Were there alternatives, in your mind, at the time

4    that you entered her or she was entered into this treatment

5    for alternative treatments if this would not have worked?

6       A.   Correct.  There's always alternatives, and we

7    discuss what we think are the best options of those

8    alternatives with a patient if they so desire to pursue

9    that.

10      Q.   So based on your testimony before, it would have

11   just meant that at this stage, unless there were other

12   drugs out there that were in trial, she would just have to

13   move away from oral meds and seek other types of

14   treatment?

15      A.   As one of the options.

16           MR. MILSTEIN:  Are you going to let me go

17   again?

18           MR. LIEDERMAN:  Yeah, yeah.

19           See, you're hopeful, too.

20   BY MR. LIEDERMAN:

21      Q.   At the time that you had these discussions with

22   Ms. Spedale about her possible enrollment, how severe would

23   you describe her condition?

24           I believe her free chain --

25      A.   Uh-huh.

1      Q.    -- free light chains where over 50?

2      A.    Her condition was by the blood markers that we had

3    something that indicated she required treatment, even

4    though, at the time, she was not experiencing major

5    symptoms.

6              And that's what I referred to as no overt

7    evidence of aggressive disease.

8      Q.    Do you have any reservations --

9              MR. MILSTEIN:  I just missed the last -- did

10   you get the last -- what did he say?

11             THE WITNESS:  So --

12             MR. MILSTEIN:  No overt --

13             THE WITNESS:  Overt --

14             MR. MILSTEIN:  -- evidence --

15             THE WITNESS:  -- evidence of --

16             MR. MILSTEIN:  -- of --

17             THE WITNESS:  -- of symptoms associated with

18   her disease.

19             MR. MILSTEIN:  Okay.  Is that how you got it?

20             Okay.  She was asymptomatic?

21             THE WITNESS:  At the time, yes.

22   BY MR. LIEDERMAN:

23     Q.    Did you have any other patients enrolled in this

24   clinical trial?

25     A.    She's the only patient I enrolled in this

Page 44

1  particular trial.

2             MR. MILSTEIN:  Can you read back -- did you

3  say she was the only patient enrolled or did you say --

4             THE WITNESS:  I enrolled.

5             MR. MILSTEIN:  But did you enroll her?

6             THE WITNESS:  Well, she's my patient, and on

7  my recommendation we proceeded to put her on this clinical

8  trial.

9             MR. MILSTEIN:  Okay.

10 BY MR. LIEDERMAN:

11    Q.   In her case, the initial results of tests during

12 the clinical trial, they were showing a positive result,

13 weren't they?

14    A.   That is correct.

15    Q.   Could you describe that?

16    A.   Her free light chain concentration in the serums

17 came down, and so she did with the first phase of the

18 treatment.

19    Q.   Now, in her records post 2009, in fact, in January

20 2015 and from March 2017, she still continues to take

21 dexamethasone?

22    A.   January of 2015?

23    Q.   Yeah.

24             Do you know whether or not she's still taking

25 any steroids?

1      A.    She has taken it on occasion since she had this

2   treatment.

3      Q.    Okay.

4      A.    Usually in lower doses than we would normally use

5   if we didn't know any different, you know, in other

6   patients.

7      Q.    In -- I'm going to pass you on to plaintiff's

8   counsel.

9            You noted in January 2016 that it was unclear

10  whether her symptoms -- strike that.  Let's do the

11  foundation.

12           You were aware that she was not allowed to go

13  through a second round of treatment because of

14  manifestation of manic or psychosis.

15     A.    That is correct.

16     Q.    How did you come to learn of that?

17     A.    Because of the communications her family had with

18  our nursing staff and with the study coordinators, it was

19  raised that she was having this toxicity.

20           And whenever we have our clinical trial, if

21  we determined that it's not in the patient's best interest

22  for whatever reason, in this case, toxicity, we remove her

23  from such protocol.

24     Q.    Did you participate in the decision to have her

25  removed from the trial?

1     A.    That is correct.

2     Q.    Okay.

3     A.    That's correct.

4     Q.    Would this be something that you would have said

5     to Dr. Bergsagel or that there would have been joint

6     discussions about it or --

7     A.    No.  I --

8     Q.    -- what would the procedure --

9     A.    I would --

10    Q.    -- been?

11    A.    -- not consult with a colleague.

12          If in my determination a patient is

13    experiencing toxicity potentially related to a medication,

14    I would stop that, and it would be my prerogative to do so.

15    Q.    Did you ever reach a conclusion in your mind as to

16    whether her symptoms were caused by the study drug?

17    A.    No.

18    Q.    Did you believe it was unclear?

19    A.    It was unclear.

20    Q.    Okay.  And why?

21    A.    Because there's many confounding factors that

22    could lead a person to develop similar symptoms.

23          I'm not a psychiatrist, so I cannot make a

24    determination, but there's other reasons why someone with a

25    background and a propensity for psychosis, including mania,

Page 47

1    could develop that in the setting of a medical comorbid

2    condition as well.

3        Q.   Did you make inquiries from Mr. Singh or

4    Dr. Bergsagel as to whether or not other patients and the

5    cohorts for this study or in any of the other study sites

6    exhibited similar mania as a result of being a participant

7    in this trial?

8        A.   Any discussion about mania occurred only after we

9    had removed her from that particular trial, starting from

10   my review of the protocol, not finding such mention and

11   then, out of interest, asking Singh about this and not

12   finding any precedent to that.

13       Q.   Did there come a point where she refused

14   treatment, Ms. Spedale refused treatment?

15       A.   Multiple times during her care we have had

16   difficulties with reaching a conclusion about her

17   proceeding with the treatment.

18       Q.   Was there ever a need to file a petition with the

19   court?

20       A.   During the time that she had the psychosis

21   associated with this protocol, and because of the

22   engagement we had from our psychiatry colleagues, there

23   were a number of interventions that I -- I wouldn't be in a

24   position to qualify, but there were interventions

25   associated to protect her and help her in the transition of

Page 48

1    this, including additional psychiatric care similar to

2    against her will.

3         Q.   Did her refusal medical assistance exacerbate her

4    conditions in your mind?

5         A.   I don't think so.  I think it just made the

6    practical management of her daily life more complicated for

7    her and her family.

8         Q.   You've been continuing to treat her to the

9    present?

10        A.   That is correct.

11        Q.   Okay.  Have you, through your years of experience

12   as a physician in treating people with a host of different

13   drugs, experienced patients who had adverse reactions to

14   the drugs that they have been prescribed or treated with?

15        A.   Yes.

16        Q.   At times, have those been severe --

17        A.   Yes.

18        Q.   -- treatment?

19             Okay.  Have you had any that have had a

20   psychosis or manic reactions other than Ms. Spedale?

21        A.   Yes, associated with steroids.

22        Q.   Okay.  What can you tell us about your

23   observations of these patients with respect to whether

24   withdrawal of the drug has resolved these adverse effects

25   over time?

1      A.   In my experience, when a patient has

2   neuropsychiatric complications thought to be related to the

3   steroids, eventually, meaning in a few days to a few weeks,

4   they will completely resolve once the medication is

5   discontinued.

6      Q.   Ms. Spedale, though, has not.

7            Her manic and psychotic issues have not fully

8   resolved.  Isn't that true?

9      A.   I'm not really qualified to answer that.

10            I know her neurocognitive status is not

11   normal.

12      Q.   Uh-huh.

13      A.   I cannot qualify whether it's still mania or

14   psychotic, but clearly her neurocognitive status is not

15   normal.

16            MR. LIEDERMAN:  Okay.  Go ahead.  Thank

17   you.

18            MR. KETHCART:  We've been going about an

19   hour.

