Hematology Subsequent Visit                              SPEDALE, IRIS R - 05-917-191-8
* Final Report *

Result Type:        Hematology Subsequent Visit
Result Date:        16-Oct-2017  11:30 MST
Result Status:      Auth (Verified)
Performed By:       Fonseca MD, Rafael on  16-Oct-2017  11:30 MST
Verified By:        Fonseca MD, Rafael on  16-Oct-2017  11:30 MST
Encounter Info:     1035532, Mayo Clinic in Arizona, MCA Patient, 02-Nov-2001 -

# * Final Report *

CHIEF COMPLAINT/REASON FOR VISIT:
Follow up multiple myeloma, currently receiving therapy with daratumumab, Revlimid, and dexamethasone, now has
completed 7 cycles.

HISTORY OF PRESENT ILLNESS:
Mrs. Spedale returns today for her scheduled followup appointment.  She is doing well and has no new symptoms to
report.  Still has significant problems with swallowing and taking her medications.  The back part of her teeth still causes
problems while she is eating.  She is concerned as the splitting of the Zyprexa has been associated with increased
drowsiness throughout the day.  She would like to discuss the dosing with Dr. Stonnington.  Her blood work looks fine and
her free light chains are stable.

ALLERGIES:
1. Ambien.
2. Celecoxib.
3. Anabolic steroids.
4. Gabapentin.
6. Geodon.
7. Naproxen.
8. Oxaprozin.

CURRENT MEDICATIONS:
The medication record has been reviewed.

PAST MEDICAL HISTORY:
Past myeloma history:

Diagnosis: She was first noted to have macroglossia which ultimately led to the diagnosis of amyloidosis.  She also had
evidence of submandibular gland enlargement.  We are seeing this patient at the request of Dr. Bruce Raphael, a
hematologist from New York City, who referred the patient to us for an evaluation regarding myeloma amyloidosis. This is
a patient who symptomatically presented with evaluation for macroglossia, was biopsied and was found to have amyloid
deposition. The patient was subsequently found to have on a bone marrow biopsy plasmacytosis that was variable,
somewhere between 30% in the aspirate to 80%-90% in one of the clot sections. The patient also was noted to have
multiple lytic bone lesions on the calvarium. The patient was referred to us for consideration of treatment including
autologous stem cell transplantation. The patient denies the presence of signs or symptoms associated with other
amyloid complications such as orthostatic hypotension, peripheral neuropathy, hepatomegaly, cardiac involvement, or
other. I note that she had an echocardiogram that showed a septum of 7 mm and was for the most part normal. The
patient was originally diagnosed in the summer of 2008.   She also had detection of t(14;16).



Printed by:      Hanson, Amber L.                                    Page 1 of 2
Printed on:      08-Dec-2017 08:15 MST                               (Continued)

Hematology Subsequent Visit
* Final Report *

SPEDALE, IRIS R – 05-917-191-8

Treatment 1: CyBorD. The patient had to be restarted on therapy with CyBorD in the summer of 2013 and completed that by year's end.

Treatment 2: SCT. Mrs. Spedale received melphalan at 200 mg/m2 on November 11 and received infusions of her stem cells back on 11/13 and 11/14. She has been followed by Meagan Higgins, NP, and Margaret Gallant, RN, at the hospital, and has successfully recovered since her admission. She still has some weakness and continues to work on her appetite and mobility. Overall, however, she seems to have recovered successfully from the transplant and has had no complications since she was dismissed.

Treatment 3: CyBorD #2. Starting in August 2013. The patient was receiving but developed GI toxicity, and it had to be discontinued. Completed the end of 2013.

Treatment 4: Rd. Started October 2014. Received until February of 2015 when she had a DVT/PE. Because of that, the patient achieved an excellent response, but the therapy ultimately had to be stopped because of gastrointestinal toxicity. I did discuss with the patient again the possibility of a stem cell transplant, but she opted for a maintenance strategy with Revlimid. She took Revlimid for about three months but ultimately developed DVT with an associated pulmonary embolism.

Treatment 5: Clinical trial participation with BET inhibitor (CPI-0610). Took for one month but had to discontinue due to toxicity and development of mania.

Treatment 6: Carfilzomib mono-therapy followed by Car-CTX. Will start next of carfilzomib single agent. Day 1 Cycle 1 was July 12, 2016. Tolerating well.

Treatment 7: Dara-Rd. Daratumumab plus Revlimid (10 mg) and dexamethasone were started April 2017.

REVIEW OF SYSTEMS:
ECOG performance status is 3. A 10-point system review was performed and is negative except for what is mentioned in the HPI.

PHYSICAL EXAM:
Physical examination was not done this visit.

IMPRESSION/REPORT/PLAN:
The patient is doing well with treatment and has no new symptoms to report. She was seen by Urogynecology and she has a follow-up appointment with them. At this point we will continue with infusions once per month at the same dose suggest. There are no changes planned in her treatment.

**Completed Action List:**
* Perform by Fonseca MD, Rafael on  16-Oct-2017  11:30 MST
* Sign by Fonseca MD, Rafael on  16-Oct-2017  11:30 MST
* Verify by Fonseca MD, Rafael on  16-Oct-2017  11:30 MST



| Next Page | Export Data | Import Data | Reset Form |

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
Food and Drug Administration

## INVESTIGATIONAL NEW DRUG APPLICATION (IND)
*(Title 21, Code of Federal Regulations (CFR) Part 312)*

Form Approved: OMB No. 0910-0014
Expiration Date: April 30, 2015
*See PRA Statement on page 3.*

NOTE: No drug/biologic may be shipped or clinical investigation begun until an IND for that investigation is in effect (21 CFR 312.40)

**1. Name of Sponsor**
Constellation Pharmaceuticals

**2. Date of Submission** *(mm/dd/yyyy)*
06/05/2013

**3. Sponsor Address**

Address 1 *(Street address, P.O. box, company name c/o)*
215 First Street

Address 2 *(Apartment, suite, unit, building, floor, etc.)*
Suite 200

| City | State/Province/Region |
|---|---|
| Cambridge | MA |

| Country | ZIP or Postal Code |
|---|---|
| USA | 02142 |

**4. Telephone Number** *(Include country code if applicable and area code)*
617 714-0573

**5. Name(s) of Drug** *(Include all available names: Trade, Generic, Chemical, or Code)*
CPI-0610
2-((4S)-6-(4-chlorophenyl)-1-methyl-4H-benzo[c]isoxazolo[4,5-e]azepin-4-yl) acetamide monohydrate
(also known as QDN02, CPI-267232)

Continuation Page for #5

**6. IND Number** *(If previously assigned)*

**7. (Proposed) Indication for Use**
Treatment of hematologic malignancies

Is this indication for a rare disease (prevalence <200,000 in U.S.)?  ☐ Yes  ☑ No

Does this product have an FDA Orphan Designation for this indication?  ☐ Yes  ☑ No  ☐

If yes, provide the Orphan Designation number for this indication:

Continuation Page for #7

**8. Phase(s) of Clinical Investigation to be conducted**  ☑ Phase 1  ☐ Phase 2  ☐ Phase 3  ☐ Other *(Specify):* _____

**9.** List numbers of all Investigational New Drug Applications (21 CFR Part 312), New Drug Applications (21 CFR Part 314), Drug Master Files (21 CFR Part 314.420), and Biologics License Applications (21 CFR Part 601) referred to in this application.

**10.** IND submission should be consecutively numbered. The initial IND should be numbered "Serial number: 0000." The next submission (e.g., amendment, report, or correspondence) should be numbered "Serial number: 0001." Subsequent submissions should be numbered consecutively in the order in which they are submitted..

Serial Number
0000

**11. This submission contains the following** *(Select all that apply)*

☑ Initial Investigational New Drug Application (IND)
☐ Request For Reactivation Or Reinstatement
☐ Development Safety Update Report (DSUR)

☐ Response to Clinical Hold
☐ Annual Report
☐ Other *(Specify):*

☐ Response To FDA Request For Information
☐ General Correspondence

| **Protocol Amendment(s)** | **Information Amendment(s)** | **Request for** | **IND Safety Report(s)** |
|---|---|---|---|
| ☐ New Protocol | ☐ Chemistry/Microbiology | ☐ Meeting | ☐ Initial Written Report |
| ☐ Change in Protocol | ☐ Pharmacology/Toxicology | ☐ Proprietary Name Review | ☐ Follow-up to a Written Report |
| ☐ New Investigator | ☐ Clinical  ☐ Statistics | ☐ Special Protocol Assessment | |
| ☐ PMR/PMC Protocol | ☐ Clinical Pharmacology | ☐ Formal Dispute Resolution | |

**12.** Select the following only if applicable. *(Justification statement must be submitted with application for any items selected below. Refer to the cited CFR section for further information.)*

*Expanded Access Use, 21 CFR 312.300*

☐ Emergency Research Exception From Informed Consent Requirements, 21 CFR 312.23 (f)
☐ Charge Request, 21 CFR 312.8

☐ Individual Patient, Non-Emergency 21 CFR 312.310
☐ Individual Patient, Emergency 21 CFR 312.310(d)

☐ Intermediate Size Patient Population, 21 CFR 312.315
☐ Treatment IND or Protocol, 21 CFR 312.320

### For FDA Use Only

| CBER/DCC Receipt Stamp | DDR Receipt Stamp | Division Assignment |
|---|---|---|
| | | IND Number Assigned |

**FORM FDA 1571 (1/13)**     Page 1 of 3     PSC Publishing Services (301) 443-6740    EF

CONSTELLATION PROD_006429

**13. Contents of Application** – This application contains the following items *(Select all that apply)*

☑ 1. Form FDA 1571 *(21 CFR 312.23(a)(1))*
☑ 2. Table of Contents *(21 CFR 312.23(a)(2))*
☑ 3. Introductory statement *(21 CFR 312.23(a)(3))*
☑ 4. General Investigational plan *(21 CFR 312.23(a)(3))*
☑ 5. Investigator's brochure *(21 CFR 312.23(a)(5))*
☑ 6. Protocol(s) *(21 CFR 312.23(a)(6))*
  ☑ a. Study protocol(s) *(21 CFR 312.23(a)(6))*
  ☑ b. Investigator data *(21 CFR 312.23(a)(6)(iii)(b))* or completed Form(s) FDA 1572
  ☑ c. Facilities data *(21 CFR 312.23(a)(6)(iii)(b))* or completed Form(s) FDA 1572

6. Protocol(s) *(Continued)*
  ☐ d. Institutional Review Board data *(21 CFR 312.23(a)(6)(iii)(b))* or completed Form(s) FDA 1572
☑ 7. Chemistry, manufacturing, and control data *(21 CFR 312.23(a)(7))*
  ☑ Environmental assessment or claim for exclusion *(21 CFR 312.23(a)(7)(iv)(e))*
☑ 8. Pharmacology and toxicology data *(21 CFR 312.23(a)(8))*
☐ 9. Previous human experience *(21 CFR 312.23(a)(9))*
☐ 10. Additional information *(21 CFR 312.23(a)(10))*
☐ 11. Biosimilar User Fee Cover Sheet *(Form FDA 3792)*
☐ 12. Clinical Trials Certification of Compliance *(Form FDA 3674)*

**14.** Is any part of the clinical study to be conducted by a contract research organization?   ☑ Yes   ☐ No   ☐

If Yes, will any sponsor obligations be transferred to the contract research organization?   ☑ Yes   ☐ No   ☐

If Yes, provide a statement containing the name and address of the contract research organization, identification of the clinical study, and a listing of the obligations transferred *(use continuation page)*.

| Continuation Page for #14 |

**15.** Name and Title of the person responsible for monitoring the conduct and progress of the clinical investigations
Michael R. Cooper, MD, Chief Medical Officer

**16.** Name(s) and Title(s) of the person(s) responsible for review and evaluation of information relevant to the safety of the drug
Michael R. Cooper, MD
Chief Medical Officer

**I agree not to begin clinical investigations until 30 days after FDA's receipt of the IND unless I receive earlier notification by FDA that the studies may begin. I also agree not to begin or continue clinical investigations covered by the IND if those studies are placed on clinical hold or financial hold. I agree that an Institutional Review Board (IRB) that complies with the requirements set forth in 21 CFR Part 56 will be responsible for initial and continuing review and approval of each of the studies in the proposed clinical investigation. I agree to conduct the investigation in accordance with all other applicable regulatory requirements.**

**17.** Name of Sponsor or Sponsor's Authorized Representative
Michael R. Cooper, MD, Chief Medical Officer, Constellation Pharmaceuticals

**18.** Telephone Number *(Include country code if applicable and area code)*
617 714-0573

**19.** Facsimile (FAX) Number *(Include country code if applicable and area code)*

**20.** Address

Address 1 *(Street address, P.O. box, company name c/o)*
215 First Street

Address 2 *(Apartment, suite, unit, building, floor, etc.)*
Suite 200

| City | State/Province/Region |
| Cambridge | MA |

| Country | ZIP or Postal Code |
| USA | 02142 |

**21.** Email Address
michael.cooper@constellationpharma.com

**22.** Date of Sponsor's Signature *(mm/dd/yyyy)*
06/05/2013

**23.** Name of Countersigner

**24.** Address of Countersigner

Address 1 *(Street address, P.O. box, company name c/o)*

Address 2 *(Apartment, suite, unit, building, floor, etc.)*

| City | State/Province/Region |

| Country | ZIP or Postal Code |
| United States of America | |

**WARNING : A willfully false statement is a criminal offense (U.S.C. Title 18, Sec. 1001).**

**25.** Signature of Sponsor or Sponsor's Authorized Representative

*Michael R. Cooper, M.D.*   | Sign |

**26.** Signature of Countersigner

| Sign |

FORM FDA 1571 (1/13)          Page 2 of 3

1571ES          1/13

DocuSign Envelope ID: CBD02295-DBE3-4B81-A995-77927B33F6B6

Spedale v. Constellation: Preclinical Safety Testing of CPI-0610

David Jacobson-Kram, PhD, DABT

ToxRox Consulting, LLC

McLean, VA

DocuSign Envelope ID: CBD02295-DBE3-4B81-A995-77927B33F6B6

## I.   Professional Background

- From 2014 to the present I have consulted with the pharmaceutical industry in the area of non-clinical safety assessment. During that time I have worked with dozens of companies ranging from virtual start-ups to the major pharmas. Prior to the establishment of my consultancy I worked as the head of toxicology in FDA's Office of New Drugs for 11 years. During that period I was the scientific lead for approximately 200 pharmacology/toxicology reviewers. Prior to joining FDA I was vice president of toxicology for 15 years at BioReliance Corporation, a contract testing laboratory, I have also served as a staff scientist in EPA's Office of Toxic Substances and held academic positions at George Washington University School of Medicine and Johns Hopkins University Oncology Center.
- 30 graduate credits, Principles of Toxicology, Massachusetts Institute of Technology, Cambridge, MA
- Certified Diplomat of the American Board of Toxicology 1996, recertified four times.

In preparation for my report, I was asked to provide an expert opinion on the regulatory submission process for drug development, including the federal guidelines and regulations governing the preclinical drug process.  I was also asked to opine whether the preclinical studies and submission by Constellation for the study drug CPI-0610 were sufficient and were pursuant to federal regulation. Last, I have analyzed the preclinical data to determine the toxicity of the study drug and whether additional neurotoxicity testing would have been necessary in these circumstances.

## II.   Documents Reviewed

- ICH M3(R2)
- ICH S9
- Investigator's Brochure, CPI-0610 edition 5.1
- Investigator's Brochure, CPI-0619 edition 1
- Final Report – CPI-267232: Dose Escalation Toxicity and Toxicokinetics Study in Beagle Dogs
- Final Report – CPI-267232: 14-Day Repeated Oral Dose Toxicity and Toxicokinetics Study in Beagle Dogs
- Final Report – A 14-Day Study of CPI-0610 by Oral Gavage in Rats with a 14-day recovery period
- Final Report - A 14-Day Study of CPI-0610 by Oral Gavage in the Beagle Dog with a 14-day recovery period
- E. Korb, M. Herre, I. Zucker-Scharff, R.B. Darnell and C. D. Allis. BET protein Brd4 activates transcription in neurons and BET inhibitor Jq1 blocks memory in mice. Nat Neurosci. 2015 Oct; 18(10): 1464–1473.

1

DocuSign Envelope ID: CBD02295-DBE3-4B81-A995-77927B33F6B6

### III.    Drug Development Process

The process for development of new drugs follows a standardized pathway throughout the regulatory submission. The pathway is clearly described in the International Committee on Harmonizataion guidelines (www.ich.org) and deal with issues of Safety, Quality and Efficacy. The guidelines describe the types of studies required to support an Investigational New Drug (IND) Application and a New Drug Application (NDA), as well as the sequence in which studies need to be performed.

Most phase 1 studies are first in man (FIM), i.e., the first time a new chemical entity is given to humans. Since there is no risk/benefit paradigm, the regulatory emphasis is on safety. The preclinical requirements to enable phase 1 studies are discussed in ICH M3 (R2). These studies include toxicology studies in two species (rodent and nonrodent), safety pharmacology and genetic toxicology. The drug tested in the toxicology studies should be delivered by the same route as it will be delivered clinically during the phase 1 human trial, and should have a duration at least equivalent to the duration of the clinical study.  The goals of these toxicology studies are to:

- determine a safe start dose for the clinical study drug;
- which if any organs may be adversely affected, and if adverse effects are seen, are they reversible after the drug is withdrawn; and
- pharmacokinetic parameters such as the time it takes for the drug to reach its maximum concentration in the blood and the rate at which it is eliminated.

The ultimate goal is to define a No Adverse Effect Level (NOAEL) and then in combination with a safety factor (usually 10-fold lower than the NOAEL), the start dose can be calculated. Sponsors use this information to design the clinical study and submit the information to FDA as part of an IND.  FDA has 30 days to review the clinical protocol and supporting information to determine if, in their opinion, the study drug is safe to move forward with human clinical testing.  Generally, the initial doses given to the study population are below the levels needed to have a pharmacological effect.  The overall study is designed to determine drug tolerability, pharmacokinetics, pharmacological effects and to avoid any serious adverse events.

Phase 1 studies designed to support the development of oncology drugs for the treatment of patients with advanced disease and limited therapeutic options are very different from those described in ICH M3 (R2). It was recognized that a different guidance was needed to support preclinical safety testing for this class of drugs and guidance was published by ICH in 2009 (ICH S9). As mentioned above, initial doses in phase 1 studies with healthy volunteers generally are below a level that causes a pharmacological effect. When treating oncology patients with advanced disease, it is desirable that patients are initially dosed at levels that have pharmacological effects. The goals of the preclinical studies are not to determine a NOAEL.  Rather, initial clinical doses are based on a dose that produces 1/10 the Severely Toxic Dose in 10% of the animals (STD 10) for rodents. If the non-rodent is the most appropriate species, then 1/6 the Highest Non-Severely Toxic Dose (HNSTD) is considered an appropriate starting dose. The HNSTD is defined as the highest dose level that does not produce evidence of lethality, life-threatening toxicities or

2

irreversible findings. This is a standard followed by the medical and regulatory community, and accepted by the FDA, when testing drug toxicity. As a result, it is generally expected that phase 1 trials will produce some type of toxicity. Patients are closely monitored and clinical oncologists often titrate doses based on toxicity and tolerability.

## IV.     Constellation's Preclinical Studies and Toxicology Results

In his expert report, Dr Sutton suggested that Constellation failed to perform a preclinical safety pharmacology study for neurotoxicity. ICH S9 says the following about safety pharmacology:

> "An assessment of the pharmaceutical's effect on vital organ functions (including cardiovascular, respiratory and central nervous systems) should be available before the initiation of clinical studies; such parameters could be included in general toxicology studies. Detailed clinical observations following dosing and appropriate electrocardiographic measurements in non-rodents are generally considered sufficient. Conducting stand-alone safety pharmacology studies to support studies in patients with advanced cancer is not called for. In cases where specific concerns have been identified that could put patients at significant additional risks in clinical trials, appropriate safety pharmacology studies described in ICH S7A and/or S7B should be considered. In the absence of a specific risk, such studies will not be called for to support clinical trials or for marketing."

In performing preclinical safety testing on CPI-0610, Constellation adhered to this guidance. No specific safety concerns were identified that would have led to additional studies described in ICH S9. Rodents exhibit stereotypical behavior patterns and deviations from normal behavior can be recognized when technicians perform daily clinical observations. These types of assessments were performed in both the rodent and dog studies. No change in behavior patterns were observed that might suggest neurological effects.

A pivotal 14-day GLP toxicology study with recovery in rats (Study 0610-TOX-006) was performed as directed by ICH S9. The objectives of this study were to determine the potential toxicity of CPI-0610, when given by daily oral gavage at doses of 0, 2, 6, 20 and 60 mg/kg/day for up to 14 days to rats (10M/10F per group) and to evaluate the potential reversibility of any findings following a 14-day treatment-free period. In addition, the toxicokinetic characteristics of CPI-0610 were determined. The following observations were made:

> "At 60 mg/kg/day, due to severe adverse clinical signs, one toxicokinetic female was euthanized on Day 9 and another was found dead on Day 11. The adverse clinical signs, included early moribundity of females, decreased fecal output, reduced fecal size, hunched posture, dehydration, prominent backbone, thin body condition, decreased activity, decreased muscle tone, weakness, eyes partially closed, cold to the touch, stained/wet/erected/oily/ungroomed fur and hypersensitivity. In addition to the overt clinical toxicity, CPI-0610 was not tolerated in males and females at the high dose of 60 mg/kg/day and treatment-

3

DocuSign Envelope ID: CBD02295-DBE3-4B81-A995-77927B33F6B6

> related changes included lower mean body weights compared to controls (ranging from 18 to 32%,) that were consistent with lower body weight gain and food consumption (ranging from 22 to 61%)."

Clearly, 60 mg/kg exceeded the maximum tolerated dose.

At the end of the 14-day recovery period,

> "all drug-related changes in animals previously given 60 mg/kg/day were partially to fully reversible except for minimal to severe tubular degeneration in the testes (correlating with decreased testicular weights and macroscopically with small size) and secondary epididymidal alterations (oligo/aspermia and cellular debris correlating macroscopically with small size). Partially unresolved findings included clinical observations of suspected dehydration (males and females), and hypersensitivity to touch, thin body condition and/or red stained fur were still present in some female animals. CPI-0610-related effects at 20 mg/kg/day included lower mean body weight (-9%, compared to controls) and mean food consumption (-10%) in males; decreases in spleen weights (19 to 30%) and minimal hypocellularity of the bone marrow in females. Mild vaginal mucification was observed in 2 females; however the toxicological significance of this finding remains unclear. These changes were considered not to be adverse given the low magnitude, lack of any associated significant clinical signs and complete reversibility over the course of the 14-day recovery period."

It appears therefore that in rats, 20 mg/kg represented the MTD. Toxicokinetic data from this study are shown below.

| Parameter | Period | CPI-0610 Dose | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 2 mg/kg/day | | 6 mg/kg/day | | 20 mg/kg/day | | 60 mg/kg/day | |
| | | Male | Female | Male | Female | Male | Female | Male | Female |
| Cmax | Day 1 | 191 | 224 | 682 | 515 | 2300 | 2960 | 9220 | 7970 |
| (ng/mL) | Day 14 | 282 | 398 | 1000 | 1080 | 2980 | 3040 | 9150 | 7640[a] |
| $AUC_{(0-t)}$ | Day 1 | 970 | 867 | 3590 | 2970 | 13,100 | 13,100 | 107,000 | 87,400 |
| (ng·h/mL)[a] | Day 14 | 961 | 915 | 3290 | 2810 | 12,300 | 11,000 | 60,100 | 96,300[a] |

Ms Spedale received 150 mg BID for 14 days. Pharmacokinetic data from a phase 1 clinical study where patients were given doses from 6 to 400 mg QD showed that a single dose of 300 mg produced a $C_{max}$ of approximately 1700 ng/ml and an AUC of approximately 14,000 (ng·h/mL). The $C_{max}$ with 150 mg BID would most likely be significantly lower. Therefore, Ms Spedale's exposures were most closely mimicked at steady state in the rat 20 mg/kg group which showed no significant clinical signs. Three other patients also received 300 mg and seven other patients were dosed with 400 mg QD without neurotoxicological effects.

