IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


Iris Spedale and Daniel Spedale,
husband and wife,

      Plaintiff,

                         No. 2:17-cv-00109-JJT

  vs.

Constellation Pharmaceuticals,
Inc.,

      Defendant.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


VIDEOTAPED DEPOSITION OF

LEIF BERGSAGEL, M.D.


May 15, 2018

11:07 a.m.


5777 East Mayo Boulevard
Phoenix, Arizona


Talia Douglas, RPR, CR No. 50775

1                    APPEARANCES OF COUNSEL

2

   For the Plaintiff:
3
        SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.
4       ALAN C. MILSTEIN, ESQ.
        308 Harper Drive, Suite 200
5       Moorestown, NJ 08057
        856.661.2078
6       amilstein@shermansilverstein.com

7

   For Defendant Constellation Pharmaceuticals, Inc.:
8
        MORRISON MAHONEY, LLP
9       ARTHUR LIEDERMAN, ESQ.
        120 Broadway, Suite 1010
10      New York, NY 10271
        212.825.1212
11      aliederman@morrisonmahoney.com

12

   For Mayo Clinic and Dr. Fonseco and Dr. Bergsagel:
13
        ROBERT F. KETHCART, ESQ.
14      SNELL & WILMER L.L.P.
        400 East Van Buren Street, Suite 1900
15      Phoenix, AZ 85004
        602.382.6000
16      rkethcart@swlaw.com

17

   ALSO PRESENT:
18
        J. Robert Sonne, Esq., Mayo Clinic Arizona
19      Frederick Van Norman, Videographer

20

21

22

23

24

25

Page 3

1                       INDEX OF EXAMINATION

2

3    WITNESS:  LEIF BERGSAGEL, M.D.

4    EXAMINATION                                        PAGE

5    By Mr. Liederman                                      8

6    By Mr. Milstein                                      47

7    By Mr. Liederman                                    114

8    By Mr. Milstein                                     115

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                          INDEX OF EXHIBITS

2

3      Exhibit              Description                        Page

4      Exhibit 1     Clinical Trial Agreement                   17

5      Exhibit 2     Clinic Trial Protocol: 0610-01             47
                     CONSTELLATION PROD_014572
6                    through 014704

7
       Exhibit 3     Investigator's Brochure                    49
8                    CONSTELLATION PROD_002467

9                    through 002530

10     Exhibit 4     IND Safety Report Follow-Up #1             49
                     CONSTELLATION PROD_014953
11                   through 014958

12     Exhibit 5     Re:   Initial IND (Serial No. 0000),       49
                     Hematologic Malignancies CPI-0610
13                   CONSTELLATION PROD_006852
                     through 007026
14
       Exhibit 6     Rat Study                                  49
15                   CONSTELLATION PROD_008393, 008404,
                     008425
16
       Exhibit 7     Beagle Dog Study                           49
17                   CONSTELLATION PROD_009631, 009667

18     Exhibit 8     Clinical Trial Agreement                   49
                     CONSTELLATION PROD_000006
19                   through 000025

20     Exhibit 9     Email Communications Between               49
                     Spedales and Mr. Singh
21
       Exhibit 10    Research Participant Consent and           49
22                   Privacy Authorization Form

23     Exhibit 11    Research Participant Consent and           49
                     Privacy Authorization Form
24
       Exhibit 12    Email                                      49
25                   CONSTELLATION PROD_000347, 000351,
                     000352, 002737
                     000352, 002737

Page 5

1

2                    INDEX OF EXHIBITS (CONTINUED)

3

4    Exhibit              Description                    Page

5    Exhibit 13    Email                                  49
              CONSTELLATION PROD_002673, 002674,
6             002676, 002677

7    Exhibit 14    Email                                  49
              CONSTELLATION PROD_002944, 000285,
8             000285 through 000295

9    Exhibit 15    Email                                  49
              CONSTELLATION PROD_000332
10
     Exhibit 16    Email                                  49
11            CONSTELLATION PROD_002722

12   Exhibit 17    Original SAE Report                    49
              CONSTELLATION PROD_000260
13            through 000262

14   Exhibit 18    January 18, 2016 Prescriptions         49

15   Exhibit 19    January 18, 2016 Prescriptions         49

16   Exhibit 20    Initial 15-Day IND Safety Reports      49
              CONSTELLATION PROD_013615
17            through 013628

18   Exhibit 21    Analysis of Similar Events for         49
              IND Safety Reports
19            CONSTELLATION PROD_000267, 000268

20   Exhibit 22    Email                                  49
              CONSTELLATION PROD_000317, 000318,
21            000325

22   Exhibit 23    3/29/16 Letter From Navaid Khan, MD    49

23   Exhibit 24    Clinical Document Copy                 49
              Fam Med Limited H&P
24
     Exhibit 25    June 23, 2014 Memo                     76
25            CONSTELLATION PROD_006125
              through 006127
              through 006127

Page 6

1

2                      INDEX OF EXHIBITS (CONTINUED)

3

4    Exhibit                Description                    Page

5    Exhibit 26    Initial 15-Day IND Safety Report         77
                   CONSTELLATION PROD_013545
6                  through 013558

7    Exhibit 27    Initial 15-Day IND Safety Report         79
                   CONSTELLATION PROD_013591
8                  through 013599

9    Exhibit 28    Patient Registration Form                94
                   CONSTELLATION PROD_000001    .
10                 through 000005

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        VIDEOTAPED DEPOSITION OF LEIF BERGSAGEL, M.D.

2                      MAY 15, 2018

3

4    THE VIDEOGRAPHER:  My name is Frederick Van

5    Norman, legal videographer, representing Esquire Deposition

6    Services.  Our court reporter is Talia Douglas, also

7    representing Esquire Deposition Services.

8               We're on the record at 11:07 on May 15th,

9    2018.  The witness being video and audio recorded is Leif

10   Bergsagel, M.D.

11              The case name in Iris Spedale and Daniel

12   Spedale versus Constellation Pharmaceuticals, Incorporated.

13   It's being held in the United States District Court for the

14   District of Arizona.  The case number is 2:17-cv-00109-JJT.

15              Our location is the Mayo Clinic at 5777 Mayo

16   Boulevard, Phoenix, Arizona.

17              Will counsel present please voice identify

18   yourselves, after which time our court reporter will swear

19   in the witness.

20              MR. MILSTEIN:  Alan Milstein for the

21   plaintiffs.

22              MR. LIEDERMAN:  Arthur Liederman from the law

23   firm of Morrison Mahoney for Constellation

24   Pharmaceuticals.

25              MR. KETHCART:  Robert Kethcart with the law

Page 8

1  firm Snell & Wilmer for the deponent, and with me today is

2  Robert Sonne for Mayo Clinic Arizona.

3

4                      LEIF BERGSAGEL, M.D.,

5  having been first duly sworn, testifies as follows:

6                      EXAMINATION

7  BY MR. LIEDERMAN:

8      Q.   Good morning, Dr. Bergsagel.

9      A.   Good morning.

10     Q.   Some background information, if I could.

11              Okay.   What is your medical specialty?

12     A.   Hematology.

13     Q.   And what's your medical background?

14     A.   I'm trained in internal medicine and board

15  certified in medical oncology.

16     Q.   And are you presently associated with a particular

17  hospital?

18     A.   The Mayo Clinic.

19     Q.   And how long have you been associated with the

20  Mayo Clinic?

21     A.   14 years.

22     Q.   Were there other hospitals that you were

23  associated with previously?

24     A.   Yes.

25     Q.   What hospitals?

Page 9

1      A.   I was associated with New York Presbyterian

2   Hospital in Manhattan and the Naval Hospital Bethesda, in

3   Bethesda.

4      Q.   And do you hold a title with the Mayo Clinic?

5      A.   I'm a consultant at the Mayo Clinic.

6      Q.   And how long have you held that position as a

7   consultant?

8      A.   I think for 12 or 13 years.

9      Q.   Was there a previous title or position that you

10  held with the Mayo Clinic?

11     A.   When I was first assumed, I was an associate

12  consultant.

13     Q.   With respect to your position as a consultant, do

14  you see patients?

15     A.   I do.

16     Q.   Okay.  Is this the equivalent of an attending --

17     A.   Yes.

18     Q.   -- physician?

19     A.   Yes.

20     Q.   Okay.  Have you ever treated the plaintiff in this

21  case, Ms. Iris Spedale?

22     A.   Could you -- yes.

23     Q.   Did you actually perform medical services for

24  her?

25     A.   Yes, yes.

1    Q.   Okay.  And what type of medical services did you

2    provide for her?

3    A.   I saw her as a patient with multiple myeloma being

4    treated on a clinical trial.

5    Q.   Okay.  Were these merely meetings or did you

6    actually prescribe any type of medication or treatments for

7    her?

8    A.   I don't recall right now if I wrote the orders for

9    the investigational medicine that she received or whether

10   that was Dr. Fonseca, but I might have.

11            I would have taken a history from her and

12   done a physical examination, recorded those findings in the

13   medical record on the occasions that I saw her.

14   Q.   Now, the investigational drug that you were seeing

15   her in connection with, was that CPI-0610?

16   A.   Yes.

17   Q.   Okay.  Had you been involved in clinical trials

18   prior to CPI-0610 at the Mayo Clinic?

19   A.   Yes.

20   Q.   What about involvement with clinical trials prior

21   to joining the Mayo Clinic?

22   A.   Yes.  I was involved in perhaps one or two

23   clinical trials -- well, a few clinical trials before

24   joining the Mayo Clinic when I was at New York Presbyterian

25   Hospital.

1    Q.   What role did you perform in connection with the

2    New York Presbyterian clinical trials?

3    A.   I was an investigator in that I enrolled

4    patients -- that I -- I wasn't the principal investigator,

5    but I was an investigator or I was involved in enrolling

6    patients on a clinical trial.

7    Q.   In those prior clinical trials at New York

8    Presbyterian, what -- those clinical trials were what

9    phase?

10   A.   The trial that I remember -- I'm not sure about

11   the other ones -- was a trial that would be either the very

12   end stage of a Phase 1 or the beginning of a Phase 2, and I

13   don't remember precisely where we were when I enrolled

14   patients.

15   Q.   And focusing on your time at the Mayo Clinic, how

16   many clinical trials were you associated with?

17   A.   I would -- 15, 20, something like that.

18   Q.   And with respect to the CPI-0610, what role did

19   you specific play, did you have a title with respect to

20   that?

21   A.   Principal investigator?

22   Q.   And prior to being a principal investigator for

23   CPI-0610, how many times prior at the Mayo Clinic were you

24   a principal investigator?

25   A.   I think three or four times, something like

1  that.

2      Q.   Just generally, unless this is too complicated a

3  question -- you'll let me know -- what is required to

4  become a principal investigator as opposed to an

5  investigator?

6      A.   Often there's a greater intellectual contribution

7  so that you are involved from the beginning with designing

8  the clinical trial and writing the protocol.

9           Although that does differ if -- there are two

10  main kinds of clinical trials, investigator initiated, in

11  which the principal investigator really assumes most of the

12  work, and then company sponsored, like the trial we're

13  talking about here in which a case is more of a referral.

14      Q.   In connection with CPI-0610, you used the word

15  referral.

16           Was the clinical trial from the sponsor

17  referred to the Mayo Clinic or to you specifically?

18      A.   It was referred -- well, initially, it was

19  referred to me, and I reviewed it.

20           And then I would have submitted it to the IRB

21  for approval.

22      Q.   Prior to CPI-0610, had you been involved with any

23  clinical trials with Constellation Pharmaceuticals?

24      A.   No.

25      Q.   Did you have any relationship, contact with

1    Constellation Pharmaceuticals prior to being introduced to

2    the study drug CPI-0610?

3         A.   Yes, I believe that I did.

4                   Although I'm not certain, but I believe that

5    I did.

6         Q.   Do you recall the circumstances, even generally,

7    if that's --

8         A.   Generally, yeah.

9                   So I published a paper in 2011 dealing with

10   this class of drug, which was long before this clinical

11   trial would have started.

12                  And following that, I believe I was

13   approached by Constellation, although it might have been

14   the reverse.  And I did preclinical work with the drug that

15   they had.

16                  Actually, I'm pretty sure this was, that they

17   were developing before they developed CPI-0610.  And I

18   worked with that preclinical drug in my laboratory.

19        Q.   What type of preclinical work would you be doing

20   with a drug like that?

21        A.   Well, I would be treating myeloma cell lines, so

22   these were immortalized myeloma cells in vitro in a

23   laboratory, and treating a mouse that has multiple

24   myeloma.

25        Q.   Was there any individual or individuals that you

```
 1   had contact with at Constellation prior to CPI-0610?

 2        A.   Yes.  There were -- Rob Simms would be one

 3   individual.

 4                There were -- but there were other scientists

 5   as well.

 6        Q.   And was there any particular contact person in

 7   connection with CPI-0610 that you had with Constellation?

 8        A.   Mike Cooper.

 9        Q.   And was -- had you known Michael Cooper before

10   contact?

11        A.   No.

12        Q.   Did you know what role he played at Constellation

13   Pharmaceuticals?

14        A.   I knew his responsibilities with respect to this

15   protocol, but I'm not sure about his broader roles at

16   Constellation.

17        Q.   Now, you mentioned the role of investigator and

18   principal investigator.

19                Could you describe what the role of a

20   principal investigator or primary investigator is rather?

21        A.   So he assumes responsibility for the design and

22   implementation in a clinical trial in accordance with the

23   rules and regulations.

24        Q.   What role does a primary investigator have in

25   connection with the clinical trial agreement that's
```

1   affected between the institution and the sponsor?

2        A.   He submits it, I suppose, to the legal office in

3   terms of -- the clinical trial gets submitted to the IRB

4   for review for its scientific, but I believe the

5   negotiations of the contract are done -- well, I guess I'm

6   not certain.

7                I submit it to be approved by the IRB, and

8   then the negotiations are conducted by the -- actually, I'm

9   not sure who conducts the negotiations.  The clinical --

10       Q.   As a prime --

11       A.   -- trails office.

12       Q.   As a prime investigator, are you the first to

13  receive a copy of the agreement?

14       A.   Yes.

15       Q.   Do you do anything with the agreement --

16       A.   Oh.

17       Q.   -- in terms of a review prior to going to

18  counsel?

19       A.   No.   I would typically -- if I receive an

20  agreement from a sponsor, then I send it immediately to

21  counsel.

22                But honestly, I'm not -- I guess I'm not sure

23  if I'm the person to receive it or if it goes to the

24  clinical trials coordinator who is coordinating all the

25  administrative aspects of the clinical trial.

1      Q.   So at the Mayo, there's a clinical coordinator,

2    clinical --

3      A.   There's a clinical trials office that handles

4    these details.

