IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


Iris Spedale and Daniel Spedale,
husband and wife,

        Plaintiff,

                              No. 2:17-cv-00109-JJT

    vs.

Constellation Pharmaceuticals,
Inc.,

        Defendant.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


DEPOSITION OF

DANIEL SPEDALE


July 24, 2018

10:50 a.m.


One North Central Avenue
Suite 900
Phoenix, Arizona


Talia Douglas, RPR, CR No. 50775

```
                                                    Page 2
 1                   APPEARANCES OF COUNSEL

 2
     For the Plaintiff:
 3
         SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.
 4       ALAN C. MILSTEIN, ESQ.
         308 Harper Drive, Suite 200
 5       Moorestown, NJ 08057
         856.661.2078
 6       amilstein@shermansilverstein.com

 7
     For Defendant Constellation Pharmaceuticals, Inc.:
 8
         MORRISON MAHONEY, LLP
 9       ARTHUR LIEDERMAN, ESQ.
         120 Broadway, Suite 1010
10       New York, NY 10271
         212.825.1212
11       aliederman@morrisonmahoney.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                       INDEX OF EXAMINATION

2

3    WITNESS:  DANIEL SPEDALE

4    EXAMINATION                                              PAGE

5    By Mr. Liederman                                            5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     INDEX OF EXHIBITS

 2

 3     Exhibit            Description              Page

 4     (None)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              DEPOSITION OF DANIEL SPEDALE

2                    JULY 24, 2018

3

4                    DANIEL SPEDALE,

5    having been first duly sworn, testifies as follows:

6                      EXAMINATION

7    BY MR. LIEDERMAN:

8        Q.   Good morning.

9              For the record, my name is Arthur Liederman.

10   I represent Constellation Pharmaceuticals, the defendant in

11   this action.

12             Have you ever been deposed before?

13       A.   No.

14       Q.   Okay.  You can always consult with Counsel, and if

15   you want to take a break at any time, just indicate it.

16             If you don't understand a question, just

17   indicate that you don't understand or you want it repeated

18   or -- and it goes without saying that we're dealing with

19   things that are a few years back, so the best of your

20   recollection.

21       A.   Okay.

22       Q.   Just a little bit of background on yourself.

23             What type of occupation have you had in --

24       A.   I was in marketing and sales.

25       Q.   For a series of corporations?

1      A.   No.   Primarily for one corporation, Eastman

2  Kodak.

3      Q.   Okay.  And the highest level of education that

4  you've obtained?

5      A.   A BS degree.  And graduate work, but no

6  master's.

7      Q.   Okay.  What college was that?

8      A.   University of Rochester.

9      Q.   Kodak?

10     A.   (Inaudible response)

11     Q.   And are you presently married?

12     A.   Yes.

13     Q.   And you're married to Iris Spedale, co-plaintiff

14  in this case?

15     A.   Yes, I'm married to Iris.

16     Q.   How many years have you been married?

17     A.   This November will be 50 years.

18     Q.   So before your wife was diagnosed with multiple

19  myeloma, could you describe her personality?

20     A.   Oh, she was a very happy, vivacious woman, fun to

21  be around, traveled.  We had lots of friends.

22          It was -- it was a pleasure to be with her

23  because she was actually in my field of work, somebody who

24  fully appreciated what I was doing.  And she encouraged me.

25  She always supported whatever I do.

1           And as she may or may not have shared with

2   you previously, she gave up a lot of her career to travel

3   with me as my career moved around.

4           So as a -- you know, was an attorney.  She

5   told you.  But as I moved from place to place, she had to

6   take bar exams at place to place.

7       Q.   Do you have children?

8       A.   We do.

9       Q.   How many children?

10      A.   We have two children, a son, Darren, my daughter,

11  Rebecca.

12      Q.   Rebecca lives where?

13      A.   In Chicago, Deerfield.

14      Q.   Up until the time that your wife had multiple

15  myeloma, did she ever have a need for any consult with a

16  neurologist or psychologist or psychiatrist?

17      A.   No need.

18      Q.   Okay.  Any evidence that you were aware of, of any

19  type of personality issue?

20      A.   No.

21      Q.   So before the multiple myeloma, any significant

22  physical injuries or conditions that your wife may have

23  had?

24           Do you recall?

25      A.   She was really healthy as a horse.

1    Q.   So do you recall the first time you knew that she

2    had a problem that eventually led to the diagnosis of

3    multiple myeloma?

4    A.   She started complaining of difficulty in

5    swallowing.  Her tongue was getting -- I forget what she

6    said.  She had sores on her tongue.

7              And we consulted a dentist and a variety of

8    doctors -- ear, nose and throat and so on -- in the Phoenix

9    area.  And they prescribed a bunch of things, but she

10   wasn't getting any better.

11             That was the first I was aware that she was

12   having a problem.

13   Q.   Okay.  So at this time you were living out in

14   Phoenix?

15   A.   In Surprise.

16   Q.   In Surprise.

17             MR. MILSTEIN:  You know, she said that.  I

18   didn't know -- I didn't know if you were saying surprise.

19   I didn't realize you were talking about a town named

20   Surprise.

21             MR. LIEDERMAN:  I heard Surprise, and I said,

22   okay, she didn't mean it was going to be a surprise to

23   eventually find out.  I figured that --

24             MR. MILSTEIN:  Surprise --

25             MR. LIEDERMAN:  -- they have stupid names out

1  here.

2              MR. MILSTEIN:  Is it also where they have

3  truth or consequences?

4              MR. LIEDERMAN:  Yes.

5              THE WITNESS:  Yeah.

6              MR. MILSTEIN:  All right.  So you lived In

7  Surprise.  All right.

8              THE WITNESS:  Surprise, Arizona, yes.

9  BY MR. LIEDERMAN:

10     Q.   Were you already both retired and living out here

11  or were you still working?

12     A.   No.  I was retired.

13     Q.   And was Iris doing any work?

14     A.   At the time that this problem started, she was

15  retired.

16     Q.   Did you have a primary -- well, strike that.

17              Did she have a primary care physician at that

18  time in Phoenix, an internist for regular --

19     A.   We both used the same doctor during those days,

20  Dr. Siclovan.

21     Q.   How would you spell that name?

22     A.   Constantin Siclovan, S-i-c-l-o-v-a-n.

23              First name Constantin.  He's from

24  Transylvania, a very nice doctor.

25     Q.   Is he still practicing?

```
 1      A.    He is.

 2      Q.    And what year do you recall this would have been

 3   with the diagnosis of multiple myeloma, that time frame?

 4      A.    He did not diagnose --

 5      Q.    No --

 6      A.    -- her.

 7      Q.    -- no.  I know he didn't.

 8            But do you know what time frame that was at

 9   the time of the multiple myeloma?

10      A.    Boy, I can't be sure.

11            You know, I want to say about 9 or 10 years

12   ago --

13      Q.    Okay.

14      A.    -- in that time frame.

15      Q.    That's fine.

16            Did your wife consult with him about the

17   condition that she had that she was dealing with?

18      A.    She told him that, you know, she had sores in her

19   mouth and she was seeing the other doctors.

20      Q.    Did he refer her to other doctors?

21      A.    No.  At that point, he -- I forget how -- I really

22   don't recall.  That's -- I don't recall that.

23            But I know that she said that she had talked

24   to him about it.

25      Q.    Okay.  So did there come a time that she went to
```

1    the Mayo Clinic?

2        A.    Yes.

3        Q.    And was that while she was still searching for

4    some answers to the problem or was it already after a

5    diagnosis, if you know?

6        A.    No.  It was after she was diagnosed.

7        Q.    Okay.  When she had many of these visits to try to

8    determine a diagnosis, did you accompany her or would she

9    go alone?

10       A.    On most of them.

11       Q.    She had mentioned in her deposition that she had

12   traveled to New York.

13              Do you recall the circumstances for any trip

14   to New York regarding her multiple myeloma?

15       A.    She didn't know she had multiple myeloma when she

16   went to New York.  She -- I'm trying to remember how it

17   happened.

18              I think she was looking on the Google or

19   something about problems with the tongue and so forth.  And

20   I think she got a response to an email that she might have

21   sent out, do you know anything about tongue issues.

22              And there was a dentist, I think, or a dental

23   doctor -- I'm not sure what he was, but there was somebody

24   at the dental school who was teaching.

25       Q.    What dental school?

```
 1      A.   In New York.

 2      Q.   NYU Dental School?

 3      A.   I think so, yeah.

 4                And again, the reason that she went to New

 5      York, she was going to be with her sister who was having

 6      some minor kind of procedure.  And she was there, and this

 7      other person was within a few blocks.  So she made the

 8      appointment to see that person.

 9                And it was actually this doctor, this

10      dentist, who first said, I think I know what you have.  And

11      nobody else had come up with this.  And he says, I think

12      you have amyloidosis, which she hadn't heard that term.  I

13      hadn't heard that term.  He said, but I'm really not sure

14      if that's what it is, because if it is what that is, it's

15      usually associated with cancer.

16                And he referred her to Dr. Bruce Raphael, I

17      think, or something like that, somebody in NYU, also, who

18      was a -- what's the word I'm -- oncologist.

19      Q.   Uh-huh.

20                MR. MILSTEIN:  Smart dentist.

21                THE WITNESS:  Huh?

22                MR. MILSTEIN:  Smart dentist.

23                THE WITNESS:  Yes.  Well, he said he hadn't

24      seen it in 20 years.  It was that rare.

