## 5    EFFECTS IN HUMANS

### 5.1    Introduction to clinical trials

CPI-0610 is being evaluated in three separate Phase 1 clinical studies in patients with progressive lymphoma (Study 0610-01); in patients with acute leukemia, myelodysplastic syndrome (MDS) or myelodysplastic/myeloproliferative neoplasms (MDS/MPN) (Study 0610-02); and in patients with multiple myeloma (Study 0610-03). Each of these studies evaluates CPI-0610 given by mouth daily for 14 consecutive days followed by a 1-2 week break from treatment. The Phase 1 trial in lymphoma was the first study to enroll patients, and began at a capsule dose of 6 mg QD. The Phase 1 trials in patients with acute leukemia, MDS or MDS/MPN and in patients with myeloma began with a capsule dose of 24 mg QD.

Between September of 2013 and June of 2015 a total of 93 patients had been treated across the three studies. The numbers of patients enrolled, as well as the dose levels at which they were treated, are presented in Table 5-1 Table 5-1. All of the patients included in Table 5-1 Table 5-1 were treated with the capsule formulation of CPI-0610.

**Table 5-1    Enrollment in Studies 0610-01, 0610-02, and 0610-03**

|                      | 0610-01 | 0610-02 | 0610-03 |
|----------------------|---------|---------|---------|
| Enrolled             | 47      | 27      | 19      |
| Treatment terminated | 37      | 25      | 17      |
| Ongoing[a]           | 10      | 2       | 2       |
| **Dose Levels:**     |         |         |         |
| 6 mg QD              | 5       |         |         |
| 12 mg QD             | 3       |         |         |
| 24 mg QD             | 3       | 3       | 3       |
| 48 mg QD             | 7       | 5       | 3       |
| 80 mg QD             | 6       |         |         |
| 120 mg QD            | 4       | 5       | 4       |
| 170 mg QD            | 7       | 3       | 4       |
| 85 mg BID            |         |         | 3       |
| 110 mg BID           |         |         | 2       |
| 230 mg QD            | 9       | 3       |         |
| 300 mg QD            | 3       | 4       |         |
| 400 mg QD            |         | 6       |         |

[a] As of 27 June 2015

Brief summaries of the results in each study are provided below.

### 5.2    Summaries of clinical trials

### 5.2.1    Study 0610-01: Phase 1 study in patients with lymphoma

The patients enrolled in this study have progressive lymphoma for which effective standard treatments are no longer available. Table 5-2 Table 5-2 summarizes the characteristics of the first 47 patients treated in this study with CPI-0610 capsules, doses ranging from 6 to 300 mg QD.

CONSTELLATION PROD_013687

**0610-03 Myeloma Patient Status**

| Patient No. | Initials | Age/sex | Cancer | Dose (mg/day) | Date C1D1 | Date of Last Dose |
|---|---|---|---|---|---|---|
| 07-301 | RR | 67/male | IgA myeloma | 24 | 7/15/2014 | 2/3/2015 |
| 07-302 | PEC | 65/female | multiple myeloma | 24 | 7/22/2014 | 8/4/2014 |
| 07-303 | JB | 56/male | multiple myeloma | 24 | 9/17/2014 | 9/30/2014 |
| 02-304 | SRK | 66/male | multiple myeloma | 48 | 10/17/2014 | 12/14/2014 |
| 07-305 | MR | 58/male | multiple myeloma | 48 | 10/21/2014 | 2/10/2015 |
| 01-306 | TT | 66/male | multiple myeloma | 48 | 10/28/2014 | 12/2/2014 |
| 07-307 | KB | 56/female | multiple myeloma | 120 | 11/18/2014 | 11/28/2014 |
| 02-308 | JMN | 44/male | IgG kappa mutliple myeloma | 120 | 11/19/2014 | 2/3/2015 |
| 08-309 | RSC | 80/male | multiple myeloma | 120 | 12/3/2014 | 12/16/2014 |
| 07-310 | CD | 71/female | multiple myeloma | 120 | 12/3/2014 | 1/6/2015 |
| 07-311 | EG | 78/male | multiple myeloma | 170 | 1/7/2015 | 1/20/2015 |
| 07-312 | JC | 61/male | progressive multiple myeloma | 170 | 1/13/2015 | 2/17/2015 |
| 01-313 | RCF | 64/female | multiple myeloma | 170 | 1/22/2015 | 3/31/2015 |
| 07-314 | RD | 66/male | multiple myeloma | 170 | 2/4/2015 | 3/18/2015 |
| 02-315 | AL | 72/male | multiple myeloma | 85 BID | 2/18/2015 | 4/9/2015 |
| 07-316 | LG | 61/female | multiple myeloma | 85 BID | 2/25/2015 | 3/31/2015 |
| 02-317 | WAB | 67/male | multiple myeloma | 85 BID | 3/27/2015 | 4/29/2015 |
| 08-318 | CHS | 71/male | multiple myeloma | 110 BID | 5/6/2015 | 8/11/2015 |
| 02-319 | MDH | 56/female | multiple myeloma | 110 BID | 6/9/2015 | 7/13/2015 |
| 07-320 | DB | 58/male | multiple myeloma | 110 BID | 7/21/2015 | 8/23/2015 |
| 02-321 | RRG | 70/male | multiple myeloma | 150 BID | 9/10/2015 | 11/4/2015 |
| 01-322 | EK | 71/female | multiple myeloma | 150 BID | 9/15/2015 | 9/28/2015 |
| 02-323 | VLT | 56/female | multiple myeloma | 150 BID | 10/13/2015 | 11/23/2015 |
| 01-324 | JMJ | 79/female | multiple myeloma | 150 BID | 10/15/2015 | 10/28/2015 |
| 08-325 | IRS | 72/female | multiple myeloma | 150 BID | 12/10/2015 | 12/23/2015 |
| 01-326 | LMJ | 66/female | multiple myeloma | 225 QD (tabs) | 3/8/2016 | 3/22/2016 |
| 07-327 | JL | 57/male | multiple myeloma | 225 QD (tabs) | 3/22/2016 | 5/10/2016 |
| 08-328 | KWB | 62/male | IgG kappa mutliple myeloma | 225 QD (tabs) | 6/1/2016 | 6/13/2016 |
| 07-329 | JCH | 66/male | multiple myeloma | 225 QD (tabs) | 6/14/2016 | |
| 07-330 | SES | 64/female | multiple myeloma | 225 QD (tabs) | 6/22/2016 | |

CONSTELLATION PROD_000568

U.S. Department of Health and Human Services
Food and Drug Administration

For use by user-facilities,
importers, distributors and manufacturers
for MANDATORY reporting

Relsys International, Inc., FDA Facsimile Approval: 01-JAN-1997

# MEDWATCH
**3500A Facsimile**

Constellation Pharmaceuticals

| Mfr Report # | 15US000050 |
|---|---|
| UF/Importer Report # | |
| | FDA Use Only |

Page 1 of 5

## A. PATIENT INFORMATION

| 1. Patient Identifier | 2. Age at Time of Event: 63 Years | 3. Sex | 4. Weight |
|---|---|---|---|
| DER | or Date of Birth: 03/06/1952 | ☐ Female ☒ Male | 177.7 lbs or 80.6 kgs |

In confidence

## B. ADVERSE EVENT OR PRODUCT PROBLEM

1.☒ Adverse Event  and/or   ☐ Product Problem (e.g., defects/malfunctions)

2. Outcomes Attributed to Adverse Event (Check all that apply)
- ☐ Death: _____ (mm/dd/yyyy)
- ☐ Life-threatening
- ☒ Hospitalization - initial or prolonged
- ☐ Required Intervention to Prevent Permanent Impairment/Damage (Devices)
- ☐ Disability or Permanent Damage
- ☐ Congenital Anomaly/Birth Defect
- ☐ Other Serious (Important Medical Events)

3. Date of Event (mm/dd/yyyy) 07/23/2015

4. Date of This Report (mm/dd/yyyy) 08/10/2015

5. Describe Event or Problem
Event Verbatim [PREFERRED TERM] (Related symptoms if any separated by commas)
Thrombocytopenia [Thrombocytopenia]
Anemia [Anaemia]
Confusion [Confusional state]

Case Description:
A 63 year-old black male patient, 01-229, was enrolled in the 0610-02 study, "A Phase 1 Study of CPI-0610, a Small Molecule Inhibitor of BET Proteins, in Patients with Acute Leukemia, Myelodysplastic Syndrome, or Myelodysplastic/Myeloproliferative Neoplasms."

His medical/surgical history included myelodysplastic/myeloproliferative overlap disease, hypertension, hyperlipidemia, Hepatitis C, low back pain, enlarged prostate, gastroesophageal reflux, leukocytosis, fatigue and QTC
continued in additional info section...

6. Relevant Tests/Laboratory Data, Including Dates
27Jul2015: Head CT Without Contrast: Impression: No acute intracranial abnormality.
27Jul2015: Chest X-ray: Impression: No evidence for pneumonia or pulmonary edema.
27Jul2015 16:15: Blood Culture: No growth at less than 24 hours reported 28Jul2015 07:39.
continued in additional info section...

7. Other Relevant History, Including Preexisting Medical Conditions (e.g. allergies, race, pregnancy, smoking and alcohol use, hepatic/renal dysfunction, etc.)
Race: Black
#1 --/--/2009 to 07/27/2014 Medical History, (Continued)
#2 --/--/2011 to --/--/2011 Medical History, (Continued)
#3 --/--/2012 to Ongoing Medical History, (Continued)
continued in additional info section...

Submission of a report does not constitute an admission that medical personnel, user facility, importer, distributor or manufacturer or product caused or contributed to the event.

## C. SUSPECT PRODUCT(S)

1. Name (Give labeled strength & mfr/labeler)
#1. CPI-0610 (CPI-0610) Capsule
#2.

2. Dose, Frequency & Route Used
#1. 400 mg, qd 14 days, Oral
#2.

3. Therapy Dates (if unknown, give duration) from/to (or best estimate)
#1. 07/16/2015 to UNK
#2.

4. Diagnosis for Use (Indication)
#1. MDS/MPN (Myelodysplastic syndrome)
#2.

5. Event Abated After Use Stopped or Dose Reduced?
#1. ☐ Yes ☒ No ☐ Doesn't Apply
#2. ☐ Yes ☐ No ☐ Doesn't Apply

6. Lot #   #1.   #2.
7. Exp. Date   #1.   #2.

8. Event Reappeared After Reintroduction?
#1. ☐ Yes ☐ No ☒ Doesn't Apply
#2. ☐ Yes ☐ No ☐ Doesn't Apply

9. NDC# or Unique ID

10. Concomitant Medical Products and Therapy Dates (Exclude treatment of event)
1) ALLOPURINOL (ALLOPURINOL)
2) HYDREA (HYDROXYCARBAMIDE)
continued in additional info section...

## G. ALL MANUFACTURERS

1. Contact Office - Name/Address (and Manufacturing Site for Devices)
Constellation Pharmaceuticals
215 First Street, Suite 200
Cambridge, MA 02142   UNITED STATES

2. Phone Number
617-714-0573

3. Report Source (Check all that apply)
- ☐ Foreign
- ☒ Study
- ☐ Literature
- ☐ Consumer
- ☒ Health Professional
- ☐ User Facility
- ☐ Company Representative
- ☐ Distributor
- ☐ Other:

4. Date Received by Manufacturer(mm/dd/yyyy) 07/28/2015

5. (A)NDA #
IND # 118814
STN #
PMA/ 510(k) #

6. If IND, Give Protocol # 0610-02

7. Type of Report (Check all that apply)
- ☐ 5-day ☐ 30-day
- ☐ 7-day ☐ Periodic
- ☐ 10-day ☒ Initial
- ☒ 15-day ☐ Follow-up #

Combination Product ☐ Yes
Pre-1938 ☐ Yes
OTC Product ☐ Yes

9. Manufacturer Report Number
15US000050

8. Adverse Event Term(s)
Thrombocytopenia, Anaemia, Confusional state

## E. INITIAL REPORTER

1. Name and Address
Dr. Amir Fathi
Massachusetts General Hospital (MGH)
55 Fruit Street Boston, MA 02114 UNITED STATES
continued in additional info section...

Phone #

2. Health Professional? ☒ Yes ☐ No
3. Occupation Investigator
4. Initial Reporter Also Sent Report to FDA ☐ Yes ☐ No ☒ Unk

10-Aug-2015 09:54

Constellation Pharmaceuticals

## MEDWATCH
3500A Facsimile (Back)      **(Continued)**

| | |
|---|---|
| Mfr Report # | 15US000050 |
| UF/Importer Report # | |
| | FDA Use Only |

**Page 2 of 5**

---
**ADDITIONAL INFORMATION**
---

**B5. EVENT DESCRIPTION (Continued)**

elevation. The patient had episodes of thrombocytopenia from 07-Jul-2014 to 23-Jul-2014 and anemia from 2009 to 27-Jul-2014.

Concomitant medications included allopurinol, Hydrea (hydroxyurea), oxycodone, OxyContin (oxycodone), and simvastatin.

Complete blood count (CBC) collected at the time of study screening on 06-Jul-2015 showed a hemoglobin of 8.0 g/dL, hematocrit 25.9 %, platelet count 47 K/uL, and a white blood cell (WBC) 64.54 K/uL. On 16-Jul-2015, study Day 1, the pre-dose CBC showed a hemoglobin of 7.8 g/dL, hematocrit 26.0 %, platelet count 34 K/uL, and a WBC 125.22 K/uL. In light of his rapidly increasing WBC the patient was started on treatment with hydroxyurea.

The patient received his first dose of study drug on 16-Jul-2015 at a dose of 400 mg oral daily for 14 days. The patient received his most recent dose of study drug prior to the event on 26-Jul-2015.

On 23-Jul-2015, the patients platelet count was 17 K/uL (normal range 150-400 K/uL). On 27-Jul-2015, the patient presented to an emergency room with confusion, anemia, and worsening (grade 4) thrombocytopenia and was hospitalized. Initial laboratory tests on 27-Jul-2015 collected at 15:45 showed a platelet count of 6 K/uL, hemoglobin 2.4 g/dL (normal range 13.5-17.5 g/dL), hematocrit 7.6 % (normal range 41.0-53.0 %), red blood cell count (RBC) 0.78 M/uL (normal range 4.50-5.90 M/uL) and WBC 7.18 K/uL (normal range 4.5-11.0 K/uL). Repeat laboratory tests collected at 17:13 showed a platelet count of 6 K/uL, hemoglobin 2.2 g/dL, hematocrit 7.1 %, RBC 0.73 M/uL and WBC 7.10 K/uL. On 27-Jul-2015 the patient was transfused with 2 units of RBCs and 1 unit of platelets. A chest x-ray showed no pneumonia or pulmonary edema; a computerized tomogram (CT) of the head without contrast showed no acute intracranial abnormality. Blood cultures were drawn. On 28-Jul-2015 at 01:30 laboratory results showed improvement with platelets 10 K/uL, hemoglobin 3.9 g/dL, hematocrit 11.6 %, RBC 1.25 M/uL and WBC 5.75 K/uL. Blood culture report at 07:39 showed no growth at less than 24 hours. On 28-Jul-2015 the patient was transfused with 4 units of RBCs and 1 unit of platelets. During the course of his hospitalization the patient experienced black tarry stools and nose bleeds. The gastrointestinal (GI) service was consulted and endoscopy was performed, but no clear source of bleeding was found. Three more subsequent transfusions were given on 29-Jul-2015 (2 units RBCs 1 unit platelets), 30-Jul-2015 (1 unit RBCs 1 unit platelets) and 31-Jul-2015 (1 unit platelets only). The patient was discharged on 03-Aug-2015. The grade 3 confusion ended on 31-Jul-2015. The anemia and thrombocytopenia were not yet resolved.

Treatment with study drug was interrupted due to the events thrombocytopenia, anemia and confusion.

On 06-Aug-2015 the Principal Investigator discontinued the patient from the study due to progressive disease.

The events thrombocytopenia, anemia and confusion met serious criteria of hospitalization.

The Principal Investigator assessed the SAE thrombocytopenia as grade 4 in intensity and possibly related to study drug, but also possibly related to the patients progressive disease and treatment with hydroxyurea. Thrombocytopenia is unexpected for CPI-0610, and therefore this case meets expedited reporting criteria.

The Principal Investigator assessed the SAEs anemia and confusion as not related to study drug. In the opinion of The Principal Investigator had not yet provided alternative causalities for the anemia and confusion.

The Sponsor assessed the event thrombocytopenia as possibly related to study drug. The Sponsor assessed the events anemia and confusion as not related to study drug.

**B6. RELEVANT TESTS (Continued)**

Head CT, Abdominal CT, Endoscopy: No clear source of bleeding was found.

**B6. LABORATORY DATA**

| # | Date | Test / Assessment / Notes | Results | Normal High / Low |
|---|---|---|---|---|
| 1 | 07/06/2015 | Haematocrit | 25.9 % | 53.0 41.0 |
| 2 | 07/16/2015 | Haematocrit | 26.0 % | 53.0 41.0 |
| 3 | 07/27/2015 | Haematocrit 15:45 | 7.6 % | 53.0 41.0 |

10-Aug-2015 09:54

Constellation Pharmaceuticals

**MEDWATCH**
3500A Facsimile (Back)    **(Continued)**

Page 3 of 5

| Mfr Report # | | |
|---|---|---|
| | | 15US000050 |
| UF/Importer Report # | | |
| | | FDA Use Only |

| 4 | 07/27/2015 | Haematocrit | 7.1 % | 53.0 |
|---|---|---|---|---|
| | 17:13 | | | 41.0 |
| 5 | 07/28/2015 | Haematocrit | 11.6 % | 53.0 |
| | 01:30 | | | 41.0 |
| 6 | 07/06/2015 | Haemoglobin | 8.0 g/dl | 17.5 |
| | screening | | | 13.5 |
| 7 | 07/16/2015 | Haemoglobin | 7.8 g/dl | 17.5 |
| | Day 1 pre-dose | | | 13.5 |
| 8 | 07/27/2015 | Haemoglobin | 2.2 g/dl | 17.5 |
| | 17:13 | | | 13.5 |
| 9 | 07/27/2015 | Haemoglobin | 2.4 g/dl | 17.5 |
| | 15:45 | | | 13.5 |
| 10 | 07/28/2015 | Haemoglobin | 3.9 g/dl | 17.5 |
| | 01:30 | | | 13.5 |
| 11 | 07/06/2015 | Platelet count | 47 | 400 |
| | | K/uL | | 150 |
| | | screening | | |
| 12 | 07/16/2015 | Platelet count | 34 | 400 |
| | | K/uL | | 150 |
| | | Day 1 pre-dose | | |
| 13 | 07/23/2015 | Platelet count | 17 | 400 |
| | | K/uL | | 150 |
| 14 | 07/27/2015 | Platelet count | 6 | 400 |
| | | K/uL | | 150 |
| | | 15:45 | | |
| 15 | 07/27/2015 | Platelet count | 6 | 400 |
| | | K/uL | | 150 |
| | | 17:13 | | |
| 16 | 07/28/2015 | Platelet count | 10 | 400 |
| | | K/uL | | 150 |
| | | 01:30 | | |
| 17 | 07/27/2015 | Red blood cell count | 0.78 | 5.90 |

Constellation Pharmaceuticals

**MEDWATCH**
3500A Facsimile (Back)      (Continued)

| Mfr Report # | 15US000050 |
|---|---|
| UF/Importer Report # | |
| | FDA Use Only |

Page 4 of 5

| | | | | 4.50 |
|---|---|---|---|---|
| | | M/uL | | |
| | | 15:45 | | |
| 18 | 07/27/2015 | Red blood cell count | 0.73 | 5.90 |
| | | | | 4.50 |
| | | M/uL | | |
| | | 17:13 | | |
| 19 | 07/28/2015 | Red blood cell count | 1.25 | 5.90 |
| | | | | 4.50 |
| | | M/uL | | |
| | | 01:30 | | |
| 20 | 07/06/2015 | White blood cell count | 64.54 | |
| | | K/uL | | |
| | | screening | | |
| 21 | 07/16/2015 | White blood cell count | 125.22 | |
| | | K/uL | | |
| | | Day 1 pre-dose | | |
| 22 | 07/27/2015 | White blood cell count | 7.18 | |
| | | K/uL | | |
| | | 15:45 | | |
| 23 | 07/27/2015 | White blood cell count | 7.10 | |
| | | K/uL | | |
| | | 17:13 | | |
| 24 | 07/28/2015 | White blood cell count | 5.75 | |
| | | K/uL | | |
| | | 01:30 | | |

**B7. OTHER RELEVANT HISTORY**

| # | Start/Stop Date | Condition Type / Condition | Notes |
|---|---|---|---|
| 1 | --/--/2009<br>07/27/2014 | Medical History<br>Anaemia | |
| 2 | --/--/2011<br>--/--/2011 | Medical History<br>Hepatitis C | |
| 3 | --/--/2012<br>Ongoing | Medical History<br>Leukocytosis | |
| 4 | 01/--/2014<br>Ongoing | Medical History<br>Fatigue | |

10-Aug-2015 09:54

Constellation Pharmaceuticals

**MEDWATCH**
3500A Facsimile (Back)   **(Continued)**

| | | |
|---|---|---|
| Mfr Report # | | 15US000050 |
| UF/Importer Report # | | |
| | | FDA Use Only |

Page 5 of 5

| 5 | 07/07/2014<br>07/23/2014 | Medical History<br>Thrombocytopenia | |
|---|---|---|---|
| 6 | 07/16/2014<br>Ongoing | Medical History<br>Electrocardiogram QT<br>prolonged | QTC elevation |
| 7 | Ongoing | Medical History<br>Myelodysplastic syndrome | MDS/MPN overlap disease |
| 8 | Ongoing | Medical History<br>Hypertension | |
| 9 | Ongoing | Medical History<br>Hyperlipidaemia | |
| 10 | Ongoing | Medical History<br>Back pain | |
| 11 | Ongoing | Medical History<br>Prostatomegaly | |
| 12 | Ongoing | Medical History<br>Gastrooesophageal reflux<br>disease | |

C10. CONCOMITANT MEDICAL PRODUCTS (Continued)

3) OXYCODONE (OXYCODONE)
4) OXYCONTIN (OXYCODONE HYDROCHLORIDE)
5) SIMVASTATIN (SIMVASTATIN)

E1. NAME AND ADDRESS (Continued)
Email: AFATHI@mgh.harvard.edu

10-Aug-2015 09:54

U.S. Department of Health and Human Services
Food and Drug Administration

For use by user-facilities,
importers, distributors and manufacturers
for MANDATORY reporting
**Constellation Pharmaceuticals**

Relsys International, Inc., FDA Facsimile Approval: 01-JAN-1997

# MEDWATCH
**3500A Facsimile**

| | |
|---|---|
| Mfr Report # | |
| UF/Importer Report # | 15US000063 |
| | FDA Use Only |

**Page 1 of 4**

## A. PATIENT INFORMATION

| 1. Patient Identifier | 2. Age at Time of Event: | 3. Sex | 4. Weight |
|---|---|---|---|
| R-E 03-155 | 63 Years | ☐ Female | 181.0 lbs |
| In confidence | or Date of Birth: 07/14/1952 | ☒ Male | or 82.1 kgs |

## B. ADVERSE EVENT OR PRODUCT PROBLEM

1. ☒ Adverse Event  and/or    ☐ Product Problem (e.g., defects/malfunctions)

2. Outcomes Attributed to Adverse Event (Check all that apply)

☐ Death: _____ (mm/dd/yyyy)
☐ Life-threatening
☒ Hospitalization - initial or prolonged
☐ Required Intervention to Prevent Permanent Impairment/Damage (Devices)
☐ Disability or Permanent Damage
☐ Congenital Anomaly/Birth Defect
☐ Other Serious (Important Medical Events)

| 3. Date of Event (mm/dd/yyyy) | 4. Date of This Report (mm/dd/yyyy) |
|---|---|
| 11/08/2015 | 11/19/2015 |

5. Describe Event or Problem
Event Verbatim [PREFERRED TERM] (Related symptoms if any separated by commas)
Confusion [Confusional state]
Hyponatremia [Hyponatraemia]
Hypertension [Hypertension]

Case Description:
A 63 year old white male, patient 03-155, was enrolled in the 0610-01 study, "A Phase 1 Study of CPI-0610, a Small Molecule Inhibitor of BET Proteins, in Patients with Progressive Lymphoma."

The patient's antecedent medical history included diffuse large B-cell lymphoma, pleural effusion, hypertension, constipation, deep vein thrombosis (DVT), gastroesophageal reflux disease (GERD), abdominal pain, dyspnea, insomnia, nephrolithiasis, hiatal hernia, and melena.
continued in additional info section...

6. Relevant Tests/Laboratory Data, Including Dates
08Nov2015: Physical exam: Blood pressure 153/100, pulse 127, temperature 97.4 degrees F (36.3 degrees C), temperature source Oral, resp. rate 20, height 1.803 m (5'11"), SPO2 94% (in emergency room)
08Nov2015: CT Head without contrast: Impression: No acute intracranial abnormality or mass effect.
continued in additional info section...

7. Other Relevant History, Including Preexisting Medical Conditions (e.g. allergies, race, pregnancy, smoking and alcohol use, hepatic/renal dysfunction, etc.)
Race: Caucasian
#1 --/--/1980 to UNK Current Condition, (Continued)
#2 --/--/1980 to Ongoing Current Condition, (Continued)
#3 02/--/2014 to Ongoing Current Condition, (Continued)
continued in additional info section...

Submission of a report does not constitute an admission that medical personnel, user facility, importer, distributor, manufacturer or product caused or contributed to the event.

## C. SUSPECT PRODUCT(S)

1. Name (Give labeled strength & mfr/labeler)
#1. CPI-0610 (CPI-0610) Tablet
#2.

| 2. Dose, Frequency & Route Used | 3. Therapy Dates (if unknown, give duration) from/to (or best estimate) |
|---|---|
| #1. 225 mg, qd days 1-14, Oral | #1. 11/06/2015 to 11/07/2015 |
| #2. | #2. |

4. Diagnosis for Use (Indication)
#1. Diffuse Large  (Continued)
#2.

| 5. Event Abated After Use Stopped or Dose Reduced? |
|---|
| #1. ☐ Yes ☐ No ☒ Doesn't Apply |
| #2. ☐ Yes ☐ No ☐ Doesn't Apply |

| 6. Lot # | 7. Exp. Date |
|---|---|
| #1. | #1. |
| #2. | #2. |

| 8. Event Reappeared After Reintroduction? |
|---|
| #1. ☐ Yes ☐ No ☒ Doesn't Apply |
| #2. ☐ Yes ☐ No ☐ Doesn't Apply |

9. NDC# or Unique ID

10. Concomitant Medical Products and Therapy Dates (Exclude treatment of event)
1) ACYCLOVIR            /00587301/ (ACICLOVIR)
continued in additional info section...

