Arthur J. Liederman (Bar No.1184167)
(*Admitted Pro Hac Vice*)
aliederman@morrisonmahoney.com
Nicole M. Battisti (Bar No. 4961413)
(*Admitted Pro Hac Vice*)
nbattisti@morrisonmahoney.com
**MORRISON MAHONEY LLP**
120 Broadway, Suite 1010
New York, NY 10271
Telephone: (212) 825-1212
Facsimile: (212) 825-1313

Jeffrey S. Hunter, Esq. (Bar No. 024426)
JHunter@rcdmlaw.com
**RENAUD, COOK, DRURY, MESAROS, PA**
One North Central, Ste. 900
Phoenix, AZ 85004-4117
Tel: (602) 307-9900

*Attorneys for Defendant*
*Constellation Pharmaceuticals, Inc.*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

---

| | |
|---|---|
| IRIS SPEDALE and DANIEL SPEDALE, husband and wife, | Civil No. 2:17-CV-00109-ESW |
| Plaintiffs, -against- | **DEFENDANT'S STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| CONSTELLATION PHARMACEUTICALS, INC., | |
| Defendant. | |

---

Pursuant to Rule 56(c)(1) of the Federal Rules of Civil Procedure, Defendant Constellation Pharmaceuticals, Inc. ("Constellation" or "Defendant") submits the following Statement of Facts to support its Motion for Summary Judgment.

1. On December 1, 2015, Plaintiff, Iris Spedale, signed a "Research Participant Consent and Privacy Authorization Form" (referred to herein as the "Informed Consent") for purposes of enrolling in a Phase 1 Clinical Trial/Research Study ("Clinical Trial") of CPI-0610 ("study drug") sponsored by the defendant, Constellation, for the treatment of multiple myeloma. [**Executed Informed Consent**, p. 21, attached as **Exhibit A**.]

2. Ms. Spedale began Day 1 of Cycle 1 of the Clinical Trial on December 10, 2015 for a 14 day regimen, which would have ended on December 23, 2015. [**Medical Record from December 10, 2015**, attached as **Exhibit B**].

3. Ms. Spedale's treating oncologist at the Mayo Clinic, Dr. Rafael Fonseca, noted that she was exhibiting mild forms of grade 1 mania as of December 29, 2015, which subsequently worsened to a grade 3 mania. [**Medical Record from January 18, 2016**, attached as **Exhibit C**; **Deposition of Dr. Rafael Fonseca**, p. 78, lines 3-7, 21-25, p. 82, lines 13-15, attached as **Exhibit D**].

4. Ms. Spedale allegedly continued to experience manic symptoms for months and even into 2017, which she attributes to the study drug. Dr. Fonseca noted on _____ that Ms. Spedale returned to her normal self. [**Medical Record from October 16, 2017**, attached as **Exhibit E**].

**Clinical Trial Process / Ms. Spedale's Enrollment**

5. On June 5, 2013, Constellation submitted an Investigational New Drug ("IND") Application to the FDA for the study drug, CPI-0610, a BET inhibitor. [**IND Application**, attached as **Exhibit F**].

6. The International Committee on Harmonization ("ICH") guidelines describe the types of studies that are required to support an IND application and the sequence in which the studies need to be performed. These pre-clinical/pre-IND studies include toxicology studies in two species (rodent and non rodent), safety pharmacology studies, and genetic toxicology studies. [**Expert Report of Dr. David Jacobson-Kram**, Section III, p. 2, attached as **Exhibit G**].

7. Phase 1 studies designed to support the development of oncology drugs are very different than the development of other drugs. ICH recognizes different guidelines to support pre-clinical safety testing for oncology drugs governed by guideline ICH S9. *Id*.

8. ICH S9 states that, "[a]n assessment of the pharmaceutical's effect on vital organ functions (including cardiovascular, respiratory and **central nervous system**) should be available before the initiation of clinical studies; **such parameters could be included in general toxicology studies**. … Conducting stand-alone safety pharmacology studies to support studies in patients with advanced cancer is not called for." *Id*. at Section IV, p. 3 [Emphasis Added].

