Alan C. Milstein
SHERMAN, SILVERSTEIN, KOHL,
ROSE & PODOLSKY, P.A.
A Professional Corporation
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662-0700
Facsimile: 856-488-4744
E-Mail: amilstein@shermansilverstein.com
*Attorneys for Plaintiffs Iris Spedale and Daniel Spedale*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Iris Spedale and Daniel Spedale, husband and wife, <br><br> Plaintiffs, <br><br> v. <br><br> Constellation Pharmaceuticals, Inc., <br><br> Defendant. | Docket No. CV-17-00109-PHX-JJT <br><br> **JURY TRIAL DEMANDED** <br><br> **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

Plaintiffs Iris Spedale and Daniel Spedale (collectively, "Plaintiffs"), by and through their counsel, Alan C. Milstein of Sherman, Silverstein, Kohl, Rose & Podolsky, P.A., respectfully submit this memorandum in opposition to the Motion for Summary Judgment ("Motion") filed on behalf of Defendant Constellation Pharmaceuticals, Inc. ("Constellation").

Constellation sponsored a Phase 1 clinical trial of its experimental drug CPI-0610, a BET inhibitor. (BET inhibitors slow the production of the natural protein substances called bromodomains.) One unusual aspect of the study was that individual study sites, such as the Mayo Clinic ("Mayo"), did not conduct independent trials. Instead, these sites formed part of a single clinical trial controlled by Constellation at the hub. Constellation drafted the protocol and informed consent document, and was actively involved in running the trial, as opposed to an out-of-the-way sponsor.

As of August 2015, at the very latest, Constellation knew or should have known that scientists (including Constellation's co-founder) were concerned about whether a BET inhibitor could cause adverse neurological effects, and recognized that a full understanding of their function in the brain was of the utmost importance. Nevertheless, Constellation failed to warn of the risk of neurological injury associated with the drug, and failed to exclude from the study any subject who had history of drug-induced neurotoxicity or mania. Moreover, the informed consent form drafted by Constellation's Chief Medical Officer misleadingly repeatedly suggested to potential human subjects that CPI-0610 was a "treatment" for multiple myeloma, when CPI-0610's efficacy with regard to the treatment of multiple myeloma would have, as Constellation admits, been completely unknown at the time.

Plaintiff Iris Spedale had a history of multiple myeloma, which was well-addressed by existing therapies. In 2009, she experienced a drug-induced mania secondary to a steroidal treatment that she received. In late 2015, after Ms. Spedale's myeloma recurred, she enrolled in Constellation's clinical trial. Contrary to

1    Constellation's representation that Ms. Spedale was unaware of what the informed
2    consent document said, the study coordinator at Mayo read the document to Ms.
3    Spedale.  If that document had been clear that the study was not meant to be a
4    treatment for her cancer, and that she was being asked to enter a trial only to test a
5    drug's safety, she would not have enrolled in the drug trial, would not have taken CPI-
6    0610, and would have chosen a different course of medical treatment for her myeloma.

7    	Constellation first argues that it had no duty towards Ms. Spedale, either in
8    general or with regard to informed consent.  Constellation relatedly argues that only
9    physicians have a duty to obtain informed consent.  In actuality, under controlling
10   federal regulations, both the investigator *and the sponsor* possess duties towards a
11   study subject, including the duty of disclosing risks and obtaining a subject's informed
12   consent.  The compelling facts of this matter support a jury finding that Constellation
13   breached these duties, and caused Ms. Spedale to suffer permanent injuries.

14   	Constellation then argues that it cannot be held liable in strict products liability
15   because Ms. Spedale did not actually purchase the drug.  This argument has long been
16   rejected by Arizona courts.  Constellation further argues that it cannot be held liable on
17   a products liability theory because, under Restatement (Second) of Torts § 402(A),
18   comment k., there is no liability for harm caused by an experimental drug.
19   Constellation is over-reading comment k.  As Arizona courts have made clear,
20   comment k. does not preclude a strict liability cause of action in these circumstances.

21   	Constellation further argues that there is no evidence of causation in this case.
22   Contrary to this argument, neurologist James P. Sutton, M.D. issued his opinion based
23   on the literature about the class of drugs Ms. Spedale ingested, her predisposition to
24   drug-induced mania, the temporal nature of the incident (occurring while she was
25   taking the study drug), and the elimination of any other possible causes.  It belies
26   reason that these medical experts for Constellation could conceive of any other reason
27   for her serious adverse reaction other than the study drug, and yet not even advance a
28   single theory to exculpate their drug as the source of harm.

