Alan C. Milstein
SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.
A Professional Corporation
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662-0700
Facsimile: 856-488-4744
E-Mail: amilstein@shermansilverstein.com
*Attorneys for Plaintiffs Iris Spedale and Daniel Spedale*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Iris Spedale and Daniel Spedale, husband and wife, | Docket No. CV-17-00109-PHX-JJT |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | **PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS, AND RESPONSE TO DEFENDANT'S STATEMENT OF FACTS** |
| Constellation Pharmaceuticals, Inc., | |
| Defendant. | |

Pursuant to Local Rule of Civil Procedure 56.1(b), Plaintiffs Iris Spedale and Daniel Spedale (collectively "Plaintiffs"), by and through the undersigned counsel, respectfully submit this Statement of Additional Facts, as well as this response to the Statement of Facts ("SOF") filed on behalf of Defendant Constellation Pharmaceuticals, Inc. ("Defendant" or "Constellation").

## STATEMENT OF ADDITIONAL FACTS

1.     Ms. Spedale was first diagnosed with multiple myeloma in 2009, at the age of sixty-seven.[1]

2.     Prior to that, she was in relatively good health, and lived a happy life with her husband Daniel and their children Darren and Rebecca.[2]

---

[1] See Medical records from May 8, 2003 to July 12, 2017, true and correct copies of which are collectively attached as **Exhibit "1,"** at May 7, 2009.

3.      She had had no history of psychological problems such as mania or psychosis.[3]

4.      Significantly, however, she did experience some adverse neurological effects while on steroids as part of her cancer treatment.[4]

5.      She sought treatment of her cancer at the Mayo Clinic in Phoenix under the care of Rafael Fonseca, M.D.[5]

6.      She soon began intravenous chemotherapy with the drug combination known as CyBorD on a weekly basis.[6]

7.      The treatment initially proved quite successful.[7]

8.      In July of 2009, one of the members of the staff treating Ms. Spedale noted that her speech was unusually rapid.[8]

9.      One of the drugs in the CyBorD regimen is the steroid dexamethasone, and Ms. Spedale told the staff person that such drugs interfered with her ability to sleep but that she had always been able to adjust to the effects.[9]

10.     By mid-September, the neurological effect of the steroids had markedly increased.[10]

11.     Averaging only about two hours of sleep a night, her personality and demeanor changed, and her physician diagnosed her with steroid- or drug-induced mania.[11]

---

[2] See Plaintiffs' Exhibit 1 at May 7, 2009; see also Constellation's SOF, Exhibit O at 7:9-25.

[3] See Constellation's SOF, Exhibit O at 7:14-20.

[4] See Plaintiffs' Exhibit 1 at September 18, 2009.

[5] See Constellation's SOF, Exhibit O at 14:18-15:2.

[6] See Plaintiffs' Exhibit 1 at May 7, 2009; see also Constellation's SOF, Exhibit O at 16:6-25.

[7] See Plaintiffs' Exhibit 1 at September 16, 2009; see also Constellation's SOF, Exhibit O at 19:25-22:7.

[8] See Plaintiffs' Exhibit 1 at July 31, 2009.

[9] See Constellation's SOF, Exhibit O at 22:23-24:13.

[10] See Plaintiffs' Exhibit 1 at September 16, 2009.

[11] See Plaintiffs' Exhibit 1 at September 18, 2009.

12.     She was prescribed olanzapine and, by October 13, 2009, when she next saw Dr. Fonseca, she was "back to her normal self," according to her husband of almost fifty years.[12]

13.     Under Dr. Fonseca's care, Ms. Spedale underwent a stem-cell transplant that was extremely successful, leaving her in remission for over three years.[13]

14.     She experienced two brief returns of the cancer and again was treated first with the CyBorD regimen, and then with lenalidomide, though each time with a lower dose of dexamethasone to eliminate its potential adverse effects.[14]

15.     In November 2015, when the cancer again appeared in diagnostic tests, but with limited if any actual debilitating symptoms, Dr. Fonseca initially concluded that "the logical next step would be the use of carfilzomib," a standard therapy chemotherapy drug typically given by infusion.[15]

16.     Since Ms. Spedale was still feeling quite good, despite the diagnosis, she and Dr. Forseca discussed whether there was a treatment she could take orally without having to visit Mayo each time for intravenous chemotherapy.[16]

17.      In his note, Dr. Fonseca wrote, "another possibility would be for the patient to participate in one of our clinical trials."[17]

18.     He further wrote, "We are particularly interested in oral medications that could be provided on a long-term basis.  I have communicated with our study coordinators.  As soon as they have determined her eligibility, we will be in contact with the patient again."[18]

---

[12] See Plaintiffs' Exhibit 1 at October 13, 2009.
[13] See Plaintiffs' Exhibit 1 at June 1, 2010.
[14] See Medical records from August 13, 2013, September 17, 2013, and October 21, 2014, true and correct copies of which are collectively attached as **Exhibit "2."**
[15] See Constellation's SOF, Exhibit P.
[16] See Constellation's SOF, Exhibit P.
[17] See Constellation's SOF, Exhibit P.
[18] See Constellation's SOF, Exhibit P.

-3-

19.     On December 1, 2015, Ms. Spedale returned to Mayo and enrolled in the clinical trial sponsored and controlled by Constellation titled "A Phase 1 Study of CPI-0610, a Small Molecule Inhibitor of BET Proteins, in Patients with Previously Treated Multiple Myeloma," also known as "the 0610-03 study."[19]

**Constellation's Clinical Trial**

20.     At the time Ms. Spedale enrolled in the clinical trial, Constellation, a startup company in Cambridge, Massachusetts with approximately seventy employees, had no drugs which had received FDA approval, and no source of capital other than its investors.[20]

21.     Its best hope for financial success was CPI-0610, which was still in the earliest phase of experimentation.[21]

22.     CPI-0610 is in a class of experimental drugs called BET inhibitors, which slow the production of the natural protein substances called bromodomains.[22]

23.     In order for a drug to gain FDA approval, it must pass through three phases of clinical trials (Phase 1, Phase 2, and Phase 3).[23]

24.     Before it even starts such trials, the manufacturer must conduct pre-clinical research, both in the lab and in animal studies, to determine the universe of potential harm to human subjects.   In the pre-clinical animal studies conducted by Constellation, rats and dogs experienced neurotoxic events.   For example, hypersensitivity, hypersensitivity to touch, and tremors were noted in rats; and tremors and abnormal gait were noted in dogs.[24]

---

[19] See Constellation's SOF, Exhibit A.
[20] See Deposition of Michael Cooper, a true and correct copy of which is attached as **Exhibit "3,"** at 12:11-13:1, 15:4-14, 17:5-8, and 20:18-21:13.
[21] See Plaintiffs' Exhibit 3 at 14:22-15:3.
[22] See Plaintiffs' Exhibit 3 at 12:11-13:1, 15:21-16:18.
[23] See Plaintiffs' Exhibit 3 at 17:17-23.
[24] See Plaintiffs' Exhibit 3 at 17:24-18:9; see also Excerpts from pre-clinical testing reports, true and correct copies of which are attached as **Exhibits "4" and "5**."

