Alan C. Milstein
SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.
A Professional Corporation
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662-0700
Facsimile: 856-488-4744
E-Mail: amilstein@shermansilverstein.com

*Attorneys for Plaintiffs Iris Spedale and Daniel Spedale, husband and wife*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Iris Spedale and Daniel Spedale, husband and wife, <br><br> Plaintiffs, <br><br> v. <br><br> Constellation Pharmaceuticals, Inc., <br><br> Defendant. | Docket No. CV-17-00109-PHX-JJT <br><br> **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE OPINIONS OF PLAINTIFFS' EXPERT JAMES P. SUTTON, M.D.** |

# INTRODUCTION

Plaintiffs Iris Spedale and Daniel Spedale (collectively "Plaintiffs"), by and through the undersigned counsel, respectfully submit this memorandum of law in opposition to the "Motion to Exclude Opinions of Plaintiffs' Expert James P. Sutton, M.D." ("Motion") filed on behalf of Defendant Constellation Pharmaceuticals, Inc. ("Constellation" or "Defendant").

In its Motion, Defendant Constellation baselessly seeks to exclude the testimony of Dr. Sutton, who has decades of experience in neurology and clinical trials, under Federal Rule 702 and <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993). Constellation's memorandum often, and without much warning, switches between arguments as to Dr. Sutton's qualifications to give opinions under Rule 702, and arguments as to the reliability of Dr. Sutton's opinions under <u>Daubert</u>. Constellation's principal argument, however, appears to be that Dr. Sutton is not qualified to render an opinion in this case, because it involves a cancer drug. In actuality, this case is about whether Constellation's drug caused neurological damage, and whether Constellation knew or should have known that someone, who is not that sick relatively, with a history of drug-induced mania, should be in a Phase 1 trial of its drug. Dr. Sutton is a Board-certified neurologist with extensive experience in the clinical trials arena, and is plainly qualified to give his opinions in this case.

Constellation also contends that certain of Dr. Sutton's opinions are not reliable. In reality, Dr. Sutton relies extensively on scientific and medical literature, his significant clinical and clinical trials experience, medical records, and discovery materials, all of which is well in line with <u>Daubert</u>, as applied by the Ninth Circuit. The central focus of Constellation's arguments in this regard is its repeated attempts to disavow an article co-written by C. David Allis, Ph.D., one of its co-founders ("Allis Article"), regarding research and findings suggesting that the original version of BET inhibitors causes molecular changes in mouse neurons, and can lead to memory loss in mice that receive it. Dr. Sutton has provided a declaration refuting these arguments.

-1-

At bottom, Constellation's Motion essentially seeks a ruling on the weight and persuasiveness of Dr. Sutton's testimony, which is solely an issue for the jury. The Motion should be denied.[1]

**STATEMENT OF RELEVANT FACTUAL BACKGROUND**

In an effort to avoid a duplicative recitation of the underlying facts, the Plaintiffs rely upon their accompanying "Statement of Additional Facts," and memorandum of law in opposition to Constellation's motion for summary judgment.

Dr. Sutton is an eminently qualified neurologist. In 1980, he received his B.S. in Life Sciences and Chemical Engineering from MIT. In 1984, he received his M.D. from UMass Medical School. Subsequently, he completed Neurology residencies at NYU Medical School and Harbor-UCLA Medical Center, and a Fellowship in Movement Disorders and Neuropharmacology at Rush-Presbyterian Medical School. Dr. Sutton became Board-certified in neurology in 1991. His current clinical practice consists of treating patients with complex neuropsychiatric issues. Moreover, he has served as principal investigator for well over 100 clinical trials, and has reviewed an equal number of clinical protocols and investigator brochures. He has also reviewed thousands of SUSAR (Suspected Unexpected Serious Adverse Reaction) safety reports. He has studied the mechanism of action, and pre-clinical safety data, for well over fifty investigational new drugs, including independent reviews of the literature. He is also a published author. Through his education, training, experience, review of the medical literature, and other professional activities, he is familiar with the scientific, medical, ethical, regulatory, and legal foundations for the conduct of human subject medical research.[2]

---

[1] The twelve-point font used within Constellation's memorandum violates the requirements of Local Rule 17.1(b)(1), and the memorandum should be stricken.

