# *EXHIBIT 3*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Iris Spedale and Daniel Spedale, husband and wife, | Docket No. CV-17-00109-PHX-JJT |
| Plaintiffs, | |
| v. | |
| Constellation Pharmaceuticals, Inc., | |
| Defendant. | |

## <u>DECLARATION OF JAMES P. SUTTON, M.D.</u>

I, James P. Sutton, M.D., hereby say, state, and aver as follows:

1.     I have reviewed the Affidavit of Robert Sims, Ph.D. submitted by Constellation Pharmaceuticals, Inc. ("Constellation") in connection with the above-referenced matter.

2.     I have submitted an expert report in connection with this matter.

3.     I submit this declaration in order to address Constellation's inaccurate contentions regarding my expert opinions in this matter, and my reference to the article entitled, "BET Protein BRD4 activates transcription in neurons and BET Inhibitor Jq1 Blocks Memory in Mice." <u>Nat. Neurosci. 2015</u>; 18(10):1464073 (Aug. 24, 2015) ("Article").

4.     Dr. Sims provides no basis for the statement that his affidavit was necessary to correct "factually inaccurate statements made about the findings in the Article."

5.     In ¶ 5 of Dr. Sims' affidavit, he states: "I am familiar with the article titled, "BET protein Brd4 activates transcriptions in neurons and BET inhibitor JQ1 blocks memory in mice," ('Article') published in Nature Neuroscience in August 2015, which was co-authored by Dr. C David Allis."

6.     "Co-authored" is factually correct but belies Dr. Allis' role; in actuality Dr. Allis was the senior author.

-1-

7.      In ¶ 6 of Dr. Sims' affidavit, he states: "I have spoken with counsel for Constellation Pharmaceuticals, Inc. regarding the above captioned matter and have been made aware that plaintiffs' expert neurologist, Dr. James P. Sutton, M.D., has opined that the Article had proven that BET inhibitors could cause brain injury in mammals."

8.      In actuality, I only stated that the informed consent form did not include language to this effect.  I stated this as a fact.  I did not "opine" that "the Article had proven that BET inhibitors could cause brain injury in mammals."  Rather, research that was known or should have been known to Constellation, well prior to Ms. Spedale's enrollment in December 2015, made clear that CPI-0610 could very well negatively affect the brain function or psychological state of an individual such as Ms. Spedale, or any human subject, or otherwise produce neurological side effects, and this risk associated with the drug should have been disclosed.

9.      In ¶ 8 of Dr. Sims' affidavit, he states: "The purpose of this article and testing was to evaluate potential effects of a chromatin regulator, BRD4, on gene expression and any downstream biological responses in a neuronal setting in neuronal cells and animal behavioral experiments."

10.      The authors of the Article ("Authors") do not state a "purpose" as such; in actuality the word "purpose" does not appear anywhere in the Article. Dr. Sims is providing his interpretation or analysis, that is to say an opinion, stated as though it were fact. By his use of the wording "*the* purpose" [emphasis added], one might assume that his statement is a complete, accurate, and unbiased representation of the Authors' intent. It is none of these, however. Rather than argue the point, I offer the Authors' own words as rebuttal. From the third paragraph of the introduction:

> Brd4 is well-positioned to regulate transcription in neurons in response to neuronal activation.  Acetyl marks are critical to brain function and are linked to memory formation and multiple neurological disorders.  Brd4 activity is regulated by casein kinase 2 (CK2), which is activated in response to neuronal stimulation.  In addition, a full understanding of if

-2-

and how Brd4 functions in the brain is of particular importance now as multiple BET protein inhibitors are currently in clinical trials.

11.    And, from the summary section of the Article:

Small molecule BET inhibitors are in clinical trials, yet almost nothing is known about Brd4 function in the brain.

12.    By omission, Dr. Sims belies the fact that the Authors found "particular importance" in studying Brd4 function in the brain because "multiple BET protein inhibitors are currently in clinical trials" and "almost nothing is known about Brd4 function in the brain."

13.    Additional insight into purpose can be found in a Rockefeller University press release dated August 24, 2015[i], containing the following passage:

Allis, Korb, and their colleagues decided to test BET inhibitors in the brain.  BET proteins help regulate the process of transcribing genes into proteins, a key step in cell division. Since neurons divide less frequently than other cell types, scientists hadn't given much consideration to the role of BET proteins in the brain, says Korb.

14.    In ¶ 10 of his affidavit, Dr. Sims states: "Based on my expertise in pharmacology and experience with BET inhibitors generally, it cannot be assumed that two chemically distinct BET bromodomain inhibitors have the same pharmacokinetic properties, blood brain barrier penetration, and pharmacologic effects without direct and comparative experimental determination."

15.    As phrased, this is true; it is exceedingly unlikely that JQ1 and CPI-0610 have *any* properties that are "the same." However, this is largely irrelevant. Since Jay Bradner's seminal 2010 publication in "Nature," and the decision to openly share JQ1 with other scientists in the field, JQ1 has become the prototype molecule for BET bromodomain inhibitor research. It is implausible that any credible scientist studying a novel BET bromodomain inhibitor would discount or ignore findings from a groundbreaking study performed with JQ1, simply because his or her molecule did not

-3-

have the "same pharmacokinetic properties, blood brain barrier penetration, and pharmacologic effects" as JQ1.