20            Is it all right if we take a break for a few

21   minutes?

22            THE WITNESS:  You know, I need just to answer

23   a couple of calls because I'm on call.

24            MR. MILSTEIN:  Okay.

25            THE WITNESS:  So I'll be -- I'll right back,

Page 50

```
1    if that's okay.

2                    MR. KETHCART:  Let's go off the record.

3                    THE VIDEOGRAPHER:  We're off the record at

4    3:13.

5

6                    (Recess taken from 3:13 p.m. to 3:20 p.m.)

7                    THE VIDEOGRAPHER:  We're back on the record

8    at 3:20 p.m.

9                              EXAMINATION

10   BY MR. MILSTEIN:

11       Q.   Doctor, I represent the Spedales.

12                    You are still her oncologist; is that

13   correct?

14       A.   That is correct.

15       Q.   And you've treated her since what, 2014?

16       A.   2009 when she --

17       Q.   I'm sorry.

18                    2009?

19       A.   -- first came here to me.

20       Q.   Right.

21       A.   Yeah.

22       Q.   And she came here already diagnosed; is that

23   right?

24       A.   That is correct.

25       Q.   And I think it was in -- so you were looking at
```

1    that record, the May 2009 record.

2                        So she had a drug induced mania as a result

3    of the steroids; is that correct?

4        A.   With the first line of treatment, yes.

5        Q.   Right.

6                        And that mania she had was sort of like a, if

7    you can characterize it as a sort of speed kind of

8    reaction, that is speaking fast, not sleeping,

9    hyperactivity; is that right?

10       A.   That would be a good colloquial description of

11   someone who has mania.

12       Q.   Right.

13                       I mean, I've taken steroids and they keep me

14   up at night.

15                       I don't think I've ever had mania, but --

16       A.   Uh-huh.

17       Q.   -- you know, you grit your teeth.

18                       And that's a common reaction to the steroids;

19   is that right?

20       A.   There's a whole range of reactions, and that could

21   be one of them.

22       Q.   Right.

23                       But she was not psychotic as a result of the

24   steroid adverse event, correct?

25       A.   When -- when she first started taking the

Page 52

1    medication, her symptoms, mania like symptoms presented.

2                    To what degree the intensity of the symptoms

3    is such that one is diagnosed formally with mania is

4    outside of my area of expertise, and that's why we got the

5    psychiatrist involved.

6        Q.   I understand that.

7                    But you didn't consider her psychotic, right?

8        A.   Not at the beginning.

9        Q.   Okay.

10       A.   But certainly as she progressed in her symptoms,

11   we -- you know, we thought that it potentially could be

12   that.

13       Q.   Potentially, but it never got there, right?

14                   She wasn't -- she wasn't sent into a mental

15   institution, correct?

16       A.   Psychosis is not necessarily synonymous with sent

17   to a mental institution.

18       Q.   But the answer to my question, she was not put

19   into a mental institution, correct?

20       A.   Not during that episode.

21       Q.   She wasn't?

22       A.   She was not, right.

23       Q.   And as far as you know, she didn't have -- she

24   wasn't dilutional?

25       A.   She made some comments and statements that could

Page 53

1   be considered dilutional at the time, and she was

2   incoherent in some of the statements she made to me.

3       Q.   But when you compare her then to what happened as

4   a result of being in the clinical trial for 6101, it's a

5   world of difference, isn't it?

6                   MR. KETHCART:   Form.

7                   THE WITNESS:   It's hard to quantify or

8   measure exactly what that means.

9                   In both instances, she had neurocognitive

10  toxicity that manifested itself with mania like symptoms.

11  BY MR. MILSTEIN:

12      Q.   Okay.   But you saw her in both instances,

13  correct?

14      A.   That's correct.

15      Q.   And as a result of the adverse reaction that she

16  had from the 610 drug --

17      A.   Uh-huh.

18      Q.   -- she ended up in a mental institution for a

19  period of time, correct?

20      A.   That is correct.

21      Q.   She was psychotic, right?

22      A.   From what I can gather that the psychiatrist said,

23  the answer --

24      Q.   All right.

25      A.   -- would be yes.

Page 54

```
 1       Q.   She was incapable of taking care of herself,

 2   correct?

 3       A.   Correct.

 4       Q.   She had dilutions that her husband was trying to

 5   kill her or those kinds of sort of psychotic machinations

 6   of the brain, right?

 7       A.   That is correct.

 8       Q.   Much more severe that you saw as a result of the

 9   drug induced, steroid induced mania that she had in May of

10   2009, correct?

11       A.   I would call it a matter of degree of similar

12   symptoms.

13       Q.   Much more severe in the 2015 reaction to 0610,

14   correct?

15       A.   That is --

16                 MR. KETHCART:  Form.

17                 THE WITNESS:  That is correct.  The intensity

18   of her symptoms was worse.

19   BY MR. MILSTEIN:

20       Q.   While the intensity of the symptoms was different,

21   she certainly, in May of 2009, exhibited an adverse

22   reaction to a drug, correct?

23       A.   Correct.

24       Q.   And you concluded that because of the temporal

25   relationship between when those symptoms occurred and the
```

Page 55

1      drug that she was on, right?

2                    MR. KETHCART:   Foundation.

3                    THE WITNESS:   We concluded it was a

4      possibility that her symptoms were related to the

5      dexamethasone and a number of factors, including the

6      temporality of the association and the commonality of the

7      of the symptom in particular with that medication.

8      BY MR. MILSTEIN:

9        Q.   So -- but without question, she exhibited -- I

10     mean, the mania that she had wasn't caused by some natural

11     occurrence in her brain.  It was caused by the drug in

12     2009.  Right?

13       A.   In patients who receive steroids, just like it

14     happens for diabetes, we don't know if it's the steroids

15     causing the mania or the diabetes or if it's a masking of

16     previous position that a person would have to similar

17     symptoms.

18       Q.   In your notes --

19       A.   Yes.

20       Q.   -- don't you continually refer to it as

21     essentially steroid toxicity?

22       A.   That is correct.

23       Q.   Right.

24                    I mean, you continuously say she had a toxic

25     drug reaction to the steroid, which caused mania, right?

```
 1      A.    Correct.

 2      Q.    You don't -- I mean, you don't backtrack in any

 3   way in any of your notes and say, well, it may have been

 4   something else.

 5            Your conclusion in the notes, which is

 6   important for other doctors who read it and are treating

 7   her, was that she had drug induced mania, correct?

 8            MR. KETHCART:  Form.

 9            THE WITNESS:  It is correct.

10   BY MR. MILSTEIN:

11      Q.    So let's -- so --

12            MR. KETHCART:  Excuse me.

13            MR. MILSTEIN:  Sure.

14   BY MR. MILSTEIN:

15      Q.    Now let's move to 2015, December.

16            Your December -- correct me if I'm wrong.

17            Your December 1 note does not say you went

18   over the informed consent document with her, correct?

19      A.    Can you restate the question again?

20      Q.    Correct me if I'm wrong --

21      A.    Uh-huh.

22      Q.    -- your December 1 --

23            MR. KETHCART:  It's back here.

24   BY MR. MILSTEIN:

25      Q.    -- 2015 note does not say you went over the
```

1    informed consent document with her.

2        A.    My note does not explicitly state that I went

3    through every page of the consent form with her.

4        Q.    Your note doesn't say you went over the consent

5    form at all, does it?

6        A.    No.   It describes the usual and customary practice

7    of what we do in describing clinical trials with our

8    patients.

9        Q.    Right.

10             So why don't you read it into the record,

11   that December 1st note with respect to the clinical trials.