A pivotal 14-day GLP repeated dose toxicity study with recovery animals was conducted in dogs (Study 0610-TOX-007):

> "The objectives of this study were to determine the potential toxicity of CPI-0610, when given at doses of 0, 2, 4 or 8 mg/kg/day by daily oral gavage for 14 days to dogs (3M/3F per group) and to evaluate the potential reversibility of any findings following a 14-day treatment-free period. In addition, biomarkers of target engagement and toxicokinetic characteristics were determined. There were two preterminal deaths during the course of the study. One male at 8 mg/kg/day and one female at 8 mg/kg/day were euthanized on Days 10 and 14, respectively, due to poor and deteriorating condition. The cause of deterioration for both animals was considered to be due to lung inflammation and hemorrhage, associated with CPI-0610-related macroscopic changes observed in the lungs, trachea, heart and pericardium. CPI-0610 was well-tolerated at doses $\leq$ 4mg/kg/day and no treatment-related effects were observed on clinical observations, body weights, food consumption, hematology, coagulation, clinical chemistry, or urinalysis findings."

Clearly the 8 mg/kg exceeded the MTD. The toxicokinetic data from this study are shown below.

| Parameter | Period | CPI-0610 Dose | | | | | |
| | | 2 mg/kg/day | | 4 mg/kg/day | | 8/6[a] mg/kg/day | |
| | | Male | Female | Male | Female | Male | Female |
|---|---|---|---|---|---|---|---|
| $C_{max}$ | Day 1 | 581 | 591 | 1030 | 895 | 1910 | 2440 |
| (ng/mL) | Day 14 | 631 | 527 | 1390 | 1340 | 1970[a] | 4010 |
| $AUC_{(0-t)}$ | Day 1 | 3900 | 3810 | 7610 | 5890 | 18600 | 16900 |
| (ng*hr/mL) | Day 14 | 4550 | 4170 | 10600 | 12100 | 19800[a] | 52200 |

Ms Spedale's exposures most closely mimic those seen in dogs given 4 mg/kg at steady state which were well tolerated in the dog study i.e. at this dose no significant behavioral changes were seen in these animals.

## V.    Opinions

In his written expert opinion Dr Sutton says: "He (Dr Cooper) is uncertain as to "FOB" stands for, admits he has never heard of The Irwin Screen, does not know what motor activity neurotoxicity tests are, and has never heard of open field figure eight cage rack chambers". As noted above, a standalone neurobehavioral test such as the Irwin screen is not required for drugs such as CPI-0610 which are covered under ICH S9. To confirm that the Oncology Division at FDA follows this guidance, I contacted a toxicology supervisor in the division.  Her response was as follows:

> "While safety pharm (CNS, resp, and CV) assessments are done with the initial IND, no stand-alone studies are needed. CNS and resp assessments are typically done through standard endpoints of general tox (clin ob + histopath). CV

DocuSign Envelope ID: CBD02295-D8E3-4B81-A995-77927B33F6B6

> assessment is done by adding additional endpoints into the general tox (e.g. ECG, etc)."

Nothing in the behavior of the animals or in the histopathological evaluation suggested a risk for neurotoxicity.

> In his expert opinion Dr Sutton states that:

> "The Chief Medical Officer at Constellation Pharmaceuticals lacked an in-depth understanding of the potential effect of their drug on the epigenome and health of neuronal and non-neuronal populations in the central nervous system." Epigenomics is still a relatively new field; tests for epigenomic effects are not required for any drug either under ICH M3 (R2) or ICH S9. Therefore, Constellation was not required to test for epigenomic effects during the preclinical phase. The study by E. Korb et al. (E. Korb, M. Herre, I. Zucker-Scharff, R.B. Darnell and C. D. Allis. BET protein Brd4 activates transcription in neurons and BET inhibitor Jq1 blocks memory in mice. Nat Neurosci. 2015 Oct; 18(10): 1464–1473), showed that BET inhibitors can cross the blood brain barrier and enter neurons and interact with Brd4. This interaction in mice appears to affect the process of memory consolidation which can block long-term memory formation and appears to reduce chemically-induced seizures. I am not aware of any connection between inhibition of memory consolidation and mania. It is my opinion that including this information in the informed consent form would not have affected the willingness of patients to enroll in the study. Oncology drugs developed under ICH S9 are designed to treat patients with advanced cancer whose disease is refractory or resistant to available therapy, or where current therapy is not considered to be providing benefit. The informed consent clearly states that the study is designed to test tolerability and pharmacokinetics. This patient population would likely accept the potential risk of some loss in the ability to form long-term memories

Was Constellation negligent in not performing additional neurobehavioral studies of CPI-0610? In my opinion they were not. The preclinical studies did not suggest that drug treatment affected the normal stereotypical behavior of experimental animals and no histopathology of the central nervous system was seen. Neurobehavioral effects were not seen in other patients treated similarly or in patients receiving higher doses of the drug.

Constellation performed all the preclinical studies required by ICH S9 and FDA's conclusion that the proposed clinical study was sufficiently supported by preclinical toxicology studies i.e., no clinical hold was issued. It is my opinion that Constellation performed due diligence in its preclinical safety assessment.

DocuSign Envelope ID: CBD02295-DBE3-4B81-A995-77927B33F6B6

## VI.    Conclusion

It is my opinion that Constellation performed due diligence in its preclinical safety assessment. This conclusion is supported by the facts that:

1) Constellation performed all the preclinical studies required by ICH S9.
2) FDA agreed that the study was safe to proceed since they did not issue a clinical hold
3) The preclinical package that I reviewed is standard in the industry and consistent with the regulatory guidelines

DocuSigned by:

*David Jacobson-kram*

49355CAB5D364AC...

David Jacobson-Kram, PhD, DABT

9/4/2018 11:19:08 PM BST

7

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

------------------------------------------------------------------------

IRIS SPEDALE and DANIEL SPEDALE,
husband and wife,

Civil No. 2:17-CV-00109-ESW

                  Plaintiffs,

     -against-

CONSTELLATION PHARMACEUTICALS, INC.,

                  Defendant.

------------------------------------------------------------------------

## AFFIDAVIT OF DR. ROBERT SIMS

STATE OF MASSACHUSETTS :

                  ss.:

COUNTY OF MIDDLESEX:

Dr. Robert Sims, being duly sworn, deposes and says:

1.  I am currently employed at Constellation Pharmaceuticals, Inc. as Senior Vice President, Research.  I have been employed at Constellation since 2008.

2.  I have received my Bachelors of Science in Microbiology and Ph.D. in Cellular and Molecular Biology from the University of Texas at Austin.

3.  My scientific focus and expertise is in the areas of cellular and molecular biology, biochemistry and pharmacology with an emphasis on chromatin and epigenetics.

4.  I personally was involved in the preclinical and clinical development of the study drug at issue in this litigation, CPI-0610, since 2010 and was the team co-leader that discovered CPI-0610.  I oversaw the translational biology activities for CPI-0610 until 2017.

1

5.   I am familiar with the article titled, "BET protein Brd4 activates transcriptions in neurons and BET inhibitor JQ1 blocks memory in mice," ("Article") published in Nature Neuroscience in August 2015, which was co-authored by Dr. C David Allis.

6.   I have spoken with counsel for Constellation Pharmaceuticals, Inc. regarding the above-captioned matter and have been made aware that plaintiffs' expert neurologist, Dr. James P. Sutton, M.D., has opined that the Article had proven that BET inhibitors could cause brain injury in mammals.

7.   I submit this affidavit to clarify the findings of the Article and to correct any misinterpretations that Dr. Sutton has of the Article and any factually inaccurate statements made about the findings in the Article.

8.   The purpose of this article and testing was to evaluate potential effects of a chromatin regulator, BRD4, on gene expression and any downstream biological responses in a neuronal setting in neuronal cells and animal behavioral experiments.

9.   The BET inhibitor being used in this study (JQ1) was not the same BET inhibitor that Constellation was developing, or more specifically, not the same as CPI-0610.

10.   Based on my expertise in pharmacology and experience with BET inhibitors generally, it cannot be assumed that two chemically distinct BET bromodomain inhibitors have the same pharmacokinetic properties, blood brain barrier penetration, and pharmacologic effects without direct and comparative experimental determination.

11.   After significant testing had been done in mice with the JQ1 inhibitor, it was determined that there was a change in the gene transcription in the neurons that exhibited a very specific behavioral effect on long-term memory formation as indicated on one test, novel object recognition.  This effect that was identified was very subtle and was immediately reversible upon discontinuation of the BET inhibitor.

12.   There were **no** major changes in short-term memory, movement, learning ability or anxiety, so the neurological and psychological characteristics of the mice were considered to be normal and unaffected by the BET inhibitor.

13.   There were no findings that the mice suffered brain cell death or change in the brain's neuronal structure.

14.   Therefore, any statement that the Article suggests BET inhibitors could cause brain injury in mammals is factually inaccurate.

15.   No findings derived from this Article would suggest that Constellation's BET inhibitor, CPI-0610, would negatively affect an individual's brain function or psychological state.

16.   I can confirm that based on my personal involvement with the preclinical studies for CPI-0610, the brain and central nervous system was tested during 6 independent general toxicology studies and no findings of neurological or psychological issues were found.

17.   As of this date, I am aware of no FDA regulation or guideline that requires specific neurotoxicity testing for BET inhibitors due to concern of the inhibitor causing neurological and/or psychological issues.

18.   During the time that the research underlying the Article was being conducted and through the publication, I have had contact with Dr. Allis.  However, he never mentioned the findings of the research with respect to the work we were undertaking at Constellation, nor would I expect him to do so.  The data and findings did not and would not have any significance to the work of Constellation, nor would it have created a concern or "red flag" for our team requiring any other action that what was taken in the preclinical workup and protocol for CPI-0610.

3

The foregoing statements made by me are true and correct to the best of my knowledge.  I

am aware that if the foregoing are willfully false, I am subject to punishment.

Dated: New York, New York
      November 19, 2018

 

                                       Dr. Robert Sims

Sworn and Subscribed
before me this __19__ day of November, 2018



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Food and Drug Administration
Silver Spring MD 20993

IND 118814

**STUDY MAY PROCEED**

Constellation Pharmaceuticals
Attention: Michael R. Cooper, M.D.
Chief Medical Officer
215 First Street, Suite 200
Cambridge, MA 02142

Dear Dr. Cooper:

Please refer to your Investigational New Drug Application (IND) submitted under section 505(i) of the Federal Food, Drug, and Cosmetic Act for CPI-0610.

We have completed our 30-day, safety review of your application and have concluded that you may proceed with your proposed clinical investigation for treatment of hematologic malignancies.

In addition, we have the following comments for your consideration:

<u>Non-Clinical</u>

Your IND included draft reports of nonclinical toxicology studies. We thus remind you that quality assured final reports for your repeat dose studies in rats and dogs (Study #s 0610-TOX-006 and 0610-TOX-007) should be available to us upon request before (October 04, 2013) which is 120 days from the date of our receipt of the IND. You should also submit to us a description of any differences between the finalized study reports and the information presented in the initial draft reports. Please refer to Guidance for Industry Q&A document *"Content and Format of Investigational New Drug Applications (IND's) for Phase 1 Studies of Drugs, Including Well-characterized, Therapeutic, Biotechnology-derived Products"* for further details.

<u>Clinical Pharmacology</u>

<u>Regarding your first-in-human protocol:</u>
1. Consider adding a food effect cohort to your proposed study or another early study to obtain preliminary food effect data on the pharmacokinetics and safety of the drug to guide dosing recommendations for the clinical safety and efficacy studies.

2. Consider adding Hour 12 and Hour 24 PK sampling times after last dose of your proposed product in Cycle 1 to be sure that the terminal $T_{1/2}$ may be reliably estimated.

IND 118814
Page 2

During the development of CPI-0610, address the following:

1. Characterize single and multiple dose pharmacokinetics, as well as dose proportionality in humans.

2. Conduct population pharmacokinetic analysis to evaluate the effect of intrinsic and extrinsic factors on the pharmacokinetics of CPI-0610 in humans.

3. As the development of your drug progresses, you should pool available clinical data and conduct thorough dose-response and exposure-response analyses for safety and effectiveness. Such analyses should be updated periodically using newly generated data. This effort will be crucial for selecting optimal doses for registration studies. Refer to Guidances for Industry *Population Pharmacokinetics* and *Exposure-Response Relationships — Study Design, Data Analysis, and Regulatory Applications* for more information.

4. Validate the analytical methods used to determine the concentrations of CPI-0610 (and its metabolites). Refer to the Guidance for Industry *Bioanalytical Method Validation*.

5. Quantitate and characterize the mechanism(s) of potential drug-drug interactions to determine the need for in vivo studies. This should include an evaluation of the in vitro ability of CPI-0610 (and its metabolites) to act as substrates, inhibitors or inducers of cytochrome P450 enzymes, conjugating enzymes and transporters. For an updated list of potential metabolic pathways and transporters identified by the Agency please refer to the newly released *Drug Interaction Studies* Draft Guidance for more information.

6. Identify the pathways by which CPI-0610 (and its metabolites) are eliminated and excreted to determine the need for organ impairment trial(s). Please refer to the Guidances for Industry *Pharmacokinetics in Patients with Impaired Renal Function* and *Pharmacokinetics in Patients with Impaired Hepatic Function* for more information.

7. Evaluate QT/QTc interval prolongation potential of CPI-0610. In oncology, alternative proposals to the "TQT" trial may be appropriate. Submit your overall QT risk evaluation plan for FDA review. For more information, refer to the Guidance for Industry entitled *E14 Clinical Evaluation of QT/QTc Interval Prolongation*.

8. As stated above, food-effect bioavailability studies should be conducted early in the drug development to guide the decisions to administer the drug with or without food, and select formulations for further development. Food-effect bioavailability information should be available to design clinical safety and efficacy studies. Conduct a food effect trial per Guidance for Industry *Food-Effect Bioavailability and Fed Bioequivalence Studies*.

9. Determine bioavailability of CPI-0610 in humans per Guidance for Industry *Bioavailability and Bioequivalence Studies for Orally Administered Drug Products — General Considerations*.

IND 118814
Page 3

As sponsor of this IND, you are responsible for compliance with the FDCA
(21 U.S.C. §§ 301 et. seq.) as well as the implementing regulations [Title 21 of the Code of
Federal Regulations (CFR)].  A searchable version of these regulations is available at
http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm.  Your responsibilities
include:

- Reporting any unexpected fatal or life-threatening suspected adverse reactions to this
  Division no later than 7 calendar days after initial receipt of the information
  [21 CFR 312.32(c)(2)].

  If your IND is in eCTD format, submit 7-day reports electronically in eCTD format via the
  FDA Electronic Submissions Gateway (ESG). To obtain an ESG account, see information
  at the end of this letter.

  If your IND is not in eCTD format:

  - you should submit 7-day reports by a rapid means of communication, preferably by
    facsimile or email. You should address each submission to the Regulatory Project Manager
    and/or to the Chief, Project Management Staff;

  - if you intend to submit 7-day reports by email, you should obtain a secure email account
    with FDA (see information at the end of this letter);

  - if you also send copies of these reports to your IND, the submission should have the
    same date as your facsimile or email submission and be clearly marked as "Duplicate."

- Reporting any (1) serious, unexpected suspected adverse reactions, (2) findings from other
  clinical, animal, or in-vitro studies that suggest significant human risk, and (3) a clinically
  important increase in the rate of a serious suspected adverse reaction to this Division and to
  all investigators no later than 15 calendar days after determining that the information
  qualifies for reporting [21 CFR 312.32(c)(1)].  If your IND is in eCTD format, submit 15-
  day reports to FDA electronically in eCTD format.  If your IND is not in eCTD format, you
  may submit 15-day reports in paper format; and

- Submitting annual progress reports within 60 days of the anniversary of the date that the
  IND went into effect (the date clinical studies were permitted to begin) [21 CFR 312.33].

## SUBMISSION REQUIREMENTS

Cite the IND number listed above at the top of the first page of any communications concerning
this application.  Each submission to this IND must be provided in triplicate (original plus two
copies).  Please include three originals of all illustrations that do not reproduce well.  Send all
submissions, electronic or paper, including those sent by overnight mail or courier, to the
following address:

IND 118814
Page 4

> Food and Drug Administration
> Center for Drug Evaluation and Research
> Division of Hematology Products
> 5901-B Ammendale Road
> Beltsville, MD 20705-1266

All regulatory documents submitted in paper should be three-hole punched on the left side of the page and bound. The left margin should be at least three-fourths of an inch to assure text is not obscured in the fastened area. Standard paper size (8-1/2 by 11 inches) should be used; however, it may occasionally be necessary to use individual pages larger than standard paper size. Non-standard, large pages should be folded and mounted to allow the page to be opened for review without disassembling the jacket and refolded without damage when the volume is shelved. Shipping unbound documents may result in the loss of portions of the submission or an unnecessary delay in processing which could have an adverse impact on the review of the submission. For additional information, see http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/Drug MasterFilesDMFs/ucm073080.htm.

Secure email between CDER and sponsors is useful for informal communications when confidential information may be included in the message (for example, trade secrets or patient information). If you have not already established secure email with the FDA and would like to set it up, send an email request to SecureEmail@fda.hhs.gov. Please note that secure email may not be used for formal regulatory submissions to applications (except for 7-day safety reports for INDs not in eCTD format).

The FDA Electronic Submissions Gateway (ESG) is the central transmission point for sending information electronically to the FDA and enables the secure submission of regulatory information for review. If your IND is in eCTD format, you should obtain an ESG account. For additional information, see http://www.fda.gov/ForIndustry/ElectronicSubmissionsGateway/.

If you have any questions, please contact me at (301) 796-8493.

> Sincerely,
>
> *{See appended electronic signature page}*
>
> Patricia Garvey, R.Ph.
> Senior Regulatory Project Manager
> Division of Hematology Products
> Office of Hematology and Oncology Products
> Center for Drug Evaluation and Research

--------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

--------------------------------------------------------------------------------

/s/

----------------------------------------------------

PATRICIA N GARVEY
06/28/2013



# Investigator's Brochure

# CPI-0610

| | |
|---|---|
| **Sponsor:** | Constellation Pharmaceuticals<br>215 First Street, Suite 200<br>Cambridge, MA 02142 |
| **Edition Number:**<br>**Release Date:** | 005.1<br>30 April 2018 |
| **Replaces Previous Edition Number:**<br>**Previous Release Date** | 005<br>28 February 2018 |

**Confidentiality Statement**

This document is the proprietary and confidential property of Constellation Pharmaceuticals.

CONSTELLATION PRODUCTION_016990

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... 2

TABLE OF TABLES ................................................................................................... 3

TABLE OF FIGURES .................................................................................................. 4

LIST OF ABBREVIATIONS ........................................................................................ 5

1   SUMMARY ...................................................................................................... 7

2   INTRODUCTION ............................................................................................. 9

3   PHYSICAL, CHEMICAL, AND PHARMACEUTICAL PROPERTIES AND
    FORMULATION ............................................................................................. 11

    3.1   Drug Substance ..................................................................................... 11

    3.2   Drug Product ......................................................................................... 11

    3.3   Route of Administration ........................................................................ 11

    3.4   Drug Handling ....................................................................................... 11

4   NONCLINICAL STUDIES ............................................................................. 12

    4.1   Nonclinical Pharmacology ..................................................................... 12

        4.1.1   Primary Pharmacodynamics ......................................................... 12

        4.1.2   Secondary Pharmacodynamics ..................................................... 16

        4.1.3   Safety Pharmacology ................................................................... 16

    4.2   Pharmacokinetics and Product Metabolism in Animals ........................... 16

        4.2.1   Absorption .................................................................................. 16

        4.2.2   Protein Binding and Stability ....................................................... 17

        4.2.3   Metabolism ................................................................................. 17

        4.2.4   Pharmacokinetic Drug Interactions .............................................. 18

    4.3   Toxicology ............................................................................................ 18

        4.3.1   Single-Dose Toxicity Studies ...................................................... 18

        4.3.2   Repeat-Dose Toxicology Studies ................................................. 19

        4.3.3   Genotoxicity Studies ................................................................... 21

        4.3.4   Reproduction and Developmental Toxicity ................................... 21

        4.3.5   Carcinogenicity ........................................................................... 21

        4.3.6   Local Tolerance ........................................................................... 21

        4.3.7   Other Toxicity ............................................................................ 21

        4.3.8   Summary of Observations in the Toxicology Studies ..................... 21

5   EFFECTS IN HUMANS ................................................................................. 23

CONSTELLATION PRODUCTION_016991

5.1     Introduction .................................................................................................. 23

5.2     Pharmacokinetics and Product Metabolism in Humans .............................. 24

5.2.1     Pharmacokinetics .................................................................................. 24

5.2.2     Pharmacodynamics in Humans ............................................................. 25

5.3     Safety and Efficacy ...................................................................................... 26

5.3.1     Safety in Patients with Hematologic Malignancies Treated with CPI-0610 in Phase 1, Dose Escalation Clinical Studies ............................................................. 26

5.3.2     Efficacy in Patients with Hematologic Malignancies ........................... 30

6     SUMMARY OF DATA AND GUIDANCE FOR THE INVESTIGATORS ..................... 32

6.1     Hematologic Toxicity ................................................................................... 32

6.1.1     Thrombocytopenia ................................................................................. 32

6.1.2     Neutropenia and Lymphopenia ............................................................. 33

6.2     Gastrointestinal Toxicity .............................................................................. 33

6.3     Testicular Toxicity ........................................................................................ 34

6.4     Hyperglycemia ............................................................................................. 34

6.5     Mutagenic and Teratogenic Potential .......................................................... 35

6.6     Drug-drug Interactions ................................................................................. 35

7     REFERENCE SAFETY INFORMATION FOR ASSESSMENT OF EXPECTEDNESS OF SERIOUS ADVERSE REACTIONS ........................................................................ 36

8     REFERENCES ......................................................................................................... 37

## TABLE OF TABLES

Table 1     Mean (± SD) Pharmacokinetic Parameters of CPI-0610 Dosage Forms in Male Beagle Dogs Following 2.5 mg/kg Oral Administration after Famotidine or Feeding Pretreatment or No Pretreatment ................................................................. 17

Table 2     Metabolite Profiles of CPI-0610 in Cryopreserved Hepatocytes ........................... 18

Table 3     Mean CPI-0610 Toxicokinetic Parameters in Rats ............................................... 19

Table 4     Mean CPI-0610 Toxicokinetic Parameters in Dogs .............................................. 21

Table 5     Day 1 Mean CPI-0610 Pharmacokinetic Parameters from Patients Primarily in Study 0610-01[a] ........................................................................................................ 25

Table 6     Treatment-Emergent Adverse Events that were Considered Related to Study Drug in ≥4% of Patients in Any of the Phase 1 CPI-0610 Clinical Studies as of 27 June 2017 ........................................................................................................ 28

Table 7     Treatment-Emergent Serious Adverse Events that were Report in ≥2 Patients in Any of the Phase 1 CPI-0610 Clinical Studies as of 27 June 2017 .................................. 30

Table 8     Serious Adverse Reactions Reported in Patients Treated with at Least One Dose of CPI-0610 as of 27 June 2017[a] ....................................................................... 36