5      Q.   And the day-to-day duties that you would undertake

6    as a primary investigator would involve -- well, what type

7    of day-to-day activities would they involve?

8      A.   When the trial is ongoing, the major

9    responsibility is communication with Constellation through

10   a regularly scheduled teleconference, which I'm not sure if

11   it was once a month or every other week, where I would hear

12   about what was happening with the patients on the clinical

13   trial.

14            It was unusual that I would get queries

15   outside of those regularly scheduled conferences, but I

16   might.

17     Q.   Now, this role of a -- is it principal or primary

18   investigator?

19     A.   Principal.

20     Q.   Principal --

21     A.   Principal.

22     Q.   -- investigator.

23            Are there any particular educational

24   requirements that are needed to take on the role of a

25   principal investigator?

1       A.   I don't know that there are any educational

2   requirements, but the people who assume that role are ones

3   that have had leadership, generally, or have developed the

4   concepts underlying the clinical trial.

5                MR. LIEDERMAN:  Okay.  We can mark this, I

6   think, which will be -- I just want to make sure this has

7   the -- oh, it does.

8                So why don't we mark this as -- do you have a

9   copy of it, Alan, already?

10               MR. MILSTEIN:  What are you marking it as?

11               MR. LIEDERMAN:  The agreement.

12               MR. MILSTEIN:  No.

13               MR. LIEDERMAN:  Oh, this is being marked 1.

14               MR. MILSTEIN:  Okay.  So we're going to just

15   mark all of the exhibits --

16               MR. LIEDERMAN:  Numerically, yeah.

17               MR. MILSTEIN:  -- without designation of

18   yours or mine.

19               MR. LIEDERMAN:  Do you want to do it

20   differently or --

21               MR. MILSTEIN:  That's fine.

22               MR. LIEDERMAN:  Okay.

23               (Exhibit No. 1 marked)

24   BY MR. LIEDERMAN:

25       Q.   I'll show you what has been marked as Exhibit

1  Number 1 and ask you just to briefly take a look at it

2  first.

3           So Doctor, this document is entitled, the

4  clinical -- the top --

5      A.   Clinical trial agreement.

6      Q.   Clinical trial agreement.

7           Do you recall ever seeing the clinical trial

8  agreement between Constellation and the Mayo that's been

9  marked as Exhibit 1?

10     A.   I don't remember seeing it.

11     Q.   Okay.

12     A.   I see that I had signed it.

13     Q.   Now, is this the type of agreement generally that

14  you would at least receive and then pass along to counsel

15  office or the clinical investigation?

16     A.   Yeah.  I'm not sure if it comes to me first, but

17  it would come to me for signature after it had been through

18  the -- after it was ready for agreement.

19           MR. MILSTEIN:  When you say you signed it, it

20  was just stamped with your signature, correct?

21           THE WITNESS:  Well, if --

22           MR. MILSTEIN:  I mean, if you look at it --

23           THE WITNESS:  To sign it, you have to put in

24  your name and password online.

25           So it wasn't like somebody else does that, if

```
 1   you see what I mean.
 2                  MR. MILSTEIN:  Yeah.  So you're saying you
 3   would have done it -- you would have had to be at the
 4   computer to do it?
 5                  THE WITNESS:  Right.  I would have received
 6   it and looked at it and signed it and digitally put in my
 7   name and password.
 8   BY MR. LIEDERMAN:
 9       Q.   Would you have had occasion to read the entire
10   agreement or go through the various provisions of it?
11       A.   I would have had occasion to.
12       Q.   Okay.  Do you recall whether you did?
13       A.   I don't recall whether I did.
14       Q.   Now, this agreement that was Exhibit 1 is for the
15   study product that we were talking about, the CPI-0610; is
16   that correct?
17       A.   Yes.
18       Q.   Okay.
19                  MR. MILSTEIN:  What are you looking for?
20   BY MR. LIEDERMAN:
21       Q.   Here, I'll just show you in -- take a look at
22   paragraph -- this is paragraph 23.
23       A.   (Indicating)
24       Q.   Did you have an understanding of what the
25   relationship was between the sponsor and the institution?
```

1     A.    I don't know.

2     Q.    Okay.  In the description in 1.1, it refers to the

3   institution's principal investigator to be your name, who

4   will be responsible for the direction of the trial in

5   accordance with applicable institution policies and

6   applicable law.

7               Okay.  Are you acquainted with this

8   description?

9               What did you understand this to require of

10  you?

11              MR. KETHCART:   Foundation.

12              He's already said that he's not sure if he

13  remembered it, so I'm not sure that if he can testifying as

14  to what was intended by that provision.

15  BY MR. LIEDERMAN:

16    Q.    Okay.  Did you -- how would you describe your

17  responsibilities with respect to the direction of the

18  trial?

19    A.    My responsibilities were to see that the trial was

20  conducted in accordance with the institutional

21  requirements, which are governed by the institutional

22  review board, and so to make sure that we followed all of

23  the procedures that would be effected.

24    Q.    Now, there is another company that's listed on the

25  agreement, INC Research.

1          Do you recall what their role was in respect

2   to the trial?

3     A.   Yes.  They would be the clinical research

4   organization that takes responsibility for collecting all

5   of the data and presenting it in an anonymized fashion for

6   review by external people.

7     Q.   In fulfillment of the role as a principal

8   investigator, do you recall what type of documents you

9   would then be relying on that you might receive from

10  Constellation?

11    A.   Well, I would receive documents that discuss

12  adverse events, if they're serious, that documents which --

13  if there are amendments to the clinical trial procedure,

14  those kinds of things.

15          MR. MILSTEIN:  When you say procedure, do you

16  mean the protocol?

17          THE WITNESS:  The protocol, yeah.

18  BY MR. LIEDERMAN:

19    Q.   This was a Phase 1 trial, correct?

20    A.   (Inaudible response)

21    Q.   When --

22          MR. MILSTEIN:  You have to answer yes or no.

23          THE WITNESS:  Yes.

24  BY MR. LIEDERMAN:

25    Q.   Could you describe what a Phase 1 trial is as

1   opposed to the other phases?

2       A.   Sure.   A Phase 1 trial is a trial designed to

3   identify the maximally, often the maximally tolerated dose

4   that can be given of a drug.

5                   And that is in distinction to Phase 2 trials

6   or 3 trials, which look to determine the efficacy.

7                   MR. MILSTEIN:   What's the last thing he said

8   Phase 1 or Phase -- can you read that back?

9                   (Requested portion of record read)

10                  MR. KETHCART:   Efficacy.

11                  Okay.   That's what I thought you said.

12  BY MR. LIEDERMAN:

13      Q.   Well, we'll talk about with respect to CPI, this

14  particular study drug, 1610.

15                  Were you responsible for recruiting subjects

16  for the --

17      A.   Yes.

18      Q.   -- trial?

19                  And do you recall what type of procedure you

20  followed in order to recruit such patients?

21      A.   I can't recall specifically for this Phase 1

22  clinical trial.

23                  But I can tell you my general practice when

24  recruiting patients to Phase 1 trials is, first of all,

25  look through to see if they meet the eligibility criteria

1    for the clinical trial, which varies from trial to trial.

2              And then assuming the patient did meet the

3    eligibility criteria, I would approach them and say that

4    there is an opportunity to participate in a clinical trial

5    of a new drug and that the purpose of a trial is to

6    determine the maximally tolerated dose, and that we don't

7    know whether or not the drug will be effective in the

8    treatment of their condition or not.

9    Q.    Is this a different presentation than you would

10   give for Phase 2 or Phase 3 trial recruitment?

11   A.    It is.  In a Phase 2 and a Phase 3 trial, we have

12   expectation to believe that the drug is active.  But

13   perhaps more so, we have an idea of what the side effects

14   are.  And so we can talk to the patient in greater detail

15   about the side effects of the treatment.

16             Not all -- certainly not all Phase 2 drugs

17   are effective, but that, in fact, is the purpose of those

18   clinical trials.

19   Q.    In what -- what is the procedure that you go about

20   in order to obtain medical records or names of individuals

21   that you could review for inclusion criteria or exclusion

22   criteria?

23   A.    I use my own patients.  So as a principal

24   investigator, I am not recruiting other physicians'

25   patients.

1            So these would be patients I would be seeing

2    as part of my regular practice.  And if I thought that they

3    would be interested, then I would approach them about this.

4        Q.   Is there any protocol for informing other treating

5    physicians --

6        A.   There is.

7        Q.   -- regarding the clinical trial?

8        A.   There is.

9            We have a regular scheduled meeting where we

10   discuss the available clinical trials.  And we also are

11   able to contact the research coordinators and say, I have a

12   patient that I think might be eligible for a clinical trial

13   and ask them to look through the ones that are open to see

14   if there's a fit.

15       Q.   Do you require ever having conversations with

16   Dr. Fonseca about this clinical trial?

17            MR. MILSTEIN:  Did you say do you require or

18   do you remember?

19            THE WITNESS:  Do I recall.

20   BY MR. LIEDERMAN:

21       Q.   Do you recall.

22            MR. MILSTEIN:  Recall.

23            Okay.  That's what I thought.  That's what I

24   thought you meant.

25            MR. LIEDERMAN:  What did I say, require?

1          MR. MILSTEIN:   Yeah.

2   BY MR. LIEDERMAN:

3      Q.    Recall.

4      A.    I don't recall speaking to him specifically about

5   the enrollment of this patient.

6                I do recall a conversation later on after she

7   had an adverse event.

8      Q.    Had you worked with Dr. Fonseca previously in

9   connection with any clinical trials in which you were an

10  investigator or a principal investigator?

11     A.    Yes.

12     Q.    How many instances would he have had involvement

13  with the clinical trials you were associated with?

14     A.    Many.  20, 30.

15     Q.    Did he ever play a role as an investigator or only

16  a treating physician?

17     A.    I believe he also played a role as an

18  investigator.

19     Q.    Okay.  Would you know whether these involved Phase

20  1 clinical trials?

21     A.    I don't know.

22     Q.    How often in your experience at the Mayo were you

23  associated with a Phase 1 trial?

24     A.    I would say that during the 14 years I've been

25  here that we've almost always had a Phase 1 clinical trial

1    option available for our patients.

2                    Now, the Phase 1 clinical trials might span

3    two or three years.  So I don't know quite how many that

4    would have been over the 14 years, but 10 trials maybe.

5                    MR. MILSTEIN:  You're talking about purely

6    Phase 1, not Phase 1/2?

7                    THE WITNESS:  They're just purely Phase 1.

8    BY MR. LIEDERMAN:

9         Q.   Is a Phase 1 trial particularly -- with respect to

10   a Phase 1 trial, would you describe that as open to any and

11   all patients with a particular target disease --

12        A.   No.

13        Q.   -- or condition?

14        A.   No.

15        Q.   Would there only be specific individuals with a

16   specifically targeted disease or condition --

17        A.   Yes.

18        Q.   -- that would be appropriate for Phase 1?

19        A.   Yes.

20        Q.   Could you describe what that difference might be,

21   what the difference might be?

22        A.   Yeah.  The Phase 1 trials that I'm involved with

23   are typically restricted to patients with multiple myeloma,

24   and so that obviously excludes patients with other

25   diseases.

1                And then typically the Phase 1 trials would

2    require that patients meet certain eligibility criteria,

3    that they have received certain kinds of treatments

4    previously, that they have a certain level of blood counts

5    and kidney function and heart function, that they are able

6    to potentially benefit from the trial.

7        Q.    Would you describe -- how would you describe the

8    difference in the risk to a subject in a Phase 1 trial to

9    one in a Phase 3 trial, if there is any difference?

10                MR. KETHCART:   Objection to form.

11   BY MR. LIEDERMAN:

12       Q.    I'll do first, do you -- is there a difference in

13   risk between a Phase 1 trial for a patient entering it as a

14   subject and a Phase 3 trial?

15       A.    There is a difference in risk.

16       Q.    And how would you describe that risk?

17       A.    The risk in a Phase 1 study is fairly poorly

18   understood, whereas the risk in a Phase 3 study is much

19   better defined.

20       Q.    Is there a greater risk for the unknown in a Phase

21   1 trial?

22       A.    That's -- that's hard to say.   It's really an

23   unknown risk.

24                I can give you an example.   There was

25   recently a Phase 3 study that was terminated early in

1   multiple myeloma because of excess mortality in the

2   investigation alarm.

3            That isn't usually -- it's not something you

4   necessarily see in the Phase 1 studies.

5       Q.   With respect to the Phase 1 trial for the 1610 --

6            MR. MILSTEIN:   I think it's 0610.

7   BY MR. LIEDERMAN:

8       Q.   -- 0610, do you know whether the protocols

9   discussed whether or not the trial should be open to those

10  who still have alternative treatments available to them for

11  the treatment of their myeloma?

12      A.   I don't recall the eligibility criteria at this

13  moment.

14           MR. LIEDERMAN:   We can mark this, but --

15           MR. MILSTEIN:   You don't need to give me a

16  copy.

17           MR. LIEDERMAN:   Oh, okay.

18           MR. MILSTEIN:   Just tell me which version you

19  have.

20           MR. LIEDERMAN:   Version 4, 2015.

21           Which one do you have?

22           MR. MILSTEIN:   I have version 7.

23           MR. KETHCART:   Do you need a break?

24           THE WITNESS:   (Inaudible response)

25           MR. KETHCART:   Okay.

1  BY MR. LIEDERMAN:

2     Q.   Okay.  I'm going to read you just one provision

3  from page 29 of version 4 of the study design.

4            "This study will be conducted in adult

5  patients with multiple myeloma that has progressed

6  following standard of treatment and for whom further

7  effective standard treatment is not available."

8            Do you recall ever hearing phrases like that

9  in connection with any clinical trial protocols that you've

10  been associated with?

11            MR. KETHCART:  Form.

12            THE WITNESS:  Yes.

13  BY MR. LIEDERMAN:

14     Q.   Okay.  Do you recall that as being one of the

15  study design criteria for the 0610?

16     A.   No.

17     Q.   Where that is a provision in a study design, what

18  do you do with respect to that type of a comment in the

19  protocol?

20            MR. KETHCART:  Form and foundation.

21            THE WITNESS:  What I do is --

22            MR. MILSTEIN:  Before you answer that, what

23  paragraph is --

24            MR. LIEDERMAN:  Paragraph 3.1.

25            MR. MILSTEIN:  And what's the heading of the

 1   paragraph?

 2                   MR. LIEDERMAN:  Overview of study design.

 3   Section 3 is study design.

 4                   Is that your call?

 5                   THE WITNESS:  Yeah.  I need to answer this.

 6                   MR. LIEDERMAN:  Go ahead.

 7                   THE VIDEOGRAPHER:  Off the record?

 8                   MR. LIEDERMAN:  Off the record.

 9                   THE VIDEOGRAPHER:  Okay.  We're off the

10   record at 11:42.