25                MR. MILSTEIN:  Wow.
```

1           THE WITNESS:  And as a matter of fact, I know

2    that he brought his students in while she was there to show

3    them this because he hadn't seen it.

4    BY MR. LIEDERMAN:

5        Q.   Uh-huh.

6        A.   And as I understand, it's discussed for five

7    minutes in most doctors' education, and that's it.  It's --

8    you know, it's that rare.

9           Anyway, he recognized it, and he sent her to

10   this oncologist who said we need to run some tests.  So he

11   ran the tests.

12          MR. MILSTEIN:  That's an amazing story really

13   for a dentist to --

14          THE WITNESS:  Oh, it's --

15          MR. MILSTEIN:  -- pick that up.

16   BY MR. LIEDERMAN:

17       Q.   So this is while she was still out there visiting

18   her sister?

19       A.   Visiting her sister.

20          So he ran the tests.  And Darren was in New

21   York at the time.  Her sister was in New York at the time

22   obviously.

23          And I got called back, and she told me what

24   had happened.  And I flew into New York to be there, and we

25   all met with Bruce Rafael in his office.  And he explained,

1    this is what you have, and it's multiple myeloma and

2    amyloidosis.  And he said, you need to start treatment.

3                     And then he said, where do you live?  And we

4    said, we live in Phoenix, Arizona.  He said, Oh, Phoenix.

5    He said, well, I have a colleague there who is a specialist

6    in this area, Dr. Rafael Fonseca.

7        Q.    His last name was his first name.

8        A.    Exactly.

9                     So he picks up the phone, and he gets on the

10   phone.  I remember the conversation.  And he said, Rafie, I

11   have of a very sick lady in my office.  He told him what

12   she had.  Would you be willing to see her?  That's the

13   conversation, as I recall it.

14                    And because they were colleagues, he said,

15   yes, I will see her.  End of the conversation.  The next

16   day, we flew back to Phoenix, and we saw him three days

17   later.

18       Q.    So then -- so you attended certainly the first

19   meeting with Dr. Fonseca?

20       A.    I was at the first meeting with Dr. Fonseca.

21       Q.    So did you have any impressions of Dr. Fonseca on

22   your meeting with him?

23       A.    I thought he was a very congenial person,

24   obviously highly recommended by his peers.

25                    I did some looking on the Internet again, and

1    he was, at that time, I think the head of research at the

2    Mayo Clinic for this -- for cancer, this type of cancer.

3        Q.   Over the years that you have been watching him

4    treat your wife, who indicated she's still under treatment

5    with Dr. Fonseca --

6        A.   That is correct.

7        Q.   -- do you have any impressions, certainly given

8    your marketing background, on his communication skills?

9        A.   His communication skills?

10            I think he was pretty open in discussion

11   telling her, you know, the various things that she needed

12   to have as things progressed.

13       Q.   Would he openly invite questions and give detailed

14   answers to questions?

15       A.   He was open to questions, yeah.

16       Q.   Okay.  So on that first visit, what was the

17   treatment that you recall him, at that point,

18   recommending?

19       A.   Well, the first thing that he did is he wanted to

20   re-run all of the tests.  Because even though the tests

21   were verified in New York, the Mayo Clinic has their own

22   system of way they need to do it.  So we ran all of those

23   tests, and he confirmed that that's exactly what was going

24   on.

25            And I recall at the first meeting he said,

1   you're a sick girl.  He said, you need to get into

2   treatment right away.  And he said, we have a trial that

3   we're doing right now which looks very promising.  We've

4   had good results, but, you know, it is not completed.

5              And he said, rather than putting you in the

6   trial where you either do or do not get this product, I

7   would like you to go right on this treatment.  And the

8   treatment was called CyBorD, which was an acronym for

9   Cytoxan.

10              I forget what they are, but you can look that

11   up.  It was new at the time.  And he got her onto it within

12   the next week.

13      Q.   So it involved a series of different types of

14   medicines being --

15      A.   No these were infusions.

16      Q.   These were infusions?

17              So it was a combination?  It was a cocktail

18   of --

19      A.   Well, I think she had to take -- she took

20   something orally, but -- I think it was the dexamethasone

21   or something like that, but everything else she was getting

22   infused.

23      Q.   How often were the infusions?

24      A.   I think when she first started, it was every

25   week.

1    Q.   So how many hours would she be receiving the

2   infusion?

3    A.   Well, the -- from the time we got there to the

4   time we left, probably about four or five hours.

5    Q.   Was there -- when he made that recommendation to

6   go on this treatment, did he indicate that this was

7   chemotherapy of a certain sort?

8              Did he refer to that term?

9    A.   I don't recall him using that term.

10             He just said, this is the treatment that I

11  recommend that you go on.

12    Q.   And he said at that time that it was not an

13  approved FDA treatment?

14    A.   No.  It was just -- they were just finishing a

15  trial on it, and they -- it would have been -- I forget how

16  it was phrased.

17             If you were in the trial, it was no cost to

18  do it.

19    Q.   Uh-huh.

20    A.   But he felt because she was so sick at the time

21  that he didn't want to take the chance that she would or

22  would not get the real stuff.

23             So he said, I'm going to recommend that you

24  go on this, and he put her on it.

25    Q.   Okay.  So at the time that he did that, made that

1    recommendation, to the time that she actually went and

2    started her first infusion --

3        A.   Yes.

4        Q.   -- was certain paperwork required to be signed?

5             Do you recall?

6        A.   I can't recall that.

7        Q.   Had you ever heard of the phrase up to that moment

8    in time called of an informed consent?

9        A.   No.

10       Q.   Did you ever hear of that phrase before?

11       A.   No.

12       Q.   Have you ever had -- before this moment in time,

13   had you ever gone for surgery or significant medical

14   treatments besides just seeing a doctor and getting a shot

15   or --

16       A.   Have I --

17       Q.   -- being prescribed anything?

18       A.   Did I ever have surgery?

19       Q.   Yeah.

20       A.   Yeah.

21       Q.   So I don't -- it's not relevant.

22             I mean, was it orthopedic type surgery,

23   organic surgery?

24             I mean --

25       A.   I had a hernia.

1      Q.    Okay.  Do you recall having to sign certain

2   documents saying that you understand the risks?

3      A.    Yes.

4      Q.    Okay.  So you never heard the term informed

5   consent --

6      A.    No.

7      Q.    -- at that time?

8      A.    I never heard that term.

9      Q.    But were you familiar with the fact that when

10   certain treatments and procedures are performed, it's

11   common that patients are asked to at least understand

12   certain risks that go with the treatment?

13      A.    That would seem reasonable.

14      Q.    So did Dr. Fonseca talk about the side effects and

15   risks of undergoing this treatment?

16            Obviously the benefits that he believed

17   existed were clear, and I appreciate that.

18      A.    I don't --

19      Q.    Did he talk about what she might experience as

20   a --

21      A.    I really --

22      Q.    -- side effect?

23      A.    I really don't remember any discussion about

24   that.

25      Q.    So how many weeks were the infusions going on

1   for?

2              Are we talking about months or weeks?

3   A.   Yeah, months.

4   Q.   Months?

5   A.   I would be guessing.

6              Two or three months.  I'm not sure.  But I

7   know every time she had to go back for her blood work to

8   see whether it was working or not, her numbers were going

9   down.

10             Her -- there's something called kappa light

11  chain something.

12  Q.   I know.

13  A.   Anyway --

14  Q.   I forget -- well, you probably know more about it

15  than I do, but for us to start talking about it, it's

16  like --

17  A.   Yeah.

18  Q.   -- lay people, the blind leading the blind.

19  A.   They were going in the right direction.

20             And at the end of this first set of

21  treatments that she had, she actually got her numbers down

22  to one or two.

23             And when she started, it was like 1400.  She

24  was --

25  Q.   So --

Page 21

1       A.   -- high.

2       Q.   Okay.  So there was improvement --

3            MR. MILSTEIN:  There were documents to sign

4   to go on that regimen drug?

5            THE WITNESS:  I'm assuming that there might

6   have been.

7   BY MR. LIEDERMAN:

8       Q.   Okay.  So besides the fact that when there were

9   tests run during the course of treatment it was giving

10  positive feedback to all of you --

11      A.   Yes.

12      Q.   -- how well was she tolerating the medicine that

13  she was being given during this period?

14      A.   She was having problems with swelling in her -- in

15  her legs.

16           There was -- she had some other side effects,

17  but the fact that she was getting better, she just was

18  soldiering on, whatever it was.

19      Q.   So her mental state on the diagnosis was

20  obviously -- was there some depression?

21      A.   No.  I think she was looking forward to getting

22  treatment to get better.

23      Q.   Okay.  And during the course of this treatment,

24  you said that there was some swelling.

25           Was there nausea?  Was there diarrhea?  Was

1    there --

2        A.    I think --

3        Q.    -- vomiting?

4        A.    Yeah.  I think she had a lot of -- I don't

5    remember them all, honestly, but I know there were some

6    side effects, but they weren't enough to cause her to want

7    to stop because her numbers were going down.

8        Q.    Okay.  No long difficult days, though, through the

9    treatment, you know, that you --

10       A.    No.  One --

11       Q.    -- soldier through but it's still --

12       A.    Well, one of the things that was helpful, each

13   time she got the treatment, they gave her, I think

14   Compazine or something like that, which made her really

15   drowsy.

16            And as soon as the treatment was done, I was

17   able to, with their assistance, get her into the car.  She

18   went to sleep.

19       Q.    So --

20       A.    So that was it.

21       Q.    What I want to try to focus on is try to find the

22   time frame.

23            So in 2009 she had what has been referred to

24   in the medical records as a steroid introduced mania.

25            So do you recall that there was a point in

1    time, perhaps in 2009, that there was such a situation?

2        A.    She -- she was hyperactive, and I didn't know that

3    that's what it was called.  But, you know, she was awake

4    for hours and hours at a time.

5              She was re-putting the spices away.  She was

6    taking books out.  She was -- she was -- what's the word I

7    want to use?

8              She was highly --

9        Q.    Hyper.

10       A.    -- hyper.

11             And I noticed that, and I -- you know, I

12   would try and slow her down.  And she just kept going and

13   going, and I didn't know what it was that I was looking at,

14   but yeah, something in there, which later we heard was

15   caused by the dexamethasone was causing this.

16       Q.    Now, you had never seen this type of activity

17   exhibited before in your wife?

18       A.    Never, not in 47 years.

19       Q.    And when you witnessed this, was she aware of

20   behavior that wasn't typical for her or was she not aware

21   that you were aware?

22             Did you talk to her about it?

23       A.    Yeah.  I don't think she was aware of it so much

24   as I was aware of it.

25       Q.    Did you attempt to reach out any doctor or any

1   physician about it?

2        A.   Oh, I called Dr. Fonseca.

3             I said something -- something is going on.

4   Because she's like the Energizer Bunny.  I mean, she was

5   just, blah.

6        Q.   And did he give you a response at that time or did

7   he say --

8        A.   Oh, he --

9        Q.   -- let me see her?

10       A.   No, no.  He said, when she comes in the next time,

11  let's discuss that.  And he said maybe we need to reduce

12  something that she's taking, if we can, to help alleviate

13  that problem.

14            My concern was that she would go until she

15  just fell asleep, you know.  She would be up 13, 15 hours

16  at a time.  And then I would see her sitting in her chair,

17  and she's out cold.

18       Q.   So in Dr. Fonseca's notes in July of 2009, so

19  that -- according to medical records that were produced by

20  the Mayo Clinic, the date certainly where he had been

21  dealing with this behavior, he said that she acknowledges

22  that she had had this behavior in the past.

23       A.   No.

24       Q.   You don't believe that that's the case?

25       A.   No.

1           She never -- believe me, I would -- I would

2    know after seeing something like that.  That was totally a

3    surprise.

4       Q.   And what about any bipolar type disorder, he

5    talked to her about that and indicated that she indicated

6    she may have had that.

7       A.   First of heard of that, no.

8       Q.   Did he ever indicate to you that he thought that

9    it was a manic/depressive condition that was being

10   evidenced by her?

11      A.   I never -- I don't recall him --

12      Q.   You don't recall?

13      A.   -- using that term.

14      Q.   Now, do you recall that she was referred by

15   Dr. Fonseca for a psychiatric consult or evaluation?

16           Did you go with her to such an evaluation?

17      A.   I did not go with her to the evaluation.  I drove

18   her to it.  I was not there.

19           But part of that, I think, was when she was

20   acting so hyper, she was really rude to the nurses.  She

21   was -- she was -- she was overactive.  I don't know how

22   else to describe that to you.

23           But I do know that he -- he said, let's check

24   out and see if there's something that might be involved

25   here.

1      Q.   Now, according to the medical records, that was

2   sometime in September of 2009 that there was that

3   consult?

4      A.   Right.

5      Q.   It noted -- and I don't know whether you have any

6   recollection of this -- that after she stopped the steroid,

7   the effects were still continuing.

8      A.   I --

9      Q.   Do you recall that?

10     A.   My recollection is, once they stopped that, that

11   behavior -- the stuff stopped.

12     Q.   So in the medical record of the psychiatrist, he

13   just said that she described herself as a drama queen.

14              Is that totally foreign to you that that

15   would ever be a phrase that she would use?

16     A.   I haven't heard that before.  I'm not sure what

17   that is.

18     Q.   Now, did she ever share with you what she,

19   according to the records, shared with her psychiatrist,

20   that in her early 20s she saw a psychiatrist for depression

21   and that she tends to be on the depressed side?

22              Did you ever see instances over your years of

23   marriage of depression or depressed state?

24     A.   There were times that she was sad.

25              You know, things would happen, and I would be

1   sad at the same time.  I -- no, I don't remember

2   depression.

3       Q.   Did you ever -- did she ever inform you or did you

4   ever speak to any doctor or did she inform you of any

5   comments by a doctor that she must avoid steroids because

6   of this one reaction, this instance of reaction with the

7   mania?

8       A.   I'm trying to understand what you just asked me.

9       Q.   Okay.

10      A.   Did she know or did --

11      Q.   Well, did she ever tell you that she was told or

12  were you ever present when either you both were told that

13  she should now avoid all steroids because she has a --

14      A.   I don't --

15      Q.   -- propensity for --

16      A.   I don't recall that conversation.  No, I don't --

17  I don't recall that.

18      Q.   At the time that she was having these steroid

19  induced reactions, did you notice a higher level of anger

20  and anxiety as well as hyperactivity?

21      A.   I didn't notice any anger as much as the

22  hyperactivity.

23      Q.   What about irritability?

24           MR. LIEDERMAN:  I'm going to get some water.

25           Do you want any -- you have water.

```
 1              THE WITNESS:  Yeah.

 2              No, I don't -- I don't remember that being

 3  the issue.  The thing that I was mostly focused on was how

 4  hyperactive she was.