## G. ALL MANUFACTURERS

1. Contact Office - Name/Address (and Manufacturing Site for Devices)
Constellation Pharmaceuticals
215 First Street, Suite 200
Cambridge, MA 02142  UNITED STATES

2. Phone Number
617-714-0573

3. Report Source (Check all that apply)
☐ Foreign
☒ Study
☐ Literature
☐ Consumer
☒ Health Professional
☐ User Facility
☐ Company Representative
☐ Distributor
☐ Other: _____

| 4. Date Received by Manufacturer(mm/dd/yyyy) | 5. |
|---|---|
| 11/09/2015 | (A)NDA # |
| | IND # 118814 |

6. If IND, Give Protocol #
0610-01

STN #
PMA/ 510(k) #

7. Type of Report (Check all that apply)
☐ 5-day ☐ 30-day
☐ 7-day ☐ Periodic
☐ 10-day ☒ Initial
☒ 15-day ☐ Follow-up #

Combination Product ☐ Yes
Pre-1938 ☐ Yes
OTC Product ☐ Yes

9. Manufacturer Report Number
15US000063

8. Adverse Event Term(s)
Confusional state, Hyponatraemia, Hypertension

## E. INITIAL REPORTER

1. Name and Address          Phone # 614-293-7807
Dr. Kristie Blum
Ohio State University Comprehensive Cancer Center
B 315 Starling Loving Hall
320 W. 10th Ave. Columbus, OH 43210 UNITED
continued in additional info section...

| 2. Health Professional? | 3. Occupation | 4. Initial Reporter Also Sent Report to FDA |
|---|---|---|
| ☒ Yes ☐ No | Investigator | ☐ Yes ☐ No ☒ Unk |

Constellation Pharmaceuticals

**MEDWATCH**
3500A Facsimile (Back)    **(Continued)**

| Mfr Report # | 15US000063 |
|---|---|
| UF/Importer Report # | |
| | FDA Use Only |

Page 2 of 4

**ADDITIONAL INFORMATION**

B5. EVENT DESCRIPTION (Continued)

Concomitant medications included acyclovir, allopurinol, chlorhexidine, cyclobenzaprine, docusate, enoxaparin, Atrovent (ipratropium), lactulose, lidocaine, lorazepam, magnesium citrate, miconazole 2% cream, omeprazole, ondansetron, oxycodone, MiraLax (polyethylene glycol 3350), prochlorperazine, senna, and zolpidem.

The patient received his first dose of study drug on 06-Nov-2015 at a dose of 225 mg (tablet formulation) orally once daily. His serum sodium was 136 mmol/L on that date. The last dose of CPI-0610 prior to the event was taken on 07-Nov-2015.

On 08-Nov-2015, the patient woke in the middle of the night and was confused; according to his wife he was asking odd questions and was disoriented. The patient's wife gave him a couple of oxycodone tablets for his chronic abdominal pain. He subsequently presented to the emergency room (ER) with confusion. He also reported left upper quadrant/flank pain that had worsened over the previous week and that his last bowel movement had occurred on 03-Nov-2015. Vital signs included blood pressure 153/100, temperature 97.4 degrees Fahrenheit, pulse 126, respirations 20, and oxygen saturation 94%. Upon admission to the ER, the patient underwent a computerized tomography (CT) scan of the head which was negative for intracranial abnormality or mass effect. Laboratory results indicated hyponatremia, with a serum sodium level of 126 mmol/L. Due to the patient's abdominal pain, he also had an x-ray of the abdomen which showed a dilated bowel concerning for partial ileus versus torsion. The patient reported having a history of "twisting bowel" many years ago.  After the patient had been in the ER for approximately 40 minutes, his mental status returned to its baseline. The decision was made to admit the patient to the hospital for further evaluation of his confusion, hyponatremia, and hypertension. Study drug was held at that time. Later that day, his serum sodium was 130 mmol/L and vital signs included blood pressure 162/92, temperature 98.7 degrees Fahrenheit, pulse 88, respirations 24, and oxygen saturation 96%. On exam, telangiectasias were noted on the face and decreased breath sounds were noted in the left lung base with a Pleurx catheter in place; the exam was otherwise within normal limits. His systolic blood pressures had been 135-170 during the beginning of his hospital stay but improved after starting hydralazine and hydrochlorothiazide.

On 09-Nov-2015, his serum sodium was 134mmol/L. A CT scan of the abdomen and pelvis showed increased lymphadenopathy with dilated 8 cm transverse colon likely related to ileus. He was made NPO with sips/ice chips until he had a bowel movement. Mineral oil enemas were given with no relief. The patient was then treated with magnesium citrate and soap suds enema, resulting in a large bowel movement on 10-Nov-2015. He was continued on Colace (docusate), senna, and MiraLax (polyethylene glycol 3350). He was also continued on opioids for chronic pain.

On 11-Nov-2015, the patient experienced increased shortness of breath and anxiety. A chest x-ray showed continued pleural effusions. He was diuresed with intravenous Lasix (furosemide). Lovenox (enoxaparin) was discontinued since the patient had completed 6 months of therapy following DVT diagnosis and in light of epistaxis.

On 13-Nov-2015, the patient was discharged. His serum sodium was 129 mmol/L at discharge. He was advised to start taking dexamethasone, hydrochlorothiazide, loratidine, mineral oil enemas as needed, and sodium chloride nasal spray. He was advised to stop taking allopurinol, CPI-0610, enoxaparin, lactulose, ondansetron, and zolpidem. He was advised to continue taking acyclovir, chlorhexidine, cyclobenzaprine, docusate, ipratropium/albuterol, lidocaine, lorazepam, magnesium citrate, miconazole 2% cream, omeprazole, ondansetron, oxycodone, MiraLax (polyethylene glycol 3350), prochlorperazine, and senna. The serious adverse events of confusion, hyponatremia, and hypernatremia were considered resolved, as they no longer met serious criterion, although hypertension remained grade 2 and hyponatremia remained at grade 3.

Treatment with study drug was not resumed, as it was discontinued due to the events of confusion, hyponatremia, and hypertension.

The events of confusion, hyponatremia, and hypertension met the serious criterion of hospitalization. The Investigator assessed the events CTCAE grade 3 in intensity and related to study drug. These events are unexpected for CPI-0610, and therefore this case meets expedited reporting criteria.

The sponsor assessed the events of confusion, hyponatremia, and hypertension as possibly related to the study drug because of the temporal relationship between CPI-0610's administration and the occurrence of these events. However, the patient's ongoing therapy with narcotics for control of pain is an alternative potential explanation for his confusion. The persistence of his hyponatremia following cessation of therapy with CPI-0610 suggests that an alternative cause for this laboratory abnormality is possible as well. The etiology of the increase in the patient's blood pressure at the time of his initial evaluation is unclear, but he does have an antecedent history of hypertension.

B6. RELEVANT TESTS (Continued)

19-Nov-2015 16:41

Constellation Pharmaceuticals

**MEDWATCH**
3500A Facsimile (Back)      **(Continued)**

| Mfr Report # | | 15US000063 |
|---|---|---|
| UF/Importer Report # | | |
| | | FDA Use Only |

**Page 3 of 4**

08Nov2015: X-ray Abdomen: Dilated bowel concerning for partial ileus versus torsion.
09Nov2015: CT Abdomen and Pelvis: Showed increased LAD with dilated 8 cm transverse colon likely r/t ileus.
11Nov2015: Chest X-ray: Continued pleural effusions.

### B6. LABORATORY DATA

| # | Date | Test / Assessment / Notes | Results | Normal High / Low |
|---|---|---|---|---|
| 1 | 11/06/2015 | Blood sodium | 136 mmol/l | 143 |
| | | 07:40 | | 133 |
| 2 | 11/08/2015 | Blood sodium | 130 mmol/l | 143 |
| | | 12:07 | | 133 |
| 3 | 11/08/2015 | Blood sodium | 126 mmol/l | 143 |
| | | 03:02 | | 133 |
| 4 | 11/09/2015 | Blood sodium | 134 mmol/l | 143 |
| | | | | 133 |
| 5 | 11/13/2015 | Blood sodium | 129 mmol/l | 143 |
| | | | | 133 |

### B7. OTHER RELEVANT HISTORY

| # | Start/Stop Date | Condition Type / Condition | Notes |
|---|---|---|---|
| 1 | --/--/1980 UNK | Current Condition Hypertension | |
| 2 | --/--/1980 Ongoing | Current Condition Gastrooesophageal reflux disease | |
| 3 | 02/--/2014 Ongoing | Current Condition Melaena | |
| 4 | 10/--/2014 UNK | Current Condition Nephrolithiasis | |
| 5 | 02/--/2015 Ongoing | Current Condition Abdominal pain | |
| 6 | 03/24/2015 Ongoing | Current Condition Diffuse large B-cell lymphoma | |
| 7 | 03/24/2015 Ongoing | Current Condition Pleural effusion | |
| 8 | 03/24/2015 Ongoing | Current Condition Dyspnoea | |
| 9 | 04/--/2015 Ongoing | Current Condition Insomnia | |

**MEDWATCH**
3500A Facsimile (Back)    **(Continued)**

| | Mfr Report # | |
|---|---|---|
| | | 15US000063 |
| | UF/Importer Report # | |
| | | FDA Use Only |

| 10 | 04/--/2015 Ongoing | Current Condition Constipation |
|---|---|---|
| 11 | 05/28/2015 Ongoing | Current Condition Deep vein thrombosis |
| 12 | | Medical History Hiatus hernia |

C4. DIAGNOSIS FOR USE (Continued)
#1:Diffuse Large B-cell Lymphoma (Diffuse large B-cell lymphoma)

C10. CONCOMITANT MEDICAL PRODUCTS (Continued)

2) ALLOPURINOL (ALLOPURINOL)
3) CHLORHEXIDINE (CHLORHEXIDINE)
4) CYCLOBENZAPRINE (CYCLOBENZAPRINE)
5) DOCUSATE (DOCUSATE)
6) ENOXAPARIN (ENOXAPARIN)
7) ATROVENT (IPRATROPIUM BROMIDE)
8) LACTULOSE (LACTULOSE)
9) LIDOCAINE (LIDOCAINE)
10) LORAZEPAM (LORAZEPAM)
11) MAGNESIUM CITRATE (MAGNESIUM CITRATE)
12) MICONAZOLE (MICONAZOLE)
13) OMEPRAZOLE (OMEPRAZOLE)
14) ONDANSETRON (ONDANSETRON)
15) OXYCODONE (OXYCODONE)
16) MIRALAX          /00754501/ (MACROGOL)
17) PROCHLORPERAZINE (PROCHLORPERAZINE)
18) SENNA          /00142201/ (SENNA ALEXANDRINA)
19) ZOLPIDEM (ZOLPIDEM)

E1. NAME AND ADDRESS (Continued)
STATES
Email: kristie.blum@osumc.edu

MAURICE PRETER, M.D.


PSYCHIATRY AND NEUROLOGY


1160 FIFTH AVENUE 112 NEW YORK, NY 10029
TEL +1 212 7135336
FAX +1 212 7135336
EMAIL: OFFICE@PSYCHIATRYNEUROLOGY.NET
PSYCHIATRYNEUROLOGY.NET


IN RE: SPEDALE VS. CONSTELLATION


PREPARED FOR:

MORRISON MAHONEY LLP
120 BROADWAY SUITE 1010
NEW YORK, NY  10271


DATE OF THIS REPORT:
SEPTEMBER 4, 18


REPORT BY:
MAURICE PRETER, M.D.


*Maurice Preter*

_____

(SIGNATURE LINE)

## Table of Contents

**Section 1 – Introduction: Page 3**

**Section 2 – Database: Page 7**

**Section 3 – Summary of Data: Page 9**

**Section 4 – Introduction to Neuropsychiatric Issues: Page 36**

**Section 5 – Opinions and Support for Opinions: Page 41**

**Appendix: Curriculum Vitae of Maurice Preter MD**

## Section 1:

## Introduction

I have reviewed this case that involves an episode of mania in a 73-year-old female with a family history of bipolar affective disorder (manic depressive illness) and a past psychiatric history of depressive episodes, as well as a characterological make-up self-described as that of a "drama queen". Ms. Spedale was suffering from her third recurrence of myeloma when it was recommended by her treating physician at the Mayo Clinic that she enter a Phase 1 clinical trial of a component in a novel class of anticancer drugs, the BET inhibitor CPI-0610[1]. Both Ms. Spedale's psychological vulnerabilities and the conditions under which this treatment was chosen are relevant to what happened subsequently. The study component CPI-0610 is a member of a promising class of novel anti-cancer drugs and has absolutely no track record of causing or even exacerbating psychiatric illness. Its use was specifically intended to prevent the recurrence of multiple previously occurring treatment-related adverse effects including thromboembolism (blood clots), polyneuropathy (nerve

---

[1] BET inhibitors are a class of drugs with anti-cancer, immunosuppressive, and other effects in clinical trials in the United States and Europe and widely used in research. These molecules reversibly bind the bromodomains of Bromodomain and Extra-Terminal motif (BET) proteins BRD2, BRD3, BRD4, and BRDT, and prevent protein-protein interaction between BET proteins and acetylated histones and transcription factors. A detailed discussion of the complexity of BET inhibitors' mode of action is beyond the scope of this report but such discussions are available. These molecules are at the forefront of novel approaches to the treatment of otherwise lethal disease.

damage) and mania. It was a rescue treatment of the third relapse of a lethal disease. Ms. Spedale's manic episode, while indeed contemporaneous with the therapeutic trial of component CPI-0610 was preceded by a year and a half of a grossly disturbed sleep pattern and massive anxiety with regards to her illness. In hindsight, it is difficult to assess whether or not this long-standing physiological and psychological risk was unintentionally downplayed by the patient and her family. A low (sub-psychotic mania) level of manic elation is no doubt a blessing for someone suffering with a deadly disease who is undergoing terrifying medical procedures[2]. In any event, sometime in December of 2015 Ms. Spedale had another episode of overt mania that for unclear reasons she refused treatment for. This manic-disorganized mental state subsequently escalated, until an encounter with the police department led to Ms. Spedale's involuntary inpatient treatment on the psychiatric ward of a local hospital. Just like the first time around, the manic episode subsided after her sleep disturbance was treated pharmacologically. She also continued for several months to show signs of paranoid ideation and a confusional state that eventually

---

[2] At a time when neuropsychiatry, and medical science in general honored a more integrated, psychologically-minded approach to patient care, this was called the "manic defense" (e.g., Bateman JF et al. The manic state as an emergency defense reaction. J Nerv Ment Dis. 1954 Apr;119(4):349-57.

resolved after the neurotropic medication she was prescribed was reduced to a more appropriate geriatric dosage.

There are both psychological as well as biological elements in this story that warrant consideration. Plaintiff's medical records indicate a feeling of helplessness facing the end of life, a feeling of "unfinished business" with respect to her long marriage [3] etc. On the biological side, there may well have been a physiologically mediated switch from the more depressive Ms. Spedale to the permanently psychophysiologically activated Ms. Spedale after she and her husband moved from the rainy North East to notoriously sunny Arizona. Increases in solar insolation may impact the expression of bipolar disorder, especially with a family history of mood disorders. Sleep disturbance is a classic prodrome of manic breakdown [4]. I suspect this self-initiated phototherapy of a chronic low-level bipolar depressive state towards the manic came at a high price, specifically a chronic sleep disturbance and perhaps even an exacerbation of preexisting paranoid tendencies [5].

_____

[3] Apparently, she had suspected her husband of developing dementia for a while, then proceeded to divorce him during the post-acute phase of her manic decompensation.

[4] Sierra P, Livianos L, Arques S, Castelló J, Rojo L. Prodromal symptoms to relapse in bipolar disorder. Aust N Z J Psychiatry. 2007 May;41(5):385-91.

5 Bauer M, Glenn T, Alda M et al. Solar insolation in springtime influences age of onset of bipolar I disorder. Acta Psychiatr Scand. 2017 Dec;136(6):571-582, and other references available upon request.

IN RE: SPEDALE VS. CONSTELLATION

REPORT BY MAURICE PRETER, M.D.

PAGE 6 OF 42

With this colorful backdrop, and perhaps surprisingly, plaintiff claims a causal association between her unfortunate psychological and cognitive decompensation in late 2015/early 2016 and the use of the novel component.

I am a medical doctor, with two specialties, neurology and psychiatry. I am on the teaching faculty of several New York City hospitals and university medical centers, including New York Presbyterian Hospital (Columbia Presbyterian Medical Center), the Mount Sinai School of Medicine, and Lenox Hill Hospital. My qualifications are delineated further in my Curriculum Vitae that is attached at the end of this report.

My role as a neuropsychiatric expert is to describe and define the extent to which Ms. Spedale's psychological and cognitive decompensation following the treatment of her third cancer recurrence was indeed due to her (entirely voluntary and consented-to) participation in Constellation's Phase 1 trial of CPI-0610.

### SECTION 2: DATABASE

In the process of forming my opinion, I have reviewed the following:

1. Multiple medical records from the Mayo Clinic in Arizona, from between 2009 and 2018, ca. 8,000 pages.

2. Medical records of Ms. Spedale's inpatient psychiatric hospitalization, from the Banner Del E Webb Medical Center, 2016, ca. 85 pages. One notes the absence of nursing or social work entries or any person-specific narrative content.

3. Constellation's Adverse Central Nervous System (CNS) event notifications to the FDA (2 cases of confusion/delirium, both with concomitant use of multiple CNS-toxic prescription drugs).

4. Various MRI images.

5. Report by James P. Sutton, MD.

6. Constellation's web site as of August 2018.

7. Pacific Neuroscience Medical Group's web site (James P. Sutton, MD, Director), "thisisyourbrain.com".

8. Pertinent medical research literature.

In addition to the above case specific information, I have collectively considered my 26 years of professional experience as a medical doctor, and specifically my experience as a fully double residency-trained psychiatrist and neurologist, Board-certified in both psychiatry and neurology. My professional career, starting with my general medical

education in Germany and France, followed by six years of internal medicine internship, then neurology and psychiatry dual residency training at the Albert Einstein College of Medicine in New York City, my years working as a neurologist and psychiatrist in public and private university hospitals, as well as in clinics in the rural South, has provided me with a profound exposure to the range of neurological and psychiatric conditions, and to psychiatric and medical-neurological treatments for all conditions and ages. Adding to this, in providing my opinions, I have considered my experience as an academic clinician and member of the teaching faculty of several university medical centers, as a scientific author in neurology and psychiatry, as a member of professional organizations and of editorial boards, as well as my professional experience as a neuropsychiatrist in private practice, and as a medical-legal neuropsychiatric expert consultant. Also, pertinent to my knowledge of the issues, I have published scientific articles based on experimental studies with human subjects that I conducted myself as a research psychiatrist at the New York State Psychiatric Institute based at Columbia University. Further, I have lectured nationally and internationally on topics related to anxiety, psychological trauma and mood and cognitive impairment.

### SECTION 3: SUMMARY OF DATA

The following summary was sourced from the documents provided to me. This summary does not contain any of my personal opinions.

The study drug (CPI-0610) that is alleged to be responsible for the purported de-novo (out-of-the-blue) onset of bipolar (manic-depressive) illness is a BET inhibitor and had 3 studies ongoing for different indications – myeloma, leukemia, and lymphoma. The lymphoma phase 1 started first. Ms. Spedale was enrolled in the myeloma trial at the Mayo Clinic on December 1, 2015, which is the date she signed the informed consent. The clinical trial had a 14-day on, 7-days off cycle. She only completed 1 cycle (from December 10, 2015 – December 24, 2015). She was noticed to have manic symptoms during the 14 days (around Day 8). Once she completed the 1st 14-day cycle, the study was discontinued. However, as she refused treatment for her increasingly severe and long-standing sleep disturbance, her manic agitation worsened, her ADLs deteriorated, and she ended up being committed to a psychiatric ward at a local hospital (Banner Del E Medical Center).

During Ms. Spedale's decompensation, but preceding her psychiatric hospitalization, an EMR (electronic medical record) from a physician assistant in the Department of Internal Medicine at the Mayo Clinic Arizona, Daniel J. Schreck on 1/26/2016, states the following:

> "HISTORY OF PRESENT ILLNESS: Mrs. Spedale is a pleasant 73-year-old female with a past medical history significant for amyloidosis/multiple myeloma status post autologous stem cell transplant in November of 2009 with recurrence and treatment with CyBord chemotherapy, with recurrence

in 2013 and reinitiation on CyBord with good response but developed gastrointestinal toxicity at that time and then was tried on Revlimid for approximately three months but developed DVT with associated pulmonary embolus, who now has recurrence of multiple myeloma and was recently started on a clinical trial with a BET inhibitor, who has had worsening lower extremity edema, neuropathy, difficulty performing ADLs, and difficulty sleeping.

The patient was recently started on a clinical trial BET inhibitor at the beginning of December. She reports she was taking six pills in the morning and six pills at night for two weeks and then had one week off. During this time, she had to be having daily labs drawn, so she had a PICC that was in her right upper extremity. She reports while she was going through this treatment, she had increased stress over the holidays because family came to visit. She reported significant side effects of the trial medication including nausea and vomiting daily as well as lower extremity edema and neuropathy. She reports over this time that she did have what she believes were panic attacks with a feeling of her neuropathy slowly creeping up her legs. She states that she has also had difficulty sleeping at night. She states that she feels that her "death is impending" at this time. She felt that she had much longer to live, but this is her third relapse of her myeloma, and she has "so much to do before she dies." She states that in addition to family visiting over the holidays that caused increased stress, she has had some

marital issues. She states that her husband has caused increased anxiety at home as well, so she has asked him to leave the house, which he has done. She states that after her family left the beginning of January, she had continued lower extremity edema, neuropathy, and she had difficulty with ambulating, bending over, and performing her ADLs6. She reports that she tried to get help in the house and at the same time it seemed that home health had been ordered. She states that she was having multiple calls during the day from Mayo Clinic trying to set up assistance. She was very upset about this, as she was having difficulty sleeping at night because she felt she, again, had "so much to do" and she was not sleeping during the night and was sleeping during the day, and this was interrupting her sleep. The patient states that she does feel depressed and does feel anxious at times, but she does not want to take medications. She reports that she has significant side effects when taking pills. She was given Zyprexa to help with sleep recently. She states she took a 2.5 mg one night but developed significant GI symptoms with it, and states that she did not get much sleep with the medication and did not take it again. She had previously been on the medication after developing steroid-induced psychosis in 2009. The patient had also developed some discomfort at her PICC line site. She described it

_____

6 ["Activities of daily living"]

as an itchiness, so plans were made for her PICC line to be removed. During
that procedure, the patient was evaluated by Psychiatry on January 19th. At
that time, it was felt patient had a mood disorder with manic features
thought to be secondary to the BET inhibitor and recommended that the
patient continue the 2.5 mg of Zyprexa at night. The patient at that time was
also given referrals for therapy, as the patient felt that she would be willing
to talk with somebody as well as feels as she needs "anger therapy."

The patient has a history of DVT as well as PE secondary to Revlimid. She
started Coumadin in February of 2015. She has since taken herself off of
this medication, as she felt that there are too many side effects with other
medications that she had been taking, and she was having difficulty having
a therapeutic INR. She does not want to go back on this medication. The
risks and benefits were reportedly discussed with the patient.

The patient has a history of a disk herniation to the right side at L4 and L5.
She did undergo a steroid injection on November 18, 2015. There were
questions if this could cause patient's mood disorder, but the patient reports
she had an injection previously and this did not cause similar symptoms and
it was felt that this was less likely from the epidural and more likely from
the BET inhibitor.

During this examination, patient does have flight of ideas and tangential
thinking. She at this time denies suicidal ideation. The patient denies chest

pain, palpitations. She states she occasionally gets short of breath when she walks, but she reports this is her baseline. She denies her symptoms at this time feeling similar to her previous PE. She states she does have significant neuropathy in her lower extremities, worse on the right. She also reports her right lower extremity swelling is worse and she has difficulty wearing TED hose. She states that she has been having difficulty ambulating, bending, and performing her ADLs, and was trying to set up assistance with friends. She was also concerned about her dog and who will take her when she is gone. She has also been relying on friends to help get her to her several doctors' appointments since she has asked her husband to leave. She was concerned that her husband was having significant stress due to her illness and what was required while she was undergoing her therapy. She states at this time, she denies chest pain, abdominal pain, nausea, vomiting, or diarrhea. She denies fevers or chills. [...]

CURRENT MEDICATIONS: The patient reports that she has not been taking medications as prescribed. She, again, reports she has significant side effects to multiple medications, although the list that we have is as follows:

1. Cyclosporine ophthalmic 0.05% emulsion one drop each eye, b.i.d.

2. Zyprexa 2.5 mg at bedtime.

3. Ondansetron 4 mg p.o. q.8h. as needed for nausea and vomiting.

4. Polyethylene glycol 3350, 17 g p.o. at bedtime.

5. Psyllium 1 tablespoon p.o. daily

ALLERGIES: 1. Steroids cause psychosis. 2. Celecoxib causes GI reflux and dizziness. 3. Naproxen causes GI issues. 4. Oxaprozin causes GI issues. 5. Revlimid causes DVT and PE. 6. White petroleum mineral oil (unknown reaction).

PAST MEDICAL/SURGICAL HISTORY:

1. Amyloidosis/multiple myeloma status post autologous stem cell transplant in November of 2009 as well as CyBord chemotherapy. The patient was restarted on CyBord in the summer of 2013 but was discontinued due to gastrointestinal toxicity. She was then started on Revlimid for about three months but developed a DVT with pulmonary embolism. She had relapse in October of 2015 and was recently treated on clinical trial of a BET inhibitor at the beginning of December and has developed significant side effects of lower extremity edema, neuropathy, and mood disorder with manic features.

2. Hyperparathyroidism and vitamin D deficiency. 3. Conjunctivitis sicca. 4. Right L4-L5 anterior disk herniation status post steroid injection November 18, 2015. 5. History of DVT/PE, status post Revlimid in February of 2015. Patient took herself off of her Coumadin due to difficulty maintaining therapeutic INR and multiple side effects of the medications. Risks and benefits were reportedly discussed with the patient 6.