9. Constellation's expert toxicologist (Dr. David Jacobson-Kram), who was the former head of toxicology of the FDA's Office of New Drugs, reviewed Constellation's pre-clinical package and IND submission and concluded that Constellation adhered to the

controlling guidelines of ICH S9 and no specific safety concerns were identified during the general toxicology studies to have required additional studies. *Id*. at p. 6.

10. In addition, neurobehavioral effects were not seen in other patients treated similarly or in patients receiving higher doses of the drug than Ms. Spedale during the Phase 1 clinical trial. *Id*.

11. Moreover, Constellation's microbiologist, Dr. Robert Sims, who was personally involved with the pre-clinical development of the study drug confirmed that the brain and central nervous system were tested in 6 independent general toxicology studies and no findings of neurological or psychological issues were found. [**Affidavit of Dr. Robert Sims**, ¶ 16, attached as **Exhibit H**].

12. Dr. Sims also confirmed that he is "aware of no FDA regulation or guideline that requires specific neurotoxicity testing for BET inhibitors due to concern of the inhibitor causing neurological and/or psychological issues." [**Exhibit H**, ¶ 17].

13. The FDA approved Constellation's IND Application on June 28, 2013, which confirmed that the proper studies were performed and included in their preclinical IND package. [**FDA Approval Letter**, attached as **Exhibit I**].

14. Thereafter, CPI-0610 was being evaluated in three separate Phase 1 clinical studies around the country involving patients with progressive lymphoma, acute leukemia, and multiple myeloma. [**Investigator's Brochure dated April 30, 2018**, p. 8, attached as **Exhibit J].**

15. Constellation and the Mayo Clinic of Arizona entered into a Clinical Trial Agreement on or about April 3, 2014, for purposes having the Mayo Clinic act as one of the clinical trial sites for the trial focusing on treatment of multiple myeloma patients in accordance

with the protocol approved by the FDA and the Institutional Review Board ("IRB") utilized by the Mayo Clinic. [**Clinical Trial Agreement**, p. 1, attached as **Exhibit K**].

16. Pursuant to the Clinical Trial Agreement, the Mayo Clinic was responsible for obtaining a written Informed Consent for each trial subject. [**Exhibit K,** p. 4, section 6].

17. The Clinical Trial Agreement specified that the relationship of the Mayo Clinic to Constellation is "one of independent contractor and not one of partnership, agent and principal, employee and employer, joint venture, or otherwise." [**Exhibit K,** p. 12, section 23].

18. Under federal regulation, an investigator is responsible for "protecting the rights, safety, and welfare of subjects under the investigator's care." [21 C.F.R. § 312.60; Plaintiffs' Complaint ("Compl."), ¶ 62, on file herein, Dkt 1].

19. The regulations also state that the Sponsor of a clinical trial is responsible for selecting qualified investigators, providing the investigators what they need to conduct an investigation properly, ensure proper monitoring of the investigation, ensure the investigation is conducted in accordance with the general investigational plan and protocols, maintain an effective IND, and ensure the FDA and all participating investigators are promptly informed of significant new adverse effects or risks with respect to the drug. [21 C.F.R. § 312.50; Compl. ¶ 61].

20. It is the duty of an Investigational Review Board ("IRB"), to review, amend, and approve the informed consent; review, approve or disapprove all research activities covered by the IRB regulations, and ensure that the informed consent is sought from each prospective subject. [21 C.F.R. §50.20, 21 C.F.R. § 56.109(a), 21 CFR §56.111;

4

**Dr. Italo Biaggioni, M.D. Expert Report**, Page 3, ¶ 6; p. 4, ¶ 10, attached as **Exhibit L**].

21. All clinical trials are required by Federal Regulation to be approved by an Institutional Review Board ("IRB") that is independent of the Study Sponsor. [**Exhibit L**, Page 2, ¶ 1].

22. The Mayo Clinic retained its own internal IRB to review the protocol, informed consent, and other clinical trial documents, as well as ensure that the risks to the subjects were minimized. [**Exhibit L**, pgs 2-5].

23. An investigator may not begin the informed consent process with subjects until the IRB reviews and approves the clinical investigation, consent form, and the information to be given to subjects as part of the consent process. 21 CFR §§ 50.20, 56.103(a), and 56.109.