Moreover, contrary to Constellation's argument, a reasonable juror could easily find that Constellation's reckless actions and utter disregard for the safety and welfare of subjects such as Ms. Spedale justify the imposition of punitive damages.

Two final points are in order.  First, Constellation's Motion violates Local Rule 7.1(b)(1) insofar as Constellation appears to use Times New Roman 12-point font in the body text, and a smaller font in the footnotes.  As such, Constellation has in effect impermissibly filed an overlength pleading, which is prejudicial to the Plaintiffs, and should be stricken.  Second, the "Affidavit of Dr. Robert Sims" that Constellation attaches to its Motion as Exhibit "H" should be stricken, as it tellingly fails to state that it is made under penalty of perjury.[1]  Even putting all of this aside, the Motion fails.

## STATEMENT OF THE FACTS

Prior to 2009, Ms. Spedale was in relatively good health, and lived a happy life with her husband Daniel and their two children.  Plaintiffs' Statement of Additional Facts ("SOAF"), ¶ 2.  Ms. Spedale had had no history of psychological problems such as mania or psychosis.  SOAF, ¶ 3.

Ms. Spedale was first diagnosed with multiple myeloma in 2009, at the age of sixty-seven.  SOAF, ¶ 1.  She sought treatment of her cancer at Mayo, under the care of Rafael Fonseca, M.D.  SOAF, ¶ 5.  She soon began intravenous chemotherapy with the drug combination known as CyBorD on a weekly basis.  SOAF, ¶ 6.  The treatment initially proved quite successful.  SOAF, ¶ 7.

One of the drugs in the CyBorD regimen is the steroid dexamethasone.  SOAF, ¶ 9.  In July 2009, a staff member noticed that Ms. Spedale's speech was unusually rapid, and by mid-September, the adverse neurological effect of the steroids on Ms. Spedale had markedly increased.  SOAF, ¶¶ 8, 10.  Averaging only about two hours of sleep a night, her personality and demeanor changed, and her physician diagnosed her with steroid- or drug-induced mania.  SOAF, ¶ 11.  She was prescribed olanzapine

---

[1] See, e.g., 28 U.S.C. § 1746.

and, by October 13, 2009, when she next saw Dr. Fonseca, she was "back to her normal self," according to her husband of almost fifty years. SOAF, ¶ 12. Ms. Spedale was in remission for over three years. SOAF, ¶ 13. She experienced two brief returns of the cancer and again was treated first with the CyBorD regimen, and then with lenalidomide, though each time with a lower dose of dexamethasone to eliminate its potential adverse effects. SOAF, ¶ 14.

In November 2015, the cancer again appeared in diagnostic tests, but with limited if any actual debilitating symptoms. SOAF, ¶ 15. Dr. Fonseca initially concluded that "the logical next step" would be the use of a standard therapy chemotherapy drug typically given by infusion. SOAF, ¶ 15. Since Ms. Spedale was still feeling quite good, despite the diagnosis, she and Dr. Forseca discussed whether there was a treatment she could take orally. SOAF, ¶ 16.

Dr. Fonseca noted, "another possibility would be for the patient to participate in one of our clinical trials." SOAF, ¶ 17. On December 1, 2015, Ms. Spedale returned to Mayo and enrolled in the clinical trial sponsored and controlled by Constellation titled "A Phase 1 Study of CPI-0610, a Small Molecule Inhibitor of BET Proteins, in Patients with Previously Treated Multiple Myeloma," also known as "the 0610-03 study." SOAF, ¶ 19.

At the time, Constellation, a startup company in Massachusetts, had no FDA-approved drugs, and no source of capital other than investors. SOAF, ¶ 20. Its best hope for financial success was CPI-0610, still in the earliest phase of experimentation. SOAF, ¶ 21. CPI-0610 is in a class of experimental drugs called BET inhibitors, which slow the production of the natural protein substances called bromodomains. SOAF, ¶ 22. In order for a drug to gain FDA approval, it must pass through the three phases of clinical trials. SOAF, ¶ 23. Before it even starts such trials, the manufacturer must conduct pre-clinical research, both in the lab and in animal studies, to determine the universe of potential harm to human subjects. In Constellation's pre-clinical animal studies, rats and dogs experienced neurotoxic events. SOAF, ¶ 24.