25.     As the title of the 0610-03 study reflects, Ms. Spedale was enrolled in a Phase One study.[25]

26.     Such studies by definition are to determine whether the experimental drug is safe for humans, and at what maximum dose.[26]

27.     Both the protocol and informed consent document (the document that would be provided to the study subjects) for the 0610-03 study were written by Michael R. Cooper, M.D., who at the time served as Constellation's Chief Medical Officer.[27]

28.     The original version of the protocol is dated September 13, 2013.[28]

29.     The original version of the protocol lists the "study population" as follows: "Patients with multiple myeloma that has progressed following at least one prior line of standard treatment will be enrolled in this study."[29]

30.     Subsequently, prior to Ms. Spedale's enrollment, Constellation amended the protocol, and narrowed the "study population" as follows: "Patients with multiple myeloma that has progressed <u>following standard treatment, and for whom further effective standard treatment is not available</u>, will be enrolled in this study."[30]

31.     The protocol, however, failed to state within the "exclusion criteria" that patients for whom further effective standard treatment is indeed available are excluded from the study.[31]

32.     In Ms. Spedale's case, further effective standard treatment was available.[32]

---

[25] See Constellation's SOF, Exhibit A.
[26] See Plaintiffs' Exhibit 3 at 30:22-31:1; see also Constellation's SOF, Exhibit N at 21:25-22:6.
[27] See Plaintiffs' Exhibit 3 at 10:16-18, 23:9-19, 58:22-59:14; see also Constellation's SOF, Exhibits A and AA.
[28] See "Clinical Trial Protocol: 0610-03," true and correct excerpts of which are attached as **Exhibit "6,"** cover page.
[29] See Plaintiffs' Exhibit 6 at pages 4, 31-33.
[30] See Constellation's SOF, Exhibit AA at pages 4, 33-35 (emphasis added).
[31] See Constellation's SOF, Exhibit AA at pages 33-35.

33.     Moreover, as Leif Bergsagel, M.D. testified, Phase 2 studies (i.e., studies in which safety has already been determined) were available.[33]  Thus, the study should have excluded not only multiple myeloma patients for whom further effective standard treatment is available, but also multiple myeloma patients for whom Phase 2 or Phase 3 studies are available.

34.     Compounding these issues, the informed consent document drafted by Constellation lacks any mention whatsoever of the exclusion criteria set forth in the "study population," or even the incomplete and flawed inclusion and exclusion criteria in the protocol.[34]

35.     And, as discussed in detail below, medical and scientific research available to Constellation should have caused Constellation to also exclude individuals with a prior history of drug-induced neurotoxicity or mania, and warn the investigating doctors and staff as well as potential human subjects of the risks of suffering such neurotoxicity as a result of exposure to CPI-0610.

36.     The trial was conducted at multiple sites around the country.[35]

37.     One unusual aspect of the 0610-03 study was that individual sites did not conduct independent trials.  Instead, the various sites acted as a single trial controlled by Constellation at the hub.[36]

38.     The import of this fact was that, since this was a dose escalation study, a study site like Mayo would have limited experience with subjects at the lower doses and might begin their implementation of the study with a subject at a higher dose.[37]

39.     Indeed, in this case, the initial dose for subjects was 3mg twice a day for fourteen days.   At Mayo, where Ms. Spedale was one of the first human subjects

---

[32] See Plaintiffs' Exhibit 1 at December 1, 2015.
[33] See Constellation's SOF, Exhibit N at 53:22-54:1.
[34] See generally Constellation's SOF, Exhibit A.
[35] See Plaintiffs' Exhibit 3 at 34:4-35:12.
[36] See Plaintiffs' Exhibit 3 at 36:14-37:13.
[37] See Plaintiffs' Exhibit 3 at 33:9-24.

-6-

enrolled in the trial, she was started at 150mg a day for fourteen days, or *fifty times* the initial dose.[38]

40.     Under the protocol written by Dr. Cooper, the primary objective of the 0610-03 study was "To determine the maximum tolerated dose (MTD) of CPI-0610 and characterize its dose-limiting toxicities (DLTs) when given orally once daily for 14 consecutive days and followed by a 7-day break."[39]

41.     Secondary objectives included "to characterize the safety and tolerability of CPI-0610 ... to characterize the pharmacokinetics of CPI-0610 ... to characterize of the pharmacodynamic effects of CPI-0610" and, at the very bottom of the list of five, "to characterize any anti-myeloma activity associated with CPI-0610 *treatment.*"[40]

42.     Thus, neither the primary nor any of the secondary objectives of the 0610-03 Study was to determine the efficacy of CPI-0610.  Despite this, the use of CPI-0610 is represented throughout the protocol, as well as in the informed consent document, as "treatment."  But this was a Phase 1 study about safety only, and no one could yet conclude that the drug provided any therapeutic benefit whatsoever.[41]

43.     As Dr. Cooper admitted: "Certainly at the outset of a phase one study there probably is no proof to humans that it has anti-tumor activity.  So at the time that a phase one study begins, at least a human phase one of a new compound, there is no clinical evidence that the compound has antitumor activity."[42]

44.     Accordingly, to suggest that the study drug was therapeutic is to wrongly induce individuals like Ms. Spedale, and wrongly induce physicians to convince

---

[38] See Plaintiffs' Exhibit 3 at 39:4-7 and 46:8-48:8.
[39] See Constellation's SOF, Exhibit AA; see also Plaintiffs' Exhibit 3 at 32:16-33:24.
[40] See Constellation's SOF, Exhibit AA (emphasis added).
[41] See Constellation's SOF, Exhibits A and AA.
[42] See Plaintiffs' Exhibit 3 at 42:17-19.

-7-

1   individuals like Ms. Spedale, to forgo other available treatments, as they must in order

2   to participate in the trial.[43]

3        45.    The informed consent implies in several places that participation in the

4   trial is treatment.  Point 10 on page 17 states "there may be other ways to treat your

5   cancer," implying this is one way to treat a patient's cancer.   A statement on page 5

6   provides that "the dose you receive may not be the best dose for treating your cancer,"

7   implying the study drug is treating the patient's cancer.[44]

8        46.    The protocol represents that certain pre-clinical work was successfully

9   conducted by Constellation but, as Dr. Sutton opines, it fails to mention that

10  Constellation did not test the drug for potential neurotoxicity, nor did it investigate

11  whether its drug could penetrate the blood-brain barrier.[45]   This is the barrier that

12  prevents toxic substances such as chemotherapy drugs from seeping out of the blood

13  stream into the brain and causing damage.

14       47.    The result of this failure to conduct the necessary pre-clinical work is

15  that Constellation failed to include in the exclusion criteria for potential human

16  subjects any subject who had a history of drug-induced neurotoxicity or mania, and

17  failed to warn the investigating doctors and staff as well as potential human subjects of

18  the risks of suffering such neurotoxicity as a result of exposure to CPI-0610.[46]

19       48.    This failure by Constellation to conduct such pre-clinical work, to warn

20  of the risk of neurotoxicity from BET inhibitors, and to exclude subjects with a history

21  of drug-induced neurotoxicity is inexcusable, as is Constellation's position today that

22  Ms. Spedale's adverse event was unforeseeable.[47]

23

24

25

26         [43] See generally Constellation's SOF, Exhibit Y.
           [44] See Constellation's SOF, Exhibit A, pages 5 and 17.
27         [45] See Plaintiffs' Exhibit 3 at 24:21-24 and 26:6-11; see also Constellation's
    SOF, Exhibit AA.
28         [46] See generally Constellation's SOF, Exhibit Y.
           [47] See generally Constellation's SOF, Exhibit Y.

49.     In August 2015, before Ms. Spedale agreed to participate in the trial, C. David Allis, Ph.D., one of Constellation's three co-founders, co-authored a published article ("Allis Article") entitled "BET protein Brd4 activates transcription in neurons and BET inhibitor Jq1 blocks memory in mice."[48]

50.     In the introduction, the authors caution that "small molecule BET inhibitors are in clinical trials, yet almost nothing is known about Brd4 function in the brain."[49]

51.     Erica Korb, Ph.D., the first study author, explained as follows regarding the findings: "[w]e found that if a drug blocks a BET protein throughout the body, and that drug can get into the brain, you could very well produce neurological side effects."[50]

52.     The compound tested was known to cross into the bloodstream and was found to reduce molecular activity in the brain.   Dr. Korb offered the following explanation for this finding: "[t]o turn a recent experience into a long-term memory, you need to have gene transcription in response to these extracellular signals, ... [a]fter administering a Brd4 inhibitor, we no longer saw those changes in transcription after stimuli."[51]

**Ms. Spedale's Participation in the Trial**

53.     Believing that the use of the study drug was a treatment option for her cancer, and not just a new more convenient delivery method, and that she was fortunate enough to be a good candidate for the clinical trial, Ms. Spedale agreed to participate.[52]

---

[48] See Allis Article, a true and correct copy of which is attached as **Exhibit "7."**

[49] See Plaintiffs' Exhibit 7.