[2] See July 6, 2018, expert report and curriculum vitae of James P. Sutton, M.D., a true and correct copy of which is collectively attached as **Exhibit "1,"** page 1; see also Deposition of Dr. Sutton, a true and correct copy of which is attached as **Exhibit "2,"** 6:9-11:20.

In the course of reaching his opinions, Dr. Sutton reviewed and relied upon, among other things, thirty-four scientific and medical articles, including the Allis Article, which articles are listed in his report; depositions and exhibits to depositions; numerous documents produced during discovery; Ms. Spedale's medical records, including neurological evaluations, spanning from 2001 to 2017; multiple versions of the protocols and other documents related to Constellation's clinical trial of the bromodomain inhibitor CPI-0610; guidelines, regulations, and laws pertaining to the protection of human subjects; and records of teleconferences related to the study and Ms. Spedale's participation.[3]

Dr. Sutton's opinions can be summarized as follows:

- Design of study:
  - Prior to Ms. Spedale's enrollment in the trial, the Allis Article was published. The introduction cautions that "small molecule BET inhibitors are in clinical trials, yet almost nothing is known about Brd4 function in the brain." Constellation's protocol failed to ensure human subject protection, as, among other things, there was no disclosure of the risks of BET inhibitors in this regard, or exclusion or precautionary provisions for patients with prior or active neurological or psychiatric illness (¶¶ 7, 9);
  - Constellation failed to keep abreast of BET inhibitor research in a manner that would allow for immediate review and action (¶ 9);
  - Constellation was negligent in prematurely and recklessly advancing CPI-0610 from animal studies to clinical trials (¶ 1);
  - Constellation was negligent in its choice of Michael Cooper, M.D. as Chief Medical Officer, given his limitations (¶ 8).

---

[3] See Plaintiffs' Exhibit 1, pages 1-2; see also Plaintiffs' Exhibit 2 (discussing review throughout).

-3-

- Informed consent:
  - Constellation had the obligation to obtain Ms. Spedale's informed consent, yet that consent was never obtained (¶ 6);
  - The informed consent failed to disclose that the study of CPI-0610 was not therapy or treatment but instead designed to study the toxicity of CPI-0610 (¶ 5).
- Causation:
  - Based on the literature about the class of drugs Ms. Spedale ingested, her predisposition to drug-induced mania, the temporal nature of the incident (occurring while she was taking the study drug), and the elimination of any other possible cause, Dr. Sutton concluded that Ms. Spedale suffered disabling mania and psychosis, and a severe, irreversible, and permanent brain injury, as the direct result of her exposure to a toxic dose of CPI-0610 (¶¶ 2, 3, 4, 10).[4]

At his deposition, Dr. Sutton testified that it would have been implausible and in fact unimaginable that Constellation would not have been aware of the Allis Article, and the research that came before it.[5] Dr. Sutton testified why at least one step that Constellation should have taken in response to such information would have been to include an exclusion criteria for patients, such as Ms. Spedale, who had previously suffered steroid-induced psychosis, and had a predisposition to psychosis from an exogenous agent.[6] Dr. Sutton further testified as to how the informed consent was insufficient.[7] Dr. Sutton also testified that participation in the trial and Constellation's drug caused the harm to Ms. Spedale.[8]

---

[4] See Plaintiffs' Exhibit 1 at pages 8-13.
[5] See Plaintiffs' Exhibit 2 at 45:16-49:13.
[6] See Plaintiffs' Exhibit 2 at 47:21-48:13.
[7] See Plaintiffs' Exhibit 2 at 68:6-88:20.
[8] See Plaintiffs' Exhibit 2 at 57:24-68:5.