16.     That JQ1 and CPI-0610 would have different pharmacokinetic properties is unsurprising. JQ1 is not being used in human clinical trials because of its unfavorable pharmacokinetics (it has a short half-life of about an hour); CPI-0610 was developed to have good bioavailability and exposure. This means better delivery of CPI-0610 to tumor cells. It is hard to see how this would translate into a more favorable toxicity profile, however, that is not relevant. The issue at hand is not predictability but plausibility. If JQ1 and CPI-0610 do not have the same pharmacokinetic properties, does that affect the plausibility that they can have the same off-target effects on neuronal transcription? The answer, simply, is "no."

17.     With regard to the question of blood brain barrier penetration (BBBP), it is true that one cannot assume that because one BET inhibitor has excellent penetration, such as JQ1, another will also. In fact, BBBP is less dependent on a drug's mechanism of action or class than its chemical structure and physical properties. Small molecular size and lipid solubility, two properties shared by JQ1 and CPI-0610, favor BBBP. Nevertheless, even a small difference in chemical structure, such as the presence of a quaternary amine, can mean the difference between excellent CNS penetration and no penetration at all. In addition, some molecules one would not think capable of entering the CNS can do so by active transport. Others one would predict to have excellent BBBP are subject to efflux transporters such as P-glycoprotein (Pgp).

18.     The only way to know a drug's BBBP for certain, then, is to actually measure this. If this very simple assay is not performed, however, one must rely on the data that is available.

19.     So, do JQ1 and CPI-0610 have the "same … blood brain barrier penetration?" Most likely not. Is this relevant? No. Does CPI-0610 have clinically significant blood brain barrier penetration? Unknown, however CPI-0610 has a

-4-

chemical structure very similar to JQ1, is lipophilic, and is small in molecular weight, all factors favoring blood brain barrier penetration.

20.     Most importantly however, JQ1 and CPI-0610 are, by the simple fact of both being BET bromodomain inhibitors, more alike pharmacologically than not.

21.     The chemical structures of JQ1 and CPI-0610 are remarkably similar:

JQ1                                    CPI-0610



22.     JQ1 and CPI-0610 both act by binding to the acetylated lysine recognition motifs on the bromodomain of bromodomain and extra-terminal (BET) domain proteins (BRD2, BRD3, BRD4 and BRDT).

23.     JQ1 and CPI-0610 both act by preventing the interaction between BET proteins and acetylated histone peptides, disrupting chromatin remodeling and gene expression.

24.     Constellation's use of a biotinylated JQ1 derivative to assay CPI-0610 inhibition of members of the BET family (BRD2/3/4/T; BD1 or BD2) attests to functionally relevant similarities in ligand-protein binding.[ii]

25.     JQ1 and CPI-0610 are both highly selective, with no significant binding to bromodomains outside the BET family:

**Structure-based phylogeny of human bromodomains and their inhibitors[iii]**



26.     In ¶ 11 of his affidavit, Dr. Sims states: "After significant testing had been done in mice with the JQ1 inhibitor, it was determined that there was a change in the gene transcription in the neurons that exhibited a very specific behavioral effect on long-term memory formation as indicated on one test, novel object recognition. This effect that was identified was very subtle and was immediately reversible upon discontinuation of the BET inhibitor."

27.     This paragraph contains factual inaccuracies that need to be addressed. In actuality, three behavioral tests were performed; an open field test, a novel object-recognition task, and a fear-conditioning paradigm.

28.     There were no abnormalities seen in the open field test. From the Article:

> Jq1 did not affect distance travelled or zone preference indicating Jq1 does not cause problems with mobility or anxiety.

29.     To understand the results of the novel object-recognition task, one needs to understand the methodology. From the Article:

-6-

We next used a novel object-recognition task in which mice were briefly exposed to 2 identical objects and later presented with one familiar and one novel object. If mice remember the previous objects they will subsequently spend more time with a novel object4. All groups behaved similarly during habituation and the initial exposure although mice receiving Jq1 for 3 weeks explored less during testing.

*Strikingly,* [emphasis added] while control mice preferred the novel object as expected, Jq1-treated mice showed *no preference* [emphasis added] (Fig. 7c).  However, when mice were tested immediately after the initial exposure, control and Jq1 treated mice performed equally well (Supplementary Fig. 7h–j) suggesting that Jq1 does not disrupt learning or short-term memory but instead affects long-term memory. To control for possible health issues resulting from long-term treatments, we injected mice with a single dose of Jq1 or DMSO either 6 hours before or within 30 minutes after their initial exposure to objects and tested the following day.  We found a *complete loss of preference* [emphasis added] in mice that received a single dose after training compared to control mice (Fig. 7d).  This suggests that Jq1 given during the process of memory consolidation can block long-term memory formation.  The smaller effect observed after a dose given before training may be due to a smaller amount of Jq1 remaining in the brain during the consolidation process several hours later.