12       A.    What do I read in the record?

13       Q.    Yeah, just read it.

14       A.    What we said is, after further consideration, she

15   will participate in the trial.  She had an opportunity to

16   meet with our study coordinator and review the potential

17   risk, benefit, logistics, and usual protocol for the

18   clinical trial.  She will be enrolled later today.

19       Q.    Okay.  So it does not in any way suggest that you

20   went over the informed consent document with her?

21       A.    Not in this note.

22       Q.    Okay.  And it's true, isn't it -- don't they teach

23   you in medical school from a very early point, if it's not

24   in the records, it didn't happen?

25             You've heard that phrase, right?

Page 58

1             MR. KETHCART:  Form, foundation.

2    BY MR. MILSTEIN:

3        Q.   Have you ever heard the phrase, if it's not in the

4    record, it didn't happen?

5        A.   I have heard that phrase.

6        Q.   Okay.  And you're pretty -- and you are a careful

7    scrivener, so to speak, of the discussions that you've had

8    with your patients in putting into the records --

9             THE VIDEOGRAPHER:  We're off the record at

10   3:29.

11            (Recess taken from 3:29 p.m. to 3:31 p.m.)

12            THE VIDEOGRAPHER:  We're back on the record

13   at 3:31.

14   BY MR. MILSTEIN:

15       Q.   Okay.  And I was just saying you are a fairly

16   careful scrivener with respect to recording conversations

17   you have with your patients, correct?

18            MR. KETHCART:  Form and foundation.

19            THE WITNESS:  Yes.

20   BY MR. MILSTEIN:

21       Q.   Now, when you said that you had no reason to

22   believe that she would not be a good candidate for this

23   trial, you were dependent, were you not, on information

24   supplied by Constellation with respect to the preclinical

25   work they had done on the drug and the clinical trials that

1   had already been conducted, correct?

2       A.   The clinical trial documents are developed with

3   information that's provided by a pharmaceutical company.

4           And the principal investigator for that will

5   review that material and then propose that as a clinical

6   trial, and we depend on that document.

7       Q.   I'm talking about you in particular.

8           When you recommended to Ms. Spedale and her

9   family that this might be a good fit for her --

10      A.   Uh-huh.

11      Q.   -- the information that you had was information

12  that would have been supplied by Constellation, correct?

13      A.   As one of many sources.

14          Without knowing the specific to the compound,

15  this type of drugs were an active discussion in the myeloma

16  community regarding drugs that were of interest for further

17  development.

18      Q.   That is BETs?

19      A.   The BETs, correct.

20      Q.   But this particular compound that Constellation

21  was trying to put on the market, Constellation had

22  information about animal studies that it conducted, for

23  instance.

24          You didn't have that information, correct?

25      A.   I only had the information specific to the

1  clinical trial document that was provided to us.

2       Q.   So did not have the animal studies results that --

3       A.   I don't know if they were animal studies or not.

4            All I can say is --

5       Q.   Okay.

6       A.   -- I can only read the protocol material that

7  was --

8       Q.   Right.

9       A.   -- provided to us.

10      Q.   You had no information from Constellation that

11 suggested that the drug could cause neurological or

12 psychiatric adverse events, correct?

13      A.   Not anything beyond what's in the clinical

14 trial.

15      Q.   You mean what's in the protocol.

16      A.   In the protocol.

17      Q.   And there's nothing in the protocol that suggests

18 that a patient who would be in this trial could have an

19 adverse event such as the one that Ms. Spedale had,

20 correct?

21            MR. KETHCART:  Foundation.

22            THE WITNESS:  There's no specific toxicity

23 mentioned in the protocol that would lead us to believe

24 that would happen in her case.

25 BY MR. MILSTEIN:

Page 61

1     Q.   And again, that information is dependent on what

2   Constellation supplies to you, correct?

3     A.   Not to me, but to the person who writes a clinical

4   trial.  I --

5     Q.   Who writes the protocol?

6     A.   Whenever I use the word clinical trial and

7   protocol, they're interchangeable.  But yes, the

8   protocol.

9     Q.   Okay.  And do you understand that Dr. Bergsagel

10  testified that he didn't write the protocol; constellation

11  wrote the protocol?

12            Do you understand that?

13     A.   He has to have the final sign-off to any protocol,

14  just like any principal investigator.  So he has to review

15  the material for accuracy and sign off as the package is

16  submitted to our research --

17     Q.   I don't know why you're arguing with me.

18            He testified that he read it, but he

19  testified that they wrote it, not him.

20     A.   I don't know what he did, but --

21     Q.   Okay.

22     A.   -- I'm just saying it's customary practice that a

23  protocol is developed, and it was submitted to the IRB.

24            But I do consider that my responsibility when

25  I submit a protocol that the contents are accurate and

Page 62

1    consistent with what we know.

2        Q.    Okay.  He testified they wrote the protocol and

3    they wrote the informed consent document.

4               Do you know that or do not know that?

5        A.    I don't know that.

6        Q.    Okay.  You were not a co-investigator on this

7    trial, were you?

8        A.    I was mentioned in the IRB form that allows me to

9    present the protocol and discuss with the study coordinator

10   the informed consent.

11              I didn't develop the protocol, and I didn't

12   participate in any other way in its development.

13       Q.    Okay.  After Ms. Spedale was enrolled and started

14   to be dosed by this drug, do you know whether she was on

15   any other drugs or was it a requirement of the study that

16   she not be on any other cancer drugs?

17       A.    At the time it was required she not be on any

18   other anti-myeloma therapy.

19              She could have been on medications for other

20   symptoms or medical problems, but she couldn't be on

21   specific therapy trying to address her myeloma.

22       Q.    Okay.  And so any drugs that you had prescribed

23   for her before she was no longer taking when she was in

24   this clinical trial, correct?

25       A.    She had to have stopped her previous anti-myeloma

Page 63

1   therapy.

2       Q.   And that would include any steroids that you would

3   have prescribed in the past, correct?

4       A.   With a therapeutic intent.

5            Steroids, when they're prescribed for

6   myeloma, they're prescribed in a very specific fashion,

7   meaning usually a high dose of a medication in the pill or

8   intravenous form.

9       Q.   All right.  And do you know whether, when she was

10  taking the particular drug in the clinical trial, that did

11  not include a steroid component, correct?

12      A.   To the best of my knowledge, the answer is no, she

13  was not getting steroids at the time.

14      Q.   Now, let me have you turn, if you can, to -- I

15  think it's Exhibit 4.

16           And let me represent to you that

17  Dr. Bergsagel testified that this is the amended MedWatch

18  form.  Although he said he did not believe he prepared it.

19           And by the way, do you know who prepared this

20  document?

21           MR. KETHCART:  Foundation.

22           THE WITNESS:  I wouldn't know.

23  BY MR. MILSTEIN:

24      Q.   Okay.  You didn't do it, right?

25           And I'm particularly looking at the -- if you

Page 64

1    start on 14955, which is the adverse event report.

2              MR. LIEDERMAN:   Those are the numbers at the

3    bottom he's referring to.

4              THE WITNESS:   14955, yeah.   I would have not

5    developed this specific document.

6    BY MR. MILSTEIN:

7         Q.   You would not?

8         A.   I would have not.

9         Q.   Okay.  So you could see the date of the event is

10   December 29, 2015.

11             Do you see that?

12        A.   I see that.

13        Q.   And you can see the patient's antecedent medical

14   history included, and then there's the dexamethasone

15   induced mania, right?

16        A.   That's correct.

17        Q.   And that's from your records, correct, and your

18   diagnosis and conclusion, correct?

19        A.   Whoever prepared this form did a narrative of my

20   medical records and documentation of previous medical

21   episodes.

22        Q.   And then if we look at the MedWatch form -- and by

23   the way, were you aware of what was going on when she was

24   taking the drugs?