# TABLE OF FIGURES

Figure 1    CPI-0610 Suppresses the Expression of *MYC* and Up-regulates the MYC-target
            Gene p21 ............................................................................................................. 13
Figure 2    CPI-0610 suppresses the expression of *IL6* and *IL10* ............................................ 13
Figure 3    Anti-tumor Activity of CPI-0610 against Raji Burkitt Lymphoma Xenografts in
            SCID Mice ........................................................................................................... 14
Figure 4    Tumor Expression of *MYC* mRNA and Plasma Concentrations of CPI-0610
            Following a Single Oral Dose in the Raji Burkitt Lymphoma Xenograft Model ..... 15
Figure 5    Anti-tumor Activity of CPI-0610 against MV4-11 Acute Leukemia Xenografts in
            Nude Mice ........................................................................................................... 15
Figure 6    Repression of BET-target Genes *IL8* and *CCR1* in Circulating Blood 2 Hours Post-
            dose as a Function of the Plasma Concentration of CPI-0610. ................................. 26

CONSTELLATION PRODUCTION_016993

CPI-0610
Investigator Brochure, Edition 5.1                                    30 April 2018

# LIST OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| ABC | Activated B-cell |
| ADME | Absorption, distribution, metabolism, and excretion |
| AUC | Area under the curve |
| BD | Bromodomain |
| BET | Bromodomain and extra-terminal |
| BID | Twice a day |
| ChIP | chromatin immunoprecipitation |
| CL | Clearance |
| $CL_{int}$ | Intrinsic clearance |
| $C_{max}$ | Maximum concentration |
| $C_{minSS}$ | Steady state trough concentrations |
| CMML | Chronic myelomonocytic leukemia |
| CTCAE | Common Terminology Criteria for Adverse Events |
| CYP | Cytochrome P450 |
| DLBCL | Diffuse large B-cell lymphoma |
| DLT | Dose-limiting toxicity |
| $EC_{90}$ | Concentration causing 90% of the maximum effect |
| F | Bioavailability |
| FL | Follicular lymphoma |
| GCB | Germinal center B-cell |
| GI | Gastrointestinal |
| $GI_{50}$ | Half maximal growth inhibition |
| GLP | Good Laboratory Practice |
| HDPE | High density polyethylene |
| hERG | Human ether-a-go-go gene |
| HNSTD | Highest non-severely toxic dose |
| HPMC | Hydroxypropyl methylcellulose |
| HSC | Hematopoietic stem cells |
| $IC_{50}$ | Half maximal inhibitory concentration |
| ICH | International Conference on Harmonization |
| IL-6 | Interleukin-6 |
| IV | Intravenous |
| $K_a$ | absorption rate constant |
| $K_d$ | Dissociation constant |

CPI-0610
Investigator Brochure, Edition 5.1                                  30 April 2018

| | |
|---|---|
| KO | Knockout |
| LPS | Lipopolysaccharide |
| MDS | Myelodysplastic syndrome |
| MEF | Murine embryonic fibroblasts |
| MPN | Myeloproliferative neoplasm |
| MT-1 | Melatonin type 1 receptor |
| MT-2 | Melatonin type 2 receptor |
| MTD | Maximum tolerated dose |
| ND | Not detected |
| NF-$\kappa$B | Nuclear factor kappa-light-chain-enhancer of activated B cells |
| NOAEL | No observable adverse effect level |
| PBMC | Peripheral blood mononuclear cell |
| PD | Pharmacodynamic |
| PK | Pharmacokinetics |
| PO | Orally |
| PR | Partial response |
| QD | Once daily |
| qPCR | Quantitative polymerase chain reaction |
| SC | Subcutaneous |
| shRNA | small hairpin ribonucleic acid |
| $STD_{10}$ | Severely toxic dose in 10% of animals |
| $T_{1/2}$ | Elimination half-life |
| TID | Three times daily |
| TNF-$\alpha$ | tumor necrosis factor-alfa |
| TGI | Tumor growth inhibition |
| Vd | Volume of distribution |

CONSTELLATION PRODUCTION_016995

# 1   SUMMARY

CPI-0610 is a small molecule inhibitor of BET (bromodomain and extra-terminal) proteins being developed to treat patients with cancer. It is currently available in 25 mg and 100 mg strength tablets for oral administration. CPI-0610 antagonizes the binding of BET proteins to chromatin through its ability to disrupt the interaction between their bromodomains (small, well defined clefts in the surface of these proteins) and acetylated lysine residues on the tails of histones.

The BET proteins are of interest because of their unique role in transcriptional regulation. For selected genes, the BET proteins facilitate expression by recruiting other proteins, like P-TEFb, that are normally required for gene transcription, to specific sites on chromatin. Several genes whose expression is regulated by BET proteins are important in the pathogenesis of cancer. Notable among these genes are *MYC* and *BCL2*, both of which are broadly implicated in both hematologic malignancies and solid tumors. The BET proteins are also involved in regulating the expression of a subset of NF-kB-dependent genes that play roles in inflammation and in some malignancies (e.g., the activated B-cell-like subtype of diffuse large B-cell lymphoma [ABC-DLBCL]).

CPI-0610 binds to the bromodomains of the BET proteins with $IC_{50}$ values ranging from 0.01 to 0.55 μM. In hematologic cancer cell lines, including human Burkitt lymphoma, diffuse large B-cell lymphoma, multiple myeloma, and acute leukemias, CPI-0610 demonstrates broad growth inhibitory activity, with the majority of concentrations producing 50% inhibition of growth ($GI_{50}$) values ≤ 1 μM. In the MV4-11 leukemia cell line, CPI-0610 has an $EC_{50}$ of 0.184 μM for the suppression of *MYC* transcription and a $GI_{50}$ (concentration producing 50% inhibition of growth) of 0.150 μM. These anti-proliferative effects were confirmed in Raji Burkitt lymphoma and MV4-11 acute leukemia subcutaneous xenograft models. In the Raji xenograft model, an oral dose of 30 mg/kg twice daily (BID) was the most efficacious well tolerated dose, producing 77% tumor growth inhibition (TGI) after 16 days of treatment, while in the MV4-11 model the same dose and schedule provided 92% TGI after 25 days of treatment and was likewise well tolerated. Higher doses of CPI-0610 (e.g., 60 mg/kg orally [PO] twice daily) were associated with rapid weight loss; however, recovery of body weight was rapid (within 4-6 days) with dose reduction.

CPI-0610 is a potent and selective inhibitor of BET proteins. It does not appreciably interact with other bromodomain-containing proteins or significantly bind to a panel of physiologically relevant receptors, transporters and ion channels, with the exception of the melatonin type 1 receptor (MT-1), for which there is no known toxicologic consequence. In addition, CPI-0610 did not inhibit binding of human ether-a-go-go gene (hERG) at concentrations up to 10 μM.

CPI-0610 was well absorbed when given orally to dogs and rats and its oral bioavailability is high, ranging between 76% and 94%. Plasma protein binding is similar in mice, rats, dogs, and humans, ranging from 95.5% in rats to 97.8% in humans. In human hepatocytes, metabolism occurs by oxidation and amide bond hydrolysis. CPI-0610 has low potential for inhibition of Cytochrome P450 (CYP) enzymes. In vitro studies showed CPI-0610 to have no inhibitory activity against human CYP1A2, CYP2D6 and CYP3A4. CPI-0610's $IC_{50}$ values against CYP2C9 and CYP2C8 were 29.4 μM and 6.1 μM, respectively. Pre-incubation for 20 min with 10 μM CPI-0610 resulted in no time-dependent inhibition of CYP3A4 activity.

CONSTELLATION PRODUCTION_016996

Toxicology studies have been completed with CPI-0610 in the rat and dog.  In both dose range-finding and GLP-compliant repeat-dose studies CPI-0610 was given as an oral suspension once daily (QD) for 14 consecutive days followed by a 2-week recovery period.  A common set of toxicities has been observed in both species, consisting of the following: lymphoid depletion; hypocellularity of the bone marrow with associated anemia and thrombocytopenia; GI mucosal atrophy, erosion and ulceration; degeneration of the testicular seminiferous epithelium; and mild to moderate hyperglycemia.  These toxicities were reversible, with the exception of the testicular findings, for which 14 days is likely insufficient to demonstrate recovery.

CPI-0610 has been evaluated in 3 separate Phase 1 trials in patients with lymphoma, myeloma, and acute leukemia, myelodysplastic syndrome (MDS), myelodysplastic/myeloproliferative neoplasms (MDS/MPN), or myelofibrosis (MF).  All three studies have evaluated a schedule in which CPI-0610 is given daily for 14 consecutive days followed by a one week break from treatment.  CPI-0610 was initially given in capsule doses ranging from 6 to 400 mg QD and from 85 to 150 mg BID.  Subsequently a micronized tablet formulation of CPI-0610 with improved bioavailability was evaluated at dose of 125, 225 and 275 mg QD.  Although the maximum tolerated dose (MTD) has not been reached, the tablet dose of 225 mg QD has been selected as the recommended Phase 2 dose (RP2D) for the Phase 1 studies in patients with lymphoma and acute leukemia, MDS, MDS/MPN and MF.  A total of 23 patients have received the RP2D across the three clinical studies.  The $C_{max}$ and AUC for the 255 mg dose are approximately 2000 ng/mL and 19,000 ng·h/mL, respectively.  The half-life was approximately 16 hours.

The principal toxicity of CPI-0610 has been thrombocytopenia, which has been dose-dependent (increasing in incidence and severity with CPI-0610 exposure), reversible (sometimes requiring an addition week [14 versus 7 days] off treatment for platelet recovery between treatment cycles) and non-cumulative.  Other common treatment-related toxicities include fatigue, nausea, vomiting, diarrhea, decreased appetite and dysgeusia (altered taste).  Most of these events have been low grade and reversible.  The most common treatment-related CTCAE grade 3 or greater adverse events have been thrombocytopenia, anemia, neutropenia and nausea.

Complete and partial responses have been observed in patients with diffuse large B-cell lymphoma (DLBCL) and follicular lymphoma (FL) treated with CPI-0610.  The majority of these responses have been observed at the 230 and 300 mg QD capsule dose levels, coincident with the achievement of plasma CPI-0610 concentrations that suppress the expression of *IL8* and *CCR1*.

## 2   INTRODUCTION

BET bromodomain inhibition with small molecules is a novel therapeutic strategy to the treatment of cancer. Rather than affecting an upstream signaling pathway (as do many protein kinase inhibitors), it inhibits the transcription of a small set of genes that integrate a diverse array of abnormal signals.

The four BET proteins (BRD2, BRD3, BRD4, and BRDT) constitute a sub-family within a larger group of 46 bromodomain-containing proteins. Each of the BET proteins contains two bromodomains, designated as BD1 and BD2. These tandem bromodomains have very similar structures, both when compared within a single BET protein and when compared across all four BET proteins. As a consequence of their structural similarity, CPI-0610 inhibits the binding of all four of these proteins to acetylated lysine residues on chromatin.

The BET proteins facilitate gene expression by providing a "scaffolding" function for the assembly of the transcriptional machinery. They recruit to specific sites on chromatin other proteins, like P-TEFb, that are normally required for gene transcription. This scaffolding function has been described by several groups for BRD4's regulation of *MYC* transcription in leukemia, lymphoma and myeloma cell lines (Hargreaves et al., 2009; Dawson et al., 2011; Delmore et al., 2011; Mertz et al., 2011).

The dominant role that inhibition of *MYC* transcription plays in mediating the phenotypic effects of BET inhibition has been confirmed independently (Dawson et al., 2011; Delmore et al., 2011; Mertz et al., 2011). Following exposure of leukemia, myeloma or lymphoma cells to a small molecule BET inhibitor (e.g., JQ1, IBET) there is a rapid decrease in *MYC* mRNA. Maximal inhibition of transcription is achieved within approximately 4 hours, and is accompanied by decreases in the level of MYC protein. Following drug washout *MYC* transcription is rapidly restored to baseline levels. The tumor suppressor gene, *p21*, is known to be tightly regulated by MYC, and as *MYC* transcription is inhibited there is a concomitant and marked increase in the transcription of *p21*. Evaluation of whole genome expression profiles before and at 4 hours following exposure to JQ1 demonstrates that the genes affected are primarily *MYC* and MYC target genes. Importantly, small molecule inhibitors of BET proteins can suppress the expression of *MYC* in the context of translocation, amplification, or when the gene is structurally normal.

While effects on MYC transcription have a dominant effect in many malignant cells, it is clear that effects on the transcription of other genes may play a role in cancer and inflammation as well. For example, BET inhibition reduces the expression of *BCL2*, potentially via the association of BRD2 and BRD4 with a *BCL2* enhancer. And overexpression of BCL2 was able to block the phenotypic effects of BET inhibition in a mixed lineage leukemia cell line. BET proteins are also involved in regulating the expression of a subset of NF-κB-dependent genes that play roles in both inflammation (e.g., IL6) and some malignancies. Mechanistically, BET inhibition elicits these alterations of the NF-κB pathway by blocking the inhibitor of nuclear factor kappa-B kinase subunit beta (IKKβ). This results in stabilization of IκB, subsequently inhibiting the NF-κB pathway by sequestration of NF-κB proteins in the cytoplasm. Additionally, following exposure to lipopolysaccharide and treatment with compound for 16 hours, CPI-0610 inhibited the release of *IL6* with an $IC_{50}$ of 0.069 µM in the THP-1 acute leukemia cell line.

CONSTELLATION PRODUCTION_016998

Zuber and colleagues discovered a connection between BRD4 and leukemogenesis as the result of screening a library of small hairpin RNAs (shRNAs; Zuber et al., 2011). The library was focused against 243 known chromatin regulators, i.e., against the 'writers', 'erasers', and 'readers' of epigenetic marks. The model screened was a murine model of AML driven by MLL-AF9 and Nras$^{G12D}$. Several shRNAs against *Brd4* had the strongest effects in this screen, and there was good correspondence between knockdown efficiency and growth inhibition. shRNAs against *Brd4* also induced cell-cycle arrest in two human MLL-AF9$^+$ AML lines.  It should be noted that *Brd4* is neither mutated nor over-expressed in most malignancies, but this study and others have demonstrated that maintenance of the malignant phenotype can be dependent on *Brd4*.

# 3    PHYSICAL, CHEMICAL, AND PHARMACEUTICAL PROPERTIES AND FORMULATION

## 3.1    Drug Substance

- Development name: CPI-0610 Monohydrate
- Chemical name: 2-((4S)-6-(4-chlorophenyl)-1-methyl-4H-enzo[c]isoxazolo[4,5-e]azepin-4-yl) acetamide monohydrate
- Molecular formula: $C_{20}H_{16}ClN_3O_2 \cdot H_2O$
- Molecular weight: 383.83 g/mol
- Physical state: Crystalline solid
- Physical appearance: White to light brown solid
- Solubility: Sparingly soluble in water

## 3.2    Drug Product

CPI-0610 monohydrate tablets contain the micronized active pharmaceutical ingredient and the following inactive excipients: microcrystalline cellulose, lactose monohydrate, hydroxypropyl cellulose, croscarellose sodium, sodium lauryl sulfate, colloidal silicon dioxide, and magnesium stearate.  The 25 mg and 100 mg tablets are supplied in high density polyethylene (HDPE) bottles, which are heat induction sealed.  Each 120 cc bottle contains 100 plain-faced light brown tablets.

CPI-0610 monohydrate capsules are available in 2, 10 and 25 mg strengths.  In addition to the active ingredient, CPI-0610 monohydrate, the capsules contain the following inactive excipients microcrystalline cellulose and magnesium stearate.  The capsules are supplied in HDPE bottles, heat induction sealed, with a child proof cap.  Each 75 ml HDPE bottle contains 30 capsules of 2, 10 or 25 mg strengths.  The 2 mg capsules are white in color; the 10 mg capsules are Swedish Orange (red) in color; the 25 mg capsules are yellow in color.

## 3.3    Route of Administration

CPI-0610 is orally administered.

## 3.4    Drug Handling

CPI-0610 capsules and tablets should be stored at controlled room temperature (20-25ºC).

CONSTELLATION PRODUCTION_017000

# 4    NONCLINICAL STUDIES

## 4.1    Nonclinical Pharmacology

### 4.1.1    Primary Pharmacodynamics

#### 4.1.1.1    In Vitro Studies

##### 4.1.1.1.1    Potency and Selectivity of CPI-0610 as a BET Inhibitor

CPI-0610 binds to the first and second bromodomains (BD1, BD2) of the BET protein family (BRD2, BRD3, BRD4, and BRDT) with $IC_{50}$ values ranging from 0.01 µM to 0.55 µM as determined by a proximity-based, competitive binding assay. The $IC_{50}$ values were corroborated by determining the dissociation constant ($K_d$) of CPI-0610 from the first bromodomain of BRD4 (BRD4-BD1) using isothermal calorimetry ($K_d$: $0.13 \pm 0.02$ µM). The 2.2 Å co-crystal structure of CPI-0610 in complex with BRD4-BD1 showed clear density for compound within the acetyl-lysine binding pocket of the protein. CPI-0610 displayed selective binding to BET bromodomains when compared to seven other non-BET bromodomains, with $IC_{50}$ values for non-BET bromodomains being 20-fold to over 5000-fold higher. In cellular assays, CPI-0610 suppressed *MYC* mRNA gene transcription with an $IC_{50}$ value of 0.184 µM in the MV4-11 acute leukemia cell line following 4 hours of compound treatment. The cellular potency of CPI-0610 was also assessed through its ability to suppress the expression of the NF-κB target gene IL6 following lipopolysaccharide treatment. Following exposure to lipopolysaccharide and treatment with compound for 16 hours, CPI-0610 inhibited the release of IL6 with an $IC_{50}$ of 0.069 µM in the THP-1 acute leukemia cell line.

##### 4.1.1.1.2    Anti-proliferative Activity and Mechanism of Action in Hematologic Cancer Cell Lines

BET bromodomain inhibitors display broad anti-proliferative activity across a range of cancer cell lines derived from hematologic malignancies.  Using resazurin reduction as an indicator of cellular viability, CPI-0610 was observed to inhibit the proliferation of fifteen lymphoma cell lines with fifty percent growth inhibitory concentrations ($GI_{50}$) ranging from 0.4 µM to 2.5 µM. The cell lines tested included those derived from patients with diffuse large B-cell lymphoma (ABC and GCB sub-types), follicular lymphoma, and Burkitt lymphoma, suggesting that this compound may be broadly active across a range of lymphoma subtypes. In addition, cell lines derived from patients with acute leukemia and multiple myeloma were observed to be phenotypically sensitive to CPI-0610 treatment, exhibiting a cell cycle arrest (G1) followed by acute induction of apoptosis as monitored by flow cytometry.

It has been established that BET bromodomain inhibition results in the down-regulation of key cancer genes such as *MYC* and *BCL2*, as well as factors involved with NF-κB signaling. Consistent with this observation, CPI-0610 induced the rapid down-regulation of *MYC* mRNA in the multiple myeloma cell line LP-1 (Figure 1, left panel). The tumor suppressor gene p21, a well-known MYC target, was up-regulated upon MYC suppression by CPI-0610 (Figure 1, right panel). These effects were rapidly reversible, as *MYC* levels returned to their pre-treatment levels by 2 hours after removing CPI-0610 from the cell culture media. Chromatin immunoprecipitation experiments showed that BRD4 was released from the *MYC* locus following CPI-0610 treatment. In addition, the cell cycle arrest induced by CPI-0610 could be

CONSTELLATION PRODUCTION_017001

CPI-0610
Investigator Brochure, Edition 5.1                                              30 April 2018

rescued by over-expressing an exogenous, BET bromodomain-resistant form of MYC, directly implicating MYC down-stream of BET in the G1 arrest.

**Figure 1     CPI-0610 Suppresses the Expression of *MYC* and Up-regulates the MYC-target Gene p21**



LP-1 cells were treated with DMSO or 5 μM CPI-0610 for the indicated times. The relative mRNA expression levels of MYC (left panel) or p21 (right graph) were determined by comparing DMSO versus CPI-0610 treated cells. The different bar colors in the individual graphs represent two distinct normalization methods (GAPDH or PPIB).

CPI-0610 also robustly regulates the expression of key genes in the NF-κB signaling pathway, including *IL6* and *IL10*, in the activated B cell (ABC) diffuse large B cell lymphoma (DLBCL) cell line TMD8 (Figure 2).  Samples assessed after 6 and 24 hours of treatment with CPI-0610 show a significant and sustained suppression of these integral signaling molecules.

**Figure 2     CPI-0610 suppresses the expression of *IL6* and *IL10***



TMD8 cells were treated with DMSO or 1.6 μM CPI-0610 for the indicated times. The relative mRNA expression levels of *IL6* (orange bars) or *IL10* (gray bars) were determined by comparing DMSO versus CPI-0610 treated cells

Constellation Pharmaceuticals, Inc.                    Confidential                                      13

#### 4.1.1.2   In Vivo Studies

#### 4.1.1.2.1   Efficacy in the Raji Burkitt Lymphoma Xenograft Model

The efficacy of CPI-0610 was evaluated in the Raji Burkitt lymphoma subcutaneous xenograft model with 3 different oral daily dosing regimens: 30 mg/kg QD, 30 mg/kg BID, and 60 mg/kg BID for 16 consecutive days. The 30 mg/kg BID regimen was well tolerated and more efficacious than 30 mg/kg QD.  CPI-0610 given at 60 mg/kg PO BID was efficacious but caused excessive body weight loss; the dose was therefore reduced to 60 mg/kg PO QD, which was subsequently well tolerated.

The left panel of Figure 3 shows tumor volumes over time, comparing the 3 different regimens of CPI-0610 treatment to vehicle administration. With all 3 dosing regimens, tumor growth inhibition was associated with a decrease of more than 50% in the expression of *MYC* mRNA in the lymphoma tissue, when compared to the vehicle control (right panel). In all treatment arms, the tumor concentration of CPI-0610 after 2 hours of dosing was greater than 6 µM, which is more than ten times above the in vitro $EC_{50}$.

**Figure 3**     **Anti-tumor Activity of CPI-0610 against Raji Burkitt Lymphoma Xenografts in SCID Mice**



BID = twice per day; QD = once per day.
Data are shown as mean ± SEM, n = 10.
The mice in the 60mg/kg PO QD arm were treated with 60mg/kg PO BID for the first week and with 60mg/kg PO QD for the rest of the study

CPI-0610's ability to inhibit *MYC* mRNA expression in vivo was assessed in the Raji Burkitt lymphoma subcutaneous xenograft model in SCID/NOD mice. After administration of a single oral dose, the decrease in *MYC* mRNA expression in tumor tissue was dose-dependent and the maximum effect (75% inhibition of *MYC* mRNA expression) was detected at the highest dose (30 mg/kg) and at the earliest time point (4h) after dosing. *MYC* mRNA levels remained decreased for 8 hours and returned to baseline after 12 hours, paralleling the clearance of CPI-0610 from the plasma (Figure 4).

**Figure 4      Tumor Expression of *MYC* mRNA and Plasma Concentrations of CPI-0610
Following a Single Oral Dose in the Raji Burkitt Lymphoma Xenograft Model**



### 4.1.1.2.2   Efficacy in the MV4-11 Acute Leukemia Xenograft Model in Nude Mice

The effects of CPI-0610 treatment on the growth of MV4-11 acute leukemia xenografts in nude mice were evaluated with both oral and subcutaneous dosing and with different dosing frequencies. The four treatment arms included the following regimens: 5 mg/kg SC TID, 15 mg/kg SC BID, 15 mg/kg SC QD, and 30 mg/kg PO QD, all for 28 consecutive days. Results are shown in Figure 5.