11                   (Recess taken from 11:42 a.m. to 11:45 a.m.)

12                   THE VIDEOGRAPHER:  We're back on the record

13   at 11:45.

14                   MR. MILSTEIN:  And just for the record, so

15   the sentence that Counsel read is on the page 27 of

16   amendment 6, version 7, and Bates stamped 014598.

17   BY MR. LIEDERMAN:

18       Q.   Would you have an understanding of what is meant

19   by, for whom further effective standard treatment is not

20   available?

21                   Would that have any particular meaning to

22   you --

23       A.   Yes.

24       Q.   -- as a principal investigator?

25       A.   Yes, it would.

1           Someone for whom further effective treatment

2     is not available would be someone who had failed the drugs

3     that we thought were active or have been unable to tolerate

4     the drugs that we thought were active or certainly drugs of

5     the same class as the ones that they had failed previously.

6           Q.    Would this be a particular caveat that might be

7     used in Phase 1 as opposed to Phase 2 or Phase 3 trial

8     designs?

9           A.    Yes, it is.

10          Q.    Okay.  Do you -- are you aware of any reason why

11    it would be more appropriate for Phase 1 trial?

12          A.    Because the efficacy is not known or the

13    toxicity.

14                MR. MILSTEIN:  When you're saying class, are

15    you talking about BETs or broader than that?

16                THE WITNESS:  But here, no, I'm talking about

17    class of approved agents.

18                So proteasome inhibitors is a class or drugs

19    related to thalidomide is a class or drugs related to

20    dexamethasone is a class.

21                MR. MILSTEIN:  So when you're Talking about a

22    class of these drugs, are you defining that as BETs or

23    broader than that?

24                THE WITNESS:  I haven't been talking about

25    the class of these drugs.

Page 32

1          I haven't been talking about the class -- I

2     haven't been taking about the class of, like, a CPI-0610.

3     But would you like me to?

4               MR. MILSTEIN:  No, no.  So, for instance,

5     earlier, and --

6               MR. LIEDERMAN:  Go ahead.

7               MR. MILSTEIN:  Earlier you had said you had

8     done some preclinical work on a class of drugs.

9               THE WITNESS:  Yes.

10              MR. MILSTEIN:  Did you mean BETs?

11              THE WITNESS:  Yes, I did.

12              MR. MILSTEIN:  Okay.

13    BY MR. LIEDERMAN:

14         Q.   With respect to the drafting of the informed

15    consent, who generally prepares the informed consent that's

16    used in these trials at the Mayo Clinic?

17         A.   The --

18              MR. KETHCART:  Objection.

19              MR. MILSTEIN:  Wait.

20              When you say these trials, so there's a

21    difference --

22              MR. LIEDERMAN:  Trials at the Mayo Clinic.

23              MR. MILSTEIN:  But there's a difference, as

24    the doctor had said, between sponsored controlled trials

25    and doctor controlled trials.

1    BY MR. LIEDERMAN:

2         Q.   For sponsored controlled trials, who generally

3    creates the informed consent?

4         A.   The sponsor.

5         Q.   Okay.  And is there a role that's played by the

6    Mayo Clinic with respect to the informed consent

7    preparation?

8                   MR. KETHCART:  Form and foundation.

9                   THE WITNESS:  The consent form is reviewed

10   and submitted for approval, the IRB.

11   BY MR. LIEDERMAN:

12        Q.   With respect to 0610, what role did you play with

13   the informed consent?

14        A.   I reviewed the informed consent and submitted it

15   to the IRB.

16        Q.   And did you add any comments --

17        A.   I don't remember.

18        Q.   -- or edits, modifications?

19        A.   I don't remember.

20        Q.   Did you have any conversations that you recall

21   with Constellation, anyone of Constellation Pharmaceuticals

22   with respect to informed consent?

23        A.   I don't recall.

24        Q.   Okay.  You had mentioned Dr. Cooper.

25                   Was he the principal contact that you had at

1   Constellation Pharmaceuticals or were there others?

2        A.   He was the principal contact.

3        Q.   Okay.  Any discussions regarding the informed

4   consent, if any had occurred, would those have been with

5   Dr. Cooper or any other individual?

6        A.   It would have been with Dr. Cooper.

7        Q.   So how did you, as a principal investigator,

8   ensure that participants understood the specifics about the

9   trials, including the fact it was dose study?

10            MR. KETHCART:  Objection to form and

11   foundation.

12            THE WITNESS:  To ensure the participants were

13   informed about the specifics of the trial, I made sure that

14   they signed the informed consent that would have been

15   explained to them by the study coordinator and an

16   investigator.

17   BY MR. LIEDERMAN:

18       Q.   And who is the study coordinator and investigator

19   for the 0610?

20       A.   Mr. Singh.

21       Q.   Did you have any private conversations with any of

22   the patients before they enrolled --

23            MR. KETHCART:  Objection to form.

24   BY MR. LIEDERMAN:

25       Q.   -- regarding their enrollment?

1    A.    The patients who were my patients, I would have

2    had many conversations in private before enrolling in this

3    trial.

4              The patients that were not my patients, I

5    don't -- it's unlikely, although I don't -- I can't say

6    about all of them.

7    Q.    Do you recall Ms. Spedale?

8    A.    Yes.

9    Q.    Do you recall whether you had meetings with her

10   alone before she actually signed the informed consent

11   regarding the trial?

12   A.    I don't recall.

13   Q.    Was there any script that was created for the

14   discussions about a trial such as 0610 for people like the

15   coordinators or any others who might be introducing a trial

16   to a potential patient?

17              MR. KETHCART:  Form.

18              THE WITNESS:  I don't think so.

19   BY MR. LIEDERMAN:

20   Q.    Okay.  Were there any times in the past that you

21   could recall where a script was created?

22   A.    No.

23   Q.    Any type of a checklist that might be created?

24              MR. KETHCART:  Form.

25              THE WITNESS:  There is definitely a

1    checklist, but whether it is a checklist for them to go

2    through with the patient or not, I'm not certain.

3    BY MR. LIEDERMAN:

4        Q.    Okay.   How would you as the principal

5    investigator, then, be sure that a study coordinator stated

6    all the facts and information to the patient --

7                    MR. KETHCART:   Form and foundation.

8    BY MR. LIEDERMAN:

9        Q.    -- prior to signing informed consent?

10       A.    I believe it's a core aspect of their

11   responsibilities for which they're trained and evaluated by

12   their clinical trials unit.

13       Q.    How long has Mr. Singh been associated with the

14   Mayo Clinic?

15                   MR. KETHCART:   Foundation.

16                   THE WITNESS:   I don't know.

17   BY MR. LIEDERMAN:

18       Q.    You don't know.

19                   Prior to 0610, had you had dealing with

20   Mr. Singh?

21       A.    Yes.

22       Q.    Were those on prior trials?

23       A.    Yes.

24       Q.    Do you know how many trials approximately you were

25   working with Mr. Singh on before 0610?

1      A.   Perhaps three or four.

2      Q.   Now, even though this is a Phase 1 study with

3   respect to 0610, and you had mentioned that it's not a

4   question of efficacious, can participants still see results

5   in the course of their Phase 1 involvement?

6      A.   What do you mean by see results?

7      Q.   Well, could it still be efficacious?

8      A.   Yes, it could still be efficacious.

9      Q.   In this particular study, do you know whether or

10   not Ms. Spedale had a positive result with the drug,

11   meaning dealing with her tumor?

12      A.   Did she have a tumor response?

13      Q.   Yes.

14      A.   I don't remember.

15      Q.   Do you have any reason to believe that Ms. Spedale

16   did not know that she was participating in a Phase 1

17   clinical trial?

18      A.   No.

19      Q.   In the documentation that you received from

20   Constellation, did you ever recall seeing any

21   representation by Constellation Pharmaceuticals in written

22   form that the study drug was a therapeutic drug?

23      A.   I don't understand.

24      Q.   That in fact was efficacious?

25      A.   I don't recall.

1              I can say that I know that other drugs of

2    this class, BET inhibitors, shown activities in other

3    cancers, leukaemia and lymphoma.

4              And Constellation may have had activity in

5    other cancers that may have been relayed to me, but I don't

6    know.

7         Q.   Now, your role is to monitor the adverse events

8    during the course of a clinical trial?

9         A.   Yes.

10        Q.   And were you monitoring adverse events for 0610?

11        A.   Yes.

12        Q.   What would you do if you learned of a serious

13   adverse event?

14        A.   Well, we need to determine whether it represents a

15   dose limiting toxicity.

16             And in general with Phase 1 clinical trials,

17   there's a design called three plus three when you look at

18   the number of adverse events.

19             And if there's a dose limiting toxicity, you

20   would increase the size of the cohort from three to an

21   additional three.

22        Q.   Do you recall plaintiff's adverse event?

23        A.   Yes.

24        Q.   And how did you learn of it?

25        A.   Dr. Fonseca told me about it.

1    Q.   Did you perform a review of her case?

2    A.   Yes.

3    Q.   What did you determine?

4    A.   As best as I can recall, I determined that it was

5    unclear, the relationship to the study drug.

6                    MR. LIEDERMAN:  Off the record.

7                    THE VIDEOGRAPHER:  Please stand by.

8                    Off the record at 12:57.

9                    (Recess taken from 12:57 p.m. to 11:58 p.m.)

10                   THE VIDEOGRAPHER:  We're back on the record

11   at 11:58.

12   BY MR. LIEDERMAN:

13   Q.   Were you aware of whether any other patient in the

14   clinical trial for 0610 experienced mania or psychosis?

15   A.   I'm not aware of that.

16   Q.   Okay.  Let me go to 27.

17                   Do you recall -- strike that.

18                   As part of the process of conducting the

19   Phase 1 clinical trial -- strike that.

20                   Besides the Mayo Clinic, are you aware of

21   whether there were other sites that are involved in the

22   Phase 1 trial for 0610?

23   A.   Yes.

24   Q.   Do you know how many sites there were in this

25   instance?

1       A.   I believe three to four.

2       Q.   Okay.  Is there a regular procedure for the

3   principal investigators to confer with each other along

4   with a sponsor regarding the ongoing clinical study?

5       A.   Yes.  There's a regularly scheduled teleconference

6   that occurred either once or twice per month.

7       Q.   Okay.  And that would be conducted by whom, by a

8   sponsor or by any --

9       A.   It could have been INC or it could have been the

10  sponsor.  I'm not sure which one set it up.

11      Q.   Okay.  And what was part of the agenda for these

12  discussions?

13      A.   We would review the patients who had been treated

14  on the trial and their toxicities and make a determination

15  if there had been a dose limiting toxicity.

16      Q.   Were you familiar with two patients who were

17  enrolled prior to plaintiff who experienced what was

18  described as confusion?

19      A.   I don't remember.

20      Q.   Would you have occasion to review MedWatch reports

21  as part of your role as a principal investigator?

22      A.   I don't remember, per se.

23           Although with other clinical trials, I would

24  have had occasion to.

25      Q.   So generally, how would the other principal

Page 41

1    investigators learn of particular experiences at other

2    sites with the patient population?

3         A.   It would be discussed on the teleconference, and

4    there would be a summary of the teleconference

5    circulated.

6         Q.   And who would prepare the summary and circulate

7    it?

8         A.   I don't know if it was INC or Constellation.

9         Q.   Do you recall, prior to the plaintiff enrolling,

10   that there were any reports that would have identified as a

11   risk mania or psychosis?

12        A.   I don't recall.

13        Q.   Okay.  Did any --

14             MR. MILSTEIN:  I don't think you produced any

15   of the records of these conversations with Constellation

16   and the principal investigators, so if you could just make

17   a note of that.

18             MR. LIEDERMAN:  Okay.

19             MR. MILSTEIN:  I'll follow it up.

20             MR. LIEDERMAN:  That's okay.  I'll remember

21   it.  I promise.

22   BY MR. LIEDERMAN:

23        Q.   Do you recall whether prior to the plaintiff

24   enrolling if there was any experience of confusion with any

25   of your patient population on 0610?

1    A.    I don't recall any.

2    Q.    What about subsequent to the plaintiff's event?

3    A.    I don't recall any.

4    Q.    According to the records, one incidence of

5    confusion was at Mass General Hospital.

6                Do you recall that as being one of the sites?

7    A.    I don't recall that.

8    Q.    Okay.  Do you recall whether Ohio State University

9    was a site?

10    A.    No.  I don't recall that either.

11    Q.    Okay.

12    A.    I don't recall University of Philadelphia or

13    Pennsylvania, University of Pennsylvania.

14    Q.    As --

15    A.    I probably got that wrong.

16    Q.    What?

17    A.    Anyways --

18    Q.    As a principal investigator, would you classify an

19    event of confusion or mania as the same thing?

20    A.    I would look carefully at the toxicity guide book

21    that we have, DSM criteria, to see which one it fit into.

22    Q.    Are you still involved with the CPI-0610?

23    A.    No.

24    Q.    Was there any subsequent trial conducted at the

25    Mayo Clinic with respect to this study drug?

1    A.   No.

2    Q.   So the study drug -- the study of the study drug

3    included with the Phase 1 that you were a principal

4    investigator with?

5    A.   My involvement with it did.

6    Q.   Do you know what the half life is for this study

7    drug?

8    A.   No.

9    Q.   Okay.  Is it common for a patient to experience an

10   adverse event while on a medication and continue to

11   experience it months and years after the medication is

12   discontinued?

13   A.   Yes.

14             MR. KETHCART:  Form and foundation.

15             MR. MILSTEIN:  What was your answer?  Yes,

16   right?

17             THE WITNESS:  Yes.

18   BY MR. LIEDERMAN:

19   Q.   Have you ever seen a study participant within the

20   0610 experience an adverse event that never resolved?

21             MR. MILSTEIN:  Other than Ms. Spedale?

22             THE WITNESS:  I'm thinking through the

23   patients that I saw.  I don't believe that I did.

24   BY MR. LIEDERMAN:

25   Q.   Did you prepare a report with respect to Ms.

1    Spedale's adverse event?

2                   MR. KETHCART:  Form.

3                   THE WITNESS:  I don't recall.

4    BY MR. LIEDERMAN:

5        Q.   Okay.  Would you have been responsible for

6    conducting an initial investigation into the adverse

7    event?

8        A.   Well, I would be responsible for discussing it on

9    the clinical, on the teleconference that we had.  I'm not

10   sure -- the clinical trials coordinator may have done some

11   of the investigation.

12                  I would have also have reviewed the chart

13   ahead of time myself at that time so I could discuss it.

14       Q.   Did you ever reach any conclusions on your part

15   with respect to the relationship of the study drug and her

16   event?