 5              It was like, like I said, I use the term

 6  Energizer Bunny, but I don't recall anything other than

 7  that personally.

 8  BY MR. LIEDERMAN:

 9      Q.   Do you know if she was ever being treated with

10  Zyprexa?

11      A.   Recently.

12      Q.   What about back in 2009.

13      A.   I'm not aware of that.

14      Q.   So were you aware of any drugs that were being

15  given to her for her mental state --

16      A.   No.

17      Q.   -- or behavior?

18      A.   I was not.

19      Q.   So now -- well, we were just talking about -- I'm

20  just trying to frame it according to the records.

21              I'm not asking you to accept precisely the

22  date, but the records that I was referring to were like

23  2009.

24              And, you know, that this lawsuit is about a

25  clinical trial that was being conducted by Constellation
```

1   and the drug that she was being given in 2015.

2              The winter of 2015 was the drug that the

3   defendant had sponsored as a clinical trial at the Mayo

4   Clinic.

5       A.   Yes.

6       Q.   Okay.  So that's November 2015.

7       A.   Okay.

8       Q.   So just before, your wife was testifying about the

9   fact that she had been -- there has been a long period of

10  ups and downs in her treatment.  I guess that's a fair

11  statement to make.

12      A.   Yeah.

13      Q.   And the upsides have been what was believed to

14  have a remission in her condition --

15      A.   Yeah.

16      Q.   -- right?

17              And you got to the point in the fall of the

18  2015 where Dr. Fonseca noticed changes in her test results

19  that indicated that she needed to go back to treatment,

20  right?

21      A.   Correct.

22      Q.   There was some reference to free light chains.

23              You've heard that term?

24      A.   All along for all of -- that was part of what we

25  learned about multiple myeloma and so on.

1    Q.   Okay.  And what prompted this use of the drug that

2    Constellation Pharmaceuticals was sponsoring was an

3    increase in her free light chains --

4    A.   I --

5    Q.   -- in 2015.

6    A.   I didn't know that.

7    Q.   Okay.

8    A.   I just knew it was a treatment that was an option

9    for her.

10    Q.   So now, referring to the period before those free

11    light chain tests increased and Dr. Fonseca recommended

12    that she utilized the Constellation Pharmaceuticals drug --

13    okay?

14                So between 2009 and up to that period, as we

15    said, there were ups and downs.

16                So there were periods where she had to go

17    back on treatments --

18    A.   She's --

19    Q.   -- right?

20    A.   -- had a number of different treatments, yes.

21    Q.   Okay.  And have those -- and as far as the

22    delivery mechanism for those treatments, have they run the

23    gamut in both infusions and oral medications?

24    A.   Not so much oral, but infusions.

25                They -- I forget what they call it when they

1    inject it into the stomach.  There's a name for that I -- a

2    different way of getting it in.  But to my knowledge, she

3    wasn't getting any kind of chemo that was oral through that

4    period of time.

5              It was either infusions or -- I can't

6    remember the name.  There's a name, though, when you --

7    because she used to have different spots in her stomach.

8    They had to move it around.  I remember that.

9        Q.   So how well was she over all this period time

10   generally tolerating, to your recollection, all these

11   different therapies?

12       A.   She was doing okay.  I mean, we were going away

13   during the summer months because, as you know, it's very

14   hot here.

15       Q.   Uh-huh.

16       A.   And, you know, we were enjoying cooler weather up

17   in Show Low.

18             We had a place to go to there.  But it just a

19   couple of hours away from the Mayo Clinic, so that when she

20   had to have her regular visits, it was just a couple of

21   hours to drive back down.

22             Things were going okay.  I mean, they were

23   positive.

24       Q.   But was there long -- strike that.

25             Were there instances of vomiting, diarrhea,

1  nausea associated with these treatments?

2      A.   Not -- not that I can recall the ladder ones.

3      Q.   Any type of side effects that you recall over this

4  period?

5      A.   I really -- no.  I don't remember.

6      Q.   So this period, though, of going into remission,

7  which, I mean, any -- you know, it could result in a

8  certain level of euphoria or positive feeling to getting

9  negative results and going back to treatment, all this up

10  and down, how was this affecting her mental health?

11      A.   She was in a positive state of mind.  I mean, we

12  were making plans for trips.

13            We had actually taken a few trips when she

14  was in remission.  It was -- things were good.

15      Q.   How did she take it after she was in remission to

16  find out that it was now requiring more treatments and it

17  was not --

18      A.   I think she -- you know, we both were frustrated

19  that these things didn't last longer and what have you.

20            But at the same time, we knew that there was

21  always new treatments being made available.  And when we

22  would see Dr. Fonseca, I would say, are there new

23  treatments coming out because this -- you know, we've tried

24  this and that.

25            And there were always some new treatments

1    over the span of 10 years.

2        Q.   What was her attitude towards the various delivery

3    systems of some of these?

4             I mean, was she getting to the point where

5    she said, no more infusions, no more injections, you've got

6    to come up with something else?

7        A.   I don't remember her rejecting any of that during

8    that period of time.

9        Q.   Any instances where you were present, either where

10   she expressed to you privately that she felt this way or

11   you were present when she said it to a doctor, please find

12   me something else; I'll do whatever you want, but please,

13   let's -- I don't want this anymore --

14       A.   I --

15       Q.   -- if I can avoid it?

16       A.   I don't ever recall that comment.

17       Q.   Okay.  So let's focus, then, on that fall of 2015.

18            Were you present when she was given the

19   results from Dr. Fonseca about the free light chains that

20   eventually prompted and led to the treatment with the

21   Constellation Pharmaceutical drug?

22       A.   She knew that her numbers were going back up

23   again.

24            I'm assuming that when you talk free light

25   chains, that's the same thing as --

1     Q.   Free light chain.

2     A.   -- kappa?

3     Q.   I --

4     A.   Because that's -- that's what we look at it.   It

5  was a kappa number.

6               MR. MILSTEIN:   So here's what they are.

7               So the body creates antibodies --

8               THE WITNESS:   Right.

9               MR. MILSTEIN:   -- something called

10  immunoglobulins.

11              And when you have myeloma, instead of

12  creating or producing the full gamut of immunoglobulins, it

13  produces these light chains, which are either lambda or

14  kappa.

15              THE WITNESS:   Oh, okay.

16              MR. MILSTEIN:   So if, in these tests, either

17  the lambda or the kappas are abnormally high, it suggests

18  it's not producing the others.

19              THE WITNESS:   Yeah.   So it's light chain,

20  yeah.

21              MR. MILSTEIN:   Those are called the light

22  chains --

23              THE WITNESS:   Oh, okay, yeah.

24              MR. MILSTEIN:   -- those two.

25              THE WITNESS:   We had been referring to them

Page 35

1    as the kappa numbers.

2              MR. MILSTEIN:  Yeah.

3              THE WITNESS:  That's what I knew it as.

4    BY MR. LIEDERMAN:

5        Q.   Did you ever hear of proteasome inhibitors?

6        A.   Excuse me?

7        Q.   Proteasome inhibitors, did you ever of that

8    phrase?

9        A.   I'm not familiar with that phrase.

10       Q.   Back in 2013, Dr. Fonseca's notes talk about the

11   fact that he had suggested participation in a clinical

12   trial that uses an oral proteasome inhibitor.

13             Do you recall being present when there was

14   such a discussion?

15       A.   I don't recall anything about oral until 2015.

16       Q.   You don't recall being present for any discussion

17   where Dr. Fonseca said that when he raised that possibility

18   of a clinical trial, she was inclined to go with the

19   standard of care medications at that point?

20       A.   She was inclined to do what?

21       Q.   Go with the standard of care medications at that

22   point, in other words, not participate in a clinical

23   trial?

24       A.   That had to do with orals in 2013?

25       Q.   In 2013.

Page 36

1                    Were you ever present?

2        A.    I don't remember that.

3        Q.    Were there meetings that she had with Dr. Fonseca

4    where such discussions could have taken place --

5        A.    I was --

6        Q.    -- that you were not with her or were you with her

7    at every --

8        A.    Up until 2015, I was involved with nearly every

9    meeting that she had with him.  I didn't -- you know, I

10   just don't remember that.

11             It could have been said.  I just don't

12   remember it.

13       Q.    Okay.  Do you recall at the beginning of 2015 --

14   well, strike that.

15             Do you recall -- this is before the

16   Constellation sponsored drug.

17             Do you recall her ever having GI infections

18   during the course of the treatments?

19       A.    GI?

20       Q.    Yes, gastrointestinal infections.

21       A.    I don't recall.

22       Q.    What about an instance where she -- in early 2015

23   it happened to be, according to the notes, that she came to

24   the hospital with acute shortness of breath and intense

25   chest pain.

```
 1                    Do you recall taking her --

 2     A.    Yeah.

 3     Q.    -- to the hospital?

 4     A.    I remember that.  She had blood clots.

 5           We didn't know that at the time, but that's

 6     what was causing that.

 7     Q.    So tell me the circumstances.

 8           I mean, what led up to you -- did you rush

 9     her to an emergency room or was it a regular visit that you

10     scheduled?

11     A.    It didn't really -- it didn't happen that way.

12     She kept telling me that she was having shortness of

13     breath.

14           And I said, well, you know, should we go

15     check this out?  And she would say, oh, you know, I'll get

16     over it.  And I kept asking her, I said, how is it doing?

17     And she kept saying, well, I'm still having it.

18           Then she said to me, Dan, I'm feeling pain.

19     I said that's it.  Let's go to emergency --

20     Q.    Was --

21     A.    -- room.

22     Q.    -- this all occurring over one day or multiple

23     days?