Osteoporosis. 7. Gastroesophageal reflux disease, sleep-related. 8. Hyperlipidemia, declined treatment. 9. Prolapse, ureterovaginal, incomplete. 10. Vitreous detachment posterior. 11. Scintillating scotoma.

SOCIAL HISTORY: The patient is married. She reports she has had significant stress with her marital status over the past several weeks. She has asked him to leave the house, which he has done, reportedly staying in a hotel in two weeks and is now in Tucson.

She has one son who lives in Florida that she reports she does not want to cause added stress to. She also has a stepdaughter who lives in Chicago, who she reportedly does not have the best relationship with. She does not currently smoke tobacco. Does not drink alcohol.

FAMILY HISTORY: Mother passed away at the age of 49 secondary to stomach cancer. Father passed away at 76, had a history of diabetes and myocardial infarction. […]

PHYSICAL EXAM: […] General: Mrs. Spedale is a pleasant 73-year-old female who does have flight of ideas and tangential thinking with pressured speech during examination.

[…] Psych: Patient, again, has pressured speech with tangential thinking and flight of ideas during examination--will bounce back and forth between ideas. She denies suicidal ideation. Reports that she does not want to take new medications, although she would be willing to take lorazepam at its

lowest dose by mouth. She reports that she does not want to see a psychiatrist while she is here. She would be willing to be evaluated by Palliative Medicine as well as a social worker to help assist with her seeing a therapist in the outpatient setting but, again, does not want to take new medications.

IMPRESSION/REPORT/PLAN: Impression and Plan: 1. Bilateral lower extremity edema. Patient presents with bilateral lower extremity edema as well as neuropathy. She has been having difficulty ambulating and performing her ADLs. She has a history of a DVT as well as PE while on Revlimid in February 2015, previously on Coumadin; she took herself off this medication as she was finding it difficult to have therapeutic levels and having multiple drug interactions. [...] 2. Mood disorder with manic features. The patient was recently evaluated by Psychiatry, Dr. Thomas Nelson, on January 19th. She did not appear to lack complete decisional capacity at that time nor was it felt she needed a behavioral health unit. It was felt her mood disorder was secondary to her BET inhibitor and less likely her epidural injection she had in November. It was recommended that patient continue on Zyprexa 2.5 mg at night and that she continue it for a week or longer to address the after-effects of the medication, but she states she only took the medication once, as she developed significant GI symptoms and states she does not want to take this medication again. She also states that she does not want to see a psychiatrist while she is here in

the hospital. She will send them directly out of the room if they were to
come in. She states that she would be willing to talk to Palliative Medicine,
as she does not feel like she wants to take any further medications for her
underlying disease. The patient is willing to try lorazepam at its lowest dose
at 0.25 mg by mouth. She states that she will take this medication tonight in
hopes that it will help her have a restful sleep. We will also consult Social
Work. […]"


A few days earlier, a nurse on staff with Ms. Spedale's hematologist-oncologist, Dr.
Fonseca, wrote the following:

"18-Jan-2016 13:39 MST Auth (Verified) Iverson, Kimberly D on 18-Jan-
2016 13:46 MST

[…]

RN call to patient husband, Dan 917-881-3964 per Dr. Fonseca request to
contact family and patient. […] RN states clinic has received calls from pt
spouse and son with concern for pt health and safety. Pt denies plan to harm
herself or others, denies suicidal thoughts or ideation. Pt states frustration r/t
Mayo staff and recent clinical trial, appointments and personal domestic
challenges at home with spouse. Pt states having a caregiver/neighbor, Alice
Lewis across the street who cares for her and her dog. Pt states she has an
appointment with Dr. Engle today at 2:20pm at which time will voice her

concerns. Pt friend, Dan is there with patient and confirmed assisting in bringing her to the clinic. RN reviewed PMHx noting Dr. Engle practice aware even as of this morning with pt and family dynamics. RN advised Dr. Fonseca and CRC, JR of this conversation.

A staff psychiatrist, Dr. Stonnington was consulted by Internal Medicine on 1/27/2016. Some pertinent excerpts of her note follow.

"REASON FOR CONSULTATION: Referred by Hospital Internal Medicine for evaluation of mania.

HISTORY OF PRESENT ILLNESS: Mrs. Spedale is a pleasant 73-year-old married female with a past medical history significant for amyloidosis/multiple myeloma and is status post autologous stem cell transplant November 2009. Also in 2009, she was treated with CyBord, and the dexamethasone associated with that appeared to trigger a manic episode for which she did see my colleague, Dr. Robert Bright, September 18, 2009. He recommended Zyprexa, but reportedly she only took it once and became overly sedated and did not continue on it. They did stop the dexamethasone, and it did take about two months for her manic symptoms to resolve. Since that time the patient has had three relapses. After the second relapse, she was given Revlimid for about three months but then developed a DVT with a pulmonary embolism, and it was discontinued and she was started on warfarin. She then had a third relapse in October 2015, and then was treated

in a clinical trial of a BET inhibitor beginning in December which she did for two weeks. It was in the context of this trial that she has developed manic symptoms very similar to the previous manic episode in 2009. She has not been given any steroids during this trial. Husband does note that her sleep patterns have been off for the past year or so where she does not really sleep at night and then may sleep in the daytime. During this most recent manic episode, she has had much more disrupted sleep. Her thoughts are more active, and she is much more tangential in her thinking and speech. She is also more distrustful of healthcare providers, and she has been very frustrated with her husband. She is very concerned that he has dementia, and she thinks that he is agitating her with his anxiety, and about a week ago she asked him to leave. She made a decision also prior to this hospitalization to discontinue all of her medications including the warfarin; her rationale is that it causes her side effects and that the warfarin is causing her increased risk of internal bleeding. She believes that if she just is by herself or goes to a spa that things will recover on their own and that she is made worse by having others around her or getting or taking any medications.

Patient was seen in conjunction with medical student, Paul Salem. Patient was receptive to talking to the medical student, but she was very guarded about seeing a psychiatrist who she thinks is just going to diagnosis and medicate, and she is very distrustful of that and does not agree with it. She makes it very clear that she is upset with Dr. Bright previously for having

diagnosed her with a manic episode and with recommending the Zyprexa. Patient, however, did give me permission to talk with her husband, in part because of a wish to have him diagnosed with dementia.

Patient has refused medications during this admission other than a single dose of lorazepam 0.25 mg. She states that although she had told Dr. Nelson in a recent consultation that she would take the olanzapine, she actually was not taking

[…]

FAMILY PSYCHIATRIC HISTORY: Significant for possible bipolar illness in patient's father though no actual formal diagnosis or treatment.

Past psychiatric history is as noted above. Patient also has a remote history of seasonal affective disorder which she states resolved when she moved to Arizona. Patient at baseline is reportedly very outgoing and has always liked to take charge and be in control.

[…]

IMPRESSION/REPORT/PLAN: 1. Mania in the context of BET inhibitor therapy, though does have a history of some milder mood cycling and tendency towards bipolar disorder, both in terms of her own history and family history. Also has had disturbed sleep patterns for much longer which could have predisposed her to a manic episode with the stress of taking the BET inhibitor therapy.

2. At this point she still has capacity for medical decision making, although some of her judgment is clouded by the manic mood state.

Recommendations:

1. In reviewing the notes from Dr. Bright, it does appear that he was under the impression she indeed did take the Zyprexa 2.5 mg daily for a couple weeks after her last manic episode and did well with it. Therefore, that would be my first choice. However, patient seems to indicate that she really did not take it and is not wanting to take it. As an alternative, suggest a trial of Geodon starting at 20 mg at bedtime to avoid oversedation although may need to increase that dose if it is not providing enough sedation to allow her to sleep. Patient is fairly resistant at this point however to taking the medication, though she does recognize the importance of sleep and may do so for that purpose.

[…]

DD: 01/27/2016 17:08 DT: 01/27/2016 17:44

Addendum by Stonnington MD, Cynthia on 16-Feb-2016 09:44 MST (Verified) I have been contacted by Dr. Fonseca. Apparently, patient's mania has progressed. She is completely sleep deprived and refuses to help herself get any sleep. She is has become more paranoid, convinced that her husband wants to harm her despite no evidence to support that, and called the police to evict him, and refused to let her sister help her. She continues to refuse to

take any medications. In her paranoia, she is convinced that nobody is acting in her best interests. She informed Mayo Clinic not to share any information about her care with anyone in her family (including her husband and son), because she is paranoid that we would abuse this information rather than help her.

She is refusing to accept almost all medical care. For example, she made an appointment with a mobile care doctor through the Southland program suggested by Dr Engel, but when she spoke to the nurse from the program, she became suspicious that the mobile doctor would report back to Dr Engel and so told him she didn't want him to come.

Another reason she is refusing to take even medications that are for her physical (not mental) health (such as warfarin) is that she is suspicious that the Mayo (or her family) is trying to 'trick" her into taking mental health medications by disguising them as medications for her physical health. - Adele, her sister, flew out from NYC to try to help her, since she seemed to be the one family member that she would have any trust for at all. But after just one day of staying with Iris, Iris screamed at her to leave the house and she had to get out "right now". Adele had to stay in a hotel for the remainder of her weeklong visit. - This past week, she called Adele late at night at her hotel, saying that she was having a panic attack and Adele needed to come over immediately. Adele rushed over and was there 10 minutes later, at which time Iris started screaming through the door that she couldn't come in

and that she had arrived "too late", and started cursing Adele and would not let her in the house. --She filed a protective order against her husband, and the day after he had been served with the order of protection by the police that she filed, she called him several times and left messages saying she wants to talk to him and see how he is doing. She has also asked in her voice messages (he won't pick up the phone when she calls) if he would come over to fix some light bulbs and do housework around the house. She appears not to have the mental capacity to understand that he could go to jail for getting anywhere near her now that she has served him with this legal order.

To summarize, the patient is not only unable to recognize that she needs both mental and physical health treatment, but she refuses to accept the help that she needs and she is endangering her life as a result. She is also cutting herself off from her family who care about her, and has pushed everyone away who could help her. She is now living alone with nobody to help her since she refuses to let anyone help her (either family members or medical professionals), and is now at risk of physical demise. She has been repeatedly unwilling to accept psychiatric treatment or take recommended medications, such as Zyprexa, for her manic state and poor sleep. She has cancelled her appointments to psychiatry and also cancelled a recent appointment to see Dr. Fonseca. Before her manic state, she was being treated for blood clots and now has refused treatment. Dr. Fonseca has not been able to measure or monitor her disease (myeloma) again since she has been in this manic state.

As a result of her manic state, there is a concerning lack of self-care, awareness and poor judgement, all of which is endangering her health and well-being. This has also devastated her family and her marriage. Because of the refusal to voluntarily accept treatment that will help her and her acutely disabled state, we will need to proceed with a petition for court-ordered treatment. Dr. Fonseca and Dr. Engle have both communicated their support of this plan."

In spite of the medical-psychiatric clinical opinion expressed by Dr. Stonnington, Ms. Spedale apparently returned home and only after further deterioration was eventually committed to a psychiatric inpatient ward on or about March 10, 2016. She remained hospitalized until the end of March 2016.

Her general clinical and cognitive status later that year is described in Dr. Caselli's consultation note (neurologist), from October 2016.

"Neurology Consult

18-Oct-2016 00:00 MST Auth (Verified) Caselli MD, Richard on 18-Oct-2016 12:21 […]

REASON FOR REFERRAL: Encephalopathy.

HISTORY OF PRESENT ILLNESS: […] In 2009 as part of the protocol for stem cell therapy she received dexamethasone and developed a steroid psychosis, for which she was seen by Dr. Robert Bright in our department.

She was successfully treated with Zyprexa 2.5 mg daily and recovered over several weeks. […] In January while on an experimental medication of a "BET inhibitor" she developed another manic episode that was substantially worse than what she experienced on steroids. She was seen in January 2016 by Dr. Stonnington and was refractory to therapy, eventually prompting inpatient psychiatric treatment for over a month. She was improved upon leaving the hospital in early April but still quite impaired. She improved further after that and was able to live alone with only minimal help. Her son who accompanies her states that she continued to be mildly manic but was functioning. As an example, he states that he she might call him on the phone and would be speaking nonstop for an hour, at which point she was simply hang up. However, she was otherwise completely able to function including working her telephone, television, and so forth. Over the past months things have changed considerably. She is much more subdued, slower to respond, no longer seems to be able to use her phone or work the television. Despite that, she was still self-administering her own medications and decided on her own to discontinue the Risperdal that she was on. She had been treated in the past with Zyprexa but at some point, this was switched to Risperdal under the care of a local psychiatrist within the past year, and her prescribed dose was 0.25 mg at bedtime. Her son came to be with her because of this recent decline and assist her through her evaluations, but she has not taken it for

at least the past week. She did in fact take a single dose last night under his supervision. She was seen by Dr. Wilner in our department, who identified that cognitively she actually did not seem to be terribly impaired and she had more of a psychiatric presentation. MRI scan of the brain demonstrates myelomatous infiltration in the clivus, calvarium, and upper cervical spine, which although new since 2011 is felt by Dr. Fonseca to be completely consistent with what is known about her myeloma. [...]

She was seen yesterday by Dr. Stonnington, who noted that while still exhibiting some manic features, she seemed quite different from what Dr. Stonnington had seen back in January in that she is much more subdued and more confused.

CURRENT MEDICATIONS: Risperidone 0.25 mg daily. Carfilzomib chemotherapy. Acyclovir. Aspirin 1 per day.

[...]

PHYSICAL EXAM: Vital Signs: Height 155 cm, weight 66.3 kg, respiratory rate 14 per minute. General appearance is that of a neatly dressed woman with excellent hygiene and nutrition. She has fluent speech with perhaps a mild reduction in prosody. She speaks tangentially and seems to change subjects in rapid succession, although this all appears beneath a somewhat slowed and subdued demeanor. She is able to write a sentence without evidence of tremor or micrographia. She is able to

follow all commands. On the Controlled Oral Word Association Test she had an uncorrected score of 38, which is actually normal, even if it might potentially represent a decline from a previously better performance that we do not have documented. On the Kokmen test of mental status she source 34.5/38, including 7/8 on orientation, 7/7 on attention, 4/4 on learning, 4/4 on calculations, 3/4 on constructions, 4/4 on information, 3/3 in abstractions and 2.5/4 on recall. Cranial nerve testing II-XII including visual fields and funduscopic examination was normal and there was specifically no nystagmus. On motor examination there is no evidence of any cogwheeling or other muscle tone abnormality. Deep tendon reflexes are present and symmetric throughout. Muscle strength is normal throughout. On cerebellar and extrapyramidal testing Mrs. Spedale is able to arise from a seated position without difficulty and has no retropulsion. Steppage base, posture and arm swing all appear to be normal. Rapid alternating movements and finger-to-nose are normal and there was no evident tremor. Sensory examination including proprioception and light touch was normal. Neurovascular examination including carotid auscultation was normal.

IMPRESSION/REPORT/PLAN: Mrs. Spedale does surprisingly well on clinical cognitive assessment given the decline in functional impairment that sounds to have occurred.

I might parenthetically add that toward the end of our meeting together she did in fact pull out her flip phone and seemed to be able to utilize it. Nonetheless, the change that has been observed by her son and by Dr. Stonnington further reinforced by my own observation of the slowed demeanor that she seemed to exhibit certainly all seem to be consistent. All of this seems layered upon a background mild manic psychosis, which does not sound to have completely resolved since her episode last winter. I tried to convince Mrs. Spedale that a spinal tap would be the most appropriate next step and she unfortunately was quite adamant in refusing it. | believe she will complete the EEG that has been scheduled for this Friday. I discussed with her and her son that if the EEG was normal, that we might be able to simply observe this with continued reimplantation of low-dose neuroleptic, but if the EEG showed severe dysrhythmic slowing, that a spinal tap would be the most appropriate next step looking for evidence of central nervous system infection in her immunocompromised state or autoimmune inflammatory encephalopathy."

Upon a follow-up visit on November 23, 2016, Dr. Caselli found Ms. Spedale to show significant improvement, if not reverted to her old (perhaps somewhat hypomanic) self"

"Service Date: 11/23/2016 Facility Name: MCA Provider Name: Richard J. Caselli, M.D. Account Number: 1035532 Visit Type: Subsequent Visit

CHIEF COMPLAINT / REASON FOR VISIT: Follow up encephalopathy.

REFERRAL SOURCE: Self.

[…] She is a 74-year-old woman with multiple myeloma and secondary amyloidosis who I saw on October 18 at which time she had residual encephalopathic problems related to a manic psychosis for which she was hospitalized in a psychiatric unit earlier in the year. The main question we were facing was whether this was a complication of her myeloma or chemotherapy, or whether this might be instead a primary psychiatric problem. We worried about possible central nervous system opportunistic infections and other related malignant complications, but Mrs. Spedale was adamantly against the notion of a spinal tap. An EEG demonstrated only minimal dysrhythmic slowing, and after discussion with her son we elected to observe this with close follow-up which leads us to today's visit. Since I saw her last she has been seen in psychiatric follow-up by Dr. Cynthia Stonnington who noted that Mrs. Spedale seemed to be making good improvement on Zyprexa 10 mg daily despite the fact that Mrs. Spedale had been in completely [sic, presumably "incompletely"] compliant with her dosing. […]

PHYSICAL EXAM: On examination today, Mrs. Spedale appears more animated than I recall her from last time. She has somewhat of a hypomanic affect. She is clever, conversant, and making many associations. For

example, when I asked her for her son's address she gives me 3 different addresses all related to her son. She is able to write a sentence without tremor or micrographia and, in fact, actually has a larger handwriting today than she did a month ago. Similarly, her constructions are larger and more accurate. On the Kokmen Test of Mental Status today, she scored a perfect 38/38 in contrast to a mildly reduced score last time. On the Controlled Oral Word Association Test her score has also improved. She was able to give me 45 words today which compares with 38 words a month ago. Cranial nerve testing 11-XII including visual fields and funduscopic examination was normal. Motor examination including deep tendon reflexes, muscle strength, and muscle tone was normal throughout. Cerebellar extrapyramidal testing demonstrated she had perhaps a hint of a slightly foreshortened steppage, but otherwise seemed to have normal gait. Finger-to-nose and rapid alternating movements were normal and there was no tremor. Sensory examination including proprioception and light touch was normal.

IMPRESSION/REPORT/PLAN: Mrs. Spedale appears mildly hypomanic, but I do not detect any overt cognitive difficulties today. She spent a good deal of time talking about problems she was having with her computer which, after all was said and done, boiled down to the fact that she cannot remember her password that she set up for a new computer because apparently she did not write it down or share it with her son. I am not certain

this qualifies as having problems with operating a computer, and apart from that I did not detect any obvious areas of cognitive impairment. She is scheduled for neuropsychological testing on December 28, and I suggested that perhaps we could need again soon after that to review the results and if her son might be able to join us to see whether we had sufficient reason to reconsider her current living arrangement. This may rely as much on Dr. Stonnington's opinion of her progress with regard to her manic syndrome as it does with her cognitive skills, but I will share this information with Dr. Stonnington as well. [… ]"


Also of note are the following two clinical entries. The first one is by Dr. Bright, a staff psychiatrist who saw Ms. Spedale in the context of her bipolar decompensation in the beginning of her treatment for myeloma. At the time the manic episode was assumed to be brought about by high-dose corticosteroids, and because it was diagnosed and treated in time (and treatment complied with at least to some extent), resolved without further complications. Dr. Bright then proceeded to clear Ms. Spedale to be able to consent to, and participate in her very onerous cancer treatment that followed. Dr. Bright also remarked upon the patient's sensitivity to "average" doses of neuroleptics, often leading to noncompliance:

"

2-Oct-2009 […]

CHIEF COMPLAINT/PURPOSE OF VISIT: Mrs. Spedale returns today for follow-up of dexamethasone-induced mania.

HISTORY OF PRESENT ILLNESS: At the time of her last visit, I started her on Zyprexa Zydis 5 mg at bedtime. She returns today accompanied by her husband. Ms. Spedale states that a whole tablet of the Zyprexa Zydis 5 mg was excessively sedating, but that she has cut the dose in half to a 2.5-mg dose and is doing quite well on it. Her husband confirms that she is sleeping eight hours on most nights. She states she has slept 12 hours on a couple of nights. Her husband states that he has noticed a very significant improvement in her mood and sleep cycle over the past week. He reports a particularly noticeable improvement over the last four days, and states that she is calmer and even made a loving comment to him today. They both report that she has diminished anger, anxiety, and irritability. While her husband was able to see that she was "flying around" while on the dexamethasone, he feels that she has returned back to her normal extroverted, talkative but not irritable, pleasant self. The patient is pleased to show me that her lower extremity edema has resolved. She hopes to demonstrate to her doctors that she is now on "good behavior" so that she can proceed with stem cell transplant, which she is hopeful will help with her amyloidosis and multiple myeloma."

Dr. Bright's initial note also recorded some of Ms. Spedale's past psychiatric history as well as family history.

"18-Sep-2009 00:01 MST Auth (Verified) Psy/Psi Consult Bright MD, Robert

[…]

PAST MEDICAL HISTORY: Past Psychiatric History: Mrs. Spedale states that when she was in her early 20s she saw a psychiatrist in New York for depression. She discontinued care because he was "Freudian and just listened and did not give me any feedback," She states that in general "I tend to be on the depressed side." She herself has wondered whether she might have a seasonal component to her depression as she became more depressed in the winters in New York. She states that this did completely resolve with her relocation to Arizona.

[…] The patient's husband himself is seeing a psychiatrist at the VA and the patient describes him as "a basket case since I got sick." She describes him as "over anxious." She believes that he is taking Wellbutrin. […]

FAMILY HISTORY: Questionable history of bipolar illness in patient's father but no history of treatment or diagnosis. The patient recalls her father as having episodes of heightened energy and describes him as being a compulsive gambler. She does not recall him having grandiose ideas, psychotic symptoms, diminished need for sleep, or pressured speech. […] The patient describes her mother as a sad and lonely housewife who was never diagnosed with or treated for depression. […]"

The second note of interest is dated 8/31/2016. That August, Ms. Spedale was seen by in pulmonary consultation for shortness of breath. I will discuss the relevance of this observation separately.

"[…]

Service Date: 08/31/2016 Facility Name: MCA Provider Name: Robert W. Viggiano, M.D. Account Number: 1035532 Visit Type: Consultation

[…] REASON FOR CONSULTATION: The patient is referred by Matthew A. Rank, M.D., for shortness of breath.

HISTORY OF PRESENT ILLNESS:

The patient is a very pleasant, 73-year-old woman who has had a history of amyloidosis diagnosed involving her tongue and also apparently some cranial lesions.

[…] The patient informed Dr. Rank that she has had shortness of breath and wanted to see me. The patient states that she has had shortness of breath for 10 or more years, even prior to her diagnosis of amyloidosis. She states that she gets anxious and she will get short shortness of breath and usually it will resolve as the anxiety decreases. She also feels that she has some cardiac issues but she is unable to really detail what with her concerns are.

[…]

I| discussed with the patient that her chest x-rays, echocardiogram, and pulmonary function tests are all normal except for a slight or minimal decrease in her diffusing capacity.

The patient has had shortness of breath for 10 or more years, even prior to any of her above diagnoses.

As we left the room, the patient started another note conversation regarding her pulmonary emboli. I discussed with her that given the pulmonary function testing and echocardiogram, I think it is very likely that these have resolved. I discussed with her that the only way to know for sure would be to do a CT scan with contrast. She seemed very reluctant to do it at the present time and wants to think about it. In the future if she wants to have this it certainly can be ordered to assess her pulmonary vasculature. […]"

Finally, pursuant to plaintiff's treating physician Dr. Fonseca, the one physician who has been consistently treating Ms. Spedale for over a decade, she had returned to her normal self by the fall of 2017 (notes dated October 16, November 17, 2017; April 10, 2018, pp. 1934 and following of the PDF file "Mayo Clinic Records").

### Section 4: Introduction to neuropsychiatric issues

The specific neuropsychiatric issue I have been asked to address as a neuropsychiatric expert in this case is to describe and define the extent to which Ms. Spedale's psychological and cognitive decompensation following the treatment of her third cancer recurrence was due, if at all, to her (entirely voluntary and consented-to) participation in Constellation's Phase 1 trial of CPI-0610. I am concerned that we are dealing with a classic case of *post hoc ergo propter ho*c, which is a logical fallacy that states, since event X occurred in temporal proximity to Y, Y must be the cause of X. The lack of psychiatric care and follow-up other than the occasional medication visit, the dispersion of medical care among multiple physicians and providers, and perhaps local laws and customs that made it more difficult to intervene earlier in a rather obvious downward spiral, all played a role in plaintiff's development of mania.

While this report does not specifically focus on matters of informed consent in research, I did review the documented process and the printed materials used in Ms. Spedale's case. At a minimum, the argument that Ms. Spedale was not properly consented, or perhaps was not able to understand what she was asked to consent to for reasons of some underlying neuropsychiatric impairment, or alternatively, that she consented to participate in the study which subsequently, and "out-of-the-blue" sent her into a tailspin does not fit the facts nor does it follow logic.

It is not entirely unexpected or surprising to see a person with a family and personal background of bipolar disorder develop a case of overt mania, especially under such trying

life circumstances[7]: To name but a few, Ms. Spedale's multiple courses of chemotherapy, the very realistic prospect of treatment failure in the context of a clinical study, long-standing marital worries etc. With this in mind, we can isolate two main variables – the first one is Ms. Spedale's long-standing sleep disturbance, perhaps triggered as much by intensive sunlight as by psychological factors: Ms. Spedale's fear of dying, her marital issues etc.[8] The second one is chronic subclinical, as well as overt panic anxiety. Why is this relevant? Lack of sleep/change in sleep pattern is a classic prodrome/predictor and the most common risk factor for bipolar (manic) decompensation. Sleep disturbance in turn, can be caused, as well as worsened by underlying, untreated anxiety. Very often panic expresses itself as physical symptom, commonly as shortness of breath[9], which she sought consultation for in mid-2016.

The argument that Constellation should somehow have known (or knew) of the risk of mania with a BET inhibitor is unsubstantiated. There is nothing in the medical literature suggesting that persons with manic-depressive antecedents undergoing treatment with BET

---

[7] Preter M, Bursztajn HB. Crisis and opportunity—The DSM-V and its neurology quandary. Asian Journal of Psychiatry 2009; 2(4): 143.