24. Dr. Peter Leif Bergsagel of the Mayo Clinic was appointed as the principal investigator of the Clinical Trial, and executed FDA Form 1572, Statement of Investigator, on April 2, 2014, where he agreed to "personally conduct or supervise the described investigation(s)" and "inform any patients, or any persons used as controls, that the drugs are being used for investigational purposes…" [**FDA Form 1572**, attached as **Exhibit M**].

25. Dr. Bergsagel testified that he reviewed the informed consent and submitted it to the IRB for their review and approval. [Bergsagel Deposition, p. 33, lines 5-15, attached as **Exhibit N**].

26. Plaintiff had been under treatment with Dr. Rafael Fonseca, an oncologist, at the Mayo Clinic in Arizona since her cancer diagnosis in 2009. [**Plaintiff Daniel Spedale Deposition**, p. 14, lines 3-17, attached as **Exhibit O**].

27. On November 17, 2015, Ms. Spedale's treating oncologist suggested enrolling in the clinical trial since he believed it was the best treatment option for her at that time. [**Medical Record from November 17, 2015**, attached as **Exhibit P].**

> "Mrs. Spedale continues to do well but her free light chain has gone up. I think we need to start considering the next line of treatment in her situation. Because of the previous problems with blood clots, I would be inclined not to use meds at least for the time being. The logical next step would be the use of carfilzomib. The patient inquired about the use of bortezomib. She believes she tolerated it well though I reminded her that she had significant GI toxicity at the end of her therapy. Another possibility would be for the patient to participate in one of our clinical trials. We are particularly interested in oral medications that could be provided on a long-term basis. I have communicated with our study coordinators. As soon as they have determined her eligibility we will be in contact with the patient again. Otherwise, I will see the patient again after the holidays so we can start the next line of therapy. The patient and her husband had ample opportunity to ask questions and they were addressed."

28. A few days later on November 20, 2015, Mr. Spedale emailed the Mayo Clinic study coordinator to inquire about a new drug NINLARO ixazomib which was FDA approved for relapsed multiple myeloma patients asking whether this would be a better alternative. **[Email chain between Daniel Spedale and Charanjit Singh, dated November 20, 2015**, p. 2, attached as **Exhibit Q].**

29. On November 23, 2015, the study coordinator responded to Mr. Spedale that "[Dr. Fonseca] would recommend to first try the study drug (BET inhibitor). Then she can try the approved Ixazomib later." [**Exhibit Q,** p. 1].

30. A few hours later, Mr. Spedale responded, "Thank you for checking with Dr. Fonseca. Yes we do want to continue with the trial." *Id*.

31. Ms. Spedale was subsequently seen on December 1, 2015 by Dr. Fonseca when she asked additional questions about participation in the clinical trial.

    "Mrs. Spedale has been interested in the potential of participating with clinical trial CPI-0610 using a BET inhibitor as treatment for recurrent myeloma. She had some more questions about the trial and wished to meet before so we could address them." [**Medical Records from December 1, 2015**, attached as **Exhibit R**]**.**

32. Dr. Fonseca's notes state:

    "Mrs. Spedale had an opportunity to talk to me about various treatment options. Because of her past problems with thrombosis with IMiDs and the gastrointestinal toxicity with the proteosome inhibitors we probably would be faced with a choice of carfilzomib, ixazomib or a clinical trial. After further consideration she will participate in the clinical trial. She had an opportunity to meet with our study coordinator and review the potential risks, benefits, logistics and usual protocol for the clinical trial. She will be enrolled later today." *Id*.

33. On this same day (December 1, 2015), Ms. Spedale was also seen by the principal investigator of the clinical trial at the Mayo Clinic, Dr. Bergsagel. His notes indicated that she had agreed to participate in the clinical trial of CPI-0610. **[Exhibit R]**.

34. Ms. Spedale admits that signature on the informed consent is hers. [**Plaintiff Iris Spedale Deposition**, p, 30, lines 7-9, attached as **Exhibit S**]**.**

35. Ms. Spedale testified that she never read the informed consent, was never told about anything in the informed consent, and signed the informed consent relying on Dr. Fonseca's medical expertise. [**Exhibit S**, pgs, 29-30, p. 33, lines 11-25, p. 34, lines 1-13, p. 36, lines 1-16].