-4-

As the title of the 0610-03 study reflects, Ms. Spedale was enrolled in a Phase One study. SOAF, ¶ 25. By definition, such studies are to determine whether the experimental drug is safe for humans, and at what maximum dose. SOAF, ¶ 22.

Both the protocol and informed consent document for the study (the document that would be provided to the study subjects) were written by Michael R. Cooper, M.D., who served as Constellation's Chief Medical Officer. SOAF, ¶ 27. The original version of the protocol, dated September 13, 2013, lists the "study population" as follows: "Patients with multiple myeloma that has progressed following at least one prior line of standard treatment will be enrolled in this study." SOAF, ¶¶ 28, 29. Subsequently, prior to Ms. Spedale's enrollment, Constellation amended the protocol, and narrowed the "study population" to "[p]atients with multiple myeloma that has progressed <u>following standard treatment, and for whom further effective standard treatment is not available, will be enrolled in this study</u>." SOAF, ¶ 30. The protocol failed to state within the "exclusion criteria" that patients for whom further effective standard treatment is indeed available are excluded from the study. SOAF, ¶ 31. In Ms. Spedale's case, further effective standard treatment was available. SOAF, ¶ 32.

Moreover, as Leif Bergsagel, M.D. testified, Phase 2 studies, <u>i.e.</u>, studies in which safety has already been determined, were available. SOAF, ¶ 33. Thus, the study should have excluded not only multiple myeloma patients for whom further effective standard treatment is available, but also multiple myeloma patients for whom Phase 2 or Phase 3 studies are available. SOAF, ¶ 33.

What is more, the informed consent document lacks any mention whatsoever of the exclusion criteria set forth in the "study population," or even the incomplete and flawed inclusion and exclusion criteria in the protocol. SOAF, ¶ 34. Further, medical and scientific research available to Constellation should have caused Constellation to also exclude individuals with a prior history of drug-induced neurotoxicity or mania, and warn the investigating doctors and staff as well as potential human subjects of the risks of suffering such neurotoxicity as a result of exposure to CPI-0610. SOAF, ¶ 35.

The trial was conducted at multiple sites around the country. SOAF, ¶ 36. One unusual aspect of the 0610-03 study was that individual sites did not conduct independent trials. Instead, the various sites acted as a single trial controlled by Constellation at the hub. SOAF, ¶ 37. The import of this fact was that, since this was a dose escalation study, a study site like Mayo would have limited experience with subjects at the lower doses, and (as occurred here) might begin their implementation of the study with a subject at a higher dose. SOAF, ¶¶ 38, 39. Indeed, in this case, the initial dose for subjects was 3mg twice a day for fourteen days. At Mayo, where Ms. Spedale was one of the first human subjects enrolled in the trial, she was started at 150mg a day for fourteen days, or *fifty times* the initial dose. SOAF, ¶ 39.

Under the protocol written by Dr. Cooper, the primary objective of the 0610-03 study was "To determine the maximum tolerated dose (MTD) of CPI-0610 and characterize its dose-limiting toxicities (DLTs) when given orally once daily for 14 consecutive days and followed by a 7-day break. SOAF, ¶ 40. Neither the primary nor any of the secondary objectives of the 0610-03 study was to determine the efficacy of CPI-0610 (nor could they have been). SOAF, ¶ 42. Despite this, the use of CPI-0610 is represented throughout the protocol, as well as in the informed consent document, as "treatment." SOAF, ¶ 45. As Dr. Cooper admitted, this was a Phase 1 study about safety only, and no one could yet conclude that the drug provided any therapeutic benefit whatsoever. SOAF, ¶¶ 42-43. Accordingly, to suggest that the study drug was therapeutic is to wrongly induce individuals like Ms. Spedale, and wrongly induce physicians to convince individuals like Ms. Spedale, to forgo other available treatments, as they must in order to participate in the trial. SOAF, ¶ 44.

The protocol represents that certain pre-clinical work was successfully conducted by Constellation but, as Dr. Sutton opines, it fails to mention that Constellation did not test the drug for potential neurotoxicity, nor did it investigate whether its drug could penetrate the blood-brain barrier, the barrier that prevents toxic substances such as chemotherapy drugs from seeping out of the blood stream into the

brain and causing damage. SOAF, ¶ 46. The result of this failure is that Constellation failed to include in the exclusion criteria any subject who had a history of drug-induced neurotoxicity or mania, and failed to warn the investigating doctors and staff as well as potential human subjects of the risks of suffering such neurotoxicity as a result of exposure to CPI-0610. SOAF, ¶ 47.