[50] See   https://neurosciencenews.com/bet-inhibitors-memory-loss-2494/   (last visited December 5, 2018).

[51] See id.

[52] See Constellation's SOF, Exhibit O at 49:9-21, 50:15-20, and 61:19-25.

54.     As Dr. Sutton put it: "She trusted the study organizers regarding their recommendation to join the study, relied on their representations that it was safe for her to do so, believed that the study drug was a treatment option, and believed that this was the recommended treatment of the options available to her."[53]

55.     As Dr. Fonseca noted on December 1, 2015, Ms. Spedale "has been interested in the potential of participating with clinical trial CPI-0610 using a BET inhibitor as treatment for recurrent myeloma. She had some more questions about the trial and wished to meet before so we could address them."[54]

56.     He further noted, "because of her past problems with thrombosis with IMiDs and the gastrointestinal toxicity with the proteasome inhibitors, we probably would be faced with a choice of carfilzomib, ixazomib, or a clinical trial.  After further consideration, she will participate in the clinical trial.  She had an opportunity to meet with the study coordinator and review the potential risks, benefits, logistics and usual protocol for the clinical trial.  She will be enrolled later today."[55]

57.     Later on that day, Ms. Spedale met with Charanjit Singh, the study coordinator at Mayo, who read the informed consent document to Ms. Spedale. Thereafter, Ms. Spedale executed the informed consent document, which in fact did not inform her of the risk of neurotoxicity and severe drug-induced mania.[56]

58.     If the informed consent form had been clear that this study was not meant to be a treatment for her cancer, and that she was being asked to enter a trial only to test a drug's safety, she would not have enrolled in the drug trial, would not

---

[53] See Constellation's SOF, Exhibit Y at page 5.
[54] See Constellation's SOF, Exhibit R.
[55] See Constellation's SOF, Exhibit R.
[56] See Constellation's SOF, Exhibit A; see also Exhibit O at 53:22-56:16; Exhibit X at 53:16-54:3; accord "Defendant's First Set of Interrogatories" and "Plaintiffs' Responses to Defendant's First Set of Interrogatories," true and correct copies of which are collectively attached as **Exhibit "8,"** at ¶ 3.

1  have taken CPI-0610, and would have chosen a different course of medical treatment
2  for her myeloma.[57]

3      59.    On that date, Ms. Spedale was in good mental health and felt physically
4  fit and ready to get on with living her life.[58]

5      60.    On December 1, 2015, she also met with Mayo's Peter Bergsagel, M.D.,
6  listed as the Principal Investigator of the study, although Dr. Bergsagel was only one
7  of several around the country performing the trial precisely in the manner dictated by
8  Constellation.[59]

9      61.    Dr. Bergsagel noted: "multiple myeloma, relapsed, for treatment on a
10  clinical trial with BET inhibitor CPI-0610."  The plan, he noted, was to "proceed with
11  bone mineral [sic] aspiration and biopsy and initiate treatment."[60]

12      62.    After receiving the bone marrow biopsy the next day, she saw Dr.
13  Bergsagel again on December 10, 2015.[61]  Dr. Bergsagel noted, "she feels well and has
14  no complaints referable to multiple myeloma and is prepared to start treatment."[62]

15      63.    That day she took her first dose of 150 mg of CPI-0610, and continued
16  to take 150 mg twice a day, as instructed, for a total of fourteen days.[63]

17      64.    On December 18th, the eighth day of receiving a total daily dose of 300
18  mg, Ms. Spedale began a devastating downwards spiral that was induced by the
19  toxicity of CPI-0610 which was coursing through her bloodstream.[64]

20      65.    On December 29, 2015, Mr. Singh wrote the following email to Dr.
21  Cooper of Constellation about Ms. Spedale:  "We saw our patient today for cycle 2
22  day 1 visit on study.  …  Our patient did experience significant nausea, vomiting and

[57] See Exhibit 8, ¶¶ 2, 10.
[58] See Constellation's SOF, Exhibit O at 43:12-44:2.
[59] See Plaintiffs' Exhibit 3 at 36:14-37:13.
[60] See Constellation's SOF, Exhibit R.
[61] See Constellation's SOF, Exhibit B.
[62] See Constellation's SOF, Exhibit B.
[63] See Constellation's SOF, Exhibit B.
[64] See Constellation's SOF, Exhibit C; see also Exhibit Y.

1    diarrhea. … We are wondering if we can reduce the dose due to the nausea, vomiting,

2    diarrhea she was experiencing."[65]

3        66.     Dr. Cooper wrote back that same day rejecting the request to reduce the

4    dose, exercising Constellation's control over the conduct of the trial and Ms. Spedale's

5    dose, stating, "the dose of CPI-0610 should not be reduced unless the patient has

6    experienced a dose-limiting toxicity."[66]

7        67.     Thus, even though Ms. Spedale was obviously already experiencing a

8    severe reaction to the study drug, Dr. Cooper insisted Mayo continue to follow the

9    dictates of the Protocol he had written, not because it was in her best therapeutic

10    interest but because she was in Constellation's study.

11        68.     On January 4th, Ms. Spedale's mania increased in severity, and Mayo

12    permanently discontinued dosing Ms. Spedale. The next day, Mr. Singh advised Dr.

13    Cooper that Ms. Spedale "has developed significant mania over the past week."[67]

14        69.     Dr. Cooper responded by asking whether she had a history of bipolar

15    disease.[68]

16        70.     Mr. Singh answered in the negative but told him that she does have a

17    history of drug-induced mania.[69]

18        71.     Dr. Cooper then asked first whether she was on any steroids and then the

19    critical question of "whether the patient's mania developed while she was taking CPI-

20    0610?" Mr. Singh first mistakenly responded that it was six days after she had

21    completed the first cycle and Dr. Cooper was quick to state that because it began when

22

23

24 _____

25      [65] See e-mail chain of December 29, 2015 to January 13, 2016, a true and

26 correct copy of which is attached as **Exhibit "9"** at December 29, 2015.

     [66] See Plaintiffs' Exhibit 9 at December 29, 2015.

27      [67] See Plaintiffs' Exhibit 9 at January 5, 2016, 6:18 PM.

     [68] See e-mail chain of January 5 to 12, 2016, a true and correct copy of which

28 is attached as **Exhibit "10."**

     [69] See Plaintiffs' Exhibit 10.

she was not taking the drug it "decreases the suspicion that CPI-0610 precipitated her mania.  But of course it's still possible."[70]

72.    When Mr. Singh corrected his previous email and advised that "her symptoms started when she was on the protocol," Dr. Cooper responded, "ok, so it sounds like the temporal connection may be a bit stronger than I thought."[71]

73.    As Dr. Sutton opines, the onset of Ms. Spedale's psychosis was unmistakably the result of her exposure to the high doses of the study drug, given she had no history of mental illness other than a similar episode of drug-induced mania, the temporal nature of the event, and the fact that the experimental compound was associated with neurotoxicity in the literature.[72]

74.    Sadly, however, Constellation has resisted to this day concluding that its drug caused the adverse event.  Its communications with the federal government, however, speak otherwise. Sponsors have an obligation to promptly report serious adverse events to the FDA or else risk fines and the suspension of its research.  While anything but prompt, Constellation submitted just such a report to the FDA on January 25, 2016.[73]

75.    The report provides, in pertinent part, as follows:

> Around day 8 of her first cycle of treatment with the study drug, the patient developed mild symptoms of mania.  On 29-Dec-2015, cycle 1 day 20, the investigator evaluated the patient and assessed her mania as grade 1.  … [O]n 04-Jan-2016, … her mania had increased to grade 3 in severity.  The patient was reported by the investigator to have experienced steroid-induced psychosis in the past, but there was no evidence that she was taking steroids during this current episode of mania.  …   Treatment with study drug was

---

[70] See Plaintiffs' Exhibit 10.