Dr. Sutton has provided a declaration refuting Dr. Sims' inaccurate contentions on a point-by-point basis.[9] As the declaration makes clear, the relevance of the Allis Article goes well beyond the effects of a single BET bromodomain inhibitor in mice; rather, the article is evidence of longstanding concern within the scientific community, a concern present well before even August 2015, about the potential neurotoxicity of BET bromodomain inhibitors.[10] In fact, the summary of the article states that "small molecule BET inhibitors are in clinical trials, yet almost nothing is known about BRD4 function in the brain,"[11] completely supporting the opinions that these risks had to be disclosed. Similarly, Erica Korb, Ph.D., the first study author, explained as follows regarding the findings in an August 2015 press release: "[w]e found that if a drug blocks a BET protein throughout the body, and that drug can get into the brain, you could very well produce neurological side effects."[12] Moreover, as Dr. Sutton makes clear, the chemical structures of JQ1 (the prototype molecule for BET bromodomain inhibitor research, which was discussed in the Allis Article) and CPI-0610 (the bromodomain inhibitor tested in the clinical trial) are remarkably similar, and both have chemical properties that favor penetration of the blood-brain barrier.[13] As Dr. Sutton also makes clear, the article demonstrates fundamental neurological changes experienced by mice receiving the bromodomain inhibitor, which changes were far beyond "very subtle."[14] Indeed, the behavioral effect that Dr. Sims contends was "very subtle" was in actuality a "complete loss of novel object recognition"; the cognitive correlate is the complete loss of the ability to form a new memory.[15]

---

[9] See Declaration of James P. Sutton, a true and correct copy of which is attached as **Exhibit "3,"** ¶ 3.
[10] See Exhibit 3 at ¶¶ 9-13, 94-100.
[11] See Exhibit 3 at ¶ 11. BRD4 is a member of a bromodomain and extraterminal domain (BET) family of proteins that includes the ubiquitously expressed BRD2, BRD3, BRD4, and BRDT proteins. See Exhibit 3 at ¶ 22.
[12] See Plaintiffs' Exhibit 3 at ¶ 43.
[13] See Exhibit 3 at ¶¶ 14-25.
[14] See Exhibit 3 at ¶¶ 26-57.
[15] See Exhibit 3 at ¶ 31.

Ultimately, research that was known or should have been known to Constellation well prior to Ms. Spedale's enrollment made clear that the bromodomain inhibitor CPI-0610 could very well negatively affect the brain function or psychological state of an individual such as Ms. Spedale, or any human subject, or otherwise produce neurological side effects, and this risk associated with the drug should have been disclosed.[16]  Dr. Sutton averred that he found "astonishing" Dr. Sims' claim that the data and findings in the article would not have any significance to Constellation; in Dr. Sutton's view, given all of the foregoing, the data "should have had significance to Constellation," and "should have created a concern."[17]

## LEGAL ARGUMENT

### 1. Legal Standard

Rule 702 provides that expert testimony is admissible if the witness is sufficiently qualified by knowledge, skill, experience, training, or education, and:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[18]

In Daubert and Kumho Tire, the Supreme Court held that, regardless of an expert's area of expertise, Rule 702 requires the district court to fulfill a "gatekeeping" function,[19] which extends to determine the issues of "qualification, reliability and fit."[20]  Case law addressing the qualifications requirement makes clear that the standard is an extremely flexible one, and challenges to qualifications under Rule 702

---

[16] See Plaintiffs' Exhibit 3 at ¶¶ 58-59.
[17] See Plaintiffs' Exhibit 3 at ¶¶ 101-102.
[18] See Fed. R. Evid. 702; see also Wendell v. GlaxoSmithKline LLC, 858 F.3d 1227, 1232 (9th Cir. 2017).
[19] See Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993); accord Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).
[20] See Schneider v. Fried, 320 F.3d 396, 401 (3d Cir. 2003).

-6-

almost always go to the weight to be given to the expert's testimony.[21]  With regard to reliability, proposed expert testimony "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'"[22]  This entails a preliminary assessment of whether "the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue."[23]  Ultimately, Daubert and Kumho Tire require the trial court to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[24]

The Supreme Court has recognized that, in medical causation cases, the distinction between the methodology employed and the conclusion reached by an expert may not be entirely clear.[25]  However, "a challenge to 'fit' is very close to a challenge to the expert's ultimate conclusion about the particular case, and yet it is part of the judge's admissibility calculus under Daubert."[26]  The Ninth Circuit's recent rulings emphasize Daubert's admonition that a trial court's analysis should be applied "with a 'liberal thrust' favoring admission."[27]  Moreover, it has emphasized that the purpose of the gatekeeping function is to "screen the jury from unreliable nonsense opinions, but not to exclude opinions merely because they are impeachable."[28]