-7-



30. The Article presents the results of the novel object-recognition task graphically in Figure 7c:

**Figure 7**



**Figure 7c**



2079932.1

31.     Thus, the behavioral effect Dr. Sims contends was "very subtle" was **complete** loss of novel object recognition. The cognitive correlate is **complete** loss of the ability to form a new memory. This is why the second half of the Article title states "… BET inhibitor Jq1 **blocks** memory in mice [emphasis added.]"

32.     Nowhere in the Article do the Authors state or provide data that would support Dr. Sims' contention that this effect was "immediately reversible upon discontinuation of the BET inhibitor."

33.     In ¶ 12 of his affidavit, Dr. Sims states: "There were no major changes in short-term memory, movement, learning ability or anxiety …"

34.     The Article does state that the open field test indicated no "problems with mobility or anxiety."

35.     Regarding "short-term memory" and "learning ability," the Article does state that "Jq1 does not disrupt learning or short-term memory … "  The full context of this statement is essential to understand what this does and does not mean, however. The relevant text is cited above, in ¶ 29 of this declaration.

36.     In addition, one needs to know that the terms learning, short-term memory ("STM") and long-term memory ("LTM"), as used in the Article, have precise and specific scientific definitions and meanings that differ from common usage. They are used in and can be thought of as sequential and interrelated processes that constitute integral stages of memory formation and storage.

37.     The connection between these processes (learning, STM, LTM) and neuronal function at a cellular and molecular level are complex and remain incompletely understood. The Authors' finding that a BET inhibitor blocked memory was an important discovery, one that provided important new insight into the science of memory. Equally important, however, was the discovery that JQ1 **only** blocked LTM and not learning or STM. The importance lies in the role of gene transcription in memory, knowledge regarding the gene transcription-dependent phase of long-term

-9-

potentiation (LTP3), and how this might all fit together. Put another way, finding out that a BET inhibitor could block memory was like finding a "missing piece" of a puzzle. Seeing that this was the due to a specific effect on LTM was like seeing where the puzzle piece goes.

38.     Thus, the Authors' statement that "…Jq1 does not disrupt learning or short-term memory but instead affects long-term memory" should not be interpreted as an endorsement of JQ1's benevolence. It is simply a statement that helps an educated reader to follow the logic behind the research, the significance of the results, and the basis for the Authors' conclusions.

39.     In ¶ 12 of his affidavit, Dr. Sims states that "… the neurological and psychological characteristics of the mice were considered to be normal and unaffected by the BET inhibitor."

40.     I find this statement baffling. Nowhere in the Article do the Authors state, suggest or provide data that would support the contention that "the neurological … characteristics of the mice were considered to be normal and unaffected by the BET inhibitor." In fact, the only reasonable conclusion to be drawn from the Article is the exact opposite.

41.     First, it is important to recognize that memory is a fundamental "neurological … characteristic."  Memory was not "considered to be normal and unaffected by the BET inhibitor."

42.     As the Article observed, "BET inhibitor Jq1 blocks memory in mice"; "The loss of Brd4 function affects critical synaptic proteins, which results in memory deficits in mice ... "; "Loss of Brd4 function affects critical synaptic proteins and the BET inhibitor Jq1 results in memory deficits … "; "… Jq1 does not disrupt learning or short-term memory but instead affects long-term memory"; "… Jq1 given during the process of memory consolidation can block long-term memory formation."; "… Jq1 disrupts the transcriptional responses that are critical to neuronal function"; "… Jq1 inhibition of Brd4 and its family members blocked novel object preference,

-10-

indicating impairments in memory consolidation"; "… BET protein inhibition affects memory consolidation."; and "… BET protein inhibitors have been proposed as a treatment for several types of cancer and are currently in clinical trials. Initial mouse studies reported that Jq1 was well tolerated, and we did not find obvious deficits in the health or mobility of mice.  However, our study provides new evidence that use of such inhibitors causes memory deficits in mice and thus may also cause neurological problems in patients receiving these drugs."

43.     Moreover, as set forth in the August 24, 2015 press release: "Promising class of new cancer drugs causes memory loss in mice."

> "We found that if a drug blocks a BET protein throughout the body, and that drug can get into the brain, you could very well produce neurological side effects,' says Korb."; "To test how the drug affected mice's memories, researchers placed the animals in a box with two objects they've never seen before, such as pieces of Lego or tiny figurines.  Mice typically explore anything unfamiliar, climbing and sniffing around it.  After a few minutes, the researchers took the mice out of the box.  One day later, they put them back in, this time with one of the objects from the day before and another, unfamiliar one.  Mice that received the placebo drug were much more interested in the new object, presumably because the one from the day before was familiar.  But mice treated with Jq1 were equally interested in both objects, suggesting they didn't remember the previous day's experience."

44.     Equally baffling is the other part of Dr. Sims's contention in ¶ 12 of his affidavit, that the "… psychological characteristics" of the mice were normal.

45.     First, the use of the term "psychological" instead of "behavioral" when describing animal experiments is odd, to say the least. The distinction is not pedantic, as the field of behavioral neuroscience demands clarity and precision.  Nowhere in the Article does the word "psychological" appear, and, given the academic stature of the Authors, I would not expect it to.