25             I mean --

Page 65

1     A.    I was.

2     Q.    -- were you monitoring that?

3     A.    I was, yes.

4     Q.    Because you still considered yourself to be her

5    oncologist, even though she was in the clinical trial and

6    taking the study drug, correct?

7     A.    That is correct.

8     Q.    And did they send you copies of -- I don't know

9    how it works at Mayo.

10          Did you get copies of medical records or are

11   they just all on some, the computer that you're easily,

12   that you're able to look at?

13    A.    Our medical record is integrated, so we all have

14   access to those records.

15          In an event like this, there are usually

16   associated communications we have on the phone or email,

17   which would alert me in more than one way, including verbal

18   ways from our nurses if a patient is experiencing a

19   complication within a clinical trial and outside of a

20   clinical trial.

21    Q.    Okay.  And so before she -- she signs the informed

22   consent document December 1st.

23          You've already seen the record where she says

24   or someone says she was hopeful that the drug would help

25   her myeloma.

1                  I think you've testified that one of the

2    benefits she saw to participating was that this was an oral

3    drug she could take.

4                  So she could take it at home, didn't have to

5    come in and be infused, correct?

6        A.    That is correct.

7        Q.    And she was off all other drugs, all other cancer

8    drugs, correct?

9        A.    That is correct.

10       Q.    So isn't it fair to say that in her mind the only

11   therapy she was getting for her cancer was this drug, the

12   drug in the clinical trial, correct?

13                  MR. KETHCART:  Foundation.

14                  THE WITNESS:  Let me ask you a question.

15                  You mentioned allude to hopeful in that

16   document.

17                  What is the date of that document we're

18   referring to?

19   BY MR. MILSTEIN:

20       Q.    I believe that was a December 17th.

21                  MR. LIEDERMAN:  December 1 --

22                  MR. MILSTEIN:  December 1?

23                  MR. LIEDERMAN:  -- also by Bergsagel.

24   BY MR. MILSTEIN:

25       Q.    Oh, December 1 also.

1              So that's the date she signed up.

2      A.   Just for clarification, then I'll ask you to

3      repeat the question, if Dr. Bergsagel saw her that day and

4      dictated that note on that day, as was the practice at the

5      time, I would not have read his specific notes or the terms

6      used in that note.

7              Because it usually takes at least two days

8      before we would have medical record notes appear.

9      Q.   Okay.  That's not my --

10     A.   I just want to clarify that --

11     Q.   I --

12     A.   -- part.

13     Q.   -- understand.  I understand.

14             So let me see if I can get you the informed

15     consent document.

16             So Exhibit 10 is the informed consent

17     document.

18             And would you agree that one of the purposes

19     of the trial is listed there at the bottom, whether or not

20     the new drug, this experimental drug that's involved in

21     this Phase 1 safety study, whether it will be helpful for

22     her cancer, correct?

23     A.   We are very careful in how we explain Phase 1.  So

24     I would refer first to the first paragraph.  The main

25     purpose of the study is to determine to the highest dose

Page 68

1    that can be given to a patient.

2              Of course, as any other medical research

3    institution, if someone were to respond to a drug in a

4    Phase 1 trial, you would want to know that, and that's why

5    that's stated here in the consent form.

6    Q.   You didn't write this, right?

7              Constellation wrote this.

8              No one is accusing you of representing that

9    this drug has efficacy.

10   A.   Sure.

11   Q.   We're talking -- and Mayo is not a defendant, and

12   you're not a defendant.

13             They're the defendant.

14   A.   Uh-huh.

15   Q.   They're the ones who wrote this.

16             Isn't it true that they say one of the

17   purposes of this study is to see if the drug helps her

18   cancer?

19   A.   I'm not defending Mayo or Constellation.

20             I'm just explicitly stating what I do every

21   time --

22   Q.   I understand.

23   A.   -- I enroll a patient --

24   Q.   But you didn't --

25   A.   -- into a clinical trial.

1     Q.   You didn't -- your report doesn't say you went

2    over the informed consent document with her.

3              So just answer my question.

4              Isn't it true that listed as one of the

5    purposes of this trial whether or not the drug helps her

6    cancer?

7                   MR. LIEDERMAN:  Objection.

8                   MR. KETHCART:  Form.

9                   MR. LIEDERMAN:  You're asking him to

10   interpret something you're telling him that he didn't even

11   write.

12   BY MR. MILSTEIN:

13    Q.   Isn't that the sixth purpose there?

14    A.   What I can say is that in the document that I have

15   in front of me, being a consent form, the last bullet

16   states that there will be an interest in knowing if the

17   drug will help the disease, but it very clearly states

18   also, the main purpose of the study is to determine the

19   high dose of the medication, which is what we would always

20   tell patients that go into trials like this.

21    Q.   All right.  And you understand what the

22   therapeutic misconception is, right?

23    A.   Clearly.

24    Q.   That is that a patient, a cancer patient is going

25   to look at his or her doctor and believe that whatever his

1    or her doctor is recommending is in her best therapeutic

2    interest, whatever the document says, correct?

3        A.   Correct.

4        Q.   So we know, one, she was hopeful, correct?

5        A.   As I stated before, I believe any patient who goes

6    into a clinical trial, even in a Phase 1 trial, does have a

7    component of hope as they --

8        Q.   So we know --

9        A.   -- consider medications.

10       Q.   -- she was hopeful that the drug would help her

11   cancer, correct?

12       A.   I don't know of any patient that would go

13   unhopeful to a clinical trial.

14       Q.   You just have to answer the question.

15            So we know she was hopeful that drug would

16   help --

17       A.   There's a component --

18            MR. KETHCART:  Form and foundation.

19            Slow down, please.

20   BY MR. MILSTEIN:

21       Q.   We know -- we know that the informed consent

22   document says it's one of the purposes that the drug will

23   help her cancer, correct?

24       A.   The last bullet point --

25       Q.   All right.

Page 71

1      A.   -- of this page states that.

2      Q.   We know that, to be in this trial, she's got to be

3  off all other cancer drugs.

4           So that in her mind, the only drug she's

5  taking for her cancer is this drug, correct?

6           MR. KETHCART:  Form, foundation.

7           THE WITNESS:  I cannot tell what she's

8  thinking about the therapeutic --

9  BY MR. MILSTEIN:

10     Q.   Okay.

11     A.   -- intent.

12     Q.   The only drug she is taking for her cancer is this

13  drug --

14     A.   As --

15     Q.   -- correct?

16     A.   -- stated before, yes.

17           MR. KETHCART:  For our court reporter, just

18  slow down a little bit.  She's -- we're typing fast over

19  there.

20  BY MR. MILSTEIN:

21     Q.   Okay.  So let's -- let's go back to that other

22  document.

23     A.   This one?

24     Q.   So it says, the patient received her first dose of

25  the study drug on 10 December 2015 at a dose of 100 (sic)

Page 72

1    milligrams PO BID for 14 consecutive days followed by a

2    7-day rest period.

3              Do you see that?

4    A.    Which paragraph is that?

5              Yes, I see that.

6    Q.    Okay.  And were you aware of what dose she

7    actually was taking?

8    A.    Yes.

9    Q.    And --

10   A.    Because we have to adhere to what's written in the

11   protocol.

12   Q.    You keep saying we.

13             You weren't -- you were not implementing the

14   protocol, were you?

15   A.    Okay.  When I mean we, I'm talking in general, all

16   clinical trials.

17   Q.    Okay.

18   A.    To clarify, in this particular case, I was aware

19   of the specific dose that Ms. Spedale --

20   Q.    Okay.

21   A.    -- was taking for this protocol.

22   Q.    But I'm asking about you.

23             So you're her oncologist.  You're getting

24   reports of what she is taking.