**Figure 5      Anti-tumor Activity of CPI-0610 against MV4-11 Acute Leukemia Xenografts
in Nude Mice**



TID = 3 times per day; BID = twice per day; QD = once per day; SC = subcutaneous; PO = oral administration.
Data are shown as mean ± SEM, n = 12 (in 15 mg/kg SC BID group, n=11)

All of the CPI-0610 dosing regimens were well tolerated, as assessed by changes in body weight. Mice treated with CPI-0610 at 5 mg/kg SC TID and 15 mg/kg SC BID exhibited a significant reduction in tumor volumes whereas 15 mg/kg SC QD and 30 mg/kg PO QD did not

significantly reduce tumor volumes compared to vehicle. The enhancement of anti-tumor activity provided by the more frequent administration of CPI-0610, highlighted by the efficacy of the 5 mg/kg SC TID regimen and the lack of efficacy with the 15 mg/kg SC QD regimen, is consistent with the high clearance of the compound in mice and its rapidly reversible pharmacodynamic effects.

A pharmacokinetic/efficacy model (a sigmoid $E_{max}$ model) was identified that provided the best fit of the relationship between CPI-0610 exposure and efficacy in the MV4-11 xenograft model in mice. Efficacy (%TGI) could not be adequately explained by total AUC, and instead was best explained by the minimum steady-state plasma concentration ($C_{minSS}$) of CPI-0610 achieved with different routes and schedules of administration. Based on the model parameters, the $EC_{50}$, $EC_{90}$, and $EC_{99.9}$ $C_{minSS}$ values were 128, 200, and 602 ng/mL, respectively.

### 4.1.2   Secondary Pharmacodynamics

The binding of CPI-0610  was evaluated in a screening assay against a panel of 54 physiologically relevant receptors, transporters and ion channels at 10 µM. For most targets, CPI-0610 inhibited the binding of  the respective control compound by less than 25%, reflecting that it had no relevant effect on these targets.  However, 10 µM  CPI-0610 was found to inhibit 95% of the binding of  iodomelatonin to the melatonin type 1 receptor (MT-1). Also, a paradoxical 44% increase in the binding of the agonist MIP-1-alpha on the CCR1 receptor was observed in presence of 10 µM  CPI-0610.  In subsequent binding assays CPI-0610 was found to have no affinity for the CCR-1 receptor.  The $IC_{50}$ of CPI-0610 for MT-1 was determined to be approximately 0.2 µM.  In a functional assay of the human MT-1 receptor the $IC_{50}$ of CPI-0610 was approximately 0.41 µM.  A literature search found no toxicologic effects resulting from specific MT-1 binding inhibition.  Although there is emerging evidence that melatonin may have a role in glucose regulation, the evidence does not point to MT-1, but is instead linked to single nucleotide polymorphisms of the melatonin type 2 receptor (MT-2) and to the experimental administration of mixed MT-1/MT-2 inhibitors (Peshcke and Muhlbauer, 2010; Espino et al., 2011).

### 4.1.3   Safety Pharmacology

CPI-0610 was assessed for its potential to cause cardiac arrhythmias associated with delayed ventricular repolarization (QT interval prolongation). An in vitro hERG binding assay was performed at 10 µM CPI-0610 and showed no displacement of astemizole, the reference ligand.

The effects of CPI-0610 on the cardiovascular system were also studied after single oral doses of 3, 6, and 10 mg/kg in conscious beagle dogs implanted with telemetry transmitters. There were no CPI-0610-related changes observed in heart rate, blood pressure or the electrocardiogram.

### 4.2   Pharmacokinetics and Product Metabolism in Animals

### 4.2.1   Absorption

The PK profiles of CPI-0610 monohydrate capsules and tablets have been evaluated in dogs under different pretreatment conditions.  A solution formulation of amorphous CPI-0610 was also evaluated in dogs to give an estimate of maximal absorption and bioavailability.  The results of these studies are shown in Table 1.  Exposures from tablets following pretreatment with famotidine (elevated gastric pH) and no pretreatment were similar (within 1.1-fold based on $AUC_{0\text{-last}}$ or $C_{max}$), as were other PK parameters.  The bioavailability of tablets after no pretreatment was approximately 29%, which was an improvement compared to capsules (16%

F), and approached the theoretical maximal bioavailability seen with a solution formulation of CPI-0610 (40%). CPI-0610 tablets do not show a food effect, with similar exposure (within 1.2-fold based on $AUC_{0-last}$ and 1.1-fold based on $C_{max}$) in both fasted and fed dogs.

The CPI-0610 tablets show greater exposure and bioavailability compared to the capsule dosage form. There is no change in exposure at high gastric pH, and there is no effect of food on the pharmacokinetics of CPI-0610 monohydrate tablets.

**Table 1**     **Mean (± SD) Pharmacokinetic Parameters of CPI-0610 Dosage Forms in Male Beagle Dogs Following 2.5 mg/kg Oral Administration after Famotidine or Feeding Pretreatment or No Pretreatment**

| Parameter | Tablet 25 mg | | | Capsule 25 mg | Solution 2.5 mg/kg |
|---|---|---|---|---|---|
| | Famotidine | Food | No Pretreat | No Pretreat | No Pretreat |
| $C_{max}$ (ng/mL) | 600 ± 138 | 645 ± 121 | 596 ± 113 | 379 ± 141 | 1076 ± 275 |
| $T_{max}$ (h) | 2.67 ± 1.51 | 1.92 ± 1.20 | 2.00 ± 0.0 | 1.67 ± 1.21 | 1.25 ± 0.612 |
| $AUC_{0-last}$ (ng/mL·h) | 5690 ± 1302 | 6282 ± 1106 | 5162 ± 1262 | 3172 ± 1064 | 8063 ± 1888 |
| $AUC_{0-inf}$ (ng/mL·h) | 6827 ± 1653 | 7970 ± 2038 | 6053 ± 1692 | 3737 ± 1336 | 10200 ± 3355 |
| $T_{1/2}$ (h) | 9.37 ± 1.54 | 10.39 ± 3.26 | 8.71 ± 1.33 | 9.06 ± 3.13 | 11.5 ± 7.00 |
| F (%)[a] | 32 | 35 | 29 | 16 | 40 |

a. Calculated using $AUC_{(0-las)}$ from 0.5 mg/kg IV arm of Report 0610-DMPK-002

The clearance of CPI-0610 is moderate in both mice and rats and low in dogs. The half-life of elimination after oral administration was approximately 2 hours in rats and mice and 9 hours in dogs. Distribution volumes are high in all three species, exceeding 1 L/kg. CPI-0610 was well absorbed when given orally to dogs and rats and its oral bioavailability is high, ranging between 75.6 and 93.8%.

## 4.2.2   Protein Binding and Stability

CPI-0610 is highly protein-bound and the extent of protein binding is similar across species. The average percentage of plasma protein binding for CPI-0610 determined by rapid equilibrium dialysis at a concentration of 1 μM was 97.2%, 95.5%, 95.6% and 97.8% in mouse, rat, dog and human plasma, respectively. CPI-0610 is stable in mouse, dog and human plasma and moderately stable in rat plasma. The average percentage remaining after 5 hours of incubation at 37°C was 90.2%, 69.5%, 103% and 91.4% in mouse, rat, dog and human plasma, respectively.

## 4.2.3   Metabolism

The in vitro metabolism of CPI-0610 has been evaluated by monitoring the disappearance of parent compound in mouse, rat, dog and human liver microsomes and hepatocytes at 1 μM. CPI-0610 has low intrinsic clearance when incubated with liver microsomes from all 4 species. The liver microsomal intrinsic clearance ($CL_{int}$) of CPI-0610 is 2.6, 11.4, 2.4, and 1.1 μL/min/mg of protein in mice, rats, dogs and humans, respectively and its in vitro half-life is 267, 61, 257 and 630 minutes in the same systems, respectively. These results were confirmed in cryopreserved hepatocytes in which CPI-0610 was also stable. In hepatocytes, the intrinsic clearance ($CL_{int}$) of CPI-0610 is 2.7, 11.1, 1.7, and 4.0 μL/min/million cells in mice, rats, dogs and humans, respectively. The apparent four-fold difference in intrinsic clearance between human microsomes and human hepatocytes probably reflects inter-sample variation.

CONSTELLATION PRODUCTION_017006

Using cryopreserved hepatocytes, no human-specific metabolites of CPI-0610 were seen. The metabolites of CPI-0610 in human hepatocytes are predominantly the results of oxidation and amide bond hydrolysis. A total of five, three and two metabolites of CPI-0610 were observed in rat, dog and human hepatocytes, respectively (Table 2).

**Table 2      Metabolite Profiles of CPI-0610 in Cryopreserved Hepatocytes**

| Peak label | Mass (MH$^+$) | In Cryopreserved Hepatocytes after 120 min incubation | | | Potential metabolism |
|---|---|---|---|---|---|
| | | Rat | Dog | Human | |
| CPI-0610 | 366.1 | √ | √ | √ | Parent |
| M1 | 384.1 | √ | ND | ND | Unknown |
| M2 | 368.1 | √ | ND | ND | Unknown |
| M3 | 352.1 | √ | √ | ND | Unknown |
| M4 | 382.1 | √ | √ | √ | Oxidation |
| M5 | 367.1 | √ | √ | √ | RNH2 to ROH |

ND: not detected

M4 and M5 are the only two metabolites of CPI-0610 identified in human hepatocytes. M4 and M5 were also identified in rat and dog hepatocytes, thereby supporting the adequacy of these two species for the preclinical safety assessment of CPI-0610.

### 4.2.4    Pharmacokinetic Drug Interactions

### 4.2.4.1    Interaction with CYP Enzymes

CPI-0610 was found to cause weak or no inhibition of the cytochrome P450 enzymes assayed in vitro.  In one experiment (CPI-0610 showed no inhibition of the activity of human CYP1A2, CYP2D6 and CYP3A4; IC$_{50}$ values against CYP2C9 and CYP2C8 were 29.4 μM and 6.1 μM, respectively. In a separate experiment 10 μM CPI-0610 did not inhibit CYP3A4 or CYP2D6 activities and pre-incubation for 20 min with 10 μM CPI-0610 resulted in no time-dependent inhibition of CYP3A4 activity. Based on these data, the risk of CPI-0610 causing pharmacokinetic drug interactions by inhibition of the major drug-metabolizing enzymes is low in humans.

### 4.3    Toxicology

### 4.3.1    Single-Dose Toxicity Studies

Single doses of CPI-0610 provided as an oral suspension were administered to male rats at doses of 60, 200, 400 and 600 mg/kg. No adverse effects were identified at any dose. Single doses of CPI-0610 provided as an oral suspension were administered to dogs at 10, 30, and 100 mg/kg, and no adverse effects were observed at the 10 mg/kg dose. At the 30 and 100 mg/kg doses there were increases in the white blood cell count, decreases in the reticulocyte count, and increases in serum glucose, total cholesterol, triglycerides and total bilirubin, with a decrease in serum calcium. These changes in hematology and clinical chemistry parameters were greater at the 100 mg/kg dose, and additional CPI-0610-related effects included vomiting, diarrhea, and tremor with slight decreases in food consumption and body weight.

CONSTELLATION PRODUCTION_017007

## 4.3.2    Repeat-Dose Toxicology Studies

### 4.3.2.1    Rats

An initial dose range-finding (non-GLP) study was conducted in rats with once daily oral suspension doses of 0, 60, 180 and 300 mg/kg/day for up to 14 consecutive days. The 300 mg/kg and 180 mg/kg dose groups had to be terminated on Day 6 and Days 8 or 9, respectively, because of the deteriorating condition of the animals. The 60 mg/kg/day dose resulted in the death of one rat on Day 15, and like the higher doses was associated with significant toxicities of the immune system (lymphoid depletion), gastrointestinal tract (atrophy, erosion), and hematopoiesis (decreased). Changes in hematology values at all doses included decreases in platelets and reticulocyte counts, while the total white blood cell count increased, possibly in response to tissue injury or infection. Most notable among the changes in serum chemistry values was a moderate increase in the serum glucose.

Subsequently a GLP-compliant study of CPI-0610 was conducted in rats with once daily oral suspension doses of 0, 2, 6, 20 and 60 mg/kg/day for up to 14 consecutive days. The 2, 6, and 20 mg/kg/day doses were all well tolerated, and the 20 mg/kg dose was considered an NOAEL. Consistent with the preceding dose range-finding study, the 60 mg/kg/day dose resulted in lymphoid depletion, bone marrow hypocellularity, various findings in the gastrointestinal mucosa (ulceration, hemorrhage, inflammation and hyperplasia), and degeneration of the tubular seminiferous epithelium with evidence of reduced spermatogenesis. Changes in hematology and clinical chemistry values were similar to those observed in the dose range-finding study, consistent with suppression of hematopoiesis, with inflammation, and included increases in serum glucose. Following a 2-week recovery period all of these findings demonstrated evidence of recovery, with the exception of the effects on the testis, for which 2 weeks may be an inadequate duration for demonstration of recovery.

Table 3 summarizes the exposures to CPI-0610 at the doses that were explored in the GLP-compliant, 14-day repeated-dose toxicology study in the rat.

**Table 3    Mean CPI-0610 Toxicokinetic Parameters in Rats**

| Parameter | Period | CPI-0610 Dose | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 2 mg/kg/day | | 6 mg/kg/day | | 20 mg/kg/day | | 60 mg/kg/day | |
| | | Male | Female | Male | Female | Male | Female | Male | Female |
| Cmax | Day 1 | 191 | 224 | 682 | 515 | 2300 | 2960 | 9220 | 7970 |
| (ng/mL) | Day 14 | 282 | 398 | 1000 | 1080 | 2980 | 3040 | 9150 | 7640[a] |
| AUC$_{(0-t)}$ | Day 1 | 970 | 867 | 3590 | 2970 | 13,100 | 13,100 | 107,000 | 87,400 |
| (ng·h/mL)[a] | Day 14 | 961 | 915 | 3290 | 2810 | 12,300 | 11,000 | 60,100 | 96,300[a] |

a.  60 mg/kg/day females were bled on Day 12 at 1, 2 and 24 hours post dose

### 4.3.2.2  Dogs

An initial dose range-finding (non-GLP) study was conducted in dogs with once daily oral suspension doses of 0, 3, 10 and 30 mg/kg/day for up to 14 consecutive days. The 3 mg/kg dose was well tolerated, but the animals dosed at 10 and 30 mg/kg/day were euthanized on Day 13 and Day 6, respectively, because of their deteriorating condition. The principal histopathologic findings included lymphoid depletion, various lesions in the gastrointestinal mucosa (ulceration and hemorrhage), and abnormalities in spermatogenesis. There were decreases in reticulocyte and platelet counts, as well as decreases in the white blood cell count. Increases in serum glucose were also observed.

A subsequent GLP-compliant study of CPI-0610 was conducted in dogs with once daily oral suspension doses of 0, 2, 4, and 8/6 mg/kg/day for up to 14 consecutive days. The 2 and 4 mg/kg/day doses were well tolerated, and the 4 mg/kg/day dose was considered the maximum tolerated dose. In contrast, the 8 mg/kg/day dose was not well tolerated, and in males a one-day interruption in treatment occurred on Day 8, which was followed by resumption of treatment at 6 mg/kg/day on Day 9. Female dogs continued to be treated at the 8 mg/kg/day dose. Although the one-day omission of dosing and dose reduction in the male dogs was associated with improvement in their clinical condition, one male dog treated at 8/6 mg/kg/day had to be euthanized on Day 10 because of its deteriorating condition. One female dog treated at 8 mg/kg/day also had to be euthanized on Day 14 because of its deteriorating condition. The cause of death in both of these animals was considered to be pulmonary inflammation and hemorrhage consistent with an infectious pneumonia.

As in the preceding dose range-finding study the principal toxicities included lymphoid depletion, bone marrow hypocellularity, various lesions in the gastrointestinal mucosa (villous necrosis and/or atrophy, erosion, neutrophilic inflammation, hemorrhage) and germ cell depletion in the testis.  The presence of *Cryptosporidium* in the ileum and/or jejunum of some dogs suggests a weakening of the immune system, and this immunosuppression is thought to have predisposed the animals to the development of pneumonia, manifested as pulmonary inflammation with hemorrhage. The pulmonary inflammation and hemorrhage extended to involve the adjacent pericardium and epicardium. The acute myocardial degeneration observed in a single animal is also considered likely related to the pulmonary process. Hematology parameters were notable for decreases in reticulocytes, platelets, lymphocytes and eosinophils. Clinical chemistry values included increases in serum glucose and changes consistent with inflammation (e.g., increased fibrinogen levels). Following a 2-week recovery period most of these abnormalities had resolved or were resolving, with the exception of the germ cell depletion in the testis, for which a 2-week recovery period was considered insufficient.

Table 4 summarizes the exposures to CPI-0610 at the doses that were explored in the GLP-compliant, 14-day repeated-dose toxicology study in the dog.

**Table 4      Mean CPI-0610 Toxicokinetic Parameters in Dogs**

| Parameter | Period | CPI-0610 Dose | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2 mg/kg/day | | 4 mg/kg/day | | 8/6[a] mg/kg/day | |
| | | Male | Female | Male | Female | Male | Female |
| $C_{max}$ | Day 1 | 581 | 591 | 1030 | 895 | 1910 | 2440 |
| (ng/mL) | Day 14 | 631 | 527 | 1390 | 1340 | 1970[a] | 4010 |
| $AUC_{(0-t)}$ | Day 1 | 3900 | 3810 | 7610 | 5890 | 18600 | 16900 |
| (ng*hr/mL) | Day 14 | 4550 | 4170 | 10600 | 12100 | 19800[a] | 52200 |

a. For males, Day 14 mean $C_{max}$ and mean $AUC_{(0-t)}$ were based on a dose level of 6 mg/kg/day.

### 4.3.3    Genotoxicity Studies

No genotoxicity studies have been conducted with CPI-0610.

### 4.3.4    Reproduction and Developmental Toxicity

No reproductive and developmental toxicity studies have been conducted with CPI-0610.

### 4.3.5    Carcinogenicity

No carcinogenicity studies have been conducted with CPI-0610.

### 4.3.6    Local Tolerance

No local tolerance studies have been conducted with CPI-0610.

### 4.3.7    Other Toxicity

The overall absorbance maximum of CPI-0610 is 233 nm. The maximal absorbance between 290 and 700 nm is 313 nm. Because the extinction coefficient at 313 nm is close to the no-concern limit (ICH S10) and because the maximum absorption is outside the range of concern, no specific safety concern for the phototoxicity of CPI-0610 is foreseen and no further investigations were conducted.

### 4.3.8    Summary of Observations in the Toxicology Studies

The findings observed after repeated-dose administration showed dose-dependence in both preclinical safety species, as well as consistency and reproducibility between species and across studies.  At the end of a 2-week recovery period, the vast majority of the findings showed partial or total reversibility, with the exception of the testicular findings, for which the 2-week recovery period was likely too short.  In addition, the 2-week GLP dog study also showed that most critically ill animals no longer exhibited signs of ill condition after a reduction of the dose of CPI-0610.  The vast majority of the CPI-0610-induced findings are linked to the pharmacology of a BET inhibitor, either directly or indirectly, as a result of immune suppression and gastrointestinal barrier injury.  The main findings in repeated-dose toxicity studies are discussed below.

**Lymphoid depletion**, most markedly in the thymus, was observed in both species and is consistent with the pharmacology of BET bromodomain inhibition.  Dose-dependence was clear in dogs as lower thymus weights and minimal to marked lymphoid depletion (thymus and lymph nodes) were apparent at doses $\geq 4$ mg/kg/day, moderate lymphoid necrosis was seen in one female at 8 mg/kg/day and decreased spleen weights were observed at $\geq 10$ mg/kg/day.  In rats, decreased weight and minimal to marked lymphoid depletion of the thymus were observed at

doses of ≥ 20 mg/kg/day. The anatomic changes correlated with decreases in lymphocyte counts at 8/6 mg/kg/day in dogs and 60 mg/kg/day in rats.  Lymphoid depletion is considered to be indirectly the cause of the mixed bronchio-alveolar inflammation of the lung in dogs (≥ 2 mg/kg/day).  The latter culminated with the poor and deteriorating conditions, and with the inflammation and hemorrhage in the lungs observed in the two 8/6 mg/kg/day dogs that had to be euthanized early.  The immunosuppressive consequences of lymphoid depletion, as witnessed by the presence of *Cryptosporidium* in the ileum and/or jejunum of some dogs (≥4 mg/kg/day), most probably enabled these deteriorating conditions. The cardiac findings (epicardial, pericardial and myocardial) observed in dogs are not the result of a direct effect of CPI-0610 on the cardiac tissue, but are considered secondary to an extension of the pulmonary inflammation and infection observed in the same animals.  Like the pulmonary inflammation, the cardiac findings are, therefore, also considered an indirect consequence of immune suppression.

**GI tract findings** were seen across large portions of the GI tract in both species.  In dogs, at doses of 8/6 mg/kg/day, they consisted mostly of erosion, hemorrhage, and ulceration as well as associated regeneration, hyperplastic changes and neutrophilic cell infiltration. The same general picture was seen in rats (20 mg/kg/day and above), where degeneration and ulceration were observed in the tongue and the stomach and the regenerative changes were characterized by mucosal hyperplasia from the stomach to the colon.  Infections and local cellular damage in the GI tract of both species and the respiratory tract of dogs probably caused the inflammation that was manifested both systemically by increases in fibrinogen and band neutrophils (8/6 mg/kg/day dogs) and locally in the associated lymph nodes, by lymphoid hyperplasia in the rats and erythrophagocytosis in the dogs.

**Hypocellularity of the bone marrow,** mild to moderate and consistent with the pharmacology of CPI-0610, was observed in dogs (60 mg/kg/day) and in rats (≥ 20 mg/kg/day).  It seemed to affect both red and white lineages, as described in dogs, and was associated with decreases in red cell parameters and platelet counts in both rats (60 mg/kg/day) and dogs (8/6 mg/kg/day).

**Decreased testis weights** and degeneration of the tubular seminiferous epithelium were observed in rats (60 mg/kg/day) and dogs (≥ 2 mg/kg/day).  These were accompanied by the presence of debris in the epididymides and are presumed to be the cause of the decrease in seminal vesicle (rats) and prostate (both species) weights. Corresponding changes of ovarian, vaginal and uterine atrophy were seen in rats. It is to be noted that the reversibility of testicular degeneration could not be demonstrated in these studies, but that full recovery has been previously demonstrated in mice four months after termination of dosing with a BET inhibitor (Matzuk et al., 2012). It is anticipated that recovery would also have taken place with CPI-0610, but a 2-week recovery period was too short for the regeneration of the germinal epithelium to take place.

**Mild to moderate hyperglycemia** was observed in dogs at 8/6 mg/kg/day and in rats at 60 mg/kg/day, accompanied by increases in the urine glucose/creatinine ratio (both species), serum cholesterol, low density lipoproteins and triglycerides (in dogs). The origin of the hyperglycemia is unclear. A direct pharmacological effect of BET bromodomain inhibition and/or an effect on the melatonin type 1 receptor cannot be ruled out.  These metabolic changes showed signs of recovery at the end of the 2-week period although some of them were still apparent in one gender of a single species.