17       A.   I thought it was unclear, the relationship.

18       Q.   And the reason why you felt it was unclear?

19       A.   I thought that she had other possible

20   precipitating causes for the mania she suffered, which she

21   had a similar episode in the past with leukocorticoids.

22                  MR. MILSTEIN:  She had a similar episode in

23   the past with what?

24                  THE WITNESS:  Leukocorticoids.

25                  MR. MILSTEIN:  All right.  Drug induced?

Page 45

1          THE WITNESS:  Drug induced.  Yeah, drug

2    induced.

3          And because the event lasted for so long

4    after exposure to the drug, and because it was not an

5    adverse event that had been reported to my knowledge in

6    this trial or other trials of this class of drug.

7    BY MR. LIEDERMAN:

8    Q.   Did you have occasion to speak with Dr. Fonseca

9    about her treatment?

10   A.   Yes.

11   Q.   And this would have been post the event?

12   A.   Yes.

13   Q.   Okay.  Were you aware of what type of a treatment

14   she had been receiving up to her entry into the clinical

15   trial?

16   A.   Yes.

17   Q.   And was this gained through discussions with

18   Dr. Fonseca?

19   A.   Yes.

20   Q.   Did he ever communicate to you that she had ever

21   any type of psychological or emotional issues?

22   A.   Yes.

23   Q.   Would this have occurred prior to her entry into

24   the trial?

25   A.   No.

1      Q.   Okay.  So what context did it come up during your

2   discussion with Dr. Fonseca after she had her event?

3      A.   It came up in the context of trying to understand

4   the nature or the cause of the event she suffered.

5      Q.   Were you aware that Dr. Fonseca had recommended

6   that she enter the trial --

7               MR. KETHCART:  Form and foundation.

8   BY MR. LIEDERMAN:

9      Q.   -- before the trial occurred, before she entered

10   the trial?

11               MR. KETHCART:  Same objection.

12   BY MR. LIEDERMAN:

13      Q.   Strike that.

14               Before she entered the trial, when she was a

15   candidate, were you familiar with whether or not

16   Dr. Fonseca had a role in recommending her for the trial?

17      A.   I don't know.  I assume he did.

18      Q.   Do you recall ever Dr. Fonseca coming to you and

19   asking you if you could consider her for the trial?

20      A.   I don't recall that.

21               Our typical practice would be to ask the

22   study coordinator.

23      Q.   Which would be Mr. Singh?

24      A.   Mr. Singh.

25      Q.   And then what would be the procedure for Mr. Singh

1   if he was approached by Dr. Fonseca according to your

2   recollection of the protocols?

3       A.    He would review the eligibility criteria, and

4   also, if there was a spot available on the trial, and then

5   respond to Dr. Fonseca.

6                    MR. LIEDERMAN:  Do you want to?

7                    MR. MILSTEIN:  Yeah.

8                    MR. LIEDERMAN:  I'll let you.

9                    Because he felt he has quite a bit of

10  questioning, and we're under a time constraint, so I am

11  deferring to him, and I'll see what questions I have.

12                         EXAMINATION

13  BY MR. MILSTEIN:

14      Q.    Doctor, I'm Alan Milstein.  I represent the

15  Spedale family.

16                    MR. MILSTEIN:  So let's mark as exhibit --

17  what are we up to, 3?

18                    MR. LIEDERMAN:  3.

19                    THE COURT REPORTER:  2.

20                    MR. LIEDERMAN:  2.

21                    MR. MILSTEIN:  2.  Okay.

22                    You know, it might be easier if, suppose I

23  just mark -- I'll put a 2 on there, and then you could put

24  the stickers on later.

25                         (Exhibit No. 2 marked)

1    BY MR. MILSTEIN:

2        Q.   So Exhibit 2 is the protocol, and this is

3    amendment 6, version 7.

4                 I take it that Constellation wrote the

5    protocol, correct?

6        A.   Yes.

7        Q.   Okay.  You didn't write it at all, correct?

8        A.   I may have written some lines, added some lines.

9        Q.   But do you know whether you wrote any lines?

10       A.   I don't know whether I did.

11       Q.   So the protocol is for the Phase 1 study of this

12    drug 0610, which is a, what's called a BET; is that

13    correct?

14       A.   (Inaudible response)

15       Q.   And a BET is a -- how do you pronounce this,

16    bromod --

17       A.   Bromodomain and --

18       Q.   Bromodomain inhibitor?

19       A.   Yes.

20       Q.   And how does a bromodomain inhibitor actually

21    work?

22       A.   It mimics an acetyl group, which is found on

23    histones so that the bromodomain does not recognize the

24    acetyl mark that is there, and instead, it recognizes or it

25    finds this BET drug.  And as a result, the bromodomain

1    can't do its job.

2         Q.   And when you inhibit the bromodomain, what is the

3    hypothesis with respect to whether or not that is an

4    effective means of controlling tumors?

5         A.   The hypothesis is that it --

6         Q.   Did you want to get that, by the way?

7         A.   Yeah, why not.  I'll see what this is.

8                   MR. LIEDERMAN:  We'll go off the record.

9                   MR. MILSTEIN:  Well, let's see if he needs --

10                  THE WITNESS:  No.  This patient has got to go

11   to the emergency room.

12                  I need to --

13                  MR. MILSTEIN:  Okay.

14                  THE WITNESS:  I need to get this.  Sorry.

15                  THE VIDEOGRAPHER:  Okay.  Please stand by.

16                  This ends Media Number 1 of our ongoing

17   deposition.

18                  We're off the record at 12:12.

19                  (Recess taken from 12:12 p.m. to 12:20 p.m.)

20                  (Exhibit Nos. 3 through 24 marked)

21                  THE VIDEOGRAPHER:  This begins Media Number 2

22   of our ongoing deposition.

23                  We're back on the record at 12:20.

24   BY MR. MILSTEIN:

25        Q.   Okay.  Doctor, you were going to explain how

Page 50

1   inhibiting this particular -- is it a chemical or is it an

2   enzyme?

3                   What is it?

4       A.    It's part of an enzymatic complex, yes.

5                   The way that works by inhibiting bromodomain

6   inhibitors is that you inhibit the transcription of genes.

7   A particularly important gene is one called MYC.

8       Q.    And by inhibiting this particular gene, how does

9   that control the tumor?

10      A.    That gene drives the tumor.  And if you inhibit

11  it, the tumor cells will die.

12      Q.    And how many BETs are out there that have been

13  approved by the FDA?

14      A.    I'm not sure that any have been approved.

15      Q.    Are there other BETs that you understand are

16  manufactured by Constellation?

17      A.    There was -- I mentioned a preclinical BET that I

18  used in the laboratory.

19                  I'm not aware of any other ones like 0610,

20  which are in the clinic.

21  BY MR. MILSTEIN:

22      Q.    And do you know the names of any of the other BETs

23  that are being experimented on?

24      A.    They have funny names.  There's one called iBET,

25  which I believe is GlaxoSmithKline.

1              There was a drug -- it's skipping my -- I

2      forget some of the other names.  OTX seems to be the

3      acronym --

4          Q.   And do you know how the BETs differ from one

5      another?

6          A.   Generally, they're based on a small molecule that

7      was called JQ-1, and the different BETs are modifications

8      of that with different carbons or oxygens placed around

9      it.

10         Q.   So Constellation contacted you with respect to

11     conducting this particular clinical trial; is that right?

12         A.   Yes.

13         Q.   And they prepared the protocol, correct?

14         A.   Yes.

15         Q.   They prepared the informed consent document?

16         A.   Yes.

17         Q.   Your understanding was there are about six other

18     sites, right?

19         A.   I think I said three to four.  I'm not sure how

20     many.

21         Q.   Oh, three to four?

22              Okay.  Ms. Spedale was patient number what?

23         A.   I don't know.

24         Q.   Now, she ended up with, I think, 150 milligrams

25     twice a day or something like that.

1          This was a dose escalation study; is that

2  right?

3     A.   Yes.

4     Q.   There were cohorts of three?

5     A.   Yes.

6     Q.   And how many were in the study?

7     A.   I don't remember.

8     Q.   Did you know that there was a prior study of 61

9  patients before your study?

10    A.   That's not what I recall.

11    Q.   What do you recall?

12    A.   I recall that there was a contemporaneous study

13  going on in lymphoma that may have -- it may be prior.

14          I believe it opened before ours did, but I

15  believe the two studies were going on contemporaneously.

16    Q.   Okay.

17    A.   I'm not aware of another one.

18    Q.   Okay.  All right.  I think we'll see some of the

19  those documents.

20          So let me show you Exhibit 2.

21          This is the investigator's brochure.

22          Did you get a copy of this?

23    A.   Yes.

24    Q.   So let me have you turn, if you can, to page 41.

25          So do you see where it says, "Table 5-2

1    summarizes the characteristics of the first 61 patients

2    treated"?

3         A.    Yes.

4         Q.    Did that include your study or is this a prior

5    study?

6         A.    I don't know.

7         Q.    Well, did you get this -- I mean, the date is 29

8    August 2016.

9              Did you get this, a copy of this prior to

10   beginning the study?

11        A.    I don't know when the study began.

12             I don't remember when the study began, but I

13   would have received this around the date that it was

14   issued, I believe.

15        Q.    Now, I know Counsel asked you about whether it was

16   a part of the inclusion criteria that human subjects

17   enrolled in the study not have other treatments available,

18   or effective standard treatments available.

19             Do you know whether Ms. Spedale had other

20   alternative treatments available?

21        A.    As I recall, she did not.

22        Q.    Well, I mean, there were other studies going on,

23   correct?

24        A.    There were definitely other studies going on.

25        Q.    Phase 2 studies.

1      A.    There were probably Phase 2 studies.

2      Q.    In fact, do you recall that she was looking at

3   another study and trying to determine whether she should be

4   in this one or that one?

5      A.    I don't recall.

6      Q.    And that's because you didn't really have much

7   contact with her before she was enrolled; is that right?

8      A.    That's correct.

9      Q.    Who did the informed consent discussion with

10   her?

11      A.    I'm sure Mr. Singh did.

12      Q.    Okay.

13      A.    I believe Dr. Fonseca would have also discussed it

14   with her.

15      Q.    A Phase 1 study is safety only, correct?

16      A.    That's correct.

17      Q.    And would you agree that it's inappropriate to

18   even discuss efficacy to a potential human subject when

19   enrolling that subject in a Phase 1 study?

20                  MR. KETHCART:   Form.

21                  THE WITNESS:   I wouldn't agree with that.

22   BY MR. MILSTEIN:

23      Q.    So let me have you turn to page 45.

24                  Do you see under psychiatric disorders,

25   confusional state?

1    A.    I'm looking.  I do see it, yes.

2    Q.    Third from the bottom.

3              So in this particular study, 14.3 percent of

4    the patients enrolled, I think of those 61, or maybe not.

5              Maybe not of the 61, but 14.3 percent of

6    those in the 225 milligram group had this psychiatric

7    disorder confusional state.

8              Do you see that?

9    A.    Yes.

10             MR. KETHCART:  Form, foundation.

11             THE WITNESS:  Yes, I see that.

12   BY MR. MILSTEIN:

13   Q.    Were you aware of that prior to or subsequent to

14   Ms. Spedale's enrollment?

15             MR. KETHCART:  Form and foundation.

16             THE WITNESS:  I don't know.

17   BY MR. MILSTEIN:

18   Q.    Were you ever aware of it?

19             MR. KETHCART:  Form and foundation.

20             THE WITNESS:  I am aware of it because of Ms.

21   Spedale.

22   BY MR. MILSTEIN:

23   Q.    Okay.  Did Constellation ever say to you that

24   there was a study in which a patient ended up with a

25   psychiatric disorder characterized as a confusional

1   state?

2           MR. KETHCART:   What time period do you want

3   him to talk about?

4   BY MR. MILSTEIN:

5       Q.   Any time period.

6           Did they ever say that to you or write that

7   to you or put that in an email?

8       A.   I don't remember.

9       Q.   So if you look at page 56 --

10          MR. KETHCART:   And I'm going to -- just to

11  clarify, I want to make sure that you understand why I'm

12  saying objection to this.

13          This is from August of 2016, which is after

14  her.

15          So you're asking him questions that seem to

16  be asking him about stuff that he knew before she was in

17  the study.

18          MR. MILSTEIN:   Well --

19          MR. KETHCART:   And I want to make sure that

20  we've got a very clear record as to what he's talking

21  about.

22          MR. MILSTEIN:   Okay.   It's uncertain whether

23  the events were before or after.

24          MR. KETHCART:   And that could be.

25          I just want to make sure that we're clear

1   about what time period he's talking about.

2   BY MR. MILSTEIN:

3       Q.   So if you look at the psychiatric disorders on

4   page 56, do you see where it says, "Mania"?

5       A.   Yes.

6       Q.   And it's at 150 milligrams capsule BID.

7            And BID means what --

8       A.   Twice a day.

9       Q.   -- twice a day?

10           And do you know whether this is

11  Mrs. Spedale?

12      A.   No.

13      Q.   And on page 57, again under psychiatric disorders,

14  mania, do you see where it's listed as one, which is 20

15  percent of those at 150 milligrams a day?

16      A.   Yes.

17      Q.   Let me show you what's Exhibit 4.

18           MR. MILSTEIN:  Oh, here's your stack.  You've

19  got everything here.

20           MR. LIEDERMAN:  Oh.

21  BY MR. MILSTEIN:

22      Q.   So will you just thumb through this?

23           If you look at page 3, you are listed as the

24  initial reporter.

25           Do you see that?

```
 1     A.   Yes, I see that.

 2     Q.   So the date of the event is December 29th, 2015.

 3               This particular report, I think, is May 19th.

 4               I think we're going to see later on you had

 5     filed an earlier report just a few days after the event.

 6               Does this refresh your recollection as to

 7     your reporting of the adverse event?

 8     A.   I'm not sure how to answer that.

 9     Q.   Well, go to the next page where it says, event

10     description.

11               MR. KETHCART:  Which page?

12               MR. MILSTEIN:  Well, it's Bates stamped

13     14956.

14     BY MR. MILSTEIN:

15     Q.   So did you write this?

16               Did you dictate this?

17     A.   No.

18     Q.   Who did?

19     A.   I don't know.

20     Q.   Are you sure you did not?

21     A.   I don't know.

22     Q.   Okay.  So she signed the informed consent form, I

23     believe it was December 9th, I believe.  December 1st.

24               And her first dose of the study drug was at a

25     dose of 150 milligrams twice a day.
```

1          Does that sound right to you?

2     A.   It sounds right to me.

3     Q.   What was the -- do you know what the doses started

4  out as?

5     A.   No.  We -- no.

6     Q.   What document would you need to produce -- you

7  know, your counsel produced some documents.