24     A.    It was maybe two are three days that I was aware

25     of the shortness of breath issue.
```

1           But by the second or third day, whatever it

2    was, when she told me that she was feeling pain in her

3    chest, I said we've got to get this checked out.

4        Q.   So what did you -- did you ever learn what the

5    condition was that she had?

6        A.   I think what we were told is that she had blood

7    clots.

8        Q.   Did you ever hear the phrase pulmonary embolism

9    associated with --

10       A.   Is that a blood clot?

11       Q.   Well, I'm just asking you if you've ever heard the

12   phrase.  I'm not asking you to diagnose.

13       A.   I have no idea.

14       Q.   Okay.

15               MR. MILSTEIN:  That's when a blood clot --

16               THE WITNESS:  Yeah.

17               MR. MILSTEIN:  -- travels into the lungs and

18   heart.

19               THE WITNESS:  Yeah.

20   BY MR. LIEDERMAN:

21       Q.   Yeah.

22               But I'm not testing you on your medical

23   knowledge?

24       A.   I -- sorry.

25       Q.   Did you or she or both of you meet with

1    Dr. Fonseca about the condition that caused her --

2        A.   Well, after, yeah.

3        Q.   And was there anything that he told you or any

4    change in treatment that resulted?

5        A.   What the heck was the sequence there?  I think

6    that we stopped the treatment at that time because that was

7    causing it.

8               And I don't remember what the next -- I think

9    he said let's -- let's wait a while before -- what was the

10   time frame that you were just talking about?

11       Q.   This was in the early part of 2015 --

12       A.   Would it have been, like --

13       Q.   -- during the spring.

14       A.   -- during the summer?

15              Spring?

16       Q.   Spring.

17       A.   Yeah.  I think we stopped after that because of

18   what was going on.

19              And I think the discussion was, let's wait a

20   month or two and then decide what we're going to do next,

21   but we've got to stop with whatever is causing this.  I do

22   remember that.

23       Q.   So there was that point in time when the free

24   light chain had gone up, and you, again, met with

25   Dr. Fonseca where he reported the fact that the tests had

1    gone up.

2             And she had not been on treatment right now

3    from the time of those pulmonary embolisms, the chest

4    pains, to this point in time.

5        A.    Yeah.

6        Q.    So do you recall the meeting with Dr. Fonseca

7    where he talked about the light chains going up --

8        A.    Yes.

9        Q.    -- and any discussion of initiating new

10   treatment?

11       A.    Yes.  There were a number of treatments that were

12   available --

13       Q.    Well, let's just stop.

14             You -- you remember that conversation?

15       A.    I do, yeah.

16       Q.    Okay.  And it was just the two of you, you and

17   wife, that were present?

18             Anybody else present?

19       A.    I'm wondering if her sister was with us on that.

20             I know Adele was with us on one of those.

21   I'm not sure if that was the case.

22       Q.    Would a meeting like this have been a meeting that

23   would have just been a regular scheduled visit or would his

24   office say, please come in --

25       A.    No.  We --

Page 41

1     Q.    -- we need to discuss a problem?

2     A.    We had scheduled this visit.

3           I forget how many months we decided we were

4     going to wait, and then we had scheduled the visit to see

5     where we go next.

6     Q.    Okay.  So what do you recall him saying?

7     A.    Well, I seem to remember that meeting he said,

8     okay, your numbers are going up; here is a bunch of

9     treatments that are available.

10          And he -- I don't remember the names of them

11    all, but they were like two or three or four options that

12    were given.

13    Q.    Was this written down or did he just review it

14    orally or did he have a chart?

15          Did he have --

16    A.    No.  He was telling us orally.

17          And I asked him if he would, you know,

18    document them so that I could share them with my son,

19    Darren.

20          And one of the -- one of the treatments he

21    said -- you know, we had talked about coming back and forth

22    constantly because she had to have the infusions and so

23    forth.

24          He said there is a treatment that is going on

25    right now, they're testing, where you could take things

Page 42

1    orally and you would have more freedom to travel and so on

2    and so forth.  Is that something that you would even want

3    to consider?

4                 And I don't remember how Iris reacted to

5    that, but the idea that she wouldn't have to be constantly

6    coming in, getting infused and all of that I think appealed

7    to her at that time.

8        Q.   Did he discuss utilizing drugs that had been used

9    previously as an optional treatment, as an option for

10   treatment?

11       A.   It was one of the treatment options.

12       Q.   Did he indicate whether or not -- did he remind

13   you and your wife of any issues that had arisen while using

14   those other drugs, such as toxicity?

15       A.   I don't recall that part of the discussion.  I

16   think in my own mind, all of these have some side

17   effects.

18       Q.   True.

19                But do you recall that your wife had

20   particular GI toxicity issues associated with some of them

21   so that she got through it, it improved, but it was tough

22   tolerating it?

23       A.   I don't remember that, but I know that she had --

24   she had problems, like you're describing, at least on one

25   of those treatments.

Page 43

1       Q.   So in developing kind of an analysis of the

2    options with the two of you, did Dr. Fonseca note that that

3    was one negative to those other options, that she had

4    already had experienced some toxicity?

5       A.   I don't think that that was brought up as a

6    discussion point.

7            It's important that at each one of these

8    meetings Iris always was the decision maker on that.  I

9    never intervened with you ought to do this, you ought to do

10   that, what have you.  It was always her choice, whatever

11   she decided to do.

12      Q.   Did you have any doubts about her competence or

13   capability to make the decision?

14      A.   No.

15           Why should I?  No.

16      Q.   Was -- would you say that even though there had

17   been now unfortunately six years or more of this long

18   odyssey dealing with this myeloma, that she was still the

19   same person that you knew before she even was diagnosed

20   with the myeloma?

21      A.   For the most part, yes.  I mean, she -- you know,

22   we made our plans.  We did our things.  We had couples that

23   we went out with.

24           It was a good life, you know, as far as --

25   aside from the fact that she was having to be treated for

Page 44

1    that, we did the best we could to have a good life

2    together.

3        Q.   It's hard when I use this phrase to say sharp

4    mind, but as a trained lawyer, did she have an analytical

5    mind or --

6        A.   I wouldn't call it an analytical mind.

7             Sometimes she, you know, would be picky about

8    some things, as opposed to myself where I'm pretty much,

9    hey, that sounds like a good idea.  Let's do that.

10       Q.   Would you describe her, for lack of a better term,

11   a researcher into things --

12       A.   No.

13       Q.   -- that she would search out on the Internet

14   information for things?

15       A.   Primarily she wasn't a researcher.  She was

16   somebody who liked to make friends.

17            She never -- let me rephrase that.  She never

18   met a stranger.

19       Q.   Okay.

20       A.   She was always --

21       Q.   They were never a stranger after the few

22   moments?

23       A.   That's -- that was Iris.

24       Q.   For all the drugs and treatments, though, over

25   those years, did you see her doing research on her own on

Page 45

1    the Internet just to be totally aware of what treatment she

2    was getting, learning more about the drugs that she was

3    getting?

4        A.    If she was doing it, I wasn't aware of it.  We

5    didn't have a discussion about it.

6        Q.    Okay.  So you -- what you're indicating is that

7    when you were attending these meetings, you were an

8    observer, not a participant as much?

9        A.    Primarily.

10       Q.    You didn't feel that she wasn't asking enough

11   questions and you had to add in your own questions?

12             You could rely on her holding the

13   conversation with the doctor?

14       A.    I felt that she was asking the same kind of

15   questions I would, and there was no reason for me to add

16   anything on to it.

17       Q.    So was it -- was it coming from her or Dr. Fonseca

18   the idea of the preference, if there's an oral medication,

19   oh, gee, let's think about that?

20       A.    When it was presented as a treatment option, she

21   was the one who responded to it.

22       Q.    So she was encouraging him knowing on his list of

23   options that there was one that was an oral one?

24       A.    Well, I she thought -- I think she felt that she

25   could have an oral treatment that would work like all the

Page 46

1    others where she was always having to come and, you know,

2    be infused, that would be a better option.

3         Q.   Did he tell you at that time about what he meant

4    by an oral medication, when it was, where it was from,

5    where she would get it, anything about it, or was it just a

6    general decision at that point?

7         A.   General discussion.

8         Q.   Okay.  So at that point -- at that meeting, was a

9    decision made that she would go the route of the oral

10   medication?

11        A.   He was going to find out if it was available.

12        Q.   Okay.  Where did he have -- did he indicate where

13   he had to go to find out if it was available?

14        A.   Someone within the organization was running it,

15   and he had to -- he had to find out whether there was an

16   option for her to be in it or not.

17        Q.   Okay.  You said running it.

18             So did he say this was all part of a study

19   being run at the Mayo Clinic?

20             Because running it, you run a study.

21        A.   Well --

22        Q.   To be in something, you're in a study.

23        A.   I don't --

24        Q.   Did he say this a study -- this is a trial that

25   we're running, and I want to find out if she can

```
 1    participate?

 2        A.   Well, I don't recall which word he might have

 3    used, but he had to find out whether she could

 4    participate.

 5        Q.   Okay.

 6        A.   I think there was a Dr. Bergsagel I can't

 7    pronounce it.

 8                   MR. LIEDERMAN:  Off the record.

 9                   (Recess taken from 11:38 a.m. to 11:39 a.m.)

10    BY MR. LIEDERMAN:

11        Q.   So these years that your wife and you have been

12    confronting cancer, have you met other cancer patients --

13        A.   Yes.

14        Q.   -- or been aware of other people who were dealing

15    with cancer?

16        A.   Yes.

17        Q.   So are you aware of the fact that there are things

18    like clinical trials where there are constantly new drugs

19    being tried to see if it would be effective?

20        A.   Sure.  I knew the term trials.

21        Q.   Okay.  And have you known people who have gone in

22    or sought entrance into clinical trials because they had

23    within looking for good treatments?