[8] See Footnote (5) and (6) above

[9] For an overview, see Preter M. Lifelong Opioidergic Vulnerability Through Early Life Separation: A Recent Extension of the False Suffocation Alarm Theory of Panic Disorder. In: Nardi AE, Freire RC (eds.): Panic Disorder. Neurobiological and Treatment Aspects. Springer 2016.

inhibitors are at heightened risk for a manic breakdown. Further, any medical intervention, especially any novel intervention may have unforeseen adverse effects, and Ms. Spedale consented to the risk. I believe this was justifiable given the desperate medical situation she was in at her third recurrence of myeloma, including her preference for a treatment in pill form that would not require indwelling venous catheters. Opting for a novel treatment was also justified considering multiple previously encountered adverse effects as discussed above.

The two subjects with delirium (confusion) that occurred during the Phase 1 clinical trial and that became the subject of FDA notifications were concurrently taking multiple psychotropic medications such as opiates, zolpidem and others that independently or jointly are known to cause confusion and a slew of other neuropsychiatric derangements. In addition, Ms. Spedale has been the only subject who suffered a bipolar decompensation. This as well as the other data point to causation that is much more likely to be person-, rather than medication-specific.

A paper published by Dr. Allis's group in 2016 that showed potential memory impairment in rats that were exposed to BET inhibitors has in my opinion no bearing on this case of an older woman with bipolar disorder who eventually decompensated under the circumstances outlined. Sleep disturbance for any reason as well as cancer itself, both cause hypercortisolism (high levels of the "stress hormone", cortisol) and can trigger mania in those at risk for it (and in fact did in 2009, when Ms. Spedale was given exogenous corticosteroids as part of her chemotherapy). Prompt and early treatment of her sleep disturbance (and her underlying neuropsychiatric issues such as panic disorder) may or

may not have prevented or attenuated the late-2015 overt breakdown. The persistence of neuropsychiatric symptoms as well as neuroimaging correlates (white matter changes on MRI) after a prolonged episode of sleep disturbance, and larval/overt mania are unsurprising[10]. Very likely, all of this could have been prevented early on, as it apparently was in 2009, with simple psychiatric interventions allowing Ms. Spedale to return to a more normal sleep cycle through treatment of her agitated, anxious insomnia. Also, Ms. Spedale's noncompliance with suggested treatments had been, and continued to be an issue. The claim that all this represents "irreversible brain injury" [11]with white matter changes and abnormal EEG[12] uniquely due to a brief exposure to the novel therapeutic component CPI-0610 is based on neuromythology, not medical science. It betrays a very limited experience with psychiatric patients. While it is true that bipolar disorder, chemotherapy, ageing and a host of other conditions can cause frontal lobe white matter abnormalities, suggesting that "histone modification of the type caused by BET inhibitors is known to play a major role in psychiatric illness" is at the current state of psychiatric knowledge nothing short of fantastic.

―――――――――――――――――――

[10] Wang JF et al. Increased oxidative stress in the anterior cingulate cortex of subjects with bipolar disorder and schizophrenia. Bipolar Disorders 11/5 (2009). There is also a large body of research on the immunology of bipolar disorder which is beyond the scope of this report (e.g., van den Ameele S et al.: Markers of Inflammation and Monoamine Metabolism Indicate Accelerated Aging in Bipolar Disorder. Front Psychiatry. 2018 Jun 14;9:250).

[11] Ms. Spedale's confusional state resolved by fall 2017, according to contemporaneous medical notes.

[12] This prolonged episode is perhaps better explained by adverse effects from neuroleptic medications as in 2009, but on a significantly more aged brain, fragilized by multiple courses of toxic chemotherapies, sleeplessness and massive anxieties.

Rather, her prolonged recovery after the episode, Ms. Spedale's exquisite sensitivity to neurotropics such as olanzapine and risperidone dating back to at least 2009, the massive long-standing anxiety as an underlying risk factor, the long-standing sleep disturbance in an elderly person with bipolar disorder after multiple courses of chemotherapy who has evidence of brain atrophy raises the concern of a dementing process long preceding any of the events in 2015-2016. Dementia is common in older bipolar subjects[13] (except in those on lithium) and poses an entirely different set of problems to the patient, none of which can be addressed in a lawsuit.

---

[13] E.g., Kessing, L. V. and Nilsson, F. M. (2003). Increased risk of developing dementia in patients with major affective disorders compared to patients with other medical illnesses. *Journal of Affective Disorders*, **73**, 261–269. McIntosh, A. M. et al. (2007). Progressive grey matter loss in patients with bipolar disorder. *European Psychiatry*, **22**, S256. Young, R. C., Murphy, C. F., Heo, M., Schulberg, H. C. and Alexopoulos, G. S. (2006). Cognitive impairment in bipolar disorder in old age: literature review and findings in manic patients. *Journal of Affective Disorders*, **92**, 125–131.

## Section 5: Opinions and Support for Opinions

I have reached the opinion below as a board-certified neurologist and psychiatrist based on the currently available information listed in Section 3.

It is my opinion that for the reasons referenced above, Ms. Spedale's psychological and cognitive decompensation in 2015-2016 was the end result of an extended downward spiral in terms of her medical as well as psychological health rather than due to one specific factor (or culprit) in isolation. The enrollment in the BET inhibitor study was an effort to stem the progression of her disease. It is unsurprising that Ms. Spedale became psychiatrically symptomatic at that time, though ultimately, breakdown in psychological terms occurred much earlier but was unfortunately not acted upon.

Putting the blame for this simplistically on Constellation's medication trial does not fit the rather complex facts and remains purely conjectural.

## Support for Opinions

All of my opinions are given to a reasonable degree of scientific, neurological, psychiatric and medical probability and certainty. They are based on the currently available information, as well as my education, background, and training as a medical doctor, neurologist and psychiatrist. Should any information become available to alter these opinions I reserve the right to amend them at that time.

**Appendix: Curriculum Vitae of Maurice Preter MD**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


Iris Spedale and Daniel Spedale,
husband and wife,

       Plaintiff,

                          No. 2:17-cv-00109-JJT

  vs.

Constellation Pharmaceuticals,
Inc.,

       Defendant.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


VIDEOTAPED DEPOSITION OF

CHARANJIT (J.R.) SINGH


May 16, 2018

9:19 a.m.


5777 East Mayo Boulevard
Phoenix, Arizona


Talia Douglas, RPR, CR No. 50775

```
 1                    APPEARANCES OF COUNSEL

 2
      For the Plaintiff:
 3
          SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.
 4        ALAN C. MILSTEIN, ESQ.
          308 Harper Drive, Suite 200
 5        Moorestown, NJ 08057
          856.661.2078
 6        amilstein@shermansilverstein.com

 7
      For Defendant Constellation Pharmaceuticals, Inc.:
 8
          MORRISON MAHONEY, LLP
 9        ARTHUR LIEDERMAN, ESQ.
          120 Broadway, Suite 1010
10        New York, NY 10271
          212.825.1212
11        aliederman@morrisonmahoney.com

12
      For Mayo Clinic and Dr. Fonseco and Dr. Bergsagel:
13
          ROBERT F. KETHCART, ESQ.
14        SNELL & WILMER L.L.P.
          400 East Van Buren Street, Suite 1900
15        Phoenix, AZ 85004
          602.382.6000
16        rkethcart@swlaw.com

17
      ALSO PRESENT:
18
          J. Robert Sonne, Esq., Mayo Clinic Arizona
19        Frederick Van Norman, Videographer

20

21

22

23

24

25
```

Page 3

1                       INDEX OF EXAMINATION

2

3    WITNESS:   CHARANJIT (J.R.) SINGH

4    EXAMINATION                                      PAGE

5    By Mr. Liederman                                    6

6    By Mr. Milstein                                    38

7    By Mr. Liederman                                   97

8    By Mr. Milstein                                   124

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                           INDEX OF EXHIBITS

2

3    Exhibit                  Description                    Page

4    Exhibit 30    Email                                      39
                   Page 125 and 126
5
     Exhibit 31    Email                                      50
6                  Page 117 and 118

7    Exhibit 32    Email                                      55
                   Page 74, 77, 78, 79
8
     Exhibit 33    Bi-Weekly PI Teleconference Highlights     97
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1        VIDEOTAPED DEPOSITION OF CHARANJIT (J.R.) SINGH

 2                         MAY 16, 2018

 3

 4             THE VIDEOGRAPHER:  My name is Frederick Van

 5    Norman, legal videographer, representing Esquire Deposition

 6    Services.  Our court reporter is Talia Douglas,

 7    representing also Esquire Deposition Services.

 8             We're on the record at 9:19 a.m. on May the

 9    16th, 2018.  The witness being video and audio recorded is

10    Charanjit Singh.  The case name is Iris Spedale and Daniel

11    Spedale versus Constellation Pharmaceuticals, Incorporated.

12             It's being held in the United States District

13    Court for the District of Arizona.  The Case Number is

14    2:17-cv-00109-JJT.  Our location is the Mayo Clinic at 5711

15    Mayo Boulevard, support services building, in Phoenix,

16    Arizona.

17             Will all counsel present please identify

18    yourselves, after which time our court reporter will swear

19    in the witness.

20             MR. MILSTEIN:  Alan Milstein.  I represent

21    the plaintiffs.

22             MR. LIEDERMAN:  Arthur Liederman from

23    Morrison Mahoney, representing Constellation

24    Pharmaceuticals.

25             MR. KETHCART:  Robert Kethcart with the law
```

1    firm of Snell & Wilmer.  And with me today is Robert Sonne

2    for Mayo Clinic Arizona, representing Mayo Clinic Arizona

3    and the deponent.

4

5                    CHARANJIT (J.R.) SINGH,

6    having been first duly sworn, testifies as follows:

7                         EXAMINATION

8    BY MR. LIEDERMAN:

9        Q.   Good morning, Mr. Singh.

10       A.   Good morning.

11       Q.   Have you ever been deposed before?

12       A.   No.

13       Q.   Okay.  So if you are unclear on the question, you

14   can always stop and ask for it to be repeated or just

15   indicate you don't know.

16                You have counsel here that could provide

17   assistance to you as well.  No one is asking, since this is

18   a few years ago, to have perfect memory.  So it's to the

19   best of your recollection, and if you can't really recall,

20   you can indicate so.  That's all.

21                And there are documents, obviously, that are

22   involved in this.  If there are documents that we show you

23   and you need to take time to reflect on it to refresh your

24   recollection, then just do so.  Just say, you know, you're

25   taking the time.

1          You're as much in charge of this deposition

2    as any questioner.  Okay?

3        A.   Okay.

4        Q.   Do you feel comfortable?

5        A.   Yes.

6        Q.   Okay.  So first, just some background information.

7             What's your education and background?

8        A.   I have a bachelor of arts in psychology, miner in

9    Spanish.

10       Q.   And where did you go school?

11       A.   University of Arizona.

12       Q.   And what type of employment did you obtain

13   immediately upon graduating college.

14       A.   I was the clinical research coordinator for a

15   private research firm in Phoenix.

16       Q.   What was the name of that company?

17       A.   Hope Research Institute.

18       Q.   And how long were you employed there?

19       A.   Roughly about two years.

20       Q.   And were you involved then with clinical trials?

21       A.   Yes.

22       Q.   About how many clinical trials over the two years

23   were you involved with?

24       A.   Approximately probably close to over 50.

25       Q.   Okay.  Just remember, it's not an exam.

1      A.   Yeah.

2      Q.   So there's no right or wrong.

3      A.   Yeah.

4      Q.   And you could say approximately.  You could say

5   I'm not sure.  We could say greater than or less than.

6   Okay?

7           And what type -- did you ever have any

8   experience or contact with Constellation Pharmaceuticals

9   prior to the trial drug CPI-0610?

10     A.   No.

11     Q.   Okay.  And at the end of those two years, you

12   moved along to other employment?

13     A.   Yes.

14     Q.   And where did you go?

15     A.   Mayo Clinic in Arizona.

16     Q.   So you've been with the Mayo Clinic now for

17   approximately how many years?

18     A.   10 years.

19     Q.   10 years?

20           And the role when you first joined Mayo

21   Clinic was -- did it have a title?

22     A.   Clinical research coordinator.

23     Q.   Okay.  And has that changed, the title, over the

24   10 years?

25     A.   Yes.

1    Q.   What's the title -- when did the title change and

2    what was the title change?

3    A.   After clinical research coordinator, I was

4    promoted to a senior clinical research coordinator.  And

5    currently, I've been promoted to a supervisor.

6    Q.   Okay.  So could we just go over briefly, in 25

7    word or less -- no.

8         Could we go over, just briefly, what's the --

9    how would you describe a clinical trial coordinator's role?

10   A.   Clinical research coordinator coordinates the

11   research subject's care on the trial.

12   Q.   And does the position change to the next level

13   that you described?

14   A.   No.

15   Q.   And what about the supervisor position?

16   A.   Yes.

17   Q.   What's the change in responsibilities for a

18   supervisor?

19   A.   As a supervisor, I now supervise clinical research

20   coordinators and data coordinators and the special clinical

21   research coordinators.

22   Q.   How many employees are there in the clinical trial

23   group at the Mayo Clinic?

24   A.   In my particular group?

25   Q.   In your particular group.

1    A.   There approximately probably close to 40 clinical

2    research coordinators.

3    Q.   And at any one time, how many clinical trials are

4    there ongoing within your group?

5    A.   I do not know the exact number.  Approximately

6    over 100.

7    Q.   Over a 100?

8         And would that just be coordinated by the

9    people in your group?

10   A.   Yes.

11   Q.   Okay.  And it runs the gamut of different types of

12   drugs for different types of disciplines or diseases or

13   illnesses --

14   A.   Yes.

15   Q.   -- I assume?

16        And at the time of -- so up until the time of

17   December 2015, how many clinical trials would you have been

18   involved with as a coordinator?

19   A.   I don't remember.

20   Q.   Could it be more than 100?

21   A.   By myself?

22   Q.   Well, where you were the coordinator.

23   A.   No.  It wouldn't be that much.

24   Q.   So 50?

25   A.   No.

Page 11

1      Q.    Okay.

2      A.    It wouldn't be that much.

3      Q.    So how many a year would you be doing in that time

4    frame, in the time frame from when you first got out of

5    school to the time of the --

6      A.    It varies.

7            It all depends on what my supervisor at that

8    time gave me in terms of my effort of my work.

9      Q.    What are your responsibilities with respect to the

10   enrollment of patients in a clinical trial?

11     A.    I help coordinate the subject's enrollment on the

12   trial.

13     Q.    So when you say coordinate, can you provide any

14   more specificity about what actions you might take, besides

15   just regular communications just to have them come for --

16     A.    I --

17     Q.    -- appointments.

18     A.    I collaborate with physicians.  I collaborate with

19   nurses.  I collaborate with the scheduling department.

20           Specific actions that I do is I get informed

21   consent.  I do scheduling, test procedures, part of the

22   protocol.

23           And I also work with the physician to get all

24   the medical aspects of the protocol completed.

25     Q.    What's your understanding of an informed

1    consent?

2        A.    The informed consent is where we go over the study

3    with the patient.

4              It would ensure that they understand the

5    consent form, and we go over the consent form with them

6    thoroughly, as written, and they voluntarily sign it.

7        Q.    Okay.  And how did you come to learn about the

8    role of the informed consent in the process?

9        A.    Training.

10       Q.    Training by whom?

11       A.    Training by the department and training by online

12   modules that we do.

13       Q.    And are those modules from third party --

14       A.    Some of them are, yes, and some of them are Mayo

15   Clinic.

16       Q.    Now, you had worked for a prior company as a

17   coordinator before joining the Mayo Clinic.

18             When you joined the Mayo Clinic, did you

19   engage in almost total reorientation to the role,

20   reeducation, for instance, on the informed consent?

21       A.    Yes.  We have to complete training when I was

22   employed here.

23       Q.    Was that training intermittent or was there a

24   training period of a certain time before you started

25   handling coordination?

Page 13

```
 1      A.   Do you mean when I was by myself?

 2      Q.   When you joined the Mayo Clinic.

 3      A.   I was trained when I joined, yes.

 4      Q.   So there was a program of training --

 5      A.   There --

 6      Q.   -- for a certain period of time?

 7      A.   Yes.  There was a training period.

 8      Q.   About how long was the training period before you

 9  started --

10      A.   I don't --

11      Q.   -- coordinating?

12      A.   -- remember.  Approximately four to six months.

13      Q.   Okay.  And those were lectures?

14      A.   They were on-the-job training, shadowing, me going

15  into other of my colleagues doing the consenting.

16              So me shadowing them, me actually doing

17  consenting while a colleague of mine sat in with me.  Like

18  I said, online modules and also working one on one with my

19  supervisor.

20      Q.   So you acted as a study coordinator for CPI-0610,

21  correct?

22      A.   Yes.

23      Q.   Okay.  So how did you become the study coordinator

24  for this particular trial drug?