36. Constellation, as the sponsor/manufacturer of the study drug, was not privy to any conversations between Ms. Spedale and her treating oncologist, nor was Constellation part of the decision to enroll her in the clinical trial. Ms. Spedale testified that the only

person she spoke with about the clinical trial was Dr. Fonseca and JR Singh. [**Exhibit S**, pgs. 25-28].

37. The enrollment for the Phase 1 clinical trial began in September 2013. Between September 2013 and June 2015, a total of 93 patients had been treated across the three Phase 1 studies, at doses of 6mg – 400mg once a day and 85mg – 110 mg twice a day. [**See Table 5-1 of Investigator's Brochure, dated April 5, 2016**, attached as **Exhibit T**].

38. By the conclusion of the phase 1 study, a total of 138 patients had been evaluated in the three separate phase 1 studies, evaluating 64 patients with lymphoma, 44 patients with leukemia, and 30 patients with multiple myeloma with doses ranging from 6mg – 400mg once a day and 85mg – 150 mg twice a day. [**Exhibit J,** p. 23].

39. At the time of Ms. Spedale's enrollment, a total of 24 patients (out of 30) in the multiple myeloma arm of the phase 1 study had already been enrolled, with Ms. Spedale being the 25th patient to be enrolled and evaluated at a dose of 150mg twice a day. A total of five patients were evaluated at the 150mg dose, and Ms. Spedale was the last and final one enrolled of the five. [**0610-03 Myeloma Patient Status Spreadsheet**, attached as **Exhibit U**].

40. Of the 138 patients that had been evaluated, plaintiff was the only individual to report an adverse event of mania/psychosis. [**Exhibit N**, p. 39, lines 13-15].

41. Plaintiff has focused on to two adverse events that were reported prior to plaintiff's enrollment in the clinical trial – 1) a patient in the leukemia arm of the study at Massachusetts General Hospital ("MGH") who presented to the hospital with "confusion," which later resolved and was determined by the principal investigator at

MGH to not be related to the study drug, and 2) a patient in the lymphoma arm of the study at Ohio State University Cancer Center ("Ohio State") who also presented to the ER with confusion, which fully resolved within 40 minutes. The principal investigator at Ohio State assessed the confusion event as related to the study drug but unexpected. [**FDA Medwatch Reports**, attached as **Exhibit V**].

42. Plaintiff had a prior medical history of steroid induced mania in 2009, which had fully resolved after she was cleared by her treating psychiatrist at the Mayo Clinic. [**Dr. Preter Expert Report,** p. 35, attached as **Exhibit W**].

**Informed Consent Form**

43. As previously stated, plaintiff executed the Informed Consent Form for the enrollment in the clinical trial on December 1, 2015. [**Exhibit A**, p. 21]

44. The Informed Consent was presented to plaintiff by the clinical research coordinator at the Mayo Clinic, Mr. Charanjit Singh. He testified that he explained the research study to the plaintiff and answered all her questions to the best of his ability. [**Exhibit A**, p. 21; **Deposition of Charanjit Singh**, p. 42, lines 22-23; p. 53-54, lines 16-3, attached as **Exhibit X**.]

45. The informed consent signed by plaintiff was compliant with the federal regulations. [**Exhibit L**, Page 6, ¶ 7].

46. Constellation's IRB expert confirmed that the current guidelines of the Mayo Clinic IRB required that the plan be in place to obtain consent, including the method for obtaining informed consent, the amount of time planned for the consent process, and the study team members who would meet with the patient to obtain their informed consent. [**Exhibit L**, Page 4, ¶ 9].

9

47. The Mayo Clinic's guidelines stated that their IRB was responsible for ensuring that the consent document accurately described the risks and benefits. [**Exhibit L,** Page 4, ¶ 11].

48. At the beginning of the Informed Consent, it expressly provided that,

> "The main purpose of this study is to determine the highest dose of CPI-0610 that can be given without causing severe side effects. This is a Phase I study, which means that CPI-0610 is in very early stages of testing in humans. ... Future studies may then test whether or not CPI-0610 is useful against different types of cancer."

> "CPI-0610 is experimental, which means that it is not approved by the U.S. Food and Drug Administration (FDA) or other regulatory agencies around the world to treat cancer or for any other disease." [**Exhibit A**, p. 3, section 2].