In August 2015, before Ms. Spedale agreed to participate in the trial, C. David Allis, Ph.D., one of Constellation's three co-founders, co-authored a published article ("Allis Article") entitled "BET protein Brd4 activates transcription in neurons and BET inhibitor Jq1 blocks memory in mice." SOAF, ¶ 49. In the introduction, the authors caution that "small molecule BET inhibitors are in clinical trials, yet almost nothing is known about Brd4 function in the brain." SOAF ¶ 50. Erica Korb, Ph.D., the first study author, explained: "[w]e found that if a drug blocks a BET protein throughout the body, and that drug can get into the brain, you could very well produce neurological side effects." SOAF, ¶ 51.

Believing that the use of the study drug was a treatment option for her cancer, and not just a new more convenient delivery method, and that she was fortunate enough to be a good candidate for the clinical trial, Ms. Spedale agreed to participate. SOAF, ¶ 53. Specifically, on December 1, 2015, Ms. Spedale met with Charanjit Singh, the study coordinator at Mayo, who read the informed consent document to Ms. Spedale. SOAF, ¶ 57. Thereafter, Ms. Spedale executed the informed consent document, which in fact did not inform her of the risk of neurotoxicity and severe drug-induced mania. SOAF, ¶ 57. If the informed consent form had been clear that this study was not meant to be a treatment for her cancer, and that she was being asked to enter a trial only to test a drug's safety, she would not have enrolled in the drug trial, would not have taken CPI-0610, and would have chosen a different course of medical treatment for her myeloma. SOAF, ¶ 58. On that date, Ms. Spedale was in good mental health and felt physically fit and ready to get on with living her life. SOAF, ¶ 59.

On December 11, 2018, Ms. Spedale took her first dose of 150 mg of CPI-0610, and continued to take 150 mg twice a day, as instructed, for a total of fourteen days. SOAF, ¶ 63. On December 18th, the eighth day of receiving a total daily dose of 300 mg, Ms. Spedale began a devastating downwards spiral that was induced by the toxicity of CPI-0610 which was coursing through her bloodstream. SOAF, ¶ 64.

On December 29, 2015, Mr. Singh wrote the following email to Dr. Cooper about Ms. Spedale: "We saw our patient today for cycle 2 day 1 visit on study. … Our patient did experience significant nausea, vomiting and diarrhea. … We are wondering if we can reduce the dose due to the nausea, vomiting, diarrhea she was experiencing." SOAF, ¶ 65. Dr. Cooper immediately rejected the request to reduce the dose, exercising Constellation's control over the conduct of the trial and Ms. Spedale's dose, stating, "the dose of CPI-0610 should not be reduced unless the patient has experienced a dose-limiting toxicity." SOAF, ¶ 66.

On January 4th, Ms. Spedale's mania increased in severity, and Mayo permanently discontinued dosing Ms. Spedale. The next day, Mr. Singh advised Dr. Cooper that Ms. Spedale "has developed significant mania over the past week." SOAF, ¶ 68. Dr. Cooper responded by asking if she had a history of bipolar disease. SOAF, ¶ 69. Mr. Singh answered in the negative but told him that she had a history of drug-induced mania. SOAF ¶ 70. When Mr. Singh advised that "her symptoms started when she was on the protocol," Dr. Cooper responded, "ok, so it sounds like the temporal connection may be a bit stronger than I thought." SOAF, ¶ 72.

As Dr. Sutton opines, the onset of Ms. Spedale's psychosis was unmistakably the result of her exposure to the high doses of the study drug, given she had no history of mental illness other than a similar episode of drug-induced mania, the temporal nature of the event, and the fact that the experimental compound was associated with neurotoxicity in the literature. SOAF, ¶ 73.

On January 25, 2016, Constellation provided a serious adverse event report to the FDA that stated, in pertinent part, as follows (SOAF, ¶ 67):

-8-

> Around day 8 of her first cycle of treatment with the study drug, the patient developed mild symptoms of mania. On 29-Dec-2015, cycle 1 day 20, the investigator evaluated the patient and assessed her mania as grade 1. … [O]n 04-Jan-2016, … her mania had increased to grade 3 in severity. The patient was reported by the investigator to have experienced steroid-induced psychosis in the past, but there was no evidence that she was taking steroids during this current episode of mania. … Treatment with study drug was permanently discontinued on 04-Jan-2016 due to the event of mania.
>
> * * *
>
> The event met the serious criterion of other important medical event. The investigator assessed the SAE as grade 3 in intensity and possibly related to the study drug.