[71] See Plaintiffs' Exhibit 10.

[72] See Constellation's SOF, Exhibit Y at pages 8-13; see also Exhibit Z at 57:24-68:5.

[73] See January 25, 2016, report to the FDA, a true and correct copy of which is attached as **Exhibit "11."**

-13-

permanently discontinued on 04-Jan-2016 due to the event of mania.

* * *

The event met the serious criterion of other important medical event. The investigator assessed the SAE as grade 3 in intensity and possibly related to the study drug.[74]

76.     Significantly, Constellation never hypothesized what the cause of the psychosis could have been were it not caused by its study drug.[75]

77.     Indeed, it conducted no further investigation into other possible causes— of which there were none—nor did it ever follow up with the FDA to explain why the only drug it had been testing for possible FDA approval was not responsible for the horrific adverse consequences to one of Constellation's study subjects.[76]

78.     As the weeks progressed, Ms. Spedale's drug-induced mania proved more debilitating. As her son Darren noted, his mother—who had previously been loving, perfectly normal, and rational—basically "snapped."[77]

79.     She talked nonstop, experienced chronic panic, anxiety and paranoia, even calling the fire department and 911 on multiple occasions.[78]

80.     On March 10, 2016, she was found wandering into the kitchen of a restaurant she frequented claiming they were trying to poison her and making inappropriate comments. She was ultimately was detained by law enforcement who delivered her to a medical facility where she was diagnosed as psychotic, delusional

---

[74] See Plaintiffs' Exhibit 11.

[75] See Plaintiffs' Exhibit 11; see also Constellation's bi-weekly PI teleconference highlights, a true and correct copy of which is attached as **Exhibit "12."**

[76] See Plaintiffs' Exhibit 12.

[77] See Darren Spedale's March 14, 2016, letter to Ms. Spedale's case worker at Banner Hospital, a true and correct copy of which is attached as **Exhibit "13"**; see also Plaintiffs' Exhibit 8, ¶ 21.

[78] See Plaintiffs' Exhibit 8, ¶ 21; Exhibit 13.

and paranoid, and where she remained involuntarily hospitalized from March 11 to March 31, 2016.[79]

81.     While she has recovered to some extent with the help of antipsychotic medications, she is today just a shadow of her former self, her marriage of fifty years is broken, and she is unable to live any semblance of her former life without assistance.[80]

**James P. Sutton, M.D.'s Opinions**

82.     The Plaintiffs' expert witness James P. Sutton, M.D. graduated from Massachusetts Institute of Technology in 1980, and received his M.D. from University of Massachusetts Medical School in 1984.[81]

83.     He then did two one year residencies in neurology at New York University Medical Center and Harbor-UCLA Medical Center.[82]

84.     He subsequently did a two year fellowship in movement disorders and neuropharmacology at Rush-Presbyterian-St. Luke's Medical Center in Chicago.[83]

85.     In 1991, Dr. Sutton became Board-certified in neurology.[84]

86.     Since 1990, he has been a practicing neurologist.[85]

---

[79] See Banner Del Webb letters and discharge summary, true and correct copies of which are attached as **Exhibit "14"**; see also Surprise Police Department Responding Unit Summaries dated March 3, 2016, and March 10, 2016 and Revocation Notice from Motor Vehicle Division dated March 16, 2016, true and correct copies of which are collectively attached as **Exhibit "15."**

[80] See e.g., Constellation's SOF, Exhibit O at 87:17-96:3; Plaintiffs' Exhibit 8 at ¶¶ 21, 22, 25.

[81] See Constellation's SOF, Exhibit Y at page 1, and Curriculum Vitae, attached to Exhibit A following the Sutton Report.

[82] See Constellation's SOF, Exhibit Y at page 1 and Curriculum Vitae, attached to Exhibit A following the Sutton Report.

[83] See Constellation's SOF, Exhibit Y at page 1 and Curriculum Vitae, attached to Exhibit A following the Sutton Report.

[84] See Constellation's SOF, Exhibit Y at page 1 and Curriculum Vitae, attached to Exhibit A following the Sutton Report.

[85] See Constellation's SOF, Exhibit Y at page 1 and Curriculum Vitae, attached to Exhibit A following the Sutton Report.

1      87.    From 1993 to 2002, Dr. Sutton held an appointment at the Harbor-

2  UCLA Medical Center Movement Disorders Clinic.[86]

3      88.    In addition to treating patients at his practice, Dr. Sutton has been

4  principal investigator for over 100 clinical trials from 1992 to present.[87]

5      89.    Dr. Sutton testified that about half his practice involves clinical trials of

6  drugs related to neurological conditions, which are conducted at his office.[88]

7      90.    In connection with the clinical trials conducted at Dr. Sutton's practice,

8  the practice employs three clinical trial coordinators and a research director who also

9  acts as a coordinator.[89]

10      91.    Dr. Sutton testified that he personally reviews the informed consent form

11  page by page with the clinical trial participants, discusses the safety information and

12  answers any questions, and he also delegates all activities conducted by the clinical

13  trial coordinators and research director in accordance with ethical and legal

14  guidelines.[90]

15      92.    Dr. Sutton has studied the mechanism of action and pre-clinical safety

16  data for over fifty investigational new drugs.[91]

17      93.    Dr. Sutton has written a number of articles in the field of neurology, as

18  well as a chapter on genetics of rare and unusual movement disorders, reviewing the

19  relationship between genetics, cellular biology, and phenotype for each disorder.[92]

20

21

22

23  [86] See Constellation's SOF, Exhibit Y at page 1 and Curriculum Vitae, attached to Exhibit A following the Sutton Report.

24  [87] See Constellation's SOF, Exhibit Y at page 1 and Curriculum Vitae, attached to Exhibit A following the Sutton Report.

25  [88] See Constellation's SOF, Exhibit Z at 8:25-9:1; 10:7-11.

26  [89] See Constellation's SOF, Exhibit Z at 11:21-24.
    [90] See Constellation's SOF, Exhibit Z at 12:10-24; 13:18-14:7.

27  [91] See Constellation's SOF, Exhibit Y at page 1 and Curriculum Vitae, attached to Exhibit A following the Sutton Report.

28  [92] See Constellation's SOF, Exhibit Y at page 1 and Curriculum Vitae, attached to Exhibit A following the Sutton Report.

94.     In addition to his background and experience, Dr. Sutton's opinions are informed by his review of the depositions, medical records, documents produced in discovery, as well as thirty-four references he considered in reaching his opinions.[93]

95.     In broadest terms, Dr. Sutton opined as follows:

- Design of study:
  - Constellation's protocol failed to ensure human subject protection, as, among other things, there was no exclusion or precautionary provisions for patients with prior or active neurological or psychiatric illness (¶ 7);
  - Constellation failed to keep abreast of BET inhibitor research in a manner that would allow for immediate review and action to ensure human subject safety (¶ 9).
  - Constellation was negligent in prematurely and recklessly advancing CPI-0610 from animal studies to clinical trials (¶ 1);
  - Constellation was negligent in its choice of Michael Cooper, M.D. as Chief Medical Officer, given his "shallow" or limited knowledge of the relevant science or medicine (¶ 8).

- Informed consent:
  - Constellation had the obligation to obtain Ms. Spedale's informed consent, yet that consent was never obtained (¶ 6);
  - The informed consent failed to disclose that the study of CPI-0610 was not therapy or treatment but instead designed to study the toxicity of CPI-0610 (¶ 5).