---

[21] See, e.g., Corzo v. Maricopa County Community College District, No. CV-15-02552-PHX-ESW, 2018 WL 4931695, at *1 (D. Ariz. Oct. 11, 2018); Hangarter v. Provident Life and Accident Ins. Co., 373 F.3d 998, 1015 (9th Cir. 2004).
[22] See id. (quoting Daubert, 509 U.S. at 590); accord Keller v. Feasterville Family Health Care Ctr., 557 F. Supp. 2d 671, 675 (E.D.Pa. 2008).
[23] See Daubert, 509 U.S. at 592-93.
[24] See Kumho Tire, 526 U.S at 152.
[25] See General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997).
[26] See In re Paoli, 35 F.3d 717, 746 (3d Cir. 1994).
[27] See Messick v. Novartis Pharm. Corp., 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting Daubert, 509 U.S. at 588); accord Wendell v. GlaxoSmithKline LLC, 858 F.3d 1227, 1232 (9th Cir. 2017).
[28] See Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc., 738 F.3d 960, 969 (9th Cir. 2013).

**2.     Analysis**

**a.     Dr. Sutton is Qualified to Render His Opinions in this Case**

According to Constellation, in order to give opinions in this case, Dr. Sutton should be an IRB member, and/or have "expertise in clinical trial studies, BET inhibitors, oncology drugs and the guidelines and requirements in dealing with the FDA submission process." Constellation argues that Dr. Sutton does not meet any of these qualifications, and contends that "[t]here is no standard, credible, relevant and accepted research or relevant expertise that Dr. Sutton can rely upon that will aid the jury in determining whether" Constellation's conduct of the study was proper.

Constellation's position lacks merit. Ms. Spedale suffered neurological injuries as a result of the study drug and, contrary to Constellation's argument, the fact that the injuries were caused by a BET inhibitor drug which Constellation hoped would treat cancer does not somehow negate Dr. Sutton's extensive knowledge, training, experience in neurology, and the clinical trials arena.

Constellation cites to Cloud v. Pfizer in attempt to support its argument.[29] Cloud, however, primarily involves analysis on the issue of reliability, not qualifications.

Moreover, Constellation's argument fails on its own terms, as Dr. Sutton certainly has extensive relevant clinical trial experience. Dr. Sutton has reviewed over a hundred "clinical trial protocols and investigator brochures, as well as SUSAR safety reports numbering in the thousands."[30] In addition, Dr. Sutton has "studied the mechanism of action and preclinical safety data for well over fifty investigational new drugs … ."[31] Dr. Sutton testified that about half his practice involves clinical trials of drugs related to neurological conditions and with neurological effects.[32] Dr. Sutton has over twenty-five years of experience with clinical trials, having been involved in

---

[29] See Cloud v. Pfizer, 198 F. Supp. 2d 1118 (D. Ariz. 2001).
[30] See Plaintiffs' Exhibit 1 at pages 1-2.
[31] See Plaintiffs' Exhibit 1.
[32] See Plaintiffs' Exhibit 2 at 8:25-9:1, 10:7-11.

over 150 clinical trials, and having served as principal investigator for over 100 trials.[33] In connection with the clinical trials conducted at Dr. Sutton's practice, the practice employs three clinical trial coordinators and a research director who also acts as a coordinator.[34] Dr. Sutton testified that he personally reviews the informed consent form page by page with the clinical trial participants, discusses the safety information and answers any questions, and he also delegates all activities conducted by the clinical trial coordinators and research director in accordance with ethical and legal guidelines.[35] Constellation makes much of the fact that Dr. Sutton's clinical trial experience is limited to Phase 2 and 3 trials. This is a distinction without difference in the context of the claims asserted in this case, as the informed consent process and requirements are the same regardless of the trial's particular phase.[36] He is more than qualified by knowledge, training, and experience in medicine/clinical trials to understand the literature, study the records, analyze the case, and give opinions.

        **b.**    **Dr. Sutton's Opinions Regarding the Clinical Trial are Admissible Under <u>Daubert</u>**

Contrary to Constellation's contention, in reaching his opinions, Dr. Sutton properly relied upon on his experience, as well as his review of numerous documents including Ms. Spedale's medical records, documents produced by Constellation in discovery, multiple versions of the clinical trial protocol, clinical trial guidelines, regulations and laws, and scientific literature.