46.     Regardless, nowhere in the Article do the Authors state, suggest or provide data that would support the contention that the "… psychological

-11-

1    characteristics of the mice were considered to be normal and unaffected by the BET

2    inhibitor."

3         47.    In actuality, the only statement regarding behavior relevant to human

4    psychology in the Article is as follows: "In an open field test Jq1 did not affect

5    distance travelled or zone preference indicating Jq1 does not cause problems with

6    mobility or anxiety."

7         48.    The Authors did, however perform a series of fear-conditioning

8    experiments that Dr.  Sims does not mention in his affidavit. In the Authors' own

9    words:

10              We also tested a fear-conditioning paradigm of 3 tones paired
                with shocks to determine the extent of the memory deficits
11              (Fig. 7e).  All mice learned both cued conditioning and the
                context-dependent conditioning (Supplementary Fig. 7k, l)
12              demonstrating that Jq1 did not affect this simple behavior
                dependent on the amygdala.  However, mice given Jq1 for 3
13              weeks froze more in a new context suggesting they were less
                able to distinguish between the training context and a new
14              context.  This indicates that the more difficult hippocampal-
                dependent test of context discrimination may also require
15              BET protein function (Fig. 7f).  Together, these data provide
                in vivo support of our cell-based data demonstrating that Jq1
16              disrupts the transcriptional responses that are critical to
                neuronal function.
17

18

19        49.    In a typical fear conditioning experiment, a mouse is placed in a small

20   box or cage (the context). A tone (the cue) is played and an electric shock is delivered.

21   This is repeated, perhaps two more times. A fearful mouse exhibits voluntary

22   immobility or "freezing," and this behavior is measurable. The mouse quickly learns

23   to fear the tone, even after the first tone and shock. The response increases after each

24   additional shock. The learned behavior is called "cued fear." Additionally, the mouse

25   will have learned to fear the box it was first placed in, and this is also measurable.

26   This is called "contextual fear." If the mouse is placed in a new (or seemingly new)

27   box, however, and the original tone is played, there will still be a cued fear response,

28

-12-

however the response will be attenuated. This attenuation is the result of a third type of learned behavior called "context discrimination."

50. In the Article, JQ1 did not affect cued or contextual fear, however significantly blocked context discrimination. Once again, as shown below (Figure 7f), the effect was not subtle:

Figure 7f



51. Fear conditioning is an animal model for a variety of disorders in humans (e.g., anxiety, phobias, post-traumatic stress disorder, panic disorder, schizophrenia). In addition, cued fear and contextual fear are thought to be mediated by the amygdala, a brain structure that is activated in mania.[iv] Context discrimination, on the other hand, is believed to be mediated by interactions between the hippocampus and amygdala.

52. Though the Article does not explicitly discuss the implications of this as it might pertain to human psychological illness, the mice exposed to JQ1 were significantly more fearful than control mice in the context discrimination portion of the fear conditioning experiment. Once again, the only reasonable conclusion to be drawn from the Article is the exact opposite of Dr. Sims'.

53. In ¶ 13 of his affidavit, Dr. Sims states: "There were no findings that the mice suffered brain cell death or change in the brain's neuronal structure."

-13-

54.     First, this implies that the researchers had looked but did not see brain cell death or change in the mice brains' neuronal structure. There was no neuropathological examination.

55.     This also implies that I meant neuropathological "brain injury," in my expert report, when it should have been clear that I did not.  The term "injury" is used in many different ways and is defined by the Oxford English Dictionary as: "The fact of being injured; harm or damage."  The origin is "Late Middle English: from Anglo-Norman French injurie, from Latin injuria 'a wrong', from in- (expressing negation) + jus, jur- 'right'."

56.     In ¶ 14 of his affidavit, Dr. Sims states: "Therefore, any statement that the Article suggests BET inhibitors could cause brain injury in mammals is factually inaccurate."

57.     As set forth in detail above, this conclusion is derived from false facts and assumptions.  Among other things, as set forth in Rockefeller's August 24, 2015, press release,

> Many patients with hard-to-treat cancers have already received these experimental drugs. The Rockefeller scientists say their findings suggests more research is needed to determine whether the therapies can enter the brain, since that could potentially cause some unwanted side effects. "We found that if a drug blocks a BET protein throughout the body, and that drug can get into the brain, you could very well produce neurological side effects," says Korb.

58.     In ¶ 15 of his affidavit, Dr. Sims states: "No findings derived from this Article would suggest that Constellation's BET inhibitor, CPI-0610, would negatively affect an individual's brain function or psychological state."

59.     In actuality, I did not say that CPI-0610 "would" negatively affect an individual's brain function or psychological state.  Rather, as stated above, the research that was known or should have been known to Constellation well prior to Ms. Spedale's enrollment in the subject clinical trial in December 2015 made clear that CPI-0610 could very well negatively affect the brain function or psychological

-14-

state of an individual such as Ms. Spedale, or any human subject, or otherwise produce neurological side effects, and this risk associated with the drug should have been disclosed.

60.     In ¶ 16 of his affidavit, Dr. Sims states: "I can confirm that based on my personal involvement with the preclinical studies for CPI-0610, the brain and central nervous system was tested during 6 independent general toxicology studies and no findings of neurological or psychological issues were found."