25             And you get a report that she's taking 150

Page 73

1    milligrams PO BID, correct?

2         A.    Correct.

3         Q.    Do you also know which cohorts she's in, that is

4    whether or not she's getting the lower dose or one of the

5    higher doses?

6         A.    That is correct.

7         Q.    Do you know that when you're reading this?

8         A.    In her case, as would be in any Phase 1 trial, we

9    look at what cohort the patient is going into.

10        Q.    So you knew which cohort she was going into?

11        A.    I can't say that I remember specifically in her

12   case which cohort she was.

13               But it's the customary practice of mine to

14   look at Phase 1 trial, look at the dose cohort that a

15   patient is going into.

16        Q.    Okay.  Do you know whether she was taking, if she

17   was taking 300 milligrams a day, whether that was a

18   significantly higher dose than the individuals who were in

19   the first, the earliest cohort?

20        A.    I can't recall the comparison of the doses --

21        Q.    Okay.

22        A.    -- in the cohorts.

23        Q.    And then it says, on December 18th, 2005 (sic),

24   day 8 of her first cycle of treatment with the study drug,

25   the patient developed mild symptoms of mania.

Page 74

1                    Do you see that?

2       A.   I see that.

3       Q.   And were you -- did you become aware of that

4    immediately, that is on day eight --

5       A.   I would --

6       Q.   -- on December 8th?

7       A.   I would have to go back to the rest of the medical

8    records and perhaps our email communications to know, but I

9    think it's likely that it was communicated to me.

10      Q.   Okay.  Were you asked to opine as to whether or

11   not the mania that she developed and increased over time so

12   that it became a serious adverse event, ultimately ending

13   her in a mental institution, were you asked to opine

14   whether you thought the cause of the mania was essentially

15   the drug she was taking?

16                    MR. KETHCART:  Form.

17                    THE WITNESS:  I was asked to provide an

18   attribution to the toxicity once we had clear evidence of

19   the toxicity.

20                    It's possible.  If your question is to

21   December 18, was I asked to provide a causation to the drug

22   and the symptoms, I could not remember right now, but I

23   know I had to do it for a fact as we filled out the

24   toxicity forms for the protocol.

25   BY MR. MILSTEIN:

1     Q.   As you filled out the what?

2     A.   We fill out forms reporting toxicities associated

3   with medications and protocols.

4     Q.   Okay.  But you didn't fill out the MedWatch forms

5   or the adverse event forms?

6     A.   No.  The study coordinators do that on our

7   behalf.

8     Q.   But I'm asking you what you did.  Okay?

9          I'm really --

10    A.   Sure.

11    Q.   I'm really only concerned with --

12    A.   But you're asking me for an opinion.

13    Q.   I'm really only asking what you did.  Okay?

14    A.   Sure.

15    Q.   Were you asked to opine as to the cause of the

16   psychotic reaction she had to this drug or whether or not

17   it was caused by the drug?

18              MR. KETHCART:  Form.

19              THE WITNESS:  Once the toxicity was

20   determined to be present, yes, I was asked to provide an

21   opinion as to whether --

22   BY MR. MILSTEIN:

23    Q.   Who asked you that?

24    A.   -- it was medication related.

25              Mr. Singh, our study coordinator, would have

Page 76

1    come to me and asked me, what is the attribution of this

2    toxicity to the drug.

3        Q.   Okay.  When you say would have, I want to know

4    whether it did occur, whether you remember --

5        A.   It did occur.

6        Q.   Okay.  So it's your testimony Mr. Singh came to

7    you.

8             You were already aware that she had this

9    severe psychotic reaction.

10            And he said, do you think it's caused by the

11   study drug?

12       A.   Which date are you referring to?

13       Q.   Any date.  Any date.

14       A.   Oh, I can say that once it was established, and

15   the reason for my question, I would have provided that

16   opinion.

17            I am not certain that on December 18 --

18       Q.   No, I --

19       A.   -- I would have provided --

20       Q.   I understand that.

21       A.   -- that opinion.

22       Q.   I'm talking about if any -- and this is a -- this

23   is an amended MedWatch form.

24            So I'll represent to you that whoever

25   prepared the adverse event report, there was -- this is --

Page 77

1    the event was 12/29.

2            There was an adverse event report like this

3    prepared.  I believe it was January 20th or something like

4    that.  And then it was amended as her condition progressed.

5            I'm asking what you recall specifically about

6    being asked whether or not you believed the psychosis that

7    she experienced was related to the study drug.

8            MR. KETHCART:  Form.

9            THE WITNESS:  The patient came back for a

10   subsequent visit.

11           And at the time, I don't remember

12   specifically discussing attribution to psychosis, knowing

13   her background of what we had before.

14   BY MR. MILSTEIN:

15       Q.   When you say the patient came back, this was after

16   she was in the mental institution or before?

17       A.   No, before she was in a mental institution.

18           Once the diagnosis of a psychosis became

19   clear, I do remember the study coordinator asked me about

20   attribution, the study coordinator being Mr. Singh.

21       Q.   Okay.  I didn't realize that -- well, let's first

22   talk about what you first said.

23           So at some point in time you saw her after

24   the event occurred and before she was put into the mental

25   institution?

Page 78

1      A.    That is correct.

2      Q.    And how would you describe her?

3      A.    The symptoms of the mania had recurred and were

4    present during that visit, in addition to a number of other

5    toxicities that she reported to us, including

6    gastrointestinal toxicity at the time, which was most

7    prominent in her mind at the time.

8      Q.    Okay.  And at what point did Mr. Singh ask you

9    whether or not you believe the psychosis that's reflected

10   in the MedWatch forms was caused by the study drug?

11                 MR. KETHCART:   Foundation.

12   BY MR. MILSTEIN:

13     Q.    If you recall.

14                 If you don't recall, it's a fair answer.

15     A.    I don't recall specifically when that happened,

16   but I know for a fact it would have happened on December

17   29th, if not earlier.

18                 Because that was her subsequent appointment

19   when she came back to see us for completion of the cycle

20   one day 20 phase of her protocol.

21     Q.    Okay.  I mean, you see on the next paragraph it

22   says, on 29 December 2015, the investigator evaluated the

23   patient and assessed her mania as grade 1.

24                 Is that you?

25     A.    That would be me, correct.

Page 79

```
 1      Q.    Are you sure?

 2      A.    Let me verify my notes.

 3            If Mr. Singh is referring to the investigator

 4      in this case, that would be, in all likelihood, me.

 5            I cannot remember that specifically, but that

 6      would be, in all likelihood, me.

 7      Q.    Okay.  I mean, it makes sense because --

 8      A.    Sure.

 9      Q.    -- the last sentence of the paragraph says the

10      patient was reported by the investigator to have

11      experienced steroid induced psychosis in the past.

12            And that was certainly you, correct?

13      A.    Correct.

14      Q.    But there was no evidence she was taking steroids

15      during this current episode of mania.

16            So Mr. Singh comes to you probably December

17      29th.

18            Is that reflected in your notes?

19      A.    I don't see it on my note here.

20      Q.    Okay.

21      A.    Is this a complete set of notes from the medical

22      record?

23      Q.    I'm not sure if it is or it isn't.

24            MR. LIEDERMAN:  What's the date that you're

25      looking at?
```

1             MR. MILSTEIN:  December 29th.

2             THE WITNESS:  I believe there's a note

3    missing here from this package.

4             MR. LIEDERMAN:  (Indicating)

5             THE WITNESS:  Thank you.

6             MR. LIEDERMAN:  December 29.

7             THE WITNESS:  So to answer the specific

8    question, yes, it was me.