## 5    EFFECTS IN HUMANS

### 5.1    Introduction

CPI-0610 has been evaluated in three separate Phase 1 clinical studies in a total of 138 patients with progressive lymphoma (Study 0610-01); acute leukemia, MDS, MDS/MPN, or MF (Study 0610-02); or multiple myeloma (Study 0610-03).  All three studies have been conducted exclusively in the US and evaluated escalating doses of CPI-0610 when administered in treatment cycles comprised of a 14-day treatment period and a 7-day off-treatment period.  CPI-0610 was first evaluated in a capsule formulation across the dose range of 6 to 400 mg QD and 85-150 mg BID and subsequently in a tablet formulation at doses of 125, 225 and 275 mg QD. The tablet formulation includes micronized drug substance to improve the solubility of CPI-0610 at higher gastric pH and thereby increase bioavailability, particularly at higher doses of CPI-0610.  The exposure ($C_{max}$ and AUC) achieved with the 225 and 275 mg QD tablet doses exceeded that achieved with the 300 and 400 mg capsule doses (see Table 5), supporting the switch to the tablets.

The 225 mg QD dose in tablet form has been administered to more patients than any other dose (N=23) and has been selected as the RP2D for patients with lymphoma (Study 0610-01) and for patients with leukemia and the other malignancies evaluated in Study 0610-02.  While the MTD was not reached in these clinical studies, the 225 mg QD dose is believed to provide exposure to CPI-0610 that is within the therapeutic range with acceptable safety.

Study 0610-01 is an ongoing, First-in-Human, Phase 1, multicenter, dose escalation study in patients with progressive lymphoma for which effective standard treatments are no longer available.  A total of 64 patients have been treated in Study 0610-01 so far.  A wide range of lymphoma subtypes have been included in the study, with diffuse large B-cell and follicular lymphoma accounting for 56% and 13% of the 64 treated patients, respectively.  Most patients have been heavily pretreated (median prior lines of therapy = 4).  The dose escalation portion of Study 0610-01 is complete, with the following capsule doses having been tested within the study: capsule doses of 6, 12, 24, 48, 80, 120, 170, 230 and 300 mg QD and tablet doses of 125 and 225 mg QD.  Patients with ABC-DLBCL are being enrolled into the dose expansion portion of the study where they will receive the RP2D of 225 mg QD.

Study 0610-02 is an ongoing, Phase 1, multicenter, dose escalation study in patients with acute leukemia, MDS or MDS/MPN and MF.  A total of 44 patients have been enrolled in the study. Most patients enrolled to the study have had acute myeloid leukemia (AML), including 20 patients with primary AML and 12 with transformed disease. Seven patients had a diagnosis of MDS, 5 had a diagnosis of chronic myelomonocytic leukemia (CMML) and one patient had MDS/MPN NOS. No patients with myelofibrosis had been enrolled at the time of the data cut-off for this IB. The median number of lines of prior systemic therapy was 3.  This study has evaluated CPI-0610 administered once daily in capsule form (24, 48, 120, 170, 230, 300, and 400 mg QD) as well as tablet form (225 and 275 mg QD).  Dose escalation is complete, with the RP2D of 225 mg QD selected.  This study is enrolling patients specifically with myelofibrosis to evaluate CPI-0610 as a single agent and in combination with ruxolitinib.

Study 0610-03 was a Phase 1, multicenter, dose escalation study in 30 patients with multiple myeloma that was closed by the Sponsor in July 2017.  In addition to the 225 mg QD dose administered in tablet form, capsule doses administered once (24, 48, 120, 170 mg QD) and

twice daily (85, 110 and 150 mg BID; daily doses of 170, 220 and 300 mg) were evaluated in this study. The BID dosing regimen was observed to reduce the maximum plasma concentration achieved with a given total daily dose, thereby limiting the ability to reach the plasma concentrations needed to suppress *IL-8* and *CCR1* (and presumably other BET-target genes required for anti-tumor activity). In addition, twice daily dosing appeared to be associated with an increase in the frequency of nausea and vomiting as compared to once daily dosing in Study 0610-01.

The pharmacokinetic profile of CPI-0610 when administered once daily has been fairly consistent across the three Phase 1 clinical studies (see Section 5.2.1). Maximum exposure of CPI-0610 following tablet administration is achieved within 1-5 hours. The exposure ($C_{max}$ and AUC) achieved following a single 225 mg dose in tablet form was 2021 ng/mL and 19,342 ng·hr/mL, respectively. The half-life is approximately 16 hours, supporting once daily dosing. The mean CPI-0610 pharmacokinetic parameters are provided in Table 5.

The safety profile of CPI-0610 has also been consistent across the three Phase 1 clinical studies in patients with various hematologic malignancies and therefore, the safety data from all three studies are presented collectively in Section 5.3.1. As shown in Table 6, dose-related thrombocytopenia is the principal dose-limiting toxicity following CPI-0610 administration. The thrombocytopenia increased in both frequency and severity with dose of CPI-0610, which influenced dose escalation within the clinical studies.

The other commonly reported adverse events that were considered related to CPI-0610 treatment include: nausea, fatigue, decreased appetite, diarrhea, vomiting, dysgeusia, and anemia. Most adverse events experienced with CPI-0610 to date are low grade (Grade 1 or 2) and reversible.

The efficacy of single-agent CPI-0610 has been limited to patients with lymphoma; there have been no objective responses in unselected populations of patients with acute leukemia, MDS or MDS/MPN (Study 0610-02) or multiple myeloma (Study 0610-03). See Section 5.3.2 for more information on patients who responded or had durable stable disease.

## 5.2    Pharmacokinetics and Product Metabolism in Humans

### 5.2.1    Pharmacokinetics

The pharmacokinetic profile of CPI-0610 was evaluated in the three Phase 1 dose escalation studies conducted in patients with lymphoma, leukemia and multiple myeloma. The mean pharmacokinetic parameters determined primarily from Study 0610-01 are summarized in Table 5. The pharmacokinetics of CPI-0610 have been similar across the patient populations evaluated.

Dose proportional increases in systemic exposure were observed within the dose range of 6 to 170 mg QD administered in capsule form; however, AUC values were similar across the 170-400 mg dose range, suggesting a limitation on drug absorption, potentially related to the low aqueous solubility of the crystalline form of CPI-0610.

The tablet formulation with micronized drug substance had improved oral bioavailability relative to higher capsule doses of CPI-0610. In the 10 patients with lymphoma who were treated with the tablet dose of 225 mg QD, the mean $C_{max}$ and $AUC_{24}$ after the first dose was 2021 ng/mL and 19,342 ng·h/mL, respectively, which were higher than the mean respective values achieved with capsule doses of 170, 230 and 300 mg QD, while the exposure achieved with the 275 mg QD tablet dose exceeded that of the 225 mg QD tablet dose. The pharmacokinetics of the tablet

CONSTELLATION PRODUCTION_017013

formulation was otherwise similar to that of the capsule.  Maximum plasma concentrations were reached at 2.9 hours and the half-life was 16.2 hours. Oral clearance was 14.1 L/h.  Minimal accumulation was observed following multiple-dose administration ($AUC_{24}$ accumulation factor of 1.2), which is consistent with CPI-0610's half-life and a once daily dosing schedule.

**Table 5     Day 1 Mean CPI-0610 Pharmacokinetic Parameters from Patients Primarily in Study 0610-01[a]**

| Dose | N | $t_{max}$ (h) | $C_{max}$ (ng/mL) | $C_{24}$ (ng/mL) | $AUC_{24}$ (ng·h/mL) |
|---|---|---|---|---|---|
| **Capsules** | | | | | |
| 6 | 5 | 2.35 ± 1.60 | 55.0 ± 13.2 | 7.1 ± 4.4 | 550 ± 102 |
| 12 | 3 | 2.83 ± 1.26 | 70.1 ± 31.5 | 11.9 ± 12.8 | 950 ± 630 |
| 24 | 3 | 5.44 ± 2.70 | 235.3 ± 104.6 | 42.5 ± 69.6 | 2971 ± 2,045 |
| 48 | 7 | 2.79 ± 1.61 | 315.6 ± 168.0 | 56.1 ± 43.8 | 3445 ± 1,614 |
| 80 | 6 | 1.71 ± 0.77 | 540.5 ± 117.8 | 112.0 ± 82.8 | 5781 ± 1,992 |
| 120 | 4 | 1.39 ± 0.26 | 639.9 ± 160.6 | 55.0 ± 44.1 | 3846 ± 967 |
| 170 | 7 | 2.53 ± 2.26 | 1175 ± 446 | 224.7 ± 196.6 | 12,840 ± 7,083 |
| 230 | 9 | 2.78 ± 2.24 | 1423 ± 550 | 197.0 ± 152.7 | 13,727 ± 6,833 |
| 300 | 3 | 3.40 ± 3.23 | 1684 ± 247 | 143.7 ± 201.3 | 14,456 ± 7,344 |
| 400[b] | 7 | 3.18 ± 1.89 | 1938 ± 762 | 167.8 ± 112.8 | 16,494 ± 8452 |
| **Tablets** | | | | | |
| 125 | 7 | 1.55 ± 1.18 | 1390 ± 365 | 85.2 ± 37.9 | 10,714 ± 2,938 |
| 225 | 8 | 2.78 ± 1.19 | 2021 ± 483 | 310.2 ± 227.5 | 19,342 ± 6,453 |
| 275[b] | 6 | 3.36 ± 2.61 | 2574 ± 889 | 200.4 ± 187.7 | 22,263 ± 8865 |

a.  Mean pharmacokinetic parameters are from Study 0610-01 only, unless otherwise specified
b.  Mean pharmacokinetic parameters for 400 mg capsule dose and 275 mg tablet dose are from Study 0610-02

### 5.2.2   Pharmacodynamics in Humans

In the first Phase 1 trials of CPI-0610, the expression of a small number of genes has been evaluated in peripheral blood. The genes of interest were selected on the basis of experiments performed ex vivo with human peripheral blood mononuclear cells (PBMCs) exposed to a BET inhibitor, which identified a small number of genes whose expression at the level of mRNA was robustly down-regulated. Peripheral blood samples have been collected with a subset of the PK sampling time points in the Phase 1 trials of CPI-0610 in an effort to understand the relationship between systemic exposure to CPI-0610 and suppression of these BET inhibitor-sensitive genes. Analysis of the expression of these genes along with the CPI-0610 plasma concentration versus time data shows that there is a time- and concentration-dependent relationship. This behavior is most consistently observed for *IL8*, less so for *CCR1*.

Examples of the exposure-response relationships for *CCR1* and *IL8* are presented in Figure 6. The data shown includes patients treated with different doses in the Phase 1 trial in lymphoma (Study 0610-01).  Gene expression values were normalized to those measured at a single time point pre-treatment (100%). The reliance on a single pre-treatment measurement makes it difficult to discriminate between post-treatment changes that reflect a treatment effect and those that reflect inherent variability in the gene's expression. Nevertheless, at higher doses and plasma concentrations there is evidence of suppression of the expression of these genes. This provides an estimate of the plasma concentrations of CPI-0610 ($\geq 2.6\ \mu M$) associated with suppression of BET target gene expression. Work is ongoing to understand the extent to which inhibition of

CONSTELLATION PRODUCTION_017014

gene expression in PBMCs correlates with suppression of genes (like *MYC*) in tumor tissue that are more likely relevant for the compound's anti-tumor activity.

**Figure 6      Repression of BET-target Genes *IL8* and *CCR1* in Circulating Blood 2 Hours Post-dose as a Function of the Plasma Concentration of CPI-0610.**



CPI-0610 concentration determined 2-hours post administration of CPI-0610.  Gene expression was measured from RNA extracted from patient blood and analyzed using qRT-PCR

## 5.3     Safety and Efficacy

### 5.3.1     Safety in Patients with Hematologic Malignancies Treated with CPI-0610 in Phase 1, Dose Escalation Clinical Studies

CPI-0610 has been evaluated at comparable dose ranges in various hematologic malignancy populations and has a similar safety profile in all of these indications.  In all three Phase 1 studies, hematologic changes and gastrointestinal adverse events were reported with the highest frequencies, and also with the highest incidence of treatment-related adverse events and CTCAE grade 3 or higher adverse events that were considered related to study drug.

As shown in Table 6, thrombocytopenia (includes adverse events termed "thrombocytopenia" or "platelet count decreased") was the most common treatment-related adverse event, reported in 32% of the 138 patients treated in the three Phase 1 clinical studies.  There was a lower frequency reported in patients with leukemia and the other hematologic malignancies evaluated in Study 0610-02 (14%) than the other studies, which is likely due to the difficulty in discriminating between disease-related and treatment-related thrombocytopenia in these patient populations.  Approximately half the patients with treatment-related thrombocytopenia (21 of 44 patients) had thrombocytopenia of CTCAE grade 3 or higher (15% of the 138 patients treated in the three Phase 1 studies).  The thrombocytopenia reported was dose-dependent (increasing in incidence and severity with CPI-0610 exposure), reversible, and non-cumulative.  An additional week off treatment prior to initiation of the subsequent treatment cycle was needed for platelet recovery for some patients.

Anemia, neutropenia (including neutrophil count decreased) and lymphocyte count decreased were the other commonly reported treatment-related hematologic changes; they also had a higher incidence of CTCAE grade 3 or greater treatment-related adverse events.  The incidence of treatment-related anemia, neutropenia and lymphocyte count decreased was 12%, 9% and 7%,

CONSTELLATION PRODUCTION_017015

respectively, across the three clinical studies.  These hematologic events did not have a clear dose response.  Of all the hematologic changes reported in the three clinical studies, only one case of febrile neutropenia in Study 0610-01 was reported as a treatment-related serious adverse event.

The treatment-related gastrointestinal adverse events reported with the greatest frequency were nausea, diarrhea and vomiting, with incidences of 27%, 19% and 17%, respectively, across the three clinical studies.  The majority of these gastrointestinal events were of low severity.  As shown in Table 7, diarrhea, vomiting and nausea were the only serious adverse events that were considered to be related to study drug in more than one patient (5, 3 and 2 patients, respectively).

The other frequently reported treatment-related adverse events were fatigue (25%), decreased appetite (20%), and dysguesia (14%), most of which were of low severity.

CPI-0610
Investigator Brochure, Edition 4

13 September 2017

**Table 6    Treatment-Emergent Adverse Events that were Considered Related to Study Drug in ≥4% of Patients in Any of the Phase 1 CPI-0610 Clinical Studies as of 27 June 2017**

| System Organ Class Preferred Term | Study 0610-01 (N=64) | | Study 0610-02 (N=44) | | Study 0610-03 (N=30) | | Total (N=138) | |
|---|---|---|---|---|---|---|---|---|
| | CTCAE Grade 1-5 | CTCAE Grade ≥3 | CTCAE Grade 1-5 | CTCAE Grade ≥3 | CTCAE Grade 1-5 | CTCAE Grade ≥3 | CTCAE Grade 1-5 | CTCAE Grade ≥3 |
| Number of Patients with at Least One ADR | 50 (78.1%) | 24 (37.5%) | 35 (79.6%) | 16 (36.4%) | 29 (96.7%) | 12 (40%) | 114 (82.6%) | 52 (37.7%) |
| Total ADRs | 287 | 61 | 212 | 44 | 152 | 31 | 651 | 136 |
| Gastrointestinal disorders | 21 (32.8%) | 3 (4.7%) | 26 (59.1%) | 4 (9.1%) | 16 (53.3%) | 1 (3.3%) | 63 (45.7%) | 8 (5.8%) |
| Nausea | 11 (17.2%) | 1 (1.6%) | 18 (40.9%) | 4 (9.1%) | 8 (26.7%) | 1 (3.3%) | 37 (26.8%) | 6 (4.3%) |
| Diarrhea | 6 (9.4%) | 3 (4.7%) | 12 (27.3%) | 1 (2.3%) | 8 (26.7%) | 0 | 26 (18.8%) | 4 (2.9%) |
| Vomiting | 8 (12.5%) | 0 | 12 (27.3%) | 1 (2.3%) | 3 (10.0%) | 0 | 23 (16.7%) | 1 (0.7%) |
| Abdominal pain | 1 (1.6%) | 0 | 2 (4.6%) | 0 | 0 | 0 | 3 (2.2%) | 0 |
| Abdominal distention | 0 | 0 | 2 (4.6%) | 0 | 0 | 0 | 2 (1.4%) | 0 |
| Constipation | 0 | 0 | 2 (4.6%) | 0 | 1 (3.3%) | 0 | 3 (2.2%) | 0 |
| Dyspepsia | 0 | 0 | 2 (4.6%) | 0 | 2 (6.7%) | 0 | 4 (2.9%) | 0 |
| Stomatitis | 1 (1.6%) | 0 | 2 (4.6%) | 0 | 0 | 0 | 3 (2.2%)3 | 0 |
| Metabolism and nutrition disorders | 16 (25.0%) | 3 (4.7%) | 19 (43.2%) | 2 (4.6%) | 8 (26.7%) | 0 | 43 (31.2%) | 5 (3.6%) |
| Decreased appetite | 8 (12.5%) | 0 | 15 (34.1%) | 0 | 4 (13.3%) | 0 | 27 (19.6%) | 0 |
| Hyperglycemia | 3 (4.7%) | 0 | 3 (6.8%) | 0 | 1 (3.3%) | 0 | 7 (5.1%) | 0 |
| Hypophosphatemia | 1 (1.6%) | 1 (1.6%) | 0 | 0 | 2 (6.7%) | 0 | 3 (2.2%) | 1 (0.7%) |
| Hyperuricemia | 1 (1.6%) | 0 | 2 (4.6%) | 2 (4.6%) | 0 | 0 | 2 (1.4%) | 1 (0.7%) |
| Investigations | 20 (31.3%) | 12 (18.8%) | 11 (25.0%) | 6 (13.6%) | 12 (40.0%) | 5 (16.7%) | 43 (31.2%) | 23 (16.7%) |
| Platelet count decreased[a] | 14 (21.9%) | 8 (12.5%) | 5 (11.4%) | 3 (6.8%) | 8 (26.7%) | 4 (13.3%) | 27 (19.6%) | 15 (10.9%) |
| Neutrophil count decreased[b] | 5 (7.8%) | 2 (3.1%) | 3 (6.8%) | 3 (6.8%) | 2 (6.7%) | 1 (3.3%) | 10 (7.2%) | 6 (4.3%) |
| Lymphocyte count decreased | 6 (9.4%) | 3 (4.7%) | 0 | 0 | 4 (13.3%) | 0 | 10 (7.2%) | 3 (2.1%) |
| White blood cell count decreased | 4 (6.3%) | 1 (1.6%) | 1 (2.3%) | 1 (2.3%) | 5 (16.7%) | 0 | 10 (7.2%) | 2 (1.4%) |
| Alanine aminotransferase increased | 3 (4.7%) | 0 | 3 (6.8%) | 1 (2.3%) | 1 (3.3%) | 0 | 6 (4.3%) | 1 (0.7%) |
| Aspartate aminotransferase increased | 3 (4.7%) | 0 | 2 (4.6%) | 1 (2.3%) | 1 (3.3%) | 0 | 6 (4.3%) | 1 (0.7%) |
| Weight decreased | 2 (3.1%) | 0 | 2 (4.6%) | 0 | 1 (3.3%) | 0 | 4 (2.9%) | 0 |
| Blood and lymphatic system disorders | 21 (32.8%) | 9 (14.1%) | 6 (13.6%) | 5 (11.4%) | 13 (43.3%) | 8 (26.7%) | 40 (29.0%) | 22 (15.9%) |
| Thrombocytopenia[a] | 13 (20.3%) | 4 (6.3%) | 1 (2.3%) | 1 (2.3%) | 7 (23.3%) | 4 (13.3%) | 21 (15.2%) | 9 (6.5%) |
| Anemia | 6 (9.4%) | 6 (9.4%) | 5 (11.4%) | 4 (9.1%) | 6 (20.0%) | 4 (13.3%) | 17 (12.3%) | 11 (8.0%) |
| Neutropenia[b] | 2 (3.1%) | 1 (1.6%) | 0 | 0 | 1 (3.3%) | 1 (3.3%) | 3 (2.2%) | 2 (1.4%) |
| Febrile neutropenia[b] | 1 (1.6%) | 1 (1.6%) | 0 | 0 | 0 | 0 | 1 (0.7%) | 1 (0.7%) |
| General disorders and administration site | 14 (21.9%) | 1 (1.6%) | 14 (31.8%) | 4 (9.1%) | 10 (33.3%) | 2 (6.7%) | 38 (27.5%) | 7 (5.1%) |
| Fatigue | 11 (17.2%) | 0 | 12 (27.3%) | 3 (6.8%) | 10 (33.3%) | 1 (3.3%) | 34 (24.6%) | 4 (2.9%) |
| Chills | 0 | 0 | 2 (4.6%) | 1 (2.3%) | 2 (6.7%) | 0 | 4 (2.9%) | 1 (0.7%) |
| Nervous system disorders | 11 (17.2%) | 0 | 10 (22.7%) | 0 | 3 (10.0%) | 0 | 24 (17.4%) | 0 |
| Dysgeusia | 8 (12.5%) | 0 | 8 (18.2%) | 0 | 3 (10.0%) | 0 | 19 (13.8%) | 0 |

CPI-0610
Investigator Brochure, Edition 5.1

30 April 2018

| System Organ Class Preferred Term | Study 0610-01 (N=64) | | Study 0610-02 (N=44) | | Study 0610-03 (N=30) | | Total (N=138) | |
|---|---|---|---|---|---|---|---|---|
| | CTCAE Grade 1-5 | CTCAE Grade ≥3 | CTCAE Grade 1-5 | CTCAE Grade ≥3 | CTCAE Grade 1-5 | CTCAE Grade ≥3 | CTCAE Grade 1-5 | CTCAE Grade ≥3 |
| Dizziness | 3 (4.7%) | 0 | 1 (2.3%) | 0 | 0 | 0 | 4 (2.9%) | 0 |
| Headache | 0 | 0 | 3 (6.8%) | 0 | 0 | 0 | 3 (2.2%) | 0 |
| Skin and subcutaneous tissue disorders | 9 (14.1%) | 1 (1.6%) | 4 (9.1%) | 1 (2.3%) | 2 (6.7%) | 0 | 15 (10.9%) | 2 (1.4%) |
| Rash | 3 (4.7%) | 1.6(%) | 1 (2.3%) | 0 | 1 (3.3%) | 0 | 5 | 1 (0.7%) |
| Pruritus | 3 (4.7%) | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| Respiratory, thoracic and mediastinal disorders | 3 (4.7%) | 0 | 3 (6.8%) | 0 | 5 (16.7%) | 1 (3.3%) | 11 (8.0%) | 1 (0.7%) |
| Dyspnea | 0 | 0 | 1 (2.3%) | 0 | 3 (10.0%) | 0 | 4 (2.9%) | 0 |
| Vascular disorders | 1 (1.6%) | 0 | 4 (9.1%) | 1 (2.3%) | 0 | 0 | 4 (2.9%) | 1 (0.7%) |
| Hot flush | 0 | 0 | 2 (4.6%) | 0 | 0 | 0 | 2 (1.4%) | 0 |
| Total thrombocytopenia[a] | 23 (35.9%) | 9 (14.1%) | 6 (13.6%) | 4 (9.1%) | 15 (50.0%) | 8 (26.7%) | 44 (31.9%) | 21 (15.2%) |
| Total neutropenia[b] | 7 (10.9%) | 3 (4.7%) | 3 (6.8%) | 3 (6.8%) | 2 (6.7%) | 1 (3.3%) | 12 (8.7%) | 7 (10.9%) |

ADR = adverse drug reaction

a. Total thrombocytopenia includes patients who reported an adverse event of platelet count decreased and/or thrombocytopenia

b. Total neutropenia includes patients who reported an adverse event of any of the following: neutrophil counts decreased, neutropenia and febrile neutropenia

CPI-0610
Investigator Brochure, Edition 4                                                13 September 2017