8               What documents would you need to produce so

9  that we can find out which group she was in, which -- you

10  know, which of the --

11     A.   Which cohort --

12     Q.   -- which cohort she was in?

13     A.   Which cohort she was in.

14               I believe if you look at the clinical trial,

15  the protocol, it lists at the beginning the cohorts that

16  they would have, and she would be the one which is 150

17  milligrams BID.

18     Q.   Okay.  So look at it, which is Exhibit 2.

19     A.   It says here that they would begin --

20     Q.   What page is that?

21     A.   On page 38, that they would begin at 6 milligrams

22  per day, I think.

23     Q.   So the three individuals in the first cohort got 6

24  milligrams a day once a day?

25     A.   It doesn't give that detail in there.  It says 6

Page 60

1   milligrams a day.

2       Q.   So it could be twice.

3            It could be three, twice a day?

4       A.   It could be.

5       Q.   And so Ms. Spedale, we know, gets -- I'm just

6   trying to do the math here.

7       A.   600.  No, 300.

8       Q.   She gets 300, which is how much more than 6?

9       A.   It's 50 times as much.

10      Q.   50 times as much.

11           And had you ever given a patient before her

12  50 times as much as you gave the first patient?

13           Was she the first one in the cohort to get

14  150 twice a day?

15      A.   I don't remember.

16      Q.   Now, it's a dose escalation study with the end

17  point being -- a Phase 1 study, by definition, is a study

18  to determine at what dose is the study drug too dangerous

19  to give to a human being, correct?

20      A.   Toxic.  What the maximum -- where you see side

21  effects, yeah.

22      Q.   Right.

23      A.   Dangerous side effects.

24      Q.   The point is to find the maximum safe dose,

25  correct?

Page 61

1     A.   Yeah.

2     Q.   Or the --

3     A.   Maximum tolerated dose is the --

4     Q.   Or, by definition, the minimum unsafe dose,

5  correct?

6     A.   Yes.

7     Q.   Did you conclude that 150 milligrams twice a day

8  was an unsafe dose?

9     A.   I don't recall.

10    Q.   Okay.  Back to your adverse event report or

11 somebody's adverse event report.

12              So she gets the first dose on December 10th,

13 and she's supposed to get that dose which was 300 times the

14 minimum dose for 14 consecutive days, correct?

15              MR. KETHCART:  Form.

16              THE WITNESS:  Yes.

17 BY MR. MILSTEIN:

18    Q.   And on the eighth day, she starts to get mild

19 symptoms of mania, correct?

20    A.   Yes.

21    Q.   And to your knowledge, she did not have mania

22 before starting this regimen of this high dose of this

23 drug, correct?

24    A.   Correct.

25    Q.   You do know that there was an instance in her

1   history, not where she was psychologically impaired as a

2   result of natural causes, but had a drug induced incidence

3   of psychiatric adverse event, correct?

4                   MR. KETHCART:  Foundation.

5                   MR. LIEDERMAN:  Objection.

6                   THE WITNESS:  Yeah.

7                   Can I answer the question?

8   BY MR. MILSTEIN:

9       Q.   Yeah.

10      A.   No.  I'm not sure.

11      Q.   I thought you said you knew she had a history

12   of --

13      A.   Yeah, but --

14      Q.   -- steroid --

15      A.   Induced, yeah, but I'm not sure that it met all

16   the other things that you said.

17      Q.   Well, it was steroid induced mania or steroid

18   induced --

19      A.   I believe steroid induced mania.

20      Q.   Okay.  Do you know whether that prior -- does that

21   suggest to you that, with respect to Ms. Spedale drugs, a

22   particular kind of drug can cause her to have an adverse

23   reaction of mania?

24                   MR. KETHCART:  Form and foundation.

25                   THE WITNESS:  Yes.

Page 63

1   BY MR. MILSTEIN:

2       Q.   Okay.  And do you know how long ago before 2015

3   that she had that incident?

4       A.   No.

5       Q.   Let me represent to you that it was 2009, 6 years

6   before.

7                Because it's curious that you said you could

8   not conclude that the adverse reaction that she had and

9   that's reported in these MedWatch forms was a result of the

10  150 milligrams she was getting twice a day for 8 days.

11               Is that what your testimony is?

12      A.   Yes.

13      Q.   You certainly would agree that time-wise the

14  proximity suggests it was caused by the drug, correct?

15      A.   Yes.

16      Q.   I mean, she didn't have mania before.

17               You're giving her high doses of a drug, and

18  she develops mania, correct?

19      A.   Yes.  Although at this point you have to see if

20  there was anything else that might have contributed, any

21  other medications.

22      Q.   Well, your role as a principal investigator is to

23  investigate the causes of adverse events, correct?

24      A.   Yes.

25      Q.   And one of the reasons you do that is because

Page 64

1    there are other studies going on and other human subjects

2    involved in those studies.

3              And it's important for other investigators

4    and other human subjects to know what kinds of adverse

5    events there are out there before they enroll, correct?

6    A.    Yes.

7    Q.    And if you were going to do a differential

8    diagnosis as to the cause of the mania, is there any doubt

9    that it's caused by the drug?

10   A.    Yes.

11   Q.    What's the doubt?

12   A.    It might be caused by other drugs she's

13   receiving.

14   Q.    Do you know whether she was taking any other

15   drugs?

16   A.    I don't know.

17   Q.    Did you conduct an investigation?

18   A.    I would have.

19   Q.    What?

20   A.    Yes.  I would have done that.

21   Q.    And what was your conclusion?

22   A.    I don't remember.

23   Q.    Did you know whether the steroid induced mania

24   that had occurred in 2009 did not include psychosis,

25   delusions or such serious psychiatric adverse events that

Page 65

1   required her being in a mental institution?

2       A.   No.

3               MR. KETHCART:   Form and foundation.

4   BY MR. MILSTEIN:

5       Q.   Now, the study drug was discontinued on January 4,

6   2016 due to the event of mania.

7               Did I read that right?

8       A.   I'm not sure you read that correctly.

9       Q.   About halfway down, "Treatment with study drug was

10  permanently discontinued on 4 January 2016 due to the event

11  of mania."

12      A.   I believe you're still not reading it correctly.

13              I believe she received the 14 consecutive

14  days, and then she didn't receive further treatment.

15      Q.   Okay.  Did she --

16      A.   So the treatment would have stopped from December

17  24th.

18      Q.   Okay.  So you're saying that even after December

19  18th she still received the treatment?

20      A.   From what I'm reading here, she received 14 days

21  from December 10th to the 24th, and then she didn't receive

22  any further treatment.

23      Q.   Now, it says that on December 29th the

24  investigator evaluated the patient and assessed her mania

25  as grade 1.

1          Did I read that right?

2     A.    Yes.

3     Q.    Would that be you?

4     A.    It could be me or it could be Dr. Fonseca.

5     Q.    Was Dr. Fonseca listed as a co-investigator?

6     A.    I don't recall.

7     Q.    But the mania had increased to grade 3 in

8  severity?

9     A.    That was -- that was subsequently.  That was on

10 January 4th.

11    Q.    Right.

12          And the patient was reported by the

13 investigator to have experienced steroid induced psychosis

14 in the past, but there was no evidence she was taking

15 steroids during the current episode of mania.

16          Did I read that right?

17    A.    Yes.

18    Q.    Was that you or Dr. Fonseca?

19    A.    I don't recall.

20    Q.    And then the event met the serious criterion of

21 other important medical event.  The investigator assessed

22 the SAE, which is serious adverse event, as grade 3 in

23 intensity and possibly related to the study drug.

24          Did I read that right?

25    A.    I'm not sure where you're reading at this point.

Page 67

1      Q.   Right in the middle.

2                MR. KETHCART:  Which paragraph?  It's a dense

3      page.

4                THE WITNESS:  Oh, I see.

5      BY MR. MILSTEIN:

6      Q.   It's almost exactly in the middle, "The event met

7      the serious criterion of other important medical event."

8      A.   Yes.  I see that.

9      Q.   You would certainly agree that the SAE is possibly

10     related to the study drug?

11     A.   Yes.

12     Q.   And it says, "The sponsor assessed the event as

13     possibly related to the study drug because of temporal

14     coincidence of the patient's treatment with CPI-0610 and

15     the onset of mania.  However, it is noted that the

16     patient's symptoms worsened while she remained off of

17     treatment with CPI-0610, arguing against a causal

18     relationship between the study drug and her mania."

19                Did I read that right?

20     A.   Yes.

21     Q.   But I think you testified earlier that the fact

22     that a study drug is discontinued, that in such

23     circumstances, it's not uncommon for the adverse event to

24     continue?

25                MR. KETHCART:  Form and foundation.

1           THE WITNESS:  I don't think I said that.

2    BY MR. MILSTEIN:

3        Q.   Well, are you saying that now?

4             Do you think it's uncommon that once the

5    study drug is withdrawn, that the serious adverse event

6    would terminate?

7             MR. KETHCART:  Form.

8             THE WITNESS:  I wouldn't say that.

9    BY MR. MILSTEIN:

10       Q.   What would you say?

11       A.   I would say that it is uncommon for an adverse

12   event to last a long time after a drug discontinuation.

13       Q.   Okay.  But you understand that she did improve,

14   right?

15       A.   Is that a question or --

16       Q.   Yes.

17       A.   -- is that --

18       Q.   She did improve ultimately.

19       A.   I'm pleased to hear that.

20       Q.   Okay.  And so when you say it's uncommon to last a

21   long time, what do you characterize as a long time?

22       A.   A week.

23       Q.   But even if it's uncommon, it's certainly possible

24   that a drug induced mania could last longer than a week,

25   correct?

Page 69

1       A.   I believe it's possible.

2       Q.   It says near the bottom, "Follow-up information,"

3    "The investigator updated the serious criteria for the

4    reported event of mood disorder with manic features to

5    include persistent significant disability/incapacity and

6    other important medical event."

7                 Did I read that right?

8       A.   Yes.

9       Q.   Then if you go to the next page, "The investigator

10   considered the mood disorder with manic features to be of

11   CTCAE."

12                What does that stand for?

13      A.   That's the grading system we use for clinical

14   trial toxicity.  So I think clinical trial consensus and

15   adverse events.

16      Q.   Okay.  "Grade 3 intensity, serious, an important

17   medical event, related to study drug CPI-0610 and not

18   related to any of the study procedures."

19                Did I read that right?

20      A.   Yes.

21      Q.   So in this amended adverse event report, the

22   investigator has concluded that the serious important

23   medical event is related to the study drug CPI-0610; is

24   that right?

25      A.   Yes.

1                    MR. KETHCART:   Form.

2    BY MR. MILSTEIN:

3        Q.   So let me show you what's been marked as exhibit

4    5.

5                    Did you see the IND before you started the

6    study?

7        A.   I don't recall.

8        Q.   Now, before human subject research is conducted,

9    it's appropriate to conduct preclinical studies on animals,

10   correct?

11       A.   Yes.

12       Q.   Although because a drug is safe for animals

13   doesn't necessarily mean it's safe for humans, correct?

14       A.   Yes.

15       Q.   And because a drug is toxic for animals doesn't

16   necessarily mean it toxic for humans?

17       A.   Yes.

18       Q.   But it is helpful to the sponsor and the principal

19   investigator to know what the universe of adverse events

20   might be based on preclinical work in the laboratory and on

21   animals, correct?

22       A.   Yes.

23       Q.   So let's just look at the INE for a moment.

24                   And I'm going to have you turn, if you can,

25   to page 33.

1        By the way, what -- did you do preclinical

2   work on this particular compound or on another BET?

3        A.   On another BET.

4        Q.   And did you do it with animals?

5        A.   Yes.

6        Q.   What animals did you use?

7        A.   Mice.

8        Q.   So with respect to work that was done on beagle

9   dogs, if you look at the paragraph on beagle dogs, it was

10  noticed that there was a slight tremor as well as slight

11  decrease in food consumption.

12            Were you aware of that?

13       A.   No.

14       Q.   And if you look at the next page, page 34 -- oh,

15  I'm sorry.

16            So if you turn to page 38, in the second full

17  paragraph, clinical observations of hypersensitivity to

18  touch, do you see that?

19       A.   What paragraph?

20       Q.   It's the second full paragraph, second line.

21       A.   Yes, I see that.

22       Q.   Would you characterize that as a psychological

23  reaction?

24            MR. KETHCART:  Form, foundation.

25            THE WITNESS:  No.  I would think of that as a

1    neuropathy typically.

2    BY MR. MILSTEIN:

3        Q.    Is it neurological?

4        A.    Neuropathy, peripheral neuropathy.

5        Q.    Now, if you look at what I was looking at, at page

6    36, the drug -- would you agree that this drug in the

7    animal studies affects a number of things with respect to

8    these animals?

9        A.    Yes.

10       Q.    So, for instance, red blood cell count,

11   hemoglobin, hematocrit, platelet count, increases in blood

12   cell count, ulceration, mixed cell inflammation in the

13   stomach, increases in glucose and lactate, decreases in

14   total protein and albumen, decreases in alkaline,

15   phosphates and increases and urea.

16               The drug seems to do things other than simply

17   work on these genes that you described earlier; is that

18   correct?

19       A.    Yes.

20       Q.    And it affects, at least in animals, the chemical

21   processes that naturally occur in the body?

22       A.    Maybe the expected effect of, say, targeting MYC

23   would be to affect many of those things that you mentioned,

24   but that's sort of expected.

25               I mean, it kind of suggests that it's doing

1   what we would expect.

2        Q.   Okay.  And would you expect it to have some

3   effects on the brain?

4        A.   No.

5        Q.   And why not?

6        A.   MYC is a gene which is involved in proliferation,

7   and there's not -- so cell division.

8                There's not a lot of that going on in the

9   brain.  It's going on in the gut.  It's going on in the

10  blood system.

11       Q.   I'm going to show you what's Exhibit 6.

12               So this is the final report of a rat study on

13  the drug; is that right?

14       A.   Yes.

15       Q.   Did you get this kind of information?

16       A.   There would be a summary of this kind of

17  information in the investigator brochure.

18       Q.   So it says, at 60 milligrams, on the second page,

19  at 60 milligrams a day due to severe adverse clinical

20  signs, the rat was euthanized.

21               The adverse clinical signs included early

22  moribundity of females, increased, or decreased fecal

23  output, reduced fecal size, hunched posture, dehydration,

24  prominent backbone, thin body condition, decreased

25  activity, decreased muscle tone, weakness, eyes partially

1    closed and cold to the touch,

2    stained/wet/erected/oily/ungroomed fur and

3    hypersensitivity.

4                Did I read that right?

5    A.   Yes.

6    Q.   Let me show you Exhibit 7.

7                This is the beagle dog study.

8    A.   Yes.

9    Q.   The clinical observations include decreased

10   activity, abnormal gait, reduced appetite, tremors,

11   weakness.