24                   Have you known anyone who has gotten into a

25    trial or said that they've been in trials?
```

Page 48

1     A.   I had no idea what their motivation might be.

2     Q.   Forget about the motivation, but just that they

3  went into trials.

4     A.   We knew some people that had been in trials, yeah.

5     Q.   Okay.  What was your understanding of what a

6  clinical trial would be?

7               I mean, was it your understanding vis-a-vis

8  whether the drug is approved or not approved yet by the

9  FDA?

10    A.   I had no concept of what that meant other than it

11 was a treatment that you could be trying to see if it would

12 work for you.

13    Q.   So you don't --

14            MR. MILSTEIN:  You don't know clinical

15 trials -- there are clinical trials, Phase 4 trials, that

16 are after a drug is approved?

17            THE WITNESS:  Yes.

18 BY MR. LIEDERMAN:

19    Q.   So are you aware of the fact that there are

20 clinical trials, though, before a trial is approved in

21 route to a hopeful approval?

22    A.   I wasn't aware of that.

23    Q.   Okay.  Did Dr. Fonseca say anything during the

24 meeting --

25            MR. MILSTEIN:  I didn't mean to suggest that.

1          I mean, he knew this drug was not FDA

2     approved.

3               MR. LIEDERMAN:  Okay.

4               MR. MILSTEIN:  That was your question.

5               MR. LIEDERMAN:  Okay.

6               THE WITNESS:  That isn't what you asked.

7     BY MR. LIEDERMAN:

8     Q.   No, no.  And I'll get there.

9          Did Dr. Fonseca say whether or not the drug

10    that he was suggesting was FDA approved?

11    A.   Did he say it was?

12         I don't -- no.  I don't remember him saying

13    that.

14    Q.   Okay.  Did he say it wasn't approved?

15    A.   I don't remember him saying that either.

16    Q.   At that point, you just recall him saying there's

17    this drug --

18    A.   There's this --

19    Q.   -- this oral medication --

20    A.   There's a treatment that you have as an option.

21    That's what I remember.

22    Q.   Okay.  Did he say anything to you about the fact

23    that it was a treatment that was as good as the other

24    alternatives that he was listing?

25    A.   I don't think he presented it that way.  He just

1    gave Iris this menu of options and said, what do you want

2    to do at this time?

3                    She made that decision.  He didn't force any

4    particular one on her.

5        Q.   Okay.  What do you recall happening after that

6    meeting?

7                    Was there a decision made or -- strike that.

8                    You said that as a result of this meeting, he

9    said he would check and see whether or not this drug could

10   be made available for her.

11                   Or, as you said, did he use the phrase, let

12   me see if I can get her into the study?

13       A.   See if she was eligible to get into the study, I

14   think, is what --

15       Q.   So he used the term study, if you recall?

16       A.   No, the treatment.

17       Q.   Okay.

18       A.   He never used the word study.

19       Q.   Okay.

20       A.   He said see if she could get on the treatment.

21       Q.   So when you left, did you have any discussions

22   with your wife about what the options were now being

23   presented?

24       A.   I asked her.  I said, you know, what do you think?

25                   She said, well, if I can get the treatment

Page 51

1    and, you know, not have to come in for the infusions, that

2    probably would be good for us because we could travel more

3    and do this and that.

4                I said, it's your call.  Whatever you decide

5    is okay with me.

6        Q.    What was the next communication exchange with the

7    Mayo Clinic, then, or anyone at the Mayo Clinic --

8        A.    I --

9        Q.    -- that you recall?

10       A.    I believe we got a call from Dr. Fonseca's

11   office -- I don't think it was him, but one of his aids or

12   whatever they are -- and said that there was an opening for

13   Iris, that she could get the treatment if she wanted to get

14   into it.

15       Q.    Okay.  And again, you don't recall -- did she

16   field the call or did you take the call?

17       A.    I don't remember.

18                MR. LIEDERMAN:  Okay.  Off the record.

19

20                (Recess taken from 11:43 a.m. to 11:44 a.m.)

21                MR. LIEDERMAN:  Okay.  Go back.

22   BY MR. LIEDERMAN:

23       Q.    So was there -- so you returned to the Mayo Clinic

24   as a result of that call?

25       A.    Yeah.

1     Q.    Okay.  Did you meet with Dr. Fonseca again or with

2     somebody else?

3     A.    What happened there?

4           I don't remember the sequence of that.  I

5     know that somewhere in that time frame -- and I wasn't at

6     the meeting.

7           Iris met this Dr. B and had some discussion

8     with him about the fact that, you know, she wanted the

9     treatment or something along those lines.

10          I wasn't at the meeting with him.  She just

11    told me that I had to meet with Dr. -- is it Bergsagel?

12    Q.    Bergsagel.

13    A.    Yeah, that guy.

14          So as far as I know, I -- I do not recall

15    being at that meeting, but I remember her telling me, yeah,

16    so if we're going to do this, we need to start it at such a

17    date.

18          I think it was early December.  I forget the

19    time frame.  If you're going get in it, that would be the

20    time you would have to get into it.

21    Q.    Did your wife ever use the phrase clinical trial

22    after coming back from meeting Dr. Bergsagel?

23    A.    Did she use the phrase clinical trial?

24          I don't know that she used it, but I think

25    that that's what we thought.  It was -- it was a clinical

1    trial.

2        Q.   Okay.  So after that meeting that she had with

3    Dr. Bergsagel, do you recall going back again with her this

4    time to the Mayo Clinic to see Dr. Fonseca?

5        A.   No.  I don't remember seeing Fonseca again after

6    that -- at that meeting.

7        Q.   Okay.  She said she met -- when she met

8    Dr. Bergsagel, did she mention that she had also met with

9    Dr. Fonseca as well?

10        A.   I don't recall that.

11        Q.   Did she, at that meeting, meet with -- to your

12    knowledge, did she have any meeting with somebody who

13    eventually became known to you as J.R.?

14        A.   I -- let me stop.

15             The first time I remember seeing J.R. was in

16    Dr. Fonseca's office.  I don't know if that was at a

17    meeting.

18             I don't know the time frame of that, but I

19    remember seeing this tall guy.  I think he's an Indian

20    fellow --

21        Q.   Uh-huh.

22        A.   -- and he introduced himself as J.R.

23        Q.   Was he there for much of the meeting or he was

24    just an introduction?

25        A.   He was there just to introduce himself and say

Page 54

1    that, you know, he was somehow involved with this treatment

2    that Iris was going to be getting.

3         Q.   Okay.

4         A.   And that's all I really remember about the

5    meeting.

6         Q.   Okay.  Do you remember the reason for being there

7    and meeting with Dr. Fonseca at all?

8         A.   I really don't.

9         Q.   Okay.

10        A.   It could have been a regular meeting.

11             I just don't remember the particular occasion

12   of that meeting.

13        Q.   Do you see what's been marked in your wife's

14   deposition as Exhibit 1, which is a document to your

15   left?

16        A.   Yeah.

17        Q.   Okay.  So just glance at that.  That's a 27 page

18   document.

19             It's a research participant consent and

20   privacy authorization form.

21             MR. MILSTEIN:  21.

22             MR. LIEDERMAN:  21 pages.

23             THE WITNESS:  Okay.

24   BY MR. LIEDERMAN:

25        Q.   Have you ever seen this document before?

1          I'm not talking about as a result of meetings

2     with Counsel or as part of this litigation.

3          Before the lawsuit, have you ever seen this

4     document before?

5     A.   I was aware of this document.

6     Q.   When you say aware, how were you aware of its

7     existence?

8     A.   Because at the first meeting that Iris had to go

9     to at the Mayo Clinic to get the treatment started, this

10    J.R. fellow was there.  And he said, we've got this

11    document.

12    Q.   Okay.  So let me just go back just to set the

13    stage.

14    A.   That's when I --

15    Q.   You --

16    A.   -- saw this.

17    Q.   -- saw it when she came for her first treatment.

18         You came with her for the first treatment?

19    A.   I was there for the first treatment.

20    Q.   Okay.  So just march me through, as best as you

21    recall.

22         When you get to the Mayo Clinic, where would

23    you go when you got to the building?

24         Would you go to hematology or was there a

25    particular area that you now had to go to?

1     A.    I think the first meeting was where she would

2   normally get her normal infusions.

3                It was on the third floor or something like

4   that.

5     Q.    Okay.  And you -- is there a reception desk there

6   or some reception or do you just walk in there and you just

7   have to know where you're going?

8     A.    The way it works there is they call your name.

9   And you get up and somebody takes you in and brings you

10   to --

11    Q.    So for this instance, rather than go for the

12   typical type of treatment she had gone for in the past, did

13   somebody come and get you to take you to J.R. or did J.R.

14   come out and meet you and then bring you back to some room?

15    A.    I don't really remember that sequence, but I know

16   whenever we got to the room, J.R. was there.

17    Q.    Okay.  Was it a conference room or --

18    A.    No.

19    Q.    -- an office?

20    A.    It was a treatment room.

21                He -- he said we need to get started on this

22   pretty quick.  And he had this document, and he -- he was

23   reading -- I never read the document.

24                I never had my hands on the document, but he

25   was reading --

1    Q.    Okay.

2    A.    -- that.

3    Q.    So let me -- let's break it down.

4            MR. MILSTEIN:  Let him just tell the story.

5            THE WITNESS:  No, no.  But I want to -- but

6    it's easier not to do a long narrative.

7    BY MR. LIEDERMAN:

8    Q.    So he -- you never had the document?

9    A.    Yeah.

10   Q.    So who had the document, then?

11           He didn't?

12   A.    Yeah, he had it.

13   Q.    And he had it -- and did he ever give the document

14   to your wife?

15   A.    At that first meeting?

16           I didn't see him do that.  He might have.  I

17   didn't see him do that.

18           MR. MILSTEIN:  But she signed it.

19   BY MR. LIEDERMAN:

20   Q.    Well -- I mean, for the signature, for a

21   signature.

22   A.    Yeah.

23   Q.    But were you present when she signed the

24   document?

25   A.    No.  I never -- I did not see her sign the

1    document.

2        Q.    Okay.  During the time that you were having these

3    conversations or you were witnessing the conversation he

4    was having with certainly your and you being present, were

5    you all sitting or standing?

6        A.    She was lying kind of elevated, like this.  I was

7    sitting in a chair.  He was standing.

8        Q.    So she was in a chair or on a hospital --

9        A.    No.  She was comfortable on the bed, you know, in

10   a room.

11       Q.    Is this a private room or a room with other

12   people?

13       A.    No.  There was no other people.  It was a private

14   room just the three of us --

15       Q.    Okay.

16       A.    -- a treatment room.

17       Q.    Okay.  And he was standing, and the two of you

18   were sitting?

19       A.    Correct.

20       Q.    Okay.  And do you recall him holding this document

21   while he's talking to --

22       A.    He was going through all the things in the

23   document, explaining what they were.

24       Q.    So he would go page by page through the

25   document?

1    A.   He was just saying, there's this.  There's this.

2  This means that.  This is that.  This means that.

3    Q.   So do you recall what he said generally this

4  document purported to be?

5    A.   I think it talked about what the trial was all

6  about.

7    Q.   Okay.  So did he say that this was a consent to

8  participate?

9    A.   I don't recall him using that term.

10    Q.   Did he say that she had to agree to participate?

11    A.   I think he said you need to sign this so we can

12  get started.

13    Q.   Did he say that there were, in these pages,

14  certain risks laid out to taking the drug?

15    A.   I don't recall the specific details.  I know he

16  went through all of this --

17    Q.   So --

18    A.   -- page by page.

19    Q.   So he would turn to a page, and would he read the

20  page --

21    A.   No.

22    Q.   -- to you verbatim?

23    A.   He would highlight what each one of the items on

24  the page were.

25            And I don't remember at this point in time

Page 60

1    what they were.

2        Q.   So if you look at page 3 -- because you didn't

3    ever see it, you don't -- I'm just asking you to look at it

4    just because I'm going to refer to it.

5        A.   Okay.

6        Q.   So do you recall -- you can see that there are

7    questions that are being listed, like that are marked

8    number 1 and number 2.

9             Did he go through a page like this, as best

10   as you can recall, by saying, okay, so we're on page 3, or

11   holding up page 3, it says here why is this research study

12   being done?

13            Do you recall him, like, reading out a

14   question and then giving you --

15       A.   I think --

16       Q.   -- a general statement?

17       A.   I think he read every one of these bullets and

18   said this is what it is.

19            I don't recall word for word for word for

20   word, but I seem to recall --

21       Q.   So --

22       A.   -- every --

23       Q.   -- in respect to --

24            MR. MILSTEIN:  Arthur --

25            MR. LIEDERMAN:  I'm sorry.  Go ahead.

```
                                                          Page 61
 1              MR. MILSTEIN:  One second, Arthur.

 2              We are not going to maintain that he did not

 3   go through the document point by point.

 4              So it's not our defense and we're not going

 5   to say that they were not aware of anything that's in this

 6   document.

 7              MR. LIEDERMAN:  Fine.  Okay.  All right.

 8              MR. MILSTEIN:  All right?

 9              Even if they don't recall him going through

10   each one, that's not her defense.

11              The document is what the document is, and it

12   says certain things.

13   BY MR. LIEDERMAN:

14       Q.  At any point in time in the discussion of this

15   document, do you recall at least wondering whether or not

16   this drug was not yet known to be a proven cancer

17   treatment?

18       A.  Did I know?  I didn't know.

19       Q.  Were doubts ever raised through J.R.'s

20   presentation of this document that this drug had not yet

21   been considered a proven effective treatment for her

22   cancer?

23       A.  I'm not sure.  I really -- I'm just not sure.  I

24   think we both thought this was just one of the treatment

25   options that was available to her at that time.
```

Page 62

```
 1                I don't think Iris thought about whether it

 2     was FDA approved or not.  I don't even think that was in

 3     our thinking as much as, hey, here's a treatment that is

 4     going to be better, perhaps, than what you've had before.

 5        Q.    There's a paragraph in the informed consent that

 6     says that the product may have side effects that --

 7                MR. MILSTEIN:  I don't want to be picky, but

 8     let's just call it Exhibit 1.

 9                MR. LIEDERMAN:  Exhibit 1, yes.

10                MR. MILSTEIN:  It's not titled informed

11     consent.

12                MR. LIEDERMAN:  Okay.  I'm sorry.  I'll

13     accept that.

14     BY MR. LIEDERMAN:

15        Q.    There's a paragraph that says that the --

16        A.    Okay.

17        Q.    -- product may have side effects that no one knows

18     about yet.

19                Did J.R. ever indicate that this drug may

20     have side effects that nobody knows about yet?

21        A.    I can't remember that.  I just don't remember

22     that.