25      A.   So the way it works is that the supervisor looks
```

1    at a coordinator's workload and sees how much effort they

2    have and if that coordinator could take on the study.

3              So for -- at that time, my supervisor

4    assigned the study to me based on my current workload.

5         Q.   Okay.  And this study was called a Phase 1 trial

6    study, right?

7         A.   Yes, from my memory.

8         Q.   Okay.  Are you acquainted with the difference

9    between the Phase 1, Phase 2 and Phase 3 clinical trials?

10        A.   Yes.

11        Q.   And how would you describe the difference between

12   a Phase 1, Phase 2 and Phase 3?

13        A.   You know, Phase 1 is where you find the minimum

14   tolerated dose, safety measures.

15             Phase 2 comes after Phase 1 and where the

16   Phase 1 shows some sort of efficacy possibly and safety,

17   and then they go to Phase 2.

18             And then Phase 3 is where they want to do a

19   registration trial, randomization trial where they want to

20   get the results where it could potentially be sent to the

21   FDA for approval.

22        Q.   When you're meeting with patients to enroll them

23   in trials, is there a different approach that you take in

24   going over a possible enrollment in a Phase 1 trial versus,

25   let's say, a Phase 3 trial?

1       A.    I go over what's written in the consent form

2   because the consent form has that information.

3       Q.    So you're guided, not by your own experience, but

4   by the documents --

5       A.    Yes.

6       Q.    -- that are provided?

7       A.    Yes.

8       Q.    Okay.  And how do you end up receiving the

9   documents that constitute the particular clinical trial

10  that you're working on?

11      A.    Which document?

12      Q.    Well, what -- let's start with a good foundation.

13            What documents do you receive when you are

14  assigned a clinical trial?

15      A.    I receive all of the documents that are approved

16  by our IRB that pertain to the study.  For example, the

17  informed consent.

18      Q.    Are you involved in selection of the IRB?

19      A.    No, I'm not.

20      Q.    Okay.  And generally, what would those documents

21  comprise of, the group of documents comprise of?

22      A.    The informed consent is one of them, any IRB

23  approval letters, any other regulatory items that was

24  approved by the IRB.

25      Q.    What about the protocols?

1       A.    The protocols, well, that's approved by IRB, so

2    that is something that I have access to.

3       Q.    What about documents like an investigator's

4    brochure?

5       A.    That's also approved by IRB that I have access to

6    as well.

7       Q.    Now, when you say you have access to it, does that

8    mean that if you wanted to and needed to look at it, you

9    would look at it?

10      A.    Those are documents that I need for my job, yes.

11      Q.    Okay.  Now, is it a matter of course that you do

12   read the protocol?

13      A.    Yes.

14      Q.    Okay.  So you read the protocol before, as well as

15   the informed consent?

16      A.    Well, it's a continuing process, yes.

17      Q.    Okay.

18      A.    I constantly look at the protocol.  I constantly

19   look at the consent form.

20      Q.    What are your responsibilities during the course

21   of the trial?

22            Are you involved in the dosing or the changes

23   in dosing or just merely coordinating the work of doctors

24   involved in the trial with the patients?

25            Broad question.

1    A.    I'm not part of any medical decisions or medical

2    aspects.   That's not part of my training.

3                   I'm mainly involved in coordinating the

4    subject's care on that trial.

5    Q.    Okay.  Do you recall the time frame when you may

6    have started working as a study coordinator for the

7    clinical trial that was CPI-0610?

8    A.    I don't know exactly when I was assigned that

9    study, no.

10   Q.    How long before the first cohort of patients

11   starts to be administered the drug would you start your

12   involvement as a coordinator?

13   A.    It varies.

14                   It varies depending on when my supervisor

15   assigns the study.  It varies when the IRB approves it.  So

16   it varies on different type of studies.

17   Q.    Okay.  So is it generally a few months before the

18   trial actually starts that you get involved or it could be

19   any length of time?

20   A.    It could be -- it could be anywhere between a

21   month to six months to three months.

22   Q.    Do you recall whether this particular study

23   required a lot of advance preparation by you or involvement

24   by you before the first patient was enrolled?

25   A.    I guess I'm not understanding the question.

1      Q.   Okay.  So was this -- do you have any idea whether

2   this was a long time period pre first administration of the

3   drug for this trial versus other trials you've been --

4      A.   I don't --

5      Q.   -- involved with?

6      A.   -- remember.

7      Q.   You don't remember.

8           Were there any difficulties that you recall

9   in finding and enrolling patients for this trial?

10     A.   No.

11     Q.   Okay.  Do you recall approximately how many

12   patients were going to be involved in this trial?

13           MR. MILSTEIN:  Were involved, you mean?

14   BY MR. LIEDERMAN:

15     Q.   Were involved for Phase 1 at your site?

16     A.   I don't remember the exact number, but I think

17   it's between three and five patients we accrued on the

18   trial.  I don't know the exact numbers.

19     Q.   Okay.  Do you know whether there were other

20   sites --

21     A.   There were --

22     Q.   -- involved with --

23     A.   There were other sites nationally, yes.

24     Q.   Okay.

25           MR. MILSTEIN:  So you only had five patients.

1               Is that what you said?

2               THE WITNESS:  I don't know --

3               MR. MILSTEIN:   About?

4               THE WITNESS:  I don't know exact numbers.

5               MR. MILSTEIN:   About?

6               THE WITNESS:   I'm estimating between three

7    and five or even less.  I don't know the exact numbers.

8    BY MR. LIEDERMAN:

9        Q.   Would you be involved in any -- strike that.

10               Do you know whether there was coordination

11   between the sites during the course of a trial with respect

12   to experiences with the patients, outcomes, adverse events?

13       A.   So we did have weekly calls or bi -- I don't know

14   how often they were, but there were calls made that was

15   organized by Constellation between all the sites to call in

16   to discuss the study.

17       Q.   And what was the frequency, if you recall?

18       A.   I don't recall.  I think it might have been weekly

19   or biweekly.

20       Q.   Is this common in your experience with clinical

21   trials?

22       A.   It is common for Phase 1, yes, and for other

23   phases as well.

24               But from my experience in Phase 1, it is

25   common to have weekly calls or biweekly calls.

Page 20

1     Q.   Did you ever come to learn of any reason why it
2 was common in Phase 1 as opposed to the other two phases to
3 have these types of calls?
4     A.   I guess I'm not understanding the question.
5     Q.   Did you ever learn why or come to ever understand
6 the reason why, as you said, it was more common in Phase 1
7 to have these types of calls?
8     A.   From my understanding, just because of the safety
9 aspects of it.
10    Q.   Because of the dosing?
11    A.   The dosing, yes.
12             And -- and depending on the company, as well,
13 how often they wanted it in the organization that they did.
14    Q.   Now, Dr. Bergsagel was involved with this clinical
15 trial, correct?
16    A.   Bergsagel, yes.
17    Q.   Bergsagel?
18    A.   Yes.
19    Q.   Good thing he wasn't here.
20             MR. KETHCART:  He's not a deserter.
21 BY MR. LIEDERMAN:
22    Q.   Had you worked with him previously on any clinical
23 trials?
24    A.   Yes.
25    Q.   About how many would you say?

1        A.    I don't remember.

2        Q.    Okay.  Were you familiar, before this trial, with

3   Dr. Fonseca?

4        A.    Yes.

5        Q.    Had you worked with him in any clinical trials?

6        A.    I have, yes.

7        Q.    Was he involved as an investigator or principal

8   investigator in any trials you worked on?

9        A.    Yes, yes.

10             From my memory, he was either a principal

11   investigator or a co-investigator.

12        Q.    Now, before you start to enroll patients, is there

13   a time when you have any discussions pre-enrollment with

14   Dr. Berg --

15        A.    Bergsagel.

16        Q.    -- Bergsagel about the trial and the protocols?

17        A.    Yes.  Depending on the situation, there's always

18   conversations between me and the investigator to make sure

19   that everything is going according to protocol.

20        Q.    And do you also go over the informed consent with

21   the doctor?

22        A.    I go over the -- I go over with them that I did

23   get the informed consent to the patient, yes.

24        Q.    Do you have a regular reason for a discussion with

25   them going over the pages of the informed consent or just

1    tell them that you have it and you reviewed it?

2        A.    With the physician?

3        Q.    With the physician.

4        A.    I just notified them that I received the informed

5    consent from the patient.

6        Q.    Okay.  What type of contact do you have with a

7    company like Constellation Pharmaceuticals in preparation

8    for the trial?

9        A.    In preparation for the trial before the study is

10   opened?

11       Q.    Yes.

12       A.    Any studies start up activities that they need me

13   for training, any documents they need or any issues that

14   they may foresee that could happen that they wanted me to

15   be aware of.  So it could be anything.

16       Q.    So in connection with this particular trial

17   product of 0610, do you recall specific conversations that

18   preceded the opening of the trial?

19       A.    I don't recall any specific conversation.

20       Q.    Okay.  Do you recall whether or not there were

21   numerous conferences was Constellation or very few from

22   your recollection?

23       A.    I can't tell you from recollection.

24       Q.    Okay.  Did you receive any training from them in

25   any particular area of the trial?

1      A.   The training was, yes, in the SIV, the site

2  initiation visit.

3      Q.   So they came to visit?

4      A.   Yes.

5      Q.   And who was it, if you recall, came visit from

6  Constellation?

7      A.   I don't recall if it was Constellation or if it

8  was a CRO.

9      Q.   Okay.

10      A.   But there was training prior to the study.   I

11  don't recall who led it.

12      Q.   And what type of training was it that you

13  recall?

14      A.   It was protocol training.

15          I don't recall exactly what it is, but it

16  was -- it was protocol training, and then the investigator

17  came, as well, for investigator training, GCP, good

18  clinical practice.

19          And database training as well, from memory,

20  but I don't know exactly what else.

21      Q.   Now, other than those biweekly calls, do you

22  recall whether, during this trial, there were any other --

23  strike that.

24          So that was -- that was prior to the opening

25  of the trial.

1                    During the course of the trial, do you recall

2      calls with Constellation or any visits by anyone from

3      Constellation --

4          A.   I'm not sure --

5          Q.   -- about the trial?

6          A.   -- if I was part of the biweekly calls prior to us

7      opening the study.  Because, like I said, it wasn't opened

8      here.

9                    We may have had some conversations over the

10     phone or I was part of maybe.  I don't really recall.

11         Q.   Okay.

12         A.   I was part of the conference calls after we had

13     the study open.  We had to enroll the patients here.

14         Q.   Okay.  And other than those calls, did you have

15     any other contact with Constellation that you can recall?

16         A.   Emails.

17         Q.   Just emails?

18         A.   Yes.

19         Q.   You don't recall any phone conversations?

20         A.   Not that I can specifically remember.

21         Q.   Okay.  And were there any Constellation visits

22     during the time that the trial was ongoing here?

23         A.   That Constellation came over here?

24         Q.   Yes.

25         A.   Possibly, but I don't remember.

Page 25

1    Q.   Okay.

2              MR. KETCHCART:   Do you need water or anything?

3              THE WITNESS:   No.   I'm okay.

4              MR. KETCHCART:   Okay.   I just want to make

5    sure.

6    BY MR. LIEDERMAN:

7    Q.   So in enrolling patients, how did you obtain the

8    names of patients for CP -- I'll just call it 0610?

9    A.   It depended on the situation.

10             So sometimes I had a physician who had this

11   study already in mind, that they thought they would be a

12   good candidate.   And then they would ask me to start the

13   screening procedures and go over their study with the

14   patient.

15             Or in another cases, the physician asked us

16   to screen the patient for any trials that they could

17   potentially be a good candidate for, and then we would get

18   the results of that to the physicians.

19             And then they will let us know which trial

20   they would like us to discuss with the patient -- they

21   discuss with the patient.

22   Q.   Who created the screening protocol for this

23   particular trial?

24   A.   Well, the screening procedures are in the

25   protocol.   We follow what's in the protocol.

1    Q.    Okay.  And is there a doctor that supervises those

2    screening procedures?

3    A.    The principal investigator or the

4    co-investigator.

5    Q.    Who was the co-investigator on this trial?

6    A.    I don't remember who the co-investigators were.

7    Q.    What's the role of a co-investigator?

8    A.    A co-investigator leads the study with a PI.  They

9    are the medical personnel for the study.

10   Q.    They're much more day to day, hands on, from the

11   principal?

12   A.    Not necessarily.

13   Q.    Okay.  And is it common that there's a

14   co-investigator for every trial --

15   A.    A lot --

16   Q.    -- that you recall?

17   A.    -- of our protocols have co-investigators.

18   Q.    Okay.  And for this one, you recall there was one,

19   even though --

20   A.    I --

21   Q.    -- you can't recall the name?

22   A.    I can't recall the name.  I do recall there were

23   co-investigators.

24   Q.    Okay.

25   A.    I would have to look at the documents.

1     Q.   As we go through some of the documents, if you see

2  one, we'll follow up --

3     A.   I don't --

4     Q.   -- with that.

5     A.   -- remember, but I think there were.

6     Q.   So was there any script that you would use when

7  you were going over the informed consent with the --

8     A.   I would --

9     Q.   -- patient?

10     A.   I would use the informed consent as written.

11     Q.   Now, were you present for discussions of the

12  principal -- strike that.

13          Would the principal investigator personally

14  meet with every patient before they're enrolled?

15          MR. KETHCART:  Foundation.

16          THE WITNESS:  Not every patient.  Sometimes

17  it could have been a co-investigator.

18  BY MR. LIEDERMAN:

19     Q.   Okay.  So your recollection is that either the

20  principal investigator or the co would meet with every

21  patient prior to enrollment --

22     A.   It depended on the situation.

23     Q.   -- or at the time of enrollment?

24     A.   I can't recall, but it depends on the situation.

25     Q.   What, if you recall -- were there particular

1  reasons why the doctors would be meeting with some patients

2  but not others?

3                MR. KETHCART:  Foundation.

4  BY MR. LIEDERMAN:

5      Q.   Go ahead.

6      A.   Huh?

7      Q.   Go ahead.

8                MR. KETHCART:  I'm just objecting on

9  foundation.

10               THE WITNESS:  Oh, okay.

11               MR. KETHCART:  If you know the answer, then

12 you can answer the questions.

13 BY MR. LIEDERMAN:

14     Q.   Go ahead.

15               MR. KETHCART:  It's just a question of

16 whether you know the answer.

17               THE WITNESS:  Well, I guess it depends on the

18 situation.

19 BY MR. LIEDERMAN:

20     Q.   Are there any particular situations that you have

21 in mind that might dictate why a particular enrollee might

22 not see a doc -- well, let's look at it this way.  Strike

23 that.

24               You're meeting with -- as part of the

25 clinical trial staff or group --

1      A.   Yes.

2      Q.   -- there would be you and there would be the

3   principal investigator and possibly a co-investigator.

4              Anybody else associated with a particular

5   trial?

6      A.   Whoever is on the delegation log, yes.

7              There could be nurses.  There could be data

8   coordinators.  There could be lab personnel.  There could

9   be regulatory personnel.

10             So there --

11     Q.   Okay.

12     A.   -- are multiple personnel that could be involved

13  in the study.

14     Q.   And typically, who is the first person of this

15  team to have contact with a potential enrollee?

16     A.   A majority of times, it is the physician

17  investigator.

18     Q.   Okay.  And he would receive the name through some

19  referring doctor?

20             MR. KETHCART:  Foundation.

21  BY MR. LIEDERMAN:

22     Q.   How would he receive it?

23     A.   It would --

24     Q.   Let's open it up.

25     A.   -- depend on the situation.

1      Q.   Okay.  Now, in going through that script -- not

2   the script.

3            In going through the informed consent, if a

4   patient had questions regarding the informed consent, would

5   you refer the questions to the principal investigator.

6      A.   If it was medical questions, yes.

7      Q.   Okay.  If it was questions about risk?

8      A.   I would answer them.

9            If it was medical questions about risk, then

10  I would defer to the physician.

11           So it depended on the type of question that I

12  was asked.

13           MR. LIEDERMAN:  Okay.  We have the -- are

14  those the exhibits --

15           MR. MILSTEIN:  Yeah.

16           MR. LIEDERMAN:  -- that we had?

17           MR. MILSTEIN:  Here's some other ones here.

18           MR. LIEDERMAN:  Thank you.

19  BY MR. LIEDERMAN:

20     Q.   As part of your work, would you, as a matter of

21  course, have access to the clinical trial agreement?

22     A.   I would have access to the clinical trial

23  agreement.

24     Q.   Is there any need that you particularly had in

25  preparing for the opening of a trial for the clinical trial

1   agreement, referring to it?

2       A.   I refer to it, but not like I would with a

3   protocol consent form.

4       Q.   Okay.  Were there aspects of the clinical trial

5   agreement that you needed to look at in order to determine

6   what the role of the trial would be or what your activities

7   would be?

8       A.   Not that I know of.

9       Q.   Okay.  I'm going to show you what's been

10  previously marked as Exhibit 2 and ask you if you've seen

11  this document before?

12      A.   Protocol?

13      Q.   Protocol for this drug.

14      A.   Yes.

15      Q.   And that was the type of -- this was the --

16      A.   Oh, well, this was for lymphoma.

17      Q.   Was that the lymphoma one?

18      A.   Yeah.

19               MR. KETHCART:  Uh-huh.

20               MR. LIEDERMAN:  Did we mark the -- we've got

21  the trial agreement marked twice.

22               Did we mark the protocol?

23               MR. MILSTEIN:  The only one I marked was --

24               MR. LIEDERMAN:  That one?

25               MR. KETHCART:  Uh-huh.

Page 32

1                    MR. MILSTEIN:  -- was that one.

2                    MR. LIEDERMAN:  Okay.

3                    MR. MILSTEIN:  So mark the one for myeloma.

4                    MR. LIEDERMAN:  This is also lymphoma.  Okay.

5                    MR. MILSTEIN:  I think the only one that you

6      sent me was the one for lymphoma.

7                    MR. LIEDERMAN:  Is it?

8                    I may have gotten two and never distinguished

9      them.

10                    MR. KETHCART:  Can I have the binder?

11                    MR. MILSTEIN:  Huh?

12                    MR. KETHCART:  Can I have that binder?

13                    MR. MILSTEIN:  (Indicating)

14                    MR. KETHCART:  Thank you.

15                    MR. MILSTEIN:  Did you do the lymphoma trial

16     here?

17                    THE WITNESS:  No.  I did the myeloma trial

18     here.

19                    MR. MILSTEIN:  Do you know if they did the

20     lymphoma trial here?

21                    THE WITNESS:  Not that I remember.  I'm not

22     sure.

23                    MR. MILSTEIN:  Okay.

24                    MR. LIEDERMAN:  Okay.

25                    MR. MILSTEIN:  Do you have it?

1          MR. LIEDERMAN:  If I did, I didn't bring it

2    with me.  I left some documents.

3          MR. MILSTEIN:  You definitely never produced

4    it.

5          Do you know whether there was a protocol for

6    the myeloma trial as opposed to the lymphoma trial or

7    whether you just used the lymphoma protocol?

8          THE WITNESS:  I'm sorry.  Could you repeat

9    the question?

10          MR. MILSTEIN:  Do you know whether you had a

11   specific protocol for the myeloma trial?

12          THE WITNESS:  Yes.  It was approved by IRB.

13          MR. MILSTEIN:  Okay.

14          MR. LIEDERMAN:  Okay.

15          MR. MILSTEIN:  Do you have it?

16          MR. KETHCART:  I don't know the answer to

17   that.

18          MR. MILSTEIN:  What?

19          MR. KETHCART:  I assume we do, but I don't

20   know the answer.

21          MR. MILSTEIN:  I mean, do you have it here?

22          MR. KETHCART:  Not with me, no.

23   BY MR. LIEDERMAN:

24      Q.   Okay.  Are you familiar with a patient that was

25   enrolled in the trial, Iris Spedale?

Page 34

1     A.    I am familiar with the patient, yes.

2     Q.    Okay.  Do you recall the circumstances as to how

3  she was introduced to you to be a potential enrollee?

4     A.    From my memory, I was requested to see if there

5  were any clinical trials that she may be eligible for.

6     Q.    And who would have asked you to take a --

7     A.    One of the physicians.

8     Q.    Would that have been Dr. Fonseca?

9     A.    From my memory, I think it was Dr. Fonseca, yes.

10     Q.    Do you recall any specific requirements or

11  specifications for the type of trial that they were looking

12  for, for her?

13     A.    Not that I remember.

14     Q.    Would that have been conveyed in the email or

15  orally?

16     A.    It would have been both.

17     Q.    I'm going to give you the documents that you

18  produced because I don't want to really start to have to

19  mark every exhibit.

20           And these are documents you produced in

21  response to subpoena that went with the notice of

22  deposition.

23           Did you undertake, in response to the

24  subpoena or request of counsel, a search for communications

25  regarding Ms. Spedale and her enrollment in this and

1    involvement in this trial?

2        A.    Could you repeat the question?

3        Q.    Did you do a search for records --

4        A.    Yes.

5        Q.    -- to see --

6        A.    I was requested to produce any documents that had

7    pertained to her involvement in the study, which I

8    produced.

9        Q.    And where did you conduct the -- what type of a --

10   what did you do in order to find the documents?

11       A.    All my patients, I have saved emails in a folder

12   in my computer.

13             So I went to that and printed everything out

14   in that folder.

15       Q.    Okay.  So the first document that -- and this

16   would be the entirety, then, of what you preserved?

17       A.    Yes.

18       Q.    Okay.  Do you have any destruction practice or is

19   it everything retained generally with respect to the emails

20   for a particular patient?

21       A.    You mean what my custom --

22       Q.    Practice.

23       A.    -- and practice is?

24             My custom and practice is to keep anything

25   that's relevant to the study.

1    Q.   Okay.  So --

2              MR. MILSTEIN:  Do you keep the protocol?

3              THE WITNESS:  With the protocol, yes, I have

4    the protocol.

5              MR. MILSTEIN:  Okay.  But that wasn't

6    produced?

7              THE WITNESS:  I --

8              MR. KETHCART:  Correct.

9              MR. LIEDERMAN:  Right.

10              MR. MILSTEIN:  Okay.  Can you produce that?

11              MR. KETHCART:  Not today, no.

12              MR. MILSTEIN:  Can you send it to both of us,

13    what you have?

14              MR. LIEDERMAN:  We'll take a look.  I'll

15    coordinator with him, and we'll see.

16              If I didn't have it -- maybe I have it back

17    in my notebook.

18              MR. MILSTEIN:  Okay.  But, I mean, either

19    way, I think --

20              MR. LIEDERMAN:  It will be helpful, I

21    think.

22              MR. MILSTEIN:  I would like to have the

23    protocol that was in your possession.

24              MR. KETHCART:  Okay.

25    BY MR. LIEDERMAN:

Page 37

1     Q.   Okay.  So you can use your own records to refresh

2  your recollection.

3             Do you know when you may have had your first

4  contact with anybody in the Mayo staff regarding

5  Ms. Spedale?

6     A.   I don't remember by memory, no, but I could look

7  in my documents and see.

8     Q.   Sure.

9             Go ahead.

10            MR. KETHCART:  Should we take a break and he

11  can go through?

12            MR. LIEDERMAN:  Why don't we do that if he

13  has to look through it.

14            And let's take a break.

15            THE WITNESS:  Okay.

16            MR. LIEDERMAN:  Why don't you just glance

17  over it and see what there is that could help refresh your

18  recollection, and then we can move through.

19            MR. MILSTEIN:  I mean, we can -- I can just

20  take him through the documents, if you want me to do that.

21            I've gone through the document.  I know which

22  ones.

23            MR. LIEDERMAN:  If -- I'll let you ask the

24  questions on that and take a look because I haven't gone

25  through all of his production --

Page 38

1                    MR. MILSTEIN:  Okay.

2                    MR. LIEDERMAN:  -- and you were.  So why

3      don't we do that.

4                    Are you going to have them marked or are you

5      just going to have them --

6                    MR. MILSTEIN:  Yeah.  I'm going mark them,

7      yeah.

8                    MR. LIEDERMAN:  Okay.  So Mr. Singh,

9      plaintiff's counsel is going to mark these, and then you'll

10     be asked questions.

11                   THE WITNESS:  Okay.

12                   MR. LIEDERMAN:  That will make it easier.

13                   MR. KETHCART:  Why don't you hand those back

14     to him.

15                        EXAMINATION

16     BY MR. MILSTEIN:

17       Q.   No, no.  Keep them.  Keep them.

18                   All right.  So could you find the email from

19     Kyle Morgan to you, dated November 20th, 2015?

20                   MR. KETHCART:  Go ahead and leave those on

21     there.

22                   THE WITNESS:  Oh, yeah.

23                   MR. KETHCART:  Those are separating the

24     documents.

25                   THE WITNESS:  Okay.  These up here?

1            MR. KETHCART:  So it's going to be under one

2    of these headings, and it's going to say from Michael

3    Morgan, I believe, or from Kyle Morgan.

4            THE WITNESS:  Yeah.

5            MR. KETHCART:  Okay.

6            THE WITNESS:  November 20th, 8:04 a.m.

7            MR. MILSTEIN:  Okay.  So I'm going to mark

8    this as Exhibit 30.

9            (Exhibit No. 30 marked)

10   BY MR. MILSTEIN:

11      Q.   So first of all, Kyle Morgan, I take it he was

12   your contact at INC, the CRO?

13      A.   Yes.

14      Q.   When did you first get assigned to the clinical

15   trial?

16      A.   I don't remember the exact date.

17      Q.   Approximately.

18      A.   I don't remember.

19      Q.   Was there any other clinical research coordinator

20   other than you on this trial?

21      A.   I had backups, yes.  We all had backup

22   coordinators.

23      Q.   Okay.  But when the trial started here, did it

24   start with you as the clinical research coordinator?

25      A.   From my memory, yes.

Page 40

1    Q.   Okay.  So there wasn't anybody who preceded you

2  who worked on this trial?

3    A.   I don't really remember.

4    Q.   Well, you were the one trained by Constellation

5  and the CRO as to how to conduct this trial, correct?

6    A.   Yes.  At that day when we had the SIV, I was the

7  lead coordinator.

8    Q.   Right.

9         And, I mean, you would have known, wouldn't

10  you, if there had been a prior coordinator?

11    A.   If I remember, that could have been -- that was

12  almost three years ago.

13    Q.   Okay.  But as you sit here today, you have no --

14  as far as you know, you were the first coordinator on this

15  trial as it started at Mayo, correct?

16    A.   When we had the SIV, I was, yes.

17    Q.   Okay.  And you don't remember any other

18  coordinator?

19         You don't remember talking, you know, talking

20  to a colleague and having him bring you up to date on the

21  trial because this trial started here with you as the

22  clinical researcher --

23    A.   I don't know --

24    Q.   -- coordinator.

25    A.   -- if I was --

Page 41

1                    MR. KETHCART:  Form and foundation.

2                    Go ahead and answer.

3                    THE WITNESS:  I don't know if I was the first

4      one, but I do know when we had the SIV and I was trained by

5      the team, I was fully on as the main coordinator.

6      BY MR. MILSTEIN:

7          Q.    Okay.  When you say you don't know, there's a

8      difference between not knowing and simply not having a

9      recollection of anybody else preceding you, right?

10                    I mean, you're not suggesting that there was

11     somebody, but you don't know about it.

12                    As far as you remember, you were the first

13     person, correct?

14                    MR. KETHCART:  Form.

15     BY MR. MILSTEIN:

16         Q.    As far as you remember, you were the original

17     clinical research coordinator on the trial?

18         A.    From my memory, I could say that when we had the

19     SIV, I was the main coordinator for the trial, yes.

20                    Prior to that, I don't remember if my

21     supervisor assigned it to anybody, but I do know that when

22     we had the SIV, I was the main coordinator.

23         Q.    Okay.  And do you remember the first patient on

24     the trial?

25                    I'm not asking you to -- I don't want you to

Page 42

1    tell me the name.

2              But you said you thought you had about three

3    to five people total in the trial.

4              And you knew this was a dose escalation

5    trial, correct?

6         A.   Yes.

7         Q.   Did you -- did you do the informed consent

8    discussion with everyone who was in the trial?

9         A.   I would have to look at who signed the consent

10   form.

11        Q.   As far as --

12        A.   I don't remember --

13        Q.   -- just the way it works --

14        A.   -- if I consented all the patients, but I would

15   have to look at each of the patient's consent form to see

16   if my signature was on there.

17        Q.   Okay.  But was it your job to engage in the

18   informed consent discussion --

19        A.   It was --

20        Q.   -- with whoever was going to be a research subject

21   in the trial?

22        A.   One of my responsibilities as a coordinator was to

23   get the informed consent, yes.

24        Q.   Okay.  All right.  So Exhibit 30 is an email

25   exchange between you and Mr. Morgan.

Page 43

1          MR. LIEDERMAN:  What's the date of it?

2          MR. MILSTEIN:  November 20th, 2015.

3   BY MR. MILSTEIN:

4      Q.   Well, on the second page, do you know what these

5   relate to?

6      A.   It looks like he -- well, he wanted our team to

7   address the queries below.

8      Q.   Okay.  And there are three patients 309, 318 and

9   309; is that right?

10     A.   Yeah.

11     Q.   There's two patients?

12     A.   There's two patients, 309 and 318.

13     Q.   Right.

14          And do you know if Ms. Spedale was, what

15   number her patient was?

16     A.   I do not remember her patient number.

17          MR. MILSTEIN:  Could you hand me the other

18   documents around there?

19          MR. LIEDERMAN:  She was 8-325.

20   BY MR. MILSTEIN:

21     Q.   Okay.  So she was 325.

22          So these two patients are not Ms. Spedale,

23   correct?

24     A.   If you say that her number is 325, then no.

25     Q.   Okay.  And so there was an adverse event with a

Page 44

1   patient 309 on November 8th, 2015; is that right?

2        A.    From here, it says that there was an AE that was

3   entered.

4        Q.    And do you remember that one?

5        A.    I do not remember that.

6        Q.    So --

7        A.    But it got cut off, so I don't know what else it's

8   saying.

9        Q.    All right.  So at that point, at the time, Ms.

10  Spedale, you were using protocol version 3; is that

11  right?

12       A.    I don't remember.

13       Q.    Well, it's what -- I'm looking at the document.

14              "Just wanted to confirm we are still using

15  protocol version 3 September 22nd, 2014."

16              Do you see that?

17       A.    Yeah.  I don't know what he said.  I don't have

18  that email, but --

19       Q.    What do you mean you don't have the email?

20              You have the email right here.

21              "Hi Kyle."  This is from you.  "Just wanted

22  to confirm we are still using protocol version 3 September

23  22nd, 2014."  Right?

24       A.    I would have to go back and see at that moment

25  what we had IRB approve.

Page 45

 1          Because this -- he didn't give me an answer,
 2   so I don't know what that answer was.  And I'm not going to
 3   base my decision on this email.
 4          I would have to go back into my records as
 5   well.
 6   Q.   But we're out in Phoenix to take your deposition.
 7          I mean, we're trying to figure out exactly
 8   what happened with respect to Ms. Spedale.
 9          You've produced all of the emails that are
10   supposed to relate to her.
11          I take it you've had some time to review the
12   file before the deposition?
13   A.   Yes, but this is the first time I'm seeing this
14   email.
15   Q.   All right.  "The dose I will be screening patient
16   will be 150 BID."
17          Do you see that?
18   A.   Yes.
19   Q.   Who told you that?
20   A.   I was confirming -- so that's what, at that
21   moment, from my memory, I just wanted to confirm that we
22   were all on the same page.
23          I was just being diligent to making sure
24   that --
25   Q.   I'm not asking whether you were diligent or not.

1                      I want to know, how did you know the dose

2    would be 150 milligrams?

3         A.   I don't remember exactly how or where I got that

4    information from.

5         Q.   Well, you're the clinical research coordinator,

6    right?

7                      You've got a patient who is being recruited

8    to be in the trial.

9         A.   Yes.

10        Q.   How would you find out what the dose would be?

11        A.   Oh, I would look at the protocol or I would

12   contact the study contacts, which --

13        Q.   I mean, so that's what you must have done,

14   right?

15        A.   Yes.

16        Q.   You didn't just pick out the number out of the

17   air, right?

18        A.   Oh, no.

19        Q.   Okay.

20        A.   No.

21        Q.   So you looked at the protocol, and you probably

22   contacted the research, the CRO, and you found out that 150

23   milligrams twice a day was the dose that this patient was

24   going to have, right?

25        A.   Well, I don't know exactly what my thought process

1    was at that moment, but from this email, I wanted to

2    confirm that I was using the right protocol version and we

3    will be using the right dose.

4         Q.   Okay.  Now, this is November 20th.

5              She signs an informed consent on December

6    1st.

7         A.   Yes.

8         Q.   Do you know why this document was produced?

9         A.   I don't remember exactly why --

10        Q.   I know you were instructed to say, I don't

11   remember --

12             MR. KETHCART:  Foundation.

13   BY MR. MILSTEIN:

14        Q.   -- to make this not specific.

15             But you're going to have to answer the

16   questions.  Okay?

17             MR. KETHCART:  Objection to foundation.

18   Objection to form.

19             I thing we should just take a break here.  We

20   can take --

21   BY MR. MILSTEIN:

22        Q.   I'm just trying to figure out, why was

23   this document --

24             MR. KETHCART:  We're going to take a break.

25   BY MR. MILSTEIN:

1       Q.    -- produced?

2                   Why was this --

3                   MR. KETHCART:  Thank you.  Let's go off the

4       record, please.

5                   THE VIDEOGRAPHER:  Okay.  We're off the

6       record at 10:06.

7                   (Recess taken from 10:06 a.m. to 10:13 a.m.)

8                   THE VIDEOGRAPHER:  We're back on the record

9       10:13.

10      BY MR. MILSTEIN:

11      Q.    Okay.  Exhibit 30, this was in your Iris Spedale

12      folder?

13      A.    Which one?

14      Q.    Exhibit 30.

15                  MR. KETHCART:  The email.

16                  THE WITNESS:  On November 20th?

17                  MR. KETHCART:  Yeah.

18                  THE WITNESS:  I don't -- if it was produced

19      with my attorneys, yes, it was then.

20      BY MR. MILSTEIN:

21      Q.    I mean, you're the one who produced these

22      documents --

23      A.    Okay.

24      Q.    -- correct?

25      A.    Yes.

1      Q.   I mean, you looked for them, handed them to your

2  attorney --

3      A.   Yes.

4      Q.   -- in response to the subpoena.

5           So if you produced this document, did you

6  produce it because it related to Iris Spedale?

7      A.   Yes.

8      Q.   Okay.  So is it fair to assume that when you say,

9  "The dose I will be screening patient will be 150

10  milligrams BID," that was for Iris Spedale?

11      A.   I would say I would look at -- I would have to

12  look at her chart to see what dose.  I don't remember the

13  context of this email.

14      Q.   Okay.  But it was in the chart for Iris Spedale.

15      A.   Yes.

16      Q.   That's what you produced.

17      A.   Yes.

18      Q.   Right.

19           Now, she was -- she went through the informed

20  consent process December 1st, but before that, there was --

21  we have some documents suggesting that she was considering

22  ixazomib.

23           Do you recall that discussion with her, that

24  she inquired whether she could go on that FDA approved

25  drug?

```
 1      A.    I don't recall the specific conversation I had

 2  with her in person, but through email, whatever I have

 3  documented is what the --

 4      Q.    Well, do you recall generally having that

 5  discussion about another drug that she was considering?

 6      A.    In person with her, I don't recall generally.

 7      Q.    Okay.

 8                  (Exhibit No. 31 marked)

 9  BY MR. MILSTEIN:

10      Q.    Okay.  If you could find the email dated November

11  23rd at the top.

12                  MR. KETHCART:  So each email string should be

13  separated by one of those blue sheets.

14                  THE WITNESS:  Yeah.

15                  MR. KETHCART:  So you should be able to just

16  go from blue sheet to blue sheet.