49. The informed consent further stated,

> "The purposes of this study is to find answers to the following research questions:
>
> - What is the highest dose of CPI-0610 that can be given to patients with multiple myeloma without causing severe side effects?
>
> - What are the side effects of CPI-0610?
>
> - How much CPI-0610 is in the bloodstream at specific times after taking it, and how rapidly does the body get rid of CPI-0610?
>
> - What are the effects of CPI-0610 on the expression of certain genes, both in normal blood cells and in multiple myeloma cells?
>
> - Will CPI-0610 help reduce the amount of multiple myeloma in patients' bodies?" *Id.*

50. Not only did the informed consent explain the purpose of the study, but it educated the enrollee that there may not be a medical benefit of taking the study drug and that there was potential risks associated with the study drug (some of which are not well known),

which could be serious, long lasting, permanent or even fatal. [**Exhibit A**, p. 13, section 6; p. 16, section 9].

**Plaintiffs' Expert, Dr. James P. Sutton:**

51. Plaintiffs have retained an expert neurologist, Dr. James P. Sutton, to offer various opinions regarding the allegations against Constellation. [**Dr. Sutton Expert Report**, attached as **Exhibit Y**]:

    a. Constellation was negligent in advancing the study drug from animal studies to human clinical trials because Constellation failed to adequately test for potential neurotoxicity in the preclinical phase [*Id*. at p. 8, section 1];

    b. Plaintiffs informed consent was never obtained [*Id*. at p. 10, section 5];

    c. The informed consent form does not mention that Dr. Allis, a Constellation founder, proved that a BET inhibitor could cause brain injury in mammals [*Id*. at p. 10, section 5(f)];

    d. There is no exclusion in the clinical trial protocol for patients who had other treatment options and/or had prior central nervous system neurological or psychiatric illness [*Id*. at p. 11, section 7];

    e. Constellation was negligent in not keeping abreast of BET inhibitor research, citing exclusively to the Dr. C. David Allis Article ("Allis Article"), that would have ensured human subject safety [*Id*. at p. 12, section 9];

    f. Plaintiff suffered permanent and irreparable psychological injury [*Id*. at p. 13, section 10];

    g. Plaintiff suffered severe and irreversible brain injury and disabling mania/psychosis from the study drug [*Id*. at p. 9, sections 2-3];

52. With respect to Dr. Sutton's opinions regarding whether Constellation was negligent in advancing the study drug from animal studies to human clinical testing, Dr. Sutton refuted his own opinions in his expert report when he testified that he has no opinion about Constellation's IND submission to the FDA. [**Dr. Sutton Deposition**, p. 33, lines 21-25, p. 34, line 1, attached as **Exhibit Z**].

53. The IND submission is an application by the sponsor/manufacturer of the study drug asking the FDA to advance the study from animal testing to human clinical testing. [**Exhibit G**, p. 2].

54. When asked to identify a point in time that the negligence by Constellation occurred, Dr. Sutton testified that he could not assign a specific time point, but generally stated that Constellation was negligent in not looking at the potential effects the study drug could have on many organ systems, including the brain. [**Exhibit Z**, p. 34-35, lines 22-25, 1-4].

55. Dr. Sutton was aware of no regulatory guidelines or regulations that require specific types of testing for FDA approval for cancer-oncology drugs. [**Exhibit Z**, p. 35, lines 9-12].

56. Dr. Sutton also had no opinions about specific neurological issues he felt were of concern during the general toxicology pre-clinical testing. He only testified that he believed the testing was "very sketchy and limited," but had no scientific basis for this opinion. [**Exhibit Z**, p. 35, lines 17-21].

57. Dr. Sutton was aware of no other BET inhibitor clinical trials that had conducted neurotoxicity testing in the pre-clinical phase, nor could he identify a regulation or

guideline that required such specific testing. [**Exhibit Z**, p. 31, lines 13-19, p. 32, lines 3-9, 16-18].

58. Dr. Sutton did not compare the subject clinical trial and pre-clinical submission to any other BET inhibitor IND submission, and was unaware that the IND submission for cancer drugs (like that one at issue in this case), differ from non-cancer drug. [Exhibit Z, p. 33, lines 2-11].

59. Dr. Sutton's opinions regarding the fact that plaintiffs' informed consent was never obtained, is unsupported by any evidence that Constellation had direct dealings with plaintiff, or that Constellation was contractually obligated to physically obtain her informed consent. [**Exhibit Y**, p. 10, section 5].