As the weeks progressed, Ms. Spedale's drug-induced mania proved more debilitating. As her son Darren noted, his mother—who had previously been loving, perfectly normal, and rational—basically "snapped." SOAF, ¶ 78. She talked nonstop, experienced chronic panic, anxiety and paranoia, even calling the fire department and 911 on multiple occasions. SOAF, ¶ 79. On March 10, 2016, she was found wandering into the kitchen of a restaurant she frequented claiming they were trying to poison her and making inappropriate comments. She was ultimately detained by law enforcement who delivered her to a medical facility where she was diagnosed as psychotic, delusional and paranoid, and where she remained involuntarily hospitalized from March 11 to March 31, 2016. SOAF, ¶ 80. While she has recovered to some extent with the help of antipsychotic medications, she is today just a shadow of her former self, her marriage of fifty years is broken, and she is unable to live any semblance of her former life without assistance. SOAF, ¶ 81.

The Plaintiffs' expert witness James P. Sutton, M.D. has been a Board-certified practicing neurologist since the early 1990's. SOAF, ¶¶ 82-86. In addition to treating patients at his practice, Dr. Sutton has been principal investigator for over 100 clinical trials from 1992 to present. SOAF, ¶ 88. Among many things, Dr. Sutton has opined

that research that was known or should have been known to Constellation well prior to Ms. Spedale's enrollment in the trial in December 2015 made clear that the study drug, CPI-0610, could very well negatively affect the brain function or psychological state of an individual such as Ms. Spedale, or any human subject, or otherwise produce neurological side effects, and individuals with histories such as Ms. Spedale's should have been excluded, and this risk associated with the drug should have been disclosed. SOAF, ¶¶ 95-98.  With regard to the informed consent form, Dr. Sutton testified that the information provided to patients, such as Ms. Spedale, was deficient as "she wasn't informed that the study was intended to cause severe harm or death to two people, and that that was required as part of the study design or that she was at a higher risk based on the group she was entering [and] she wasn't informed that the method of the study required intentionally increasing the dose of medicine until two people would have severe injury or death." SOAF, ¶ 108.

Finally, Dr. Sutton's opinion that Ms. Spedale suffered severe and irreversible brain injury as a direct result of exposure to a toxic dose of CPI-0610 is supported by her diagnostic testing; namely, Ms. Spedale's MRI performed in 2016 showed white matter lesions which were not present prior to the study and her EEG on October 21, 2016 was reported as abnormal, with encephalopathic slowing, which Dr. Sutton viewed as evidence of organic impairment. SOAF, ¶ 109. Dr. Sutton testified that he discounted chemotherapy as the cause of Ms. Spedale's central nervous system injury based on peer-reviewed articles. SOAF, ¶ 110. Dr. Sutton additionally ruled out other potential causes of Ms. Spedale's condition, such as hypertension and diabetes, and concluded that "there was no event between 2011 and 2016 other than her exposure to CPI-0610 and resultant psychotic illness that would provide an alternative explanation." SOAF, ¶¶ 111, 116.

**LEGAL ARGUMENT**

**1.  Constellation Is Not Entitled to Summary Judgment on the Plaintiffs' Negligence and Lack of Informed Consent Claims**

Under Arizona law, "[t]he basic elements of actionable negligence are a duty owed to the plaintiff, a breach thereof and an injury proximately caused by the breach."[2]  "Duty is simply a question of whether 'the relationship of the parties was such that the defendant was under an obligation to use some care to avoid or prevent injury to the plaintiff.'"[3]  Of course, duties can also be imposed by statutes or regulations enacted for the protection and safety of individuals such as the plaintiff. Indeed, it is well-established that "[a] person who violates a statute enacted for the protection and safety of the public is guilty of negligence *per se*."[4]