- Causation:
  - Through the process of a differential diagnosis, Ms. Spedale suffered disabling mania and psychosis, and a severe,

---

[93] See Constellation's SOF, Exhibit Y at pages 2 and 14-15.

irreversible, and permanent brain injury, as the direct result of her exposure to a toxic dose of CPI-0610 (¶¶ 2, 3, 4, 10).[94]

96.     Dr. Sutton testified that he found the Allis Article to be significant, and he explained in great detail, in his report, testimony, and declaration, why Dr. Allis' findings should have caused Constellation to conduct additional safety testing and to include an exclusion criteria for patients with prior psychiatric or neurological evidence.[95]

97.     Dr. Sutton has provided a detailed declaration ("Sutton Declaration") responding to Dr. Sims' contention that Dr. Sutton is not properly interpreting the Allis Article.[96]  As the declaration makes clear, the relevance of the Allis Article goes well beyond the effects of a single BET bromodomain inhibitor in mice; rather, the article is evidence of longstanding concern within the scientific community, a concern present well before even August 2015, about the potential neurotoxicity of BET bromodomain inhibitors.[97]  In fact, the summary of the article states that "small molecule BET inhibitors are in clinical trials, yet almost nothing is known about BRD4 function in the brain,"[98] completely supporting the opinions that these risks had to be disclosed.  Similarly, Erica Korb, Ph.D., the first study author, explained as follows regarding the findings in an August 2015 press release: "[w]e found that if a drug blocks a BET protein throughout the body, and that drug can get into the brain, you could very well produce neurological side effects."[99] Moreover, as Dr. Sutton makes clear, the chemical structures of JQ1 (the prototype molecule for BET bromodomain inhibitor research, which was discussed in the Allis Article) and CPI-

---

[94] See Constellation's SOF, Exhibit Y at pages 5, 8-13.

[95] See Constellation's SOF, Exhibit Z at 39:4-9 and 48:1-3.

[96] See Sutton Declaration, a true and correct copy of which is attached as **Exhibit "16"**; see also Constellation's SOF, Exhibit Z at 45:16-49:13.

[97] See Plaintiffs' Exhibit 16 at ¶¶ 9-13, 94-100.

[98] See Plaintiffs' Exhibit 16 at ¶ 11.  BRD4 is a member of a bromodomain and extraterminal domain (BET) family of proteins that includes the ubiquitously expressed BRD2, BRD3, BRD4, and BRDT proteins.  See Exhibit 16 at ¶ 22.

[99] See Plaintiffs' Exhibit 16 at ¶ 43.

0610 (the bromodomain inhibitor tested in the clinical trial) are remarkably similar, and both have chemical properties that favor penetration of the blood-brain barrier.[100] As Dr. Sutton also makes clear, the article demonstrates fundamental neurological changes experienced by mice receiving the bromodomain inhibitor, which changes were far beyond "very subtle."[101]  Indeed, the behavioral effect that Dr. Sims contends was "very subtle" was in actuality a "complete loss of novel object recognition"; the cognitive correlate is the complete loss of the ability to form a new memory.[102]  Dr. Sutton averred that he found "astonishing" Dr. Sims' claim that the data and findings in the article would not have any significance to Constellation; in Dr. Sutton's view, given all of the foregoing, the data "should have had significance to Constellation," and "should have created a concern."[103]

98.    Ultimately, research that was known or should have been known to Constellation well prior to Ms. Spedale's enrollment made clear that the bromodomain inhibitor CPI-0610 could very well negatively affect the brain function or psychological state of an individual such as Ms. Spedale, or any human subject, or otherwise produce neurological side effects, and this risk associated with the drug should have been disclosed.[104]

99.    Additionally, Dr. Sutton explained that other testing should have been done because "[t]he mechanism of action of the study drug is to act as a bromodomain inhibitor, therefore, affecting the DNA transcription by acting at the lysine residue of histones, basically isolating lysine residues, and the body of knowledge readily available, published data, indicating that epigenetic mechanisms are believed or were

---

[100] See Plaintiffs' Exhibit 16 at ¶¶ 14-25.
[101] See Plaintiffs' Exhibit 16 at ¶¶ 26-57.
[102] See Plaintiffs' Exhibit 16 at ¶ 31.
[103] See Plaintiffs' Exhibit 16 at ¶¶ 101-102.
[104] See Plaintiffs' Exhibit 16 at ¶¶ 58-59.

1   and continue to be believed to be part of the disease process for different psychiatric
2   disorders, including histone methylation."[105]

3          100.    Further, as Dr. Sutton testified, that he relied on peer-reviewed articles
4   which explain that "impairment of factors related to [histone] acetylation are strongly
5   associated with psychiatric illness."[106]

6          101.    Moreover, BET inhibitors "interfere with the effect, the downstream
7   effect, of histone acetylation."[107]

8          102.    Dr. Sutton testified that the fact that the Allis Article came out after the
9   clinical package was submitted to the FDA and study commenced was not essential
10  because "if the [i]nformation was available, [Constellation] should have been aware of
11  this information [and] [t]hey would need to modify the information they submitted."[108]

12         103.    Dr. Sutton explained that patients with prior neurological problems, such
13  as Ms. Spedale's history of steroid-induced psychosis, should have been excluded
14  from consideration; specifically, he testified: "We routinely exclude patients with this
15  type of prior psychiatric illness from clinical trial of medications with potential
16  neurotoxicity. It's commonplace."[109]

17         104.    Dr. Sutton testified that, while additional testing may not have picked up
18  "everything that might have happened, … it would have basically allowed for more
19  careful protocol development.  It would have allowed for clarification in the informed
20  consent as to the possible outcomes."[110]

21         105.    The rat and dog studies done by Constellation, in Dr. Sutton's opinion,
22  were deficient in that they failed to do in-depth neurotoxicity evaluations.[111]

23         106.    Dr. Sutton provided the following testimony in support of that statement:

24  _____

25  [105] See Constellation's SOF, Exhibit Z at 42:8-15.
26  [106] See Constellation's SOF, Exhibit Z at 55:22-24.
    [107] See Constellation's SOF, Exhibit Z at 56:23-57:3.
27  [108] See Constellation's SOF, Exhibit Z at 84:5-8.
    [109] See Constellation's SOF, Exhibit Z at 48:4-13.
28  [110] See Constellation's SOF, Exhibit Z at 39:4-9.
    [111] See Constellation's SOF, Exhibit Z at 82:3-7.

> Q.      What information was available at the time they [Constellation] prepared the pre-clinical package for them to have conducted any other types of neurotoxicity studies?
>
> A.      A relatively extensive body of literature on the role of histone acetylation in psychiatric illness and the fact that their agent affected histone acetylation.[112]

107.   Dr. Sutton noted that, prior to Ms. Spedale's enrollment in the study, two patients were noted to experience confusion.[113]

108.   With regard to the informed consent form, Dr. Sutton testified that the information provided to patients, such as Ms. Spedale, was deficient as "she wasn't informed that the study was intended to cause severe harm or death to two people, and that that was required as part of the study design or that she was at a higher risk based on the group she was entering [and] she wasn't informed that the method of the study required intentionally increasing the dose of medicine until two people would have severe injury or death."[114]

109.   Dr. Sutton's opinion that Ms. Spedale suffered severe and irreversible brain injury as a direct result of exposure to a toxic dose of CPI-0610 is supported by her diagnostic testing; namely, Ms. Spedale's MRI performed in 2016 showed white matter lesions which were not present prior to the study and her EEG on October 21, 2016 was reported as abnormal, with encephalopathic slowing, which Dr. Sutton viewed as evidence of organic impairment.[115]

110.   Dr. Sutton testified that he discounted chemotherapy as the cause of Ms. Spedale's central nervous system injury based on peer-reviewed articles.[116]

111.   Dr. Sutton additionally ruled out other potential causes of Ms. Spedale's condition, such as hypertension and diabetes, and concluded that "there was no event

---

[112] See Constellation's SOF, Exhibit Z at 82:8-16.
[113] See Constellation's SOF, Exhibit Z at 39:23-24.
[114] See Constellation's SOF, Exhibit Z at 79:17-21 and 80:1-3.
[115] See Constellation's SOF, Exhibit Y at pages 7-9; see also Exhibit Z at 60:10-19 and 61:2-62:17.
[116] See Constellation's SOF, Exhibit Z at 64:1-23.