Dr. Sutton's opinions are based upon his review of the literature, knowledge and training in medicine, and knowledge and training in the clinical trials arena. The Ninth Circuit has held that an expert's reliance on his own extensive clinical experience, coupled with his examination of the Plaintiffs' records, treatment, and

---

[33] See Plaintiffs' Exhibit 2 at 9:3-7; 77:14-15; see also Plaintiffs' Exhibit 1.
[34] See Plaintiffs' Exhibit 2 at 11:21-24.
[35] See Plaintiffs' Exhibit 2 at 12:10-24; 13:18-14:7.
[36] See Plaintiffs' Exhibit 2 at 17:11-25.

history, was sufficient.[37]  In Messick v. Novartis Pharm. Corp., the Ninth Circuit reversed the District Court's exclusion of an expert's specific causation opinion for failure to explain its scientific basis holding that the expert's reliance on his own extensive clinical experience and his examination of the Plaintiffs' records, treatment and history were sufficient.[38] The Ninth Circuit acknowledged that "[m]edicine partakes of art as well as science, and there is nothing wrong with a doctor relying on extensive clinical experience when making a differential diagnosis."[39]  Here, Dr. Sutton has been practicing for thirty years and has been involved in more than 150 clinical trials.

Not surprisingly, Constellation cites to cases which predate Messick to support exclusion.  Cloud is distinguishable because the court found an expert's testimony to be unreliable because the expert could not identify a scientific study supporting his conclusion that an antidepressant manufactured by Pfizer causes suicide, despite the fact that the plaintiff conceded that the expert's proposition is scientifically testable.[40] Even more problematic was the fact that the court reviewed the materials relied on by the expert and did not find that the expert's opinion was supported by the material; in fact, the court found that the expert's "reliance upon medical articles which he disavowed as providing evidence of general causation particularly disturbing and, in truth, the antithesis of a scientific method."[41]  Constellation's reliance on Grant is similarly unavailing as the passage cited in Constellation's brief refers to Dr. Pierre Blais, an expert whose opinion regarding systemic injury caused by silicone breast implants has been excluded by many other courts.[42]  The court in Grant gave weight to

---

[37] See Messick v. Novartis Pharm. Corp., 747 F.3d 1193, 1198 (9th Cir. 2014).
[38] See id. at 1198.
[39] See id. (emphasis added).
[40] See Cloud, 198 F. Supp. 2d at 1135.
[41] See id.
[42] See Grant v. Bristol-Myers Squibb, 97 F. Supp. 2d 986, 991 (D. Ariz. 2000); see also Cabrera v. Cordis Corp., 134 F.3d 1418, 1423 (9th Cir. 1998); Alfred v.

the decisions of the other courts and, without specific analysis, determined that Dr. Blais' proposed testimony regarding defects related to silicone gel filled breast implants were beyond his qualifications as a chemist and unsupported by testing.[43]

Still worse for Constellation, it relies almost exclusively on misleading fragments from Dr. Sutton's deposition testimony. Dr. Sutton's expert report, which Constellation attaches to its Motion, consists of fifteen pages, including two pages listing thirty-four scientific and medical references he considered in reaching his opinions. However, Constellation only refers to Dr. Sutton's report three times in its Motion: a citation referencing background information regarding Dr. Sutton's clinical practice; a citation to one element of Dr. Sutton's lack of informed consent opinion; and a citation to the report as a whole at the tail end of the Motion in a baseless last-ditch attempt to argue that his opinions are irrelevant, without citing to any legal authority, and the fact that Dr. Sutton has never spoken to Dr. Cooper or the other scientists who worked on the clinical trial (which, of course, makes little sense).