61.     This statement is factually inaccurate. In the study entitled "14 Day Study of CPl-0610 by Oral Gavage in Rats with a 14 Day Recovery Period." there are numerous examples of behaviors suggestive of possible neurotoxicity. The following passages, in particular, contain examples:

> At 60 mg/kg/day, due to severe adverse clinical signs, 1 toxicokinetic female was euthanized on Day 9 and another was found dead on Day 11. The adverse clinical signs, including early moribundity of females, related to the administration of CPl-06I0 included decreased fecal output, reduced fecal size, *hunched posture*, dehydration, prominent backbone, thin body condition, *decreased activity, decreased muscle tone, weakness, eyes partially closed*, and cold to the touch, stained/wet/erected/oily/ungroomed fur and *hypersensitivity*. [emphasis added]

> Partially unresolved findings included clinical observations of suspected dehydration (males and females), and *hypersensitivity to touch*, thin body condition and/or red stained fur were still present in some female animals. [emphasis added]

> The primary drug-related findings were body weight losses, decreased food consumption, and an array of clinical observations including dehydration, thin body condition and *weakness/decreased activity*." [emphasis added]

> Clinical observations related to the administration of CPl-0610 at 60 mg/kg/day beginning as of Day 6, included decreased fecal output, reduced fecal size, *hunched posture*, suspected dehydration, prominent backbone, thin body condition, stained/wet/erected/oily/ungroomed fur and *hypersensitivity to touch*. Additional clinical observation

-15-

noted in toxicokinetic animals dosed at 60 mg/kg/day (listed in Appendix 4) included *eyes partially closed, decreased activity, decreased muscle tone, weakness* and cold to the touch. [emphasis added]

CPl-0610-related clinical signs observed during the dosing period in males given 60 mg/kg/day were no longer seen during the recovery period, with the exception of suspected dehydration. In some females, suspected dehydration, *hypersensitivity*, thin body condition and red stained fur were still present at the end of the recovery period. [emphasis added]

62.     There are additional examples in the study entitled "A 14 day repeated oral dose toxicity and toxicokinetics study in beagle dogs".

63.     The study was straightforward; eight male or female beagle dogs received 0, 3, 10 or 30 mg/kg/day of CPI-0610for 14 days. The work was conducted by WuXi AppTec in Suzhou, China. In the report, it states that "This study was exploratory in nature and was not conducted in compliance with international good laboratory practice regulations."

64.     The dogs that received 0 mg/kg/day or 3 mg/kg/day of CPI-0610 showed no clinical signs of toxicity.

65.     The dogs that received 10 mg/kg/day showed slight tremors by day 8 or 11, decreased activity by day 11, and abnormal gait by day 11 or 12. The abnormal gait was characterized at times as affecting a hindlimb, and on day 13, the male was stated to have a "lame" left hindlimb.  Both dogs were euthanized on day 13 due to "test article-related toxicity."

66.     The female beagle receiving 30 mg/kg/day had tremor, hunched posture, and severe "inappetence" by day 6. The male beagle receiving 30 mg/kg/day had tremor beginning on day 4 and by day 6 also had decreased activity and severe "inappetence." Both dogs were euthanized on day 6 due to "test article-related toxicity."

-16-

67.    The test article-related toxicities leading to euthanasia consisted of body weight decrease, tremor, decreased activity, and tan/red/brown stool.

68.    Though tremor and decreased activity would be expected in animals severely ill or dying from other causes, there would need to be a clearly defined event to exclude CNS toxicity. Body weight decrease and tan/red/brown stool hint at possible GI toxicity but it is not clear if this was sufficient to account for the tremor on the last day of life.

69.    Additionally, in the 10 mg/kg group, tremor and gait abnormalities emerged days before the animals were ill enough to be euthanized.

70.    Histopathology was performed on "representative samples" of various organs, including the brain. Tissue samples were processed and embedded in paraffin, sectioned, stained with hematoxylin and eosin (H&E), and examined by light microscopy. There is no description of what constituted "representative samples" of the brain, no mention as to whether stains other than H&E were used, no reference to immunohistochemistry or electron microscopy. It is not mentioned as to whether the pathologist who reviewed the brain slides had specific training or qualification in veterinary neuropathology. It states that the brain examinations for animals in groups 1 and 4 were normal. No specific details are provided. As group 1 animals received placebo, in actuality only 2 of the 6 brains from animals receiving study drug were evaluated.

71.    The original protocol stated that "a bioanalysis report will be generated and attached to the Final Report as an appendix." This was changed to "No bioanalysis report will be drafted for this study" and the reason stated to be "since it is a non-GLP study."

72.    It thus appears that despite test animals having unexplained tremor and gait abnormalities, Constellation was satisfied with examination of "representative samples" of the brain, from only two of six animals receiving study drug, evaluated

-17-

only with H&E staining, and performed by a veterinary pathologist with unknown qualifications in veterinary neuropathology.

73.     In ¶ 17 of his affidavit, Dr. Sims states: "As of this date, I am aware of no FDA regulation or guideline that requires specific neurotoxicity testing for BET inhibitors due to concern of the inhibitor causing neurological and/or psychological issues."