9             And the reference that is made under

10   impression report and plan, where it says, CTC criteria,

11   that's the standard terminology we use to determine

12   toxicity associated with medications in clinical trials.

13            MR. MILSTEIN:  All right.  So let's mark this

14   as the next exhibit.

15            I'll put it on this one.

16            (Exhibit No. 29 marked)

17   BY MR. MILSTEIN:

18       Q.   So unless I'm missing something, your note refers

19   to gastrointestinal adverse event?

20       A.   That is correct.

21       Q.   There's nothing in your note about the

22   psychosis?

23       A.   That is correct.

24       Q.   Were you aware of what was going on as far as her

25   psychosis?

Page 81

1      A.   My clinical notes, I don't document every single

2    toxicity that a patient would have.  I just make allusion

3    to the most salient problems and new discoveries that we

4    would have in a patient in a clinical trial.

5              So I don't dictate specifically every single

6    toxicity, which could include multiple, fatigue, mild

7    nausea, et cetera.

8              So you just make allusion to the salient ones

9    that are specific to that.

10      Q.   Okay.  But do you recall that you believed at the

11    time that, in addition to the gastro problems, she had

12    toxicity which had manifested itself in the psychosis --

13      A.   In a mild form, yes.

14      Q.   -- in a mania or dementia, or not dementia, mania

15    or how else would you describe it?

16      A.   She had mild symptoms that would be similar to

17    what she had experienced in the past.

18      Q.   Okay.  And so you concluded on December 29th that

19    the mania that she experienced was drug induced?

20      A.   I can't remember the specific attribution.  I

21    would have to look at the clinical trials.

22              Because we make a series of determinations,

23    whether it's very likely, possible, probable, et cetera.  I

24    don't remember how I --

25      Q.   But --

Page 82

1    A.    -- recorded it.

2    Q.    -- I believe you're testifying that you noticed

3    that she was having mania similar to the mania that you

4    observed as a result of the steroids and concluded that

5    this was a toxicity of the study drug?

6    A.    I don't remember documenting specifically --

7    Q.    I know you didn't document it.

8    A.    -- that this is the toxicity of a drug.

9          I just said that, based on what I read from

10   the note and in the clinical trial documentations, we have

11   a form that puts attribution to toxicity to the

12   medications.

13   Q.    Okay.  Now, you understand, do you not, that after

14   December 29th, the mania escalated?

15   A.    Correct.

16   Q.    Did you see her after December 29th --

17   A.    I believe --

18   Q.    -- before she went into the mental institution?

19   A.    I believe the next appointment occurred with other

20   providers, including Dr. Engle, who was her primary care

21   provider.

22   Q.    So you didn't see her afterwards?

23   A.    No.  We peripherally knew about what was going

24   on.

25   Q.    Okay.  And were you asked at any later date

1    whether or not what was now grade 3 or 4 adverse event was

2    related to the study drug?

3                 Were you asked again by Mr. Singh?

4        A.    I was asked on multiple occasions subsequent to

5    that, what do you think about this toxicity and its

6    attribution by Mr. Singh.

7        Q.    At what point did you say, get her off the drug?

8        A.    When she had severity of symptoms that -- when her

9    mania escalated after her visit on December 29th, we took

10   her off the medication.  I -- just looking at the record, I

11   can't tell specifically which day.

12                It probably is documented in our emails when

13   we do that, but it must have been subsequent to the visit

14   on 12/29.

15       Q.    Okay.  And the reason you said get her off the

16   drug is because why?

17       A.    I always explain to the patients that we have the

18   prerogative of removing them from any trial if we don't

19   think it's in their best interesting to continue in such

20   medication.

21       Q.    And so at that point you didn't think it was in

22   her best interest?

23       A.    At that point, that was my determination based on

24   the toxicity she had.

25       Q.    And the toxicity she had was, not only the

1    gastrointestinal, but the mania?

2        A.    Correct.

3        Q.    And I know you weren't in the clinical trial.

4               Was this, in your view -- were you ever asked

5    whether this was DLT or dose limiting toxicity?

6        A.    Determining dose limiting toxicity was not in my

7    purview.  It was only to report the toxicity and the

8    attribution to those toxicities.

9               So I was not involved in determination of

10   DLT.

11       Q.    Okay.  Okay.  And you've seen her -- you still see

12   her?

13       A.    Correct.

14       Q.    And how often do you see her?

15       A.    On the average, about once a month.

16       Q.    And how is her myeloma?

17       A.    She's currently getting treatment, and this

18   treatment has provided some control, but it has proven to

19   be still a very difficult version of myeloma.  It's

20   somewhat persistent to her current therapies.

21       Q.    Okay.  At the time she entered the trial, she was

22   asymptomatic, correct?

23       A.    That is correct.

24       Q.    Is she asymptomatic now?

25       A.    From the myeloma perspective?

1    Q.   Yes.

2    A.   Yes, she is asymptomatic right now.

3    Q.   Does she have a prognosis?

4    A.   It is impossible for us to estimate that with

5    precision, but a person like her without treatment would

6    usually succumb to complications of the disease within a

7    period of a year or two.

8    Q.   Okay.  But she's in treatment?

9    A.   She's currently in treatment, yes.

10    Q.   Okay.  And is there a prognosis with treatment?

11    A.   As I said, it's impossible for me to know that

12    precisely because --

13    Q.   I know --

14    A.   -- we have been able to provide some control for

15    her disease.

16         So as she is right now, her life span could

17    go from several months to still many years.  Because we

18    still have, based on approval since she was treated, other

19    options for her treatment.

20    Q.   And she had other options for her treatment before

21    entering into the clinical trial, correct?

22    A.   Correct.  Those were discussed before.

23    Q.   This is a question more out of my own curiosity.

24         If somebody has a disease like this, why is

25    it asymptomatic?

Page 86

 1                    I don't understand.  She -- she has the

 2   cancer.

 3        A.    Uh-huh.

 4        Q.    Why is it asymptomatic?

 5        A.    In her particular case -- and this is little bit

 6   of a technicality, but it will deserve explanation because

 7   this is important to the rationale of why we treat her.

 8                    This light chains that she has in her blood

 9   and has had all along have a propensity to quote, unquote,

10   stick in the various organs of her body, including her

11   heart and her tongue.  In fact, her enlarged tongue was one

12   of the features she had when she presented.

13                    And even though someone has no symptoms,

14   absent treatment, what we face is a risk that there will be

15   more deposits, and then those proteins will interfere with

16   organ function, including heart failure, malabsorption,

17   changes with blood pressure, et cetera.  So even in the

18   absence of symptoms, per se, we have to treat.

19                    An analogy I would use for this is, someone

20   who has an early breast cancer may be completely

21   asymptomatic.  We know we have to treat it because the

22   natural progression of that is fail to the person.

23        Q.    And if it's asymptomatic, how do you know she has

24   the myeloma?

25        A.    We are very fortunate that we have blood markers

1    that we can use to determine whether someone has the

2    underlying condition.

3        Q.   So you were asked a question about her permanency

4    with respect to the psychosis that she underwent.

5             She's no longer psychotic, correct?

6        A.   She appears not to be psychotic anymore,

7    correct.

8        Q.   Right.

9             We can agree that she had a severe psychotic

10   episode, correct?

11       A.   Correct.

12       Q.   And while she has recovered from that, that may

13   have had -- the event may have caused lasting damage to her

14   brain, correct, and that's what we're seeing now?

15            MR. LIEDERMAN:  Objection.

16            THE WITNESS:  I am not qualified to make that

17   statement given that it's out of my purview.

18            But she has neurocognitive deficits that are

19   present now that we had not seen before, but I cannot make

20   that association.