**Table 7      Treatment-Emergent Serious Adverse Events that were Report in ≥2 Patients in Any of the Phase 1 CPI-0610 Clinical Studies as of 27 June 2017**

| System Organ Class Preferred Term | Study 0610-01 (N=64) | Study 0610-02 (N=44) | Study 0610-03 (N=30) | Total (N=138) SAE | Total (N=138) Related SAE |
|---|---|---|---|---|---|
| Patients with at Least One SAE | 27 (42.2%) | 31 (70.5%) | 8 (26.7%) | 66 (47.8%) | 18 (13.0%) |
| Number of SAEs | 56 | 88 | 12 | 156 | 31 |
| **Blood and lymphatic disorders** | 1 (1.6%) | 11 (25.0%) | 1 (3.3%) | 13 (9.4%) | 2 (1.4%) |
| Febrile neutropenia | 1 (1.6%) | 8 (18.2%) | 0 | 9 (6.5%) | 1 (0.7%) |
| Anemia | 0 | 2 (5.0%) | 0 | 2 (1.4%) | 0 |
| **General disorders and administration site conditions** | 11 (17.2%) | 7 (15.9%) | 1 (3.3%) | 19 (13.8%) | 2 (1.4%) |
| Disease progression | 8 (12.5%) | 0 | 0 | 8 (5.8%) | 0 |
| Fatigue | 0 | 4 (9.0%) | 0 | 4 (2.9%) | 1 (0.7%) |
| Pyrexia | 0 | 3 (6.8%) | 1 (3.3%) | 4 (2.9%) | 0 |
| Pain | 2 (3.1%) | 0 | 0 | 2 (1.4%) | 0 |
| **Infections and infestations** | 4 (6.3%) | 14 (31.8%) | 3 (10.0%) | 21 (15.2%) | 2 (2.2%) |
| Sepsis | 0 | 3 (6.8%) | 1 (3.3%) | 4 (2.9%) | 0 |
| Pneumonia | 2 (3.1%) | 2 (4.6%) | 1 (3.3%) | 3 (2.2%) | 0 |
| Lung infection | 1 (1.6%) | 3 (6.8%) | 0 | 4 (2.9%) | 1 (0.7%) |
| Device related infection | 0 | 2 (4.6%) | 0 | 2 (1.4%) | 0 |
| **Gastrointestinal disorders** | 6 (9.4%) | 8 (18.2%) | 0 | 14 (10.1%) | 6 (4.3%) |
| Diarrhea | 4 (6.3%) | 3 (6.8%) | 0 | 7 (5.1%) | 5 (3.6%) |
| Vomiting | 1 (1.6%) | 3 (6.8%) | 0 | 4 (2.9%) | 3 (2.2%) |
| Nausea | 0 | 2 (4.6%) | 0 | 2 (1.4%) | 2 (1.4%) |
| Abdominal pain | 0 | 2 (4.6%) | 0 | 2 (1.4%) | 1 (0.7%) |
| Colitis | 1 (1.6%) | 1 (2.3%) | 0 | 2 (1.4%) | 1 (0.7%) |
| Constipation | 2 (3.1%) | 2 (4.6%) | 0 | 2 (1.4%) | 0 |
| **Metabolism and nutrition disorders** | 3 (4.7%) | 4 (9.1%) | 0 | 7 (5.1%) | 2 (1.4%) |
| Dehydration | 1 (1.6%) | 2 (4.6%) | 0 | 3 (2.2%) | 1 (0.7%) |
| **Neoplasms benign, malignant and unspecified (incl cysts and polyps)** | 2 (3.1%) | 4 (9.1%) | 0 | 6 (4.3%) | 0 |
| Acute myeloid leukemia | 0 | 4 (9.1%) | 0 | 4 (2.9%) | 0 |
| **Psychiatric Disorders** | 1 (1.6%) | 3 (6.8%) | 2 (6.7%) | 6 (4.3%) | 2 (1.4%) |
| Confusional state | 1 (1.6%) | 2 (4.6%) | 0 | 3(2.2%) | 1 (0.7%) |
| Delirium | 0 | 1 (2.3%) | 1 (3.3%) | 2 (1.4%) | 0 |
| **Vascular disorders** | 1 (1.6%) | 5 (11.4%) | 0 | 6 (4.3%) | 3 (2.2%) |
| Hypotension | 0 | 3 (6.8%) | 0 | 3 (2.2%) | 1 (0.7%) |
| **Renal and urinary disorders** | 4 (6.3%) | 0 | 1 (3.3%) | 5 (3.6%) | 0 |
| Renal failure acute | 3 (4.7%) | 0 | 0 | 3 (2.2%) | 0 |
| **Respiratory, thoracic and mediastinal disorders** | 4 (6.3%) | 4 (9.1%) | 1 (3.3%) | 9 (6.5%) | 2 (1.4%) |
| Dyspnea | 2 (3.1%) | 0 | 0 | 2 (1.4%) | 0 |

SAE = serious adverse event

### 5.3.2    Efficacy in Patients with Hematologic Malignancies

In Study 0610-01, five patients have achieved an objective response to CPI-0610. One patient with T-cell- and histiocyte-rich large B cell lymphoma was treated at 48 and 80 mg QD and achieved a complete remission that allowed him to be subsequently treated with high-dose chemotherapy and stem cell transplantation. One patient with ABC-DLBCL was treated at 230 and 170 mg QD and achieved a complete remission after 5 cycles of treatment. One patient with follicular lymphoma was treated at 230 mg QD and achieved a partial remission (PR) following

CONSTELLATION PRODUCTION_017019

his fourth cycle of treatment.  One patient with defined as "ABC-like" DLBCL because poor sample quality produced a low but trending "ABC" signal, achieved a partial response after 2 cycles of treatment, despite the dose of CPI-0610 being reduced to 170 mg QD and again to 120 mg QD duet to dose-limiting thrombocytopenia.  Lastly, one patient with ABC-DLBCL treated at 120 mg/day achieved a PR by identified in Cycle 4.

Nineteen additional lymphoma patients achieved stable disease, and of these 19 patients, 6 patients maintained stable disease for 6 or more cycles of treatment, including the following: 1 patient with Waldenstrom's macroglobulinemia completed 6 cycles of treatment; 2 patients with FL completed 10 cycles; 1 patient with DLBCL completed 14 cycles; 1 patient with FL completed 18 cycles; and 1 patient with nodal marginal zone lymphoma completed over 40 cycles and continues on treatment with CPI-0610

CONSTELLATION PRODUCTION_017020

# 6    SUMMARY OF DATA AND GUIDANCE FOR THE INVESTIGATORS

CPI-0610 is being developed as a potential oncology therapeutic based on its anti-proliferative and pro-apoptotic activity in preclinical models of hematologic malignances, and on its ability to selectively suppress the expression of genes (like *MYC*, *BCL2*, and a subset of NF-κB-dependent genes) involved in the pathogenesis of these diseases. On the basis of preclinical toxicology studies, CPI-0610 was anticipated to cause reversible lymphoid depletion, suppression of hematopoiesis, injury to the mucosa of the gastrointestinal tract, and hyperglycemia. It was also anticipated to impair spermatogenesis.

The most consistent, predictable and dose-limiting clinical toxicity of CPI-0610 is thrombocytopenia. CPI-0610-related thrombocytopenia is dose-dependent, reversible and non-cumulative. Grade 3 treatment-related events of anemia, neutropenia and lymphopenia have been observed, though less frequently than thrombocytopenia, and do not demonstrate a clear dose-dependency. In general, gastrointestinal toxicity has been of low grade and manageable.  Other potentially CPI-0610-related toxicities include fatigue, vomiting, decreased appetite, and dysgeusia. There has been no clear increase in the frequency of opportunistic infections (which are common in the patient populations treated). CPI-0610-related hyperglycemia has been observed with low frequency and only at CTCAE grade 1.

## 6.1    Hematologic Toxicity

Preclinical toxicology studies of CPI-0610 demonstrated its potential to cause reversible lymphoid depletion (e.g., in the thymus, spleen and gut-associated lymphoid tissues) and hypocellularity of the bone marrow. These effects were reflected in the peripheral blood hematology values, where thrombocytopenia and reticulocytopenia were consistently observed. Peripheral lymphopenia was also observed, albeit less consistently. Both increases and decreases in the total white blood cell count were observed, likely reflecting reactions to ongoing inflammation and tissue injury.

Collectively, these findings are most consistent with anti-proliferative effects of CPI-0610 against lymphocyte and myeloid precursors. The consequent immunosuppressive potential of CPI-0610 was highlighted in the 14-day, GLP-compliant toxicology study in the dog, where at the highest dose animals developed pneumonia and were found to have *Cryptosporidium* in the GI tract.

### 6.1.1    Thrombocytopenia

Thrombocytopenia has been the most consistent and predictable toxicity of CPI-0610 in patients, reported in 32% of the 138 patients treated in the three Phase 1 clinical studies. CPI-0610-induced thrombocytopenia is dose-dependent (increasing in incidence and severity with CPI-0610 exposure), reversible and non-cumulative.  When CPI-0610 is given daily for 14 consecutive days and followed by a 1 week break in treatment, the platelet count typically reaches a nadir value on day 14 or 21 and requires 1 to 2 weeks for full recovery. At higher capsule doses ($\geq$ 170 mg/day), delays in the start of second cycle of therapy occurred in about one-third of patients, and grade 4 thrombocytopenia was observed in patients treated at 230 and 300 mg QD capsule doses, as well as at 225 and 275 mg QD tablet doses.  There was a single patient at the 125 mg tablet dose who developed reversible grade 4 thrombocytopenia that had significant confounding factors.  This patient enrolled with CTCAE grade 1 thrombocytopenia (baseline platelet count of $90 \times 10^9$/L) and received concomitant rivaroxaban, an anticoagulant

CONSTELLATION PRODUCTION_017021

associated with thrombocytopenia.  By Day 20, the patient's platelet counts had decreased to 22 $\times 10^9$/L.

There has been one patient with multiple myeloma who received the 225 mg QD tablet dose who developed CTCAE grade 3 bilateral adrenal hemorrhage.  This patient had received five prior therapies that included both dexamethasone and prednisone before enrolling in Study 0610-03 with CTCAE grade 1 thrombocytopenia (93 $\times 10^9$/L).  On Day 12, the patient developed pleuritic chest pain for which he took aspirin as an analgesic.  A computed tomography (CT) scan of the chest demonstrated indeterminate bilateral adrenal masses; the study drug was withheld and the patient was hospitalized.  On Day 14, the platelet count was 29 x$10^9$/L.  While hospitalized, the patient developed hypotension, fever, and tachycardia, with the serum cortisol level reported in the normal range.  Twenty-four hours after receiving treatment with intravenous hydrocortisone, the patient's status improved and within 2 days the adrenal insufficiency and adrenal hemorrhage were resolved.  The most likely etiology for the adrenal hemorrhage was the concomitant thrombocytopenia induced by CPI-0610 and aspirin, an agent with known irreversible platelet dysfunction.  It is most likely that the adrenal insufficiency was a result of the bilateral adrenal hemorrhage that occurred secondary to both thrombocytopenia and the platelet dysfunction caused by aspirin, not a direct inhibitory effect of CPI-0610 on the adrenal cortex.

### 6.1.2   Neutropenia and Lymphopenia

Although isolated cases of neutropenia and decreased lymphocyte count have occurred in patients treated with CPI-0610, these cases have been infrequent and without apparent relationship to dose.  The frequency of opportunistic infections has been consistent with that expected in the patient populations treated.  Patients will continue to be monitored for not only thrombocytopenia but other evidence of myelosuppression.

Clinical protocols of CPI-0610 provide guidelines for the interruption of CPI-0610 dosing for specific degrees of cytopenias (e.g., thrombocytopenia and leukopenia) and for patients who develop infection or bleeding. Support with antibiotics and transfusions should follow standard medical practice and institutional guidelines. The prophylactic use of hematopoietic colony stimulating factors (e.g., G-CSF, GM-CSF) is prohibited in clinical studies of CPI-0610, but allowed if a patient develops dose-limiting neutropenia with CPI-0610.  There were cases of febrile neutropenia mainly in subjects with AML with symptoms resulting from failing bone marrow that were treated accordingly with anti-infective.

Because of the potential immunosuppressive effects of CPI-0610, patients who are taking CPI-0610 should not take other immunosuppressive therapies at the same time. Patients who are taking more than 10 mg of prednisone per day (or the equivalent dose of another glucocorticoid) will not be enrolled into the initial clinical trials of CPI-0610. Topical, nasal and inhaled corticosteroids will be permitted.

### 6.2   Gastrointestinal Toxicity

In preclinical toxicology studies, reversible injury to the GI mucosa was a consistent observation with CPI-0610. Injury to the GI mucosa was evident from the oral cavity to the large intestine, and was manifested as epithelial atrophy, erosion, ulceration and hemorrhage, sometimes accompanied by regenerative epithelial hyperplasia. Toxicity to the GI epithelium was

anticipated on the basis of the role that *MYC* plays in many proliferating tissues and on the ability of BET inhibition to suppress the expression of *MYC*.

The clinical experience with CPI-0610 demonstrates an adverse effect profile suggestive of gastrointestinal tract toxicity. Nausea, vomiting and diarrhea have been among the most common treatment-related events.

Patients to be treated with CPI-0610 should not have ongoing inflammatory bowel disease, irritable bowel disease, or malabsorption. Patients who have had surgical procedures causing blind loop syndromes should not participate in studies of CPI-0610. Before enrolling in clinical trials of CPI-0610, any GI toxicity from previous therapies should have completely resolved, and patients should not have ongoing nausea, vomiting or diarrhea. Only patients able to take oral medications may participate in studies of CPI-0610; no parenteral form of the compound is currently available.

Patients who develop diarrhea with CPI-0610 treatment should be closely monitored and supported with either oral or intravenous (IV) hydration using appropriate fluids and electrolytes. In addition, patients with CPI-0610-related diarrhea may be administered loperamide. If diarrhea persists despite loperamide, dose reduction of CPI-0610 should be considered.

No prophylactic anti-emetic therapy will be given with the administration of CPI-0610. Patients who develop nausea and/or vomiting may be treated with 5-HT3 receptor antagonists and benzodiazepines according to standard medical practice and institutional guidelines. The use of corticosteroids as an anti-emetic therapy should be avoided, if possible, since CPI-0610 is considered to be potentially immunosuppressive.

## 6.3    Testicular Toxicity

Degeneration of the germinal epithelium with oligo/aspermia was observed in the preclinical toxicology studies of CPI-0610. The reversibility of this toxicity with CPI-0610 has not been demonstrated, although the 2-week recovery period used in the toxicology studies may have been too brief to show reversibility. Full recovery of testicular degeneration in mice has been shown with another selective BET bromodomain inhibitor, JQ1, four months after termination of dosing (Matzuk et al., 2012). Interference with germ cell formation is expected with BET bromodomain inhibition, given the role of *MYC* in proliferating tissues and the expression of BRDT (as well as the other BET family members) in the testis. It is therefore possible that CPI-0610 will reduce the ability of a male patient to conceive a child. Male patients must be informed of this potential risk when considering whether to participate in a clinical trial of CPI-0610 and provided with advice regarding sperm preservation.

## 6.4    Hyperglycemia

Mild to moderate increases in serum glucose were observed in the preclinical toxicology studies of CPI-0610. Hyperglycemia was accompanied by increases in serum total cholesterol, low density lipoproteins, and triglycerides. The origin of the hyperglycemia is unclear. CPI-0610 does bind to and inhibit the type 1 melatonin receptor, but the published literature appears to instead link hyperglycemia with the type 2 melatonin receptor.

Hyperglycemia related to CPI-0610 has been observed in approximately 5% of patients treated with CPI-0610, at low grade only. Note that glucose samples were not obtained in the fasting state. Serum glucose concentrations will continue to be monitored in the Phase 1 trials of CPI-0610.

## 6.5   Mutagenic and Teratogenic Potential

No information is currently available regarding the mutagenic or teratogenic potential of CPI-0610.  It must therefore be assumed that it carries these potential liabilities and both male and female patients must agree to use effective contraceptive methods during treatment with CPI-0610 and for 3 months thereafter.

## 6.6   Drug-drug Interactions

CPI-0610 is predicted to be metabolized in humans by hepatic oxidation and amide bond hydrolysis. While CYP enzymes are likely responsible for most of the observed oxidative metabolism, the specific CYP enzyme or enzymes responsible for CPI-0610 have not yet been identified. Therefore, patients who are receiving CPI-0610 should avoid taking other drugs or substances that are known to be strong inhibitors of CYP enzymes. Drugs that are moderate inhibitors of CYP enzymes should also be avoided, if possible. A list of CYP enzyme inhibitors and their categorization as strong, moderate or weak inhibitors is provided in the clinical protocols of CPI-0610.

CPI-0610 has low potential to inhibit CYP enzymes involved in the metabolism of other drugs, and therefore there are no prohibitions against the co-administration of other drugs on the basis of concerns that CPI-0610 will alter their clearance.

CPI-0610 was evaluated for its potential to cause prolongation of the QT interval in vitro in telemeterized dogs after a single dose and in dogs after repeated dose administration in the main 14-day GLP-compliant toxicology study. These preclinical studies show no potential for CPI-0610 to cause acute changes in heart rate, blood pressure or the electrocardiogram (e.g., the QT interval). Analysis of electrocardiograms from patients treated in the ongoing Phase 1 trials has likewise shown no clear effect of CPI-0610 on cardiovascular function or the QT interval. Nevertheless, ECGs will continue to be assessed at regular intervals in patients treated with CPI-0610; additionally, in order to avoid difficulty in the interpretation of the patient's ECG, drugs that prolong the QT interval should also be avoided.

CONSTELLATION PRODUCTION_017024

# 7    REFERENCE SAFETY INFORMATION FOR ASSESSMENT OF EXPECTEDNESS OF SERIOUS ADVERSE REACTIONS

Presented in Table 8 are the serious adverse drug reactions observed in more than one patient in the Phase 1 clinical studies of CPI-0610 that the sponsor believes there is reasonable evidence of a causal relationship between the serious event and CPI-0610. These serious reactions are presented by system organ class, severity, and frequency. Frequencies are defined as: very common ($\geq 1/10$); common ($\geq 1/100$ to $< 1/10$); uncommon ($\geq 1/1,000$ to $< 1/100$); rare ($\geq 1/10,000$ to $< 1/1,000$); very rare ($< 1/10,000$), not known (cannot be estimated from the available data) for adverse reactions irrespective of seriousness. The adverse reactions were attributed to CPI-0610 treatment in patients with the following hematological malignancies: lymphoma, acute myelogenous leukemia, myelodysplastic syndrome (MDS), myelodysplastic/myeloproliferative neoplasms (MDS/MPN), and multiple myeloma.

**Table 8    Serious Adverse Reactions Reported in Patients Treated with at Least One Dose of CPI-0610 as of 27 June 2017 that are Considered Expected for Safety Reporting Purposes[a]**

| Serious Adverse Reaction | n[b] (N=138) | Frequency[c] |
|---|---|---|
| **Gastrointestinal Disorders** | | |
| Vomiting | 3 (2.2%) | common |
| Diarrhea | 5 (3.6%) | common |
| Nausea | 2 (1.4%) | common |

a. Table based on preliminary adverse reactions from 138 patients treated with CPI-0610 at doses ranging from 6 to 400 mg QD (capsule), 85-150 mg BID (capsule) and 125 to 275 mg QD (tablet)
b. n = number of patients who have experienced the serious adverse reaction
c. Frequency convention: very common ($\geq 1/10$); common ($\geq 1/100$ to $< 1/10$); uncommon ($\geq 1/1000$ to $\geq 1/100$). Frequency refers to serious adverse reactions reported.

CONSTELLATION PRODUCTION_017025

# 8   REFERENCES

Dawson MA, Prinjha RK, Dittman A, Giotopoulos G et al. 2011.  Inhibition of BET Recruitment to Chromatin as an Effective Treatment for MLL-fusion Leukaemia.  Nature; 478(7370): 529–533.

Delmore JE, Issa GC, Lemieux ME, et al. (2011).  BET Bromodomain Inhibition as a Therapeutic Strategy to Target c-Myc. CORD Conference Proceedings; 146(6): 904-917.

Espino J, Pariente JA, Rodriguez AB (2011).  Role of Melatonin on Diabetes-related Metabolic Disorders.  World J Diabetes; 2(6):82-91.

Hargreaves DC, Horng T, Medzhitov R (2009).  Control of Inducible Gene Expression by Signal-dependent Transcriptional Elongation.  Cell; 138(1): 129-145.

Matzuk MM, McKeown MR, Filippakopoulos P (2012).  Small-molecule Inhibition of BRDT for Male Contraception.  Cell; 150(4):673-684.

Mertz JA, Conery AR, Bryant BM,et al. (2011).  Targeting MYC Dependence in Cancer by Inhibiting BET Bromodomains.  Proc Natl Acad Sci USA; 108(40): 16669-16674.

Peshcke E and Muhlbauer E (2010).  New Evidence for a Role of Melatonin in Glucose Regulation.  Best Pract Res Clin Endocrinol Metab; 24(5): 829-841.

Zuber J, Shi J, Wang E, et al. (2011).  RNAi Screen Identifies Brd4 as a Therapeutic Target in Acute Myeloid Leukaemia.  Nature; 478(7370): 524-528.

CONSTELLATION PRODUCTION_017026

DocuSign Envelope ID: 005D4A18-46F4-4DFD-AD60-BAD4D376AF6F

Confidential

# CLINICAL TRIAL AGREEMENT
## Protocol # 0610-03

This Clinical Trial Agreement ("**Agreement**") between

      **CONSTELLATION PHARMACEUTICALS**, a corporation with its principal place of business at 215 First Street, Suite 200, Cambridge, MA 02142 ("**Sponsor**")

and

      **MAYO CLINIC ARIZONA**, with a place of business at 13400 East Shea Boulevard, Scottsdale, AZ 85259 ("**Institution**")

when signed by all parties, is effective as of date of last signature (the "**Effective Date**").

Sponsor wishes to support a clinical trial entitled "A Phase 1 Study of CPI-0610, a Small Molecule Inhibitor of BET Proteins, in Patients with Previously Treated Multiple Myeloma" ("**Protocol**") to be conducted at Institution and to involve Trial Subjects ("**Trial**") and Institution desires to conduct such Trial in accordance with the protocol as approved by the Federal Food and Drug Administration ("**FDA**") and the institutional review board utilized by Institution for this Trial (the "**IRB**") and as amended from time to time (the "**Protocol**").

By separate agreement, Sponsor has engaged INC Research, LLC, a Delaware Limited Liability Company with a principal place of business in the United States at 3201 Beechleaf Court, Suite 600, Raleigh, NC 27604 (hereinafter "**INC Research**") and a contract research organization acting as an independent contractor, to act on behalf of Sponsor for the purposes of transferring certain obligations in connection to this Agreement, said obligations including negotiations of the Agreement and payment administration of grant amounts described hereunder.

The parties agree as follows:

1.    <u>Investigators and Research Staff</u>.

    1.1    <u>Principal Investigator</u>. The Institution's principal investigator will be **Leif Bergsagel, M.D.** ("**Principal Investigator**") who will be responsible for the direction of the Trial in accordance with applicable Institution policies and Applicable Law (as defined below).

    1.2    <u>Facilities Research Staff</u>. Institution represents that it and the Principal Investigator will have the necessary personnel and equipment, experience, qualifications and capabilities to a perform the Trial in a timely, professional and competent manner. Institution will ensure that only individuals who are appropriately trained and qualified assist in the conduct of the Trial as subinvestigators or research staff.