12               Is this the kind of information that you

13   would have wanted to see before starting your clinical

14   trials on humans?

15               MR. KETHCART:  Form and foundation.

16               THE WITNESS:  I would like to see a summary

17   of this.

18   BY MR. MILSTEIN:

19   Q.   And do you think a human subject would want to

20   know what some of these adverse effects were on these

21   animals before being subjected to 300 milligrams of this

22   drug?

23               MR. KETHCART:  Form and foundation.

24               THE WITNESS:  I think that they would want to

25   know the expected side effects and potentially severe side

1    effects.

2    BY MR. MILSTEIN:

3        Q.   Such as the side effects that the animals

4    experienced in their preclinical studies?

5        A.   I think that it's hard to interpret these for a

6    lay person, I would think.

7        Q.   But not for somebody like yourself, right?

8        A.   Even for someone like myself it's going to be

9    difficult, I think.

10                A veterinarian would be the best one to

11   interpret these.

12       Q.   So I'm going show you -- this is -- I know you've

13   already seen -- this is Exhibit 1, but it's also now going

14   to be Exhibit 8.

15                This is the clinical trial agreement.

16       A.   Yes.

17       Q.   And if you turn to page 9, paragraph 15.3, so in

18   this instance, Constellation agreed to indemnify, defend

19   and hold harmless the trial investigators, meaning you, and

20   any institution, meaning Mayo, at which the trial is

21   conducted, it's officers, agents and employees and the IRB

22   that approved the trial against any claim filed by a third

23   party for damages, costs, liabilities, expenses arising out

24   a trial subject injury, the design of the trial, or the

25   specifications of the trial protocol.

Page 76

1              Did I read that right?

2     A.   Yes.

3              MR. MILSTEIN:   I need some more stickers.

4              We're going to be slightly out of order here,

5     so --

6              (Exhibit No. 25 marked)

7     BY MR. MILSTEIN:

8     Q.   Let me show you what's been marked as 25.

9              So this is a memo from Constellation to all

10    clinical investigators, which would include you, right?

11    A.   Yes.

12    Q.   And it says, the purpose of the memorandum is to

13    document our selection of the starting dose of CPI-0610 at

14    24 milligrams PO QD.

15             What's PO QD?

16    A.   By mouth every day.

17    Q.   For 14 days.

18             Did I read that right?

19    A.   Yes.

20    Q.   By the way, have you read the declaration of

21    Helsinki?

22    A.   Yes.

23    Q.   And did you understand that the clinical trial as

24    designed by Constellation was supposed to comport with the

25    ethical requirements of the declaration of Helsinki?

Page 77

```
 1      A.   Yes.

 2                  (Exhibit No. 26 marked)

 3  BY MR. MILSTEIN:

 4      Q.   Let me show you 26.

 5                  And if you can turn to, on the bottom 013550,

 6  so this is an adverse event report.

 7      A.   Yes.

 8      Q.   7/23/2015 at Mass General.

 9                  I think this is the one that counsel was

10  asking you about.

11                  So this is -- if Ms. Spedale was enrolled in

12  December, December 1st, this is prior to her enrollment,

13  correct?

14      A.   I'm afraid I need to look at the date again.

15      Q.   So this is --

16      A.   Yes.

17      Q.   Right.

18      A.   Yes.

19      Q.   So it's an adverse event report where the

20  individual, if you look on the second page, has confusion,

21  anemia and worsening grade 4 thrombocytopenia.

22                  Do you see that?

23      A.   Yes.

24      Q.   Now, the principal investigator assessed the SAE's

25  anemia and confusion as not related to the study drug.
```

1          Do you see that?

2          But the opinion of the principal investigator

3   had not yet provided alternative causalities for the anemia

4   and confusion.

5          Did I read that right?

6   A.   I'm looking for that.

7          Oh, here it is, the second.

8   Q.   Did you get --

9   A.   Yes.

10  Q.   Before you started the clinical trial and before

11  you gave Ms. Spedale 300 milligrams twice a day --

12  A.   It was 150 twice a day.

13  Q.   -- 150 twice a day, did you get this, the other

14  adverse event reports?

15  A.   I don't recall.

16  Q.   Do you recall that -- you didn't write the

17  informed consent document, right?

18  A.   That's correct.

19  Q.   But do you recall in the informed consent document

20  it says that subjects will be informed of adverse events

21  that occurred with other subjects or at other sites?

22  A.   Yes.

23  Q.   That's standard, correct?

24  A.   Yes.

25  Q.   And human subjects are entitled to that

1    information, that is entitled to know what adverse events

2    occurred to other people who were in these studies,

3    correct?

4        A.   Yes.

5        Q.   And investigator should know that also so that

6    they can tell the potential human subjects these are some

7    of the adverse events we've seen before, correct?

8        A.   Yes.

9        Q.   So did you know -- had you been aware of this

10   adverse event before Ms. Spedale was recruited?

11       A.   I don't recall.

12                  (Exhibit No. 27 marked)

13   BY MR. MILSTEIN:

14       Q.   Let me show you 27.

15                  If you turn to 13596 --

16       A.   Yes.

17       Q.   So the date of this event was 11/8/2015,

18   correct?

19       A.   Yes.

20       Q.   And that's about a month before Ms. Spedale

21   started on her regimen and before she was recruited to be

22   in this trial, correct?

23       A.   Yes.

24       Q.   And this one was done, initially reported by

25   Kristie Blum at Ohio State University; is that right?

Page 80

1     A.   Yes.

2     Q.   So it says on the second, on the next page,

3   013597, "On November 8th, the patient woke in the middle of

4   the night and was confused.   According to his wife, he was

5   asking odd questions and was disoriented."

6              Did I read that right?

7     A.   Yes.

8     Q.   "November 11th, the patient experienced increased

9   shortness of breath and anxiety."

10             Did I read that right?

11             It's in the middle, and it says, "On November

12   11th."

13    A.   Yes.

14    Q.   And then if you skip a paragraph, it says,

15   "Treatment with the study drug was not resumed, as it was

16   discontinued due to the events of confusion, hyponatremia

17   and hypertension."

18             Did I read that right?

19    A.   Yes.

20    Q.   And what's hyponatremia?

21    A.   That's a low sodium level in the blood.

22    Q.   What is it?

23    A.   A low sodium level in the blood.

24    Q.   And can a low sodium level in the blood cause

25   confusion?

Page 81

1      A.    Yes.

2      Q.    Can it cause hypertension?

3      A.    No.

4      Q.    Can it cause difficulty thinking clearly?

5      A.    Yes.

6      Q.    Can it cause mania?

7      A.    No.

8      Q.    It says, "The events of confusion, hyponatremia

9  and hypertension met the serious criterion of

10  hospitalization."

11              Did I read that right?

12      A.    Yes.

13      Q.    So this patient was so confused -- well, how would

14  you characterize confusion as a symptom?

15              Would you characterize it as a psychiatric

16  symptom, a mental symptom?

17      A.    Not usually psychiatric.  I guess a mental

18  symptom.

19      Q.    "The investigator assessed the events grade 3 in

20  intensity and related to the study drug."

21              Did I read that right?

22      A.    Yes.

23      Q.    Had you been sent this adverse event report?

24      A.    I don't recall.

25      Q.    Did you know about it?

Page 82

1        A.    I don't recall.

2        Q.    Well, before you started -- so she started her

3    regimen December 8th of 2015.

4              Based on that information, do you have an

5    idea as to when you started the clinical trial?

6        A.    Would you -- I'm not sure what you mean.

7        Q.    We're trying to move backwards here.

8              So she was dosed beginning December 10th or

9    so.

10             Does that help you in recollecting when you

11   started the clinical trial?

12             MR. KETHCART:   Form.

13             THE WITNESS:   No.   But obviously before

14   then.

15   BY MR. MILSTEIN:

16       Q.    Somewhere in here is the clinical trial agreement.

17             So you signed this April 1st, 2014?

18       A.    Uh-huh.

19       Q.    And after you signed it, then they sent you the

20   protocol, right, or they sent you the protocol before?

21       A.    I'm not sure for certain, but I -- I'm not sure.

22       Q.    Okay.  But you certainly wouldn't have submitted

23   the protocol to the IRB before signing the principal

24   investigator agreement, correct?

25             MR. KETHCART:   Form and foundation.

1           THE WITNESS:  I'm not sure.

2           They want to see -- they want to make sure

3    that we've got funding, which I would think -- so I'm not

4    sure.  I wouldn't think so.

5    BY MR. MILSTEIN:

6       Q.   You wouldn't think so.

7           And do you know -- typically, how long does

8    it take you to submit something to the IRB and get it

9    approved?

10      A.   Long enough that I forget how long it takes.  It

11   takes a while, a month.

12      Q.   Okay.  And the first patients are getting fairly

13   low doses of this drug, correct?

14      A.   Correct.

15           Perhaps there may be some confusion.  There

16   are two clinical trials we're discussing here.

17           There's the Phase 1 of the lymphoma, which

18   started off at the 6 milligrams we were talking about, and

19   then the one that we did in myeloma, which started of at

20   the 24 milligrams.

21      Q.   Are you saying there's two clinical trials

22   involving the same drug?

23      A.   Yeah.  There are two clinical trials.  There's one

24   which with lymphoma -- for instance, I don't believe Ohio

25   State University was enrolling patients in the myeloma

1    clinical trial.  They were enrolling in this clinical

2    trial.

3         Q.   Okay.  So how did those trials differ, if at

4    all?

5         A.   The patient population.

6         Q.   As which kind of cancer they had?

7         A.   Right.

8         Q.   So the myeloma is what kind of cancer?

9         A.   Well, it's a blood cancer of cells that make

10   antibodies.

11             And lymphoma is also a blood cancer of

12   lymphocytes.  They're closely related.

13        Q.   Are they related to leukaemia?

14        A.   And they're related to leukaemia in a way.

15        Q.   So are you saying that you did a study of 61

16   patients on myeloma before you started the study that she

17   was involved in?

18        A.   I think that may be where the confusion is.

19             The -- I'm not sure what the 61 is, but there

20   was a clinical trial in lymphoma and then a separate

21   clinical trial in myeloma.

22        Q.   Okay.  You were the principal investigator for

23   both?

24        A.   No.

25        Q.   Who was the principal investigator for the other

1  trial?

2      A.   I don't know.

3      Q.   Was it here?

4      A.   I don't think so.

5      Q.   Oh, okay.

6           So there really wasn't confusion, on my part

7  at least.

8      A.   Okay.

9      Q.   But your understanding was there was a clinical

10  trial at another site on a different kind of cancer, but

11  your trials was on the lymphoma cancer?

12      A.   No.  There was a clinical trial at other sites on

13  lymphoma.

14           And then there was the clinical trial here,

15  as well as a few other sites on multiple myeloma.

16      Q.   Oh, multiple myeloma.  Okay.

17      A.   Yeah.

18      Q.   So you didn't do any of the study on lymphoma?

19      A.   That's right.  I didn't do any of the studies on

20  lymphoma.

21      Q.   Is your expertise on myeloma?

22      A.   Yes.

23      Q.   You certainly would have known if there was

24  another study on this drug?

25      A.   I would have.

Page 86

1      Q.    Right.

2            So the first experience that Mayo had with

3      this drug was your study on myeloma?

4      A.    I believe so.

5            Although it is possible that Rochester --

6      Mayo Clinic Rochester may have participated --

7      Q.    Okay.

8      A.    -- in the lymphoma study.  I don't really know.

9      Q.    And when you said 61 patients, you were just

10     getting that from my statements, correct?

11     A.    That's correct.

12     Q.    So based on our little discussion, do you have any

13     idea when you started your clinical trial?

14     A.    When I enrolled the first patient on the clinical

15     trial?

16     Q.    When you dosed the first patient in the clinical

17     trial.

18     A.    I believe it was in 2014, after we signed the

19     agreement.

20            I believe it was around November or December.

21     I think it was around that time.

22     Q.    And so you start off with the cohorts in the

23     lowest dose.

24            At that point, is that because that's the

25     only ones who are enrolled at that point?

Page 87

1              In other words, you don't have all of the

2    human subjects who are going to be in cohort to cohort when

3    you start the trial, correct?

4        A.   That's correct.

5        Q.   I'll show you Exhibit 9.

6              So this is an email.  It's communications

7    between the Spedales and Dr. Singh.

8              And here's the discussion of this other drug,

9    Ixazomib.

10             Was that a -- was that a clinical trial going

11   on?

12       A.   Ixazomib?

13       Q.   Yeah.

14       A.   I don't know.

15       Q.   Is that an improved drug now?

16       A.   Yes.

17       Q.   So she had a -- she certainly had an option of

18   either, if it was approved at the time, taking Ixazomib or

19   being in the clinical trial with Ixazomib, correct?

20             MR. KETHCART:  Form and foundation.

21             THE WITNESS:  J.R. says in his note here, she

22   can try the approved Ixazomib later.  Although I guess I

23   don't know whether it was approved actually at the time

24   he's writing this.

25             And the option for a clinical trial would

1    depend on whether or not there was one available for her

2    with Ixazomib at that time, which I don't know.

3              As I remember, I believe she had -- she could

4    not tolerate the related drug bortezomib, which might have

5    been the reason why that wasn't the first choice.

6    BY MR. MILSTEIN:

7        Q.   The trial that she was enrolled in, she could take

8    those drugs at home; is that right?

9        A.   Yes.

10       Q.   And that was an advantage, correct?

11       A.   Yes.

12       Q.   And was she supposed to not be taking any other

13   chemotherapy drugs at the time?

14       A.   Yes.

15       Q.   So the only therapy in her mind that she was

16   taking while she was in the clinical trial was the study

17   drug, right?

18              MR. KETHCART:   Form and foundation.

19              THE WITNESS:   Yes.

20   BY MR. MILSTEIN:

21       Q.   Even though this was a Phase 1 trial and no one

22   knew whether this drug in any way did anything with respect

23   to her cancer?

24              MR. KETHCART:   Foundation.

25              THE WITNESS:   I don't know.

1   BY MR. MILSTEIN:

2       Q.   What?

3       A.   I don't know if that's what was in her mind.

4            I mean, I guess I don't understand the

5   question.

6       Q.   It's a Phase 1 trial.  I'm not asking you what was

7   in her mind.

8            MR. KETHCART:  That was your question before,

9   which was my objection.

10  BY MR. MILSTEIN:

11      Q.   The question before, that in her mind, the only

12  therapy she was taking was this drug.

13           In the minds of Constellation and the

14  principal investigators who were implementing a protocol

15  that Constellation generated, no one could say whether this

16  drug provided any benefit to the cancer, right?