23        Q.    He may have?

24        A.    I -- I don't want to speculate.  I just don't

25     remember that.
```

Page 63

1      Q.   Okay.

2                  MR. MILSTEIN:  Arthur, again -- let's go off

3      the record for a second.

4                        (Recess taken from 11:56 a.m. to 11:57 a.m.)

5      BY MR. LIEDERMAN:

6      Q.   On that page 3 that I had referred to of Exhibit

7      1, there are those bullet points.

8                  Do you recall whether J.R. indicated to your

9      wife, with you present, that the purpose of the study was

10     to find out answers to research questions such as what are

11     the side effects of the drug?

12     A.   I don't recall that.

13     Q.   Okay.  So I understand that, you know, you recall

14     that after talking to Fonseca about the options he said

15     this is the treatment?

16     A.   Yeah.

17     Q.   As a result of meeting with J.R. and his review of

18     this document, at least in your mind first, did it ever

19     raise in your mind that what's being described by J.R. is

20     kind of at odds with what you thought was the value of the

21     this product as a treatment?

22     A.    I thought it was a treatment.  That's -- that's

23     why I thought we were there.

24     Q.   Did your wife have any questions of J.R. that you

25     recall with respect to the comments that he was making

Page 64

1   about or how he was reading or referring to the various

2   pages of this document?

3      A.   Not -- I don't recall saying anything about what

4   he was saying.

5      Q.   Not questioning him at all about what do you mean

6   that this is a research study; I thought it's a treatment?

7      A.   I don't remember that.

8               MR. MILSTEIN:  Those things are not

9   necessarily mutually excludible.

10              MR. LIEDERMAN:  You really -- off the

11  record.

12              (Recess taken from 11:59 a.m. to 12:00 p.m.)

13              MR. LIEDERMAN:  Okay.  Going back on.

14              THE WITNESS:  I have to remind you that this

15  is three years ago.

16              So, you know, my memory is pretty good, but I

17  can't remember the specifics that you're asking.

18  BY MR. LIEDERMAN:

19     Q.   So your recollection is that your wife -- you

20  don't recall being present when your wife signed the

21  document?

22     A.   I don't remember seeing her sign the document.

23     Q.   Okay.  Did you ever remember her having the

24  document in her hand and leafing through, going through the

25  document on her own or with J.R.

1      A.    I don't remember her leafing through it.    I

2    remember him leafing through it and --

3      Q.    Okay.

4      A.    -- describing what all of these things were.

5      Q.    Did there come a time that you left the room and

6    left her alone in the room or were you present even when

7    she had the first administration of the drug?

8      A.    No.   I think I was in the room when she had the

9    first -- I'm trying to remember the sequence.

10                It was really early in the morning.    We

11    had -- we had to leave the house at, I think, almost 4:00

12    or 5:00 a.m. to get there because it started at 7:00 in the

13    morning.

14                And I remember that she got something, and

15    then they had to take her blood.   They had to check

16    something in her blood.   And then they had to wait an hour

17    or something like that, and then they had to check her

18    blood again.

19      Q.    So were tests before she even met with J.R.

20      A.    They checked her blood before --

21      Q.    Okay.

22      A.    -- she started this.

23      Q.    So the signature -- the time of the signature is

24    noted in this document as 12:39 p.m.

25                So it's your recollection that she was

Page 66

1    present, the two of you were present much earlier in the

2    day?

3        A.   It seemed to me we got there earlier than 12:00

4    o'clock, yeah.  We were there early in the morning.

5        Q.   So at 12:39 -- okay.

6             If you look at the last page -- I don't know

7    if you can identify her signature or not.

8             MR. MILSTEIN:  Let's stipulate to her

9    signature.

10            THE WITNESS:  What is your question?

11   BY MR. LIEDERMAN:

12       Q.   That's her signature, right?

13       A.   That's looks like her signature.

14       Q.   Okay.  But you don't recall ever seeing her put

15   the signature --

16       A.   I don't remember --

17       Q.   -- on the paper?

18       A.   I just don't remember seeing her sign it.

19       Q.   But was there any period of time when you were not

20   present when she could have been alone with him to sign it

21   or --

22       A.   I may have gone to the bathroom.

23       Q.   Okay.

24       A.   I don't know.

25       Q.   Okay.  But from the time that -- for what you

1   recall you were present, he always had it, and when he

2   left, he left with the document?

3             He didn't leave the document with either of

4   you?

5        A.   We didn't -- I didn't have the document, no.

6        Q.   And as a result of the conversations that he had

7   in discussing this document, when he left, did your wife

8   say anything to you about his presentation?

9        A.   I don't recall her saying anything about it.

10       Q.   Okay.  The document talks about testing to find

11  out the highest dose of the drug that could be given to

12  someone.

13            Did he, if you recall, talk about that?

14       A.   I don't remember that.

15       Q.   Okay.  Did he ever use the phrase, to your

16  recollection, Phase 1 study?

17       A.   I don't remember that, no.

18       Q.   Did he ever indicate to you, as it says on page 3,

19  that a Phase 1 study means the drug is in the very early

20  stages of testing in humans?

21            Did he ever say anything?  Did he ever say

22  that verbatim?

23       A.   I don't remember hearing that.

24       Q.   Did he ever say anything that would approach in

25  your mind a suggestion that this drug was only in its very

Page 68

1    early stages of testing in humans?

2         A.    I don't remember that.

3         Q.    When Dr. Fonseca presented the options to both you

4    and to your wife, did you have any idea that the drug that

5    he was suggesting was only in its very early stages of

6    testing in humans?

7         A.    I thought it was a treatment that was being used,

8    no.

9         Q.    So as a treatment, you would never have thought it

10   was in the early stages of testing?

11        A.    That never crossed my mind.

12        Q.    Okay.

13        A.    It was one of the treatment options that he was

14   telling her she had available.

15        Q.    If he had said that to your wife and to you, would

16   you have said anything to your wife about, if she was still

17   willing to go forward with the test, whether or not she

18   would take the drug?

19               MR. MILSTEIN:   I'll object to the form, but

20   you can answer.

21   BY MR. LIEDERMAN:

22        Q.    You can answer.

23        A.    I would have deferred to whatever she wanted to

24   do.

25        Q.    Okay.

1    A.    I -- I had to be consistent about that because I

2    had been from the beginning, 10 years ago.

3    Q.    Do you think she would have wanted to go into a

4    drug that was only in its early stages of testing or she

5    wanted the treatment?

6    A.    I -- I think if she thought that it wasn't a

7    treatment that was going to work, she wouldn't want to do

8    it.

9    Q.    Okay.  At no time did Dr. Fonseca or J.R., to your

10   knowledge, with you present ever indicate in any way that

11   this was a drug that they could not confirm could be a

12   treatment?

13   A.    That statement was never made.

14   Q.    Okay.  And you would agree that if something is in

15   its early stages of testing in humans, it's not yet really

16   a confirmed treatment, right?

17               MR. MILSTEIN:  I'll object to the form of

18   that.

19               THE WITNESS:  I don't know how to answer that

20   question.

21   BY MR. LIEDERMAN:

22   Q.    Well, if something is in its early stages of

23   testing, even a product that Kodak is making --

24   A.    But the way it was described to us -- you have to

25   understand.  It was described as a treatment.

```
 1                   So I never even allowed myself to think
 2      about --
 3          Q.   No, no.
 4                   But if somebody had said it's a -- led you to
 5      believe it was a treatment, and then you found out it was
 6      in the early stages of testing, you would then question why
 7      did they say it's a treatment, wouldn't you?
 8                   MR. MILSTEIN:  I'll object to the form.
 9                   THE WITNESS:  I don't know.  I don't know how
10      to answer that.
11                   MR. MILSTEIN:  Let's go off the record for a
12      second.
13                   MR. LIEDERMAN:  Okay.
14                   (Recess taken from 12:07 p.m. to 12:10 p.m.)
15      BY MR. LIEDERMAN:
16          Q.   Okay.  Now, all there was, was the administration
17      of just the pill, right?
18                   I mean, after J.R. left, you say that that
19      day she received the pill?
20          A.   She took the pill, and they had to check her
21      blood.
22                   And then -- I forget the sequence, but that's
23      what was going on.
24          Q.   Now, she had to come back every day for the pill
25      or she was give --
```

1    A.   Oh --

2    Q.   -- a supply?

3    A.   -- we had to come back that first week every day.

4  I was exhausted.

5              I mean, you know, we were really getting up

6  very early in the morning, and I was -- by the end of the

7  first week, I was totally wiped out.

8              It was -- it was very tiring.  But yes, she

9  had to come and get that.

10             MR. MILSTEIN:  Was it one pill?

11             THE WITNESS:  No.  It was six pills.  It was

12  a lot pills.

13             I -- I mean, she thought it was like one pill

14  in the morning and one pill at night.  I did, too.  And

15  then he said, no, no, it's six pills in the morning, and

16  you have to account for the pills.  I said, what do you

17  mean account?

18             He said, we -- we need the bottle back.  We

19  need to know you --

20  BY MR. LIEDERMAN:

21    Q.   So you would come pick up the pills for the day,

22  go home, and then come back the next day?

23    A.   No.  Initially, the first week, we were coming in

24  to get all this testing done.

25             And it was after that, that we were getting

1    the pills.

2        Q.    So the testing proceeded starting the regimen of

3    the pills or it was that day that she would take a pill and

4    she was also being tested?

5              Just clear that up because I'm confused.

6        A.    No.  I think while she was doing the testing, she

7    was getting the pills.

8              But then when we went home, like the next

9    week or something like that, then she was taking the pills

10   at home.

11       Q.    Okay.

12       A.    And I remember that I had to keep reminder her,

13   look, he told us it has to be exactly 12 hours apart.  And

14   so I was trying to keep track of time so she would take the

15   right amount at the right time.

16       Q.    Generally during this period, how would you

17   describe her ability to tolerate the medication she was

18   getting?

19       A.    The first week or two, she was taking it, but she

20   was having a -- she was being challenged having to swallow

21   that many of pills.

22              And I think -- I think she said, this can't

23   be right.  I thought we were only taking one pill in

24   morning and one pill at night.

25       Q.    The challenge from -- was this a problem with

1   swallowing generally that she had?

2       A.   Well, you know, her problem is her tongue is

3   swollen, and I can't know how difficult it is for her to

4   swallow or not.

5               She'll tell me from time to time, you know, I

6   can't take horse pills.  They're too big for me to swallow.

7       Q.   Was that ever, in that meeting with Dr. Fonseca, a

8   topic of discussion --

9       A.   No.

10      Q.   -- that oral medication might be problematic

11  because it's difficult for her to swallow?

12      A.   No.  I don't think that discussion --

13      Q.   Okay.

14      A.   -- was ever --

15      Q.   But in the course of having to take these many

16  pills and keep coming back, did you have any discussion

17  with your wife about the decision going on this treatment

18  because it wasn't --

19      A.   You know, I --

20      Q.   -- as easy as you thought?

21      A.   I felt from the beginning that it was her choice.

22  And I said, Iris, you know, I know you don't like to be

23  taking these pills, but that's what this is all about.  I

24  said, you know, you're either doing this or you're not

25  doing this.

1              And she tried for the first couple of weeks.

2     I forget how long she went.  At some point in time she

3     said, I can't do this anymore.  And I don't know whether

4     that was the second week or the third week, but it was

5     somewhere in that time frame.  She said, I can't do this

6     anymore, and she stopped.

7          Q.   Did she intend to withdraw from the treatment?

8               Is that what you're saying?

9               She didn't finish out the entire first phase?

10         A.   I don't know how long she was supposed to be on

11    it, but after -- I think it was three -- no more than four

12    weeks.

13              Whatever it was, she stopped.  I can't do it

14    anymore, she said.

15         Q.   Okay.  Eventually she started to exhibit some

16    behavioral changes?

17         A.   Yes.

18         Q.   When did that happen, to your recollection,

19    chronologically from her taking the pills during this

20    period, saying that I'm stopping, that's it?

21              When -- at what point were behavioral changes

22    noticed by you?

23         A.   Between a week or two, somewhere in -- I don't

24    know.

25         Q.   After she stopped?

Page 75

1        A.    After she stopped.

2        Q.    Okay.  And what did you notice?

3        A.    Well, the first thing that I noticed she got

4    very -- she got very irritable.  That was the first thing I

5    noticed.

6              And then the next thing I noticed is that she

7    started talking really fast, like this, and was really

8    starting to -- and then she was very curt with people that

9    we were seeing and what have you.  And it was kind of -- it

10   was slow.  It was like a buildup, you know.

11             Her sister was in on New Year's Eve.  And I

12   remember that we had dinner together at an Italian

13   restaurant.  And at that time, you know, she was still

14   light and -- but the next week is when I first started

15   noticing it.  And Adele, her sister, started noticing she's

16   acting funny.

17             And then it just kept getting progressively

18   worse to the point where she was actually being mean.  And

19   her whole personality changed.  The woman -- the woman that

20   I knew for 47 years disappeared.  I don't know who this

21   woman is.  I mean, she -- she changed right in front of our

22   eyes.

23       Q.    This progression --

24       A.    Yeah.

25       Q.    -- to that point, was that over a number of weeks

1   or over five days or over --

2       A.   Oh, no.

3       Q.   -- a few days?

4       A.   No.   It was -- I said the first things I noticed

5   was within the first two weeks.   And it started getting

6   worse and worse and worse over time.   It was probably

7   within the next month, month and a half, that it was really

8   getting very bad.

9       Q.   I just want to go back to the decision period

10  about going into this Constellation product.

11      A.   Okay.

12      Q.   Was there an instance where you inquired about an

13  alternative oral treatment in lieu of the Constellation

14  product, you inquired of the people at the Mayo Clinic

15  about a different product to use rather than the one that

16  she eventually used?

17      A.   I don't remember that.

18      Q.   Do you recall ever talking to J.R. about a product

19  called i-x-a-z-o-m-i-b, ixazomib?

20      A.   No, I don't.

21      Q.   Or that there was a product that had been approved

22  by the FDA that was oral and whether or not that one should

23  be used?

24      A.   I do not remember that.

25      Q.   In an email from J.R. to -- is your email

1   DanSpedale@cox.net?

2       A.   That's one of my emails, yes.

3       Q.   He said, "I heard back from Dr. Fonseca regarding

4   ixazomib.  He said these are two different drugs.  He would

5   recommend to first try the study drug BET inhibitor.  Then

6   she can try the approved ixazomib later.  And then as for

7   the port, we can certainly see if that is the best option

8   for you when you meet with Dr. Bergsagel.  Let me know if

9   you want to pursue the trial."

10           Do you recall that type of a communication?

11      A.   The email address is correct.  I don't recall that

12  communication.

13      Q.   And then you replied on November 23, "Thank you

14  for checking with Dr. Fonseca.  Yes, we do want to continue

15  with the trial."

16      A.   What was the date of that?

17      Q.   November 23, 2015.

18      A.   So that might have been right at the beginning,

19  right?

20      Q.   Right.  That's at the beginning.

21           So do you recall that after you met with

22  Dr. Fonseca you became aware of another drug and asked J.R.

23  whether or not he would check with Dr. Fonseca about

24  whether that should be the treatment rather than the trial

25  study?

1     A.   I don't recall that.

2               And I need to make you aware that Iris uses

3     my email address because she rarely checks hers.  And I

4     just don't recall that sequence that you're describing, but

5     the email address is mine.

6     Q.   Well, the email that was signed, though, said, "Hi

7     J.R."

8               And it says, "Have a great Thanksgiving.  Dan

9     Spedale."

10    A.   So what I was responding to?

11    Q.   There's a chain here, and it was J.R.'s email.

12    "Hello Mr. and Mrs. Spedale, I heard back from Dr. Fonseca

13    regarding ixazomib.  He said these are two different drugs

14    and that he would recommend to first try the study drug."

15    A.   If that's -- if that's what I responded to at the

16    time.  I mean, if --

17    Q.   Okay.

18    A.   I can't imagine it wasn't me, but I really don't

19    remember the specifics of that.  It's been a long time.

20              I don't even remember what that other thing

21    is you're describing, so --

22    Q.   Do you recall having any questions put to him with

23    respect to her weak veins and the many blood draws and that

24    she might need a port, that you took the step to ask him

25    about whether there could be a port?

1    A.    I do know that her veins were pretty much shot

2    after six years of chemo.

3              She had very tiny veins to begin with, and

4    that seems like a reasonable request.

5    Q.    So you have no recollection as to there being this

6    other drug that's referred to or how he came to have this

7    inquiry to pass on to Dr. Fonseca?

8    A.    I just -- I just don't remember the specifics of

9    that.

10    Q.    Okay.

11    A.    I really don't.

12    Q.    And do you recall any conversation you had with

13    your wife that she learned of another drug and she was

14    going to make an inquiry at the Mayo Clinic about the use

15    of the drug?

16    A.    I really just don't remember that.

17    Q.    And when the phrase is used in an email to you of

18    study drug, you have no -- your testimony today is that, at

19    the time, you had no particular understanding of what it

20    meant to be a study drug?

21    A.    It -- it didn't -- it wasn't part of what I

22    understood this whole thing was all about.

23    Q.    And when you responded, yes, we do want to

24    continue with the trial --

25    A.    Well, by that time, we were told it was a trial.

Page 80