17                  THE WITNESS:  I got November 23rd.

18  BY MR. MILSTEIN:

19      Q.    Okay.  So this is a string of emails.

20                  So it starts, I believe, at the bottom of the

21  page when Mr. Spedale writes to you.

22                  And he says, "The second question comes from

23  the news today that a brand new drug Ninlaro ixazomib has

24  been FDA approved."

25      A.    Oh.
```

1          MR. KETHCART:  So he has two separate emails

2     with that same date.

3          So he was looking at the one from Dr. Fonseca

4     from that date.

5          And then now you're talking about the one

6     from Dan Spedale on that date?

7          MR. MILSTEIN:  Yes.

8          THE WITNESS:  Okay.

9     BY MR. MILSTEIN:

10        Q.   Okay.  So do you see at the bottom?

11        A.   Yes.

12        Q.   Okay.  And then you write back saying you heard

13     back from Dr. Fonseca regarding ixazomib.

14          "He said these are two different drugs.  He

15     would recommend to first try the study drug (BET

16     inhibitor).  Then she can try the approved ixazomib."

17          Did I read that right?

18        A.   Yes.  The ixazomib?

19        Q.   Right.

20          So do you recall speaking with -- when you

21     say, "As for the port, we can certainly see if that is the

22     best option for you when you meet with Dr. Bergsagel," what

23     does that mean, "as for the port"?

24        A.   I don't recall specifically, but --

25          MR. KETHCART:  Start down at the bottom of

Page 52

1    the email.

2    BY MR. MILSTEIN:

3        Q.   I mean, she was having trouble -- she was telling

4    you that there was, that there was difficulty in blood --

5        A.   Okay.  Yes.

6        Q.   -- draws, right?

7        A.   So it probably would be easier for them to draw

8    blood.

9        Q.   Okay.

10                MR. KETHCART:  And so he was asking about --

11   here you say that you had heard back from Dr. Fonseca.  And

12   I think that's in the previous email.

13   BY MR. MILSTEIN:

14       Q.   Now, but in your email, you say, "As Bergsagel."

15                Do you know what you meant by that?

16       A.   "As for the port"?

17       Q.   No.

18                You see in the middle of the email, you just

19   say, "As Bergsagel."

20                I'm sorry, for you to meet with -- I'm sorry.

21                You say, "As for the port, we can certainty

22   see if that is the best option for you when you meet with

23   Dr. Bergsagel."

24                Do you see that?

25       A.   Yes.

Page 53

1     Q.   So does that refresh your recollection as to

2  whether she met with Dr. Bergsagel?

3     A.   I don't remember if she met with him at that

4  moment, but she did have a meeting with him during the

5  trial.

6     Q.   Okay.  And Dr. Fonseca, to your knowledge, was not

7  a co-investigator, correct?

8     A.   From my memory, he was not a co-investigator.

9     Q.   He was her oncologist?

10    A.   Treating physician at that time.

11    Q.   Her treating physician, right.

12          So then they write back and say, okay, "we

13  want to continue with the trial."

14          Do you see that?

15    A.   Yes.

16    Q.   Now, the informed consent document, which is

17  marked as 11, is it your testimony that you went over this

18  with the Spedales?

19    A.   Yes.  My signature is on the page.

20    Q.   Do you recall going over it with them?

21    A.   I do.

22    Q.   And did you read it with them paragraph by

23  paragraph?

24    A.   It's my custom and practice to go over the consent

25  as written, all the sections, with the research subject.

Page 54

1      Q.    So did you read it with them paragraph by

2  paragraph?

3      A.    I went over each section as written, yes.

4      Q.    Okay.  And when it said one of the purposes of the

5  trial was -- this is on the third page.

6      A.    Yes.

7      Q.    Will the drug help reduce the amount of multiple

8  myeloma in patient's bodies.

9            Did you read that to them?

10     A.    Yes.  That was a section that was part of the

11 consent form.

12     Q.    Was it your understanding that Constellation had

13 written the consent form or did you know one way or the

14 other?

15     A.    I don't remember, but Constellation provided us

16 with a consent form, yes, for study start up.

17     Q.    Did you understand that, as a participant in the

18 trial, that the drug that she was on in this Phase 1 trial

19 was the only cancer treatment that she was taking while in

20 the protocol?

21     A.    Could you repeat the question?

22     Q.    Did you understand that the only cancer treatment

23 she was taking in the protocol was the study drug and that

24 that is she had to be off all other cancer drugs?

25     A.    I would have to review the eligibility criteria to

1   see if that was the criteria that there cannot be any

2   anti-cancer therapies, yes.

3       Q.   Do you recall whether she had to be off all

4   other --

5       A.   I don't --

6       Q.   -- cancer drugs?

7       A.   -- recall by memory, but I would -- it's in the

8   protocol in terms of the criteria --

9       Q.   Okay.

10      A.   -- what the allowances for other cancer

11  therapies.

12                  (Exhibit No. 32 marked)

13  BY MR. MILSTEIN:

14      Q.   Okay.  Can you turn to January 2nd, 2016 from

15  Fonseca to you?

16                  MR. KETHCART:  Say the date again, January --

17                  MR. MILSTEIN:  2nd.

18                  THE WITNESS:  Okay.  I have one from

19  Dr. Fonseca.

20  BY MR. MILSTEIN:

21      Q.   Okay.  With a copy to Kimberly Iverson.

22                  Who is Kimberly Iverson?

23      A.   From my memory, she's a nurse.

24      Q.   Was she a nurse coordinator?

25      A.   I don't know her exact title, but she was a nurse

Page 56

1    in the hematology/oncology --

2         Q.    Okay.

3         A.    -- practice.

4         Q.    All right.  So if you look on the page, which is

5    page 77 -- well, first, it starts with your email to

6    Michael Cooper, dated December 29th.

7         A.    Yes.

8         Q.    Okay.  You say, "Our subject did finish all 14

9    days of dosing.  We did not interrupt dosing during cycle 1

10   due to the nausea, vomiting or diarrhea."

11        A.    Yes.

12        Q.    So who was giving you this information, if you

13   know?

14        A.    That was being led by the medical doctor in terms

15   of following the protocol.

16        Q.    Okay.  And then Fonseca writes to you, "Thanks

17   J.R.  Indeed they do not meet SAE criteria the patient

18   voiced significant dislike of her SE, of course.

19   Especially if she is responding."

20              And then Michael Cooper writes on December

21   29th, "By protocol the dose should not be reduced unless

22   the patient has experienced a dose limiting toxicity.

23   Nevertheless, it sounds like the nausea, vomiting and

24   diarrhea were significant even if not formally dose

25   limiting."

1          And then he says, "I am concerned if we

2    reduce her dose we may lose the anti-myeloma activity which

3    appears to have been gained.  We know that with the 150

4    milligrams BID dose we are just on the cusp of the

5    concentrations of CPI-0610 needed to suppress BET target

6    genes."

7          Did I read that right?

8    A.   Yes.

9    Q.   And then there's another correspondence from Leif

10   Bergsagel to Michael Cooper, "I favor slightly the 300

11   milligrams once daily."

12          And then Cooper writes back, "That is my

13   prejudice as well."

14          And then what I want to talk to you about is

15   the email on the first page.

16   A.   Okay.

17   Q.   So you say, "I spoke with Iris just now.  She

18   reported her edema is getting worse and she is experiencing

19   bad neuropathy.  She is on her way to the ER.  I also spoke

20   with her sister and she is worried the drug is having an

21   effect on her mental status.  She noticed Iris rambling a

22   lot.  I also instructed them to call the onc doc on call.

23   I was going over the consent and nothing about mental

24   status but could effect the adrenal glands.  Not sure that

25   would have an effect on altered mental status."

```
 1                    Did I read that right?

 2                    MR. KETHCART:  We have a different email.

 3                    THE WITNESS:  Okay.

 4                    MR. KETHCART:  What's the page number

 5    that's --

 6                    THE WITNESS:  Okay.

 7                    MR. KETHCART:  -- at the bottom?

 8                    THE WITNESS:  Yeah.

 9                    MR. MILSTEIN:  74.

10                    THE WITNESS:  Okay.  Yeah, I see it.

11    BY MR. MILSTEIN:

12         Q.   Okay.  So do you recall these discussions with

13    Dr. Fonseca that her sister --

14         A.   From the email, yes.

15         Q.   Okay.  And I know the email says it, but do you

16    have a recollection of it?

17         A.   I don't have a recollection of the exact phone

18    call that I had with the sister.

19         Q.   Okay.  But do you have a general recollection?

20                    I know you don't have a specific

21    recollection.

22         A.   I don't have a general recollection.

23         Q.   Okay.

24         A.   So my memory based on the email.

25         Q.   You do have a recollection that she was having --
```

Page 59

1    at some point in time, she was having an adverse reaction

2    that was classified as mania, correct?

3        A.   I do have a memory of that, yes.

4        Q.   Okay.  And at some point in time, Dr. Fonseca

5    said, take her off the drug, right?

6        A.   Yes.

7        Q.   And who did he say that to?

8             Did he say it to you or to Bergsagel?

9        A.   I would have to look at email exchanges or the

10   medical record.

11            I don't remember the specific moment or the

12   specific conversation.

13       Q.   Okay.  And we can't find any email where

14   Dr. Fonseca actually says that in an email.

15       A.   I would have to also review the physician note.

16       Q.   Okay.  And turn to the email January 6, 2016,

17   10:03 a.m.

18       A.   Okay.

19       Q.   Do you have that?

20       A.   Yeah.

21       Q.   Okay.  And if you look at the bottom of the page,

22   this -- it's still the same email trail, and now there's

23   some additional emails added.

24            So let's first start at page 68.

25       A.   Okay.

Page 60

```
 1      Q.    So this is an email from you to Michael Cooper.

 2            And you write, "Hello Dr. Cooper."

 3            Do you see that?

 4      A.    Yes.

 5      Q.    Was it your understanding that Michael Cooper was

 6   a medical doctor or a Ph.D. or what?

 7      A.    It was my understanding he was the medical

 8   personnel for the company.

 9      Q.    Was he your main contact?

10      A.    In what context?

11      Q.    With Constellation?

12      A.    I had other contacts with Constellation.

13      Q.    Other than Michael Cooper?

14      A.    Yes, and INC.

15      Q.    Did you ever meet with Michael Cooper directly?

16      A.    Possibly.  I don't remember if I met him in

17   person.

18      Q.    Was he the person who had a site visit, do you

19   know?

20      A.    He might have came, too.

21            I would have to look at the records to see

22   who was in the attendance log.

23      Q.    Okay.  What records do you have to look at?

24      A.    We keep a training log.

25      Q.    So in addition to the Spedale file, there's a file
```

Page 61

1    called a training log?

2        A.    Yes.

3        Q.    Okay.  If you could produce that as well.

4              So you say, "Dr. Cooper, I wanted to give an

5    update on our patient.  First, the platelet count did

6    recover to 135,000 done yesterday, but our patient has

7    developed significant mania over the past week."

8              Do you see that?

9        A.    Yes.  Okay.

10       Q.    Now, you're writing this to Cooper, to Fonseca, to

11   Bergsagel, to Michael O'Meara.

12             He was another one of your contacts at

13   Constellation?

14       A.    Yes.  It looks like it.

15       Q.    To Nevin Bhardwaj.

16             He was at the CRO?

17       A.    Yes.

18       Q.    Kyle Morgan was at the CRO?

19       A.    Yes.

20       Q.    And Debbie Johnson, she was at Constellation?

21       A.    It looks like it, yes.

22       Q.    Do you know what her role was?

23       A.    I don't remember.

24       Q.    And then Suvarna Bhade at the CRO; is that right?

25       A.    It looks like it, yes.

1    Q.   Do you have any recollection as to how you knew

2  that the patient had developed significant mania over the

3  past week?

4    A.   I don't have a memory.

5    Q.   Okay.  Based on your normal practice, I mean, is

6  this something that you would come up with or is it

7  something that the doctor would tell you?

8    A.   Based on my normal practice, I convey any symptoms

9  to the medical doctor.

10    Q.   But -- I don't quite understand that.

11         So she's taking this medication at home,

12  correct?

13    A.   Yes.

14    Q.   And is she coming into the center, to Mayo at

15  all?

16    A.   Per protocol, she would come in whenever the

17  protocol said that she needed to, yes.

18    Q.   Okay.  How did you give her the drugs?

19    A.   It was a pill, and we gave her the pill with the

20  instructions for her to take.

21    Q.   Okay.  And you gave it to her in a --

22    A.   I don't remember if it blister pack or if it a

23  bottle.  I don't remember --

24    Q.   Okay.

25    A.   -- how the packaging is.

Page 63

1     Q.   And did you give her -- after the informed consent

2     and she was going to start the protocol, did you give her

3     all the pills for the first 14 days or did she have to come

4     in and get the pills each day?

5     A.   I would have to review the protocol.

6               From my memory, without the protocol in front

7     of me, I think day one was dosing in the clinic.

8     Q.   Dosing in the clinic?

9     A.   Yes.

10    Q.   Okay.  And then did you give her the pills either

11    in blister pack or in a bottle?

12    A.   I don't remember the packaging, but we gave her

13    the pills.

14    Q.   Okay.  And did you give her for the entire 14 day

15    period?

16    A.   I don't remember.  I would have look at the

17    protocol and what the protocol and the pharmacy manual

18    would say.

19    Q.   Okay.  And is it your recollection she was

20    supposed to, then, come in periodically during that 14 days

21    or just report what her symptoms were?

22              How would you know what the symptoms were so

23    that you could convey that to the principal investigator?

24    A.   For our practice, patients call us, or if the

25    protocol tells them to come in for a clinic visit, either

Page 64

1    they tell us or they tell the nurse, whoever is taking care

2    of her protocol.

3              That's how -- we relay those information to

4    the physician, which what I do.

5         Q.   Okay.  And are you the person that she would come

6    to see if she came in?

7         A.   It could be whoever the protocol requires her to

8    see.

9         Q.   Do you recollect whether you were the person that

10   the subject would come to see?

11        A.   I don't remember during the protocol if I saw

12   her.

13        Q.   Okay.  But it's your recollection -- this is based

14   on what you said -- that you were the one to convey to the

15   doctors that she was having symptoms of significant mania.

16             Correct me if I'm wrong.

17        A.   Only if I was told that.  Only if I was part of

18   the conversation with the patient or the sister in the case

19   before.

20        Q.   So if the sister and the patient told you that you

21   would, then you would then tell the doctors.

22             And in this email, you're telling everybody

23   involved in the trial.

24        A.   I don't remember what the conversation was.

25        Q.   But in this email, you're telling everybody that

Page 65

1    she has significant mania, correct?

2        A.   Part of reporting requirements.

3        Q.   Okay.

4        A.   Reporting, yes.  I was reporting the AEs to the

5    sponsor and INC.  I wanted to make sure they had all the

6    facts.

7        Q.   Okay.  And Cooper writes back to you.

8             After you're saying she's got significant

9    mania, he writes back to you, "It would be ideal if we

10   could keep the patient on treatment," right?

11       A.   From what the email says, yes.

12       Q.   So he wanted you to keep giving her the pills,

13   right?

14            Or he wanted her to keep taking the pills,

15   right.

16       A.   Well, I don't know what he --

17            MR. KETHCART:  Foundation.

18            THE WITNESS:  I don't know the context of

19   that.

20   BY MR. MILSTEIN:

21       Q.   Well, if he says, it would be ideal if we could

22   keep the patient on treatment, I mean, whether you have a

23   recollection or not, as you sit here today reading the

24   email -- you write on January 5th saying, she's got

25   significant mania.

Page 66

1              And he -- doesn't he write back to you

2     basically saying I want to keep her on the pills?

3                   MR. KETHCART:  Foundation.

4     BY MR. MILSTEIN:

5        Q.   Isn't that how you would read that?

6        A.   I don't know what he wanted me to do, but that's

7     how it was written, and I don't --

8        Q.   Okay.  Just put yourself in the position of

9     reading the email now.

10             Because you don't recollect reading it then,

11    but you're reading it now.

12       A.   I'm reading it now.

13       Q.   Okay.  So you send an email saying she's got

14    significant mania.

15             And he writes back to you, and he says,

16    "That's quite a story," with an exclamation point.

17             And then he says, "It would be ideal if we

18    could keep the patient on treatment."

19             So as you sit at your desk, do you interpret

20    that to mean we should keep giving her these pills?

21       A.   I'm not --

22                   MR. KETHCART:  Form and foundation.

23                   MR. LIEDERMAN:  Objection.

24                   MR. KETHCART:  Go ahead and answer.

25                   THE WITNESS:  I'm not going to interpret that

Page 67

1    in any way because I'm not a medical doctor.

2    BY MR. MILSTEIN:

3        Q.   But how do you read that?

4        A.   I read it as is.

5        Q.   What other treatment -- first of all, she's in a

6    Phase 1 trial, so I'm not so sure it should be

7    characterized as treatment, but what other treatment is

8    Cooper involved in with respect to Ms. Spedale?

9                MR. KETHCART:  Same objections.

10   BY MR. MILSTEIN:

11       Q.   Anything else?

12               Anything else?

13       A.   I don't --

14       Q.   Is Cooper involved in anything other than

15   overseeing the giving of this study drug to this woman?

16               MR. KETHCART:  Foundation.

17               THE WITNESS:  I don't know the exact role and

18   responsibilities of him as a medical person for

19   Constellation.

20   BY MR. MILSTEIN:

21       Q.   Did Constellation have anything to do with any

22   other treatment that this patient was getting other than

23   taking this drug?

24               MR. KETHCART:  Foundation.

25               THE WITNESS:  This patient was a patient part

Page 68

1    of the Mayo Clinic practice.

2    BY MR. MILSTEIN:

3         Q.   The patient was what?

4         A.   Part of the Mayo Clinic practice.

5         Q.   But did Constellation have any role other than

6    supplying the drug that she was taking in this study?

7         A.   Well, they do have other roles than managing the

8    study, yes.

9         Q.   Any other treatment -- did they provide any other

10   treatment?

11                  Did they provide radiation?

12                  Did they provide any other drugs?

13                  Did they -- did they give her CAT scans?

14                  Did they give her MRIs?

15                  No.   The only thing they were doing was

16   giving her this drug, right?

17        A.   I don't know that I understand your question.

18        Q.   I know you're not a medical doctor.

19                  How would you interpret it, if this doctor

20   from Constellation says it would be ideal if we could keep

21   the patient on treatment?

22                  How would you interpret that?

23        A.   I wouldn't interpret that because that's --

24        Q.   What would you do?

25        A.   I would forward this on to the physician.

1    Q.    Okay.  And did you do that?

2    A.    I CC'd Dr. Fonseca and Dr. Bergsagel, this email

3    chain.

4    Q.    The next email is now you to Cooper, again with

5    the CCs.

6          And you say, "From understanding only past

7    history, would she be experiencing the same mania while on

8    dexamethasone?  I will do more research on her records but

9    have not seen any diagnosis of bipolar."

10          Did you do the research on her records?

11    A.    From my memory, I don't know.  But from this, I

12    would have, yes.

13    Q.    And then Cooper writes back to you on January 5th

14    at 18:08, "Steroid induced psychosis is a well-known

15    problem.  It doesn't require an antecedent history of

16    bipolar disease.  I guess we need to be sure the patient

17    hasn't inadvertently taken steroids during this time."

18          And then Fonseca writes, "The patient is not

19    on any steroids," copied to you.

20    A.    Yes.

21    Q.    Do you see that?

22    A.    Yes.

23    Q.    Do you have any recollection of seeing one of the

24    five subjects in this trial who was experiencing severe

25    mania?

Page 70

1      A.    I don't remember.

2      Q.    So you have no recollection of seeing somebody --

3            MR. LIEDERMAN:  I would object to lack of

4      foundation about severe mania.  I think that's

5      misleading.

6            MR. MILSTEIN:  Significant mania, how about

7      that?

8            "Patient has developed significant mania."

9      BY MR. MILSTEIN:

10     Q.    Do you have any --

11           MR. LIEDERMAN:  You said the five patients

12     that have.

13           MR. MILSTEIN:  No.  I didn't mean to imply

14     that.

15           MR. LIEDERMAN:  Okay.

16     BY MR. MILSTEIN:

17     Q.    There were five subject in the trial that you were

18     the research coordinator of, correct --

19     A.    Uh-huh.

20     Q.    -- at most?

21           MR. KETHCART:  At Mayo.

22     BY MR. MILSTEIN:

23     Q.    At most?

24     A.    Yes.  I was the coordination for the patients who

25     were on this trial at Mayo Clinic.

Page 71

```
 1      Q.    And at most, there were five patients?

 2      A.    From memory, it could have been, yes.

 3      Q.    Okay.  And one of them, we know you've written,

 4   had significant mania.

 5                  And my question is, do you have any

 6   recollection of seeing one of your five patients with

 7   significant mania?

 8      A.    I do not have any recollection of any other

 9   patients that had --

10      Q.    No.

11                  Do you have a recollection of seeing -- I

12   mean, if I saw somebody with significant mania, it would

13   make an impression on me.

14                  I'm asking you whether you recall seeing this

15   patient, Ms. Spedale, with significant mania?

16      A.    I don't have specific memory of interacting with

17   her when she had the significant mania.

18      Q.    Do you have any general recollection?

19      A.    I don't remember.

20      Q.    Okay.  Do you remember -- other than the emails,

21   do you remember that one of the patients in this trial had

22   significant mania?

23      A.    From my memory, I do remember there was an SAE,

24   serious adverse event, that required special reporting

25   as -- and in that case, it was a mental health adverse
```

Page 72

1    event.

2         Q.   So you remember that?

3         A.   I do.

4         Q.   Okay.  If you can turn to the document where the

5    first one is January 6, 2016, 10:22 a.m.

6              MR. KETHCART:  What's the page number at the

7    bottom of that one?

8              MR. MILSTEIN:  56.

9              Are all the pages -- did you number all the

10   pages?

11             MR. KETHCART:  To be honest with you, I'm not

12   sure how they're numbered.

13             I just know that that's providing a good

14   resource for being able to find it.

15             MR. MILSTEIN:  Okay.  Yeah, I don't think so

16   because they're -- they have different page numbers.

17             MR. LIEDERMAN:  When they print out, they

18   just have numbers at the bottom of the page, the page print

19   out the order.

20             THE WITNESS:  You say 56?

21             MR. KETHCART:  Uh-huh.

22             Hand me the other stack, and I'll look

23   through the other stack.

24             THE WITNESS:  Oh, maybe it's in there.

25             MR. KETHCART:  Yeah.  It should be back in

Page 73

1    there.

2                    MR. MILSTEIN:  No?

3    BY MR. MILSTEIN:

4        Q.   I'll tell you what.

5                    See if you can find -- because it's the same

6    email chain.

7                    See if you can find where it says, Michael --

8    at the top, it says Michael Cooper, January 6, 2016, 10:22

9    a.m.

10                   MR. KETHCART:  Here's 56.

11                   THE WITNESS:  Okay.

12                   MR. MILSTEIN:  You found it?

13                   MR. KETHCART:  Yes.

14                   THE WITNESS:  Thank you.  Okay.

15   BY MR. MILSTEIN:

16       Q.   So let's start on page 57.

17                   So Cooper writes to Fonseca, with a copy to

18   you, "Did the patient symptoms of mania develop while she

19   was taking the study drug or during a break?"

20                   And then you write, "We noticed the symptoms

21   on day 20 prior to the start of the cycle 2."

22       A.   Yeah.

23       Q.   "But since then, the mania has gotten

24   significantly worse."

25                   Do you see that?

Page 74

```
 1        A.    (Inaudible response)

 2        Q.    And then Fonseca writes, "Actually her symptoms

 3   started while she was at the protocol.   They exacerbated

 4   recently, but she already had some of this behavior while

 5   she was on therapy."

 6               And then you write, "Sorry, sorry, I thought

 7   it was day 20."

 8               Do you see that?

 9        A.    Yes.

10        Q.    Do you recall this at all?

11        A.    I don't recall this specific moment, but I made a

12   mistake from the email I read.

13        Q.    Okay.  Now you recollect that her significant

14   mania started while she was taking the drug, correct?

15        A.    I don't remember specifically.

16        Q.    Okay.  And then if you could turn to the set that

17   begins with -- it's at page 45.

18               January 6, 2016, 10:22, Michael Cooper is at

19   the top to Fonseca.