60. In fact, Dr. Sutton's expert report confirms that the principal investigator and the Mayo Clinic, "were responsible for ensuring that informed consent was obtained including ensuring that the [informed consent form] accurately reflected the risk of the study and investigational agent." [**Exhibit Y**, p. 11, section 6(a)].

61. Plaintiffs have testified that they had no contact with anyone from Constellation and only spoke with Mayo Clinic employees regarding the clinical trial. [**Exhibit S**, pgs. 25-28].

62. Dr. Sutton's reasoning that the informed consent should have warned enrollees that BET inhibitors could cause brain injury in mammals based on the Allis Article is factually inaccurate and a misrepresentation of the findings in the Allis Article. [**Exhibit Y**, p. 10, section 5(f); **Exhibit H].**

63. Dr. Sims confirmed in his affidavit that there were no findings regarding brain injury, or even psychological injury/concern. There were no major changes in short-term

memory, movement, learning ability or anxiety, or that the mice suffered brain cell death or change in the brain's neuronal structure. [**Exhibit H, ¶¶** 12-14].

64. Dr. Sims further confirmed that the BET inhibitor used in the Allis Article was different than the one used by Constellation in the subject clinical trial. [**Exhibit H**, ¶ 9].

65. Constellation's dually board-certified expert in neurology and psychiatry has stated that there is no scientific or medical literature supporting the theory that CPI-0610 causes or even exacerbates psychiatric illness; or that any person with psychological antecedents who is being treated with any BET inhibitor, is at a heightened risk for a manic breakdown. [**Exhibit W, pgs. 37-39**].

66. Dr. Sutton's opinion that the exclusion criteria in the protocol should have excluded patients who had prior central nervous system neurological or psychiatric illness, is unsubstantiated by any scientific evidence or basis. [**Exhibit Y,** p. 11, section 7].

67. The Clinical Trial Protocol sufficiently identified all the risks known and identified during the preclinical phase and that enrollees should be ones that have no effective standard treatment available. [**Clinical Trial Protocol,** p. 33, section 4, p. 80, section 9, attached as **Exhibit AA.**]

**Causation:**

68. Dr. Preter explained that sleep disturbance is a classic prodrome of manic breakdown. [**Exhibit W**, p. 5].

69. Dr. Preter opined that the year and a half of grossly disturbed sleep patterns preceding her mania, combined with chronic anxiety, and multiple courses of chemotherapy all could have caused or contributed to Ms. Spedale's mania. [**Exhibit W**, pgs. 4, 36-37).

70. Moreover, on the day of Ms. Spedale's enrollment in the clinical trial, she was on a slew of medications, half of which have known mental side effects including mental fog, mood changes, impaired mental performance, headache, dizziness, hallucinations, depression, and confusion.  Importantly, one of the listed medications (Prednisone) is known for aggravating pre-existing psychiatric conditions.  [**Exhibit B**].

Dated: November 19, 2018

>*/s/ Arthur J. Liederman* (Bar No.1184167)
>(*Admitted Pro Hac Vice*)
>aliederman@morrisonmahoney.com
>*/s/ Nicole M. Battisti* (Bar No. 4961413)
>(*Admitted Pro Hac Vice*)
>nbattisti@morrisonmahoney.com
>**MORRISON MAHONEY LLP**
>120 Broadway, Suite 1010
>New York, NY 10271
>Telephone: (212) 825-1212
>Facsimile: (212) 825-1313
>
>*/s/ Jeffrey S. Hunter* (Bar No. 024426)
>JHunter@rcdmlaw.com
>**RENAUD, COOK, DRURY, MESAROS, PA**
>One North Central, Ste. 900
>Phoenix, AZ 85004-4117
>Tel: (602) 307-9900
>
>*Attorneys for Defendant
>Constellation Pharmaceuticals, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify on this 19th day of November, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

**Alan Milstein**
**Sherman, Silverstein, Kohl, Rose & Podolsky, P.A.**
308 Harper Drive, Suite 200
Moorestown, NJ 08057
AMilstein@shermansilverstein.com
*Attorney for Plaintiff*

       */s/ Cindy K. Bowlin*