21 C.F.R. § 312.3(b), one of the FDA regulations governing investigational new drug ("IND") applications such as the one at issue here, defines a "sponsor" of a clinical trial as the party that "<u>takes responsibility for</u> and initiates a clinical investigation."[5]  21 C.F.R. § 312.50 in turn sets forth six "[g]eneral responsibilities of sponsors," including (1) "selecting qualified investigators"; (2) "providing them with the information they need to conduct an investigation properly"; (3) "ensuring proper monitoring of the investigation(s)"; and (4) "ensuring that the investigation(s) is conducted in accordance with the general investigational plan and protocols contained in the IND."  21 C.F.R. § 312.60 in turn provides, in pertinent part, that "[a]n investigator shall, in accordance with the provisions of part 50 of this chapter, obtain the informed consent of each human subject to whom the drug is administered … ." 45 C.F.R. § 46.116, applicable to both device and drug trials, sets forth the general requirements for informed consent, including the requirement of explaining "the purposes of the research," disclosing "any reasonably foreseeable risks or discomforts

---

[2] See, e.g., Booth v. State, 83 P.3d 61, 65 (Ariz. App. 2004).
[3] See id. (internal quotation marks omitted).
[4] See Alaface v. National Inv. Co., 892 P.2d 1375, 1385 (Ariz. App. 1994); accord Brand v. J.H. Rose Trucking Co., 427 P.2d 519, 523 (Ariz. 1967) ("From the failure to heed a statute or regulation, the law conclusively infers a want of reasonable care.  And negligence per se results from the violation of specific requirement of law or ordinance.").
[5] See 21 C.F.R. § 312.3(b) (emphasis added).

to the subject," and disclosing "appropriate alternative procedures or courses of treatment, if any, that might be advantageous to the subject."  A violation of the foregoing regulations constitutes negligence or negligence per se, as these regulations were designed to prevent injury to participants in human research experiments, and that individuals participating "in clinical investigations are the intended beneficiaries of" those laws.[6]

In Zeman v. Williams, the District Court held that the plaintiffs stated a claim for negligence against the *sponsor* of a clinical trial premised upon the alleged violation of the foregoing regulations.  In that case, plaintiff Robert Zeman participated in a gene transfer trial testing a potential new treatment for Young-Onset Parkinson's Disease, and was injured as a result of participation.  Mr. Zeman filed suit and alleged, among other things, that Neurologix, Inc. ("Neurologix"), as the sponsor of the trial, "had a duty to draft and approve the clinical trial protocol and informed consent form with reasonable care to ensure Mr. Zeman's safety."  Mr. Zeman further alleged that "Neurologix knew or should have known that the informed consent form was inadequate because the form did not advise Mr. Zeman of all reasonable risks and alternatives to the clinical procedure."[7]  Neurologix moved to dismiss, contending that it did not owe Mr. Zeman "a legally cognizable duty with respect to the content of the consent form."[8]

After beginning its analysis by noting that "[f]ederal regulations covering experimental clinical trials articulate a general policy to protect human subjects in clinical trials," the District Court readily concluded that "[b]oth the investigator and

---

[6] See Daum v. Spinecare Medical Group, Inc., 52 Cal. App. 4th 1285 (1997); see also Grimes v. Kennedy Krieger Inst. Inc., 782 A.2d 807 (Md. 2001) (recognizing a cause of action for negligence where the federal regulations governing human subject trials were violated); Whitlock v. Duke University, 637 F. Supp. 1463 (M.D.N.C. 1986), aff'd, 829 F.2d 1340 (4th Cir. 1987).

[7] See Zeman v. Williams, Docket No. 11-10204-GAO, 2014 WL 3058298 (D. Mass. July 7, 2014), at *1-*2.

[8] See id.

the sponsor have responsibilities under the regulations regarding obtaining a subject's informed consent."[9]  As the District Court pointed out, under 21 C.F.R. § 312.50, "[a] sponsor is 'responsible for selecting qualified investigators' and (among other things) 'providing them with the information they need to conduct an investigation properly.'"[10]  The Court continued:

> The sponsor's obligation to provide the necessary information in one sense is owed to the investigator, but it also may be owed to the subject.  The subject obviously has a great stake in whether the investigation is conducted 'properly.'  That certainly includes the subject's being provided adequate information to give a properly informed consent.  It is plausible that in a given case that will not happen unless the investigator obtaining the consent himself has adequate information bearing on the risks of the procedure.  Under the regulations, the sponsor is obliged to provide the investigator sufficient information so that an informed consent is properly given by the subject.
>
> * * * *
>
> Neurologix argues that the responsibility for obtaining an informed consent rests exclusively with the investigator.  It is certainly true that the investigator has a major, if not the major, role in obtaining a properly informed consent.  But that does not foreclose the possibility that some other persons, including particularly the trial's sponsor, might also have a responsibility to help assure that the investigator actually gets a properly informed consent.  After all, even under the "learned intermediary" rule, a pharmaceutical company will not be held liable to injury to a patient only if it has given adequate information to the intermediary physician so the physician can adequately inform the patient.  [Citations omitted.]  If the investigator fails to inform a subject about some substantial risk because the sponsor has failed adequately to inform the investigator about the risk, the sponsor may be liable in tort.[11]