between 2011 and 2016 other than her exposure to CPI-0610 and resultant psychotic illness that would provide an alternative explanation."[117]

112.    Notably, Dr. Sutton explained that a prior episode of drug-induced mania is an indicator for future drug-induced mania "especially with an experimental medication ... where in the words of Dr. [Allis], quote, 'Almost nothing is known about BRD4 function in the brain,' end quote."[118]

113.    The Allis quote is significant to Dr. Sutton because it is not just his opinion, but the opinion of one of the founders of Constellation.[119]

114.    When asked whether it was his opinion that "the information that was available in 2015 would conclusively provide evidence that brain injury could reasonably be anticipated as a result of using the drug," Dr. Sutton responded, "My opinion is that there would be concern and that there would be the need to ... insure the safety of patients above and beyond what has been done to that woman."[120]

115.    Dr. Sutton explained that the fact that no other study participants exhibited the same symptoms as Ms. Spedale was not relevant because she was being given a much higher dose of the drug.[121]

116.    Dr. Sutton's causation opinion, that participation in the study and ingestion of the study drug caused Ms. Spedale to suffer her permanent, life-altering injuries, is based on the literature about the class of drugs Ms. Spedale ingested, her predisposition to drug-induced mania, the temporal nature of the incident (occurring while she was taking the study drug), and the elimination of any other possible causes.[122]

---

[117] See Constellation's SOF, Exhibit Y at page 9.
[118] See Constellation's SOF, Exhibit Z at 53:8-16.
[119] See Constellation's SOF, Exhibit Z at 54:12-123.
[120] See Constellation's SOF, Exhibit Z at 44:3-13.
[121] See Constellation's SOF, Exhibit Z at 44:14-21.
[122] See Constellation's SOF, Exhibit Y at 5, 8-13; see also Exhibit Z at 57:24-68:5.

### RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

1.      Admitted.  By way of a further response, the Informed Consent speaks for itself, and any mischaracterizations of same are denied.[1]

2.      Admitted.  By way of a further response, the December 10, 2015, medical record speaks for itself, and any mischaracterizations of same are denied.

3.      Admitted.  By way of a further response, the medical records speak for themselves, and any mischaracterizations of same are denied.

4.      Denied.  By way of a further response, the October 16, 2017, medical record cited by Constellation does not contain any indication that Ms. Spedale "returned to her normal self" on an unspecified date.  On the contrary, Ms. Spedale's mental condition has never recovered to her pre-clinical trial status.[2]  The document cited speaks for itself, and any further mischaracterizations of same are denied.

5.      Admitted.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.

6.      Admitted.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.

7.      Denied.  Dr. Jacobson-Kram actually opines, "Phase 1 studies designed to support the development of oncology drugs for the treatment of patients with advanced disease and limited therapeutic options are very different from those described in ICH ME (R2)."  (Emphasis added.)  He further opines, "It was recognized that a different guidance was needed to support pre-clinical safety testing for this class of drugs and guidance was published by ICH in 2009 … ."  (Emphasis added.)[3]  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.

---

[1] See Informed Consent, Constellation's SOF, Exhibit A.
[2] See Constellation's SOF, Exhibit Y at page 8; see also Plaintiffs' Exhibit 8, ¶ 22.
[3] See Constellation's SOF, Exhibit G, page 2.

8.      Denied as stated.  In actuality, ICH S9 proceeds to state, "In cases where specific concerns have been identified that could put patients at significant additional risks in clinical trial, appropriate safety pharmacology studies … should be considered."[4]  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.

9.      This statement constitutes a legal conclusion to which no response is required.  To the extent a response is required, the statement is denied for the reasons set forth in the accompanying memorandum of law, Dr. Sutton's expert report ("Sutton Report"), the Sutton Declaration, and Dr. Sutton's deposition testimony.[5]

10.     This statement is denied for the reasons set forth in the accompanying memorandum of law, the Sutton Report, the Sutton Declaration, and Dr. Sutton's deposition testimony.[6]

11.     Objection.  Dr. Sims' affidavit ("Sims Affidavit") is inadmissible on summary judgment as it fails to conform to the requirements for affidavits.  By way of a further response, denied for the reasons set forth in the Sutton Report, and the Sutton Declaration.[7]

12.     Objection.  The Sims Affidavit is inadmissible on summary judgment as it fails to conform to the requirements for affidavits.  By way of a further response, denied for the reasons set forth in the Sutton Report, and the Sutton Declaration.[8]

13.     Denied as stated.  Constellation's allegation that "the proper studies were performed and included in their pre-clinical IND package" is unsupported by the document cited, misleading in this context, and contrary to Dr. Sutton's expert

---

[4] See Constellation's SOF, Exhibit G, page 3; see also Plaintiffs' Exhibit 16 at ¶¶ 82-91 (analyzing ICH S9 and making clear it does not exculpate Constellation).

[5] See Constellation's SOF, Exhibit Y; see also Exhibit Z; accord Plaintiffs' Exhibit 16.

[6] See Constellation's SOF, Exhibit Y; see also Exhibit Z; accord Plaintiffs' Exhibit 16.

[7] See SOF Exhibit Y; see also Plaintiffs' Exhibit 16.

[8] See SOF Exhibit Y; see also Plaintiffs' Exhibit 16.

opinions.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.

14.   Admitted.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.

15.   Denied as stated.  As Dr. Cooper confirmed, one unusual aspect of the 0610-03 study was that individual sites did not conduct independent trials; instead, the various sites acted as a single trial controlled by Constellation at the hub.[9]  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.

16.   This statement constitutes a legal conclusion to which no response is required.  To the extent a response is required, the statement is denied for the reasons set forth in the accompanying memorandum of law, the Sutton Report, the Sutton Declaration, and Dr. Sutton's deposition testimony.[10]

17.   Admitted.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.

18.   This paragraph constitutes a legal conclusion to which no response is required.  To the extent a response is required, admitted in part.  By way of a further response, as set forth in the accompanying memorandum of law, the sponsor also has extensive non-delegable duties towards subjects, and the investigator is guided by the information provided in the protocol and informed consent document.

19.   This paragraph constitutes a legal conclusion to which no response is required.  To the extent a response is required, admitted.

20.   This paragraph constitutes a legal conclusion to which no response is required.  To the extent a response is required, admitted in part.  By way of a further response, as set forth in the accompanying memorandum of law, the sponsor also has

---

[9] See Plaintiffs' Exhibit 3 at 36:14-37:13.

[10] See Constellation's SOF, Exhibit Y; see also Exhibit Z; accord Plaintiffs' Exhibit 16.

extensive non-delegable duties towards subjects, and the IRB members are guided by the information provided in the protocol and informed consent document.  Here, as discussed in the accompanying memorandum, the Sutton Report, the Sutton Declaration, and Dr. Sutton's testimony, in light of the omissions within the protocol and informed consent document, the IRB was not fully informed of all the risks.

21.     Admitted in part.  By way of a further response, as set forth in the accompanying memorandum of law, the sponsor has extensive duties towards subjects, and the IRB members are guided by the information provided by the sponsor in the protocol and informed consent document.

22.     Admitted in part.  By way of a further response, as set forth in the accompanying memorandum of law, the IRB members are guided by the information provided by the sponsor in the protocol and informed consent document, and the sponsor retains legal responsibility.   Here, as discussed in the accompanying memorandum, the Sutton Report, the Sutton Declaration, and Dr. Sutton's testimony, in light of the omissions within the protocol and informed consent document, the IRB was not fully informed of all the risks.