In effort to discredit Dr. Sutton, Constellation misrepresents Dr. Sutton's deposition testimony, contending Dr. Sutton testified that he has no knowledge of the federal regulations that govern pre-clinical phases of cancer study drugs. In reality, Dr. Sutton's testimony was far different: when asked whether he was aware of federal regulations governing pre-clinical phases of case study drugs, he answered: "I don't have a photographic memory, knowledge of them but I am aware of them, and I reviewed them in connection with the work that I have done to review for this case."[44] Constellation also takes liberties in representing that Dr. Sutton has no direct knowledge of ICH S9, the guideline governing pre-clinical trials. Dr. Sutton actually testified that he obtained a copy of the guidelines on the Internet, and reviewed them

---

Mentor Corp., 479 F. Supp. 2d 670 (W.D. Ky. 2007); Cottengim v. Mentor Corp., No. CIV A 05-161-DLB, 2007 WL 4553995 (E.D. Ky. Sept. 24, 2007).
 [43] See id.
 [44] See Plaintiffs' Exhibit 2 at 28:15-20.

before writing his report.[45]  Dr. Sutton further explained that ICH S9 is "the one that talks about guidelines for safety testing, the basic guidelines, and then it contains a reference to what additional testing should be done."[46]  In fact, Dr. Sutton referenced both the federal regulations and ICH S9 in his report under the documents and items reviewed section, included under the bullet point "documents regarding current and past guidelines, regulations and laws pertaining to the protection of human subjects."[47]  In his declaration, Dr. Sutton discusses ICH S9 extensively, and makes clear that it in no way exculpates Constellation.[48]  Ultimately, in reaching his opinions, Dr. Sutton permissibly cites to industry practice, based upon his extensive experience of and knowledge of the composition of informed consents.  In addition, contrary to Constellation's argument, the fact that Dr. Sutton did not review any other BET inhibitor IND submissions does not impact the reliability of his opinion, as he explained that he did not view such information as relevant in the context of Constellation's conduct and Ms. Spedale's experience in this particular trial.[49]

Contrary to Constellation's suggestion, an expert's opinion is not required to be based on his or her own research; rather courts have held that an expert may "explain precisely how [he] went about reaching [his] conclusions and point to some objective source ... to show that [he has] followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in [his] field."[50]  Here, Dr. Sutton identified numerous sources, including the Allis Article, in support of his opinions.

Recognizing this, Constellation attempts to distance itself from Dr. Allis, who "was a founder of Constellation over a decade ago [but] has not been with

---

[45] See Plaintiffs' Exhibit 2 at 29:11-12; 29:18-20.
[46] See Plaintiffs' Exhibit 2 at 29:14-17.
[47] See Plaintiffs' Exhibit 1 at page 2.
[48] See Plaintiffs' Exhibit 3 at ¶¶ 82-91.
[49] See Plaintiffs' Exhibit 2 at 33:2-3.
[50] See Cabrera v. Cordis Corp., 134 F.3d 1418, 1423 (9th Cir. 1998).

Constellation for a number of years."[51]  Constellation goes as far to say that the Allis Article, which was published after the trial began, but before Ms. Spedale enrolled, "does not establish the reliable medical knowledge" which Dr. Sutton can rely on.[52] Constellation's self-serving affidavit of its senior vice president of research, Robert Sims, Ph.D., purports "to clarify the findings of the Article."[53]  Dr. Sutton testified that he found the Allis Article to be significant, and he explained that Dr. Allis' findings should have caused Constellation to conduct additional safety testing and to include an exclusion criteria for patients with prior psychiatric or neurological evidence.[54]  Dr. Sutton has provided a detailed declaration responding in detail to Dr. Sims' unsupported contention that Dr. Sutton is not properly interpreting the Allis Article.[55] Dr. Sutton has opined that research that was known or should have been known to Constellation well prior to Ms. Spedale's enrollment in the trial in December 2015 made clear that the study drug, CPI-0610, could very well negatively affect the brain function or psychological state of an individual such as Ms. Spedale, or any human subject, or otherwise produce neurological side effects, and this risk should have been disclosed.[56]

Additionally, Dr. Sutton explained that other testing should have been done because "[t]he mechanism of action of the study drug is to act as a bromodomain inhibitor, therefore, affecting the DNA transcription by acting at the lysine residue of histones, basically isolating lysine residues, and the body of knowledge readily available, published data, indicating that epigenetic mechanisms are believed or were