74.     I did not say in my expert report, nor do I contend, that there is an "FDA regulation or guideline that requires specific neurotoxicity testing for BET inhibitors due to concern of the inhibitor causing neurological and/or psychological issues."

75.     I actuality, I stated that "Constellation Pharmaceuticals failed to adequately test for potential neurotoxicity in violation of basic guidelines for preclinical safety testing of an investigational new drug." To clear up any misconceptions, by violation I mean "non-observance" and by "basic guidelines" I am referring to "Guidance for Industry, S7A Safety Pharmacology, Studies for Human Pharmaceuticals[v]" ("ICH S7A").

76.     ICH S7A provides suggestions on a preclinical "Safety Pharmacology Core Battery" and states the following:

> The purpose of the safety pharmacology core battery is to investigate the effects of the test substance on vital functions. In this regard, the cardiovascular, respiratory, and central nervous systems are usually considered the vital organ systems that should be studied in the core battery. *In some instances, based on scientific rationale, the core battery should be supplemented* [emphasis added] (see section H (2.8)) or need not be implemented (see also section I (2.9)). *The exclusion of certain tests or explorations of certain organs, systems or functions should be scientifically justified.* [emphasis added]

> Central Nervous System.

> Effects of the test substance on the central nervous system should be assessed appropriately. *Motor activity, behavioral changes, coordination, sensory/motor reflex responses and body temperature should be evaluated. For example, a*

-18-

> *functional observation battery (FOB), modified Irwin's, or other appropriate test can be used.* [emphasis added]

77.     The following passages, also in ICH S7A, provide additional guidance on when it would be advisable to perform supplemental central nervous system (CNS) safety studies, and which ones to consider:

> Follow-up and Supplemental Safety Pharmacology Studies.
>
> *Adverse effects may be suspected based on the pharmacological properties or chemical class of the test substance.* [emphasis added] Additionally, *concerns may arise* [emphasis added] from the safety pharmacology core battery, clinical trials, pharmacovigilance, experimental in vitro or in vivo studies, or *from literature reports.* [emphasis added] *When such potential adverse effects raise concern for human safety, these should be explored in follow-up or supplemental safety pharmacology studies,* [emphasis added] as appropriate.
>
> Follow-up Studies for Safety Pharmacology Core Battery.
>
> Follow-up studies are meant to provide a greater depth of understanding than, or additional knowledge to, that provided by the core battery on vital functions. The following subsections provide lists of studies to further evaluate these organ systems for potential adverse pharmacodynamic effects.
>
> Central Nervous System.
>
> Behavioral pharmacology, learning and memory, ligand-specific binding, neurochemistry, visual, auditory, and/or electrophysiology examinations.

78.     When reviewing the preclinical safety data, I found no evidence that "Safety Pharmacology Core Battery" CNS assessments were considered or performed. I found no evidence that the exclusion of these tests was discussed, let alone "scientifically justified."

79.     At various timepoints, the potential for CNS adverse effects should have been "suspected based on the pharmacological properties or chemical class of the test

substance." There was a scientific justification for concern well before the Allis Article was published, for reasons discussed in detail below (¶ 94 - ¶ 100 of this declaration, inclusive).

80.    In addition, however, ICH S7A states that "concerns may arise … from literature reports" and provides a list of "studies to further evaluate these organ systems for potential adverse pharmacodynamic effects."

81.    Nowhere in the preclinical safety data could I find that CNS Supplemental Safety Pharmacology Studies were considered or performed. I was not able to find any documentation that the possible need for additional preclinical studies was discussed after publication of the Allis Article.

82.    In 2010, a new guidance was issued, "Guidance for Industry, S9 Nonclinical Evaluation for Anticancer Pharmaceuticals[vi]" ("ICH S9"). From ICH S9:

> This guidance provides information for pharmaceuticals that are intended to treat cancer in patients with serious and life threatening malignancies. For the purpose of this guidance, this patient population is referred to as *patients with advanced cancer.* The guidance applies to both small molecule and biotechnology-derived pharmaceuticals (biopharmaceuticals), regardless of the route of administration. This guidance describes the type and timing of nonclinical studies in relation to the development of anticancer pharmaceuticals in patients with advanced cancer and references other guidance as appropriate. It describes the *minimal considerations* [emphasis added] for initial clinical trials in patients with advanced cancer whose disease is refractory or resistant to available therapy, or where current therapy is not considered to be providing benefit.
>
> The guidance also describes further nonclinical data to be collected during continued clinical development in patients with advanced cancer. When an anticancer pharmaceutical is further investigated in cancer patient populations with long expected survival (e.g., those administered pharmaceuticals on a chronic basis to reduce the risk of recurrence of cancer), the recommendations for and timing of additional nonclinical studies depend upon the available nonclinical and clinical data and the nature of the toxicities observed.

83.     Unlike ICH S7A, which had specific guidance for CNS testing in preclinical safety testing, ICH S9 applied a lesser standard and stated this in general terms. The core guidance applicable to the CNS can be paraphrased as follows:

> An assessment of the pharmaceutical's effect on … central nervous systems … should be available before the initiation of clinical studies; such parameters could be included in general toxicology studies.
>
> Detailed clinical observations following dosing … are generally considered sufficient.