21       Q.   Okay.  When do you have to get out of here?

22       A.   By 5:00.

23            That's what I was told.  I don't know what

24   time is it actually.

25            MR. MILSTEIN:  We'll absolutely get you out

Page 88

1   of here either --

2                       MR. KETHCART:  It's five after 4:00.

3   BY MR. MILSTEIN:

4        Q.   -- at 5:00 directly.

5        A.   Okay.

6        Q.   If you ask these guys, I got the last guy out

7   exactly at 2:00, so --

8        A.   Okay.

9        Q.   We'll get you out by 5:00.

10                      Do you recall there was an email discussion

11   with Constellation about whether or not her mania occurred

12   while she was on the protocol or before?

13       A.   I don't recall.

14                      Was I involved in that email conversation?

15       Q.   I think you were.

16                      So let me show you Exhibit 13, which is a

17   string of emails, and ask you if you recall --

18       A.   Okay.  I have it here.  I can read it.

19       Q.   Okay.  Does that refresh your recollection as to

20   that chain of emails and conversations?

21       A.   It does.

22       Q.   And I think that's the only time you were really

23   copied on the clinical trial documents or the emails.

24                      So what do you recall about that?

25       A.   From reading this, my recollection is that there

1    was a desire to get more information about her symptoms to

2    try to determine whether there was a cause and effect

3    associated with the medication.

4        Q.   And the individual from Constellation suggested

5    that there wasn't a cause and effect because the symptoms

6    occurred while she was not on the drug.

7                 Is that what you recall?

8        A.   "Thanks J.R.  The fact that her symptoms began

9    during a time where she was not taking further decreases my

10   suspicion," so --

11       Q.   And then what happened --

12       A.   Correct.

13       Q.   -- is Mr. -- how do you pronounce his name again,

14   Mr. --

15       A.   Singh.

16       Q.   -- Singh brought you into the conversation.

17                 And you corrected the Constellation

18   representative and said, no, no, no, her mania occurred

19   while on the protocol, while taking the drug, right?

20       A.   That is correct.

21       Q.   And is there anything -- do you recall -- strike

22   that.

23                 Do you have a present recollection of this or

24   is it simply you're reading the emails and so you're

25   responding?

Page 90

1      A.   As I'm reading the emails, I'm responding to the

2   questions.

3               I knew that there were a number of

4   conversations I had, particularly with J.R., about the

5   causality of the medications, not specifically the string

6   of the emails.

7               MR. MILSTEIN:  Okay.  All right.  That's all

8   I have.

9               Thank you.

10              MR. LIEDERMAN:  Just one line of questions.

11              MR. MILSTEIN:  Don't ever believe him when he

12   says that.

13              MR. LIEDERMAN:  Famous last words from a

14   lawyer.

15                         EXAMINATION

16   BY MR. LIEDERMAN:

17      Q.   When the decision was made for her to enroll --

18   strike that.

19              Leading up to the decision to enroll in this

20   trial, you have already indicated and the records show that

21   there were other alternatives, infusion as opposed to the

22   clinical trial.

23              As her treating physician, did you have a

24   preference if she was -- rather, strike that.

25              Did you have a preference for what form of

1   treatment you would have proceeded with?

2       A.   As a treating physician, and I'm known by my

3   colleagues about this, I go through great lengths to

4   explain to patients that they are the ones making the

5   decision with my counsel.

6               And I can't remember specifically of a

7   preference in this particular case other than saying, these

8   are the options we have for your treatment, these are the

9   pros to consider and the cons, and then based on that, make

10  that decision with the patient and her family council.

11      Q.   What I'm trying to get at was, ultimately, was the

12  decision to go to the oral option through the clinical

13  trial made by her --

14      A.   Uh-huh.

15      Q.   -- and not by you?

16      A.   The final decision is always the patient, not by

17  me.

18      Q.   And at any point in time, did she ask you whether

19  or not you had a preference all things considered?

20      A.   We get that question all the time from patients,

21  and I always bounce it back and say, it is up to you to

22  decide what the best treatment is for you based on the

23  information I have provided to you.

24      Q.   And the inclusion of the clinical trial as an

25  option, was it only an option because of your patient, Ms.

Page 92

1    Spedale's unknown objection/preference not to have an

2    infusion, but rather to have oral medication?

3              In other words, was the option, the choice,

4    presented to her of the clinical trial a reflection of the

5    fact that you, a treating physician, understood that she

6    really wanted an oral medication option?

7    A.   It was one of the factors that was provided to me,

8    yes, as her physician, to think about the options that

9    would be consistent with her wishes.

10   Q.   Did she understand that the other options, the

11   infusion options, the other options that you were

12   presenting to her, were FDA approved options, while the

13   clinical trial was not an FDA approved drug at the present

14   time, at that time?

15   A.   That would be my belief.

16   Q.   Okay.

17              MR. MILSTEIN:  Well, you don't really know

18   what she was thinking, do you?

19              THE WITNESS:  No one can know what any other

20   human thinks, so I --

21              MR. MILSTEIN:  Right.

22              THE WITNESS:  The answer is no.

23              MR. MILSTEIN:  And you've read about

24   therapeutic misconception, as we said, right?

25              THE WITNESS:  Correct.

Page 93

1                    MR. MILSTEIN:  And so even if somebody has an

2    informed consent document that says one thing, the

3    therapeutic misconception certainly conveys the possibility

4    that they believe --

5                    MR. LIEDERMAN:  Okay.

6                    MR. MILSTEIN:  -- their physician believes

7    this is in their best therapeutic option.

8                    MR. LIEDERMAN:  Let me finish my line of

9    questioning.

10                   MR. KETHCART:  Form.

11   BY MR. LIEDERMAN:

12       Q.   Okay.  You had extensive discussions with her?

13       A.   Uh-huh.

14       Q.   Based on your conversations with her, what you

15   know you said to her, did you convey to her that one

16   option, which would be oral, was not yet approved as a drug

17   by the FDA?

18       A.   That would be accurate.

19                   I would have said it with different words,

20   but I would have said, through the process of a clinical

21   trial, we have an oral medication that could be an option

22   for your treatment.

23       Q.   Okay.  In your mind, with those choices, was there

24   efficacy associated with the infusion options?

25       A.   If I would have discussed with her that we were

Page 94

1  going to move forward with an infusion, I would have talked

2  to her specifically about efficacy and would provide her

3  with some estimates of that efficacy and a percent rate of

4  response or the like.

5      Q.    And you did not do that when you were discussing

6  the clinical trial drug?

7      A.    No.

8      Q.    Okay.  Did you contrast that with her, that you

9  could discuss efficacy in one context and not in the other?

10     A.    I would have not made a contrast of saying the

11  efficacy in this is this, and in the clinical trial, it

12  would be this efficacy.

13            I would always state that in a Phase 1

14  clinical trial the efficacy is unknown, there are pros and

15  cons of participating in a clinical trial, but not mention

16  any particular number or response rate or anything of the

17  like.

18            MR. LIEDERMAN:  Okay.  No further

19  questions.

20            MR. MILSTEIN:  Nothing further.

21            MR. KETHCART:  All right.

22            THE VIDEOGRAPHER:  Please stand by.

23            This ends Media Number 1 in today's

24  deposition.

25            We're off the record at 4:16.

1              MR. KETHCART:  We will read and sign.

2              THE VIDEOGRAPHER:  Thank you.  We're off the

3  record.