    1.3    <u>Obligations of Institution and Principal Investigator</u>. Institution shall perform the services and conduct the Trial at Institution's facilities under the direction of the Principal Investigator who shall be an employee of Institution. Institution and Principal Investigator shall conduct the Trial in accordance with this Agreement and the Protocol, and in accordance with all applicable laws, rules, regulations and guidances (and their state and foreign equivalents) each as amended and in effect from time to time, including, without limitation, the Federal Food, Drug, and Cosmetic Act, the Medicare/Medicaid

1

DocuSign Envelope ID: 005D4A18-46F4-4DFD-AD60-BAD4D376AF6F

Confidential

anti-kickback statute, 42 U.S.C. § 1320a-7b, and similar state laws, and FDA regulations, good clinical practices, (including but not limited to ICH GCP Guideline (E6) to the extend adopted by the FDA), the Health Insurance Portability and Accountability Act of 1996 and regulations promulgated from time to time thereunder ("**HIPAA**"), and Title 21 of the Code of Federal Regulations, including Parts 50, 56 and 312 (collectively, "**Applicable Law**"). Institution is responsible to Sponsor for compliance by all Trial personnel, including the Principal Investigator, with the terms of this Agreement. Institution will ensure that any personnel who assist in the conduct of the Trial are informed of and agree to abide by all terms of this Agreement applicable to the activities they perform.    In furtherance of the foregoing obligations, Institution shall ensure that an IRB as applicable, established and constituted in accordance with applicable laws and regulations, oversees the conduct of the Study and is fully compliant with 21 C.F.R. § 56. Institution shall comply with the directives of the IRB respecting the conduct of the Study, and shall notify Sponsor to the extent any such directives vary from the Protocol. Institution shall obtain from each Subject, prior to the Subject's participation in the Study, a signed informed consent and necessary authorization to disclose health information to Sponsor in a form approved in writing by the IRB or a waiver of consent as directed by the IRB and further provided that the Informed Consent does not interfere or violate Institution policies.   In addition, Sponsor shall perform all of its obligations under all applicable laws, including but not limited to those referenced herein.

1.4   <u>No Substitution</u>.  Institution shall immediately notify Sponsor in writing at such time as it becomes aware that the Principal Investigator plans to leave the Institution or will be unable or unwilling to complete the Trial.   Institution may not reassign the conduct of the Trial to a different Principal Investigator without prior written authorization from Sponsor.  Any replacement Principal Investigator will be required to agree to the terms and conditions of this Agreement in a separate writing.  In the event Sponsor does not approve a replacement Principal Investigator, Sponsor may terminate this Agreement in accordance with the Termination provisions below.

1.5   <u>Delegation of Duties by Principal Investigator</u>.  Principal Investigator may delegate duties and responsibilities to subinvestigators or research staff only to the extent permitted by applicable regulations governing the Trial Conduct, as described below.

2.   <u>Protocol</u>.  Institution will conduct the Trial in accordance with the Protocol.

2.1   <u>Protocol Deviations</u>.  If it is necessary to deviate from the Protocol on an emergency basis for the safety of the Trial Subjects (hereinafter defined), Institution will notify Sponsor and the responsible IRB as soon as practicable but, in any event, no later than five (5) working days after the deviation occurs.  In the event there is a conflict between the terms of the Agreement and the Protocol with respect to any of the provisions contained within the Agreement, the Agreement shall control.   In the event of any conflict between the Protocol and the Agreement with respect to the procedure(s) or methodology for performance of the Study, the Protocol shall control.

2.2   <u>No Additional Research</u>.  During the conduct of the Trial, Institution may not conduct any additional research on a Trial subject that would violate a prohibition in the protocol or informed consent or jeopardize the validity of the Trial.

3.   <u>Sponsor Drug</u>.  Sponsor will provide Institution with sufficient quantities of the Sponsor product that is being studied ("**Sponsor Drug**") to conduct the Trial.

2

DocuSign Envelope ID: 005D4A18-46F4-4DFD-AD60-BAD4D376AF6F

Confidential

3.1 <u>Custody and Dispensing</u>.  Institution will adhere to federal regulations requiring careful custody and dispensing of Sponsor Drug, as well as appropriate documentation of such activities.

3.2 <u>Control</u>.  Institution will maintain appropriate control of supplies of Sponsor Drug and will not administer or dispense it to anyone who is not a Trial Subject, or provide access to it to anyone except Principal Investigator, subinvestigators, or Trial research staff.

3.3 <u>Use</u>.  Institution will use Sponsor Drug only as specified in the Protocol.  Any other use of Sponsor Drug constitutes a material breach of this Agreement.

3.4 <u>Ownership of Sponsor Drug</u>.  Sponsor Drug is and remains the property of Sponsor. Sponsor grants Institution no express or implied intellectual property rights in the Sponsor Drug or in any methods of making or using the Sponsor Drug.

3.5 <u>Payment for Sponsor Drug or Comparator Drug</u>.  Institution will not charge a Trial Subject or third-party payer for Sponsor Drug or for any services reimbursed by Sponsor under this Agreement.

4. <u>Compensation</u>.

4.1 <u>Research Grant</u>.  Funding will be made to the Institution by way of grant payments in accordance with Attachment A.  The grant represents Institution's costs of conducting the Trial.  All amounts are inclusive of all direct, indirect, overhead and other costs, including laboratory and ancillary service charges, and will remain firm for the duration of the Trial, unless otherwise agreed in writing by the parties.  Neither the Institution nor the Principal Investigator will directly or indirectly seek or receive compensation from patient(s) participating in the Trial ("**Trial Subject(s)**") or third-party payers for any material, treatment or service that is required by the Protocol and provided or paid by Sponsor, including, but not limited to, Sponsor Drug, Trial Subject screening, infusions, physician and nurse services, diagnostic tests, and Sponsor Drug administration.

4.2 Non-emergency additional tests or services (*i.e.*, those tests or services not required by the Protocol or performed in excess of Protocol requirements) shall not be compensable hereunder without the prior written consent of the Sponsor.

4.3 The parties to this Agreement specifically intend to comply with all applicable laws, rules and regulations, including (i) the federal anti-kickback statute (42 U.S.C. 1320a-7(b) and the related safe harbor regulations; and (ii) the Limitation on Certain Physician Referrals, also referred to as the "**Stark Law**" (42 U.S.C. 1395 (n)).  Accordingly, the Parties acknowledge and agree that the amounts payable by Sponsor under this Agreement represent the fair market value of the covered costs associated with the Trial and no part of any consideration paid hereunder is a prohibited payment for the recommending or arranging for the referral of business or the ordering of items or services; nor are the payments intended to induce illegal referrals of business.

4.4 Pursuant to applicable governmental laws, rules and regulations, the Institution understands and acknowledges that Sponsor may be required to disclose to relevant governmental authorities the payments made by or on behalf of Sponsor to the Institution under this Agreement, as well as the purpose and nature of such payments.

DocuSign Envelope ID: 005D4A18-46F4-4DFD-AD60-BAD4D376AF6F

Confidential

4.5   In the event Sponsor requires Institution personnel to travel in connection with this study, the Sponsor shall pay all expenses, including, but not limited to, actual travel, room and board.

4.6   For the purposes of this Study only, in the event that Institution receives an audit request from any foreign regulatory agencies, the parties agree that Institution shall be entitled to reasonable compensation for expenses related to such an audit; provided, however, that (1) Sponsor shall have the right to review any invoices submitted by Institution, and shall not be required to pay any expenses that are not reasonable and necessary to comply with the audit request and (2) disputed amounts on invoices shall be payable by Sponsor only upon mutual resolution of the dispute.

5.   <u>Trial Subject Enrollment</u>.  Institution has agreed to enroll Trial Subjects in the Trial in accordance with the Protocol.

5.1   <u>Multi-Center Studies</u>.  Sponsor may discontinue patient enrollment if the total enrollment needed for a multi-center Trial has been achieved.

6.   <u>Informed Consent</u>.  Institution will obtain a written Informed Consent Form ("**ICF**") for each Trial Subject that complies with Applicable Law and is consistent with the Protocol. Institution will maintain a signed original of that ICF in the Trial Subject's record.  Institution will provide Sponsor an opportunity to review and approve the content of the ICF, including any revisions made during the course of the Trial, before it is used.  Institution will allow Sponsor or its designee to inspect signed ICFs or photocopies thereof during monitoring visits or audits. Institution will submit any modifications it may propose to the ICF to Sponsor for review and written approval by Sponsor before submitting the ICF for IRB approval.  The ICF and HIPAA authorization must authorize the use and disclosure of Trial Subjects' protected health information by and to Sponsor and third parties, including U.S. and foreign regulatory authorities.

7.   <u>Protected Health Information</u>.  The parties recognize a common goal of securing all individually identifiable health information and holding such information in confidence and protecting it from unauthorized disclosure.  Institution represents and warrants that it will comply with the provisions of HIPAA and any regulations and official guidance promulgated thereunder, as well as any other state and federal laws relating to the confidentiality, privacy and security of such information.

7.1   Sponsor, though not a covered entity under HIPAA, recognizes that, pursuant to this Agreement, it has the responsibility to protect all individually identifiable patient information and to restrict the use of such information to those persons and entities, including consultants, contractors, subcontractors and agents, who must have access to such information in order to fulfill their assigned duties with respect to the Trial.  Such use also will be restricted to those uses permitted in the HIPAA authorization forms and neither Sponsor nor any party to whom Sponsor may disclose individually identifiable health information may use such information to recruit research subjects to additional studies, to advertise additional studies or products, or to perform marketing or marketing research.  The HIPAA Authorization may be incorporated into the ICF or handled as a separate document. Institution will provide Sponsor an opportunity to review and approve the content of the HIPAA Authorization (including any revisions made during the course of the Trial) before it is used.

4

Confidential

Both parties agree to notify the other in writing within thirty (30) days of receipt of information (such as Study results or findings from a Study monitoring visit, and data safety monitoring committee reports) that could affect the safety or medical care of current or former subjects, affect the willingness of subjects to continue their participation in the clinical trial, influence the conduct of the Study, or alter the IRB's approval. With regard to Sponsor, the foregoing obligations shall extend for two (2) years following completion of the Study. Both parties shall comply with their respective reporting requirement to regulatory authorities, including, for example, the Food and Drug Administration, the Office for Human Research Protections, and other authorities as required. Institution, through the Investigator and/or IRB as appropriate, shall be responsible for informing subjects of the above important information they learn from Sponsor in accordance with the IRB-approved informed consent form and Sponsor shall not contact them. No other provision of this Agreement shall be construed to override the provisions of this Article. The terms of this paragraph shall survive expiration of this Agreement.

8.    Confidential Information.   During the course of the Trial, Institution may receive or generate information that is confidential to Sponsor or a Sponsor affiliate.

   8.1    Definition. Except as specified below, Confidential Information includes all information provided by Sponsor or INC Research, or developed for Sponsor or INC Research, and all data collected during the Trial, including results, reports, technical and economic information, the Trial Data (defined below), commercialization and Trial strategies, trade secrets and know-how disclosed by Sponsor to Institution or Principal Investigator directly or indirectly, whether in writing, electronic, oral or visual transmission, or which is developed under this Agreement.   Notwithstanding the foregoing, Trial Data and results generated by Institution in the course of conducting the Study are not Confidential Information for the publishing purposes in accordance with Section 13 of this Agreement.

   8.2    Exclusions.  Confidential Information does not include information that is in the public domain prior to disclosure by Sponsor or INC Research; becomes part of the public domain during the term of this confidentiality obligation by any means other than breach of this Agreement by Institution; is already known to Institution at the time of disclosure and is free of any obligations of confidentiality; or is obtained by Institution, free of any obligations of confidentiality from a third party who has a lawful right to disclose it.

   8.3    Obligations of Confidentiality. Unless Sponsor provides prior written consent, Institution may not use Confidential Information for any purpose other than that authorized in this Agreement, nor may Institution disclose Confidential Information to any third party except as authorized in this Agreement or as required by law.  Required disclosure of Confidential Information to the IRB or to FDA representatives is specifically authorized.

   8.4    Disclosure Required by Law.  If disclosure of Confidential Information beyond that expressly authorized in this Agreement is required by law, that disclosure does not constitute a breach of this Agreement so long as Institution notifies Sponsor in writing as far as possible in advance of the disclosure so as to allow Sponsor to take legal action to protect its Confidential Information, discloses only that Confidential Information required to comply with the legal requirement, and continues to maintain the confidentiality of this Confidential Information with respect to all other third parties.

   8.5    Survival of Obligations. For Confidential Information other than Trial Data and Sample Data, these obligations of nonuse and nondisclosure survive termination of this Agreement and continue for a period of five (5) years after termination.  Permitted uses

5

DocuSign Envelope ID: 005D4A18-46F4-4DFD-AD60-BAD4D376AF6F

Confidential

and disclosures of Trial Data are described in Section 9 (Trial Data) and 13 (Publications) of this Agreement.

8.6     Return of Confidential Information.  If requested by Sponsor in writing, Institution will return all Confidential Information, at Sponsor's expense, except that required to be retained at the Trial site by applicable regulations.  However, Institution may retain a single archival copy of the Confidential Information for the sole purpose of determining the scope of obligations incurred under this Agreement.

9.     Trial Data, Biological Samples, and Records.

9.1     Trial Data.  During the course of the Trial, Institution will collect and submit certain data to Sponsor or its agent, as specified in the Protocol (collectively, "**Trial Data**"). Institution will ensure accurate and timely collection, recording, and submission of Trial Data.  Trial Data does not include patient medical records or other source documentation. All other original data and records of the work completed under this Agreement shall remain the property of Institution.

a.     Ownership of Trial Data.  Subject to Institution's right to publish the results of the Trial and the non-exclusive license that permits certain uses, completed case report forms and Trial Data forwarded to Sponsor shall be the property of Sponsor.

b.     Non-Exclusive License.  Sponsor grants Institution a royalty free non-exclusive license, with no right to sublicense, to use Trial Data for internal research, clinical programs or educational purposes.

c.     Personal Information Protection.   Each party represents and warrants that procedures compatible with relevant personal information and data protection laws and regulations will be employed so that processing and transfer of such information and data identifiers will not be impeded.  All data obtained on Institution patients will be furnished to Sponsor in a coded format, which protects patient identities.  Sponsor's ability to review the patients' medical record shall be subject to reasonable safeguards for the protection of patient confidentiality.

10.     Biological Samples.  Biological Samples means any biologic material of human origin including without limitation tissues, blood, plasma, urine, spinal fluid or other fluids derived from the Study participants in accordance with the Protocol ("**Biological Samples**").

10.1     Institution agrees to make the Biological Samples available to the Sponsor on the following conditions: (a) the Biological Samples is owned by Institution; (b) Sponsor has no rights to the Biological Samples other than the specific use in the Study; (c) the Biological Samples may only be used by the Sponsor, central lab or other contracted party ("**Designee**") to perform tests as defined in the Institutional Review Board (IRB) approved Protocol and may not be stored for future unspecified use; (d) the Biological Samples may not be sold or transferred to any other party, except a Designee; (e) at the conclusion of the Study, the Biological Samples is either returned or destroyed; and (f) any future use of the Biological Samples requires an amendment to the contract and may require additional patient consent as directed by the Institutional Review Board.

6

DocuSign Envelope ID: 005D4A18-46F4-4DFD-AD60-BAD4D376AF6F

Confidential

10.2    Records.  Institution will ensure that Trial Subject's Trial records, which include the Institution's copies of all Trial Data as well as relevant source documents (collectively, "**Records**"), are kept up to date and maintained in accordance with applicable regulations and institutional guidelines.    Principal Investigator and Institution shall maintain complete and current Study documentation throughout the Trial.   Upon request, but in any event at the Close of the Trial, the Principal Investigator and/or Institution will transfer the Trial Data to Sponsor or its designee.   For the purposes of this Agreement, "**Close of Trial**" shall mean the lock-down of all Trial data and the resolution of all queries relating to the Trial.

     a.      Retention.   Institution will retain all records and documents pertaining to the Trial for a period in accordance with the Protocol and Applicable Law (including but not limited to, 21 CFR Parts 11.10, 56 and 312.62 and 45 CFR Part 164.530(j)), but in any event no less than, fifteen (15) years after Close of the Trial unless Sponsor authorizes, in writing, earlier destruction.   At the end of such required retention period, Institution will not destroy any such records until it has obtained Sponsor's prior written permission to do so; provided, however, that if Sponsor does not give written permission to Institution to destroy such records within thirty (30) days of Institution's request to Sponsor, then Institution may forward all such records to Sponsor, at Sponsor's expense, or continue to retain such records at Sponsor's expense. Institution further agrees to permit Sponsor to ensure that the records are retained for a longer period if necessary, at Sponsor expense, under an arrangement that protects the confidentiality of the records (*e.g.*, secure off-site storage).

11.    Inspections and Audits.

11.1    Access.  Upon reasonable request, Sponsor, authorized representatives of Sponsor, and/or authorized representatives of the FDA, may during regular business hours examine and copy: all CRFs and other Trial records (including Trial Subject records and medical charts; Trial Subject consent documents; drug receipt and disposition logs); examine and inspect the facilities and other activities relating to the Trial or the IRB; and observe the conduct of the Trial.   Site visits by Sponsor and/or study monitors will be scheduled in advance for times mutually acceptable to Institution and Sponsor.   Institution will be given at least a two (2) week notice of these visits.   Except as may be justified by exceptional circumstances (such as an unexplained adverse event), Sponsor will coordinate their efforts so that frequency of site visits to Institution will be no greater than one (1) visit every six (6) to eight (8) weeks, with a visit duration of less than three (3) days.

11.2    Notice.  Institution will inform Sponsor within twenty-four (24) hours of any effort or request by the FDA or other persons to inspect or contact the Institution or research staff with regard to the Trial; will provide Sponsor with a copy of any communications sent by the FDA or such persons; and will provide Sponsor with a copy of the actual responses by Principal Investigator or Institution to such communications.

11.3    Cooperation. Institution and Principal Investigator will ensure the full cooperation of the Institution, Principal Investigator, researchers, and IRB members with any such inspection and will ensure timely access to applicable records and data.   Institution will promptly resolve any discrepancies that are identified between the Trial Data and the Trial Subject's medical records.   Institution will promptly forward to Sponsor copies of

DocuSign Envelope ID: 005D4A18-46F4-4DFD-AD60-BAD4D376AF6F

Confidential

any inspection findings (*e.g.*, Establishment Inspection Report or FDA Form 483) that Institution receives from a regulatory agency in relation to the Trial.

12.   Intellectual Property.

12.1   Pre-existing Rights. The parties understand and acknowledge that inventions, developments and intellectual property rights owned or controlled by Sponsor or Institution and existing as of the Effective Date are the separate property of Sponsor or Institution, respectively, and no license grant or assignment, express or implied, by estoppels or otherwise, with regard thereto is intended by, or shall be inferred from, this Agreement.   It is expressly agreed that neither Institution nor Sponsor transfers by operation of this Agreement to the other party any right in or license to any patents, copyrights, or other proprietary right owned as of the commencement date of this Agreement or arising outside of the research conducted under this Agreement.

12.2   Inventions. "**Inventions**" means all inventions, improvements, discoveries, and developments (whether or not patentable) and all intellectual property rights therein that are conceived, reduced to practice or otherwise made or developed in whole or in part by or on behalf of Institution, Principal Investigator, any member of the Research Staff or Sponsor using or incorporating the Sponsor Drug and arising during and in the course of the performance of the Protocol under this Agreement or otherwise derived from the Sponsor's Confidential Information provided to Institution.   Inventorship shall be determined in accordance with U.S. patent laws.

12.3   Ownership. Any Invention made, conceived or reduced to practice pursuant to or in connection with the Trial, whether made solely by Institution, Principal Investigator, Research Staff or agents of Institution or jointly by Principal Investigator, Research Staff, agents of Institution and Sponsor, shall be owned by Sponsor.

12.4   Notice.   Upon learning of any Invention, Institution will promptly and, within at least thirty (30) days, notify Sponsor in writing of such Invention.

12.5   Assignment and Assistance.  All right, title and interest in and to the Inventions, and the right to file for patents thereon in the United States and everywhere else in the world, will be exclusively owned by Sponsor.   Institution, on behalf of itself and Principal Investigator, Research Staff and agents, agrees to assign and does hereby assign to Sponsor the entire right, title and interest, both in the United States and everywhere else in the world, in and to all Inventions (collectively, "**Sponsor Intellectual Property**"). The aforementioned assignment shall include the right to all causes of action for infringement of any Sponsor Intellectual Property, including the right to institute, process, defend and settle any suit or other legal or administrative proceeding, to enjoin infringement or misappropriation of such Sponsor Intellectual Property, together with the sole right to any resulting recovery of damages, royalties, profits, legal fees and costs. Institution, on behalf of itself and Principal Investigator, Research Staff and agents, further agrees to execute and cause to be executed any and all documents reasonably necessary to vest in Sponsor the entire right, title and interest in and to all Sponsor Intellectual Property.   Sponsor will be entitled to file patent applications worldwide and/or otherwise secure intellectual property protections in and to all Sponsor Intellectual Property.   Institution shall reasonably assist Sponsor in filing for, obtaining and maintaining, patents and all other intellectual property and proprietary rights in and to the Sponsor Intellectual Property. Sponsor will reimburse Institution for all reasonable

8

DocuSign Envelope ID: 005D4A18-46F4-4DFD-AD60-BAD4D376AF6F

Confidential

expenses incurred in providing such assistance but otherwise will owe no further consideration for such assistance or with respect to any Sponsor Intellectual Property rights.

13. <u>Publications</u>.  Institution may publish the results of the Trial based on information collected or generated by Institution, whether or not the results are favorable to the Sponsor Drug.  However, to ensure against inadvertent disclosure of Confidential Information or unprotected Inventions, prior review of the proposed publication by Sponsor will be provided, but in the interest of free exchange of scientific information, Institution and Investigator may publish after the expiration of thirty (30) days following mailing of the proposed publication to Sponsor. If part of a multi-center trial, Institution agrees that the first publication is to be a joint publication involving all centers. Principal Investigator is free to decline to participate or be listed as an author in the joint publication.  If a joint manuscript has not been submitted for publication within twelve (12) months of completion, abandonment or termination of Trial at all participating sites, or after Sponsor confirms there will be no multicenter Study publication, whichever is earlier, Institution is free to publish separately, subject to the other requirements of this Agreement.

14. <u>Publicity</u>.  Neither party will use the name of the other party or of any of the other party's affiliated entities or any of its employees for promotional, publicity, endorsement or advertising purposes without written permission from the other party for the particular use contemplated. However, Sponsor reserves the right to identify the Principal Investigator and Institution in association with a listing of the Protocol in the National Institutes of Health ("**NIH**") Clinical Trials Data Bank, other publicly available listings of ongoing clinical trials, or other patient recruitment services or mechanisms.  With regard to the use of Institution's name, all requests for approval pursuant to this Section must be submitted to the Mayo Clinic Public Affairs Business Relations Group, at the following E-mail address: BusinessRelations@mayo.edu at least five (5) business days prior to date on which a response is needed.

15. <u>Subject Injury and Indemnification</u>.

15.1    In the event a Trial subject requires medical treatment for physical illness or injury that results from the administration of the Sponsor Drug or the proper performance of any Protocol procedure ("**Research Related Injury**") Institution will offer to provide medical care and Sponsor shall reimburse Institution or other emergency care provider for the reasonable and necessary costs incurred in diagnosing and treating any Research Related Injury, provided said Research Related Injury is not attributable to the negligence or willful malfeasance of Institution. Institution shall notify Sponsor in advance of treatment, whenever practicable, but in any event within twenty-four (24) hours of provision of treatment.

15.2    Institution and Principal Investigator shall coordinate and manage the request from a Trial subject for treatment and reimbursement of a Research Related Injury, and shall provide to Sponsor in a timely manner, such supporting documentation and reports as Sponsor may reasonably request.