17           MR. KETHCART:  Form.

18           THE WITNESS:  Yes.

19  BY MR. MILSTEIN:

20      Q.   Correct?

21      A.   Yes.

22      Q.   How long after she had taken the 300 milligrams a

23  day did you stop the clinical trial?

24      A.   I don't know.

25      Q.   Did you terminate the clinical trial at its

Page 90

1   conclusion or did you terminate it prior to the conclusion

2   set forth in the protocol?

3       A.   I don't recall.

4       Q.   You don't recall whether you stopped it at some

5   point?

6       A.   I --

7       Q.   I mean, did you finish?

8       A.   I do know we stopped the trial.

9       Q.   But did you stop the trial or did you finish the

10  trial?

11              You understand the difference, right?

12      A.   Right.

13      Q.   If you finish a trial, you do everything that the

14  protocol says from beginning to end, and then that's the

15  end of it.

16              You have nothing else to do in a Phase 1

17  trial.

18      A.   Right.

19      Q.   If you stop a trial, you don't complete the work

20  in the protocol and you essentially terminate --

21      A.   Right.

22      Q.   -- the clinical trial.

23              You must know whether you did one or the

24  other.

25      A.   Well, there's what's called a dose expansion

1    cohort where you -- and I don't know whether we did that or

2    not.

3              So it's something that you -- I'm not sure

4    quite how it's phrased in this trial, whether you say, we

5    will definitely do this or we might do this.

6              And so I believe -- I don't believe we did

7    the dose expansion cohort, but I don't know whether that

8    was -- so I don't -- but I don't know whether it answers

9    the question.

10    Q.   Well, how long after her adverse event did you

11   terminate the trial?

12    A.   I don't recall.

13    Q.   Was it long?

14              I mean, it's only April of -- it's May of

15   2018.

16              You certainly didn't do any of it in 2018,

17   correct?

18    A.   That's correct.

19    Q.   You didn't do any of it in 2017, correct?

20    A.   I don't recall.

21    Q.   Were there -- you were the principal investigator.

22              Were there co-investigators?

23    A.   Yes.

24    Q.   Who were the co-investigators, Dr. Singh?

25    A.   No.   The co-investigators would be applied to the

1    physicians that run the study at the different sites.

2          Q.   No, I'm talking about at your site.

3          A.   At my site?

4                I would have to review the protocol.  I would

5    have to review to check.

6          Q.   Did you write anything about the trial that you

7    were the principal investigator on?

8          A.   No.

9          Q.   You didn't write an article?

10         A.   No.

11         Q.   Did you ever see any article that was written on

12   the trial?

13         A.   No.

14         Q.   Do you know whether the drug moved to Phase 2?

15         A.   No.

16         Q.   Do you know whether the drug did not move to Phase

17   2?

18         A.   No.

19         Q.   Are you curious?

20         A.   Yes.

21         Q.   But you haven't looked into this?

22         A.   I haven't checked to see the progress.

23         Q.   Did the trial reach an end point of finding out

24   what the minimum unsafe dose was?

25         A.   Minimum unsafe dose?

Page 93

1    Q.   I mean, the purpose of the --

2    A.   The purpose was to determine the maximally

3    tolerated dose.

4    Q.   The maximally tolerated dose, which I have sat

5    down with plaintiff's lawyer in this field characterize as

6    also finding -- in order to find the maximum safe dose,

7    you've got to find the minimal unsafe dose, correct?

8              That's how you know what the maximum safe

9    dose is --

10   A.   Sure.

11   Q.   -- right?

12   A.   Sure.  The -- so I don't know the answer to that.

13   Q.   Did anybody get more than 300 milligrams a day?

14   A.   I don't know.

15   Q.   But the protocol would tell you that, wouldn't

16   it?

17   A.   The document that we looked at -- there's a

18   document we looked at earlier that listed the patients I

19   believe that received more than that, but I -- we could

20   look at it again.

21   Q.   Go ahead and look at it again.

22   A.   Was it this one?

23              MR. MILSTEIN:  That's not the protocol.

24              MR. LIEDERMAN:  No, that's not the

25   protocol.

Page 94

1                    THE WITNESS:  It wouldn't be in the protocol.

2      It was in --

3                    MR. KETHCART:  The results that you had.

4                    THE WITNESS:  Yeah.

5                    MR. KETHCART:  Are you talking about the 61

6      patients and the percentage of adverse events?

7                    MR. MILSTEIN:  Oh, yeah.

8                    MR. LIEDERMAN:  Investigators.

9                    THE WITNESS:  Yeah, the investigator brochure

10     from 2016.

11     BY MR. MILSTEIN:

12         Q.   Well, doesn't the protocol take you to the highest

13     dose?

14         A.   Here in this -- so this is -- well, here's someone

15     who was receiving 400 milligrams a day.  There were seven

16     patients.

17                    Does that answer your question?

18         Q.   But you don't know whether you gave anybody more

19     than 300 milligrams a day?

20         A.   I don't know.

21                    (Exhibit No. 28 marked)

22     BY MR. MILSTEIN:

23         Q.   Let me show you Exhibit 28.

24                    Is that your signature in the middle?

25         A.   No.

1    Q.   Do you know whose it is?

2    A.   No.

3    Q.   Come on.

4         How many investigators did you have?

5         It's got to be an investigator on this trial.

6         Let me represent to you that Ms. Spedale is

7    patient number 08325.

8    A.   Yes.

9    Q.   Isn't it -- does this say Rafael?

10   A.   I don't know.

11   Q.   That is your name under investigator's name,

12   right?

13   A.   Yes.

14   Q.   And your phone number?

15   A.   Yes.

16   Q.   And your fax number?

17   A.   Yes.

18   Q.   Is that your handwriting?

19   A.   No.

20   Q.   So let me show you Exhibit 10.

21        So this is the informed consent document,

22   correct?

23   A.   Yes.

24        Is that the one for Ms. Spedale?

25        MR. KETHCART:   Is there a signature on the

Page 96

1    back?

2               THE WITNESS:   This is a blank one, I think.

3               MR. KETHCART:   That's what I'm wondering.

4               THE WITNESS:   Oh, no, it's signed.   Okay.

5               MR. KETHCART:   Yeah.

6    BY MR. MILSTEIN:

7        Q.   And Dr. Singh signed it on behalf of --

8        A.   Mr. Singh.

9        Q.   Oh, Mr. Singh.

10               What is Mr. Singh's -- he's not a doctor.

11       A.   That's correct.   He's a study coordinator.

12       Q.   Oh, he's a study coordinator.

13               So you had a CRO, correct?

14       A.   That would be INC.

15       Q.   And did you meet with them at all?

16       A.   There was probably a site initiation visit where I

17   met with them.

18       Q.   And who was the representative of the CRO who was

19   principally involved?

20       A.   I don't recall.

21       Q.   And they're out of North Carolina.

22               How did they get involved in this?

23               Did they get assigned by Mayo or assigned by

24   Constellation?

25       A.   Constellation.

1    Q.   So they're the ones who signed the CRO?

2    A.   Yes.

3    Q.   Was that the CRO for all of the groups, do you

4    know?

5    A.   I'm almost certain, yeah.

6    Q.   Was there also a data monitor organization?

7    A.   I don't know.

8    Q.   So under why is the research study being done, it

9    says, "The main purpose of the study is to determine the

10   highest dose that can be given without causing severe side

11   effects."

12              Did I read that right?

13              MR. KETHCART:   Can you read it again?

14              He didn't have it open to where you were at.

15   BY MR. MILSTEIN:

16   Q.   On page 3, "The main purpose of the study is to

17   determine the highest dose of CPI-0610 that can be given

18   would causing severe side effects," right?

19   A.   That's correct.

20   Q.   And that's language written by Constellation,

21   correct?

22   A.   Yes.

23   Q.   Do you think for a human subject it would be more

24   appropriate to say that the main purpose of the study is to

25   determine the dose at which the human subject will suffer

1    severe side effects?

2                    MR. KETHCART:  Form --

3                    MR. LIEDERMAN:  Objection.

4                    MR. KETHCART:  -- and foundation.

5    BY MR. MILSTEIN:

6        Q.   Go ahead.  You can answer.

7        A.   No.

8        Q.   Why not?

9                    It's --

10       A.   Not all side effects cause suffering.

11                   If your blood counts go low, you don't

12   actually feel anything.

13       Q.   Okay.  Well, maybe I used the word suffering

14   instead of causing.

15                   Do you think it would be more helpful to the

16   human subject if it said the main purpose of this study is

17   to determine the dose at which, or the lowest dose or the

18   minimum dose at which the human subject, at which CPI-0610

19   can be given to a human subject -- well, strike that.

20   Strike that.

21                   In your mind, is it clear that the subjects

22   in the trial understand that the purpose of the study is to

23   find out at what point they may suffer severe side effects?

24                   MR. LIEDERMAN:  Objection.

25                   THE WITNESS:  I wouldn't say that either.

1          The -- first of all, I think I already

2    mentioned it, but they're not suffering for many of the

3    side effects.

4          The -- and the purpose, to my mind, is to

5    find out the toxicity in the doses which are safe.  I think

6    that's what they should understand.

7    BY MR. MILSTEIN:

8       Q.   Okay.  And the toxicity meaning the doses that are

9    unsafe?

10      A.   Yes.

11      Q.   And then under the purpose of the study when they

12   list five purposes, they say, will CPI-0610 help reduce the

13   amount of multiple myeloma in patients bodies.

14          Did I read that right?

15      A.   Yes.

16      Q.   This is a Phase 1 study, is it not?

17      A.   Yes.

18      Q.   Isn't it inappropriate -- and that's language

19   written by Constellation, is it not?

20      A.   Yes.

21      Q.   Isn't it inappropriate in a Phase 1 study to say

22   to the human subject that one of the purposes is to find

23   out whether the drug will reduce the amount of their

24   cancer?

25          MR. LIEDERMAN:  Objection.

1                     THE WITNESS:  No.

2    BY MR. MILSTEIN:

3        Q.   On page 13, can you go there?

4        A.   Yeah.

5        Q.   Risk of CPI-0610.

6                     This is all written by Constellation; is that

7    right?

8        A.   Yes.

9        Q.   Is there anything in here about whether the drug

10   can cause mania of the type experienced by Ms. Spedale?

11       A.   I don't think so.  Let me look.

12       Q.   Is there anything in here about whether the drug

13   has caused confusion in other patients?

14                    MR. KETHCART:  I think he's still looking at

15   the thing to answer your last question.

16                    THE WITNESS:  I think the only thing relevant

17   would be when it says that there are side effects that we

18   do not know about yet.

19                    MR. LIEDERMAN:  That's referring to page 14?

20                    THE WITNESS:  Yeah.

21   BY MR. MILSTEIN:

22       Q.   Look at 14 for a second.

23                    Where it says studies in animals suggest

24   CPI-0610 may have a number of different side effects, it

25   doesn't list what those side effects are, does it?

1   A.   That's correct.

2   Q.   Then it says, "Your study doctor will let you know

3   if he or she learns anything new about the safety of the

4   drug or any new findings."

5            Did I read that right?

6   A.   Yes.

7   Q.   But you don't know whether you even received those

8   adverse event reports and other studies prior to Ms.

9   Spedale signing this form, do you?

10   A.   I don't recall.

11   Q.   It does say on the second paragraph, "High levels

12   of blood glucose can cause dehydration, with excessive

13   thirst and urination, and if extremely high can cause

14   patients to become confused."

15            Do you see that?

16   A.   No.

17            Where is that?

18   Q.   Second paragraph.

19   A.   Page -- which page?

20   Q.   14 of 21.

21   A.   Yes.

22   Q.   But it doesn't say there that there have been

23   instances of patients who are so confused that they had to

24   be hospitalized, does it?

25   A.   It doesn't say that.

Page 102

1      Q.   And you didn't know whether that was, in fact, the

2    case, right?

3      A.   I don't recall.

4      Q.   How can we determine whether you actually added

5    anything or anyone from the IRB added anything to this

6    informed consent document or whether it was entirely

7    written by Constellation?

8      A.   I don't know.  Perhaps the IRB has got records of

9    modifications.

10     Q.   Okay.  Did you meet with the IRB?

11     A.   No.

12          Oh, I -- when the clinical trial is being

13   reviewed by the IRB, I join a teleconference.

14          So I don't actually go there in person, but I

15   participate in the teleconference.

16     Q.   Is the IRB here in Phoenix?

17     A.   It's a central IRB.  And so there are members of

18   it here, but most people are in Rochester.  There are also

19   some people in Florida.

20          MR. KETHCART:  Is this a good time for a

21   break?

22          We've been going for quite a while.

23          MR. MILSTEIN:  We only have 20 minutes.

24          Do you have to be somewhere at 2:00 o'clock?

25          THE WITNESS:  I would like to get going.

Page 103

1              MR. KETHCART:  He does have patient

2     commitments later.

3              THE WITNESS:  Yeah.

4              MR. KETHCART:  And then we do have Dr.

5     Fonseca getting ready to show up.

6              THE WITNESS:  Yeah.

7              MR. KETHCART:  Are we going to get done in 20

8     minutes or --

9              MR. MILSTEIN:  I'm trying to.

10             MR. KETHCART:  Okay.  Are you good?

11             THE WITNESS:  Yeah.

12             MR. KETHCART:  Okay.

13             Are we done with the informed consent form?

14             MR. MILSTEIN:  Yeah.

15    BY MR. MILSTEIN:

16       Q.   Let me show you Exhibit 12.

17             Who is Michael O'Meara?

18             Is he at Constellation or is he here?

19       A.   He's at Constellation.

20       Q.   So you dealt with -- did you deal with both Cooper

21    and O'Meara?

22       A.   I don't remember O'Meara.

23       Q.   And who is J.R.?

24       A.   That's Mr. Singh.

25       Q.   Let me show you Exhibit 13.

Page 104

1                    Do you know what a DLT is?

2        A.    Dose limiting toxicity.

3        Q.    Meaning that would be the end point, correct?

4        A.    There can be -- we grade the dose -- well, it

5    would be important in determining whether or not to go to

6    the next dose level, the number of dose limiting toxicities

7    that occur.

8        Q.    And was there any conclusion with respect to

9    whether 300 milligrams was a dose limiting toxicity?

10       A.    I don't recall.

11       Q.    So if you look at the second page, 02674, so

12   there's an email from Rafael Fonseca to a number of people,

13   including you?

14       A.    Yeah.

15       Q.    "Actually her symptoms started to while she was at

16   the" -- I think it's supposed to say protocol.

17       A.    Yeah.

18       Q.    "They exacerbated recently but she already had

19   some of this behavior while she was on therapy.  Regarding

20   attribution I think it's going to be possible."