```
 1      Q.   Okay.  And what did you understand a trial to
 2  be?
 3      A.   I thought it was like the same kind of trial that
 4  Iris first heard about on CyBorD.
 5           They said we have this trial going where, you
 6  know, some people get it and some people don't.  But, you
 7  know, we want you to have the drug because -- Dr. Fonseca,
 8  we want you to have the drug because of the state that
 9  you're in.  You need to be using the drug and not get it.
10           So that was my context, if that's what you're
11  asking.
12      Q.   By the way, at the time that she went off this
13  drug, the Constellation --
14      A.   Yeah.
15      Q.   -- drug, do you recall whether she got any
16  positive results back from her blood test that there were
17  improvements?
18      A.   Oh, gee, I --
19      Q.   If you don't remember, you don't remember.
20      A.   That one, I don't know.
21      Q.   Tell me about -- just go over, you know, her
22  participation and family life or housewife, housekeeping
23  affairs before the Constellation Pharmacy trial and the
24  behavioral changes after, how it affected your life and her
25  life at home?
```

Page 81

1       A.    Well, prior to the trial, we -- as I said to you

2    early on in the discussion, we were doing things together.

3    We were going out.  We were having dinner with other

4    people.  We were involved in activities at Sun City Grand,

5    and things were going pretty good.

6              But after the changes started with, I was

7    going to say the third or fourth week, she became -- she

8    became so angry, and she became mean spirited.  She would

9    change from one minute to the next.  She was constantly

10   asking me to do this, constantly -- her whole tone, her

11   whole behavior became strange.

12      Q.    Was she able to -- was she no longer doing things

13   at home that she was able to do before or was she still

14   carrying on activities in the house?

15      A.    I don't think she was carrying on activities like

16   she was doing before.

17             She wanted everybody -- she wanted me, not

18   everybody -- she wanted me to be doing all of these things.

19   And it was coming at a mile a minute.  Dan, you've got to

20   do this.  Dan, you've got to do that.  Dan -- where are you

21   Dan?  Why didn't you -- it was building and building.

22             It got to point, I said, Iris, I can't do all

23   of this.  And she would say, I don't want to hear that.

24   And then the next thing I knew she was like, you know what,

25   I'm not getting good enough rest.  I don't want you in the

Page 82

1    bedroom.

2                    I said, well, where am I supposed to go?

3    Well, you can sleep in the den.  I said, I'm not going to

4    be comfortable over there.  She said, well, figure it out.

5    And I said, what are you talking about?  I didn't

6    understand her behavior.

7        Q.    Before the Constellation Pharmacy period, who did

8    the cooking at home?

9        A.    She did most of the cooking.

10       Q.    Was she still doing the cooking after?

11       A.    Yeah.  To some degree, uh-huh.

12       Q.    Okay.  What about shopping, shopping for food?

13       A.    I was pretty much doing the shopping, I would say,

14   most of time anyway.

15                   She may have gone out a few times.  I

16   wouldn't say she would never shop, but I don't think she

17   was shopping as she was before.

18       Q.    What about driving, did she have a driver's

19   license --

20       A.    She did --

21       Q.    -- in Arizona?

22       A.    -- at that time.

23       Q.    And what period was she utilizing the car --

24   strike that.

25                   Did there come a point in time that she

Page 83

1   stopped driving?

2       A.   At which time frame?

3       Q.   Well, did there ever come a time where she could

4   no longer drive?

5       A.   Yes.

6       Q.   And when did that --

7       A.   That was --

8       Q.   -- happen?

9       A.   That was after she was hospitalized.

10      Q.   Tell me about the circumstances leading up to her

11  hospitalization.

12      A.   I was not -- I was not living in the house at that

13  time.  She --

14           MR. MILSTEIN:  Arthur, you need to ask him

15  about the legal stuff that happened.

16  BY MR. LIEDERMAN:

17      Q.   Okay.  So you said that you were no longer living

18  in the house.

19      A.   No.  She --

20      Q.   What were the circumstances that led to you

21  leaving the house?

22      A.   I didn't want to.

23           She called the police and put out a -- what

24  the hell did they call that --

25           MR. MILSTEIN:  Restraining order?

1              THE WITNESS:  -- restraining order on me.

2              And the cops came in and said, Mr. Spedale,

3    you have to leave the house immediately.  I said, what are

4    you talking about?

5              They said, we've got this legal document.

6    They showed it to me.  And they said, you have to be out of

7    here in 90 minutes.  And I said, what are you -- they said,

8    take what you can.  You have to be out of here in 90

9    minutes.

10             I said, what are you talking about?  He said,

11   you can't talk to your wife.  You can't get within 30 or 40

12   feet of your wife or something like that.  You just need to

13   leave.  And I said, well, what if I don't?  They said,

14   you're going right to jail, and if we find out that you

15   violated any of these, you're going right to jail.

16             So the first thing I did is I had to go to a

17   hotel.  I mean, I was completely caught off guard by this.

18   I had no idea how this had even happened.  And then after I

19   was in a hotel for three or four days, I was trying to

20   figure out, well, I'll have to rent an apartment.

21             I don't know if you're familiar with Phoenix

22   during that time frame, but that's when the Cactus League

23   is here, and every rental in the city is pretty much gone.

24   There's nothing to chose from.

25             And the only thing that I could find was a

Page 85

1    three story walk-up apartment about four miles away.  And I

2    couldn't stay in a hotel for that time, so I had to rent

3    that place.  And I had to sign it for at least three

4    months.

5                    So I was no longer in the house when I got

6    word that she had been picked up at one of the restaurants

7    that we frequented.  She had gone into the kitchen, from

8    what I understand from the owner, and was going around by

9    all the boiling pots and pans.

10                   And he said, Iris, what are you doing here?

11   And she said, my food tastes funny.  I knew you guys are

12   trying to poison me.  And he told her, you have to leave.

13   And she refused to leave.  And that's when he called the

14   police.  They, in turn, called the firemen and put her on a

15   gurney and took her to Del Webb Hospital.

16                   While this was going on, my son, Darren, was

17   in communication with the police.  Because prior to this

18   event, she had been doing crazy things.  You know, she

19   would walk into neighbors' houses taking stuff.

20   BY MR. LIEDERMAN:

21        Q.    The time frame -- this was how long after she went

22   off the drug?

23                   I mean, are we talking about months or a year

24   or two later?

25        A.    Weeks.

Page 86

1   Q.   Weeks?

2            Within weeks?

3   A.   Yeah.

4   Q.   By then, it would have been a month or two

5   because --

6   A.   A month or two.

7            MR. MILSTEIN:  Let's go off the record.

8            (Recess taken from 12:31 p.m. to 12:32 p.m.)

9            MR. MILSTEIN:  Okay.  We can go back on.

10           Let him ask a question.

11           THE WITNESS:  All right.

12  BY MR. LIEDERMAN:

13  Q.   Okay.  So she was -- how long was she hospitalized

14  for?

15  A.   At least a month, I think.

16  Q.   Do you know what treatment she was being given at

17  that time while she was at the hospital?

18  A.   I wasn't supposed to even --

19  Q.   Because of the restraining order?

20  A.   Yeah.  In fact, all of -- I had no longer access

21  to any of her medical information.

22           I think there's something called a HIPAA

23  something or other.  And she had said, I don't want him to

24  know about anything about anything.

25           So I couldn't even -- that's when Darren

Page 87

1   became the only communication vehicle as to what was going

2   on with her medically.

3            MR. MILSTEIN:  So the people who you would

4   ask those questions of would be Darren and then Adele.

5            THE WITNESS:  Adele.

6            MR. MILSTEIN:  She's in New York, also.

7            That's her sister.  So if you want to

8   schedule those two.

9   BY MR. LIEDERMAN:

10      Q.   So there came a point in time that there was

11  reconciliation with your wife as far as the restraining

12  order was removed?

13      A.   Oh, that was months later.

14      Q.   Months later, then the restraining order was

15  removed?

16      A.   Yes.

17      Q.   But you haven't ever -- well, when did she end up

18  in the assisted living facility?

19      A.   I think October of 2016.

20      Q.   So not long after her hospitalization?

21      A.   Yeah, somewhere -- yeah.

22      Q.   Who made that decision that she should go into

23  assisted living?

24      A.   Darren had come back numerous times to find out

25  what was going on and found her in a state where she was

Page 88

1    just sitting around.

2              She hadn't eaten in days.  He asked her had

3    she slept at all, and she didn't know.  Have you been -- we

4    had a dog.  Have you fed the dog?  I don't know. She was in

5    a state where she just -- she was incapable of taking care

6    of herself from what Darren told me.

7              Again, I -- you know, I wasn't in the house.

8    I had a problem and a serious problem.  That's why I was

9    listening to you with your back.  I had lived for years in

10   a single story house for a reason, and now I'm suddenly

11   having to go up three flights of stairs daily, you know,

12   bringing up groceries and so on.

13             And during the process of having to do that,

14   I injured my back seriously.  In 2016, I had five epidurals

15   and some minor back surgery.  And I was in the hospital for

16   a month, and then I was rehab for a month.  So I was out of

17   everything while all of this was going on.

18             I didn't know what was going on.  But I do

19   know that the woman that I knew for 47 years no longer

20   exists.  She's -- she's not the same as she was.

21   Q.   Your back condition occurred how long after you

22   moved out of the house?

23   A.   I was in that apartment for three months.  I would

24   say I got into trouble after the second month.  Something

25   happened.

Page 89

1      Q.    After three months, you moved?

2      A.    I had only a three month lease at this place.  It

3   was very expensive.

4            And by that time, everybody had gotten away

5   from the Cactus League.  And I was looking for other

6   rentals, and I found a rental at Sun City Grand, in

7   Surprise, Arizona.

8            That was not far away from the facilities

9   there at Sun City Grand and also where I had some friends,

10  some colleagues who I could call on if I needed to go

11  somewhere because I was homebound.

12     Q.    Uh-huh.

13     A.    And so the gentleman said, okay, well, I'll rent

14  it to you up until the end of October, beginning of

15  November.  That's our big season, and I have to double your

16  rent.  I said, I can't afford that.

17           So it was during that time frame that I

18  eventually met with one of my friends from Sun City Grand

19  who had gone to this independent living facility.

20           And he said, Dan, you know, you're going to

21  be 80 soon.  You ought to think about what happens if

22  nobody is around.

23     Q.    You look good for 80.

24     A.    Thank you.

25     Q.    You do.  I'm not being facetious.

1      A.    He said, you know, what's going to happen to you?

2    He said, you need -- you need support.  You don't have any

3    support anymore at home.  You don't have any support from

4    Iris.  What are you going to do?

5                 And so I went over there.  And I said, you

6    know, this probably makes some sense.  And I talked to the

7    landlord who was going to push me out anyway.  And I said,

8    here's my situation.  He said, Dan, he said, you've been a

9    good tenant.  I'll let you out a month early.

10                So I moved in to the independent living

11   facility about a month before Iris decided that Iris had to

12   go to an assisted living facility.  And it just turns out

13   that this thing I'm in is something called a life care, and

14   they have about -- you know, 1,000 feet away from the

15   building I'm in, they have an assisted living facility over

16   there.

17                And Darren inquired.  He said, you know, what

18   are the requirements for getting my mother in here?  And,

19   you know, they gave him the details and so forth, and

20   that's when she was moved in there.

21      Q.    At what point did you start having contact with

22   your wife again?

23      A.    When I was still in the apartment, the one before

24   I went to the independent -- she would come to my apartment

25   and say, you know --

1    Q.    This is before her hospitalization?

2    A.    No.  This is after the hospitalization.

3    Q.    This is after the hospitalization but before

4    Darren decided --

5    A.    Correct.

6    Q.    -- she wasn't taking care of herself?

7    A.    There was a period of time in there where, you

8    know, she was managing -- she was eating out all the time

9    from what I was told.  She didn't cook anymore, and she was

10   not driving anymore.

11             Because during that crazy phase that she was

12   in, the cops stopped her.  You know, she had run through

13   lights.  And once she was hospitalized and they were aware

14   that all of this was going on -- how were they aware?  She

15   had called the police and the firemen to our old home

16   numerous occasions during this time that I was kicked out.

17             She was hallucinating things.  She pulled all

18   the wires out of the house.  She pulled all the cables out

19   of the house.  She thought people were coming to get her.

20   She heard noise.  So she kept calling the police and the

21   firemen.  They began to know who she was.

22             And so Darren got caught up -- again, knowing

23   these individuals -- I meant to get to this.  So at the

24   time that she was arrested and they brought her to the

25   emergency room at the hospital, they actually called

Page 92

1    Darren.

2              One of the cops happened to be a cop who had

3    been engaged multiple times at that house, and he knew her

4    son.  And he called him.  He said, Darren, I have your

5    mother in the emergency room at Del Webb Hospital, and what

6    do you want me to do?

7              And Darren had already been looking for all

8    kinds of possibilities to get her some help.  And that same

9    hospital had a ward where, you know -- I forget what you

10   call it -- mental ward.  And he said, let me call the

11   hospital.

12             He called the hospital, and they said, yes,

13   we can admit your mother tomorrow.  And that's how that

14   happened.

15        Q.   And just go back over how you -- so when she was

16   coming to see you --

17        A.   Yeah, about three or four times.

18        Q.   The protective order was still in effect at that

19   point?

20        A.   No.  It was after the protective order was quashed

21   I think is the word they used.

22        Q.   In order to get rid of it, did you have to go to

23   court with a lawyer or your son took care of trying to

24   resolve the issue --

25        A.   My son --

Page 93

1       Q.    -- with a lawyer?

2       A.    My son took her to court, to the courthouse to get

3    it squashed.

4       Q.    Okay.

5             MR. MILSTEIN:  And that lawyer that somehow

6    she had retained agreed that it was all basically a mistake

7    and she was mentally incompetent.

8             MR. LIEDERMAN:  Okay.

9             THE WITNESS:  So the person that I knew for

10   47 years doesn't exist anymore.

11   BY MR. LIEDERMAN:

12      Q.    Since the hospitalization, have there been

13   improvements in her behavior and her condition that you've

14   noticed or been aware of?

15      A.    Are you talking about on the few occasions that

16   she came to visit me?

17      Q.    No, no.

18            I'm just saying, as a general observation,

19   between the time that she got out of the hospital --

20      A.    Yeah.

21      Q.    -- I guess essentially since she's been in

22   assisted living until now, which has been how long a

23   period?

24      A.    It's been a year and a half.  Almost two years.

25      Q.    Two years.

1           So over this two-year period, have you seen

2    improvements?

3           I'm not asking whether or not she's the same

4    person that she was 30 years ago.

5           I'm saying improvements in what you saw as

6    the --

7    A.   She still --

8    Q.   -- behavioral issues that --

9    A.   She still exhibits certain behaviors around me,

10   and I think she does it at the facility.

11          Because the nurses there and what have you

12   tell me that she's rude to people there.  She's -- she's

13   very abrupt with them.  Nothing is ever right.  She's

14   constantly complaining about how she's not getting the

15   treatment she expects.

16          And I don't know how best to describe it.

17   She's not anywhere close to where she was before she

18   started taking this drug.  She's trying to cope with the

19   situation where she realizes she can't handle her own

20   needs.

21          She needs help bathing.  She needs help

22   eating.  She needs help -- she has incontinence issues that

23   she's dealing with.

24          She's just -- to her words, she's a mess.

25   And behaviorally --

Page 95

1                MR. MILSTEIN:  But she has improved since

2    being in the hospital.

3                THE WITNESS:  She --

4                MR. MILSTEIN:  That's what he's asking.

5    BY MR. LIEDERMAN:

6        Q.   It's a relative concept.

7        A.   Yeah.  Okay, relative.

8                MR. MILSTEIN:  Yeah.

9    BY MR. LIEDERMAN:

10       Q.   Right.

11               MR. MILSTEIN:  Why don't you talk a little

12   bit about how she's gotten somewhat better.

13               THE WITNESS:  I was going to say, you know,

14   to the degree that I would help a friend if they had some

15   needs and they couldn't get help anywhere, I have, to that

16   extent, allowed Iris to come over and have dinner at my

17   place.

18               They call it a meal swap.  Because at least

19   over at my facility there are other people there that are

20   closer to her age that know who she is.  And they say hello

21   to her, and it makes her feel better and what have you.  So

22   she may come over three or four times every couple of

23   weeks.

24               And the only way she can do that is if I sign

25   a sheet that said, okay.  You know, because the address