20        A.    Okay.

21        Q.    Okay.  That's the continuation --

22        A.    Yes.

23        Q.    -- where Cooper then says, "Okay.  It sounds like

24   a temporal connection may be a bit stronger than I

25   thought."
```

Page 75

1            And that's an email from Cooper to Fonseca,

2  with a copy to you and those other individuals.

3            Do you see that?

4  A.   Yes.

5  Q.   If you could turn to the email that begins -- it's

6  from Fonseca to you, January 11th, 2016 at 5:10.

7            MR. KETHCART:   I'm sorry.  What's the number

8  at the bottom of that one?

9            MR. MILSTEIN:   36.

10           THE WITNESS:   Okay.

11  BY MR. MILSTEIN:

12  Q.   Okay.  So turn to the third page, which is page

13  38.

14  A.   Okay.

15  Q.   So you write to Fonseca.

16           You say, "Dr. Bergsagel and I had a

17  teleconference call with Constellation on Friday.  They

18  wanted to follow up with you regarding if we should report

19  Iris's mania as an SAE and report it to our IRB

20  immediately.  The SAE criteria is below."

21           Do you see that?

22  A.   Yes.

23  Q.   And underneath that you say, "The criteria to

24  report to IRB within five working days UPIRTSO is."

25           What is UPIRTSO?

Page 76

1    A.   UPIRTSO?

2              All the above plus anticipated and possibly

3    related.

4    Q.   And then you say, "If you think it's in UPIRTSO,

5    then it will be required to change in consent form,"

6    right?

7    A.   Yes.

8    Q.   And Fonseca writes back to you, "Yes.  I think it

9    should be reported.  It's unclear if this is related or

10   not, but at the very least, it's possible."

11             You write back, "Sounds good.  You'll be

12   getting an IRB E sign off."

13             I guess that means tomorrow sometime,

14   correct?

15   A.   Yeah.

16   Q.   And then if you go the first page, you ask, "Which

17   do you think she should fall into, mild, severe or

18   life-threatening?"

19             And Fonseca writes back to you, "She was

20   almost 4, but I'll call it 3.  In hindsight, she was

21   already grade 1 during my last evaluation and quickly

22   progressed through 2 and 3."

23             Do you see that?

24   A.   Yes.

25   Q.   Let me show you what's been marked as 4.

Page 77

1                 We're trying to figure out who wrote the

2      adverse event report and the MedWatch form.

3                 Bergsagel says he doesn't think he did.

4      Fonseca said he doesn't think he did.

5                 Did you write it?

6                 Look at the -- at the narrative.

7                 MR. KETHCART:  On page 2 of the report, of

8      the MedWatch report?

9                 So this narrative is what he's asking if you

10     wrote.

11                THE WITNESS:  I would have to look at what

12     the reporting requirements in the protocol and look at what

13     I submitted to the company with the forms that they wanted

14     me to submit to and see if they used my wording for it.  I

15     don't remember if this was me.

16     BY MR. MILSTEIN:

17        Q.   I'm not sure what you have to look at.

18                I mean, you looked at the Spedale file.

19                Would this have been -- if you had written

20     it, would it have been in the Spedale file?

21        A.   There are forms per protocol that I fill out, SAE

22     forms that I fill out with the information, and then I fax

23     or send off to the Constellation or INC.

24        Q.   Okay.  I understand that, but my question is --

25        A.   And I, in that form --

Page 78

1       Q.    -- would that have been -- if you had written it,

2    would you have put a copy in the Spedale file?

3       A.    Yes.

4       Q.    And you produced the Spedale file, correct?

5                MR. KETHCART:  You produced -- would it have

6    been in your email?

7                THE WITNESS:  No, that would not have been in

8    my --        /

9    BY MR. MILSTEIN:

10      Q.    Oh.

11      A.    -- email.

12      Q.    I thought you said you had a folder for Spedale.

13      A.    For any electronic communication.

14      Q.    Oh, I see.

15               Well, I mean, you got a copy of the subpoena

16   and you went looking for documents related to Spedale,

17   correct?

18      A.    Email conversations, yes.

19      Q.    Oh, only emails?

20      A.    Yes.

21      Q.    All right.  So how can we find out whether you

22   wrote this or not?

23      A.    I would have to go look in the Constellation

24   database and look at --

25      Q.    What do you think by the Constellation database?

1        A.     There's a database that we enter all the data

2    in.

3        Q.     That's only on the --

4        A.     And Constellation would also have a copy of what

5    was reported as well by me.

6        Q.     Well, I mean, that one is -- it says reported by

7    Bergsagel.

8               But we have -- Bergsagel does not recall

9    writing it and doesn't think he wrote it.

10              Now, it's possible that he had you write it

11   and then he signed for it.

12              Well, let me -- let me get back to this

13   database.

14              So you have a network that has various files

15   on it, correct?

16       A.     You mean network in terms of my computer?

17       Q.     Yeah.

18       A.     It has --

19       Q.     As an employee --

20       A.     -- any email --

21       Q.     As an employee of Mayo, you have a computer that

22   is networked, correct?

23       A.     Yes.

24       Q.     And there are various files on the network,

25   correct?

Page 80

1      A.    Yeah.   There's various --

2      Q.    Okay.

3      A.    -- stuff in the computer.

4      Q.    And so if you sat at your computer today, could

5    you find -- is there a file marked Constellation

6    database?

7      A.    No.   It's a third party database that we have to

8    put in our access log-in and password.

9              It's not controlled by Mayo Clinic.   It's

10   controlled by a third party.

11     Q.    Okay.   Are you saying that there is a -- if you're

12   on a clinical trial for Constellation, they're networked

13   with Mayo with respect to that file.

14              Is that what --

15              MR. KETHCART:   Form.

16   BY MR. MILSTEIN:

17     Q.    -- you're saying?

18     A.    I'm confused in the question you're asking.

19     Q.    If Constellation has hired you for a clinical

20   trial, which they did -- they wrote the protocol.   They

21   wrote the informed consent.

22              Are you linked up with them on a computer?

23     A.    No.   That's -- we're not linked up with them on

24   the computer.

25     Q.    Okay.   So what is it you're talking about as far

Page 81

1    as a Constellation database?

2         A.   I should have rephrased it.

3              It's a database that any protocol or

4    procedure, for example, lab values, physical exam, we have

5    to input in a database so the sponsor can analyze the data.

6         Q.   Okay.  And can you still access that database?

7         A.   I don't think so.  The study is closed.

8         Q.   It's closed.

9              Okay.  All right.  So how would you be able

10   to find out whether you wrote the SAE?

11        A.   I would have to go back and see if I could get

12   access to the database from Constellation.

13        Q.   But how would that tell you whether you were the

14   one who wrote it or Dr. Bergsagel wrote it?

15        A.   Oh, it would have information that it was entered

16   by us as a site.

17        Q.   Is it your practice -- is part of your

18   responsibility to write the SAEs?

19        A.   Part of my responsibility is whatever is delegated

20   in the study procedures.

21        Q.   I don't think in the protocol it says that the

22   research coordination or the doctor is going to write the

23   SAEs.

24              So if doesn't say it, have you on occasion

25   written the SAEs for the --

Page 82

```
 1        A.   I had done --

 2        Q.   -- principle investigator?

 3        A.   I had filled out an SAE form, yes.

 4        Q.   Okay.  And do you give it to the principal

 5   investigator to review before it's finalized?

 6        A.   They have to sign off on it.

 7        Q.   Okay.  Can you find the email -- it's page 18 at

 8   the bottom.

 9             It's dated January 14th from Felecia Tarber

10   to you.

11        A.   Okay.

12        Q.   Okay.  So Felecia Tarber, she's at the CRO?

13        A.   Yes.

14        Q.   Did the people at the CRO have different jobs or

15   were they interchangeable?

16             Because we've seen several names.

17             Is there -- was there one person who was the

18   person that was your main contact?

19        A.   Each of them had different responsibilities for

20   different things I contacted for.

21        Q.   Okay.

22        A.   I don't remember exactly what their roles were.

23        Q.   Okay.  And who is Mabeline Dulan?

24        A.   She was my data coordinator.

25        Q.   In-house?
```

Page 83

 1     A.    Yes.  She's a Mayo Clinic employee.

 2     Q.    And what was her job?

 3     A.    Her job was to put the data that was captured by

 4   the protocol into the EDC, which is the electronic database

 5   I was referring to.

 6     Q.    You're talking about the Constellation database?

 7     A.    Or the database that Constellation had for the

 8   study, yes.

 9     Q.    On the Mayo network, is there a file for

10   everything related to this particular clinical trial?

11     A.    That's where we use the EDC.

12     Q.    What's EDC?

13     A.    The electronic data capturer, which is the

14   database that we input the data that's being gathered from

15   the protocol into the system so Constellation and INC have

16   access to the data so they could do their --

17     Q.    Is --

18     A.    -- whatever they need to do.

19     Q.    -- that you one you say is closed?

20     A.    Yes.

21     Q.    Okay.  Is there another file on the computer

22   that --

23     A.    No.

24     Q.    -- captures all of the Constellation database?

25     A.    No.

1    Q.    So Mayo doesn't keep copies of that stuff?

2    A.    Not the EDC part of the study, no.

3    Q.    Okay.  Who is Nevin Bhardwaj?

4    A.    From my memory, I think he was my trial monitor.

5    Q.    At the CRO?

6    A.    INC, yes.

7    Q.    So at the bottom, which is dated January 13th,

8    this is from you to Tarber and Dulan with copies to

9    Bergsagel and a few others.

10           You say, "Hello Felecia, the SAE is ongoing

11   currently.  As of now there has not been a psychiatric

12   evaluation.  The only treatment is lorazepam every six

13   hours as needed for anxiety and daily calls for social

14   services.  We're currently setting up home health conmed

15   should be in the ECRF database.  We will enter ECRF."

16           Is that the database you're talking about?

17   A.    That's the database, yes.

18   Q.    And earlier, Tarber has written to you, "Thank you

19   for providing information for the SAE mania.  Please

20   respond the queries below.  Please check your fax

21   confirmation when you fax anything."

22           Do you see that?

23   A.    Yes.

24   Q.    Do you know how you got the answers that she

25   asked?

Page 85

```
 1                  I mean is it -- is it information that you

 2   have or do you go and ask somebody?

 3       A.   Which information?

 4       Q.   That the SAE is currently ongoing.

 5       A.   That would be from my discussions with the

 6   physician or medical records.

 7       Q.   Okay.  I mean, was it your understanding she was

 8   in a mental hospital at some point in time?

 9       A.   From my memory, I think she was at an outside

10   facility.  I would have to review the records that we

11   have.

12       Q.   Okay.  And were you getting copies of the medical

13   records from the outside facility?

14       A.   I don't remember how it was gotten to us.

15                  Either I requested them or they were sent to

16   us.  I don't remember how.

17       Q.   Okay.  I'm trying to find out whether -- are you

18   getting the information and supplying it to Bergsagel and

19   Fonseca or are they getting information and supplying it to

20   you?

21       A.   It depends on the situation, on who gets the

22   information first, and I don't recall with this

23   situation.

24       Q.   Okay.  If you can find the one that's marked

25   January 12th, 11:25 from Michael Cooper to you.
```

                                                            Page 86

 1                    Page 24 is at the bottom.

 2        A.     January 12?

 3                    What page number?  Sorry.

 4                    MR. KETHCART:   Number 24 at the bottom.

 5                    THE WITNESS:  24.  Sorry.

 6   BY MR. MILSTEIN:

 7        Q.    You say -- in the second email you say, "I

 8   submitted an SAE form to INC and we will be reporting this

 9   to our IRB."

10                    Do you see that?

11                    I'm sorry.

12        A.    Yes.

13        Q.    So was that your standard practice, that you would

14   submit the SAE to the CRO?

15        A.    Yes.  I would submit to CRO after I filled it out

16   and the investigator, the physician, reviews it and signs

17   off on it.

18        Q.    And then what would the CRO do with it?

19        A.    I have -- that is a question for them.

20        Q.    Well, somebody sends it to the FDA.

21                    Do you send it to the FDA?

22        A.    I would have to look at the protocol if that was a

23   reporting mechanism by us or the sponsor.

24        Q.    And then you say, "And we will be reporting this

25   to our IRB."

Page 87

1              So you report -- did you report it to the

2    IRB?

3        A.   Yes.  From this email, I reported it to IRB.

4        Q.   And how do you do that?

5        A.   Electronic system.

6        Q.   But tell me what the electronic system is.

7        A.   It's a Mayo Clinic IRB we have here, and

8    everything is done electronically.

9        Q.   Okay.

10       A.   So I would log in to --

11       Q.   But you're sitting at your computer.  You log in

12   your name.

13              Then what do you do if you want to submit an

14   SAE to the IRB?

15       A.   I follow their form in reporting guidelines.

16       Q.   Okay.  But what do you have to click on in order

17   to do that?

18       A.   I don't remember the exact form or buttons.

19              I just follow the directions that's provided

20   to me when I access the IRB database for me to do the

21   reporting.

22       Q.   Okay.  That still exists, correct?

23       A.   Yes.

24       Q.   Okay.  So, I mean, that's on the subpoena, so I'll

25   follow up with this stuff.

Page 88

1          But we need this information, as well,

2   because it relates to Spedale.

3          Did the IRB get back to you, do you know?

4   A.   I would have to look at the records.

5   Q.   Okay.  Now, if you can get to what's at page 6,

6   from Fonseca to you, dated Mayo 11th, 2016.

7   A.   Okay.

8   Q.   You got that?

9   A.   Yes.

10  Q.   So it starts with Felecia to you saying, "Please

11  check your fax confirmation.  Provide date of resolution of

12  the SAE."

13  A.   Okay.

14  Q.   Then you write to Fonseca, "I wanted to check in

15  with you if Iris's mania has resolved.  Do you think it

16  should still be considered as an SAE?"

17          Then he writes back, "It's still going on.

18  Would keep as an SAE.  Just saw her in the clinic.  I would

19  do all communications with them via me if that is okay."

20          Do you see that?

21  A.   Yes.

22  Q.   What did you understand that to mean, "I would do

23  all communications with them via me"?

24  A.   I just read it as is, go through him.

25  Q.   But "I would do all communications with them," is

Page 89

1    he talking about the CRO?

2         A.   I don't know what he was in context for that.

3         Q.   And then go to September 13th, page 3, 11:32 a.m.,

4    September 13th, Fonseca to you.

5         A.   Okay.

6         Q.   So you write, "I wanted to see if you would say

7    her SAE of mania improved or resolved."

8              So this is now a few months after the last

9    chain.

10             What caused you to then ask Dr. Fonseca

11   whether it's been resolved?

12        A.   I don't specifically remember what prompted me to

13   ask him.

14             From my experience and custom and practice,

15   it probably would have been a request from the CRO sponsor

16   for the data.

17        Q.   Well, if it was, we would have seen that -- it

18   would be in this email chain, wouldn't it?

19        A.   Or it would have been in another email or it would

20   have been a phone call.  I don't know the mode of

21   communication.

22        Q.   Okay.

23        A.   Or it would have been through the database.

24             It could have been different modes of

25   communication.

Page 90

1    Q.   Okay.  Let me see if I get this right.

2           So I think Dr. Bergsagel said that

3  Constellation wrote the protocol and Constellation wrote

4  the informed consent.

5           And is that your understanding as well?

6    A.   Custom and practice, that is the case in terms of

7  sponsor writing the protocol, sponsor providing us with the

8  informed consent.

9    Q.   The patient meets with Dr. Bergsagel, but you're

10  the one who did of the informed consent discussion,

11  correct, with Iris Spedale?

12    A.   The patient met with Dr. Fonseca first.

13    Q.   Okay.  Met with Fonseca, met with Bergsagel, but

14  as far as the informed consent discussion, that was you,

15  correct?

16    A.   Yes.

17    Q.   And you were following the protocol, correct?

18    A.   I was following the consent when I did the

19  informed consent --

20    Q.   No.

21    A.   -- process.

22    Q.   I mean, in the discussion, you followed the

23  consent.

24           But how you were acting with respect to

25  implementing the trial was following the protocol, correct?

Page 91

1      A.   Yes.

2      Q.   Whatever Constellation told you to do in the

3  protocol, that's what you did?

4      A.   Yes.

5      Q.   After she signs the informed consent document, she

6  comes in and gets the first pill in the clinic, correct?

7      A.   Before that, there were tests and procedures that

8  we did per the protocol.

9      Q.   Okay.  So she does some blood tests before, and

10  then she comes in and she gets the pills, correct?

11     A.   There were more tests to blood test.

12     Q.   Okay.  I understand.

13     A.   Okay.

14     Q.   After that screening, the next thing in the

15  protocol that is her participation in the trial is to come

16  in and get the first pill, correct?

17     A.   And there might have been some test procedures

18  prior to the first dose as well.  I would have to look at

19  the protocol.

20     Q.   Okay.  And does she take the first dose inside

21  Mayo?

22     A.   From my memory, patients took the first dose in

23  the clinical, yes.

24     Q.   Okay.  And where is that?

25     A.   We were actually located in the Scottsdale campus

1    at this moment.

2         Q.   In the Scottsdale campus?

3         A.   Yes.

4         Q.   And is that where you were?

5              Were you there at the time?

6         A.   I don't remember if I was there when she took the

7    actual dose.

8              That would have been administered by the

9    nurse.

10        Q.   Okay.

11        A.   That's not my responsibility.

12        Q.   Is it that nurse whose name we came across?

13        A.   No.   It would have been a nurse in the

14   chemotherapy unit.

15        Q.   Okay.   The patient -- the subject drives to the

16   Scottsdale Mayo, sees a nurse.

17             And how does she know where to go?

18             Is it your job to tell her where to go?

19        A.   I schedule all the appointments based on the

20   protocol, and then the patient will get an itinerary.

21        Q.   Okay.

22        A.   The itinerary would tell her what that day's

23   schedule is.

24        Q.   You give the patient an itinerary?

25        A.   Or it was mailed to them or a phone call.

Page 93

```
 1                    I don't know what the mode of communication

 2     is, but there's many modes of communication.

 3         Q.   Okay.  And you're doing this, again, all pursuant

 4     to the protocol that Constellation wrote?

 5         A.   Yes.

 6         Q.   And she drives -- the patient drives to the

 7     clinical.

 8                    Is she told to have her husband with her or

 9     have a driver with her or --

10         A.   I don't remember.  I don't recall who drove.

11         Q.   No.

12                    But do you want to make sure that the

13     patient, the subject has somebody with her in case there's

14     a reaction?

15                    So do you tell them, don't come by yourself?

16         A.   I don't recall exactly what I said, but it is

17     custom and practice in a part of us to say that, if you

18     have could have a driver, that will be the best possible.

19         Q.   Okay.  So she comes there.

20                    And I know you weren't there.  You don't know

21     whether you were there or not.

22                    But is the procedure that she actually take

23     the first pill, you know, with a nurse right there?

24         A.   Yes.  The nurse was there giving the

25     administration of the oral medication.
```

Page 94

1    Q.   Okay.  But when you say giving the administration,

2  the nurse just hands her the pill and then she takes the

3  pill, correct?

4    A.   Yes.

5    Q.   And swallows --

6    A.   I don't know if that's exactly what happened, but

7  that's the custom and practice.

8    Q.   And with a glass of water, the way you would take

9  any pill like aspirin --

10    A.   It would --

11    Q.   -- right?

12    A.   The pill would be taken as per written in the

13  protocol.

14    Q.   Okay.  And is it your understanding that it's

15  required that -- I mean, I know when I -- I have

16  immunotherapy with B shots.

17          So I have to stay there for a half an hour

18  after I take the B shot to make sure I don't have a

19  reaction.

20          Is the patient required to stay at the clinic

21  for a period of time after the first pill?

22    A.   As per what's written in the protocol, yes.

23    Q.   Okay.  And do you know off the top of your head

24  how long she's supposed to stay there?

25    A.   Without the protocol in front of me, I don't

Page 95

1    remember how many hours she was there for, how long she was

2    there for.

3         Q.   Oh, you think it may be hours?

4         A.   I don't remember if it was -- I don't remember the

5    length of time.

6         Q.   Okay.  And if she's supposed to take 150

7    milligrams twice a day, is she only taking the first pill

8    there and then the second pill the second time in the

9    day?

10                   She's able to do that at home?

11        A.   I would have to look at the protocol in terms of

12   the dosing and in terms of what the day needed to be like

13   in terms of what the protocol said.

14        Q.   Okay.  And then you've given her information about

15   when to take these pills every day for 14 days, twice a

16   day.

17                   Did you tell her to take it at 7:00 in the

18   morning and at midnight or you say when you wake up and

19   when you go to bed?

20        A.   I instructed the patient or the nurse instructed

21   the patient through the protocol, and the protocol did have

22   also a diary.

23        Q.   Okay.  But the patient doesn't have the protocol,

24   correct?

25        A.   Yes.

Page 96

1                    No, they wouldn't have the protocol.

2        Q.    Right.

3                    So how does the patient know what the

4    protocol says?

5        A.    They're instructed by the nurse or myself.

6                    And you also have a diary that has

7    instructions on there.  And they also have what's written

8    on the medication bottle or however that's packaged is also

9    the instructions on there as well.

10       Q.    Okay.  And does the diary have information

11   about -- is a diary supposed to have information about,

12   that the patient supplies about any adverse reaction she

13   has, nausea, things like that?

14       A.    I would have to review the diary to see

15   specifically what it said.

16       Q.    But are you saying you think the diary is in the

17   protocol?

18       A.    No.  The diary is a separate form from the

19   protocol.

20       Q.    Okay.

21                   THE VIDEOGRAPHER:  Pardon me.  Approximately

22   five minutes left on the videotape.

23                   MR. MILSTEIN:  Okay.  That's all I have.

24   Thanks.

25                   MR. LIEDERMAN:  Okay.  Do you want to take a

Page 97

1    break?

2                   We'll take a break so he can change the

3    videotape, so we won't --

4                   MR. KETHCART:   Okay.

5                   THE VIDEOGRAPHER:   This ends Media Number 1

6    of our ongoing deposition.

7                   We're off the record at 11:17.

8                   (Recess taken from 11:17 a.m. to 11:24 a.m.)

9                   THE VIDEOGRAPHER:   This begins Media Number 2

10   of our ongoing deposition.

11                  We're back on the record at 11:24.

12                  MR. LIEDERMAN:   Where are the stickers just

13   to add one more exhibit?

14                  (Exhibit No. 33 marked)

15                         EXAMINATION

16   BY MR. LIEDERMAN:

17     Q.   I'm going to show you what's been marked as

18   Exhibit 33, which is called a biweekly PI teleconference

19   highlights.

20                  This one is dated 8 January 2016.

21                  I'll just ask to you to take a look at that.

22     A.   Okay.

23     Q.   Do you recognize this document?

24     A.   Yes.

25     Q.   Okay.   Could you just describe what this document

Page 98

1   is in your own words?

2        A.   This is the biweekly PI highlights that are sent

3   after their conversation teleconference is completed.

4             This is what they send out to sites so they

5   know what was discussed.

6        Q.   And on the cover page there are a series of names,

7   that some of them are dark and some of them are light gray.

8             Do you know the reason for the difference?

9        A.   My understanding is that ones that are dark are

10  the ones that attended.

11       Q.   Okay.  What are the purpose --

12            THE VIDEOGRAPHER:  Please stand by.

13            There's a microphone on the table that's not

14  on someone's body.

15            Okay.  Thank you.

16  BY MR. LIEDERMAN:

17       Q.   And generally, the purpose of these

18  teleconferences, what would you describe is the purpose of

19  the teleconference?

20       A.   I would describe it as to go over the study, to go

21  over study subjects so all the sites are aware of what's

22  going on with the trial, to discuss any changes, to discuss

23  any issues, just a conversation led by the sponsor and/or

24  CRO to make sure that everyone is aware of what's going on

25  in the study.

1      Q.   Now, the letterhead here says, is it NC Research

2   on the upper left -- INC Research.

3              On the right, it says, "Constellation

4   Pharmaceuticals."

5              But at the bottom you'll see, "INC Research,

6   Inc. - Confidential."

7              Do you know who actually prepared these

8   minutes or what's called highlights?

9      A.   I don't know who prepared these minutes.

10     Q.   Do you know whether or not -- who at the Mayo

11  would be the one to receive these minutes from whoever

12  prepared it?

13     A.   It would be the site -- the site staff who was

14  doing the study.

15     Q.   So would you be a recipient of it?

16     A.   Yes.

17     Q.   But would you be a recipient of it as a

18  co-recipient, along with others?

19     A.   With Dr. Bergsagel, yes.

20     Q.   Okay.  When you would receive these highlights,

21  would you do anything with them?

22     A.   I would read them, and then these would be

23  filed.

24     Q.   Okay.  If there was information -- okay.  Now,

25  where these focused on -- strike that.

Page 100

1                Was it common practice, to your knowledge,

2    that if there were adverse events experienced by any of the

3    sites, these meetings, telephone conference meetings, would

4    be the opportunity to disclose it to the other sites?

5        A.    It is custom and practice of these teleconferences

6    for other sites to discuss subjects participation on the

7    study, yes.

8        Q.    And where -- do you recall whether in this study

9    itself you were aware of any adverse events that may have

10   occurred at other sites?

11       A.    I don't recall specifically what they were, but it

12   is custom and practice for me to be part of these

13   teleconference so I would be aware of it --

14       Q.    Okay.

15       A.    -- during these calls.

16       Q.    And once a conference was held, if you do learn

17   about adverse events at other sites, do you have occasion

18   then to have subsequent conversations with the principal

19   investigator regarding the information that you've learned

20   on the telephone call?

21       A.    Not unless it's needed or warranted by a specific

22   situation.

23       Q.    Do you ever have instances where it changes or

24   modifies the type of conversations you have with potential

25   enrollees or participants in the trial with respect to any

1    additional risks that may be arising?

2        A.   Only if it's requested in writing and approved by

3    our IRB that we would have to reconsent the patients for

4    the new risks.

5        Q.   And that would in this case be INC Research?

6        A.   Yeah, I don't know.  I don't remember who it would

7    be, but --

8        Q.   You don't remember who the IRB was?

9        A.   Oh, who our IRB?

10             Mayo Clinic was.

11       Q.   Yeah.

12             Okay.  So that would be a decision that would

13    be made by the Mayo Clinic?

14       A.   Mayo Clinic, yes, and also the sponsor or CRO.

15       Q.   Okay.  And who would be making that at the Mayo

16    Clinic specifically?

17       A.   The principal investigator.

18       Q.   Okay.  Now, why don't you take Exhibit 11, which

19    is the consent and authorization form --

20       A.   Okay.

21       Q.   -- so that you have it in front of you?

22             So this is the --

23             MR. KETHCART:  Is he done with all of those

24    documents?

25             MR. LIEDERMAN:  Yeah.

```
 1                    MR. KETHCART:  Okay.

 2                    MR. LIEDERMAN:  You can take them away.

 3                    MR. KETHCART:  I was going to say, we can

 4    move them.

 5                    MR. LIEDERMAN:  Move them away.

 6    BY MR. LIEDERMAN:

 7         Q.   So this was a document that you looked at

 8    previously.

 9                    Had you identified the page where Ms. Spedale

10    had signed it?

11         A.   Yeah.  It is the page number 21.

12         Q.   Okay.  And is your signature also on this

13    document?

14         A.   Yes.

15         Q.   Okay.  And this signature would have been placed

16    by you at what point in time in your meeting with her?

17         A.   After the consent is reviewed, after all her

18    questions are answered and she decides voluntarily to sign

19    the consent.

20         Q.   Okay.  And her signature only follows the review

21    of the document and your discussions?

22         A.   Yes.

23         Q.   Okay.  Now, do you recall -- I'm sorry, just maybe

24    one repeat question, if it had been asked.