---

[9] See id. at *2-*3.
[10] See id. (citing 21 C.F.R. § 312.50).
[11] See id. at *3-*4; see also 45 C.F.R. § 46.116 (emphasis added) ("No informed consent … may include any exculpatory language through which the subject … is made to waive … any of the subject's legal rights, or releases or appears to

-13-

Finally, in Abdullahi v. Pfizer, Inc., a case involving a clinical trial held overseas, the U.S. Court of Appeals for the Second Circuit observed, "United States law requires that, as a predicate to FDA approval of any new drug, both American and foreign sponsors of drug research involving clinical trials, whether conducted here or abroad, procure informed consent from human subjects."[12]

Arizona law provides an additional cause of action for lack of informed consent, whereby a plaintiff must demonstrate that "adequate disclosure would have caused the plaintiff to decline the treatment," and "the treatment proximately caused injury to the plaintiff."[13]

The foregoing case law completely undercuts the basis of Constellation's argument that it has no duty to Ms. Spedale. Indeed, applying the foregoing principles, a reasonable juror could readily conclude that Constellation acted in a negligent manner towards Ms. Spedale, and failed to secure the informed consent of Ms. Spedale, and the foregoing caused Ms. Spedale to suffer serious, life-altering injuries. Among other things, as set forth in detail above, and in the SOAF and Dr. Sutton's opinions, Constellation either ignored or failed to appreciate the relevant science, which should have led to exclusion of individuals with Ms. Spedale's medical history, and a disclosure; failed to even include its own flawed inclusion and exclusion criteria within the proper sections of the protocol; and failed to include that flawed inclusion and exclusion criteria within the informed consent document. Constellation further misrepresented, in the informed consent form and otherwise, that the study drug was a "treatment" for multiple myeloma. Indeed, it is inappropriate for the sponsor of the Phase 1 study to describe it as therapy or treatment because it has never been shown to be therapeutic, and because the purpose of the trial is to establish safety as opposed to efficacy. If a drug successfully passes through Phase 1, and most

---

release the investigator, the sponsor, the institution or its agents from liability for negligence.").

[12] See Abdullahi v. Pfizer, Inc., 562 F.3d 163, 182 (2d Cir. 2009).
[13] See, e.g., Gorney v. Meaney, 150 P.3d 799 (Ariz. App. 2007).

do not, Phase 2 studies are conducted to determine if the drug has any therapeutic effect.  If the drug passes through Phase 2, and most do not, a Phase 3 study is conducted with a larger population of subjects to determine, on a greater scale, if the drug is safe and effective for humans.  All such studies are governed by a protocol that informs the study doctors and staff about the pre-clinical work that was conducted; about the purpose, objectives, and risks of the study; about who should and who should not be included in the study; and about how the study is to be implemented.  In addition, human subject research studies require every human subject to be advised of the risks and benefits of participating through an informed consent document.  Only when so advised can the subject make an informed decision whether to participate; that is, whether the risks of participating are outweighed by the potential benefits.  Understanding this risk/benefit calculus is particularly important in a Phase 1 study, where the benefits are unknown because researchers have not yet begun to investigate whether the drug has any therapeutic benefit in humans.  Finally, Dr. Sutton opines, based on the literature about the class of drugs Ms. Spedale ingested, her predisposition to drug-induced mania, the temporal nature of the incident (occurring while she was taking the study drug), and the elimination of any other possible causes, that participation in the trial and receipt of the study drug caused Ms. Spedale to suffer serious, life-altering neurological injuries.