23.     This paragraph constitutes a legal conclusion to which no response is required.  To the extent a response is required, admitted in part.  By way of a further response, as set forth in the accompanying memorandum of law, the sponsor also has extensive non-delegable duties towards subjects, and investigators are guided by the information provided in the protocol and informed consent document.   Here, as discussed in the accompanying memorandum, the Sutton Report, the Sutton Declaration, and Dr. Sutton's testimony, in light of the omissions within the protocol and informed consent document, the investigators were not fully informed of all the risks, and the consent form and information to be given to subjects was incomplete.

24.     Admitted in part.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.  In addition, the Informed Consent implies in several places that participation in the trial is treatment:

point 10 on page 17 states "there may be other ways to treat your cancer," misleadingly implying this is one way to treat a patient's cancer, and page 5 provides that "the dose you receive may not be the best dose for treating your cancer," misleadingly implying that the study drug is treating the patient's cancer.[11]

25.     Admitted.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.

26.     Admitted.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.

27.     Admitted in part.  It is denied that the cited document includes the alleged fact that Dr. Fonseca "believed it was the best treatment option for her at that time," as set forth in this paragraph.  By way of a further response, the document cited speaks for itself, and any further mischaracterizations of same are denied.

28.     Admitted.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.

29.     Admitted.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.

30.     Admitted.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.

31.     Admitted.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.

32.     Admitted.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.  Moreover, Ms. Spedale did not give her informed consent.  Charanjit Singh, the study coordinator at Mayo, testified that, in accordance with his routine and custom, he read the informed consent document to Ms. Spedale.  Thereafter, Ms. Spedale executed the informed consent

---

[11] See Constellation's SOF, Exhibit A, pages 5 and 17.

document.[12]  As discussed above and throughout, the informed consent document was materially misleading.

33.    It is admitted that, on December 1, 2015, Ms. Spedale was seen by Dr. Bergsagel.  In effect, however, Constellation was acting in a principal investigator capacity and controlling the trial.  For example, Dr. Cooper rejected Dr. Fonseca's request to reduce Ms. Spedale's dose, exercising Constellation's control over the conduct of the trial and Ms. Spedale's dose, stating, "the dose of CPI-0610 should not be reduced unless the patient has experienced a dose-limiting toxicity."[13]  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.

34.    Admitted in part.   By way of a further response, Ms. Spedale's deposition testimony is questionable, insofar as her condition may affect her memory and responses.  For this reason, her deposition was terminated early.[14]

35.    Denied.  Ms. Spedale's deposition testimony is questionable, as her condition may affect her memory and responses.  For this reason, her deposition was terminated early.   In any event, Charanjit Singh, the study coordinator at Mayo, testified that, in accordance with his routine and custom, he read the informed consent document to Ms. Spedale.  Thereafter, according to Mr. Singh, Ms. Spedale executed the informed consent document.[15]

36.    Denied as stated.   First, Ms. Spedale's deposition testimony is questionable, as her condition may affect her memory and responses.  For this reason, her deposition was terminated early.[16]  Moreover, as set forth in the accompanying memorandum of law, Constellation as the sponsor had legal duties towards Ms. Spedale that were breached.

---

[12] See Constellation's SOF, Exhibit X at 53:16-54:3.
[13] See Plaintiffs' Exhibit 9 at December 29, 2015.
[14] See Constellation's SOF, Exhibit S.
[15] See Constellation's SOF, Exhibit X at 53:16-54:3.
[16] See Constellation's SOF, Exhibit S.

37.     Admitted.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.[17]

38.     Admitted.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.[18]

39.     Admitted.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.[19]

40.     Denied as stated.  As Constellation itself admits in ¶ 41, prior to Ms. Spedale's enrollment in the trial, at least one patient presented with confusion that was determined to be related to the study drug.  Moreover, as Constellation itself admits in ¶ 39, Ms. Spedale was the final individual evaluated at the 150mg dose, suggesting that the adverse effects she suffered demonstrated a dose-limiting toxicity and injuries related to the ingestion of the study drug.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.[20]

41.     Admitted that these adverse events occurred.[21]

42.     Admitted.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.[22]

43.     Admitted.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.[23]

44.     Admitted in part.  By way of a further response, as discussed above and throughout, Mr. Singh would not have been aware of the information that Constellation omitted from the protocol.[24]

---

[17] See Constellation's SOF, Exhibit T.
[18] See Constellation's SOF, Exhibit J.
[19] See Constellation's SOF, Exhibit U.
[20] See Constellation's SOF, Exhibit N.
[21] See Constellation's SOF, Exhibit Z at 39:20-41:7.
[22] See Constellation's SOF, Exhibit W.
[23] See Constellation's SOF, Exhibit A.
[24] See Constellation's SOF, Exhibit X and Exhibit Y.

45.     This paragraph constitutes a legal conclusion to which no response is required.   To the extent a response is required, denied.   Here, as discussed in the accompanying memorandum, the Sutton Report, the Sutton Declaration, and Dr. Sutton's testimony, in light of the omissions within the protocol and informed consent document, the IRB and investigators, not to mention human subjects, were not fully informed of all the risks.[25]

46.     Admitted in part.   This is simply opinion that cannot be used to support summary judgment.   Here, as discussed in the accompanying memorandum, the Sutton Report, the Sutton Declaration, and Dr. Sutton's testimony, in light of the omissions within the protocol and informed consent document, the IRB and investigators were not fully informed of all the risks.[26]   By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.[27]

47.     Admitted in part.   By way of a further response, as set forth in the accompanying memorandum of law, the IRB members are guided by the information provided in the protocol and informed consent document, and the sponsor retains legal responsibility.   Here, as discussed in the accompanying memorandum, the Sutton Report, the Sutton Declaration, and Dr. Sutton's testimony, in light of the omissions within the protocol and informed consent document, the IRB and investigators were not fully informed of all the risks.[28]

48.     Admitted.   By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.[29]

---

[25] See, e.g., Plaintiffs' Exhibit 8, ¶¶ 2, 3; Exhibit 16; see also Constellation's SOF, Exhibits Y and Z.

[26] See, e.g., Plaintiffs' Exhibit 16; see also Constellation's SOF, Exhibits Y and Z.

[27] See Constellation's SOF, Exhibit L.

[28] See, e.g., Plaintiffs' Exhibit 16; see also Constellation's SOF, Exhibits Y and Z.

[29] See Constellation's SOF, Exhibit A.

49.    Admitted in part.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.[30]  In addition, the use of CPI-0610 is represented throughout the protocol, as well as in the Informed Consent, as treatment and therapeutic.  But this was a Phase 1 study about safety only, and no one could yet conclude that the drug provided any therapeutic benefit whatsoever.[31]  As Dr. Cooper admitted: "Certainly at the outset of a phase one study there probably is no proof to humans that it has anti-tumor activity.  So at the time that a phase one study begins, at least a human phase one of a new compound, there is no clinical evidence that the compound has antitumor activity."[32]

50.    This statement constitutes a legal conclusion to which no response is required.  To the extent a response is required, denied for the reasons set forth in the accompanying memorandum of law, the Sutton Report, and the Sutton Declaration.  Among other things, the Informed Consent misleadingly implied that the study drug would treat Ms. Spedale's cancer, and failed to note risks associated with the study drug.[33]

51.    Admitted in part.  By way of a further response, Dr. Sutton's expert report speaks for itself, and any mischaracterizations of same are denied.  It is denied that Constellation's selective citations constitute the entirety of Dr. Sutton's opinions.[34]

52.    Denied.   Constellation confusingly conflates "Constellation's IND submission to the FDA" with pre-clinical animal studies.  Dr. Sutton clarified that he has no opinion on the IND submission – an actual document presented to the FDA – and his opinion is that "[Constellation] should have conducted additional neurotoxicity

---

[30] See Constellation's SOF, Exhibit A.
[31] See Constellation's SOF, Exhibits A and AA; accord Plaintiffs' Exhibit 8, ¶ 4.
[32] See Plaintiffs' Exhibit 3 at 42:17-19.
[33] See, e.g., Plaintiffs' Exhibit 16.
[34] See Constellation's SOF, Exhibit Y; see also Exhibit Z; Plaintiffs' Exhibit 16.