---

[51] See Def's Motion at page 9.
[52] See Def's Motion, page 11.
[53] See Def's Motion, Exhibit G at ¶ 7.  Sims' Affidavit was provided for the first time in connection with this Motion.  Plaintiffs had noticed Dr. Sims' FRCP 30(b)(6) deposition on June 27, 2018, due to delays the deposition was never scheduled. The week before filing the instant Motion, Plaintiffs were informed that Dr. Sims would be available in early December.
[54] See Plaintiffs' Exhibit 2 at 39:4-9 and 48:1-3.
[55] See generally Plaintiffs' Exhibit 3.
[56] See generally Plaintiffs' Exhibit 1.

and continue to be believed to be part of the disease process for different psychiatric disorders, including histone methylation."[57] Further, as Dr. Sutton testified, that he relied on peer-reviewed articles which explain that "impairment of factors related to [histone] acetylation are strongly associated with psychiatric illness."[58]

Dr. Sutton testified that the fact that the Allis Article came out after the clinical package was submitted to the FDA and study commenced was not essential because "if the [i]nformation was available, [Constellation] should have been aware of this information [and] [t]hey would need to modify the information they submitted."[59] Dr. Sutton explained that patients with prior neurological problems, such as Ms. Spedale's history of steroid-induced psychosis, should have been excluded from consideration; specifically, he testified: "We routinely exclude patients with this type of prior psychiatric illness from clinical trial of medications with potential neurotoxicity. It's commonplace."[60] Dr. Sutton testified that, while additional testing may not have picked up "everything that might have happened, … it would have basically allowed for more careful protocol development. It would have allowed for clarification in the informed consent as to the possible outcomes."[61]

### c. Dr. Sutton's Opinions Regarding the Informed Consent Document are Admissible Under Daubert

Under Daubert, the finding that the expert's methodology is appropriate should be the end of the inquiry; it is not the function of the court to decide whether the expert's conclusion is accurate. As long as there is a "fit" between the method and the question on which the expert is testifying, the testimony should be admissible. Doubts about the expert's ultimate conclusions "will almost always be resolved by a fact

---

[57] See Plaintiffs' Exhibit 2 at 42:8-15.
[58] See Plaintiffs' Exhibit 2 at 55:22-24.
[59] See Plaintiffs' Exhibit 2 at 84:5-8.
[60] See Plaintiffs' Exhibit 2 at 48:4-13.
[61] See Plaintiffs' Exhibit 2 at 39:4-9.

finder exposed to '[v]igorous cross-examination ... and careful instruction on the burden of proof.'"[62]

Constellation argues that Dr. Sutton has not presented sufficient data or a reliable scientific methodology to support his position because his opinions are not based on his own research or work he has personally performed in the field of BET inhibitors or cellular research.  As set forth above, contrary to Constellation's argument, Dr. Sutton's reliance on his own extensive clinical practice and the literature in reaching his opinions is in accord with Ninth Circuit authority.[63]

Primiano v. Cook involved a product liability claim alleging that polyethylene components of an artificial elbow failed prematurely.  The Ninth Circuit reversed the District Court's exclusion of an expert based on the lack of a publication supporting his opinion.  The Court found notable the expert's explanation that the phenomenon at issue in the case was "so extraordinary that the specialists who publish articles do not see it in their practices."[64]  As such, Court concluded that the expert's background and experience, coupled with his explanation of his opinion, required the admissibility of his testimony at trial.[65]  Here, as in Primiano, Dr. Sutton could locate no published data that studied the effects of CPI-0610, an experimental drug, on the brain,[66] and as such Constellation's suggestion that Dr. Sutton's opinion should be excluded for this reason is baseless.

Lastly, the cases cited by Constellation in support of the argument that Dr. Sutton's opinions are personal opinion are distinguishable.  Claar v. Burlington Northern R. Co., which was decided shortly after Daubert, involved injuries related to the plaintiffs' exposure to chemicals while working at a railroad facility, and the

---

[62] See Polaino v. Bayer Corp., 122 F. Supp. 2d 63, 66-67 (D. Mass. 2000) (quoting Daubert at 596).
[63] See, e.g., Messick, 747 F.3d at 1198.
[64] See Primiano v. Cook, 598 F.3d 558, 567 (9th Cir. 2010).
[65] See id.
[66] See Plaintiffs' Exhibit 2 at 84:19-25.