84.     This is a minimal standard, however, and though not specific to the CNS, ICH S9 clearly states that at times, additional testing should be considered:

> In cases where specific concerns have been identified that could put patients at significant additional risks in clinical trials, appropriate safety pharmacology studies described in ICH S7A and/or S7B should be considered.

85.     Thus, although ICH S9 makes clear that the detailed guidance in ICH S7A may be more than necessary for "pharmaceuticals that are intended to treat cancer in patients with serious and life threatening malignancies," nothing restricts or precludes a pharmaceutical company from referring to ICH S7A, using ideas or advice from ICH S7A, or even completely following, to the letter, the guidance offered in ICH S7A. In fact, as can be seen above, the FDA specifically advises that when appropriate, "safety pharmacology studies described in ICH S7A and/or S7B should be considered.".

86.     It is important to note that ICH S9 resulted in confusion and misunderstanding, sufficient for the FDA to find it necessary to issue "S9 Nonclinical Evaluation for Anticancer Pharmaceuticals, Questions and Answers, Guidance for Industry[vii]" in June of 2018. The Guidance states:

> Since the ICH guidance S9 Nonclinical Evaluation for Anticancer Pharmaceuticals was finalized (ICH S9 or ICH S9 guidance), all parties using the guidance have experienced

-21-

some challenges with implementation of the recommendations on nonclinical evaluation for anticancer pharmaceuticals.

87.     One of the challenges alluded to was uncertainty as to if and when an IND approved using the guidance of ICH S9 could be used for "an unapproved oncology indication that is not immediately life-threatening but is serious." The 2010 ICH S9 originally stated that:

> The guidance also describes further nonclinical data to be collected during continued clinical development in patients with advanced cancer. When an anticancer pharmaceutical is further investigated in cancer patient populations with long expected survival (e.g., those administered pharmaceuticals on a chronic basis to reduce the risk of recurrence of cancer), the recommendations for and timing of additional nonclinical studies depend upon the available nonclinical and clinical data and the nature of the toxicities observed.

88.     The 2018 ICH S9 Q&A addressed this thusly:

> When moving therapeutic development from an approved indication in oncology or from an unapproved indication with a sufficient nonclinical and clinical safety dataset, to an unapproved oncology indication that is not immediately life-threatening but is serious, additional general toxicology studies, e.g., chronic studies (6- or 9-month-studies) are generally not warranted.

89.     The meaning of "sufficient" here is left open to interpretation. At the time the 0610-03 study commenced, there was in fact preliminary safety data on CPI-0610, obtained in the course of study 0610-01. The numbers were small, however, and it is unclear how and if this was determined to be a "sufficient … clinical safety dataset." Also, importantly, the ICH S9 Q&A document was not published until long after the 0610-03 study concluded.

90.     Though relevant to this case, however, this is a fine point. The undeniable fact is that ICH S9 was intended for "pharmaceuticals that are intended to treat cancer in patients with serious and life threatening malignancies" and "initial clinical trials in patients with advanced cancer whose disease is refractory or resistant

-22-

to available therapy, or where current therapy is not considered to be providing benefit." Neither of these conditions applied to Ms. Spedale, who was all but asymptomatic at the time of study enrollment, had access to multiple efficacious FDA approved medications, and who had expressed a desire to try at least one of these.

91.    Finally, ICH S7A, ICH S9, and ICH S9 Q&A all contain a similar disclaimer, worded thusly in ICH S9: "This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public." ICH S7A, ICH S9, and ICH S9 Q&A are neither legally binding nor legally exculpatory.

92.    In ¶ 18 of his affidavit, Dr. Sims states: "During the time that the research underlying the Article was being conducted and through the publication, I have had contact with Dr. Allis.  However, he never mentioned the findings of the research with respect to the work we were undertaking at Constellation, nor would I expect him to do so."

93.    The phrase "He never mentioned the findings of the research with respect to the work we were undertaking at Constellation," raises the question of whether or not Dr. Allis mentioned anything about his research, such as the plan, concerns about potential CNS effects, and so on. Dr. Sims does not mention what kind of contact he had with Dr. Allis, and how frequently he had such contact. It is also unclear if anyone else at Rockefeller University spoke with Dr. Sims about any phase of the research project.

94.    Whether or not there was specific communication, and whether or not Dr. Sims knew of the research or the Article, the Article is evidence of longstanding concern in the scientific community about the potential neurotoxicity of BET bromodomain inhibitors. This concern was present long before Ms. Spedale received her first dose of the BET bromodomain inhibitor CPI-0610in December 2015, and well before the Article was published online on August 24, 2015.

-23-

95.   To understand this, it is necessary to consider what would have transpired from conception to final publication of the Article.  The initial inspiration would have come from, perhaps, scientific curiosity, identification of a knowledge gap, and other questions and concerns.  Next, the Authors would have had to take their ideas and convert these to testable hypotheses.  They would have had to perform background research and write one or more protocols.  There would have been submissions, team meetings, committee reviews, and the like.  The next phase would have been the conducting of the experiments over a certain period of time.  After all experiments were concluded, the data would have needed to be analyzed and interpreted, and the article written.  There would most certainly have been multiple drafts, more team meetings, discussions, and revisions.  The article would then have been submitted for publication, reviewed, revised, and resubmitted, possibly multiple times before final acceptance and publication.  Each of these steps or phases would have taken weeks or months to complete.