4              (Deposition concluded at 4:16 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 96

1    STATE OF ARIZONA        )

2    COUNTY OF MARICOPA      )

3            BE IT KNOWN that the foregoing deposition was

4    taken by me pursuant to stipulation of counsel; that I was

5    then and there a Certified Reporter of the State of

6    Arizona, and by virtue thereof authorized to administer an

7    oath; that the witness before testifying was duly sworn by

8    me to testify to the whole truth; that the questions

9    propounded by counsel and the answers of the witness

10   thereto were taken down by me in shorthand and thereafter

11   transcribed into typewriting under my direction; that the

12   witness has requested a review pursuant to Rule 30(e)(2);

13   that the foregoing pages are a full, true, and accurate

14   transcript of all proceedings, all done to the best of my

15   skill and ability.

16           I FURTHER CERTIFY that I am in no way related to

17   nor employed by any parties hereto nor am I in any way

18   interested in the outcome hereof.

19           DATED at Phoenix, Arizona, this 25th day of May,

20   2018.

21

22

23

24           _____

                Talia Douglas, RPR
25              Certified Reporter #50775

1                    DEPOSITION SIGNATURE PAGE

2     SPEDALE vs. CONSTELLATION PHARMACEUTICALS, INC.
      Assignment No. J2164352
3

4            DECLARATION UNDER PENALTY OF PERJURY

5            I declare under penalty of perjury that I have

6     read the entire transcript of my Deposition taken in the

7     captioned matter or the same has been read to me, and the

8     same is true and accurate, save and except for changes

9     and/or corrections, if any, as indicated by me on the

10    DEPOSITION ERRATA SHEET hereof, with the understanding that

11    I offer these changes as if still under oath.

12

13           Signed on the _____ day of

14    _____, 20_____.

15

16

17

18

19           _____
                      Rafael Fonseca, M.D.

20

21

22

23

24

25

Page 98

```
1                    DEPOSITION ERRATA SHEET
                     Assignment No. J2164352
2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24
     SIGNATURE:_____DATE:_____
25              Rafael Fonseca, M.D.
```

Page 99

1        DEPOSITION ERRATTA SHEET
              Assignment No. J2164352
2

3   Page No._____Line No._____Change to:_____

4   _____

5   Reason for change:_____

6   Page No._____Line No._____Change to:_____

7   _____

8   Reason for change:_____

9   Page No._____Line No._____Change to:_____

10  _____

11  Reason for change:_____

12  Page No._____Line No._____Change to:_____

13  _____

14  Reason for change:_____

15  Page No._____Line No._____Change to:_____

16  _____

17  Reason for change:_____

18  Page No._____Line No._____Change to:_____

19  _____

20  Reason for change:_____

21  Page No._____Line No._____Change to:_____

22  _____

23  Reason for change:_____

24
    SIGNATURE:_____DATE:_____
25           Rafael Fonseca, M.D.

Hematology Subsequent Visit
* Final Report *

SPEDALE, IRIS R - 05-917-191-8

| | |
|---|---|
| Result Type: | Hematology Subsequent Visit |
| Result Date: | 16-Oct-2017 11:30 MST |
| Result Status: | Auth (Verified) |
| Performed By: | Fonseca MD, Rafael on 16-Oct-2017 11:30 MST |
| Verified By: | Fonseca MD, Rafael on 16-Oct-2017 11:30 MST |
| Encounter info: | 1035532, Mayo Clinic in Arizona, MCA Patient, 02-Nov-2001 - |

# * Final Report *

## CHIEF COMPLAINT/REASON FOR VISIT:
Follow up multiple myeloma, currently receiving therapy with daratumumab, Revlimid, and dexamethasone, now has completed 7 cycles.

## HISTORY OF PRESENT ILLNESS:
Mrs. Spedale returns today for her scheduled followup appointment. She is doing well and has no new symptoms to report. Still has significant problems with swallowing and taking her medications. The back part of her teeth still causes problems while she is eating. She is concerned as the splitting of the Zyprexa has been associated with increased drowsiness throughout the day. She would like to discuss the dosing with Dr. Stonnington. Her blood work looks fine and her free light chains are stable.

## ALLERGIES:
1. Ambien.
2. Celecoxib.
3. Anabolic steroids.
4. Gabapentin.
6. Geodon.
7. Naproxen.
8. Oxaprozin.

## CURRENT MEDICATIONS:
The medication record has been reviewed.

## PAST MEDICAL HISTORY:
Past myeloma history:

Diagnosis: She was first noted to have macroglossia which ultimately led to the diagnosis of amyloidosis. She also had evidence of submandibular gland enlargement. We are seeing this patient at the request of Dr. Bruce Raphael, a hematologist from New York City, who referred the patient to us for an evaluation regarding myeloma amyloidosis. This is a patient who symptomatically presented with evaluation for macroglossia, was biopsied and was found to have amyloid deposition. The patient was subsequently found to have on a bone marrow biopsy plasmacytosis that was variable, somewhere between 30% in the aspirate to 80%-90% in one of the clot sections. The patient also was noted to have multiple lytic bone lesions on the calvarium. The patient was referred to us for consideration of treatment including autologous stem cell transplantation. The patient denies the presence of signs or symptoms associated with other amyloid complications such as orthostatic hypotension, peripheral neuropathy, hepatomegaly, cardiac involvement, or other. I note that she had an echocardiogram that showed a septum of 7 mm and was for the most part normal. The patient was originally diagnosed in the summer of 2008. She also had detection of t(14;16).

| | |
|---|---|
| Printed by: | Hanson, Amber L. |
| Printed on: | 08-Dec-2017 08:15 MST |



Hematology Subsequent Visit                                    SPEDALE, IRIS R – 05-917-191-8
* Final Report *

Treatment 1: CyBorD. The patient had to be restarted on therapy with CyBorD in the summer of 2013 and completed that by year's end.

Treatment 2: SCT. Mrs. Spedale received melphalan at 200 mg/m2 on November 11 and received infusions of her stem cells back on 11/13 and 11/14. She has been followed by Meagan Higgins, NP, and Margaret Gallant, RN, at the hospital, and has successfully recovered since her admission. She still has some weakness and continues to work on her appetite and mobility. Overall, however, she seems to have recovered successfully from the transplant and has had no complications since she was dismissed.

Treatment 3: CyBorD #2. Starting in August 2013. The patient was receiving but developed GI toxicity, and it had to be discontinued. Completed the end of 2013.

Treatment 4: Rd. Started October 2014. Received until February of 2015 when she had a DVT/PE. Because of that, the patient achieved an excellent response, but the therapy ultimately had to be stopped because of gastrointestinal toxicity. I did discuss with the patient again the possibility of a stem cell transplant, but she opted for a maintenance strategy with Revlimid. She took Revlimid for about three months but ultimately developed DVT with an associated pulmonary embolism.

Treatment 5: Clinical trial participation with BET inhibitor (CPI-0610). Took for one month but had to discontinue due to toxicity and development of mania.

Treatment 6: Carfilzomib mono-therapy followed by Car-CTX. Will start next of carfilzomib single agent. Day 1 Cycle 1 was July 12, 2016. Tolerating well.

Treatment 7: Dara-Rd. Daratumumab plus Revlimid (10 mg) and dexamethasone were started April 2017.

REVIEW OF SYSTEMS:
ECOG performance status is 3. A 10-point system review was performed and is negative except for what is mentioned in the HPI.

PHYSICAL EXAM:
Physical examination was not done this visit.

IMPRESSION/REPORT/PLAN:
The patient is doing well with treatment and has no new symptoms to report. She was seen by Urogynecology and she has a follow-up appointment with them. At this point we will continue with infusions once per month at the same dose suggest. There are no changes planned in her treatment.

Completed Action List:
* Perform by Fonseca MD, Rafael on  16-Oct-2017  11:30 MST
* Sign by Fonseca MD, Rafael on  16-Oct-2017  11:30 MST
* Verify by Fonseca MD, Rafael on  16-Oct-2017  11:30 MST