15.3    Sponsor agrees to indemnify, defend and hold harmless ("**Indemnify**") the Trial investigators; any institution at which the Trial is conducted, its officers, agents, and employees; and the IRB that approved the Trial (collectively, "**Indemnified Parties**") against any claim filed by a third party for damages, costs, liabilities, expenses (each a "**Claim**") arising out of a Trial Subject injury, the design of the Trial, or the specifications of the Trial protocol;  Claims arising out of an injury or condition allegedly

9

Confidential

caused by the administration of the drug being tested; Claims arising out of Sponsor's use of the research performed under this Agreement; and infringement or misappropriation Claims.

15.4    Exclusions.  Excluded from this agreement to Indemnify are any claims for damages to the extent they are resulting from (a) failure by an Indemnified Party to comply with the Protocol or written instructions from Sponsor (b) failure of an Indemnified Party to comply with any applicable FDA or other governmental regulations, or (c) malpractice, negligence or willful misconduct in connection with the Trial, breach of this Agreement or Protocol by an Indemnified Party.

15.5    Notice and Cooperation.  Institution agrees to provide Sponsor with prompt notice of, and full cooperation in handling, any claim that is subject to indemnification.  If so requested by Sponsor, Institution agrees to authorize Sponsor to carry out the sole management of defense of an indemnified claim.  Institution shall have the right to be represented by counsel of its own choosing, but at its own expense.

15.6    Settlement or Compromise.  No settlement or compromise of a claim not subject to this indemnification provision will be binding on Sponsor without Sponsor's prior written consent.  Sponsor will not unreasonably withhold such consent of a settlement or compromise.  Neither party will admit fault on behalf of the other party without the written approval of that party.

15.7    INC Research expressly disclaims any and all liability whatsoever in connection with the Sponsor Drug or the Trial Protocol except to the extent that such liability arises from INC Research's negligent act, omission or willful misconduct.

15.8    Institution shall have no obligation to indemnify Sponsor or INC Research hereunder.  The terms of this paragraph shall survive expiration of this Agreement.

16.    Termination.

16.1    Termination Conditions.  This Agreement terminates upon the earlier of any of the following events:

a.    Trial Completion.  For purposes of this Agreement, the Trial is considered complete after conclusion of all Protocol-required activities for all enrolled Trial Subjects; receipt by Sponsor of all relevant Protocol-required data, Trial documents and Biological Samples; and receipt of all payments due to either party.

b.    Early Termination of Trial.  If the Trial is terminated early as described below, the Agreement will terminate after receipt by Sponsor of all relevant Protocol-required data, Trial documents and Biological Samples and receipt of all payments due to either party.

(1)    Termination of Trial Upon Notice.  Sponsor reserves the right to terminate the Trial for any reason upon thirty (30) days written notice to Institution.

10

DocuSign Envelope ID: 005D4A18-46F4-4DFD-AD60-BAD4D376AF6F

Confidential

  (2) <u>Immediate Termination of Trial by Sponsor</u>.  Sponsor further reserves the right to terminate the Trial immediately upon written notification to Institution for causes that include failure to enroll Trial Subjects at a rate sufficient to achieve Trial performance goals; material unauthorized deviations from the Protocol or reporting requirements; circumstances that in Sponsor's opinion pose risks to the health or well being of Trial Subjects; or regulatory agency actions relating to the Trial or the Sponsor Drug.

  (3) <u>Immediate Termination of Trial by Institution</u>.  Institution reserves the right to terminate the Trial immediately upon notification to Sponsor if requested to do so by the responsible IRB or if such termination is required to protect the health of Trial Subjects.

16.2 <u>Payment upon Termination</u>.  If the Trial is terminated early in accordance with this Agreement, Sponsor will provide a termination payment equal to the amount owed for work already performed or earned, in accordance with Attachment A, less payments already made. The termination payment will include any non-cancelable expenses, other than future personnel costs, so long as they were properly incurred and prospectively approved by Sponsor, and, only to the extent such costs cannot reasonably be mitigated. If the Trial was never initiated because of disapproval by the IRB, Sponsor will reimburse Institution for IRB fees and for any other expenses that were prospectively approved, in writing, by Sponsor.

16.3 <u>Return of Materials</u>.  Unless Sponsor instructs otherwise in writing, Institution will promptly return all materials supplied by Sponsor for, at Sponsor's expense, Trial conduct, including unused CRFs, and any Sponsor-supplied Equipment.  Institution will return and/or destroy, as applicable and at Sponsor's expense, any unused Sponsor Drug.

17. <u>Insurance</u>.  The Institution and Principal Investigator will secure and maintain in full force and effect throughout the performance of the Trial (and following termination of the Trial to cover any claims arising from the Trial) insurance coverage for medical professional liability with limits in accordance with local standards for all medical professionals conducting the Trial.

Sponsor will maintain insurance coverage of the kind and with liability limits appropriate to the circumstances to protect against any claims or liabilities that may arise from its obligations under this Agreement.  On written request by Institution, Sponsor will provide Institution with documentation of such insurance coverage.

18. <u>Debarment, Exclusion, Licensure and Response</u>.  Institution and Principal Investigator each certify that it/she/he is not debarred under subsections 306(a) or (b) of the Federal Food, Drug, and Cosmetic Act and that it/she/he will not use in any capacity the services of any person debarred under such law with respect to services to be performed under this Agreement.  Institution and Principal Investigator each also certify that it/she/he is not excluded from any federal health care program, including Medicare and Medicaid.  Institution and Principal Investigator further certify that that it/she/he is not subject to a federally mandated corporate integrity agreement and has not violated any applicable anti-kickback or false claims laws or regulations.  During the term of this Agreement and for three (3) years after its termination, Institution and Principal Investigator will notify Sponsor promptly in writing (to the extent possible, within ten (10) business days) if either of these certifications needs to be amended in light of new information or if Institution becomes

11

DocuSign Envelope ID: 005D4A18-46F4-4DFD-AD60-BAD4D376AF6F

Confidential

aware of any material issues related to the medical licensure of any associated Trial researchers (including the Principal Investigator).

19. <u>Assignment and Delegation</u>.  None of the rights or obligations under this Agreement will be assigned or subcontracted by Institution or Principal Investigator to another without the prior written consent of Sponsor, and the express agreement of Institution, Principal Investigator and the requisite new assignee or subcontractor.  Principal Investigator and/or Institution must notify Sponsor, in advance, prior to moving to another location.  This Agreement will bind and inure to the benefit of the successors and permitted assigns of the Sponsor.

20. <u>Survival of Obligations</u>.  Obligations relating to Research Grant, Confidential Information, Inventions, Records, Publications, Publicity, Debarment and Exclusion, and Indemnification survive termination of this Agreement, as do any other provision in this Agreement or its Attachments that by its nature and intent remains valid after the term of the Agreement.

21. <u>Entire Agreement</u>.  This Agreement contains the complete understanding of the parties and will, as of the Effective Date, supersede all other agreements between the parties concerning the specific Trial.  This Agreement may only be extended, renewed or otherwise amended in writing, by the mutual consent of the parties.  No waiver of any term, provision or condition of this Agreement, or breach thereof, whether by conduct or otherwise, in any one or more instances will be deemed to be or construed as a further or continuing waiver of any such term, provision or condition, or any prior, contemporaneous or subsequent breach thereof, of any other term, provision or condition of this Agreement whether of a same or different nature.

22. <u>Conflict with Attachments</u>.  To the extent that terms or provisions of this Agreement conflict with the terms and provisions of the Protocol, the terms and provisions of this Agreement will control as to legal and business matters, and the terms and provisions of the Protocol will control as to technical research and scientific matters unless expressly agreed in writing between the parties.

23. <u>Relationship of the Parties</u>.  The relationship of Institution to Sponsor is one of independent contractor and not one of partnership, agent and principal, employee and employer, joint venture, or otherwise.

24. <u>Force Majeure</u>.  Neither party will be liable for delay in performing or failure to perform obligations under this Agreement if such delay or failure results from circumstances outside its reasonable control (including, without limitation, any act of God, governmental action, accident, strike, terrorism, bioterrorism, lock-out or other form of industrial action) promptly notified to the other party (“**Force Majeure**”).  Any incident of Force Majeure will not constitute a breach of this Agreement and the time for performance will be extended accordingly; however, if it persists for more than thirty (30) days, then the parties may enter into discussions with a view to alleviating its effects and, if possible, agreeing on such alternative arrangements as may be reasonable in all of the circumstances.

25. <u>Severability</u>.  If any provision of this Agreement is determined to be illegal or unenforceable, that provision will be severed from the Agreement and the remainder will remain valid, legal, and enforceable, provided that the surviving portion materially comports with the original intent of the parties.

26. <u>Notices</u>.  All notices required under this Agreement will be in writing and be deemed to have been given when hand delivered, sent by overnight courier or certified mail, as follows, provided

12

DocuSign Envelope ID: 005D4A18-46F4-4DFD-AD60-BAD4D376AF6F

Confidential

that all urgent matters, such as safety reports, will be promptly communicated via telephone, and confirmed in writing:

> SPONSOR:
> Constellation Pharmaceuticals
> 215 First Street
> Suite 200
> Cambridge, MA 02142
> Telephone: 617-714-0555
>
> With a copy to:
> INC Research, LLC
> 3201 Beechleaf Court, Suite 600
> Raleigh, NC 27604-1547 USA
> Attention:   Site Contracts Department
> Re: Project Code 1002933
> Telephone: 919-876-9300
>
> Institution:
> Mayo Clinic Arizona
> Legal Contract Administration
> Attn: Contract Manager
> 200 First Street S.W.
> Rochester, MN  55905
> Facsimile: (507) 284-4183
>
> With a copy to:
> Mayo Clinic Legal Department
> Attn: General Counsel
> 200 First Street S.W.
> Rochester, MN 55905
> Facsimile: (507) 284-0929

INSTITUTION MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED, REGARDING ITS PERFORMANCE UNDER THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO, THE MARKETABILITY, USE OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE RESEARCH RESULTS DEVELOPED UNDER THIS WORK, OR THAT SUCH RESULTS DO NOT INFRINGE UPON ANY THIRD PARTY PROPERTY RIGHTS.  FURTHER, INSTITUTION SHALL NOT BE LIABLE FOR SPECIAL, CONSEQUENTIAL, OR INCIDENTAL DAMAGES, AND INSTITUTION'S SOLE LIABILITY FOR DAMAGES UNDER THIS AGREEMENT SHALL BE A SUM EQUAL TO THE AMOUNT PAID BY SPONSOR TO INSTITUTION UNDER THIS AGREEMENT.

Sponsor and Institution agree that if the Study is required to be registered on Clinicaltrials.gov, Institution will not be deemed the responsible party pursuant to the FDA Amendments Act of 2007 (H.R. 3580). Any change in the designation of the responsible party to Institution, would require an amendment to this agreement. Results of this study will be reported in compliance with the FDA Amendments Act of 2007 (H.R. 3580) (FDAAA).  If specifically required by the FDAAA, the results of this study will be reported on Clinicaltrials.gov.

13

DocuSign Envelope ID: 005D4A18-46F4-4DFD-AD60-BAD4D376AF6F

Confidential

The Parties are subject to and required to comply with statutes and regulations of the U.S. Government relating to exportation of technical data, computer software, laboratory prototypes, and other commodities, including but not limited to the Arms Export Control Act, 22 U.S.C. Section 2751 et seq. and the Export Administration Act of 1979, as amended.

The Parties will not use or otherwise export or re-export anything exchanged or transferred between them pursuant to this Agreement except as otherwise authorized by United States law and the laws of the jurisdiction in which it was obtained. In particular, but without limitation, items exchanged may not be exported or re-exported (a) into any U.S. embargoed countries or (b) to anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Department of Commerce Denied Person's List or Entity List. By entering into this Agreement, each Party represents and warrants that it is not located in any such country or on any such list. Each Party also agrees that it will not use any item exchanged for any purposes prohibited by United States law, including, without limitation, the development, design, manufacture or production or missiles, or nuclear, chemical or biological weapons. Each Party further agrees that it will not knowingly permit services provided pursuant to this Agreement to be obtained or used by any person or entity prohibited from receiving or using such services under U.S. law. In the event that either Party becomes aware of any suspected violations of this paragraph, that Party will promptly inform the other Party of such suspected violation.

Sponsor agrees to notify Institution of any export controlled technology being provided to Institution under this Agreement prior to its transfer to Institution. The transfer of certain technical data and commodities may require a license from an agency of the U.S. Government and/or written assurances from Sponsor that Sponsor will not re-export certain data or commodities to certain foreign countries without prior approval of such agency. While Institution will cooperate with Sponsor, at Sponsor's expense, to secure any license that such agency deems necessary, Institution cannot guarantee that such license will be granted. In the event Institution is unable to obtain a license from the United States government for export, Institution is not liable to Sponsor.

[SIGNATURE PAGE FOLLOWS]

14

DocuSign Envelope ID: 005D4A18-46F4-4DFD-AD60-BAD4D376AF6F

Confidential

In the event that the parties execute this Agreement by exchange of electronically signed copies or facsimile signed copies, the parties agree that, upon being signed by both parties, this Agreement will become effective and binding and that facsimile copies and/or electronic signatures will constitute evidence a binding Agreement with the expectation that original documents may later be exchanged in good faith.

**Agreed to and Accepted:**

**MAYO CLINIC ARIZONA**

By: _Virginia M. Bruce_
F6627CA25C504AB...
**Signature**

Virginia M. Bruce
**Printed Name**

Director, Legal Contract Administration
**Title**

4/3/2014
**Date**

**CONSTELLATION PHARMACEUTICALS**

By: _Michael R. Cooper_
**Signature**

_Michael R. Cooper_
**Printed Name**

_Chief Medical Officer_
**Title**

_01 April 2014_
**Date**

**I have read and understand this Agreement and accept the terms as they relate to my activities as Principal Investigator:**

**PRINCIPAL INVESTIGATOR**

By: _Peter L. (Leif) Bergsagel, M.D._
D01F9D12F33E460...
**Signature**

**Principal Investigator**
**Title**

**Leif Bergsagel, M.D.**
**Printed Name**

4/3/2014
**Date**

15

DocuSign Envelope ID: 005D4A18-46F4-4DFD-AD60-BAD4D376AF6F

Confidential

Attachment A

## RESEARCH GRANT PAYMENT TERMS

A-1.   General Terms.  Institution will be paid the per patient grant amount as outlined on Attachment B (Research Grant Worksheet) per Trial Subject properly enrolled in the Trial. This amount constitutes the full compensation for the work to be completed by the Principal Investigator, including all work and care specified in the Protocol for the Trial, along with all overhead and administrative services. No compensation will be available for Trial Subjects enrolled or continuing in the Trial in violation of the Protocol.

A-2.   Payment Terms. Research grant payments for each Trial Subject will be made on a monthly basis and based on eCRF data entered by the Institution and verified by INC Research.  Payments will be made in accordance with Attachment B.  Monitoring will occur approximately every six (6) weeks based on site enrollment and completion of data entry.

A-3.   Non-Procedural Costs.  Institution will be paid for additional non-procedural costs that are pre-approved by Sponsor, as set forth in Attachment B.  To request payment for such costs, Institution will remit an itemized invoice to Sponsor or its designee with documentation and receipts substantiating agreed-upon pass-through expenses.  Any non-procedural pass-through expenses will be invoiced only in the amount actually incurred with no mark-up, up to the maximum amounts shown in Attachment B.

A-4.   Final Payment.  At the conclusion of the Trial, all CRFs and Trial-related documents will be promptly made available for Sponsor review.  The final payment will be paid once:  all CRFs have been completed and received; data queries have been satisfied; all Sponsor Drug is returned; and all close out issues are resolved and procedures completed, including final IRB notification.  All queries must be resolved within ten (10) days of receipt by Institution any time during the Trial.  Sponsor or its designee will perform final reconciliation of all payments made to date against total amount due and will promptly pay Institution amounts remaining unpaid, if any. Institution will promptly reimburse Sponsor amounts overpaid within thirty (30) days of notification by Sponsor.

A-5.   Screen Failures.  A Screen Failure is a consented Trial Subject who fails to meet the screening visit criteria and is thus not eligible for enrollment into the Trial. Screen Failures will be reimbursed, if at all, as outlined in Attachment B, based on work completed pursuant to the Protocol.

A-6.   Necessary Procedures.  Institution will be reimbursed for valid necessary visits and procedures. Payment for any necessary procedure due to patient safety will be reimbursed and will require a separate invoice with documentation for the medical necessity of the procedure.  Where practicable, Sponsor's prior written consent will be obtained, unless it will compromise the integrity of the Trial or affect Trial Subject safety, in which case Sponsor will be notified as soon as practicable  after the fact.

16

DocuSign Envelope ID: 005D4A18-46F4-4DFD-AD60-BAD4D376AF6F

Confidential

A-7.   <u>Payee</u>.  The research grant payments will be made to the following payee and address:

> Payee Name: Mayo Clinic Arizona
> Payee Address:   Mayo Clinic Arizona Grants
>                  Attn:  Remit Processing
>                  PO Box 4008
>                  Rochester, MN 55903-4008
> Payee Tax Identification Number:  86-0800150
> All checks should reference IRB Number 13-008753

A-8.   <u>Invoices</u>.  All invoices must be forwarded to the following as instructed:

> INC Research, LLC
> 3201 Beechleaf Court, Suite 600
> Raleigh, NC 27604-1547 USA
> Attention: Accounts Payable
> RE:  Project Code 1002933
> SM_AP_Americas@INCResearch.com

Institution will not receive any payments for pass through expenses whereby Institution has failed to produce actual copy invoices or other documentation clearly substantiating that the expenditures were actual, reasonable, and verifiable in the amount submitted for compensation.

17

DocuSign Envelope ID: 005D4A18-46F4-4DFD-AD60-BAD4D376AF6F

Attachment B

RESEARCH GRANT WORKSHEET

Sponsor Name: **Constellation Pharmaceuticals**
Protocol: **0610-03**
Site PI: **Leif Bergsagel, M.D.**
Indication: **Multiple Myeloma**
**IRB 13-008753**

| | | |
|---|---|---|
| **Screening** | | $3,311.10 |
| **Cycle 1** | Day 1 | $1,751.10 |
| | Day 2 | $105.30 |
| | Days 3-7 | $526.50 |
| | Day 8 | $1,489.80 |
| | Days 9-13 | $243.10 |
| | Day 14 | $1,162.20 |
| | Days 15-19 | $1,024.40 |
| **Cycle 2** | Day 1 | $659.10 |
| | Days 2-7 | $105.30 |
| | Day 8 | $375.70 |
| | Days 9-14 | $105.30 |
| | Day 15-21 | $543.40 |
| | Day 15 Echo | $1,158.30 |
| **Cycle 3** | Day 1 | $534.30 |
| | Days 2-7 | $105.30 |
| | Day 8 | $375.70 |
| | Days 9-14 | $105.30 |
| | Day 15-21 | $543.40 |
| **Cycle 4** | Day 1 | $534.30 |
| | Days 2-7 | $105.30 |
| | Day 8 | $375.70 |
| | Days 9-14 | $105.30 |
| | Day 15-21 | $543.40 |
| | Day 15 Echo | $1,158.30 |
| **Cycle 5** | Day 1 | $534.30 |
| | Days 2-7 | $105.30 |
| | Day 8 | $375.70 |
| | Days 9-14 | $105.30 |
| | Day 15-21 | $543.40 |
| **Cycle 6** | Day 1 | $534.30 |
| | Days 2-7 | $105.30 |
| | Day 8 | $375.70 |
| | Days 9-14 | $105.30 |
| | Day 15-21 | $543.40 |
| | Day 15 Echo | $1,158.30 |
| **Cycle 7** | Day 1 | $534.30 |
| | Days 2-7 | $105.30 |
| | Day 8 | $375.70 |
| | Days 9-14 | $105.30 |
| | Day 15-21 | $543.40 |

18

| | | |
|---|---|---|
| Cycle 8 | Day 1 | $534.30 |
| | Days 2-7 | $105.30 |
| | Day 8 | $375.70 |
| | Days 9-14 | $105.30 |
| | Day 15-21 | $543.40 |
| Cycle 9 | Day 1 | $534.30 |
| | Days 2-7 | $105.30 |
| | Day 8 | $375.70 |
| | Days 9-14 | $105.30 |
| | Day 15-21 | $543.40 |
| Cycle 10 | Day 1 | $534.30 |
| | Days 2-7 | $105.30 |
| | Day 8 | $375.70 |
| | Days 9-14 | $105.30 |
| | Day 15-21 | $543.40 |
| | Day 15 Echo | $1,158.30 |
| Cycle 11 | Day 1 | $534.30 |
| | Days 2-7 | $105.30 |
| | Day 8 | $375.70 |
| | Days 9-14 | $105.30 |
| | Day 15-21 | $543.40 |
| Cycle 12 | Day 1 | $534.30 |
| | Days 2-7 | $105.30 |
| | Day 8 | $375.70 |
| | Days 9-14 | $105.30 |
| | Day 15-21 | $543.40 |
| End of Treatment | | $561.60 |
| End of Study | | $561.60 |
| | TOTAL*: | $33,798.70 |

| Budget Summary* | |
|---|---|
| Per Patient Costs | $33,798.70 |
| Fees: | |
| Non-Refundable Start-Up Fee | $15,000.00 |
| IRB Initial Review Fee | $3,000.00 |
| IRB Continuing Review Fee | $1,000.00 |
| Protocol Maintenance Fee Year 2 and beyond | $5,500.00 |
| Pharmacy Maintenance Fee Year 2 and beyond | $2,000.00 |

| Invoice Items | |
|---|---|
| Screen Failure (Reimbursed on a 1:1 Ratio) | $3,311.10 |
| CBC with 5-Part WBC Differential | $8.44 |
| Clinical Chemistry | $90.53 |

**\*Inclusive of 30% overhead**

Constellation Pharmaceuticals or INC Research agrees to reimburse Institution for reasonable lodging and travel expenses incurred by Subjects who must travel more than fifty (50) miles each way to the Institution in order to participate in the Study.  These subjects will be compensated at a rate of 24 cents per mile, up to $20 for hotel parking, and up to a maximum of $150 per night for a hotel stay.  Institution's invoice to INC Research for such expenses must include supporting documentation.

19

Form **W-9**
(Rev. August 2013)
Department of the Treasury
Internal Revenue Service

### Request for Taxpayer
### Identification Number and Certification

Give Form to the
requester. Do not
send to the IRS.

Name (as shown on your income tax return)
**Mayo Clinic Arizona**

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification:

☐ Individual/sole proprietor   ☐ C Corporation   ☐ S Corporation   ☐ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

☑ Other (see instructions) ▶       **Non-Profit**

Exemptions (see instructions):

Exempt payee code (if any)

Exemption from FATCA reporting
code (if any)

Address (number, street, and apt. or suite no.)
**13400 East Shea Boulevard**

Requester's name and address (optional)

City, state, and ZIP code
**Scottsdale, AZ 85259**

List account number(s) here (optional)

**Print or type**
**See Specific Instructions on page 2.**

## Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

| | | | – | | | – | | | | |
|---|---|---|---|---|---|---|---|---|---|---|

Employer identification number

| 8 | 6 | – | 0 | 8 | 0 | 0 | 1 | 5 | 0 |
|---|---|---|---|---|---|---|---|---|---|

## Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below), and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here**   Signature of U.S. person ▶ *Virginia Beltce*       Date ▶ 1/1/2014

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** The IRS has created a page on IRS.gov for information about Form W-9, at *www.irs.gov/w9*. Information about any future developments affecting Form W-9 (such as legislation enacted after we release it) will be posted on that page.

### Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, payments made to you in settlement of payment card and third party network transactions, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the

withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct.

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

Cat. No. 10231X

Form **W-9** (Rev. 8-2013)