21                    Did I read that right?

22       A.    Yes.

23       Q.    And that's in response to Cooper surmising that

24   her symptoms began when she was not taking 0610.

25                    In fact, that's -- that was incorrect.

1          She -- her symptoms started while she was on

2     the drug, correct?

3          A.   What's the question?

4          Q.   If you look at this email chain, Cooper is trying

5     to say that her symptoms started prior or when she was not

6     taking CPI-0610.

7               Fonseca says, actually they did.

8               And then Cooper at the top says, all right,

9     it sounds like the temporal connection may be a bit

10    stronger than I thought.

11              Do you see that?

12         A.   I see that.

13         Q.   Do you recall all that discussion going on?

14         A.   Yes, vaguely.

15         Q.   And did you voice an opinion one way or the

16    other?

17         A.   I don't remember.

18         Q.   Let me show you 14.

19              So Cooper says, "If the patient's mania is

20    judged to be grade 3 in severity" -- and it was considered

21    grade 3 in severity, correct?

22         A.   Yes.

23         Q.   "And related to CPI-0610, then I agree, it has to

24    be viewed as a DLT."

25              Did I read that right?

1    A.   Yes.

2    Q.   Do you recall the discussion as to whether or not

3 this essentially was the end point, a dose limiting

4 toxicity?

5               MR. KETHCART:  Foundation.

6               THE WITNESS:  This was, I believe, a dose

7 limiting -- this event was graded as a dose limiting

8 toxicity, I believe.

9 BY MR. MILSTEIN:

10    Q.   This event -- say that again?

11    A.   This event was graded as a DLT.

12    Q.   Oh, so it was concluded to be a DLT?

13    A.   I guess I don't recall.  I don't recall.

14    Q.   Well, you just said it was.

15    A.   I know.

16    Q.   So -- and let's just make sure we have our terms

17 right.

18               So the purpose of a Phase 1 clinical trial is

19 to find as an end point --

20    A.   Uh-huh, the maximally tolerated dose.

21    Q.   The maximum tolerated dose or the minimum

22 untolerated dose, correct?

23               The only way you find -- I mean, I know you

24 disagree, but the only way you can find the maximum

25 tolerated dose is to find the minimum untolerated dose,

1    correct?

2      A.   I suspect there are other ways of doing it.

3           You could find -- there may be actually a

4    dose lower than the maximally tolerated dose, which is the

5    minimally unsafe dose.

6           I think you would design your studies

7    differently.  You would start with the highest dose and

8    cause a lot of toxicity and then go down.  And that's not

9    the way we design our studies.

10     Q.   Okay.  This study was designed as a dose

11   escalation study to find the DLT, the point when the dose

12   was too high because it was too toxic, correct?

13     A.   I think perhaps you're getting confused.

14          An individual -- in a cohort of three

15   patients, one patient might suffer a DLT.  That doesn't

16   mean that dose is the dose limiting toxicity.

17          If one patient suffers a DLT within a cohort

18   and you expand the cohort to three additional patients, and

19   then if another patient also experienced a dose limiting

20   toxicity, depending on how the trial is designed, you might

21   conclude, then, that that is the maximally tolerated dose.

22          And so a single patient doesn't give you the

23   maximally tolerated dose for a study.  It gives you the

24   dose limiting toxicity in that patient.

25     Q.   Okay.  But you would also agree that Phase 1 trial

 1    studies like this are extremely small samples.

 2                And so even if you added three, if one of six

 3    experiences a severe adverse event related to the drug,

 4    that's significant, is it not?

 5        A.    That is significant, but it may not be enough to

 6    determine the maximally tolerated dose.

 7        Q.    Let me show you 15.

 8                Mr. Copper is telling Mr. Singh that it's

 9    nice to hear her symptoms are now relatively modest.

10                Do you know where you got this information?

11        A.    No.

12        Q.    This is January 20th, 2016.

13                And Cooper is saying, "It's very hard for me

14    to believe CPI-0610 triggered this event."

15                Do you see that?

16        A.    Yes.

17        Q.    Let me show you 17.

18                So this is your original SAE report; is that

19    right?

20        A.    Yes.

21        Q.    So this reporter is Leif Bergsagel, right?

22        A.    Yes.

23        Q.    Your first name -- you dropped the first name?

24        A.    Peter.

25        Q.    Peter.

1           But you like the Norwegian Leif better?

2     A.   Yeah.

3     Q.   And the date of the event is 12/29/2015.  The date

4   of the report is 1/25/2016.

5                Is that right?

6                Why did it take a month almost.

7     A.   I don't know.

8     Q.   And then describe the event.

9                And the description is mania; is that right?

10    A.   Yes.

11    Q.   Did you write this?

12                Look at the second page.

13    A.   I don't think so.

14    Q.   Would the only two candidates, if you didn't write

15   it, be Singh and Fonseca?

16    A.   I think it's most likely Mr. Singh.

17    Q.   Did he -- I mean, do you require him to show it to

18   you before they submit it?

19    A.   We certainly would have discussed it.

20    Q.   That last paragraph says, "The sponsor assessed

21   the event as possibly related to the study drug because of

22   the temporal coincidence of the patient's treatment with

23   CPI-0610 and the onset of her mania."

24                Is that right?

25    A.   You know, I might have made in my previous -- it's

```
 1    possible that INC also could have summarized this, the

 2    CRO.

 3         Q.   Really?

 4         A.   Well, honestly, I don't know who summarized it.

 5    It was just another possibility for you.

 6         Q.   It says, "However, it's noted that the patient's

 7    symptoms worsened while she remained off of treatment with

 8    CPI-0610, arguing against a causal relationship between the

 9    study drug and her mania.  It's also notable that the

10    patient has a past history of dexamethasone induced mania."

11              Did I read that right?

12         A.   Yes.

13         Q.   I mean, is the fact that she has a past history of

14    dexamethasone induced mania, I mean, doesn't that suggest

15    that drugs can induce mania in her, and doesn't it actually

16    suggest that it was the study drug, because if she's had

17    other drug induced mania, now she's got it from this drug,

18    in addition to having it from the other drug?

19              MR. KETHCART:  Foundation.

20              THE WITNESS:  I would say that it suggests

21    that she's susceptible to mania.

22    BY MR. MILSTEIN:

23         Q.   But doesn't it suggest she's susceptible to drug

24    induced mania, not mania that occurs on its own?

25              MR. KETHCART:  Foundation.
```

```
 1                THE WITNESS:  It would suggest drug induced

 2      mania as well.

 3      BY MR. MILSTEIN:

 4          Q.   I mean, no one has ever said that she's

 5      susceptible to mania if it's not drug induced, right?

 6          A.   No one has.

 7          Q.   And, I mean, you were there.  You were right there

 8      at the time.

 9                She's on this very high dose of this drug.

10      She doesn't have mania before she gets the drug.  She's

11      taking this drug, and in the eighth day of taking the drug,

12      she starts to have this manic reaction.

13                Do you really think that it's possible that

14      it's not caused by the drug or even likely it's not caused

15      by the drug or do you think of course it's caused by the

16      drug; that's what the time suggests?

17                MR. LIEDERMAN:  Objection.

18                MR. KETHCART:  Form, foundation.

19                THE WITNESS:  I think it's possible that it's

20      not caused by the drug.

21      BY MR. MILSTEIN:

22          Q.   And it's just coincidence it happens while she's

23      in this clinical trial on the eighth day of taking these

24      high doses of this drug?

25          A.   It may not be a coincidence.  It may be the
```

1   situation that she's under, the things in her life, the

2   things that lead her to be participating in a clinical

3   trial in the first place or the other medicines she's

4   taking contemporaneously.

5            There's many things going on in her life

6   which occurring because she's participating in a clinical

7   trial, but not necessarily because of the drug.

8       Q.   All right.  Let me show you 20.

9            Do you know who Ann Ferrell is?

10      A.   No.

11      Q.   Let me show you 21.

12           So this is the INC analysis of events related

13  to Ms. Spedale; is that right?

14      A.   What was the statement or the question?

15      Q.   This is the INC analysis of the event?

16      A.   It says it's analysis of similar events for safety

17  reports.

18      Q.   And do you know what that means?

19      A.   I think they're -- I'm guessing that they're

20  looking for other events that are similar to the one that

21  Ms. Spedale suffered.

22      Q.   But the description is of Ms. Spedale, is that

23  right, a 73-year-old white female?

24      A.   Yes.

25      Q.   And then under assessment of relationship, it

Page 113

1    says, "The event met the serious criterion of other

2    important medical event.  The investigator assessed the SAE

3    as grade 3 in intensity and possibly related to the study

4    drug."

5                    Did I read that right?

6    A.   Yes.

7    Q.   At the end, it says, "After review of the clinical

8    details and investigator's comments pertaining to this

9    adverse event, and based on experience to date,

10   Constellation does not believe that changes to the conduct

11   of this clinical trial are warranted until additional

12   details are available."

13                   Did I read that right?

14   A.   Yes.

15   Q.   Did you concur that assessment?

16                   MR. KETHCART:  Foundation.

17                   THE WITNESS:  I don't remember.

18                   MR. KETHCART:  This was under -- I think this

19   was underneath that document --

20                   THE WITNESS:  This was underneath that one.

21                   MR. MILSTEIN:  Okay.

22                   MR. KETHCART:  -- when you gave it to him.

23                   MR. MILSTEIN:  All right.  It's 2:00 o'clock

24   exactly.

25                   MR. KETHCART:  Good job.

1            MR. LIEDERMAN:  Let me just ask two questions

2    very quickly.

3                      EXAMINATION

4    BY MR. LIEDERMAN:

5        Q.   You had said earlier in questioning from

6    plaintiff's counsel that you wouldn't think it's

7    inappropriate to discuss efficacy with a patient in a Phase

8    1 study with an enrollee?

9        A.   That's correct.

10       Q.   Why wouldn't you think it was inappropriate?

11       A.   I've enrolled patients on Phase 1 clinical trials

12   where efficacy has been seen.

13            And the -- although the primary goal is to

14   determine safety, it's not -- we're telling the patients

15   that we have reason for why we think this drug might work.

16       Q.   You're not just starting trials on drugs in which

17   there's not some prospect of potential --

18       A.   That's correct.

19       Q.   -- efficacy?

20       A.   Yes.

21       Q.   And the risks that are associated -- strike that.

22            As an investigator, as someone who enrolls

23   patients in trials, what import is there, if any, to the

24   incidents or lack of multiple incidents of adverse events

25   when you're looking at a drug and its effect on potential

1    users?

2        A.   I don't understand.

3        Q.   Is there some -- is there significance to whether

4    or not an adverse event repeats itself across the

5    population that is on trial?

6        A.   Yes.  It's much more significant if it's a

7    recurrent event.

8                  MR. LIEDERMAN:  Okay.  I have nothing

9    further.

10                          EXAMINATION

11   BY MR. MILSTEIN:

12       Q.   Well, but you would agree that Phase 1 trials by

13   almost definition are small sample sizes, which is why

14   sometimes drugs in Phase 2 trials that are little larger

15   end up disclosing adverse events and even in Phase 3 trials

16   and sometimes even Phase 4 trials after FDA approval when

17   sample sizes are much larger that adverse events can show

18   up suggesting the drug is too dangerous to be used by

19   humans, right?

20       A.   Yes.

21                  MR. LIEDERMAN:  Okay.

22                  THE WITNESS:  Thank you.

23                  MR. MILSTEIN:  All right.

24                  THE VIDEOGRAPHER:  Please stand by.

25                  MR. MILSTEIN:  We got you out 2:00 o'clock.

Page 116

1                    THE WITNESS:   Thank you very much.

2                    MR. KETHCART:   We'll read and sign.

3                    THE VIDEOGRAPHER:   This is end of Media

4     Number 2 in today's deposition.

5                    We're off the record at 2:02.

6                    (Deposition concluded at 2:02 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF ARIZONA      )

2   COUNTY OF MARICOPA    )

3        BE IT KNOWN that the foregoing deposition was

4   taken by me pursuant to stipulation of counsel; that I was

5   then and there a Certified Reporter of the State of

6   Arizona, and by virtue thereof authorized to administer an

7   oath; that the witness before testifying was duly sworn by

8   me to testify to the whole truth; that the questions

9   propounded by counsel and the answers of the witness

10  thereto were taken down by me in shorthand and thereafter

11  transcribed into typewriting under my direction; that the

12  witness has requested a review pursuant to Rule 30(e)(2);

13  that the foregoing pages are a full, true, and accurate

14  transcript of all proceedings, all done to the best of my

15  skill and ability.

16       I FURTHER CERTIFY that I am in no way related to

17  nor employed by any parties hereto nor am I in any way

18  interested in the outcome hereof.

19       DATED at Phoenix, Arizona, this 25th day of May,

20  2018.

21

22

23

24                           _____

                             Talia Douglas, RPR
25                           Certified Reporter #50775

Page 118

1                    DEPOSITION SIGNATURE PAGE

2      SPEDALE vs. CONSTELLATION PHARMACEUTICALS, INC.
       Assignment No. J2164352
3

4               DECLARATION UNDER PENALTY OF PERJURY

5             I declare under penalty of perjury that I have

6      read the entire transcript of my Deposition taken in the

7      captioned matter or the same has been read to me, and the

8      same is true and accurate, save and except for changes

9      and/or corrections, if any, as indicated by me on the

10     DEPOSITION ERRATA SHEET hereof, with the understanding that

11     I offer these changes as if still under oath.

12

13             Signed on the _____ day of

14     _____, 20_____.
15

16

17

18

19          _____
                    Leif Bergsagel, M.D.

20

21

22

23

24

25

Page 119

```
 1                    DEPOSITION ERRATA SHEET
                      Assignment No. J2164352
 2

 3    Page No._____Line No._____Change to:_____

 4    _____

 5    Reason for change:_____

 6    Page No._____Line No._____Change to:_____

 7    _____

 8    Reason for change:_____

 9    Page No._____Line No._____Change to:_____

10    _____

11    Reason for change:_____

12    Page No._____Line No._____Change to:_____

13    _____

14    Reason for change:_____

15    Page No._____Line No._____Change to:_____

16    _____

17    Reason for change:_____

18    Page No._____Line No._____Change to:_____

19    _____

20    Reason for change:_____

21    Page No._____Line No._____Change to:_____

22    _____

23    Reason for change:_____

24
      SIGNATURE:_____DATE:_____
25              Leif Bergsagel, M.D.
```

Page 120

1    DEPOSITION ERRATTA SHEET
         Assignment No. J2164352
2

3    Page No._____ Line No._____ Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____ Line No._____ Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____ Line No._____ Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____ Line No._____ Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____ Line No._____ Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____ Line No._____ Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____ Line No._____ Change to:_____

22   _____

23   Reason for change:_____

24
     SIGNATURE:_____DATE:_____
25          Leif Bergsagel, M.D.