```
                                              Page 96
1    that she's using is the one that I pay all the bills on and
2    everything else, but she's living at a completely different
3    location than I am.
4    BY MR. LIEDERMAN:
5        Q.   So you're just saying that the other locations,
6    you still own?
7                You're renting or you own the --
8        A.   No, no.  We had to sell.
9        Q.   You sold it?
10       A.   We had to.  I had to.  There's no way to take care
11   of it.
12               MR. MILSTEIN:  When she said she lived at
13   Freedom Plaza --
14               THE WITNESS:  She --
15               -- MR. MILSTEIN:  -- is that your address or
16   your address.
17               THE WITNESS:  Her address is The Inn at
18   Freedom Plaza.  I live at Freedom Plaza.  I'm using --
19   we're using a common address only because she is incapable
20   of remembering what day it is, let alone paying bills or
21   anything else.
22               So I have to make sure that all of her bills
23   are paid and everything is paid.  It comes to this common
24   address.  We don't live together at all, but we have a
25   common address to accommodate the financial needs that she
```

1    has.

2    BY MR. LIEDERMAN:

3         Q.    Did you ever have any discussion with Dr. Fonseca

4    after her behavior started to change?

5         A.    I have had no contact with any of her doctors.

6         Q.    Okay.

7         A.    Darren is the only contact --

8         Q.    Oh, okay.

9         A.    -- for all medical.

10        Q.    You see, you just cut off a whole series of

11   questions, maybe 3 or 4.

12                    Famous last words, 3 or 4 or 10.

13                    MR. LIEDERMAN:  No further questions.

14                    MR. MILSTEIN:  No questions.

15                    MR. LIEDERMAN:  Thank you.

16                    (Deposition concluded at 12:52 p.m.)

17

18

19

20

21

22

23

24

25

Page 98

1    STATE OF ARIZONA       )

2    COUNTY OF MARICOPA     )

3              BE IT KNOWN that the foregoing deposition was

4    taken by me pursuant to stipulation of counsel; that I was

5    then and there a Certified Reporter of the State of

6    Arizona, and by virtue thereof authorized to administer an

7    oath; that the witness before testifying was duly sworn by

8    me to testify to the whole truth; that the questions

9    propounded by counsel and the answers of the witness

10   thereto were taken down by me in shorthand and thereafter

11   transcribed into typewriting under my direction; that the

12   witness has requested a review pursuant to Rule 30(e)(2);

13   that the foregoing pages are a full, true, and accurate

14   transcript of all proceedings, all done to the best of my

15   skill and ability.

16             I FURTHER CERTIFY that I am in no way related to

17   nor employed by any parties hereto nor am I in any way

18   interested in the outcome hereof.

19             DATED at Phoenix, Arizona, this 3rd day of August,

20   2018.

21

22

23

24                         _____
                           Talia Douglas, RPR
25                         Certified Reporter #50775

1                    DEPOSITION SIGNATURE PAGE

2    SPEDALE vs. CONSTELLATION PHARMACEUTICALS, INC.
     Assignment No. J2433646
3

4              DECLARATION UNDER PENALTY OF PERJURY

5          I declare under penalty of perjury that I have

6    read the entire transcript of my Deposition taken in the

7    captioned matter or the same has been read to me, and the

8    same is true and accurate, save and except for changes

9    and/or corrections, if any, as indicated by me on the

10   DEPOSITION ERRATA SHEET hereof, with the understanding that

11   I offer these changes as if still under oath.

12

13         Signed on the _____ day of

14   _____, 20_____.
15

16

17

18

19   _____
                      Daniel Spedale

20

21

22

23

24

25

```
                                                      Page 100
 1                      DEPOSITION ERRATA SHEET
                        Assignment No. J2433646
 2

 3    Page No._____Line No._____Change to:_____

 4    _____

 5    Reason for change:_____

 6    Page No._____Line No._____Change to:_____

 7    _____

 8    Reason for change:_____

 9    Page No._____Line No._____Change to:_____

10    _____

11    Reason for change:_____

12    Page No._____Line No._____Change to:_____

13    _____

14    Reason for change:_____

15    Page No._____Line No._____Change to:_____

16    _____

17    Reason for change:_____

18    Page No._____Line No._____Change to:_____

19    _____

20    Reason for change:_____

21    Page No._____Line No._____Change to:_____

22    _____

23    Reason for change:_____

24
      SIGNATURE:_____DATE:_____
25              Daniel Spedale
```

Page 101

1                    DEPOSITION ERRATTA SHEET
                      Assignment No. J2433646
2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24
     SIGNATURE:_____DATE:_____
25              Daniel Spedale