25                    Was there anybody else present when you had
```

Page 103

1   your meeting with her to discuss this document?

2       A.   I don't remember who specifically was in the

3   room.

4       Q.   Do you remember whether there might have been

5   somebody else in the room, any --

6       A.   It is custom and practice to have other family

7   members available.  I don't remember who was there.

8       Q.   It is possible her son or her husband were

9   present?

10      A.   I don't remember.

11      Q.   Okay.  Now, how long would it -- first, do you

12  recall how long this meeting might have taken?

13      A.   I don't remember how long it was --

14      Q.   As a matter of --

15      A.   -- specifically.

16      Q.   -- custom and practice, is there a particular

17  length that you put into your diary for such a meeting?

18      A.   Custom and practice, you know, usually at least an

19  hour or so --

20      Q.   Okay.

21      A.   -- depending on the situation of the patients and

22  the length of the consent form.  It all depends.

23      Q.   So as best as you can recall, either referring to

24  custom and practice, as close to what you believe would

25  have been the way that you would have handled the meeting

Page 104

1    Ms. Spedale, how would you have opened the meeting with an

2    enrollee with respect to introducing this consent form?

3       A.   Custom and practice, as I did with her from my

4    note, I usually like to send the consent form prior to the

5    visit so they could review it on their own with family

6    members or other physicians and they have a copy of it.

7       Q.   Do you do this by mail?

8       A.   Email.

9       Q.   By email?

10       A.   Yeah.

11       And then when they come in, custom and

12    practice, I then review the consent form with them as

13    written in the consent form, all the sections.  And if they

14    have any questions, I would answer their questions at the

15    best of my ability.  If they're medical questions, I will

16    refer that to the physician.

17       And then once of all their questions are

18    answered and the consent form is gone through, then I would

19    ask if they want to voluntarily participate, and then they

20    would sign the consent.

21       Q.   Okay.  How long before the meeting would you have

22    sent it out to her by email as a matter --

23       A.   It depends --

24       Q.   -- of course?

25       A.   -- on the situation.

Page 105

```
 1                 I think this one, from my memory, I sent it
 2      about a week before.
 3           Q.   Okay.  Would there have been any telephone call at
 4      some time on or about the sending of the email regarding
 5      the fact that there was a consent form being sent?
 6           A.   I don't know by memory if it was email or
 7      telephone call, but there was communication.
 8           Q.   Okay.  And you would have specifically asked that
 9      the document be read in advance?
10           A.   I don't remember what I wrote in the email.
11           Q.   Okay.  Did we have the email of you forwarding it
12      to her?
13           A.   I don't have that email.
14           Q.   Okay.  Do you know the reason why you might not
15      have a copy of that email?
16           A.   Sometimes I don't keep emails that are pertinent
17      in terms of study related if the patient hasn't gone on
18      study yet.
19                 MR. MILSTEIN:  If the patient what?
20                 THE WITNESS:  Hasn't been enrolled on the
21      study.
22      BY MR. LIEDERMAN:
23           Q.   All right.  So when the patient comes into your
24      room, is this in your office or a conference room that you
25      use?
```

1      A.    This is a patient exam room in the clinic.

2      Q.    Okay.  So is there a table where you both can sit

3  with the document or are you sitting in chairs facing each

4  other?

5      A.    We are sitting -- there's the desk -- the layout

6  is the desk, and there's a couch next to the desk.

7            And I'm in the desk, and I'm facing the

8  patient --

9      Q.    Okay.

10     A.    -- on the couch.

11     Q.    How many copies of the consent form are present in

12  the room when you're meeting with a patient?

13     A.    There could be multiple copies, the original

14  that's signed and any copies that they have previously that

15  was sent.  I don't remember this case.

16     Q.    Do you have a regular opening that you provide

17  when you're sitting down with the patient to introduce the

18  document that you're now going to review with them, the way

19  that you're describing it to them?

20     A.    No.  I just say, let's go over the consent form,

21  I'll answer any questions you have, and then take it

22  from -- and then I just -- the consent, I follow the

23  consent form.

24     Q.    So if you look at the first page --

25     A.    Yes.

1      Q.   -- do you recall whether you have any discussions

2   with respect to the meaning of the term research study?

3      A.   I don't have any memory --

4      Q.   Okay.

5      A.   -- if that was discussed or not.

6      Q.   Do you have discussions with someone like Ms.

7   Spedale to distinguish between what would be a study such

8   as a clinical trial study and treatment, the difference

9   between a treatment and a study?

10     A.   I don't remember the conversations, if I had those

11  conversations or not or if the physician had the

12  conversations.

13     Q.   Do you, as a matter of course, though, have

14  discussions that may focus on whether there is a difference

15  between research and treatment or whether this is for

16  treatment?

17     A.   You mean in general?

18     Q.   In general.

19     A.   In general, I've had subjects ask me the question

20  of, not what is a research study, but, you know, what does

21  this research study entail.

22     Q.   Okay.  I mean, there are people who may come in

23  who, in the case of cancer patients, they're looking for

24  cures, and they're enrolled in a study.

25              So is it rare or often that you run into

1    patients who are anxious for talking about the therapeutic

2    quality of the study and the drug?

3         A.    So that is a discussion for the medical doctor.

4         Q.    So is it often raised by a patient?

5         A.    Sometimes it's raised.  I don't -- I can't give

6    the numbers, but sometimes it's raised.

7                   And I don't meet with the patient.  They meet

8    with the physician as well.  So I don't know the questions

9    they ask the physician.

10                   So some of these questions can be asked by

11   the physician, to the physician.

12        Q.    Do you find that there are quite a few questions

13   that are asked by the patients when you're doing this

14   review of the consent form that you need to refer the

15   questions to the doctor?

16        A.    Only medical questions.

17        Q.    Do these often come up, though?

18        A.    It all depends on the situation.

19        Q.    Okay.  It's not like it just seems to always come

20   up whenever you're doing a review --

21        A.    No.

22        Q.    -- because the questions always been asked.

23                   Okay.  In reviewing the criteria for a Phase

24   1 research study, is there typically, to your knowledge, a

25   criteria that no standard treatment is available for the

Page 109

1    patient?

2        A.   It all depends on the protocol.

3             I don't know if that's a standard for Phase

4    1, but whatever is written in the protocol is what we go

5    by.

6        Q.   Okay.  So let's assume that the protocol does talk

7    about the fact that there should not be any other standard

8    of treatment available.

9             How is that then influencing your actions in

10   enrolling patients and your screening of patients?

11       A.   That is something that I would review.  And that's

12   something that, once I review the eligibility, I go to the

13   investigator, and they confirm it and sign off that the

14   patient is eligible.

15       Q.   Okay.  So walk me through that process, though.

16             So when you say you review the eligibility,

17   what are you doing --

18       A.   I'm looking --

19       Q.   -- given that that is a requirement?

20       A.   I'm looking at the protocol.  I'm looking at the

21   eligibility criteria.

22             For example, if there are certain lab values,

23   that's something that I could look at, that there's

24   previous medications that they can't be on.  I review all

25   of that.

Page 110

1      Q.   Are you the one reaching out and collecting that

2   from whatever is the treating physician involved with that

3   patient?

4      A.   In the EMR, yes.  It's all --

5      Q.   Okay.

6      A.   -- based on the EMR.

7      Q.   Uh-huh.

8      A.   And after I review the eligibility, I then get it

9   signed off.

10           And so the investigator, the physician signs

11  off on it, and they confirm the eligibility.

12     Q.   So if, for instance, it's a question of whether or

13  not there's a standard of treatment that's still available

14  or whether or not this person is appropriate on that basis

15  to go into the trial, how do you determine that or are you

16  not the one determining it?

17     A.   I do not determine that.  That's the physician.

18     Q.   Okay.  Now, when you say physician, is that the

19  principal investigator or is that the treating physician

20  who is the one referring the patient to a clinical trial?

21     A.   That is the investigator who is on the study.

22     Q.   Okay.

23     A.   They sign off on the --

24     Q.   So they sign off on it.

25           So if that is a requirement, that is

Page 111

1   something that's not noted.

2           That's just part and parcel of the principal

3   investigator saying enroll the person?

4       A.   Yes.

5       Q.   So you don't have a checklist or a document that

6   you look at with particular reference to the prior

7   treatments and what is still available to that person?

8       A.   I would have to look -- I would have to look at

9   what the protocol, what the procedure was on enrolling the

10  patient that INC had us do.  There might have been a

11  procedure.

12          So it wasn't -- I follow what the protocol

13  and what the INC did for enrolling the patient.

14      Q.   Is that referred to often as the investigator's?

15          MR. LIEDERMAN:  That's the wrong one.  I

16  don't think I took it.

17  BY MR. LIEDERMAN:

18      Q.   That's not the investigator's brochure, is it?

19      A.   No.  No, no.

20      Q.   What is the investigator's brochure?

21      A.   That explains the drugs.

22      Q.   Okay.

23      A.   That's printed with the data in there and other

24  information.

25      Q.   Okay.  So when you take somebody through -- if you

1    turn now to page 3 of 21.

2        A.    Okay.

3        Q.    So when you get to heading 2, generally or as a

4    matter of custom and practice, what do you usually say

5    about this section?

6        A.    Oh, I just go over it as written on the consent

7    form.

8        Q.    Are there any particular -- looking at this right

9    now, okay, would there be particular areas that you would,

10   as a matter course, emphasize in going over the document

11   with a patient such as Ms. Spedale?

12       A.    I would emphasize the whole consent form.

13       Q.    Okay.  But as you're going through the

14   paragraphs -- for instance, do you recall whether there

15   were questions with respect to 0610 and this particular

16   consent form from any patients regarding the fact that it

17   was experimental, what does experimental mean?

18       A.    I don't have any memory of any specific

19   discussions --

20       Q.    But you had an understanding of what experimental

21   meant, right?

22       A.    I had an understanding of it.

23       Q.    And what would that be?

24       A.    Experimental drug that's not approved by the

25   FDA.

Page 113

1      Q.    Now, when you look at the purpose of this study as

2   the finances to the following research questions, and you

3   take a look at the last bullet point -- and you can read

4   that one, right?

5      A.    Yeah.

6      Q.    Do you interpret any of these bullet points,

7   including the last one, as indicating that efficacy has

8   been established for the drug?

9      A.    To my own?

10     Q.    Yes.

11           Would you interpret any of this?

12     A.    No.  My own interpretation of this would be that

13   this is a question that they're trying to answer.

14     Q.    Okay.  So if a patient had said, is this going to

15   cure my cancer, what would you refer to in this --

16     A.    I would --

17     Q.    -- document?

18     A.    -- refer to the consent form, and I would refer to

19   the purpose of the study.  I would refer to --

20           MR. MILSTEIN:  But all you do is read the

21   consent form.

22           You don't add your own --

23           THE WITNESS:  No.

24           MR. MILSTEIN:  -- comments to the consent

25   form, correct?

Page 114

1              You just read it.

2              THE WITNESS:  I go over the consent form as

3   written, yes.

4              There is a --

5   BY MR. LIEDERMAN:

6       Q.   Take a look at page 16, if I could.

7       A.   So there's a benefits here.

8       Q.   Well, take a look at page 16.

9       A.   Yeah.

10      Q.   Do you see that?

11      A.   Yes.

12      Q.   And that's number 9.

13      A.   Yes.

14      Q.   Is this an area that you review as a matter of

15  custom --

16      A.   Yes.

17      Q.   -- and practice?

18      A.   Yes.  I review the consent form.

19      Q.   And that says, "There may or may not be medical

20  benefit to you."

21              Do you review, in particular, these

22  sentences?

23      A.   I review all the sections.

24      Q.   Okay.  Would you stop at this point in reading and

25  underscore this or just --

Page 115

```
 1     A.   No.

 2     Q.   So --

 3     A.   Not unless they have questions or --

 4     Q.   Do you recall whether Ms. Spedale had questions at

 5   particular points in time?

 6     A.   I don't remember.

 7     Q.   Your understanding of this drug in a clinical

 8   phase -- in a Phase 1, you understand that there are, that

 9   this is the first time that humans are being given the

10   drug.

11               Isn't that correct?

12     A.   I understand that in some Phase 1 studies, yes,

13   there are drugs that are first to human testing, yes.

14     Q.   Okay.  And with respect to this drug, do you have

15   any reason to believe there had been significant human

16   testing before it was started at your site?

17     A.   I would not know unless what was given to me in

18   terms of information from the --

19     Q.   Okay.

20     A.   -- sponsor or CRO.

21     Q.   But as a matter of course, though, with a Phase 1,

22   it's still preliminary no matter how -- whether or not

23   there have been some instances of administration of the

24   drug to humans, it has not been extensive yet?

25               MR. KETHCART:  Form and foundation.
```

1    BY MR. LIEDERMAN:

2        Q.   Is that your understanding?

3             MR. KETHCART:   Go ahead and answer.

4    BY MR. LIEDERMAN:

5        Q.   Do you have an understanding with respect to Phase

6    1 being at a preliminary stage generally the history of the

7    drug --

8        A.   I do have an understanding --

9        Q.   -- starting with humans?

10       A.   -- with Phase 1, yes.

11       Q.   And that it was pretty new with human use?

12       A.   That it was new on humans, yes.

13       Q.   Yes.

14            Okay.  So -- and as your own experience

15   through clinical trials for all of these years, both Phase

16   1, Phase 2 and Phase 3, are you aware of new adverse events

17   that become known to both the sites and the sponsor as a

18   result of Phase 1 trials?

19       A.   Yes.  There are instances where there are risks

20   that are not known.

21       Q.   Okay.  Do you recall ever having discussions with

22   patients enrolling in Phase 1 trials about the fact that

23   there is a risk that is an unknown risk and that there

24   aren't necessarily, at this time, known benefits?

25       A.   So I would go over the section of risks and go

Page 117

1    over as written.

2                    And for Phase 1 studies, particularly this

3    one -- on page 13 is the risk section, so I went over this,

4    the risks.

5                    And then it does state here, "The risks and

6    discomforts related to CPI-0610 are not well known."  So

7    that's something that would have been informed.

8                    MR. MILSTEIN:  When you say you went over

9    that, you just read it?

10                   THE WITNESS:  Yes.  I go over as written.

11                   MR. MILSTEIN:  You read as written.

12                   THE WITNESS:  Yes.

13   BY MR. LIEDERMAN:

14       Q.    Is that read aloud or read in silence?

15       A.    Read out loud.

16       Q.    You read out loud?

17       A.    I go over this talking.

18       Q.    And intermittently, do you stop and ask a patient

19   if they have questions or is it just reading it without

20   stopping?

21       A.    It depends on the situation, if they have

22   questions or --

23       Q.    Well, if they have questions -- if they have

24   questions, you would -- do you invite them before you start

25   the process, if they have questions, to interrupt you?

Page 118

1     A.   Yes, of course.

2     Q.   Okay.  Are there moments, though, that you stop

3   and take a breath and just let them absorb what was written

4   or do you just read through it?

5     A.   I would imagine that I take many breaks because

6   there's a lot to go through.

7     Q.   Okay.  And on those breaks, do you ask any

8   questions, repeated questions, such as any further

9   questions?

10              Do you invite questions while you're reading

11   it as well?

12     A.   It is custom and practice to me to continue to ask

13   them, do you have any questions?  Do you want me to stop?

14              And they're also asked at the end of going

15   over the consent form if they have any questions before

16   they sign the consent.

17     Q.   Were you present when Dr. Bergsagel or Dr. Fonseca

18   ever spoke to Ms. Spedale about the Phase 1 trial?

19     A.   I don't remember if I was present at their

20   visit.

21     Q.   Okay.  And you don't remember whether or not there

22   were any questions in particular during the review of the

23   consent form in which you required a referral of that

24   question to Dr. Bergsagel?

25     A.   I don't remember.

1    Q.   Bergsagel?

2              MR. MILSTEIN:  Bergsagel.

3              MR. LIEDERMAN:  Bergsagel.

4              THE WITNESS:  But -- no, I don't remember.

5  BY MR. LIEDERMAN:

6    Q.   Okay.  So the only question that had arisen that

7  you could recall, at least from the emails, was that prior

8  to your meeting with her for the consent form, there had

9  been a question that arose about an alternative drug?

10    A.   Yes.

11    Q.   And you referred that to the doctor --

12    A.   Yes.

13    Q.   -- and then received advice and gave that back to

14  her?

15    A.   Yes.

16    Q.   Do you recall whether your return to either her or

17  her husband regarding the recommendations or the opinions

18  of the doctor were further discussed between her and --

19  between you and the Spedales?

20    A.   No.

21    Q.   Did that result in any further discussions?

22    A.   I don't remember if it did or didn't.

23    Q.   Was there ever an intent by you or anyone at the

24  Mayo Clinic to mislead Ms. Spedale into thinking she was

25  not enrolled in a Phase 1 dose finding study?

Page 120

1      A.    No.

2      Q.    Did you ever refer to this drug as therapeutic?

3      A.    No, not that I remember.

4      Q.    Would it have been, as a matter of custom and

5   practice, ever -- did you ever use the term therapeutic

6   with respect to a clinical trial or drug?

7      A.    I would use what's in the consent form language.

8      Q.    Okay.  Did you understand what it would mean to

9   use the term therapeutic?

10     A.    For research study?  Yes.

11     Q.    Okay.  In your training, have you ever been told

12  to be cautious about any inference or implication that

13  something is therapeutic when it's in an early stage or

14  phase?

15     A.    In my training, it was told that we go through the

16  consent and use the wording in the consent form because

17  that's what has been IRB approved.

18     Q.    Did Constellation ever indicate that the study

19  drug, to your knowledge, the study drug was therapeutic?

20     A.    Not to my knowledge that I remember.

21           MR. MILSTEIN:  Other than what's in the

22  consent form, you mean?

23           THE WITNESS:  Other than the consent form.

24  BY MR. LIEDERMAN:

25     Q.    Do you recall ever conveying to Ms. Spedale that

Page 121

1    the study drug was equivalent to or better than any FDA

2    regimen, approved regimen?

3        A.    Not that I would --

4                MR. MILSTEIN:  You don't recall saying

5    anything to her other than just reading the consent form,

6    correct?

7                THE WITNESS:  Yes.

8                MR. LIEDERMAN:  You can't -- you can't

9    interrupt.

10               MR. MILSTEIN:  But your question is

11   misleading.

12               He has said --

13               MR. LIEDERMAN:  But --

14               MR. MILSTEIN:  -- the only discussion he had

15   with her --

16               MR. LIEDERMAN:  Okay.  But let's get this

17   straight.

18               MR. MILSTEIN:  -- is from reading the consent

19   form.

20               MR. LIEDERMAN:  If a question -- if you don't

21   like a question, that doesn't mean that you jump in and

22   follow up with your own question.

23               MR. MILSTEIN:  I understand.

24               MR. LIEDERMAN:  You know that, and I know

25   that.  Okay?

Page 122

1               MR. MILSTEIN:  But you can't --

2               MR. LIEDERMAN:  So unless you --

3               MR. MILSTEIN:  -- mislead him.

4               MR. LIEDERMAN:  No, no.  If it's misleading,

5     you can object.

6               MR. MILSTEIN:  But he said the only

7     discussion he's had with her --

8               MR. LIEDERMAN:  But --

9               MR. MILSTEIN:  -- was reading the consent

10    form word for word.

11              MR. LIEDERMAN:  I can ask any question --

12              MR. MILSTEIN:  He remembers nothing else.

13              MR. LIEDERMAN:  Okay.  So let's make this

14    clear.

15              I've allowed you to ask --

16              MR. MILSTEIN:  Okay.

17              MR. LIEDERMAN:  -- any question you wanted.

18              MR. MILSTEIN:  Okay.  Go ahead.

19              MR. LIEDERMAN:  And if I thought it was an

20    objectionable one, I objected, but I didn't start to run my

21    own questioning.

22              MR. MILSTEIN:  All right.

23    BY MR. LIEDERMAN:

24       Q.  In your mind, having done this as many years as

25    you have, and given all of your training, do you believe

Page 123

1    that Ms. Spedale was adequately informed that this was a

2    Phase 1 clinical trial, which was a dose finding study?

3                    MR. KETHCART:  Form and foundation.

4    BY MR. LIEDERMAN:

5        Q.   Do you believe with everything that you, all of

6    your contact and information that you had given to her, do

7    you believe that she was adequately informed?

8                    MR. KETHCART:  You can answer the question if

9    you want.

10                   THE WITNESS:  Okay.  It is the custom and

11   practice for me to go over the consent form as written,

12   answer any questions they have, and then for them to

13   voluntarily sign.

14   BY MR. LIEDERMAN:

15       Q.   Okay.  So do you believe, though, that from what

16   you did and the response that you received that she was

17   adequately informed given the fact that she then effected

18   her signature on the document?

19       A.   At the moment that I signed the consent form, it

20   was -- she voluntarily signed, yes.

21       Q.   Okay.  And was -- do you recall any expression of

22   any doubt or hesitation on her part?

23       A.   Not that I remember.

24       Q.   And if you had, would you have taken any action

25   with respect to that?

Page 124

1       A.   It was part of our training that if the patient

2   has any hesitation or any doubt or has any remaining

3   questions, that we do not sign the consent form and we get

4   those questions answered.

5       Q.   During your meeting with her, did the question

6   arise again about alternative drugs to be used as opposed

7   to this drug?

8       A.   I don't remember.

9       Q.   You don't remember.

10              MR. LIEDERMAN:   Okay.  Thank you.

11                        EXAMINATION

12  BY MR. MILSTEIN:

13      Q.   Just three other questions.

14              The only discussion you remember having with

15  Ms. Spedale in this informed consent discussion was reading

16  the consent form word for word, correct?

17      A.   Yes.  Because that's custom and practice for me to

18  go over the consent form as written.

19      Q.   But you don't remember saying anything other than

20  the words in the consent form to her?

21      A.   No.  I don't say anything that's outside the scope

22  of the consent form as custom and practice.

23      Q.   And not just outside the scope.  Outside of the

24  words actually written.

25      A.   Yes, no.

Page 125

1                Whatever is said our study that's related to

2      the consent form, I say what's in the consent form.

3           Q.    And nevertheless, you knew, as she sat before you,

4      that she had inquired as to a prior drug and whether she

5      should be given that drug as therapy, correct?

6           A.    From the email exchanges, yes.

7           Q.    And instead, she took this drug as therapy,

8      correct?

9           A.    She signed the consent form to participate, yes.

10          Q.    And to take this drug as her cancer treatment --

11                MR. KETHCART:   Form.

12     BY MR. MILSTEIN:

13          Q.    -- correct?

14          A.    From when she signed the consent form, she signed

15     that she wanted to be on the study, yes.

16          Q.    And to be on the study, that was the only cancer

17     treatment she was having at the moment, right?

18                MR. KETHCART:   Form and foundation.

19     BY MR. MILSTEIN:

20          Q.    She was taking the drug supplied by Constellation

21     pursuant to the protocol and informed consent prepared by

22     Constellation as her cancer treatment, correct?

23                MR. KETHCART:   Foundation.

24                THE WITNESS:   She signed the protocol to

25     be -- she signed the consent form to be treated on this

Page 126

1    protocol.

2    BY MR. MILSTEIN:

3        Q.   To be treated on the protocol, correct?

4        A.   Yes.

5        Q.   Treated for her cancer --

6                MR. KETHCART:  Form.

7    BY MR. MILSTEIN:

8        Q.   -- right?

9        A.   To participate on the protocol.

10       Q.   You said to be treated.

11               To be treated for her cancer, right?

12       A.   I guess I'm not understanding your question.

13       Q.   She was a cancer patient at Mayo, correct?

14       A.   Yes.

15       Q.   And you were -- and then she had cancer doctors at

16   Mayo, correct?

17       A.   Yes.

18       Q.   And the treatment that she was taking --

19       A.   Was part of the protocol.

20       Q.   Was part of the protocol, correct.

21               The protocol provided that this was the

22   treatment she was to be on to treat her cancer, correct?

23               MR. KETHCART:  Form and foundation.

24               THE WITNESS:  I don't know what the -- I have

25   to look at the protocol to see what the purpose of the --

Page 127

1                    MR. MILSTEIN:   Okay.   I've got nothing else.

2    I appreciate it.

3                    MR. LIEDERMAN:   Thanks a lot.

4                    THE VIDEOGRAPHER:   This ends Media Number 2

5    in today's deposition.

6                    We're off the record at 11:57.

7                    MR. KETHCART:   We'll read and sign, by the

8    way.

9                    (Deposition concluded at 11:57 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 128

1    STATE OF ARIZONA      )

2    COUNTY OF MARICOPA    )

3         BE IT KNOWN that the foregoing deposition was

4    taken by me pursuant to stipulation of counsel; that I was

5    then and there a Certified Reporter of the State of

6    Arizona, and by virtue thereof authorized to administer an

7    oath; that the witness before testifying was duly sworn by

8    me to testify to the whole truth; that the questions

9    propounded by counsel and the answers of the witness

10   thereto were taken down by me in shorthand and thereafter

11   transcribed into typewriting under my direction; that the

12   witness has requested a review pursuant to Rule 30(e)(2);

13   that the foregoing pages are a full, true, and accurate

14   transcript of all proceedings, all done to the best of my

15   skill and ability.

16        I FURTHER CERTIFY that I am in no way related to

17   nor employed by any parties hereto nor am I in any way

18   interested in the outcome hereof.

19        DATED at Phoenix, Arizona, this 29th day of May,

20   2018.

21

22

23

24   _____
                              Talia Douglas, RPR
25                            Certified Reporter #50775

Page 129

1                    DEPOSITION SIGNATURE PAGE

2    SPEDALE vs. CONSTELLATION PHARMACEUTICALS, INC.
     Assignment No. J2164246
3

4              DECLARATION UNDER PENALTY OF PERJURY

5              I declare under penalty of perjury that I have

6    read the entire transcript of my Deposition taken in the

7    captioned matter or the same has been read to me, and the

8    same is true and accurate, save and except for changes

9    and/or corrections, if any, as indicated by me on the

10   DEPOSITION ERRATA SHEET hereof, with the understanding that

11   I offer these changes as if still under oath.

12

13             Signed on the _____ day of

14   _____, 20_____.

15

16

17

18

19   _____
                   Charanjit (J.R.) Singh

20

21

22

23

24

25

Page 130

1                    DEPOSITION ERRATA SHEET
                     Assignment No. J2164246
2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24
     SIGNATURE:_____DATE:_____
25              Charanjit (J.R.) Singh

Page 131

1            DEPOSITION ERRATTA SHEET
                Assignment No. J2164246
2

3   Page No._____Line No._____Change to:_____

4   _____

5   Reason for change:_____

6   Page No._____Line No._____Change to:_____

7   _____

8   Reason for change:_____

9   Page No._____Line No._____Change to:_____

10  _____

11  Reason for change:_____

12  Page No._____Line No._____Change to:_____

13  _____

14  Reason for change:_____

15  Page No._____Line No._____Change to:_____

16  _____

17  Reason for change:_____

18  Page No._____Line No._____Change to:_____

19  _____

20  Reason for change:_____

21  Page No._____Line No._____Change to:_____

22  _____

23  Reason for change:_____

24
    SIGNATURE:_____DATE:_____
25           Charanjit (J.R.) Singh