### 2. Constellation Is Not Entitled to Summary Judgment on the Plaintiffs' Strict Products Liability Claims

The doctrine of strict products liability "does not rest on traditional concepts of fault"; indeed, "[a] strict products liability plaintiff does not have to prove the defendant was negligent."[14]  Arizona long ago "adopted the doctrine of strict products liability as set forth in s 402 A of the Restatement (Second) of Torts,"[15] whereby a

---

[14] See State Farm Ins. Companies v. Premier Manufactured Systems, Inc., 142 P.3d 1232, 1235 (Ariz. App. 2006).
[15] See id.

defendant can be held liable for a design defect, a manufacturing defect, or a failure to warn.[16] In Gaston v. Hunter, a decision issued forty years ago, an individual who had been harmed by an investigational drug sued the manufacturers. The drug companies argued that they could not be held strictly liable "because the drug was supplied to the doctors without charge," and therefore "no sale took place within the meaning of s 402 A." The Court of Appeals of Arizona *rejected* this argument, and "decline[d] to construe the term 'seller' so strictly."[17] It cited with approval a prior decision holding the term "seller," as used in the strict liability context, was "a description of the situation that has most commonly arisen rather than as a deliberate limitation of the principle to cases where the product has been sold … ."[18] It then held:

> In the present case, Travenol and Baxter Laboratories were in the business of selling drugs, and their ultimate goal was the commercially profitable sale of chymopapain. Travenol had submitted a New Drug Application to the Food and Drug Administration, but before the FDA would approve the drug for sale, an investigational period was required. In this phase, Travenol distributed the drug to selected physicians for use under carefully controlled conditions, with rigorous reporting of the results. <u>We find that the policies which justify the application of strict products liability principles to those who manufacture and Sell products also apply to those who manufacture and Supply products to consumers on an investigational basis, even though the "supplying" does not technically amount to a sale.</u>[19]

The Court proceeded to hold that a manufacturer of an experimental drug may be entitled to an exemption from strict liability in tort, under comment k., but only where "distribution of the drug was justified in light of the facts which were known or which should have been known to a reasonably prudent manufacturer," and a proper warning was also given by the manufacturer. Further, "for experimental drugs, the manufacturer must clearly advise that the drug is experimental, and must warn of

---

[16] See Hohlenkamp v. Rheem Mfg. Co., 655 P.2d 32 (Ariz. App. 1982).
[17] See Gaston v. Hunter, 588 P.2d 326, 338 (Ariz. App. 1978).
[18] See id.
[19] See id. at 339 (emphasis added).

known risks and those risks that should be known through the exercise of reasonable care."[20] Here, a jury could readily conclude that distribution was not justified, either in general or to an individual with Ms. Spedale's medical history; Constellation failed to clearly advise that the drug was experimental (instead representing to study subjects that it was treatment); and Constellation failed to warn of known risks, and risks that should be known through the exercise of reasonable care.

Constellation further attacks Dr. Sutton's opinion that Ms. Spedale suffered severe neurological damage as a result of her exposure to the drug it was testing for safety. What Constellation neglects to say is that, when Ms. Spedale experienced this reaction to the drug, its internal correspondence as well as it communications with the FDA described Ms. Spedale's reaction as "a serious adverse event" which was "possibly related" to the study drug because the reaction occurred while she was taking the drug, and because she had a prior incidence of drug-induced mania. SOAF, ¶¶ 74-75. Moreover, neither anyone from Constellation nor any of its experts has ever offered any other plausible cause of her psychotic episode. SOAF, ¶¶ 76-77.

Finally, a reasonable jury could readily conclude that Constellation consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others, and engaged in conduct sufficient to justify punitive damages.

Dated: Tuesday, December 18, 2018     Respectfully submitted,

SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.

By: /s/ Alan C. Milstein
Alan C. Milstein
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662-0700
Facsimile: 856-488-4744
E-Mail: amilstein@shermansilverstein.com
*Attorneys for the Plaintiffs*

---

[20] See id. at 339-42.

-17-

**CERTIFICATE OF SERVICE**

I, Alan C. Milstein, hereby certify that, on Tuesday, December 18, 2018, I served a copy of the within document upon the following counsel of record via this Court's electronic case filing system:

Arthur J. Liederman, Esquire (*Pro Hac Vice*)
Nicole M. Battisti, Esquire (*Pro Hac Vice*)
MORRISON MAHONEY LLP
120 Broadway, Suite 1010
New York, NY 10271

Jeffrey S. Hunter, Esquire
RENAUD, COOK, DRURY, MESAROS, P.A.
One North Central, Suite 900
Phoenix, AZ 85004-4117

*Attorneys for Defendant*
*Constellation Pharmaceuticals, Inc.*

By:   /s/ Alan C. Milstein