pre-clinical testing."  His opinion focuses on "what they did at the company and how they moved the medication forward."[35]

53.    Admitted.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.[36]

54.    Denied as stated.   Constellation's attempt to confuse the issue by attempting to pinpoint a point in time is a red herring.   Among other things, as Dr. Sutton opines, research that was known or should have been known to Constellation well prior to Ms. Spedale's enrollment in December 2015 made clear that CPI-0610 could very well negatively affect the brain function or psychological state of an individual such as Ms. Spedale, or any human subject, or otherwise produce neurological side effects, and this risk associated with the drug should have been disclosed.[37]

55.    Denied as stated.  Dr. Sutton actually testified, on the pages and lines cited, "I am not aware one way or the other" whether there were "any regulatory guidelines that require specific types of testing for FDA approval for cancer-oncology drugs."  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.[38]

56.    Admitted in part.   By way of a further response, Constellation is selectively quoting from Dr. Sutton's testimony; further, Dr. Sutton was conveniently never asked to identify the basis for his conclusion that the testing was "very sketchy and limited."[39]  Dr. Sutton sets forth extensive details regarding this conclusion in his report and declaration.[40]

_____

[35] See Constellation's SOF, Exhibit Z at 34:18-24; see also Plaintiffs' Exhibit 16.

[36] See Constellation's SOF, Exhibit G; see also Plaintiffs' Exhibit 16.
[37] See Constellation's SOF, Exhibit Z at 34:15-35:4; see also Plaintiffs' Exhibit 16.

[38] See Constellation's SOF, Exhibit Z; see also Plaintiffs' Exhibit 16.
[39] See Constellation SOF, Exhibit Z; see also Plaintiffs' Exhibit 16.
[40] See Constellation's SOF, Exhibit Y; see also Plaintiffs' Exhibit 16.

57.   Admitted in part.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.[41]

58.   Denied as stated.   Constellation confusingly conflates its IND submission to the FDA with pre-clinical animal studies.  Dr. Sutton clarified that he has no opinion on the IND submission – that is to say, an actual document presented to the FDA – and his opinion is that "[Constellation] should have conducted additional neurotoxicity pre-clinical testing."  His opinion focuses on "what they did at the company and how they moved the medication forward."[42]

59.   This statement constitutes a legal conclusion to which no response is required.  To the extent a response is required, denied for the reasons set forth in the accompanying memorandum of law, the Sutton Report, and the Sutton Declaration.

60.   Denied.  In reality, Constellation misleadingly omits the fact that the preceding sentence of Dr. Sutton's report states: "Constellation Pharmaceuticals drafted the ICF document and provided it to the PI and site."  As such, the "PI and site" were guided by the incomplete and inaccurate information selectively provided by Constellation.[43]

61.   Admitted.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.  Further, Ms. Spedale's deposition testimony is questionable, as her condition may affect her memory and responses.  For this reason, her deposition was terminated early.[44]

62.   Objection.  The Sims Affidavit is inadmissible on summary judgment as it fails to conform to the requirements for affidavits.  To the extent a response is required, denied for the reasons set forth in the Sutton Declaration.  Moreover, as Dr. Sutton makes clear, Erica Korb, Ph.D., the first study author, explained as follows

---

[41] See Constellation's SOF, Exhibit Z.

[42] See Constellation's SOF, Exhibit Z at 34:18-24; see also Plaintiffs' Exhibit 16.

[43] See Constellation's SOF, Exhibit Y, page 11 point 6(a); see also Exhibit 19.

[44] See Constellation's SOF, Exhibit S; see also Plaintiffs' Exhibit 16.

1  regarding the findings: "[w]e found that if a drug blocks a BET protein throughout the

2  body, and that drug can get into the brain, you could very well produce neurological

3  side effects."[45] It should be noted that Constellation's self-serving affidavit from Dr.

4  Sims was provided for the first time in connection with the instant motion for

5  summary judgment.[46]

6      63.   Objection.  The Sims Affidavit is inadmissible on summary judgment as

7  it fails to conform to the requirements for affidavits.  To the extent a response is

8  required, denied, for the reasons set forth in the Sutton Report, and the Sutton

9  Declaration.[47]

10     64.   Objection.  The Sims Affidavit is inadmissible on summary judgment as

11 it fails to conform to the requirements for affidavits.  To the extent a response is

12 required, denied, for the reasons set forth in the Sutton Report, and the Sutton

13 Declaration.[48]

14     65.   It is admitted that this individual has attempted to so opine.   The

15 Plaintiffs, however, deny the accuracy of this statement, for the reasons set forth in the

16 Sutton Report, and the Sutton Declaration.[49]

17     66.   Denied, for the reasons set forth in the Sutton Report, and the Sutton

18 Declaration.[50]

19     67.   This statement constitutes a legal conclusion to which no response is

20 required.   To the extent a response is required, please see the accompanying

21 memorandum of law and the Sutton Report.  By way of a further response, Dr. Sutton

---

23  [45] See  https://neurosciencenews.com/bet-inhibitors-memory-loss-2494/  (last visited December 5, 2018); see also Plaintiffs' Exhibit 16.

24  [46] Def's Motion, Exhibit G at paragraph 7.  Plaintiffs had noticed Dr. Sims' FRCP 30(b)(6) deposition on June 27, 2018; due to delays and Dr. Sims' supposed unavailability, the deposition was never scheduled. The week before filing the instant motion, the Plaintiffs were informed that Dr. Sims would be available in December.

[47] See Constellation's SOF, Exhibit H.
[48] See Constellation's SOF, Exhibit H.
[49] See Constellation's SOF, Exhibit H.
[50] See Constellation's SOF, Exhibit H.

has opined that the Protocol is flawed based on inadequate pre-clinical testing which is not disclosed by Constellation to its principal investigators, and based upon inadequate disclosure of risks.[51]

68.    Admitted.  By way of a further response, the document cited speaks for itself, and any mischaracterizations of same are denied.[52]

69.    Denied.  By way of a further response, see Ms. Spedale's medical records, specifically the record dated September 18, 2009.[53]

70.    Denied as unsupported by (and in fact contrary to) the summary judgment record and the document cited.   By way of a further response, Constellation's suggestion that Ms. Spedale's condition was caused by Prednisone as opposed to CPI-0610 is unsupported by the summary judgment record and denied.

Dated: <u>Tuesday, December 18, 2018</u>          Respectfully submitted,

SHERMAN, SILVERSTEIN, KOHL,
ROSE & PODOLSKY, P.A.

By:     /s/ Alan C. Milstein
        Alan C. Milstein
        308 Harper Drive, Suite 200
        Moorestown, NJ 08057
        Telephone: 856-662-0700
        Facsimile: 856-488-4744
        *Attorneys for the Plaintiffs*

---

[51] <u>See</u> Constellation's SOF, Exhibit Y; <u>see also</u> Plaintiffs' Exhibit 16.
[52] <u>See</u> Constellation's SOF, Exhibit W.
[53] <u>See</u> Constellation's SOF, Exhibit W; <u>see also</u> Plaintiffs' Exhibit 1 at September 18, 2009.

-35-

1

## CERTIFICATE OF SERVICE

I, Alan C. Milstein, hereby certify that, on Tuesday, December 18, 2018, I served a copy of the within document upon the following counsel of record via this Court's electronic case filing system:

Arthur J. Liederman, Esquire (*Pro Hac Vice*)
Nicole M. Battisti, Esquire (*Pro Hac Vice*)
MORRISON MAHONEY LLP
120 Broadway, Suite 1010
New York, NY 10271

Jeffrey S. Hunter, Esquire
RENAUD, COOK, DRURY, MESAROS, P.A.
One North Central, Suite 900
Phoenix, AZ 85004-4117

*Attorneys for Defendant*
*Constellation Pharmaceuticals, Inc.*

By:    /s/ Alan C. Milstein