exclusion of experts who "admitted that they were not sufficiently familiar with the field to diagnose the cause of plaintiffs' injuries without first reviewing [relevant] literature."[67]  In contrast, Dr. Sutton did review relevant literature, and is also sufficiently familiar with the medical context of this case, having an extensive background and knowledge in the field of neurology and clinical trials. Constellation's reliance on In re Bard IVC Filters Products Liability Litigation is likewise misplaced as, unlike the expert in that case, Dr. Sutton has not stated, nor do his extensive explanations indicate, that his opinions are solely based on his personal views.[68]

### d. Dr. Sutton's Remaining Opinions are Admissible Under Daubert

Constellation's final argument that Dr. Sutton's opinions regarding causation and Constellation's negligence are irrelevant is without merit.  Specifically, without reference to any legal authority or facts in the record, Constellation argues opinions (4), (8), and (9) in Dr. Sutton's report should be excluded.  Constellation outrageously contends that the foregoing opinions are irrelevant because Dr. Sutton has never spoken with anyone at Constellation, including Dr. Cooper or the scientists who worked on the clinical trial, or inquired about what information they had in 2014 or 2015.[69] This argument fails. It is unclear in what context Constellation would expect that Dr. Sutton could have occasion to speak with anyone at Constellation regarding any inquiries.  While Dr. Sutton has never spoken to Dr. Cooper, he did review Dr. Cooper's deposition transcript in which he provided testimony regarding his role at

---

[67] See Claar v. Burlington Northern R. Co., 29 F.3d 499, 502 (9th Cir. 1994).
[68] See In re Bard IVC Filters Products Liability Litigation, 2018 WL 495187 at *3 (D. Ariz. Jan. 22, 2018) (excluding an expert's opinion regarding injuries related to vascular filters where he "admitted that it was fair to describe his opinions as 'based on what [he] believe[s] a responsible, ethical and moral device manufacturer' would have done.") (citation omitted).
[69] See Def's Motion at page 17.

Constellation and with the clinical trial[70] as well as the article written by Dr. Allis, one of the founders of Constellation.[71]

## CONCLUSION

For the foregoing reasons, Constellation's Motion should be denied in its entirety.

Dated: Tuesday, December 18, 2018      Respectfully submitted,

SHERMAN, SILVERSTEIN, KOHL,
ROSE & PODOLSKY, P.A.

By:   /s/ Alan C. Milstein
Alan C. Milstein
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662-0700
Facsimile: 856-488-4744
E-Mail: amilstein@shermansilverstein.com
*Attorneys for the Plaintiffs*

---

[70] See Plaintiffs' Exhibit 1, pages 8-13.

[71] Finally, in its summary judgment motion, Constellation further attacks Dr. Sutton's opinion that Ms. Spedale suffered severe neurological damage as a result of her exposure to the drug it was testing for safety. Dr. Sutton issued his opinion based on the literature about the class of drugs Ms. Spedale ingested, her predisposition to drug-induced mania, the temporal nature of the incident (occurring while she was taking the study drug), and the elimination of any other possible causes. When Ms. Spedale experienced this reaction to the drug, its internal correspondence as well as it communications with the FDA described Ms. Spedale's reaction as "a serious adverse event" which was "possibly related" to the study drug because the reaction occurred while she was taking the drug, and because she had a prior incidence of drug-induced mania. SOAF, ¶¶ 74-75. Moreover, neither anyone from Constellation nor any of its experts has ever offered any other plausible cause of her psychotic episode. SOAF, ¶¶ 76-77.

**CERTIFICATE OF SERVICE**

I, Alan C. Milstein, hereby certify that, on Tuesday, December 18, 2018, I served a copy of the within document upon the following counsel of record via this Court's electronic case filing system:

Arthur J. Liederman, Esquire (*Pro Hac Vice*)
Nicole M. Battisti, Esquire (*Pro Hac Vice*)
MORRISON MAHONEY LLP
120 Broadway, Suite 1010
New York, NY 10271

Jeffrey S. Hunter, Esquire
RENAUD, COOK, DRURY, MESAROS, P.A.
One North Central, Suite 900
Phoenix, AZ 85004-4117

*Attorneys for Defendant
Constellation Pharmaceuticals, Inc.*

By:   /s/ Alan C. Milstein