96.   Thus, the concerns that led the group at The Rockefeller University ("Rockefeller"), including Constellation's co-founder C. David Allis, Ph.D., to look into the effect of BET inhibitors on the brain would have existed long before the publication of the Article in August 2015.

97.   In addition, important background and contextual information in the "Results" section of the Article provides insight into relevant and important prior science.

98.   For example, the Article states: "Similar to other post-mitotic cells that require Brd4, neurons activate a subset of genes (IEGs) in response to external signals. This rapid response is critical to the consolidation of synaptic modifications underlying synaptic plasticity and memory formation." The Authors go on to explain that for this reason they "examined whether Brd4 is involved in transcriptional activation in neurons using the small molecule inhibitor Jq1 which blocks BET proteins from binding to acetylated histones."

-24-

99.     The prior science referenced in the above passage was not controversial, subject to debate, or the arcane knowledge of a select group of scientists. One of the cited references was: "Requirement of a critical period of transcription for induction of a late phase of LTP. Science. 1994; 265:1104–1107.  Nguyen PV, Abel T, Kandel ER." The lead author, Eric R. Kandel, was one of three laureates awarded the Nobel Prize in Physiology or Medicine in 2000 for "for their discoveries concerning signal transduction in the nervous system." The dependence of neuronal signal transduction on gene transcription was discovered 20 years before Ms. Spedale was given CPI-0610, a BET inhibitor created by Constellation Pharmaceuticals for the express purpose of blocking gene transcription.

100.     This is but one of multiple examples of contextual information important to this case. The relevance of the Article is not limited to the behavioral experiments in mice and their results. The Article provides context, and establishes a connection to prior science dating back decades. Prior science that should have been known to anyone giving a completely novel type of gene transcription inhibitor to human subjects.

101.     Finally, in ¶ 18 of his affidavit, Dr. Sims states: "The data and findings did not and would not have any significance to the work of Constellation, nor would it have created a concern or 'red flag' for our team requiring any other action than what was taken in the preclinical workup and protocol for CPI-0610."

102.     I find this claim astonishing. As set forth in my expert report, in my deposition testimony, and in this supplemental affidavit, the data **should have had significance to Constellation.** The data **should have created a concern.**

103.     The statements herein are based upon my personal knowledge, and my evaluation and review of the record in this case, and the medical and scientific research and literature, except as stated herein.

104.     Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is correct.

-25-

Dated: December 17, 2018        By: _____

James P. Sutton, M.D.

---

[i] Note: Two slightly different versions of this press release can be found online. The first ("Version A") is entitled "Promising class of new cancer drugs might cause memory loss in mice" and subtitled "Findings suggest more research on the compounds is needed."[i] The second ("Version B"), currently on the Rockefeller University website, is entitled "Promising class of new cancer drugs causes memory loss in mice." The URL for Version B is https://www.rockefeller.edu/news/9974-promising-class-of-new-cancer-drugs-might-cause-memory-loss-in-mice/, suggesting that Version A was the original, and that at some point in time the title and subtitle on the Rockefeller University website were altered. The text in the body of both versions is identical, however. Sources: https://www.eurekalert.org/pub_releases/2015-08/ru-pco082415.php; and https://www.rockefeller.edu/news/9974-promising-class-of-new-cancer-drugs-might-cause-memory-loss-in-mice/.

[ii] Source: Identification of a Benzoisoxazoloazepine Inhibitor (CPI-0610) of the Bromodomain and Extra-Terminal (BET) Family as a Candidate for Human Clinical Trials Brian K. Albrecht, Victor S. Gehling, Michael C. Hewitt et al J. Med. Chem. 2016, 59, 1330−1339

[iii] Source: "Bromodomain inhibitors and cancer therapy: From structures to applications. Montserrat Perez-Salvia and Manel Esteller, Epigenetics, 2017, Vol. 12, No. 5, 323–339."

[iv] Source: Increased amygdala activation during mania: a functional magnetic resonance imaging study. Altshuler L1, Bookheimer S, Proenza MA, Townsend J, Sabb F, Firestine A, Bartzokis G, Mintz J, Mazziotta J, Cohen MS. Am J Psychiatry. 2005 Jun;162(6):1211-3.

[v] Source: Guidance for Industry, S7A Safety Pharmacology, Studies for Human Pharmaceuticals, U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), Center for Biologics Evaluation and Research (CBER), ICH, July 2001.

2079932.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[vi] Source: Guidance for Industry, S9 Nonclinical Evaluation for Anticancer Pharmaceuticals, U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), Center for Biologics Evaluation and Research (CBER), March 2010 ICH

[vii] Source: S9 Nonclinical Evaluation for Anticancer Pharmaceuticals Questions and Answers, Guidance for Industry, U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), Center for Biologics Evaluation and Research (CBER), June 2018, ICH.

-27-